UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DISTRICT

United States of America          )
                                  )
           v.                     )      No 19 CR 226-1
                                  )      Hon. Virginia M. Kendall
Robert M. Kowalski,               )
           Defendant              )
                                  )

## MOTION TO DISMISS
## PROSECUTION TEAM MISCONDUCT

Now comes Robert M. Kowalski (Robert), pro se in support of his Motion to

Dismiss states as follows:

### *INTRODUCTION*

On August 27, 2020 a superseding grand jury indictment was returned that

charged Robert with a $29 million conspiracy to embezzle with a co-conspirator, the

deceased President of Washington Federal Bank (WFB), John Gembara. While the

incredible circumstances surrounding John's death were always disquieting, the

unsealing of the indictment warranted learning more of the unique circumstances.

Rather than providing closure the response to Robert's FOIA request from the City of

Park Ridge Police only provoked substantial questions and a corresponding need for

additional transparency. In particular, the role of FDIC Special Agent Stephenson

through his "contacting" the City of Park Ridge raised several red flags in the context of

missing WFB financial records from the death scene. Accordingly, Robert filed on

October 14, 2020 a complaint 2020CH06285 in the Circuit Court of Cook County for

Declaratory Relief pursuant to 5 ILCS 140/11. (See Exhibit A).

## *OUTRAGEOUS FACTUAL BACKGROUND*

On June 4, 2020 an agreed motion was filed that stated "Mr. Kowalski abided by the conditions of release and has been a model supervisee". The filing of the Cook County Circuit Court Freedom of Information Act (FOIA) complaint was met head-on by a considerable backlash. On the same day the prosecution filed to revoke Robert's bond. The initial rule to show cause hearing occurred on October 16, 2020. (See Transcript Exhibit B). During this hearing, AUSA Netols confirmed that Natalie Lira, Robert's fiancé had recanted her concerns at that time; captured by the following colloquy:

> MR. NETOLS: Yes, I have not spoken with Ms. Lira. I'd be happy to ask her to relate the events. I notice that ***she declined to press charges,*** based on what was in the police report and what was in the Pretrial Services report. So that may tell you what the testimony may end up being.
>
> THE COURT: Oh, I see. So you didn't ask her to appear today? How did this occur?
>
> MR. NETOLS: I -- my understanding is that Mr. Kowalski asked her to appear today.
>
> THE COURT: Oh, I see. I thought you were bringing her as a witness for you.
>
> MR.NETOLS: No, I'm not -- we had agents go out and talk to her last night, late last night. And she indicated that she still loved Mr. Kowalski, and she ***recanted the statements that she made to the police, to the Pretrial Services Officer, and apparently in the order of protection.***

The court requiring further information continued the matter until October 20, 2020 had stated:

> THE COURT: So I think I'd like to hear from Ms. Lira today and I'd like to have her testimony to give to me about what happened that day. I've got competing

versions. And it would be very helpful. Is that who you intended to call, Mr. Netols?
MR. NETOLS: Yes, if you want to go to the hearing today.

Despite previously conferring with agents on the evening of October 15, 2020 and having clearly recanted. On the following Monday October 19, 2020 Natalie found herself yet again in the cross hairs of FDIC Special Agents Popovits and Gibson. They compelled her to discuss her testimony in great detail, locked in the backseat of their vehicle. The Special Agents listened and interjected critically, judgmentally, and disparagingly of Robert, in a marathon session lasting from 7:00pm until 9:30pm. (See Exhibit C) Wanting to intimidate and scare Natalie enough so that she would regret her love of Robert and agree not to reconcile their family.

This represents an effort to tamper, influence and alter a witness's testimony on behalf of the prosecution. What reason did they have to plow this Natalie field again, other than for tampering and intimidation? What legitimate browbeating interest does the government have to interfere with the love Robert and Natalie share? Especially after other Special Agents had previously ascertained Natalie's disposition the previous Wednesday. Upon leaving, Special Agent Popovits sent Natalie the following text later that same day at 9:38pm (See Exhibit C):

> *Hello Ms. Lira. This is Special Agent Popovits. I left you a message earlier today. The government will be calling you as a witness on Wednesday 10/21/20 for Mr. Kowalski's bond revocation hearing. I need to speak with you to give you directions as where to go. Please call me tonight or tomorrow morning. Thank You.*

The Special Agent displayed remarkable prescience of this hearing date and time when the bond revocation motion with its sealed exhibits itself was not filed until the next day, October 20, 2020. Nonetheless, Natalie obeyed direction from the Special

3

Agents compelling her appearance on October 21, 2020 at the Dirksen Building for the hearing. Upon arrival Special Agent Popovitis texted Natalie informing that (See Exhibit D):

> *I will meet you in the main lobby instead of 5th floor. New Covid rules. If it's not me I will send either Special Agent Jacob Evans or Special Agent Sean Stephenson. Sorry, I didn't mean to be short when you called but I was on the phone and the text was automatically generated. Let me know if you have any other questions.*

Upon arrival at the Dirksen building lobby Natalie was indeed intercepted by waiting Special Agent Stephenson and FDIC Special Agent Evans. FDIC Special Agents are not court officers. They did not escort her to the judge's courtroom. FDIC Special Agent Evans has been the primary complaining witness throughout this cause. Neither the judge nor a court officer had excused Natalie, otherwise allowed her to leave, or directed FDIC agents to interdict the prospective witness. Rather these agents teamed together to prevent a witness, Natalie from attending a legal proceeding. The Special Agents marched her directly into a windowless room on the 25th floor. Where they proceeded to hold her in custody against her will during the hearing, under circumstances where one would reasonably believe that they could not leave. These Special FDIC Agents actively prevented Natalie from attending a Federal court proceeding. She was controlled and not even permitted access to the ladies bathroom unattended. While under custody Special Agent Stephenson electronically attempted to search, scanning Natalie's cell phone records with his laptop device. (See Exhibit E)

The court had not issued a ruling to exclude Natalie or arrest her. In fact, rather than hearing from Natalie only steps away, the court was forced to listen to inherently unreliable hearsay testimony from others concerning Natalie. Certainly Natalie could

4

and would have in her own words spoken to her fear or lack thereof. Special Agents of FDIC were not taking any chances of that happening. Preferring Natalie to remain absent from such proceedings. This effectively precluded Robert from calling Natalie to testify. Meanwhile Natalie was iced in the FDIC penalty box mere steps away from the court proceedings in a successful effort to thwart judicial processes by physical restraint that went beyond mere intimidation. Natalie had every right to attend these proceedings. It was a deprivation of her civil rights, prejudicial to Robert's due process rights, and ultimately extremely detrimental to his freedom. After the conclusion of their successful operation the kind FDIC special agents reluctantly provided Natalie with a $99 witness fee and finally relented and allowed her to leave.

Witness intimidation seems to be a pervasive theme in this case. While accusing Robert of delivering to a previously unidentified witness a copy of lawful process, these FDIC special agents went a bridge further actively tampering with a federal witness actually in the courthouse under subpoena to subvert the integrity of the judicial process. The result of the motion to revoke bond was influenced. Mobster Tony Soprano worked out of the same playbook. Previously, Mrs. Gembara too had repeatedly, publicly expressed her dissent over the official cause of her late husband's death. (See exhibit F). Apparently, that's all changed now due to the ministrations of FDIC Special Agent Stephenson's special brand of gentle (coercive persuasion), "contacting". Like Natalie it's almost certain that Mrs. Gembara suffered through mind numbing persuasive sessions with FDIC. After the intimidating hostage situation, mind bending, panic inducing sessions, thought control that Natalie experienced, the reaction of John's widow is understandable. Who could blame her with Special Agent Stephenson and his cohorts, gentle on my mind, "contacting" ministry on the case? Except that a man is

5

dead under dodgy sketchy circumstances and ghosts are leaping off the pages of the documents of a formerly federally insured bank. Every step FDIC Special Agents have taken toward subverting justice only serves to confirm that a greater, "Dead men tell no tales", evil has been perpetuated.

### *WITNESS TAMPERING*

Witness tampering is among the most grave abuses of the judicial process, and as such it warrants a substantial sanction. *Secrease v. W&S Life Ins. Co., 800 F.3d at 402(7thCir 2015).*Falsifying evidence to secure a court victory undermines the most basic foundations of our judicial system. *Ty, Inc. v Softbelly's Inc., 517 F.3d at 498 (7th Cir 2008)*. Trying to improperly influence a witness is fraud on the court and on the opposing party. *Ramirez v T&H Lemont, Inc.845 F.3d 772 (7th Cir 2007)*. FDIC made a calculated effort to bolster its floundering case by kidnapping a witness, then confining her hostage in the Dirksen Building. Thereby ensuring Natalie's absence, enhancing their allegations of Robert's dangerous to the community when that witness had recanted at least twice. Further, the prosecution team acted knowingly once the court had expressed its desire to learn more from this witness. The very same witness was subjected to extreme intimidation questioning in order to sway her testimony. The intimidation had not only an unethical illegal edge, but in its attempt to dissolve familial bonds reflected an immoral purpose. Dismissing the case with prejudice is an entirely reasonable response to such a deliberate attempt to deceive the court.

Section 1512 of Title 18 constitutes a broad prohibition against tampering with a witness, victim or informant. It proscribes conduct intended to illegitimately affect the presentation of evidence in Federal proceedings or the communication of information to Federal law enforcement officers. For example, it protects individuals having

information concerning a violation of a condition of probation, parole, or bail whether or not that violation constitutes a violation of any other Federal criminal statute. Second, it protects individuals seeking to provide information to Federal judges or Federal probation and pretrial services officers.

The witness tampering conduct of the FDIC agents occurred when they intimidated, to cause Natalie to change her testimony by testifying falsely. When that failed FDIC resorted to brute force causing her to be entirely absent from the proceeding. This kidnapping deprived Robert of his Sixth Amendment right to bring a witness in his favor. FDIC variously used outright intimidation, coercion, and use of force to prevent Natalie from testifying information relevant to a case. This was accomplished in a way that causes a defendant to be wrongly convicted or punished unjustifiably in derogation of his Fifth Amendment due process rights. The goal of FDIC was to prevent Robert exercising his First Amendment rights relative to dissemination of his FOIA lawsuit requesting more transparency into an improbable death.

A district court may dismiss an indictment on the grounds of outrageous government conduct if the conduct amounts to a due process violation, *United States v Simpson 927 F.2d 1088 (9th Cir 1991)*. If the conduct does not rise to the level of a due process violation, the court may nonetheless dismiss a case for outrageous government misconduct under its supervisory powers.

To violate due process, government conduct must be "so grossly shocking and outrageous as to violate the universal sense of justice", *United States v Restrepo 930 F.2d 705 (9th Cir 1991); United States v Ramirez 710 F.2d 535 (1983)*. Due Process is not violated unless conduct is attributable to and directed by government, *United States v. Barrera-Moreno 951 F.2d 1089,1091 (9th Cir 1991)*.

7

"Outrageous government conduct occurs when the actions of law enforcement officers or informants are so outrageous that due process principals would absolutely bar the government from invoking judicial processes to obtain a conviction. *United States v Archie 20016 US Lexis 10768 (D Nev 2016); United States v Black 733 F.3d 294(9th Cir 2013); United States v Russell 411 US 423(1973)*. Dismissal under this extremely high standard is appropriate only in "extreme cases in which the government's conduct violates fundamental fairness", *United States v Pedrin 806 F.3d 1009 (9th 2015); United States v. Smith 924 F.2d 889,897(9th Cir 1991)*. The concept of outrageous government conduct focuses on the government's actions, *United States v Restrepo. 951 F.2d 1089, 1091 (9th Cir 1991)*.

Here in this case, both the prosecution and the investigative FDIC agencies are equally responsible for the capture of a witness within the halls of justice and subsequent restraint to prevent her testimony to be heard by obstructing her access to the courtroom. The government does not unilaterally get to determine who may testify. Regardless of Robert's new bond conditions would suggest not every witness is owned by the government, hog tied fashion. The conduct here is especially egregious because the government deliberately choose to seize Natalie and obstruct her not allow her to participate in a public judicial proceeding. It is especially egregious that FDIC and prosecutors deliberately mounted their operation after learning that the court had specifically requested her availability. However, the prosecution denied the defendant its opportunity to provide favorable evidence to support their theories as a result of the government's Shanghaied withholding of witnesses.

It is especially ominous that this witness tampering was sparked in a reactive attempt to silence and otherwise prejudice attorney Robert who simply wanted to

achieve closure by investigating the deeply unsettling death of John Gembara now known as individual A his alleged co-conspirator. Formerly John was his son's godfather, and close friend, and legal client of nearly thirty years. Robert initiated his due diligence in a manner that any attorney could appreciate with legal process of a publicly filed civil complaint before a court of law.

Alternately, a district court may exercise its supervisory powers in three different ways: Number one, "to remedy unconstitutional or statutory violation"; number two, "to protect judicial integrity to ensure a conviction rests on appropriate considerations validly before a jury"; or number three, "to deter future illegal conduct", quoting from *United States v Simpson 927 F.2d 1088 (9th Cir 1991)*. Dismissal is appropriate when the investigatory or prosecutorial process has violated a federal constitution or statutory right and no lesser remedial action is available", *Barrera-Moreno 951 F.2d 1089(9th Cir 1991)*. The Ninth Circuit has recognized that exercise of a supervisory power is an appropriate means of policing ethical misconduct by prosecutors. *United States v Lopez 4 F.3d1455 (9th Cir 1993)*.

Dismissal under court's supervisory powers for prosecutorial misconduct requires both: flagrant misbehavior and number two, substantial prejudice. *United States v Kearns 5 F.3d 1251(9TH Cir 1993)*. Neither accidental nor mere negligent conduct is sufficient. The idea that prejudice entails the governments conduct had at least some impact on the verdict and thus rebounded to the defendant's prejudice. In order for the court to dismiss an indictment under its supervisory powers, the court must find that there has been flagrant prosecutorial misconduct, substantial prejudice, and that no lesser remedial action is available.

The facts here represent extreme egregious prosecutorial misconduct. Natalie was interviewed by FDIC special agents and Pretrial Services at great length before the hearing of October 16, 2020. AUSA Netols dutifully related that Natalie had recanted. Nevertheless, upon learning of the court's renewed desire to hear her version the prosecution team sprang back into action with additional lengthy evening interrogations of October 19, 2020 designed to impress upon Natalie a serious need to ***UNRECANT*** or else. Upon ascertaining that Natalie was just not going to be brainwashed or intimidated a contingency plan was launched by the prosecution team. This was not going to be a finesse plan. Natalie's unavailability would serve the same purpose to Robert's detriment. All the FDIC special agents had to accomplish was merely to intimidate and take Natalie into custody during the hearing. The court could just be fed inherently faulty hearsay. That the prosecution team would dare concoct and undertake such an audacious risky scheme under the nose of this court displays a substantial wild deep seated contempt of court.

The entire overall context of the witness tampering is cause for concern. The desire to incarcerate Robert stems only from a means to restrict his due diligence discovery efforts and the deleterious effects of widespread media coverage. During Robert's ordeal the prosecution team worked with a receiver, divorce court police, to conduct a warrantless raid recovering records released by the City of Park Ridge relative to John's death from an attorney's office. Robert's FOIA circuit court of Cook County complaint for declaratory relief apparently struck raw sensitive nerves. There are too many unanswered questions. There are just too many ghosts, not all of them are "ghost loan accounts". Something else was going on at WFB. The alphabet soup named OCC auditors would prefer such to remain unexposed?

10

The prosecutor has a sworn duty to assure that the defendant has a fair and impartial trial. His interest in a particular case is not necessarily to win, but to do justice. Dismissal is justified here for all of the enumerated reasons: remedy constitutional violations, ensure convictions rest upon appropriate valid considerations, and to deter future illegality.

Wherefore, the defendant, Robert M. Kowalski (Robert) respectfully moves this Honorable Court to enter an order:

A.) Dismissing this indictment.

B.) Referring this witness tampering to the Department of Justice.

C.) Or providing such other and further relief as the court may deem equitable

Respectfully Submitted,

Robert M. Kowalski
1009 61st Street
Lagrange Highlands, Illinois 60525
(708)307-4497

Return Date: No return date scheduled
Hearing Date: 2/16/2021 10:00 AM - 10:00 AM
Courtroom Number: 2410
Location: District 1 Court
          Cook County, IL

Case: 1:19-cr-00226 Document #: 129 Filed: 03/24/21 Page 12 of 94 PageID #:1407
12-Person Jury

FILED
10/14/2020 7:28 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020CH06285

10783660

# IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

|   |   |
|---|---|
| Robert M. Kowalski, | ) |
| Plaintiff, | ) |
| AND | )  No _____ CH _____ |
| City of Park Ridge, | ) |
| Defendant, | ) |

## COMPLAINT FOR DECLARATORY RELIEF

Plaintiff, Robert M. Kowalski, pro se, hereby files his Complaint for Declaratory Relief against City of Park Ridge pursuant to Illinois Freedom of Information Act, 5 ILCS 140/11 (2020) allege, and state as follows:

### Introduction

On December 3, 2017 John F. Gembara died under suddenly in the home of a bank customer. The police report related that John was hiding from someone or something and took refuge in this home. The Chicago Sun Times reported widely upon the unusual method of death, presumably from a hanging suicide death. (see exhibit A) The unusual, peculiar part of their widely published rendition was that John died while seated in a chair. The mechanics of this cause is extremely unusual in that it is contrary to human survival instinct. It just does not work as a suicide method as described by the responding officers of the City of Park Ridge Police Report narratives, without more. The conclusion that John's death was by his own hand is delusion at best.

Accordingly, in search of a *more* reasonable and complete explanation on September 11, 2020 Plaintiff submitted a singular Freedom of Information Request to

the City of Park Ridge, Police Department. (see exhibit B). On September 24, 2020

Officer Wroblewski, police records Technician/FOIA Officer responded. (see exhibit C)

On October 2, 2020 a second FOIA response was forthcoming from the City of Park

Ridge (see exhibit D). The exemptions raised in the response, limiting complete fair

disclosure have cast even more doubt and disbelief on the stated cause of death than

ever anticipated.

### PARTIES

1.) The City of Park Ridge is a municipality located in the State of Illinois.

2.) Robert M. Kowalski is a licensed attorney in the state of Illinois. John was his friend,
banker, and client of his law practice. Also, John and his wife are godparents to
Robert's youngest son BK. Our families shared a multi-generational association.

### CONFLICTING INCOMPLETE RESPONSES

1.) All names have been redacted from police reports. Claiming Exception 7(1)(b).
Plaintiff is not seeking personal information. However, complete redaction of every
name of all those persons present is excessive. The reports lack coherence without
relevant names. Plaintiff is not seeking birthdates, drivers' licenses, personal financial
information, home or personal telephone numbers, social security numbers, personal
addresses, or license plates.

2.) The response of 9/24/20 paragraph two of the response suggests that this was a
crime? However, the official report conclusion was "case is closed as unfounded". The
certification of death record is attached (exhibit E). This crime exception is
inapplicable.

3.) The response of 9/24/20 paragraph three of the record response cites exception
7(1)(s)(iv) which pertains to confidential police informants. However, the case was

unfounded and closed? There is no indication any confidential police informant was involved.

4.) The response of 9/24/20 paragraph four response cites exception 7(1)(a) relative to Social Worker record communications. Plaintiff simply wishes to learn the cause of death. The police report received does not provide a basis for this exception. There is no indication a social worker was involved to invoke this exception.

5.) The response of 9/24/20 paragraph five of the response indicates disposal of part of the record. What exactly was disposed and why?

6.) The response of 10/2/20 paragraph two denied my request citing Juvenile Court records. The police report provided confirms that no person interviewed as part of their investigation was a juvenile.

7.) The response of 10/2/20 paragraph three denied my request citing exemption 8- information that concerns the supervision of financial institutions. The police report confirmed that a Special Agent Stephenson of the FDIC was present, and "contact" was made with the Park Ridge Police.

Mr. Gembara was the president of Washington Federal Bank. This bank was closed on December 15, 2017 by the FDIC a mere twelve days after John's death. The closure was more like an implosion, extremely rapid and entirely unexpected. There was a reported massive fraud loss to the FDIC in the amount of 84.7 Million. A report on the closure of the bank is contained in a 11/6/2018 report from the OCC inspector general (see exhibit F). The report details: how the financial loss was created over several years, FDIC auditors missed several glaring audit red flags, and resulted in part because of supposedly lax supervisory defects on the part of FDIC. It is extremely troubling in the context of a local death investigation that FDIC Special Agent

3

Stephenson suddenly materializes. Thereupon a quantity of unknown bank supervision material was confiscated. John died under circumstances akin to a FDIC assisted suicide. Perhaps this material included the identities of those persons within the ranks of the FDIC who sanctioned this fraud horribly for so long.

8.) Disclosure and transparency are the public policy within the State of Illinois.

## *CONCLUSION*

John was a highly devoted spiritual Roman Catholic. His spirit and eternal soul demands justice. The suggestion of taking one's own life was repugnant to his faith. The truth of his death has a significance to many people who remember him. The police officer report narrative does not support a death by hanging. It simply does not make sense.

The unlikeliness of the stated manner of death has been compounded by a strange police reticence to disclose. Suggests that something is being hidden. A conclusive death certificate, state file number 2017-0097103, stating "Hanging" and "Hanged self with rope has been ***sanctioned*** by the medical examiner/coroner. Nevertheless, an ongoing crime investigation continues, replete with, confidential informants, and intervening FDIC agents, after nearly two years of silence. What is wrong with this cloak and dagger double talking picture? The family deserves repose and public deserves to receive a truthful rendition of this man's death. Rather than an obviously fanciful account suppressing the truth.

WHEREFORE, the Respondent, Robert M. Kowalski, Esq., respectfully requests that this Honorable Court:

A. Comply with the Freedom of Information act by compelling the release of properly responsive information

B. Exhume the remains of John so that an autopsy finding can be used to complete cause of death.

C. For such other and further relief as the court deems just and equitable.

Robert M. Kowalski, Esq.

Robert M. Kowalski, Esq.
1009 61st Street
LaGrange, Illinois 60525
630/235-5709
Attorney No. 28705
Robertk.24@outlook.com



**CITY OF PARK RIDGE**
**POLICE DEPARTMENT**
200 S. VINE AVE
PARK RIDGE, IL 60068
TEL: 847/318-5252
FAX: 847/318-5308
TDD: 847/318-5252
www.parkridgepolice.org

## FREEDOM OF INFORMATION REQUEST

Name **Robert M. Kowalski**                    Date **9/11/2020**

Address **1009 61st Street**                    Date of Birth **04/24/1962**

**LaGrange, Illinois 60525**                    Report Number **unknown**

Signature *[signature]*                         Date/Time of Incident _____

Telephone Home **708-307-4497**                 Type/Nature of Incident **death investigation**

Work **n/a**                                     Location of Incident **1488 N Dee Road**

                                                 E-Mail Address **Robertk.24@outlook.com**

\*I authorize the police department to email any responsive records to the above email address **RMK** (please initial)
Note: If you do not initial email authorization, the response to this request will be sent via US mail (or left for pick-up if indicated below).

Records requested:

All information relative to the December 3, 2017 death of John F. Gembara at the Matczuk residence, 1488 N. Dee Road, Park Ridge Illinois

### PLEASE CIRCLE YOUR RESPONSE TO THE FOLLOWING STATEMENTS/QUESTIONS:

I would like to pick-up any responsive records and be contacted when the records are available:          (Yes)    No

Is this information to be used for commercial purposes?          Yes    (No)
*Note: It is a violation of the Freedom of Information Act to knowingly obtain a public record for commercial purposes without disclosing that it is for a commercial purpose*

Please indicate if you wish to inspect the above captioned records or obtain a copy of them:          (Inspection)    Copy

I wish to have copies certified at a fee of $1.00 per document?          Yes    (No)

|  |  |
|---|---|
| Legal or letter size, black and white: | **Copy Fees:** |
| Oversized: | no fee for the first 50 pages, $0.15 per page thereafter |
| Color copies: | actual cost |
| Accident reports: | actual cost |
|  | $5.00 standard report, $20.00 accident reconstruction report |
|  | pursuant to 625 ILCS 5/11-416 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* OFFICE USE ONLY (BELOW) \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*9/17/20*                    *9/24/20*

Date Received                Date Response Due                              Date Response extended to

Fee _____

*[signature]*                Fee Explanation _____                  *9/17/20*

Request filled by                                                          Date Request filled

*Mission Statement* The overall mission of the Police Department is to reduce the frequency and severity of external harm to persons and property; to quickly render hazardous situations safe; to rescue the endangered; to help people to live peaceably together; to maintain an atmosphere of personal security; and to identify and utilize community resources to solve criminal and social problems.

Revised March 15, 2013

# INCIDENT/INVESTIGATION REPORT

| Agency Name | | Case# |
|---|---|---|
| Park Ridge Police Department | | 17-03486 |

**ORI** IL0168900

**Date / Time Reported** 12/03/2017 15:02 Sun
**Last Known Secure** 12/03/2017 15:02 Sun

**Location of Incident** 1488 N DEE RD, Park Ridge IL 60068-

| Premise Type | Beat/GeoProx | At Found |
|---|---|---|
| Residence / Home | P1 | 12/03/2017 15:02 Sun |

**INCIDENT DATA**

| | Crime Incident(s) | (Com) | Weapon / Tools | | | | | Activity |
|---|---|---|---|---|---|---|---|---|
| #1 | Death Investigation 9430 | | OTHER | | | | | |
| | | | Entry | Exit | | Security | | |
| #2 | Crime Incident | ( ) | Weapon / Tools | | | | | Activity |
| | | | Entry | Exit | | Security | | |
| #3 | Crime Incident | ( ) | Weapon / Tools | | | | | Activity |
| | | | Entry | Exit | | Security | | |

**MO**

**VICTIM**

# of Victims **0** Type: Injury:

| V1 | Victim/Business Name (Last, First, Middle) | | Victim of Crime # | DOB Age | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
|---|---|---|---|---|---|---|---|---|---|

Home Address / Home Phone

Employer Name/Address / Business Phone / Mobile Phone

| VYR | Make | Model | Style | Color | Lic/Lis | VIN |
|---|---|---|---|---|---|---|

CODES: V- Victim (Denote V2, V3)   O = Owner (if other than victim)   R = Reporting Person (if other than victim)

**OTHERS INVOLVED**

Type: **INDIVIDUAL** Injury:

| Code DE | Name (Last, First, Middle) GEMBARA, JOHN F | Victim of Crime # | DOB Age 56 | Race W | Sex M | Relationship To Offender | Resident Status | Military Branch/Status |
|---|---|---|---|---|---|---|---|---|

Home Address / Home Phone

Employer Name/Address / Business Phone / Mobile Phone

Type: **INDIVIDUAL** Injury:

| Code RP | Name (Last, First, Middle) | Victim of Crime # | DOB Age 54 | Race W | Sex M | Relationship To Offender | Resident Status Resident | Military Branch/Status |
|---|---|---|---|---|---|---|---|---|

Home Address / Home Phone

Employer Name/Address . / Business Phone / Mobile Phone

**PROPERTY**

1 = None   2 = Burned   3 = Counterfeit / Forged   4 = Damaged / Vandalized   5 = Recovered   6 = Seized   7 = Stolen   8 = Unknown
("OJ" = Recovered for Other Jurisdiction)

| VI# | Code | Status Frm/To | Value | OJ | QTY | Property Description | Make/Model | Serial Number |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

Officer/ID# **MCGANNON, MATTHEW** (PR18120)

Invest ID# **GARCIA, LEONARDO** (PR16535)

Complainant Signature

Supervisor **ASHLEMAN, KIRK A** (PR13251)

| Case Status Administratively Closed/suspended | 02/09/2018 | Case Disposition: 9 | 02/09/2018 | Page 2 |
|---|---|---|---|---|

R_CS11BR   Printed By: PR22125, PRPDSG7319

# Incident Report Additional Name List

**Park Ridge Police Department**

OCA: *17-03486*

## Additional Name List

| | Name Code/# | Name (Last, First, Middle) | Victim of Crime # | DOB | Age | Race | Sex |
|---|---|---|---|---|---|---|---|
| 1) | WI 1 |  | |  | 26 | | M |
| | Address | | H: | | | | |
| | Empl/Addr | | B: | – – | | | |
| | | | Mobile #: | – – | | | |
| 2) | WI 2 |  | |  | 24 | W | F |
| | Address | | H: | | | | |
| | Empl/Addr | | B: | – – | | | |
| | | | Mobile #: | – – | | | |
| 3) | WI 3 |  | |  | 21 | W | M |
| | Address | | H: | | | | |
| | Empl/Addr | | B: | – – | | | |
| | | | Mobile #: | – – | | | |
| 4) | WI 4 |  | |  | 22 | W | F |
| | Address | | H: | | | | |
| | Empl/Addr | | B: | – – | | | |
| | | | Mobile #: | – – | | | |
| 5) | WI 5 | | | | 51 | W | F |
| | Address | | H: | | | | |
| | Empl/Addr | | B: | – – | | | |
| | | | Mobile #: | – – | | | |

# INCIDENT/INVESTIGATION REPORT

*Park Ridge Police Department*

Case # *17-03486*

Status Codes   1 = None   2 = Burned   3 = Counterfeit / Forged   4 = Damaged / Vandalized   5 = Recovered   6 = Seized   7 = Stolen   8 = Unknown

|  | IBR | Status | Quantity | Type Measure | Suspected Type |  |
|---|---|---|---|---|---|---|
| D | | | | | | |
| R | | | | | | |
| U | | | | | | |
| G | | | | | | |
| S | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Assisting Officers

Suspect Hate / Bias Motivated:

NARRATIVE

CS3IPP

# REPORTING OFFICER NARRATIVE

| *Park Ridge Police Department* | | OCA *17-03486* |
|---|---|---|
| Victim | Offense *DEATH INVESTIGATION* | Date / Time Reported *Sun 12/03/2017 15:02* |

**THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY**

Cmdr Ryan and I responded to a report of a suicide at 1488 N. Dee. The caller had advised a subject in the home at hung himself.

Cmdr. Ryan and I arrived at the scene and were met at the door by homeowner ▇▇▇▇ He advised the deceased was upstairs in a bedroom. Cmdr . Ryan stayed with ▇▇▇▇ at the door while I went upstairs to the master bedroom at the back of the home. I found the master bedroom door ajar and entered the room.

Inside the bedroom, I observed a M/W subject wearing a green shirt, blue jeans, and red shoes sitting in a chair under the stairwell. The subject had eyes that were open, had grey colored hair, and eye glasses on his face. The subject was pale in appearance, exhibited no movement of any kind, and was not making any sounds consistent with breathing/gasping. I checked the subject`s left arm and found he had no pulse. I further observed the subject had a cord/rope that was tied around his neck. The cord/rope was also secured/tied above him along the stairwell.

I observed the bed was not made and the TV was on with a low volume. The windows were closed and the lights were off.

Cmdr Ryan entered the room followed shortly thereafter by PRFD Station 36 personnel. They surveyed the subject (without touching him) and determined no life saving efforts would be performed and the subject was deceased. I noted the time on my department issued phone to be 1516 hrs. Sgt. Delfosse and Ofc. Wisniewski also arrived on scene and entered the bedroom while Cmdr. Ryan went downstairs. At no time did I observe any member of PRPD or PRFD touch the subject or handle anything at the scene.

I was stationed at the door to secure the bedroom. Ofc. Doucet arrived as the on scene ET.

As the room was processed and family members were moving about downstairs, I, after being properly relieved , went downstairs to assist Ofc. Wisniewski as she spoke to the family.

Det.`s Garcia and Hahn arrived at the scene at approximately 1715 hrs. Ofc. Wisniewski and I secured the perimeter of the home.

At 1920 hrs, Ofc. Wisniewski and I transported four witnesses from the home to PRPD for Detective interviews.

At 2050 hrs I was advised by Sgt. Delfosse to notify the ME 's office. I spoke to ME Investigator Johnson #73 who assigned case number #2017-05664. He directed me to include photo's and any available reports to go down with the boddy.

**CASE SUPPLEMENTAL REPORT**

Printed: 09/22/2020   10:52

*Park Ridge Police Department*

OCA: *1703486*

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

Case Status: *ADMINISTRATIVELY*     Case Mng Status: *ADMINISTRATIVELY CLOSED*     Occurred: *12/03/2017*
Offense: *DEATH INVESTIGATION*

Investigator: *FASO, MARIO A    (PR18355)*
Supervisor: *SHAUGHNESSY, KATHLEEN*
Contact:

Date / Time: *12/04/2017 02:41:50, Monday*
Supervisor Review Date / Time: *12/06/2017 11:18:03, Wednesday*
Reference: *Evidence Report*

This is a supplemental forensic technician report for 1488 N. Dee Rd.:

In summary on December 3, 2017, I responded to the scene of death investigation located at 1488 N. Dee Rd. Forensic Technician Doucet did the initial crime scene photos and I was asked to take a few other photos by MCAT personnel. See Officer McGannon's report for further information regarding the incident and F.T. Doucet's report for further on the forensic work he conducted at the scene.

Police personnel on scene included:

Sgt. Delfosse, Sgt. Ryan
Forensic Technicians M. Faso, A .Moravet
MCAT Personnel(see crime scene log sheet)

Non-Police personnel on scene included:

See incident report for further

Photographic Evidence and Diagrams:
I photographed this scene in digital media format with a Nikon D90 camera. See the photographs for details. No sketch/diagrams were completed for this case.

Crime Scene Overview:
The residence at 1488 N. Dee Rd. is a red brick two story single family residence. The front door is located on the east side of the house facing the street.

The photos of the scene were only in the master bedroom of the residence. I photographed the deceased subject that was sitting in a chair next to a spiral staircase. The subject was fully dressed and did not appear to be disheveled nor did he have any signs of defensive wounds. The subject had a green and black rope that was knotted around his neck and wrapped(not knotted) around the metal post of the spiral staircase.

I was able to unwind the rope from the post since it was not knotted. I left the rope attached to the deceased and he was later transported in that manner.

Investigator Signature

**CASE SUPPLEMENTAL REPORT**

Printed: 09/22/2020  10:52

*Park Ridge Police Department*

OCA: *1703486*

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

Case Status: *ADMINISTRATIVELY*

Offense: *DEATH INVESTIGATION*

Case Mng Status: *ADMINISTRATIVELY CLOSED*   Occurred: *12/03/2017*

Investigator: *FASO, MARIO A  (PR18355)*

Supervisor: *SHAUGHNESSY, KATHLEEN*

Contact:

Date / Time: *12/04/2017 02:41:50, Monday*

Supervisor Review Date / Time: *12/06/2017 11:18:03, Wednesday*

Reference: *Evidence Report*

---

I observed a blonde or white hair that was on the second step from the top of the staircase. I collected the hair and later placed it into property custody(MAF3). The deceased subject's Apple Iphone was recovered on the nightstand and placed into property custody(MAF4).

Green Burials of Love responded to the scene to transport the deceased subject to the Cook County Medical Examiner's Office. After the subject was moved I was able to access a red "Columbia" fleece jacket located on the back of the chair that the deceased was sitting on. I located a pair of "Ray-Ban" sunglasses and a "GMC" key fob with a red key tag with the initials "JBG"(MAF6) in the pocket of the jacket. The transport company removed the eyeglasses and yellow wedding band type ring that the subject was wearing, which were inventoried with the jacket as item number MAF5.

At the station, I used the department's ACARD Technology Pro DVD Burner to copy images directly from the Nikon D90's memory card to three DVD's. One digital negative was made and marked as MAF1 and a working copy marked as MAF2. A third copy was made for detective use. The Nikon D90's memory card was cleared and formatted after verification of image transfer was made.

Items MAF1-MAF6 were logged into evidence via the BEAST and turned over to the property custodian via the evidence lockers.

Items inventoried:
MAF1- Digital negative DVD of scene photos
MAF2- Digital copy DVD of scene photos
MAF3- Paper pharmacy fold containing a light in color(blonde/white) hair
MAF4- Apple iPhone Model A1549 with a black and gray "Luvvitt" outer case
MAF5- Bag containing the following items:
-Red "Columbia" fleece jacket with "SU" emblem size large
-One pair of "Rayban" eyeglasses black in color
-One pair of "Rayban" sunglasses black in color, in "Rayban" carrying case
-One gold in color wedding band type ring
MAF6- One "GMC" key fob with a red  key tag with initials "JBG"

---

Investigator Signature

Supervisor Signature

## CASE SUPPLEMENTAL REPORT

Printed: 09/22/2020  10:52

*Park Ridge Police Department*

OCA: *1703486*

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *ADMINISTRATIVELY*      **Case Mng Status:** *ADMINISTRATIVELY CLOSED*      **Occurred:** *12/03/2017*

**Offense:** *DEATH INVESTIGATION*

**Investigator:** *WISNIEWSKI, KARYN J   (PR15815)*      **Date / Time:** *12/06/2017 07:18:25, Wednesday*

**Supervisor:** *RYAN, RICHARD   (PR15150)*      **Supervisor Review Date / Time:** *12/06/2017 12:00:00, Wednesday*

**Contact:**      **Reference:** *Supplement / Follow Up*

---

I spoke with ▓▓▓▓ who has a business relationship with the victim, John Gambara, a loan officer at a bank. ▓▓▓▓ relates that he was contacted via telephone several times on Friday, December 1st, 2017 starting at 801 hours. The phone calls continued at 1300,1347,1408,1413 and approximately 1653 hours. ▓▓▓▓ relates the first phone call was regarding ▓▓▓▓ being advised that he was cancelling the work (cleaning leaves) he had scheduled ▓▓▓▓ to do at his home in Palos HIlls. The phone call at 1300 was regarding Gambara advising ▓▓▓▓ that he had some problems and needed a place to stay for the weekend. Other calls were concerning their friend ▓▓▓▓ who was also in the construction business. According to ▓▓▓▓ ▓▓▓▓ didn't answer his phone and Gambara wanted ▓▓▓▓ to call ▓▓▓▓ for him. After the final call at 1653 hours that night, ▓▓▓▓ drove to another home he has at ▓▓▓▓ to meet Gambara. ▓▓▓▓ relates he observed Gambara parked down the block from the residence. ▓▓▓▓ and Gambara went into the residence for approximately 20 minutes. ▓▓▓▓ relates that Gambara couldn't stay at the ▓▓▓▓ residence because there was no furniture there. ▓▓▓▓ relates he parked Gambara's vehicle in the garage there. ▓▓▓▓ and Gambara drove to the CVS on Dempster in ▓▓▓▓ vehicle, to purchase a toothbrush for Gambara. Gambara had no suitcase or extra clothes with him. ▓▓▓▓ and Gambara then arrived at ▓▓▓▓ residence at 1488 N. Dee. ▓▓▓▓ served them dinner at approximately 1900 hours. ▓▓▓▓ both relate that the dinner conversation was about Gambara's two daughters who both reside in California. The ▓▓▓▓ all relate there was no conversation about problems with family or work. The ▓▓▓▓ all related they had no other conversation or contact with Gambara Saturday or Sunday. ▓▓▓▓ relates that she brought a humidifier up to the Master bedroom where Gambara was to sleep on Saturday at approximatley 2130 hours. ▓▓▓▓ observed that Gambara was sitting in a chair watching TV. ▓▓▓▓ observed a wedding ring, a wallet and a cell phone on the nightstand next to the bed. ▓▓▓▓ did not observe anything suspicious. ▓▓▓▓ and ▓▓▓▓ both relate that Gambara did not leave the house and they didn't know where the rope used by Gambara came from. ▓▓▓▓ relates Gambara did not have the cord when he was picked up in Chicago. ▓▓▓▓ related he works in construction and that possibly the cord was in or around the house. ▓▓▓▓ stated, " I don't know if it's his cord, it didn't come with him." ▓▓▓▓ relates Gamabara sat on the couch Saturday during the day and watched a Tom Cruise movie. ▓▓▓▓ both relates that they did not see Gambara leave the house the entire weekend. ▓▓▓▓ relate they didn't leave the residence all weekend. ▓▓▓▓ relates that on Sunday, December 3rd she asked ▓▓▓▓ to check on Gambara as he hadn't exited the master bedroom that day. ▓▓▓▓ relates ▓▓▓▓ is lazy and was sleeping on the couch in the downstairs family room. After several attempts by ▓▓▓▓ to wake up ▓▓▓▓ he got up and went to the master bedroom. ▓▓▓▓ found the master bedroom door locked. ▓▓▓▓ located a key and the two entered the master bedroom. There they observed, Gambara sitting in a chair near the spiral staircase. 911 was called and police responded. Officer Mcgannon and Sgt. Delfosse were present upon my arrival. I observed Gambara sitting in a chair with a cord around his neck and the remainder tied to the staircase. Gamara was wearing a wedding band. A cell phone was on the nightstand but no wallet. E.T. Doucet arrived on scene

---

**Investigator Signature**

# CASE SUPPLEMENTAL REPORT

Printed: 09/22/2020  10:52

*Park Ridge Police Department*

OCA: *1703486*

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

Case Status: *ADMINISTRATIVELY*

Offense: *DEATH INVESTIGATION*

Case Mng Status: *ADMINISTRATIVELY CLOSED*     Occurred: *12/03/2017*

Investigator: *GARCIA, LEONARDO      (PR16535)*

Supervisor: *SHAUGHNESSY, KATHLEEN*

Contact:

Date / Time: *02/07/2018 08:28:40, Wednesday*

Supervisor Review Date / Time: *02/07/2018 10:17:15, Wednesday*

Reference: *Investigative Action Supplement*

---

that Mr. Gembara had called his cell phone on 12/01/17 several times and subsequently met him in person at his second home at ███████ During the interview, ███████████ related that Mr. Gembara advised him he was attempting to reach ████ but was unsuccessful. He advised him he had "troubles" at his work and wanted to stay at his home ████████ ultimately discovered that ████████ was in Los Angeles at his second home and was unavailable. ████████ was able to speak to Mr. Gembara upon his airplane landing and gave Mr. Gembara permission to stay at his home, which Mr. Gembara declined.

It was at this point that he called ████████████ and asked to meet him at his home on ████████ He related to ████ █████████ that he is in "trouble" with his bank and needed a place to stay. He asked to stay at his home on ████████ but ████ advised him that was not an option due to the rehab being conducted on the home. He advised him he could stay at his home in Park Ridge and allowed him to park his car inside his garage. Mr. Gembara parked his vehicle inside the garage on ████████ and ████████ drove him to his residence at 1488 N. Dee Park Ridge IL. ████████ related that he allowed him to stay in his master bedroom while he and his wife slept in the living room. He related Mr. Gembara advised him he needed to hide due to "troubles" at the bank. He related he did not ask any particular questions and that Mr. Gembara did not go into details about the issues at the bank. He related Mr. Gembara spent most of the time in the bedroom and only came out to eat. He related that on Saturday night, they all had a later dinner and Mr. Gembara did not speak about the bank issues. After dinner, he related Mr. Gembara went back to his room and discovered him hanging in the room Sunday afternoon after not hearing from him all day.

I asked ████████ if Mr. Gembara had left the residence at any point and he related that he was unaware if he had left the residence. He related he does not know where the rope came from and he has never seen it before. He denied having any knowledge about Mr. Gembara's suicide or being complicit in the suicide.

I asked him if he had any outstanding loans through Mr. Gembara's bank ███████████████████

I subsequently interviewed ██████████ She related that ████████ had asked her if John Gembara could stay for a few days and she agreed. She related Mr. Gembara is a friend of the family and she was unaware of any issues at his bank. She related that he appeared "sad" and that Mr. Gembara did not speak to her about his issues. She further related that on Sunday afternoon after not hearing from John, she became concerned and told ████████ at which point they found the bedroom door locked. They located the key, made entry, and discovered him hanging on the chair at which point they called 911. She did not recognize the rope and was unaware if he had ever left the residence throughout the weekend.

I interviewed ████████████████████ and her ████████████████ They related they had no knowledge about the suicide and did not see the body. ████████ related she saw John on Saturday during dinner and did not see anything unusual.

I interviewed ████████████ and his ████████████ They related they had no knowledge about any

---

Investigator Signature

## CASE SUPPLEMENTAL REPORT

Printed: 09/22/2020 10:52

*Park Ridge Police Department*                                    OCA: *1703486*

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

Case Status: *ADMINISTRATIVELY*          Case Mng Status: *ADMINISTRATIVELY CLOSED*          Occurred: *12/03/2017*

    Offense: *DEATH INVESTIGATION*

Investigator: *GARCIA, LEONARDO*     *(PR16535)*          Date / Time: *02/07/2018 08:28:40, Wednesday*

Supervisor: *SHAUGHNESSY, KATHLEEN*          Supervisor Review Date / Time: *02/07/2018 10:17:15, Wednesday*

    Contact:          Reference: *Investigative Action Supplement*

issues with Mr. Gembara and his bank. I asked if they recalled seeing the rope and ▮▮▮▮ advised me that he drove Mr. Gembara to Home Depot in Niles to buy the rope. He advised me that on Friday night Mr. Gembara asked him if he could drive him to Home Depot to buy rope. ▮▮▮▮ advised him he was unable to drive him because he was going out with friends on Friday night. ▮▮▮▮ asked him why he needed rope and Mr. Gembara advised him he needed to hang large Christmas decorations off the roof of his home in Palos Hills and wanted the rope before he returned home. ▮▮▮▮ agreed to drive him on Saturday afternoon. He related that on Saturday at approximately 1430 hours he drove Mr. Gembara to the Home Depot in Niles at which point Mr. Gembara purchased the rope. He further related they purchased hotdogs at Home Depot as well. He related that Mr. Gembara did not make any mention of harming himself and he was unaware of his intentions. He related that he has known Mr. Gembara for many years and has done work for him at his bank and home. ▮▮▮▮ is ▮▮ years of age and appeared distressed about the fact that he drove Mr. Gembara to the store. I subsequently retrieved video from Home Depot and confirmed ▮▮▮▮ account of the rope purchase.

I was able to reach ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ at his tx of ▮▮▮▮▮▮▮▮ He related to me that he was currently in Los Angeles and agreed to speak to me. He advised me that he received several calls from Mr. Gembara on Friday but he did not receive them due to being on an airplane. He related to me that when he landed, he spoke to Mr. Gembara. He further related that Mr. Gembara advised him he needed a place to "hide" and stated he was in "trouble" with his bank. He asked him if could stay at his home in Chicago ▮▮▮▮▮▮▮▮ advised him he was not in town and gave him permission to break a window and stay at his home for as long as he wanted. Mr. Gembara advised him he did not want to break the window in fear of the police being notified. He then decided to call ▮▮▮▮▮▮▮▮ He related he has a business relationship with Mr. Gembara and was unaware of the particular issues at the bank. ▮▮▮▮▮▮▮▮ was unaware of ▮▮▮▮▮▮▮▮ driving Mr. Gembara to Home Depot and related ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

I spoke to Mr. Gembara's ▮▮▮▮▮▮ and ▮▮▮▮▮ related that she received a text from ▮▮▮▮▮▮▮▮ on Sunday morning at 631 am stating "bye". She further related that ▮▮▮▮▮▮▮▮ was very stressed in the past few weeks relating to problems at the bank. ▮▮▮▮▮▮▮▮ also confirmed receiving texts and related they also received text messages on Saturday night from ▮▮▮▮▮▮ where he stated "hey girls". ▮▮▮▮▮▮▮▮ responded with "what's up". She did not speak to ▮▮▮▮▮ or receive additional texts.

Detective McEwen attended the autopsy of Mr. Gembara which was ruled a suicide by hanging. Mr. Gembara's vehicle was retrieved from the home on ▮▮▮▮▮▮ and given back to his family.

I made contact with Special Agent Stephenson from FDIC. He advised me that FDIC is investigating the failure of Washington Federal Bank.

This case is closed as unfounded at this time.

# Park Ridge Police Department

Incident Case Number: 17-03486

Reporting Agency: Park Ridge Police

Print Date/Time: 09/22/2020 10:52:46

**Disclaimer: The information contained within this report is reflective of the investigation at the date and time of its printing.**

**CASE SUPPLEMENTAL REPORT**

Printed: 09/22/2020 10:52

*Park Ridge Police Department*

OCA: *1703486*

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

Case Status: *ADMINISTRATIVELY*

Offense: *DEATH INVESTIGATION*

Case Mng Status: *ADMINISTRATIVELY CLOSED*     Occurred: *12/03/2017*

Investigator: *WISNIEWSKI, KARYN J     (PR15815)*

Supervisor: *RYAN, RICHARD     (PR15150)*

Contact:

Date / Time: *12/06/2017 07:18:25, Wednesday*

Supervisor Review Date / Time: *12/06/2017 12:00:00, Wednesday*

Reference: *Supplement / Follow Up*

---

to process the scene.    Sgt. Ryan also arrived on scene. Paramedics arrived on scene.    Gambara was pronounced dead at 1518 hours by Dr. Foster through telemetry.

Investigator Signature

## CASE SUPPLEMENTAL REPORT

Printed: 09/22/2020  10:52

*Park Ridge Police Department*

OCA: *1703486*

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

Case Status: *ADMINISTRATIVELY*      Case Mng Status: *ADMINISTRATIVELY CLOSED*      Occurred: *12/03/2017*

Offense: *DEATH INVESTIGATION*

Investigator: DOUCET, JASON J    (PR18200)          Date / Time: *12/06/2017 09:40:59, Wednesday*

Supervisor: SHAUGHNESSY, KATHLEEN       Supervisor Review Date / Time: *12/14/2017 07:27:17, Thursday*

Contact:                                                Reference: *Evidence Report*

---

## FORENSIC TECHNICIAN SUPPLEMENTAL REPORT

On December 3, 2017 at 1502 hours I responded 1488 N Dee rd. for a death investigation. Upon arrival I met with Sgt. Ryan. He stated that the homeowners had a guest over to their house on Friday December 1, 2017. He was staying in the master bedroom. The homeowner had not heard or seen the guest since Saturday and was worried. The master bedroom was locked. They used a key to open it. Inside the bedroom they found the house guest, John Gembara, deceased. He was sitting in a chair with a rope around his neck. He was dead of an apparent suicide.

When I arrived the fire department was leaving the scene. Inside the residence were the homeowner, ▆▆▆▆▆▆ ▆▆▆▆▆ There were some family friends sitting outside on the patio. Officers Wisniewski and McGannon were inside taking statements and Sgt. Delfosse was with the body. I did a walkthrough of the residence. I started upstairs in the bedroom where the crime scene was located. Nothing seemed out of place. The victim was sitting in a chair in the southeast corner of the room. His back was to a spiral staircase. There was a green rope tied to the staircase and around his neck. He was cleanly dressed with his shoes on. He was wearing glasses. I observed no over trauma to the body other than the rope around his neck. I walked through the rest of the house. I photographed the scene using the departmental Nikon D90. No diagrams were completed for this case.

1488 N Dee Rd. is two story brick residecnce that faces east. There were multiple vehicles in the driveway. I walked around the outside of the residence and did not observe anyting suspicous. Photos were taken of outside as well. The bedroom where the incident occurred is the master bedroom on the second floor. The bedroom is located on the west side of the redience. The bedroom has a bathroom, and walk in closet and a spiral staircase that leads to a second floor loft. On the night stand next to the bed was a glass filled with an unknown liqiud and two opened water bottles. A sample of the liquids were placed into clear plastic collection cups and sealed. The glass was taken. Both the samples and the glass were placed into property custody as JJD3. A paper grocey bag was next to the bed on the floor. It contained the same rope that was used in the suicide. It was gathered and placed into proptery custody as JJD4.

Using a Cap-Shure sterile cotton tipped applicator with aerated tip protector and sterile water I swabbed the rope that was around the victims neck. I also swabbed the rope that was tied to the staircase. Both swabs were placed into property custody as JJD5. Using a brush and Doje's A.P.B. black latent fingerprint powder I dusted the staircase with negative results.

At the station, I used the departmental ACARD Technology Pro Burner to copy images directly from the Nikon D90's memory card two DVD-R's. The digital negative copy marked as JJD1 and the working  copy DVD-R marked as JJD2 were inventoried in evidence. The Nikon D90's memory card was cleared and formatted after verification of image

---

Investigator Signature

## CASE SUPPLEMENTAL REPORT

Printed: 09/22/2020 10:52

*Park Ridge Police Department*

OCA: *1703486*

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

Case Status: *ADMINISTRATIVELY*

Case Mng Status: *ADMINISTRATIVELY CLOSED*       Occurred: *12/03/2017*

Offense: *DEATH INVESTIGATION*

Investigator: *DOUCET, JASON J       (PR18200)*

Date / Time: *12/06/2017 09:40:59, Wednesday*

Supervisor: *SHAUGHNESSY, KATHLEEN*

Supervisor Review Date / Time: *12/14/2017 07:27:17, Thursday*

Contact:

Reference: *Evidence Report*

transfer.

## CASE SUPPLEMENTAL REPORT

Printed: 09/22/2020  10:52

*Park Ridge Police Department*

OCA: *1703486*

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

Case Status: *ADMINISTRATIVELY*

Case Mng Status: *ADMINISTRATIVELY CLOSED*     Occurred: *12/03/2017*

Offense: *DEATH INVESTIGATION*

Investigator: GARCIA, LEONARDO     (PRI6535)

Date / Time: *02/07/2018 08:28:40, Wednesday*

Supervisor: SHAUGHNESSY, KATHLEEN

Supervisor Review Date / Time: *02/07/2018 10:17:15, Wednesday*

Contact:

Reference: *Investigative Action Supplement*

In summary, I was assigned the death investigation # 17-03486. Commander Ryan and Officer McGannon responded to a report of a suicide at 1488 N. Dee. ▮▮▮▮▮▮▮ met the officers at the door and advised them the deceased was upstairs in the master bedroom.

Inside the bedroom, Officer McGannon observed a M/W subject wearing a green shirt, blue jeans, and red shoes sitting in a chair under the stairwell. The subject's eyes were open, he had grey colored hair, and eyeglasses on his face. The subject was pale in appearance, exhibited no movement and did not have a pulse. The subject had a rope tied around his neck, which was secured above him along the stairwell.

There were no signs of a struggle in the bedroom. A TV attached to the wall was on and set at a low volume. The windows were closed and the lights were off. The bed was not made and appeared to be slept in prior.

Cmdr. Ryan entered the room followed by members of PRFD Station 36. PRFD determined the subject was deceased at 1516 hours and did not conduct any lifesaving efforts. Additional Officers Sgt. Delfosse and Officer Wisniewski secured the home.

E.T. Doucet arrived on scene and processed the scene. (See ET report). Officer Wisniewski conducted an initial interview with members of the home (see Wisniewski supplement).

Detective Hahn and I arrived on scene at approximately 1715 hours. I observed a two story home approximately 5000 sq. feet to be in normal living conditions. I walked through the inside and outside of the residence and did not see any signs of a struggle or signs of foul play. The home was clean and well kept. I did not smell any cleaning products or see signs of recent cleaning.

I walked upstairs to the master bedroom where Mr. Gembara was. The room is a large master bedroom approximately 30x20 in size with a spiral staircase leading up to a loft used for storage. The TV was on and tuned into FOX News. The scene had no signs of a struggle. Mr. Gembara was sitting in a chair underneath the spiral staircase. He was wearing his prescription glasses, a long sleeve green shirt, blue jeans and red shoes. There was a green and black rope attached to his neck with a small noose secured to the staircase.

Mr. Gembara was slouched forward on the chair putting pressure on his neck. I observed petechial hemorrhage in his eyes consistent with a hanging. I did not locate a suicide note in the room or in the home. The only belongings I located of Mr. Gembara were his cell phone on the night stand and his identification.

I spoke to the homeowner ▮▮▮▮▮▮ and asked him to come to the PD with ▮▮▮▮▮ and speak to me regarding the incident. He agreed and members from the patrol division drove ▮▮▮▮▮▮▮▮▮▮ to the PD while ▮▮▮▮ ▮▮▮▮ followed us to the station.

I interviewed ▮▮▮▮▮▮▮ regarding the incident. He related to me that he has known Mr. Gembara for approximately 25 years. He related that they have a business relationship and that he was introduced to Mr. Gembara through his friend ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

He related that Mr. Gembara had called him Friday morning 12/01/17 and cancelled the leaf pickup at his home. He related that ▮▮▮▮▮▮▮▮▮▮▮ has done landscaping work for Mr. Gembara for several years. He further related

Investigator Signature

## PARK RIDGE POLICE DEPARTMENT

### DEATH REPORT

Domestic Violence  **N**      Children Present  **N**      Juvenile Involved  ____

| Location of Incident | | | | Case # | |
|---|---|---|---|---|---|
| **1488 N DEE RD, PARK RIDGE** | | | | **17-03486** | |

| Date/Time Reported | Date/Time Found | Date/Time Last Seen | Est. Date/Time of Occurence | Target of Crime |
|---|---|---|---|---|
| **12/03/2017 15:02** | **12/03/2017 15:02** | **12/02/2017 21:30** | | |

### DECEASED INFORMATION

| Name (Last, First, Middle)  ☐ Juvenile | Date of Birth | Age | Race | Ethnicity | Sex |
|---|---|---|---|---|---|
| **GEMBARA, JOHN F** | ▮▮▮▮ | ▮ | **W** | | **M** |

| Address | Home Phone | Work Phone |
|---|---|---|
| ▮▮▮▮▮▮ | | |

| Employer/School | Last Seen By  ☐ Juvenile | Victim/Offender Relationship |
|---|---|---|
| | | |

| Next of Kin | Relationship |
|---|---|
| | |

| Address | Phone # |
|---|---|
| | |

| Identified | By | How Identified |
|---|---|---|
| **Y** | Address ▮▮▮▮  Phone # ▮▮▮▮ | **VISUAL RECOGNITION** |
| | | Explain  **VISUAL** |

### FOUND INFORMATION

| Found By | | Date/Time Found |
|---|---|---|
| ▮▮▮▮ | | **12/03/2017 15:02** |
| Address ▮▮▮▮ | Phone # ▮▮▮▮ | |

| Forced Entry | By | Condition of Windows and Doors |
|---|---|---|
| | | |

| Body Found In | Describe |
|---|---|
| **BEDROOM** | **CHAIR UNDER STAIRWELL** |
| Position of Body | Describe |
| **SITTING** | **BODY SEATED IN CHAIR UNDER STAIRWELL** |
| | Anything Unusual  **ROPE AROUND NECK THAT WAS SECURED TO STAIRWELL** |
| Manner Clothed | Describe |
| **FULLY CLOTHED** | **SUBJECT FULLY CLOTHED WITH SHIRT, PANTS, SHOES, EYEGLASSES** |
| Condition of Body | Describe |
| **OTHER** | **PALE/GRAY** |
| Apparent Wounds | Describe |
| | **ROPE AROUND NECK** |

### MEDICAL EXAMINER

| Medical Examiner | ME on Scene | ME Called By | Date/Time Called | Date/Time Arrived |
|---|---|---|---|---|
| **JOHNSON #73** | **N** | **MCGANNON** | **12/03/2017 20:56** | |

| Estimated Date/Time of Death | Autopsy Requested | Autopsy Location | Date | Autopsy Doctor |
|---|---|---|---|---|
| | **N** | | | |

### PERSONNEL ON SCENE

| First Officer(s) On Scene |
|---|
| **MCGANNON, MATTHEW** |

| Detectives On Scene |
|---|
| **GARCIA, LEONARDO / HAHN, RUTH M** |

| Fire Personnel On Scene | EMS Personnel On Scene |
|---|---|
| **PRFD STATION 36** | |

| Rescue Personnel On Scene | All Others On Scene |
|---|---|
| | |

| Reporting Officer Name and ID # | Supervisor ID # | Complainant Signature |
|---|---|---|
| **MCGANNON, MATTHEW    (PR18120)** | **PR16430** | |

# PARK RIDGE POLICE DEPARTMENT

## DEATH REPORT

Case # 17-03486

### EVIDENCE

| Collected | Collected By | Description of Evidence |
|---|---|---|
| | | |

| Scene Processed By | | Date/Time Processed |
|---|---|---|
| | | |

### TRANSPORT INFORMATION

| Transported By | Date/Time Called | Date/Time Transported |
|---|---|---|
| | | |

### NARRATIVE

Cmdr Ryan and I responded to a report of a suicide at 1488 N. Dee. The caller had advised a subject in the home at hung himself.

Cmdr. Ryan and I arrived at the scene and were met at the door by homeowner ████ He advised the deceased was upstairs in a bedroom. Cmdr . Ryan stayed with ████ at the door while I went upstairs to the master bedroom at the back of the home. I found the master bedroom door ajar and entered the room.

Inside the bedroom, I observed a M/W subject wearing a green shirt, blue jeans, and red shoes sitting in a chair under the stairwell. The subject had eyes that were open, had grey colored hair, and eye glasses on his face. The subject was pale in appearance, exhibited no movement of any kind, and was not making any sounds consistent with breathing/gasping. I checked the subject`s left arm and found he had no pulse. I further observed the subject had a cord/rope that was tied around his neck. The cord/rope was also secured/tied above him along the stairwell.

I observed the bed was not made and the TV was on with a low volume. The windows were closed and the lights were off.

Cmdr Ryan entered the room followed shortly thereafter by PRFD Station 36 personnel. They surveyed the subject (without touching him) and determined no life saving efforts would be performed and the subject was deceased. I noted the time on my department issued phone to be 1516 hrs. Sgt. Delfosse and Ofc. Wisniewski also arrived on scene and entered the bedroom while Cmdr. Ryan went downstairs. At no time did I observe any member of PRPD or PRFD touch the subject or handle anything at the scene.

I was stationed at the door to secure the bedroom. Ofc. Doucet arrived as the on scene ET.

As the room was processed and family members were moving about downstairs, I, after being properly relieved , went downstairs to assist Ofc. Wisniewski as she spoke to the family.

Det.`s Garcia and Hahn arrived at the scene at approximately 1715 hrs. Ofc. Wisniewski and I secured the perimeter of the home.

At 1920 hrs, Ofc. Wisniewski and I transported four witnesses from the home to PRPD for Detective interviews.

At 2050 hrs I was advised by Sgt. Delfosse to notify the ME `s office. I spoke to ME Investigator Johnson #73 who assigned case number #2017-05664. He directed me to include photo`s and any available reports to go down with the boddy.

# PARK RIDGE POLICE DEPARTMENT
## DEATH REPORT

| DECEASED INFORMATION | | |
|---|---|---|
| Name (Last, First, Middle)    Juvenile | | Case # |
| **GEMBARA, JOHN F** | | **17-03486** |

## NARRATIVE CONTINUED

# COMMUNICATIONS

## Event Report

Event ID: **17-00183796**    Call Ref #: 303    Date/Time Received: 12/03/17 15:02:32

| | | |
|---|---|---|
| Rpt #: 17-03486 | Prime **101** | Services Involved |
| Call Source: PHONE | Unit: MCGANNON, MATTHEW | LAW |

Location: **1488 N DEE RD**

X-ST:  *W DE COOK AVE*    Jur: CAD    Service: LAW    Agency: PRPD

*W OAK TREE LN*    St/Beat: P1    District: PRPD    RA:

Business:    Phone:    GP: P1

Nature: **DEATH INVESTIGATION**    Alarm Lvl: 1    Priority: P    Medical Priority:

Reclassified Nature:    **SUICIDE**

Caller:    Alarm:
Addr:    Phone:    Alarm Type:

Vehicle #:    St:    Report Only: No    Race:    Sex:    Age:

Call Taker: WS9913    Console: CAD01

Geo-Verified Addr.: Yes    Nature Summary Code:    Disposition: O    Close Comments:

Notes:  [102-TRANSPORT] {102} End Mileage: 0.0  [12/03/17 20:05:47 WS9951]
[101-TRANSPORT] {101} End Mileage: 12860.9 [12/03/17 19:49:09 WS9951]
[102-TRANSPORT] {102} Beg Mileage: 40560.0 [12/03/17 19:42:54 WS9951]
[102-TRANSPORT] {102} 2 [12/03/17 19:42:54 WS9951]
[101-TRANSPORT] {101} Beg Mileage: 12858.5 [12/03/17 19:42:18 WS9951]
RED CENTER NOTIFIED [12/03/17 16:05:03 WS9915]
caller says subj is beyond help m/56 [12/03/17 15:04:39 WS9913]
caller said he friend is in his room and hung himself [12/03/17 15:03:41 WS9913]

### Times

Call Received: 12/03/17 15:02:32    **Time From Call Received**

Call Routed: 12/03/17 15:03:23    000:00:51    Unit Reaction: 000:00:28 *(1st Dispatch to 1st Arrive)*

Call Take Finished: 12/03/17 15:03:23    000:00:51    En-Route: 000:00:28 *(1st Dispatch to 1st En-Route)*

1st Dispatch: 12/03/17 15:03:30    000:00:58  *(Time Held)*    On-Scene: 017:18:18 *(1st Arrive to Last Clear)*

1st En-Route: 12/03/17 15:03:58    000:01:26

1st Arrive: 12/03/17 15:03:58    000:01:26  *(Reaction Time)*

Last Clear: 12/04/17 08:22:16    017:19:44

### Radio Log

| Unit | Empl ID | Type | Description | Time Stamp | Comments | Close Code | User |
|---|---|---|---|---|---|---|---|
| 102 | PR1581 | D | Dispatched | 12/03/17 15:03:30 | Stat/Beat: P2 | | WS9920 |
| 101 | PR1812 | D | Dispatched | 12/03/17 15:03:30 | Out Evt: [A] at 2601 DEMPSTER ST | | WS9920 |
| 101 | PR1812 | A | Arrived | 12/03/17 15:03:58 | | | WS9920 |
| 110 | PR1515 | D | Dispatched | 12/03/17 15:04:05 | Stat/Beat: PSUP | | WS9920 |
| 110 | PR1515 | E | En-Route | 12/03/17 15:04:05 | Stat/Beat: PSUP | | WS9920 |
| 110 | PR1515 | A | Arrived | 12/03/17 15:04:05 | Stat/Beat: PSUP | | WS9920 |

**Event ID: 17-00183796  Call Ref #: 303  DEATH INVESTIGATION at 1488 N DEE RD**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 102 | PR1581 | E | En-Route | 12/03/17 | 15:04:12 | | | WS9920 |
| 130 | PR1643 | D | Dispatched | 12/03/17 | 15:05:43 | Stat/Beat: PSUP | | WS9920 |
| 130 | PR1643 | E | En-Route | 12/03/17 | 15:05:43 | Stat/Beat: PSUP | | WS9920 |
| 104 | PR1673 | D | Dispatched | 12/03/17 | 15:05:43 | Stat/Beat: P4 | | WS9920 |
| 104 | PR1673 | E | En-Route | 12/03/17 | 15:05:44 | Stat/Beat: P4 | | WS9920 |
| 104 | PR1673 | X | Canceled | 12/03/17 | 15:05:58 | | | WS9920 |
| 103 | PR1820 | D | Dispatched | 12/03/17 | 15:08:19 | Stat/Beat: P3;101 | | WS9920 |
| 103 | PR1820 | E | En-Route | 12/03/17 | 15:08:19 | Stat/Beat: P3;101 | | WS9920 |
| 102 | PR1581 | A | Arrived | 12/03/17 | 15:08:56 | | | WS9920 |
| 130 | PR1643 | A | Arrived | 12/03/17 | 15:11:45 | | | WS9920 |
| 103 | PR1820 | A | Arrived | 12/03/17 | 15:21:36 | | | WS9920 |
| 110 | PR1515 | C | Cleared | 12/03/17 | 16:52:55 | BU | BU | WS9935 |
| 424 | PR1904 | D | Dispatched | 12/03/17 | 16:57:01 | Stat/Beat: INV | | Unit:424 |
| 424 | PR1904 | E | En-Route | 12/03/17 | 16:57:01 | Stat/Beat: INV | | Unit:424 |
| 424 | PR1904 | A | Arrived | 12/03/17 | 16:57:01 | Stat/Beat: INV | | Unit:424 |
| 421 | PR1653 | D | Dispatched | 12/03/17 | 16:58:36 | Stat/Beat: INV | | Unit:421 |
| 421 | PR1653 | E | En-Route | 12/03/17 | 16:58:36 | Stat/Beat: INV | | Unit:421 |
| 421 | PR1653 | A | Arrived | 12/03/17 | 16:58:36 | Stat/Beat: INV | | Unit:421 |
| 211 | PR1835 | D | Dispatched | 12/03/17 | 19:24:51 | Stat/Beat: PV;101 | | WS9951 |
| 211 | PR1835 | E | En-Route | 12/03/17 | 19:24:51 | Stat/Beat: PV;101 | | WS9951 |
| 211 | PR1835 | A | Arrived | 12/03/17 | 19:24:51 | Stat/Beat: PV;101 | | WS9951 |
| 101 | PR1812 | T | Transport | 12/03/17 | 19:42:18 | To: PARK RIDGE POLICE DEPARTMEN | | WS9951 |
| 101 | PR1812 | MILE | Beg Mileage | 12/03/17 | 19:42:18 | Beg Mileage: 12858.5 | | WS9951 |
| 102 | PR1581 | T | Transport | 12/03/17 | 19:42:54 | To: PARK RIDGE POLICE DEPARTMEN | | WS9951 |
| 102 | PR1581 | MILE | Beg Mileage | 12/03/17 | 19:42:54 | Beg Mileage: 40560.0 | | WS9951 |
| 101 | PR1812 | A | Arrived | 12/03/17 | 19:49:01 | [Arrive Button] | | WS9951 |
| 101 | PR1812 | MILE | End Mileage | 12/03/17 | 19:49:01 | End Mileage: 12860.9 | | WS9951 |
| 101 | PR1812 | C | Cleared | 12/03/17 | 19:51:55 | | O | Unit:101 |
| 102 | PR1581 | C | Cleared | 12/03/17 | 20:05:44 | BU | BU | WS9951 |
| 102 | PR1581 | MILE | End Mileage | 12/03/17 | 20:05:44 | End Mileage: 0.0 | BU | WS9951 |
| 103 | PR1820 | C | Cleared | 12/03/17 | 20:06:05 | BU | BU | WS9951 |
| 101 | PR1812 | D | Dispatched | 12/03/17 | 20:49:25 | Stat/Beat: P1 | | WS9951 |
| 101 | PR1812 | A | Arrived | 12/03/17 | 20:49:27 | [Arrive Button] | | WS9951 |
| 203 | PR2138 | D | Dispatched | 12/03/17 | 20:51:26 | Stat/Beat: P3 | | WS9993 |
| 203 | PR2138 | E | En-Route | 12/03/17 | 20:51:26 | Stat/Beat: P3 | | WS9993 |
| 203 | PR2138 | A | Arrived | 12/03/17 | 20:59:38 | | | WS9993 |
| 101 | PR1812 | C | Cleared | 12/03/17 | 21:30:49 | | O | WS9993 |
| 204 | PR2197 | D | Dispatched | 12/03/17 | 21:46:20 | Stat/Beat: P4;203 | | WS9993 |
| 204 | PR2197 | E | En-Route | 12/03/17 | 21:46:20 | Stat/Beat: P4;203 | | WS9993 |
| 204 | PR2197 | A | Arrived | 12/03/17 | 21:46:20 | Stat/Beat: P4;203 | | WS9993 |
| 204 | PR2197 | L | Location Change | 12/03/17 | 22:02:58 | ME OFFICE | | WS9993 |
| 130 | PR1643 | L | Location Change | 12/03/17 | 22:14:07 | PARK RIDGE POLICE DEPARTMENT | | WS9993 |
| 201 | PR1875 | D | Dispatched | 12/03/17 | 22:17:54 | Stat/Beat: P1;130 | | WS9993 |
| 201 | PR1875 | E | En-Route | 12/03/17 | 22:17:54 | Stat/Beat: P1;130 | | WS9993 |
| 201 | PR1875 | X | Canceled | 12/03/17 | 22:19:47 | Pre-empted to Event # 495 | | WS9993 |
| 130 | PR1643 | C | Cleared | 12/03/17 | 22:22:37 | BU | BU | WS9993 |
| 201 | PR1875 | D | Dispatched | 12/03/17 | 22:26:33 | Stat/Beat: P1 | | Unit:201 |

**Event ID: 17-00183796    Call Ref #: 303    DEATH INVESTIGATION at 1488 N DEE RD**

| 201 | PR1875 | E | En-Route | 12/03/17 22:26:33 | Stat/Beat: P1 | | Unit:201 |
|---|---|---|---|---|---|---|---|
| 211 | PR1835 | X | Canceled | 12/03/17 22:28:38 | Pre-empted to Event # 497 | | WS9993 |
| 201 | PR1875 | X | Canceled | 12/03/17 22:30:08 | Pre-empted to Event # 499 | | WS9993 |
| 201 | PR1875 | D | Dispatched | 12/03/17 22:39:35 | Stat/Beat: P1 | | Unit:201 |
| 201 | PR1875 | E | En-Route | 12/03/17 22:39:35 | Stat/Beat: P1 | | Unit:201 |
| 201 | PR1875 | A | Arrived | 12/03/17 22:44:41 | | | Unit:201 |
| 211 | PR1835 | D | Dispatched | 12/03/17 22:56:01 | Stat/Beat: PV | | WS9942 |
| 211 | PR1835 | A | Arrived | 12/03/17 22:56:06 | [Arrive Button] | | WS9942 |
| 211 | PR1835 | L | Location Change | 12/03/17 22:56:12 | PARK RIDGE POLICE DEPARTMENT | | WS9942 |
| 203 | PR2138 | ENT | Entered VehicleId | 12/03/17 23:03:40 | [Vin:] 5NPDH4AEXFH601911 [licpl_no:] | | Unit:203 |
| 203 | PR2138 | C | Cleared | 12/03/17 23:05:54 | | BU | Unit:203 |
| 204 | PR2197 | C | Cleared | 12/03/17 23:31:58 | | BU | WS9942 |
| 202 | PR1930 | D | Dispatched | 12/04/17 00:18:52 | Stat/Beat: P2 | | WS9942 |
| 202 | PR1930 | E | En-Route | 12/04/17 00:18:54 | [Enroute Button] | | WS9942 |
| 202 | PR1930 | A | Arrived | 12/04/17 00:22:23 | [Arrive Button] | | WS9942 |
| 201 | PR1875 | C | Cleared | 12/04/17 00:22:26 | | BU | WS9942 |
| 424 | PR1904 | C | Cleared | 12/04/17 01:14:18 | | BU | Unit:424 |
| 421 | PR1653 | C | Cleared | 12/04/17 01:35:35 | | M | Unit:421 |
| 202 | PR1930 | C | Cleared | 12/04/17 02:24:13 | BU | BU | WS9966 |
| 205 | PR1819 | D | Dispatched | 12/04/17 02:24:41 | Stat/Beat: P5 | | WS9966 |
| 205 | PR1819 | E | En-Route | 12/04/17 02:24:41 | Stat/Beat: P5 | | WS9966 |
| 205 | PR1819 | A | Arrived | 12/04/17 02:24:41 | Stat/Beat: P5 | | WS9966 |
| 211 | PR1835 | C | Cleared | 12/04/17 03:26:54 | M | M | WS9921 |
| 204 | PR2197 | D | Dispatched | 12/04/17 04:11:09 | Stat/Beat: P4 | | WS9921 |
| 205 | PR1819 | C | Cleared | 12/04/17 04:11:14 | BU | BU | WS9921 |
| 204 | PR2197 | A | Arrived | 12/04/17 05:59:48 | | | Unit:204 |
| 101 | PR1607 | D | Dispatched | 12/04/17 06:02:41 | Stat/Beat: P1 | | WS9990 |
| 101 | PR1607 | E | En-Route | 12/04/17 06:02:41 | Stat/Beat: P1 | | WS9990 |
| 204 | PR2197 | C | Cleared | 12/04/17 06:15:37 | | BU | Unit:204 |
| 101 | PR1607 | A | Arrived | 12/04/17 06:42:07 | | | WS9917 |
| 101 | PR1607 | C | Cleared | 12/04/17 08:22:16 | | M | Unit:101 |

**Event Log**

| Unit | Empl ID | Type | Description | Time Stamp | Comments | Close Code | User |
|---|---|---|---|---|---|---|---|
| | | TR | Time Received | 12/03/17 15:02:32 | By: PHONE | | WS9913 |
| | | ENT | Entered Street | 12/03/17 15:02:42 | 1488 N DEE RD | | WS9913 |
| | | ENT | Entered Nature | 12/03/17 15:03:19 | SUICIDE | | WS9913 |
| | | FIN | Finished Call Taking | 12/03/17 15:03:23 | | | WS9913 |
| | | REC | Unit Rec Btn Click | 12/03/17 15:03:26 | Unit recommend for SUICIDE at 1488 N | | WS9920 |
| | | REC | Unit Recommendation | 12/03/17 15:03:30 | Plan: PRPD Cat: 2P1S Lvl: 1 | | WS9920 |
| | | REC | Unit Recommendation | 12/03/17 15:03:30 | Recmnd:102 [PAT], 101 [PAT] | | WS9920 |
| | | ARM | Added Remarks | 12/03/17 15:03:41 | | | WS9913 |
| | | ENT | Entered CallerName_C | 12/03/17 15:03:51 | | | WS9913 |
| | | ENT | Entered CallerPhone | 12/03/17 15:03:56 | ██████████████ | | WS9913 |
| | | REC | Unit Recommendation [I | 12/03/17 15:04:08 | Plan: PRPD Cat: 2P1S Lvl: 1 | | WS9920 |
| | | REC | Unit Recommendation [I | 12/03/17 15:04:08 | Recmnd:102 [PAT], 101 [PAT] | | WS9920 |
| | | ARM | Added Remarks | 12/03/17 15:04:39 | | | WS9913 |

Event ID: 17-00183796     Call Ref #: 303     **DEATH INVESTIGATION at 1488 N DEE RD**

| | | | | | | |
|---|---|---|---|---|---|---|
| | ARM | Added Remarks | 12/03/17 15:05:03 | | | WS9915 |
| | VCH | Viewed Call History | 12/03/17 15:05:09 | Location Information | | WS9915 |
| 110 | PR1515 NCI | QRY:Drivers | 12/03/17 15:20:56 | UNIT:110 OLN= | | Unit:110 |
| | RPT | Requested Report# | 12/03/17 15:37:22 | PRPD Report #17-03486 | | WS9920 |
| 101 | PR1812 NCI | QRY:Drivers | 12/03/17 16:29:56 | UNIT:101 OLN= | | Unit:101 |
| | CHG | Changed PrimeUnit | 12/03/17 16:30:57 | 102 --> 101 | | WS9920 |
| 101 | PR1812 NCI | QRY:Drivers | 12/03/17 16:50:42 | UNIT:101 OLN= | | Unit:101 |
| | CHG | Changed RelLastName | 12/03/17 17:18:12 | [ID: 322158] <UNKNOWN> --> X | | WS9935 |
| | ENT | Entered RelNmOInState | 12/03/17 17:18:22 | [ID: 322158] IL | | WS9935 |
| | ENT | Entered RelNmOIn | 12/03/17 17:18:22 | [ID: 322158] | | WS9935 |
| | ENT | Entered RelNmOInState | 12/03/17 17:18:22 | [ID: 322158] IL | | WS9935 |
| | DLQ | Driver License Query | 12/03/17 17:18:22 | OLN= | State: IL | WS9935 |
| | DLQ | Driver License Query | 12/03/17 17:18:24 | OLN: | State: Name: X, | WS9935 |
| 101 | PR1812 NCI | QRY:Drivers | 12/03/17 17:34:52 | UNIT:101 OLN= | | Unit:101 |
| 101 | PR1812 NCI | QRY:Drivers | 12/03/17 17:35:13 | UNIT:101 OLN= | | Unit:101 |
| 101 | PR1812 NCI | QRY:Drivers | 12/03/17 17:35:52 | UNIT:101 OLN= | | Unit:101 |
| 101 | PR1812 NCI | QRY:Drivers | 12/03/17 17:37:07 | UNIT:101 OLN= | | Unit:101 |
| 101 | PR1812 NCI | QRY:Drivers | 12/03/17 17:38:10 | UNIT:101 OLN= | | Unit:101 |
| 101 | PR1812 NCI | QRY:Drivers | 12/03/17 17:42:57 | UNIT:101 OLN= | | Unit:101 |
| 101 | PR1812 NCI | QRY:Drivers | 12/03/17 18:19:04 | UNIT:101 OLN= | | Unit:101 |
| 101 | PR1812 NCI | QRY:Criminal History | 12/03/17 18:20:13 | UNIT:101 FNAME= | LNAME= | Unit:101 |
| 101 | PR1812 NCI | QRY:Criminal History | 12/03/17 18:21:16 | UNIT:101 FNAME= | LNAME= | Unit:101 |
| | VCH | Viewed Call History | 12/03/17 18:42:51 | Location Information | | WS9951 |
| | ARM | Added Remarks | 12/03/17 19:42:18 | | | WS9951 |
| | ARM | Added Remarks | 12/03/17 19:42:54 | | | WS9951 |
| | ARM | Added Remarks | 12/03/17 19:42:54 | | | WS9951 |
| | ARM | Added Remarks | 12/03/17 19:49:09 | | | WS9951 |
| 101 | PR1812 RCL | Reclassified Nature | 12/03/17 19:51:55 | Nature: DEATH INVESTIGATION | | Unit:101 |
| | ARM | Added Remarks | 12/03/17 20:05:47 | | | WS9951 |
| 203 | PR2138 NCI | QRY:Vehicles | 12/03/17 23:03:42 | UNIT:203 Tag= | State= VIN= | Unit:203 |
| 203 | PR2138 NCI | QRY:Drivers | 12/03/17 23:04:03 | UNIT:203 OLN= | | Unit:203 |

**Related Names**

| Last, First, MI Suffix | Type | Race | Sex | HT | WT | Eyes | DOB | Age | Home / Mobile Ph | Work Ph |
|---|---|---|---|---|---|---|---|---|---|---|
| | CALL | | | | 0 | | | | | |
| Address: | | | | | | | | | | |
| Oln: | | | | Oln St: | | | | | | |
| Notes: | | | | | | | | | | |
| | | | | | | | | | | |
| Gembara, John F | | | M | 504 | 170 | | | 56 | | |
| Address: | | | | | | | | | | |
| Oln: | | | | Oln St: IL | | | | | | |
| Notes: | | | | | | | | | | |
| | | | M | 604 | 310 | | | 54 | | |
| Address: | | | | | | | | | | |
| Oln: | | | | Oln St: IL | | | | | | |
| Notes: | | | | | | | | | | |

Event Report

| Event ID: 17-00183796 | Call Ref #: 303 | DEATH INVESTIGATION at 1488 N DEE RD |
|---|---|---|



X

0

Address:

Oln: ▮▮▮▮▮▮▮▮▮▮▮▮▮     Oln St: IL

Notes:

▮▮▮▮▮▮▮▮▮▮    F   507   145   ▮▮▮▮▮   22

Address: ▮▮▮▮▮▮▮▮▮

Oln: ▮▮▮▮▮▮▮▮▮     Oln St: IL

Notes:

▮▮▮▮▮▮▮▮    M   602   230   ▮▮▮▮▮   21

Address: ▮▮▮▮▮▮▮▮▮

Oln: ▮▮▮▮▮▮▮▮▮     Oln St: IL

Notes:

▮▮▮▮▮▮▮▮    F   507   150   ▮▮▮▮▮   24

Address: ▮▮▮▮▮▮▮▮▮

Oln: ▮▮▮▮▮▮▮▮▮     Oln St: IL

Notes:

▮▮▮▮▮▮▮▮    M   603   0   ▮▮▮▮▮   26

Address: ▮▮▮▮▮▮▮▮▮

Oln: ▮▮▮▮▮▮▮▮▮     Oln St: NY

Notes:

▮▮▮▮▮▮▮▮    F   505   128   ▮▮▮▮▮   51

Address: ▮▮▮▮▮▮▮▮▮

Oln: ▮▮▮▮▮▮▮▮▮     Oln St: IL

Notes:

▮▮▮▮▮▮▮▮    M   507   210   ▮▮▮▮▮   41

Address: ▮▮▮▮▮▮▮▮▮

Oln: ▮▮▮▮▮▮▮▮▮     Oln St: IL

Notes:

| Related Vehicles | | | | | | | |
|---|---|---|---|---|---|---|---|

| Lic Tag | State | Type | Year | Make | Make Desc | Model | Color1 / Color2 | Vin |
|---|---|---|---|---|---|---|---|---|
| ▮▮▮▮ | IL | | 2015 | HYUN | HYUNDAI | | SIL   SIL | 5NPDH4AEXFH601911 |

Notes:



**CITY OF PARK RIDGE**
**POLICE DEPARTMENT**
200 S. VINE AVE.
PARK RIDGE, IL 60068
TEL: 847/318-5252
FAX: 847/318-5308
TDD: 847/318-5252
www.parkridgepolice.org

FRANK J. KAMINSKI
CHIEF OF POLICE

October 2, 2020

Robert Kowalski
1009 61st Street
LaGrange, IL 60525

VIA E-MAIL ONLY: robertk.24@outlook.com

Re: FOIA request dated 09/25/20

Dear Mr. Kowalski,

This letter contains the response to the FOIA request received by this office on 09/25/20. The following record has been provided in response to your request

> *Disclosure of private information is exempt pursuant to Section 7(1)(b). Therefore, the following unique identifiers have been redacted from the responsive records: personal financial information, graphic photographs, passwords or other access codes, hull numbers and personal license plates.*

> *A portion of this request has been denied pursuant to Section 7(1)(a) which provides an exemption for information prohibited from disclosure by other state or federal laws, specifically the Illinois Juvenile Court Act, 705 ILCS 405/1-8. All law enforcement records maintained by a law enforcement agency relating to a minor who has been arrested, charged or investigated must be withheld in full and may only be disclosed to the specific persons listed in this section of the Act.*

> *A portion of this request has been denied pursuant to Section 7(1)(a) which provides an exemption for information prohibited from disclosure by other state and federal laws, specifically the Federal FOIA Exemption 7(A) – could reasonably be expected to interfere with enforcement proceedings and Exemption 8 – Information that concerns the supervision of financial institutions.*

If your request for records has been denied in full or in part, you have the right to appeal the denial of the records you have requested to the Public Access Counselor at the Office of the Attorney General by submitting a written Request for Review within 60 calendar days of this denial letter
5 ILCS 140/9.5(a) to: Public Access Counselor, Office of the Attorney General, 500 South Second Street, Springfield, Illinois 62706; 1-877-299-3642 or (312) 814-5526. You must include a copy of your original FOIA request and this denial letter when filing a Request for Review. You also have the right to judicial review pursuant to Section 11 of the Freedom of Information Act.

Sincerely,

Krista Wroblewski
Police Records Technician/FOIA Officer



**CITY OF PARK RIDGE**
**POLICE DEPARTMENT**
200 S. VINE AVE
PARK RIDGE, IL 60068
TEL: 847/318-5252
FAX: 847/318-5308
TDD: 847/ 318-5252
www.parkridgepolice.org

FRANK J. KAMINSKI
CHIEF OF POLICE

September 24, 2020

Robert Kowalski
1009 61st Street
LaGrange, IL 60525

**VIA E-MAIL ONLY:** robertk.24@outlook.com

Re: FOIA request dated 09/11/20

Dear Mr. Kowalski,

This letter contains the response to the FOIA request received by this office on 09/17/20. The attached record is provided in response to your request.

*Disclosure of private information is exempt pursuant to Section 7(1)(b). Therefore, the following unique identifiers have been redacted from the responsive records: dates of birth, driver's license numbers, personal financial information, home or personal telephone numbers, home addresses and personal license plates.*

*Third party names have been redacted pursuant to Section 7(1)(c) of the Act because being named in records relating to a crime is highly personal and objectionable to a reasonable person, and the subject's right to privacy outweighs any legitimate public interest in disclosing this information.*

*The name of the individual who filed a complaint with or provided information to a law enforcement agency has been redacted pursuant to Section 7(1)(d)(iv).*

*This request has been denied pursuant to Section 7(1)(a) which provides an exemption for information prohibited from disclosure by other state or federal laws, specifically the Mental Health and Developmental Disabilities Confidentiality Act, 740 ILCS 110/3. All social worker records and communications shall be confidential and shall not be disclosed except as provided in this Act.*

*A portion of the responsive record is no longer maintained by this agency. It has been disposed of under the Authority of the Local Records Commission of the State of Illinois in compliance with an approved Disposal Certificate.*

If your request for records has been denied in full or in part, you have the right to appeal the denial of the records you have requested to the Public Access Counselor at the Office of the Attorney General by submitting a written Request for Review within 60 calendar days of this denial letter

5 ILCS 140/9.5(a) to: Public Access Counselor, Office of the Attorney General, 500 South Second Street, Springfield, Illinois 62706; 1-877-299-3642 or (312) 814-5526. You must include a copy of your original FOIA request and this denial letter when filing a Request for Review. You also have the right to judicial review pursuant to Section 11 of the Freedom of Information Act.

Sincerely,

Krista Wroblewski
Police Records Technician/FOIA Officer

# CERTIFICATION OF DEATH RECORD

## COOK COUNTY CLERK VITAL RECORDS
## CHICAGO, ILLINOIS
## MEDICAL EXAMINER/CORONER CERTIFICATE OF DEATH

STATE FILE NUMBER 2017 0097103

MEDICAL EXAMINER'S CASE NUMBER : ME2017-05664

DATE ISSUED 10/13/2020

| DECEDENT'S LEGAL NAME | | | SEX | DATE OF DEATH |
|---|---|---|---|---|
| JOHN F GEMBARA | | | MALE | DECEMBER 03, 2017 |

| COUNTY OF DEATH | AGE AT LAST BIRTHDAY | | DATE OF BIRTH | |
|---|---|---|---|---|
| COOK | 56 YEARS | | JUNE 16, 1961 | |

| CITY OR TOWN | HOSPITAL OR OTHER INSTITUTION NAME |
|---|---|
| PARK RIDGE | 1488 N DEE ROAD |

| PLACE OF DEATH |
|---|
| SCENE |

| BIRTHPLACE | SOCIAL SECURITY NUMBER | STATUS AT TIME OF DEATH | SURVIVING SPOUSE/CIVIL UNION PARTNER'S MAIDEN NAME | EVER IN U.S. ARMED FORCES? |
|---|---|---|---|---|
| EVERGREEN PARK IL | 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 | MARRIED | THERESE A KOMPERDA | NO |

| RESIDENCE | | APT. NO. | CITY OR TOWN | INSIDE CITY LIMITS? |
|---|---|---|---|---|
| 10019 S 90TH AVE | | | PALOS HILLS | YES |

| COUNTY | STATE | ZIP CODE | FATHER/CO-PARENT'S NAME PRIOR TO FIRST MARRIAGE/CIVIL UNION | MOTHER/CO-PARENT'S NAME PRIOR TO FIRST MARRIAGE/CIVIL UNION |
|---|---|---|---|---|
| COOK | IL | 60465 | EMIL S GEMBARA | BERNADETTE A POTOCKI |

| INFORMANT'S NAME | RELATIONSHIP | MAILING ADDRESS |
|---|---|---|
| THERESE A GEMBARA | WIFE | 10019 S 90TH AVE, PALOS HILLS, IL, 60465 |

| METHOD OF DISPOSITION | PLACE OF DISPOSITION | LOCATION : CITY OR TOWN AND STATE | DATE OF DISPOSITION |
|---|---|---|---|
| BURIAL | RESURRECTION CATHOLIC CEMETERY | JUSTICE, IL | DECEMBER 08, 2017 |

| FUNERAL HOME |
|---|
| WOLNIAK FUNERAL HOME, 5700 S. PULASKI RD., CHICAGO, IL, 60629 |

| FUNERAL DIRECTOR'S NAME | FUNERAL DIRECTOR'S ILLINOIS LICENSE NUMBER |
|---|---|
| NANCY ANN WOLNIAK COOK | 034011910 |

| LOCAL REGISTRAR'S NAME | DATE FILED WITH LOCAL REGISTRAR |
|---|---|
| DAVID ORR | DECEMBER 6, 2017 |

**CAUSE OF DEATH**

| | | | APPROXIMATE INTERVAL BETWEEN ONSET AND DEATH |
|---|---|---|---|
| PART I. | HANGING | | |
| IMMEDIATE CAUSE (Final disease or condition resulting in death) a. | | Due to (or as a consequence of): | |
| b. | | Due to (or as a consequence of): | |
| c. | | Due to (or as a consequence of): | |

PART II. Enter other significant conditions contributing to death but not resulting in the underlying cause given in PART I.

| | WAS AN AUTOPSY PERFORMED? NO |
|---|---|
| | WERE AUTOPSY FINDINGS USED TO COMPLETE CAUSE OF DEATH? N/A |

| FEMALE PREGNANCY STATUS | MANNER OF DEATH |
|---|---|
| NOT APPLICABLE | SUICIDE |

| DATE OF INJURY | TIME OF INJURY | PLACE OF INJURY | |
|---|---|---|---|
| DECEMBER 3, 2017 | 03:02 PM | RESIDENCE : FRIEND'S | |

| LOCATION OF INJURY | INJURY AT WORK? |
|---|---|
| 1488 NORTH DEE, PARK RIDGE, IL, 60068 | NO |

| DESCRIBE HOW INJURY OCCURRED | IF TRANSPORTATION INJURY, SPECIFY |
|---|---|
| HANGED SELF WITH ROPE | |

| ATTEND THE DECEASED? | DATE LAST SEEN ALIVE | WAS MEDICAL EXAMINER OR CORONER CONTACTED? | DATE PRONOUNCED | TIME OF DEATH |
|---|---|---|---|---|
| CERTIFIER | | | DECEMBER 03, 2017 | 03:16 PM |
| MEDICAL EXAMINER/CORONER | | | | |

| NAME, ADDRESS AND ZIP CODE OF PERSON COMPLETING CAUSE OF DEATH | DATE CERTIFIED |
|---|---|
| PONNI ARUNKUMAR MD, 2121 W HARRISON ST, CHICAGO, IL, 60612 | DECEMBER 05, 2017 |

| | PHYSICIAN'S LICENSE NUMBER |
|---|---|

1494742

This is to certify that this is a true and correct copy from the official death record filed with the Illinois Department of Public Health



Karen A. Yarbrough
Cook County Clerk







FILED
10/14/2020 7:28 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020CH06285

10783660

THE WATCHDOGS    NEWS    CHICAGO

# Why did Bridgeport bank president kill himself in customer's Park Ridge home?

By Tim Novak and Robert Herguth  |  Mar 3, 2018, 12:22am CST



The Park Ridge home of a Washington Federal Bank for Savings customer where bank chief John F. Gembara was found dead. The homeowner told police in the northwest suburb that Gembara said he "needed to hide due to 'troubles' at the bank." | Kevin Tanaka / Sun-Times

Founded to serve Polish immigrants, Washington Federal Bank for Savings, a small, family-owned bank, operated in Bridgeport for more than a century.

Some compared it to the "building and loan" in "It's a Wonderful Life." But unlike the classic Jimmy Stewart movie, there was no storybook ending for Washington Federal or John F. Gembara, who ran the bank that his late grandfather founded in 1913.

On Dec. 3, Gembara, 56, was found dead of what's been ruled a suicide inside the million-dollar Park Ridge home of a man who, records show, was a longtime friend and

bank customer with five outstanding loans from Washington Federal for a total of nearly $1.8 million.

Twelve days later, on Dec. 15, federal bank regulators shut down Washington Federal for "unsafe or unsound practices" that the Federal Deposit Insurance Corp. continues to investigate, records show.

The FBI also is involved, according to Luke Casson, the lawyer for Gembara's widow.

Washington Federal was one of eight banks nationwide that failed in 2017, according to the FDIC, the federal agency that regulates financial institutions.

Some things stand out about this one, according to Casson, who has been conducting his own review of Washington Federal, whose probable losses have been pegged by the FDIC at $60 million.



John F. Gembara. | Provided photo

Casson says that what he's found has fueled his suspicion Gembara was involved in embezzling from the bank without his wife's knowledge.

"It looks like your garden-variety bank fraud — except this one involves a banker," the family's lawyer says. "There's $60 million that went out to people," but the bank's records show those loans "being paid off without them ever being paid off. Where'd the money go?"

And, despite the findings of the Cook County medical examiner's office and the Park Ridge police that Gembara killed himself at the bank customer's house about 25 miles

from his own home in Palos Hills, Casson says Gembara's wife Therese doubts he took his own life.



Attorney Luke Casson: "It looks like your garden-variety bank fraud — except this one involves a banker." | Andreou & Casson

It's not that she's in denial, according to Casson, who says he has been involved as an attorney in multiple cases involving people who killed themselves.

"The evidence is unusual for a suicide," the attorney says. "This is as strange as it comes."

Gembara was found dead inside the sprawling home of Marek Matczuk, police records show. Matczuk, a Polish immigrant, is a roofer-turned-developer who also did maintenance work at the bank and Gembara's home, according to Casson and Robert M. Kowalski, an attorney and developer who describes himself as a lifelong friend of Gembara and longtime customer of his bank.

Matczuk told police in the northwest suburb Gembara said he "needed to hide due to 'troubles' at the bank," police records show.

Matczuk told the police that, on Dec. 1, he and Gembara met at a property Matczuk owns in Chicago. Gembara called a friend who turned out to be out of town. So Matczuk told officers Gembara left his car in a garage at Matczuk's property. Matczuk said he told Gembara he could stay with him, and they drove to his home in Park Ridge.

Matczuk told police that he, his wife and their three children had dinner with Gembara, who stayed in the couple's master bedroom for the weekend, records show.

The following afternoon, Dec. 2, Matczuk's son drove Gembara to a nearby Home Depot in Niles to buy some green rope that he told officers Gembara said he needed to hang Christmas decorations at his southwest suburban home, according to police. Security footage reviewed by police confirmed they were in the store, where they also stopped to have a hot dog.

Matczuk told police that, after his family had dinner with Gembara, their guest went to the master bedroom for the night.

The next afternoon, Dec. 3, when they hadn't seen Gembara, Matczuk's wife said they should check on him, and the couple unlocked the bedroom door and found Gembara dead, according to police reports.

The records show Gembara was in a seated position, fully clothed, with his glasses on, and the green rope he'd bought at Home Depot was wrapped around his neck and tied to the bannister of a spiral case.

The reports say there were no signs of a struggle or defensive wounds on Gembara, who was 5-feet-7 and weighed 197 pounds.

There was no suicide note, though Gembara's wife got a one-word text from his phone, police records show. "Bye" was all it said.

Matczuk says he has been advised not to speak but was shaken up what happened: "I cannot talk to you. Very horrible for me, too."

Matczuk's home is being foreclosed on by U.S. Bank, which says in a foreclosure lawsuit filed last summer in Cook County circuit court that he and his wife owe $1.2 million from a mortgage. The suit also names two secondary lenders: JPMorgan Chase, which lent Matczuk $279,000, and Washington Federal, which held a third mortgage on the home, for $662,000, issued in 2007.



me tags

Case: 1:19-cr-00226 Document #: 249 Filed: 02/24/21 Page 49 of 94 PageID #:1444

Washington Federal Bank for Savings gave loans totaling over $1 million to Marek Matczuk between 2000 and 2005 for two homes in Wicker Park, including this one at 1633 N. Winchester Ave. Both remain unfinished and vacant. | Kevin Tanaka / Sun-Times

Records show Matczuk got four other loans from Gembara's bank — a $94,000 mortgage on a home in Des Plaines and three loans totaling slightly over $1 million between 2000 and 2005 for construction of two three-story homes in Wicker Park. The homes remain vacant, with construction work yet to be completed.

Frank Kaminski, Park Ridge's police chief, says his department was aware Gembara had a financial relationship with Matczuk and has discussed the case with the FDIC.

David Barr, a spokesman for the FDIC, says it will take about six months for the agency to issue a report outlining any bad loans Gembara's bank made, who got the money and whether any of it can be recovered.

The FDIC has the authority to sue to recover money and seek penalties against bank officials who fail in their fiduciary duties.

Any criminal charges would be pursued by the FBI, which won't comment on the case.

The FDIC routinely audits banks. But it apparently turned up trouble at Washington Federal thanks to a tip, according to Casson, who says he has spoken with an FBI agent involved in the investigation.



Washington Federal Bank for Savings, 2869 S. Archer, was shut down in December for "unsafe or unsound practices" days after its president was found dead in an apparent suicide. | Google Street View | Google Street View

Since the bank's forced closing in December, with about $166.3 million in assets and $144 million in deposits, its deposits have been assumed by Royal Savings Bank. Royal took over Washington Federal's main office at 2869 S. Archer Ave. and its lone branch at 1410 W. Taylor St. in Little Italy.

Royal, based on the East Side, took over only two of the loans made by Washington Federal. The rest are now in the hands of the FDIC.

Any of the bank's losses from loans would be covered by an FDIC fund that's financed by the nation's banks.

That same fund also guarantees bank deposits up to $250,000. But about 50 customers could lose a portion of the money they deposited with Washington Federal because they exceeded that threshold.

Case: 1:19-cr-00226 Document #: 249 Filed: 02/24/21 Page 51 of 94 PageID #:1446

Kowalski says Matczuk was once his roofer and that he introduced him to Gembara years ago.

Kowalski is entangled in a contentious divorce with Martha Padilla, a onetime aldermanic candidate in the 25th Ward. Padilla's lawyers subpoenaed Gembara to give a deposition and Washington Federal to turn over Kowalski's financial records in 2016. Kowalski and the bank's lawyers filed motions to block those moves.

Separately, last October, the Illinois Supreme Court suspended Kowalski's law license after he deposited $2,500 in escrow funds from a client in his personal account at Washington Federal, records show.

Washington Federal had a history of lending money to finance homes and small apartment buildings that often were leased to tenants with taxpayer-subsidized Section 8 housing vouchers.



Ald. Patrick Daley Thompson. | Sun-Times files

Case: 1:19-cr-00226 Document #: 249 Filed: 02/24/21 Page 52 of 94 PageID #:1447

Its customers also have included some well-known names. Among them is the 11th Ward Regular Democratic Organization, controlled by the Daley family for 70 years. Ald. Patrick Daley Thompson (11th), whose uncle John Daley is a commissioner on the Cook County Board and heads the 11th Ward organization, says they got an $80,000 loan from the bank shortly before Gembara's death to rehabilitate its building at 3659 S. Halsted St.

The alderman says they needed money for "new lighting, flooring" and that he has contacted the FDIC to figure out how to proceed with repayments.

"It's a horrible situation," Thompson says of Gembara's death. "This whole thing sounds so uncharacteristic. He was a quiet, unassuming guy, always talking about his kids."



Cinespace Chicago Film Studios' Alex Pissios. | Provided photo | Provided photo

Among others to have gotten loans from Washington Federal is Alex Pissios, president of Cinespace Chicago Film Studios, where movies and TV shows including the NBC-TV hits "Chicago Fire" and "Chicago P.D." are produced.

Before taking over the West Side studio that opened in 2011, Pissios was a real estate developer working with Edward Gobbo to build homes near the United Center with loans from Washington Federal and other banks.

Both men filed for bankruptcy protection — Pissios in 2011, Gobbo the following year — while they owed money to Gembara's bank. It's unclear whether the loans ever were repaid.

Pissios's studio recently was in the news with the indictment last year of longtime top Chicago Teamsters union official John T. Coli Sr., who is accused of extorting $325,000 from Cinespace.

Though Gobbo owed Washington Federal $12 million when he filed for bankruptcy, the bank continued to lend him and his family money, records show. They got 15 loans for a total of $1.6 million last year to finance homes primarily on the South Side, the West Side and in Waukegan.

Gobbo is a nephew of William Hanhardt, a former Chicago Police Department chief of detectives who went to prison for running a mob-tied jewelry ring and died last year.

Attorneys for Gobbo and Pissios wouldn't comment.

Gembara took over the bank's executive role after his father Emil Gembara retired, though the father remained chairman of the board until his death in 2005.

Gembara's two brothers and sister also had ownership stakes in the bank, according to Casson.

The sister, Janice Weston, was a Washington Federal vice president and was on the board of directors with John Gembara. Washington Federal had three other board

members, including William Mahon of Bridgeport, a high-ranking official in the Chicago Department of Streets and Sanitation.

None of the former board members would comment.

Gembara was the father of two grown daughters. People who knew him said he was a devout Catholic.

As the national economy nosedived in 2008, Gembara sent a message to his bank's customers to reassure them.

"We are well prepared to ride out the economic storm," he wrote. "Our Bank is financially secure and we have never engaged in risking lending practices. For 95 years we have been conservative and consistent in our business practices and we will continue to in the years to come."

**MORE FROM THE WATCHDOGS:** Kratom, health supplement targeted by FDA, linked to 9 deaths in Cook County

1                    IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ILLINOIS
2                       EASTERN DIVISION

3   UNITED STATES OF AMERICA,       )  Docket No. 19 CR 00226-1
                              )
4               Plaintiff,     )  Chicago, Illinois
                              )  October 16, 2020
5             v.           )  11:06 a.m.
                              )
6   ROBERT KOWALSKI,            )
                              )
7               Defendant.     )

8

9           TRANSCRIPT OF TELECONFERENCE PROCEEDINGS
                RULE TO SHOW CAUSE HEARING
         BEFORE THE HONORABLE VIRGINIA M. KENDALL
10

11  APPEARANCES:  (Via Teleconference)

12

13  For the Government:     UNITED STATES ATTORNEY'S OFFICE by
                       MR. BRIAN PATRICK NETOLS
                       MR. JEREMY DANIEL
14                     MS. MICHELLE PETERSEN
                       Assistant United States Attorneys
15                     219 South Dearborn Street
                     Chicago, Illinois  60604
16

17  For the Defendant:      FEDERAL DEFENDER PROGRAM by
                       MR. IMANI CHIPHE
18                     55 East Monroe Street, Suite 2800
                     Chicago, Illinois  60603
19

20

21

22  Court Reporter:         GAYLE A. McGUIGAN, CSR, RMR, CRR
                     Official Court Reporter
23                     219 S. Dearborn Street, Room 2504
                     Chicago, IL 60604
24                     312.435.6047
                     gayle_mcguigan@ilnd.uscourts.gov
25

```
 1        (Proceedings had via teleconference.)

 2            THE CLERK:  Good morning.  Court resumes session.

 3            Case number 19 CR 226, Defendant 1, U.S. versus Robert

 4    Kowalski.

 5            THE COURT:  Good morning.  This is Judge Kendall.

 6    You're on the record and in open court, so please state your

 7    name and spell your last name.

 8            THE DEFENDANT:  My name is Robert Kowalski.

 9    K-O-W-A-L-S-K-I.

10            THE COURT:  Okay.  Good morning, Mr. Kowalski.

11            MR. CHIPHE:  Good morning, your Honor.  Imani Chiphe,

12    Federal Defender Program.  Chiphe is C, as in Charles, H-I-P,

13    as in Peter, H-E.

14            THE COURT:  Good morning, Mr. Chiphe.

15            MR. NETOLS:  On behalf of the government, your Honor,

16    Brian Netols.  N-E-T-O-L-S.

17            THE COURT:  Good morning, Mr. Netols.

18            PRETRIAL SERVICES OFFICER:  Good morning, your Honor.

19    Matthew Bonestroo.  B, as in boy, O-N-E-S-T-R-O-O, on behalf of

20    Pretrial Services.

21            THE COURT:  Good morning, Mr. Bonestroo.

22            Okay.  Is that everyone?

23        (Unintelligible crosstalk.)

24            MS. PETERSEN:  Michelle Petersen, P-E-T-E-R-S-E-N, is

25    also here for the government.
```

1       THE COURT:  Good morning, Ms. Petersen.

2       I think there was someone else speaking.  Was there?

3       MS. LIRA:  Yes.  Hi.  My name is Natalie Lira.

4       THE COURT:  What is --

5       MR. DANIEL:  Good morning, your Honor.  Jeremy Daniel

6   also on behalf of the United States.

7       THE COURT:  Good morning, Mr. Daniel.

8       Spell the name for -- Natalie, what was your last

9   name?

10      MS. LIRA:  L-I-R-A.

11      THE COURT:  And who are you?

12      MS. LIRA:  I have a child with Robert Kowalski.

13      THE COURT:  Okay.  All right.  Thank you.

14      MR. NETOLS:  Your Honor, if I may.  If there's a

15  hearing, Ms. Lira would be a witness.  I don't know what your

16  procedure would be as to whether she should --

17      THE COURT:  Got it.

18      MR. NETOLS:  -- or should not be on the call.

19      THE COURT:  Okay.  I think -- I think she'll be fine

20  right now.  So let's -- let me hear -- well, because she's

21  going to potentially give a factual basis, Ms. Lira, I'm going

22  to ask that -- before you hang up, I'd like you to give your

23  phone number to my courtroom deputy, and then I'm going to have

24  you hang up and we'll call you back if we need you to call back

25  in.

1          So can we get your number?

2          Do you have it, Lynn?

3          THE CLERK:  I don't.

4          MS. LIRA:  Would you like me to give it to you right

5    now?

6          THE COURT:  I would, please.

7          MS. LIRA:  Okay.  Xxx-xxx-xxxx.

8          THE COURT:  Okay.  Xxx-xxx-xxxx.  Right?

9          MS. LIRA:  Yes.

10         THE COURT:  Okay.  All right.  What I want to do is

11   talk to the lawyers first.  And if we need you in a minute, my

12   courtroom deputy will call you, and then we'll have you call

13   back in.  Okay?

14         MS. LIRA:  Okay.  Thank you.

15         THE COURT:  Thank you very much.

16         MS. LIRA:  Bye.

17         THE COURT:  Bye.

18         Okay.  Well, I received the report from the Pretrial

19   Services Officer, Ms. Minarik.  And I called this rule to show

20   cause.  And I want to hear first from the government.

21         Is that going to be you, Mr. Netols?

22         MR. NETOLS:  It will be, your Honor.

23         THE COURT:  Okay.  Go ahead.

24         MR. NETOLS:  Your Honor, the government's position is

25   that the defendant's pretrial release should be revoked.

1       The report itself indicates two violations.  First is

2   failure to report change of address.  And his address is

3   supposed to be, my understanding, is 5233 West 87th.  He's not

4   living there.

5       More problematic is that it appears -- and I know that

6   the Pretrial Services Officer can speak to this -- that the

7   monitoring officer has just not been able to contact

8   Mr. Kowalski.

9       Now, that alone I think would not have the gravity it

10  does in this case, but Mr. Kowalski has a long history of not

11  following the orders of this court and in state court and the

12  bankruptcy court.

13      In addition, the order -- the violation is failed --

14  failure to report law enforcement to Pre-Trial Services.  After

15  reviewing that, I'm not quite sure that's correct.  And that

16  actually is problematic because, as I'll go into in some detail

17  later, the problem is he -- with respect to an order of

18  protection that Ms. Lira had sworn out against him, law

19  enforcement, as with Pretrial Services, had difficulty locating

20  Mr. Kowalski, so they haven't been able to serve it.

21      And if you look at the police report, it looks like

22  Mr. Kowalski was -- actually left the scene before the police

23  were there -- arrived.  So, technically, with respect to the

24  incident at Ms. Lira's residence that's the subject of the

25  Oak Lawn police report, I don't think he actually had contact

1    with the police, but that's probably not a good thing that he

2    didn't stick around.

3            So I think the basis -- the one basis that I think is

4    accurate on the report as it's written is they are to basically

5    notice Pretrial Service of his address and stay in contact.

6    But I think also, you know, more problematic is the content of

7    the report and the -- there's a lot of noise in the background.

8    I'm assuming you can hear me, your Honor.

9            THE COURT:  I can hear you.

10           I think you should start at the beginning because I

11   read the police report that was provided to me, and I read

12   Ms. Minarik's report.  And I just think we need to go through

13   it chronologically and not worry about the -- you know, what

14   violation it constitutes yet.

15           MR. NETOLS:  Sure.

16           THE COURT:  And then once I hear that, I can make a

17   determination as to whether the report has identified a

18   violation or a correct violation.  Okay?

19           MR. NETOLS:  Yes, your Honor.

20           With respect to the first violation, the first report

21   indicates that the Pretrial Service Officer, Ms. Minarik, has

22   been -- was apprised of a temporary order of protection with

23   respect to Mr. Kowalski that was sworn out by Ms. Lira.  And

24   she also learned of a police report that was written on the

25   conduct that was apparently the cause of the order of

1    protection.  She has not been able to contact Ms. Minarik --
2    Mr. Kowalski, not at his purported residence, 5233 West 87th
3    Street, or by phone.  And so that is -- that would be the first
4    basis --
5              THE COURT:  Okay.
6              MR. NETOLS:  -- and in chronology in the report.
7              The second, as I indicated, is a little more
8    problematic, and I don't think it's technically supported, and
9    that is the issue of the -- part of the report goes on to talk
10   about police activity at the residence and an order of
11   protection.  But from reviewing the materials, it doesn't look
12   like Mr. Kowalski has been served by the order of -- with the
13   order of protection, and it doesn't look like that he was
14   present at the police activity, it looks like -- because he
15   left before the police arrived and because the -- the local law
16   enforcement had not been able to serve the order of protection.
17   That's the second basis.
18             And that -- and then the rest of it, your Honor, I
19   think is -- is the reason why the government agrees that there
20   should be a hearing, and that is the content of the police
21   report and the order -- and the fact of the order of
22   protection.  It indicates that Mr. Kowalski has another
23   violation, and that would be committing a state crime while on
24   release, and that would be a battery of Ms. Lira.
25             And in the Pretrial Services report at page 2 at the

1    top paragraph, it says that Lira told the investigating officer

2    that Kowalski struck her in the face, nose during an argument.

3    And there's a police report that that -- in which she made the

4    same statement to a police officer and then subsequently she

5    sought an order of protection, which as I indicated has not

6    been served.

7             So the government's first issue is what is

8    Mr. Kowalski's position as to whether he's changed his address

9    and whether he's notified Pretrial Services.  And that's

10   relatively straightforward.

11            The issue of his -- the crime that he appears to have

12   committed with respect to Ms. Lira is I think something

13   requiring more of a hearing, and that's why the issue of

14   Ms. Lira being a witness came up.

15            THE COURT:  Understood.  Okay.

16            All right.  So the way that I look at the situation is

17   when I receive the violation report, certainly the fact that he

18   is not in pocket and the Pretrial Services Officer is having

19   difficulty reaching him is a concern of mine, especially based

20   upon his history of not following through with certain orders,

21   both here and in the bankruptcy court.  But I'm much more

22   concerned about what occurred on, let's see, was it the 13th?

23   October 13th, out in Oak Lawn.

24            So, Mr. Chiphe, do you want to enlighten me?

25            MR. CHIPHE:  Yes, your Honor.  Thank you.  Yeah, I

1    guess we can start I guess kind of, you know, chronologically.

2           So when I looked at Ms. Minarik's report, it says that

3    Mr. Kowalski wasn't present at the 52 -- 5233 West 87th Street

4    address.  He wasn't, you know, present there, your Honor,

5    because I think that was the scene of the incident, I believe.

6    That address is the home that Mr. Kowalski was sharing with

7    Ms. Lira.  That home -- I think that building is owned by those

8    who participated in the beating of Mr. Kowalski's sister.  So

9    that's why he's no longer at that address.  And he called me

10   and he talked, just trying to make sure he wasn't involving

11   himself in any -- anything else concerning what took place.

12   And so that's why he wasn't at that address or couldn't be

13   contacted at that address, to be frank.

14          I don't know what the situation was with his phone.

15   Ms. Minarik contacted me.  I was able to reach out to

16   Mr. Kowalski, and eventually him and Ms. Minarik, they did

17   talk, and they contacted each other and they did speak.

18          So that's the issue dealing with him not being at the

19   address and not being in contact with Ms. Minarik.

20          Your Honor, with regard to this -- to this incident

21   that took place at the 5233 address, my understanding from my

22   discussion with Mr. Kowalski and my reading of the report,

23   Mr. Kowalski told me that he didn't have any -- didn't really

24   take part in what took place.  And what took place was, just

25   based on my reading of the report, was his girlfriend's family

1  member attacked his sister, Jan Kowalski, in such a manner that

2  she had to be rushed to the emergency room and taken to the

3  hospital. Mr. Kowalski did not get involved and tried not to,

4  you know, get involved. Ultimately, he didn't -- didn't want

5  any police contact, he didn't want to be arrested, he didn't

6  want to be involved at all.

7         My understanding, just from reading the report, is

8  that the attack that took place wasn't instigated by the

9  Kowalskis. Now, I do think there was some arguing, some --

10  clearly some issue going on, something like that. You know,

11  this doesn't happen -- doesn't take place in a vacuum. But he

12  wasn't involved. And there was, based on the evidence I have

13  now, no complaints sworn out against him.

14         And so that's just kind of where we have it right now,

15  your Honor.

16         THE COURT: Okay. Well, it doesn't sound like a

17  disagreement. It sounded like a regular brawl. And two

18  people -- two people were injured in the brawl, your sister

19  being one of them, who, according to the police report, was

20  lying, appeared unconscious in the driveway and raced to the

21  ER -- I mean his sister. And then, of course, the other woman

22  who has the injury to her nose and blood coming from her nose.

23         So I do need to get to the bottom of this because

24  that's not the kind of behavior or situation that he ought to

25  be in while he's on my supervised release -- pretrial release,

1    I should say.

2         So I think I'd like to hear from Ms. Lira today and

3    I'd like to have her testimony to give to me about what

4    happened that day.  I've got competing versions.  And it would

5    be very helpful.

6         Is that who you intended to call, Mr. Netols?

7         MR. NETOLS:  Yes, if you want to go to the hearing

8    today.

9         I also need, if I could point out, Mr. Chiphe didn't

10   address the issue about the failure to report residence.  He

11   focused on the fact of why he wasn't there on a given day.

12   It's -- from -- from the -- from the Pretrial Services report,

13   it's clear that he hasn't lived there in more than ten days.

14   And so that really is the issue.  He didn't keep Pretrial

15   Services apprised of his residence.

16        And, you know, the other issue, frankly, is wholly

17   apart with whatever happened there.  And we'll get into that.

18   Mr. Kowalski was not living there.  And he and his sister, the

19   co-defendant, actually came to a place that was not their

20   residence.  In other words, the issue wouldn't have happened if

21   they didn't -- didn't end up going there.

22        THE COURT:  Right, right.

23        MR. NETOLS:  And that --

24        THE COURT:  I understand.

25        MR. NETOLS:  -- kind of initiates the whole situation.

1        Yes, I have not spoken with Ms. Lira.  I'd be happy to

2   ask her to relate the events.

3        I notice that she declined to press charges, based on

4   what was in the police report and what was in the Pretrial

5   Services report.  So that may tell you what the testimony may

6   end up being.

7        THE COURT:  Oh, I see.  So you didn't ask her to

8   appear today?  How did this occur?

9        MR. NETOLS:  I -- my understanding is that

10  Mr. Kowalski asked her to appear today.

11       THE COURT:  Oh, I see.  I thought you were bringing

12  her as a witness for you.

13       MR. NETOLS:  No, I'm not -- we had agents go out and

14  talk to her last night, late last night.  And she indicated

15  that she still loved Mr. Kowalski, and she recanted the

16  statements that she made to the police, to the Pretrial

17  Services Officer, and apparently in the order of protection.

18       THE COURT:  Okay.  Well --

19       MR. NETOLS:  And so --

20       THE COURT:  -- that's not -- that's not going to help

21  me today then.  That's not going to help me.

22       MR. NETOLS:  No.

23       THE COURT:  Mr. Chiphe, had you intended to call her?

24       MR. CHIPHE:  I had not, your Honor.

25       THE COURT:  Okay.

1    MR. CHIPHE: You know, I spoke with Mr. Kowalski. I
2    didn't get a chance to speak to Ms. Lira. I kind of, you know,
3    anticipated what her testimony would be or what she would say.
4    And I didn't think -- based on that, I didn't think we needed
5    her for today, to be quite frank.
6          THE COURT: Right, okay. My misunderstanding --
7          MR. CHIPHE: Your Honor?
8          THE COURT: Yes.
9          MR. CHIPHE: If I might, I just want to circle back to
10   the -- Mr. Kowalski not reporting the change of address.
11         I do agree that is a violation. I talked to
12   Mr. Kowalski about that. I think, you know, he was
13   (unintelligible) --
14         COURT REPORTER: I'm sorry. Excuse me. This is the
15   court reporter. Would you repeat that, please?
16   "I talked to Mr. Kowalski about that."
17         MR. CHIPHE: I talked to Mr. Kowalski about that. And
18   I think he's hoping to resolve the situation with Ms. Lira and
19   be able to move back in. He wants to move back home. And so,
20   you know, I talked to him. I told him even if it's for a few
21   days, he still needs to let Ms. Minarik know that he, you know,
22   moved out for a few days. Whether he hopes to return or not,
23   he still needs to let her know. So I think that was the reason
24   he left the home was because of, you know, because of the
25   fight, you know.

1          And so, I understand, it is a violation.  And we

2   recognize that.  And I spoke to him about that, put him in

3   touch with Ms. Minarik.  But that was the reason he left the

4   home.  He was hoping that he was able to reconcile with

5   Ms. Lira to be able to move back in.

6          MR. NETOLS:  Your Honor, if I may?  Brian Netols.

7          THE COURT:  Please.

8          MR. NETOLS:  You know, what Mr. Chiphe I think is not

9   really addressing is the fact that there is a protective order

10   in place, although it's not been successfully served.  And my

11   understanding, from just looking at the NCIC, is that it would

12   protect him from entering or remaining at the resident's

13   household inhabited by the protected person.  So I'm not sure,

14   under the term of this order, how Mr. Kowalski could return to

15   the residence at 5233 West 87th.

16          THE COURT:  When did she get the protective order?

17          MR. NETOLS:  Let's see.  Looks like it was 10/8.  The

18   incident with the battery that's on the police report was 10/5

19   and then protective order was on 10/8.  It expires on 10/29.

20          MR. CHIPHE:  So that's last week.

21          THE COURT:  I didn't hear whoever said something.  So

22   that's last week did you --

23          MR. CHIPHE:  Yes.  It's Imani Chiphe, your Honor.

24   Yeah, it looks like the protective order was entered last week.

25          THE COURT:  Okay.

1      MR. CHIPHE:  And so ...

2      THE COURT:  What's going on with Jan Kowalski?  Is she

3  out of the hospital?

4      THE DEFENDANT:  Yes, your Honor.  She's recovering.

5  She's a little bit sore, but she's going to be okay.

6      THE COURT:  And that was Mr. Kowalski speaking, right?

7      (Unintelligible crosstalk.)

8      MR. CHIPHE:  It was, your Honor.

9      In addition, just for the Court's information, and I

10  think Pretrial, I think, already knows this, that Mr. Kowalski

11  at this time is residing with Jan Kowalski.

12      THE COURT:  I didn't hear that last one.  He's

13  residing with Jan Kowalski?

14      MR. CHIPHE:  Yes, your Honor.

15      THE COURT:  Okay.  Got it.

16      All right.  Mr. Bonestroo, what can you tell me about

17  what you know and what you've gathered, please?

18      PRETRIAL SERVICES OFFICER:  Your Honor, Matthew

19  Bonestroo on behalf of Pretrial Services.

20      I did review Ms. Minarik's notes.  Following the

21  filing of the violation report, Mr. Kowalski did contact Ms.

22  Minarik on the 14th of October --

23      COURT REPORTER:  Excuse me --

24      THE COURT:  Following the filing of Ms. Minarik's

25  report, Mr. Kowalski contacted me.

1          Go ahead.

2          PRETRIAL SERVICES OFFICER:  And then prior to that,

3    the last telephone contact that Ms. Minarik had with the

4    defendant was on September 21st.

5          THE COURT:  Okay.

6          PRETRIAL SERVICES OFFICER:  There were multiple

7    attempts via email, it appears, to get Mr. Kowalski to respond,

8    as well as via phone, that were unsuccessful earlier in

9    October.

10         And as far as the conduct alleged, there's nothing

11   additional besides what's contained in the violation report.

12         THE COURT:  Okay.  So he contacted Ms. Minarik after

13   she filed the report; is that correct?

14         PRETRIAL SERVICES OFFICER:  Correct --

15         THE DEFENDANT:  No.

16         THE COURT:  Who is saying "no"?

17         THE DEFENDANT:  Pardon me, your Honor.  Robert.

18         THE COURT:  Okay.  All right.  So, again, I'm talking

19   to Mr. Bonestroo right now.

20         So your understanding is that he contacted you after

21   she filed the report, correct?

22         PRETRIAL SERVICES OFFICER:  That is based upon the

23   case notes that Ms. Minarik has, that's what it appears --

24         THE COURT:  Okay.

25         PRETRIAL SERVICES OFFICER:  -- happened.  There was a

```
1   telephone call following the filing of the report.

2           THE COURT:  Okay.  And also where was he supposed to

3   be living between 9/21 and the filing of the report?

4           PRETRIAL SERVICES OFFICER:  His reported address was

5   5233 West 87th Street in Oak Lawn.

6           THE COURT:  Okay.  So he was not there?  Is that

7   correct?

8           PRETRIAL SERVICES OFFICER:  Correct.

9           MR. NETOLS:  Your Honor, Brian Netols.  If I could?

10          At page 2, it says that his -- with respect to Tiffany

11  Minarik's attempts to contact the defendant, it says his phone

12  number has been disconnected.

13          THE COURT:  Okay.  So that also is a violation not to

14  inform her of the new telephone number, right?

15          THE DEFENDANT:  Well, I had the same number.  I did

16  not have possession of this phone.

17          THE COURT:  Okay.  So I want to say one thing to you,

18  Mr. Kowalski.  While you are on the telephone and not in the

19  same room with your attorney, anything that you say can be used

20  against you or as an admission.  So if you want to talk with

21  your attorney, we'll have a procedure where you talk with your

22  attorney.  Otherwise, anything you say to me I can use.

23          Do you understand that?

24          THE DEFENDANT:  I do.  Yes, Judge.

25          THE COURT:  Okay.  I just want to make sure.
```

1    MR. CHIPHE:  Your Honor?

2    THE COURT:  Go ahead.

3    MR. CHIPHE:  Your Honor, this is Imani Chiphe.  If I

4    might?

5    And so Mr. Kowalski and I spoke -- did talk last

6    Wednesday.  I do believe that his phone somehow got misplaced,

7    was taken out of his possession during the -- that he didn't

8    have possession of his phone for a period of time.

9    COURT REPORTER:  I'm sorry, didn't have?

10    MR. CHIPHE:  He did not.  He did not have possession

11    of his phone for a period of time after the incident that took

12    place.  He does still have the same phone number.  He hasn't

13    changed his phone number.  He has the same number, and it's the

14    number that he spoke to Ms. Minarik on earlier this week.

15    Now, with regard to what Mr. Bonestroo relayed about

16    the lack of contact between Ms. Minarik and Mr. Kowalski, I

17    don't know.

18    I do know that Ms. Minarik emailed me I think on

19    Mon -- Tuesday and -- about what was going on.  And I forwarded

20    that email to Mr. Kowalski.  I spoke to him I think either

21    Tuesday afternoon or Wednesday morning, I can't remember when,

22    and he had his phone back, and instructed him to make sure he

23    gets in touch with Ms. Minarik, and he said that he did talk to

24    her.

25    THE COURT:  So what is he doing right now while he's

1    on bond?

2          MR. CHIPHE:  Your Honor, I'm not aware of Mr. Kowalski

3    being employed right now.  I think that's correct.  I think he

4    might be able to speak to that.  But I'm not aware of him being

5    employed right now.

6          THE COURT:  Okay.  Because he is -- he's out on bond.

7    And the police report, of course, describes an altercation that

8    occurred between these women based upon one of them being

9    arrested for battery at the Chicago Ridge bar owned by him, in

10   part, correct?

11         THE DEFENDANT:  No.  No.  That's not correct.

12         THE COURT:  Owned by the family and --

13         MR. CHIPHE:  No, I think --

14         THE COURT:  -- Jan and Natalie's boyfriend defender

15   Robert Kowalski.

16         Am I mistaken about that?

17         MR. CHIPHE:  Go ahead, Mr. Kowalski.

18         THE DEFENDANT:  I don't have an interest in that bar.

19         There was an incident earlier in the day, whatever

20   that -- was it the 5th or -- whatever that day was --

21         THE COURT:  Okay.

22         THE DEFENDANT:  -- that, you know, Ms. Lira came into

23   the bar and there was some activity.

24         THE COURT:  Okay.

25         THE DEFENDANT:  You know, there's a -- there's a

1   camera video that captured whatever happened.  I wasn't present
2   at that time.
3              THE COURT:  Okay.  Here's what I'm going to do.
4              First of all, Ms. Minarik, who is not on the phone
5   because she's having Mr. Bonestroo cover for her today,
6   Ms. Minarik's report says that the supervision of Mr. Kowalski
7   has been poor and that this is her third violation that she has
8   submitted to the Court.
9              They just ended the mental health counseling because
10  he had a number of missed no-show appointments.  And after
11  being admonished on several occasions for failing to appear and
12  having a long, lengthy discussion with the counselor and him,
13  it was determined that he had benefited all that was possible
14  from treatment.
15             I'm not so sure what that means.
16             But the Pretrial Services Officer Minarik, who has
17  been onboard this whole time, has concern that his
18  non-appearance and danger to the community has heightened based
19  upon these violations.
20             And I'm concerned, too.  But I feel as though I need a
21  little bit more information.
22             And so what would be helpful for me is to set this
23  over for a hearing next week to talk about this incident that
24  occurred in Oak Lawn because two women were injured.  One
25  arrested, one hospitalized.  And Mr. Kowalski and Jan Kowalski

```
1    were on the scene, according to the police report.  And I

2    need -- and now one woman who has filed an order of protection

3    against Mr. Kowalski.  And I need to know what the situation is

4    there.

5              So I'd like to have a hearing as early as Monday or

6    Tuesday or Wednesday in order to get to the bottom of this and

7    see if you can call some officers or someone to enlighten me

8    about this situation.

9              But it's not going in the right direction,

10   Mr. Kowalski, that is for certain.

11             So can --

12             THE DEFENDANT:  I think the video that we have will

13   clarify a lot, your Honor.  There's a video of each occurrence.

14             THE COURT:  Okay.  Again, Mr. Netols, do you have

15   anything to say about having a hearing on this violation?  Or

16   on this incident?

17             MR. NETOLS:  I agree, your Honor needs more

18   information.  I am unaware of any videos.  If Mr. Kowalski has

19   videos, he should tender them to his attorney to be provided to

20   the Court.  I can tender the police report from the earlier

21   incident.  That police report I understand indicates that Jan

22   Kowalski manages that -- that bar in Chicago Ridge.

23             And that's about all.

24             THE COURT:  Okay.  All right.  So what day do you want

25   to do this hearing?  What do your schedules look like?
```

```
1          MR. NETOLS:  I'm relatively free the first two days of
2     the week.
3          THE COURT:  Mr. Chiphe, how does it look for you?
4        (No response.)
5          THE COURT:  Mr. Chiphe, did I lose you, sir?
6          MR. CHIPHE:  Oh.  I apologize, your Honor.  I had it
7     on mute.  I apologize.
8          THE COURT:  Oh, no trouble.
9          MR. CHIPHE:  Tuesday --
10        (Unintelligible crosstalk.)
11         THE COURT:  I'm sorry, what?
12         MR. CHIPHE:  Tuesday or Wednesday would be fine.
13         THE CLERK:  Tuesday -- would this be in person, your
14    Honor?
15         THE COURT:  I think it should be in person.  Can you
16    do it in person?
17         MR. CHIPHE:  I need to recheck my schedule.
18         THE COURT:  Okay.
19         MR. NETOLS:  Your Honor, I need to check -- I need to
20    check with my co-counsel because I really can't.
21         THE COURT:  Oh, yes.  Okay.  Well, we can do it by
22    video.  We'll set it up to do by video.  Okay?
23         MR. CHIPHE:  Okay.
24         THE COURT:  Let's do it on -- let's do it on Tuesday
25    by video.  Can you do that?
```

1      MR. NETOLS: That would be fine.

2      THE COURT: Okay. So let's set it up for --

3      MR. CHIPHE: Yes, that's fine.

4      THE COURT: -- 10:00 o'clock in the morning on Tuesday

5      by video.

6      And Lynn will reach out to you and tell you how to do

7      that. Okay? Because we'll need to know who your witnesses

8      are, et cetera, so we can arrange for this.

9      MR. NETOLS: And we'll do some -- Brian Netols, your

10     Honor.

11     We'll do some investigation --

12     THE COURT: I appreciate that.

13     MR. NETOLS: If we reach the conclusion that, you

14     know, that it might be resolved short of a hearing, we'll

15     inform the Court as soon as possible.

16     THE COURT: Okay. I'll enter and continue this until

17     Tuesday at 10:00 a.m.

18     THE DEFENDANT: Thank you, Judge.

19     THE COURT: Thank you, everyone.

20     MR. CHIPHE: Thank you, your Honor.

21     THE COURT: Take care.

22     (Proceedings concluded at 11:38 a.m.)

23

24

25

C E R T I F I C A T E

I certify that the foregoing is a correct transcript, to the extent possible, of the record of proceedings in the above-entitled matter given the limitations of conducting proceedings via telephone.


*/s/ GAYLE A. McGUIGAN*                                    *February 2, 2021*
GAYLE A. McGUIGAN, CSR, RMR, CRR
Official Court Reporter

**COURT REPORTER: [3]** 13/14 15/23 18/9
**MR. CHIPHE: [25]**
**MR. DANIEL: [1]** 3/5
**MR. NETOLS: [25]**
**MS. LIRA: [8]** 3/3 3/10 3/12 4/4 4/7 4/9 4/14 4/16
**MS. PETERSEN: [1]** 2/24
**PRETRIAL SERVICES OFFICER: [9]** 2/18 15/18 16/2 16/6 16/14 16/22 16/25 17/4 17/8
**THE CLERK: [3]** 2/2 4/3 22/13
**THE COURT: [76]**
**THE DEFENDANT: [12]** 2/8 15/4 16/15 16/17 17/15 17/24 19/11 19/18 19/22 19/25 21/12 23/18

**1**
**13th [1]** 8/23
**19 CR 226 [1]** 2/3

**2**
**21 [1]** 17/3
**21st [1]** 16/4
**226 [1]** 2/3
**29 [1]** 14/19

**A**
**above [1]** 24/4
**above-entitled [1]** 24/4
**appearance [1]** 20/18

**B**
**Bonestroo [5]** 2/21 15/16 16/19 18/15 20/5

**C**
**cetera [1]** 23/8
**Chicago [2]** 19/9 21/22
**Chicago Ridge [2]** 19/9 21/22
**Chiphe [6]** 2/14 8/24 12/23 14/8 22/3 22/5
**co [2]** 11/19 22/20
**co-counsel [1]** 22/20
**co-defendant [1]** 11/19
**counsel [1]** 22/20
**CR [1]** 2/3

**D**
**Daniel [1]** 3/7
**defendant [1]** 11/19

**E**
**entitled [1]** 24/4
**et [1]** 23/8
**et cetera [1]** 23/8

**H**
**H-E [1]** 2/13
**H-I-P [1]** 2/12

**K**
**K-O-W-A-L-S-K-I [1]** 2/9
**Kowalski [38]**
**Kowalski's [2]** 8/8 9/8

**L**
**L-I-R-A [1]** 3/10
**Lawn [4]** 5/25 8/23 17/5 20/24
**Lira [14]** 3/15 3/21 5/18 6/23 7/24 8/12 8/14 9/7 11/2 12/1 13/2 13/18 14/5 19/22
**Lira's [1]** 5/24

**Minarik [14]** 4/19 6/21 7/1 9/19 13/21 14/3 16/3 16/12 16/23 18/14 18/16 18/18 18/23 20/4
**Minarik's [5]** 6/12 9/2 15/20 15/24 20/6
**Mr. [56]**
**Mr. Bonestroo [5]** 2/21 15/16 16/19 18/15 20/5
**Mr. Chiphe [6]** 2/14 8/24 12/23 14/8 22/3 22/5
**Mr. Daniel [1]** 3/7
**Mr. Kowalski [38]**
**Mr. Kowalski's [2]** 8/8 9/8
**Mr. Netols [4]** 2/17 4/21 11/6 21/14
**Ms. [35]**
**Ms. Lira [14]** 3/15 3/21 5/18 6/23 7/24 8/12 8/14 9/7 11/2 12/1 13/2 13/18 14/5 19/22
**Ms. Lira's [1]** 5/24
**Ms. Minarik [14]** 4/19 6/21 7/1 9/19 13/21 14/3 16/3 16/12 16/23 18/14 18/16 18/18 18/23 20/4
**Ms. Minarik's [5]** 6/12 9/2 15/20 15/24 20/6
**Ms. Petersen [1]** 3/1

**N**
**N-E-T-O-L-S [1]** 2/16
**Netols [4]** 2/17 4/21 11/6 21/14
**no [1]** 20/10
**no-show [1]** 20/10
**non [1]** 20/18
**non-appearance [1]** 20/18

**O**
**o'clock [1]** 23/4
**O-N-E-S-T-R-O-O [1]** 2/19
**Oak [4]** 5/25 8/23 17/5 20/24
**Oak Lawn [4]** 5/25 8/23 17/5 20/24
**October [1]** 8/23
**October 13th [1]** 8/23

**P**
**P-E-T-E-R-S-E-N [1]** 2/24
**Petersen [1]** 3/1
**Pre [1]** 5/14
**Pre-Trial [1]** 5/14

**R**
**Ridge [2]** 19/9 21/22

**S**
**September [1]** 16/4
**September 21st [1]** 16/4
**show [1]** 20/10
**States [1]** 3/6

**T**
**Trial [1]** 5/14

**U**
**U.S. [1]** 2/3
**U.S. versus [1]** 2/3
**United [1]** 3/6
**United States [1]** 3/6

**V**
**versus [1]** 2/3

**X**
**xxx [4]** 4/7 4/7 4/8 4/8
**Xxx-xxx-xxxx [2]** 4/7 4/8



Exhibit C



**6:43**

< 326

+1 (312) 446-2443 >

Wed, Oct 21, 1:18 PM

Can I call you later?

Give me 5 min

Can u please send me address

Ok thank u

219 s Dearborn

Ok on my way

I will meet you in main lobby instead of 5th floor. New CoviD rules

Ok

Delivered

If it's not me I will send either special agent Jacob Evans or Special Agent Sean Stephenson

Sorry I didn't mean to be short when you called but I was on the phone and that text was automatically generated.
Let me know if you have any other questions!



Exhibit D

6:21



At a meeting from a bad 80s movie lol

Exhibit F

# CHICAGO SUN✶TIMES

Log In |
Try 1
month for
$1    Subscribe

THE WATCHDOGS    NEWS    CHICAGO

# Why did Bridgeport bank president kill himself in customer's Park Ridge home?

By Tim Novak and Robert Herguth  |  Mar 3, 2018, 12:22am CST



Exhibit F

ne Park Ridge home of a Washington Federal Bank for Savings customer where bank chief John F. Gembara was found dead. The homeowner told police in the northwest suburb that Gembara said he "needed to hide due to 'troubles' at the bank." | Kevin Tanaka / Sun-imes

Founded to serve Polish immigrants, Washington Federal Bank for Savings, a small, family-owned bank, operated in Bridgeport for more than a century.

Some compared it to the "building and loan" in "It's a Wonderful Life." But unlike the classic Jimmy Stewart movie, there was no storybook ending for Washington Federal or John F. Gembara, who ran the bank that his late grandfather founded in 1913.

On Dec. 3, Gembara, 56, was found dead of what's been ruled a suicide inside the million-dollar Park Ridge home of a man who, records show, was a longtime friend and bank customer with five outstanding loans from Washington Federal for a total of nearly $1.8 million.

Twelve days later, on Dec. 15, federal bank regulators shut down Washington Federal for "unsafe or unsound practices" that the Federal Deposit Insurance Corp. continues to investigate, records show.

The FBI also is involved, according to Luke Casson, the lawyer for Gembara's widow.

Washington Federal was one of eight banks nationwide that failed in 2017, according to the FDIC, the federal agency that regulates financial institutions.

Some things stand out about this one, according to Casson, who has been conducting his own review of Washington Federal, whose probable losses have been pegged by the FDIC at $60 million.



John F. Gembara. | Provided photo

Casson says that what he's found has fueled his suspicion Gembara was involved in embezzling from the bank without his wife's knowledge.

"It looks like your garden-variety bank fraud — except this one involves a banker," the family's lawyer says. "There's $60 million that went out to people," but the bank's records show those loans "being paid off without them ever being paid off. Where'd the money go?"

And, despite the findings of the Cook County medical examiner's office and the Park Ridge police that Gembara killed himself at the bank customer's house about 25 miles from his own home in Palos Hills, Casson says Gembara's wife Therese doubts he took his own life.



Attorney Luke Casson: "It looks like your garden-variety bank fraud — except this one involves a banker." | Andreou & Casson

It's not that she's in denial, according to Casson, who says he has been involved as an attorney in multiple cases involving people who killed themselves.

"The evidence is unusual for a suicide," the attorney says. "This is as strange as it comes."

Gembara was found dead inside the sprawling home of Marek Matczuk, police records show. Matczuk, a Polish immigrant, is a roofer-turned-developer who also did maintenance work at the bank and Gembara's home, according to Casson and Robert M. Kowalski, an attorney and developer who describes himself as a lifelong friend of Gembara and longtime customer of his bank.

Matczuk told police in the northwest suburb Gembara said he "needed to hide due to 'troubles' at the bank," police records show.

Matczuk told the police that, on Dec. 1, he and Gembara met at a property Matczuk owns in Chicago. Gembara called a friend who turned out to be out of town. So Matczuk told officers Gembara left his car in a garage at Matczuk's property. Matczuk said he told Gembara he could stay with him, and they drove to his home in Park Ridge.

Matczuk told police that he, his wife and their three children had dinner with Gembara, who stayed in the couple's master bedroom for the weekend, records show.

The following afternoon, Dec. 2, Matczuk's son drove Gembara to a nearby Home Depot in Niles to buy some green rope that he told officers Gembara said he needed to hang Christmas decorations

at his southwest suburban home, according to police. They later confirmed they were in the store, where they also stopped to have a hot dog.

Matczuk told police that, after his family had dinner with Gembara, their guest went to the master bedroom for the night.

The next afternoon, Dec. 3, when they hadn't seen Gembara, Matczuk's wife said they should check on him, and the couple unlocked the bedroom door and found Gembara dead, according to police reports.

The records show Gembara was in a seated position, fully clothed, with his glasses on, and the green rope he'd bought at Home Depot was wrapped around his neck and tied to the bannister of a spiral case.

The reports say there were no signs of a struggle or defensive wounds on Gembara, who was 5-feet-7 and weighed 197 pounds.

There was no suicide note, though Gembara's wife got a one-word text from his phone, police records show. "Bye" was all it said.

Matczuk says he has been advised not to speak but was shaken up what happened: "I cannot talk to you. Very horrible for me, too."

Matczuk's home is being foreclosed on by U.S. Bank, which says in a foreclosure lawsuit filed last summer in Cook County circuit court that he and his wife owe $1.2 million from a mortgage. The suit also names two secondary lenders: JPMorgan Chase, which lent Matczuk $279,000, and Washington Federal, which held a third mortgage on the home, for $662,000, issued in 2007.



Washington Federal Bank for Savings gave loans totaling over $1 million to Marek Matczuk to build two homes in
Wicker Park, including this one at 1633 N. Winchester Ave. Both remain unfinished and vacant. | Kevin Tanaka / Sun-Times

Case: 1:19-cr-00226 Document #: 249 Filed: 02/24/21 Page 89 of 94 PageID #:1484

Records show Matczuk got four other loans from Gembara's bank — a $94,000 mortgage on a home in Des Plaines and three loans totaling slightly over $1 million between 2000 and 2005 for construction of two three-story homes in Wicker Park. The homes remain vacant, with construction work yet to be completed.

Frank Kaminski, Park Ridge's police chief, says his department was aware Gembara had a financial relationship with Matczuk and has discussed the case with the FDIC.

David Barr, a spokesman for the FDIC, says it will take about six months for the agency to issue a report outlining any bad loans Gembara's bank made, who got the money and whether any of it can be recovered.

The FDIC has the authority to sue to recover money and seek penalties against bank officials who fail in their fiduciary duties.

Any criminal charges would be pursued by the FBI, which won't comment on the case.

The FDIC routinely audits banks. But it apparently turned up trouble at Washington Federal thanks to a tip, according to Casson, who says he has spoken with an FBI agent involved in the investigation.



Washington Federal Bank for Savings, 2869 S. Archer, was shut down in December for "unsafe or unsound practices" days after its president was found dead in an apparent suicide. | Google Street View | Google Street View

Since the bank's forced closing in December, with about $166.3 million in assets and $144 million in deposits, its deposits have been assumed by Royal Savings Bank. Royal took over Washington Federal's main office at 2869 S. Archer Ave. and its lone branch at 1410 W. Taylor St. in Little Italy.

Royal, based on the East Side, took over only two of the loans made by Washington Federal. The rest are now in the hands of the FDIC.

Any of the bank's losses from loans would be covered by an FDIC fund that's financed by the nation's banks.

That same fund also guarantees bank deposits up to $250,000. But about 50 customers could lose a portion of the money they deposited with Washington Federal because they exceeded that threshold.

but says it's him and other bank clients who were defrauded.



Robert M. Kowalski. | Provided photo

Kowalski has developed townhomes in the West Loop's Fulton Market district financed by Washington Federal. He says he got millions of dollars in loans from the bank and repaid them, but the payments weren't recorded by the bank, which showed the debt remained outstanding. He says the FDIC has told him he needs to repay the money — somewhere between $20 million and $26 million.

"John claimed all the loans were alive," Kowalski says. "Where'd all the money go that was still on the books? The FDIC is looking for the cash."

Kowalski calls Gembara's "scheme . . . so deep." And he blames the FDIC for letting "it go on for so long."

Kowalski says Matczuk was once his roofer and that he introduced him to Gembara years ago.

Kowalski is entangled in a contentious divorce with Martha Padilla, a onetime aldermanic

lawyers filed motions to block those moves.

Separately, last October, the Illinois Supreme Court suspended Kowalski's law license after he deposited $2,500 in escrow funds from a client in his personal account at Washington Federal, records show.

Washington Federal had a history of lending money to finance homes and small apartment buildings that often were leased to tenants with taxpayer-subsidized Section 8 housing vouchers.



Ald. Patrick Daley Thompson. | Sun-Times files

Its customers also have included some well-known names. Among them is the 11th Ward Regular Democratic Organization, controlled by the Daley family for 70 years. Ald. Patrick Daley Thompson (11th), whose uncle John Daley is a commissioner on the Cook County Board and heads the 11th Ward organization, says they got an $80,000 loan from the bank shortly before Gembara's death to rehabilitate its building at 3659 S. Halsted St.

FDIC to figure out how to proceed with repayments.

"It's a horrible situation," Thompson says of Gembara's death. "This whole thing sounds so uncharacteristic. He was a quiet, unassuming guy, always talking about his kids."



Cinespace Chicago Film Studios' Alex Pissios. | Provided photo  | Provided photo

Among others to have gotten loans from Washington Federal is Alex Pissios, president of Cinespace Chicago Film Studios, where movies and TV shows including the NBC-TV hits "Chicago Fire" and "Chicago P.D." are produced.

working with Edward Gobbo to build homes near the United Center with loans from Washington Federal and other banks.

Both men filed for bankruptcy protection — Pissios in 2011, Gobbo the following year — while they owed money to Gembara's bank. It's unclear whether the loans ever were repaid.

Pissios's studio recently was in the news with the indictment last year of longtime top Chicago Teamsters union official John T. Coli Sr., who is accused of extorting $325,000 from Cinespace.

Though Gobbo owed Washington Federal $12 million when he filed for bankruptcy, the bank continued to lend him and his family money, records show. They got 15 loans for a total of $1.6 million last year to finance homes primarily on the South Side, the West Side and in Waukegan.

Gobbo is a nephew of William Hanhardt, a former Chicago Police Department chief of detectives who went to prison for running a mob-tied jewelry ring and died last year.

Attorneys for Gobbo and Pissios wouldn't comment.

Gembara took over the bank's executive role after his father Emil Gembara retired, though the father remained chairman of the board until his death in 2005.

Gembara's two brothers and sister also had ownership stakes in the bank, according to Casson.

The sister, Janice Weston, was a Washington Federal vice president and was on the board of directors with John Gembara. Washington Federal had three other board members, including William Mahon of Bridgeport, a high-ranking official in the Chicago Department of Streets and Sanitation.

None of the former board members would comment.

Gembara was the father of two grown daughters. People who knew him said he was a devout Catholic.

As the national economy nosedived in 2008, Gembara sent a message to his bank's customers to reassure them.

"We are well prepared to ride out the economic storm," he wrote. "Our Bank is financially secure and we have never engaged in risking lending practices. For 95 years we have been conservative and consistent in our business practices and we will continue to in the years to come."