1          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3    UNITED STATES OF AMERICA,        )   Docket No. 19 CR 00226-1
                                      )
4                   Plaintiff,        )   Chicago, Illinois
                                      )   April 16, 2021
5              v.                     )   9:16 a.m.
                                      )
6    ROBERT KOWALSKI,                 )
                                      )
7                   Defendant.        )

8                  TRANSCRIPT OF PROCEEDINGS
9              VIDEO CONFERENCE MOTION HEARING
          BEFORE THE HONORABLE VIRGINIA M. KENDALL
10

11   APPEARANCES:

12

13   For the Government:      UNITED STATES ATTORNEY'S OFFICE by
                              MR. BRIAN PATRICK NETOLS (Via Telephone)
                              MS. MICHELLE PETERSEN
14                            MR. JEREMY DANIEL
                              Assistant United States Attorneys
15                            219 South Dearborn Street
                              Chicago, Illinois  60604
16

17   For the Defendant        FEDERAL DEFENDER PROGRAM by
     as Standby Counsel:      MR. IMANI CHIPHE
18                            55 East Monroe Street, Suite 2800
                              Chicago, Illinois  60603
19

20

21

22   Court Reporter:          GAYLE A. McGUIGAN, CSR, RMR, CRR
                              Official Court Reporter
23                            219 S. Dearborn Street, Room 2504
                              Chicago, IL 60604
24                            312.435.6047
                              gayle_mcguigan@ilnd.uscourts.gov
25

1          THE CLERK:  Our first case is 19 CR 226, Defendant 1,

2   U.S. versus Robert Kowalski.

3          Please introduce yourselves, starting with the

4   United States.

5          MS. PETERSEN:  Good morning, your Honor.  Michelle

6   Petersen and Jeremy Daniel for the United States appearing by

7   video, and I believe that AUSA Brian Netols is here by phone.

8          THE COURT:  Good morning.  Can you hear me?

9          MS. PETERSEN:  It's a little bit soft, but I can hear

10  you, your Honor.

11         THE COURT:  Sorry.  Let's try this better.

12         That's better, right?

13         Okay.  Good morning --

14         MS. PETERSEN:  Yes --

15         THE COURT:  -- Ms. Petersen.

16         Good morning, Mr. Daniel.

17         And good morning, Mr. Netols.  Are you on the phone?

18         MR. NETOLS:  I am, your Honor.  I have construction by

19  my house today.  I thought it would be better -- I'm just going

20  to be keeping it on mute as much as possible so I don't

21  interrupt the Court.

22         THE COURT:  Understood.  No problem.

23         Mr. Chiphe, are you on the line?

24         There he is.  Hello, Mr. Chiphe.

25         MR. CHIPHE:  Good morning, your Honor.

1           THE COURT:  Mr. Chiphe, I had my courtroom deputy

2    contact Judge Wood so that you can come to her hearing after

3    mine, and she said no problem.

4           MR. CHIPHE:  Yes, and I texted her courtroom deputy as

5    well.

6           THE COURT:  Okay, great.

7           All right.  And, Mr. Kowalski, are you there?

8           THE DEFENDANT:  Good morning, your Honor.  I am, yes.

9    Thank you.

10          THE COURT:  Okay.  Why don't you turn your camera on.

11          THE DEFENDANT:  Your Honor, I don't have a camera.

12          THE COURT:  You have a phone with a camera.

13          THE DEFENDANT:  Okay.  Your Honor, I'm sorry, I don't

14   have -- I don't know how to do that.

15          THE COURT:  Lynn, can you walk him through it?

16          THE CLERK:  Mr. Kowalski, so the link that I sent you

17   in your email, you need to tap on that.  And I think we went

18   through this last time.  You downloaded the WebEx app. already.

19      (Pause in proceedings.)

20          THE CLERK:  And I just verified, Mr. Kowalski, that

21   once you click on the link, it will prompt you to download the

22   app.

23      (Pause in proceedings.)

24          MS. PETERSEN:  Mr. Kowalski, this is WebEx, so it's

25   the same system that we used for the Rule 16 conference.  And I

1    believe you were able to log into that.

2              THE DEFENDANT:  I don't think I have a camera.

3              THE COURT:  Mr. Kowalski, this is the same

4    conversation we've had for the last few statuses.  It's much

5    easier to work with you when we can see each other.  You have a

6    phone that has a camera.

7              THE DEFENDANT:  I do, but I'm working off my computer.

8    I'm not trying to be difficult.

9              THE COURT:  Ms. Petersen said you used the same system

10   with her just recently.

11             MS. PETERSEN:  Yes, your Honor, but his video was not

12   on during our -- during our call, but he did -- he did log into

13   it via computer, not by phone.

14             THE DEFENDANT:  I don't recall being able to do that,

15   no.

16             THE COURT:  What kind of phone do you have,

17   Mr. Kowalski?

18             THE DEFENDANT:  I have an LG.

19             MS. PETERSEN:  Your Honor, I believe Ms. Green might

20   be on the line from Pretrial, and I think she does video-chat

21   with him, so maybe she --

22             THE COURT:  Ms. Green, are you there?

23             PRETRIAL SERVICES OFFICER:  Your Honor, this is Justin

24   with Pre -- your Honor, this is Justin with Pretrial Services.

25   I'm standing in for Ms. Green today.  She is in a training this

1    morning.

2           THE COURT:  Okay.  Do you know if she video-chats with

3    Mr. Kowalski?

4           PRETRIAL SERVICES OFFICER:  Your Honor, I can't say

5    specifically if she has.  I apologize.

6           THE COURT:  Mr. Kowalski, do you video-chat with

7    Ms. Green?

8           THE DEFENDANT:  From time to time, I have (audio

9    interruption) but I have to hang up and try to reconnect.

10           THE COURT:  That's fine.

11           THE DEFENDANT:  Would that be okay?

12           THE COURT:  Yes, you can hang up and reconnect.

13       (Pause in proceedings.)

14           THE CLERK:  Can I ask everyone else to mute their

15    phones, your Honor?

16           Good morning.  This is Lynn, Judge Kendall's courtroom

17    deputy.

18           I'm reminding all parties that have called in, please

19    mute your phones.  There's a lot of echo going on.  So if you

20    are not part of this case, please mute your phone.

21       (Pause in proceedings.)

22           PRETRIAL SERVICES OFFICER:  Your Honor, this is Justin

23    with Pretrial.

24           Krista has communicated with him before.  Krista has

25    communicated with him before via video.  It was through Google

1    Duo, though, which is obviously different than the WebEx

2    portal.

3            THE COURT:  Okay, thank you.  But it just shows that

4    he has a camera, that's what I'm just trying to verify, on

5    whatever device he used to do that.

6        (Pause in proceedings.)

7            THE COURT:  It looks like Mr. Daniel has graduated out

8    of his basement.

9            MR. DANIEL:  I have, your Honor.

10           THE COURT:  We are in a jury trial, so -- that's where

11   you're all headed soon enough.

12       (Pause in proceedings.)

13           THE COURT:  Mr. Kowalski, are you on the line?

14       (No response.)

15       (Pause in proceedings.)

16           THE COURT:  Are you communicating with him?

17           THE CLERK:  No, your Honor.

18           THE COURT:  Okay.  So send him a message --

19           THE CLERK:  Okay.

20           THE COURT:  -- and see what's going on -- oh.

21           THE DEFENDANT:  Hello?

22           THE COURT:  Yes, Mr. Kowalski, is that you?

23           THE DEFENDANT:  Yes, it is.  I've been trying

24   unsuccessfully.

25           THE COURT:  Okay.  Then we will continue by telephone.

1              In the meantime, you're going to need to learn how to
2      use this system.
3              Let me start out with -- I have a number of motions on
4      my plate.
5              The first motions that I would like to deal with this
6      morning, which I can deal with with this morning, have to do
7      with discovery.
8              The second pile of motions are pretrial motions
9      regarding motions to dismiss the indictment and various counts,
10     et cetera.  That I will give you a written ruling on.
11             And then the third pile of motions has to do with
12     release, bond, or protective orders.
13             So let's go in that order.
14             And, first and foremost, I'm going to start with the
15     motion to compel discovery.
16             And in response to that motion, the government
17     elucidated a list of items that have been going over to you,
18     Mr. Kowalski; and, as such, it appears to me that discovery is
19     ongoing and that --
20             THE DEFENDANT:  Wait a second.
21             THE COURT:  Don't interrupt.
22             It appears to me that discovery is ongoing and that
23     they're providing you with discovery as the case proceeds.
24             So have you given them a list of specific items that
25     you need?

1      THE DEFENDANT:  Yes, your Honor.  That's one of the

2  problems I have.  The discovery is rolling in reverse.  They've

3  confiscated my discovery.  I don't know what I have, what I

4  don't have.  In these millions of documents that I'm supposed

5  to have, I have a little dribble of it.

6      THE COURT:  Who --

7      THE DEFENDANT:  I should be --

8      THE COURT:  Who is --

9      THE DEFENDANT:  -- receiving more --

10      THE COURT:  All right, enough.

11      Who has confiscated your discovery?  You're not in

12  custody.

13      THE DEFENDANT:  A -- a Cook County receiver, working

14  for a divorce judge, who is working in tandem with the

15  governmental discovery -- excuse me, governmental prosecution

16  team.  And, again, he's a governmental actor under color of

17  law, has burst into my attorney's office and has taken

18  everything, again, working in concert with the government for

19  the prosecution team.  It's absolutely outrageous.  All the

20  material, the attorney work client privileged information has

21  been taken.  I have absolutely nothing.  Any -- every draft

22  motion that was formulated and taken -- again, a receiver

23  working for the divorce court is the arm of the divorce court.

24  Everything that the receiver has is in custodia legis, that

25  it's in the possession of the divorce court.

1      What exactly is the prosecution team working with this

2  divorce court?  It makes the Court and the prosecution look

3  like laughing stocks here.  We -- that we're using the court

4  system now, the criminal prosecution, as a vehicle for a

5  spurned former wife to get back and take revenge upon her

6  husband?

7      THE COURT:  Okay, so this is --

8      THE DEFENDANT:  It's too much already here.

9      THE COURT:  This is exactly why I need you to be on

10  video because when you're on the telephone, you just go on and

11  on and on making accusations and complaints as opposed to

12  getting to the substance of what I'm trying to rule on.

13      So the next time, if you are not going to appear on

14  video, you are going to appear in person in my courtroom

15  because I cannot spend an hour and a half listening to your

16  tirade about how you're being treated.  I need to spend time

17  listening to substantive motions.

18      Let me turn to Ms. Petersen.  And what is the response

19  to his motion to compel, please?

20      MS. PETERSEN:  Well, your Honor, let me back up and

21  state with regards to discovery, Mr. Kowalski has been

22  re-provided with all discovery that's ever been tendered to him

23  to date, and that was re-produced to him in -- what was

24  attempted to be produced to him in December, he definitely

25  didn't sign for the discovery, and we re-sent it, and he

1    received it in January.

2            As we've outlined in our motions, we've turned over

3    voluminous discovery, the kinds of things he's asking for

4    related to business records of Washington Federal, his own

5    personal records, and we are continuing to provide him with

6    records.

7            And, your Honor, last night, he filed his motion to

8    file a sur-reply to the letter we sent him that helps outline

9    where he could find things in the discovery.

10           So we're willing to work with Mr. Kowalski and help

11   him locate the things that he, you know, is looking for in his

12   discovery.

13           Discovery is ongoing.  We've asked him for a hard

14   drive so we can give him another sort of big set of discovery,

15   and Mr. Chiphe is helping us procure one for him.

16           I can also address the divorce court receiver if you

17   would like, your Honor.  But I think discovery is -- is

18   underway, is ongoing, and we're giving him, you know, what he's

19   entitled to under Rule 16 and more.

20           THE COURT:  And what type of volume is it that you've

21   provided to him?

22           MS. PETERSEN:  So far we've provided over 3,500 -- I'm

23   sorry, 350,000 pages, as well as voluminous native files.  I

24   don't know how many, but it's hundreds or probably thousands of

25   native files.

1           And as the Court ordered, that's been provided

2    electronically.  And we've also provided over 3,000 pages of

3    written material to help him in case there's times he doesn't

4    have access to a computer.

5           So that's the volume tendered to date.

6           THE COURT:  Okay.  Mr. Kowalski, it does not exactly

7    sound like dribs and drabs.

8           THE DEFENDANT:  Wait a second here.  We got Mr. Netols

9    saying we've got millions of documents.  Ms. Petersen just

10   stated 350,000.  That's barely 10 percent of the whole total.

11   Where is the rest of it at?  Bring it on.

12          And, moreover, I want to get working on this.  I'm

13   just one man here.  And I don't want to tirade, but -- I want

14   to work on this.  My life is at stake.

15          If they've got millions of documents and they've given

16   me 350 -- or they've taken back much of them, this is

17   counter -- it's not helping me.  It's counterproductive.  And

18   it's not fair.  And I think there's a fundamental fairness that

19   should be observed.

20          THE COURT:  How many of the 350,000 documents have you

21   read?

22          THE DEFENDANT:  I've gone through everything.  And

23   there's not 350,000.  That's an exaggeration.

24          THE COURT:  Well -- and I don't know where you're

25   getting the millions.  I don't know if that was a statement

1    that Mr. Netols made at some point.  I don't know.

2              All right.  Tell me --

3              THE DEFENDANT:  It's the most information --

4        (Unintelligible crosstalk)

5              MR. NETOLS:  -- did not make that statement, your

6    Honor --

7              THE DEFENDANT:  -- in his 30-year career.

8              THE COURT:  Tell me about the -- Ms. Petersen, tell me

9    about this receiver, please, or the divorce court.

10             MS. PETERSEN:  Yes, your Honor.

11             Mr. Kowalski has an ongoing divorce case, which, you

12   know, is separate from this case, obviously, in Cook County.

13             As part of that divorce case, the Cook County Court

14   ordered a -- (audio interruption)

15             THE COURT:  I'm sorry --

16             MS. PETERSEN:  This is a bar in which Mr. Kowalski --

17             COURT REPORTER:  Ms. Petersen?  This is the court

18   reporter.

19             MS. PETERSEN:  Yes.

20             COURT REPORTER:  I didn't understand what you said.

21             "As part of that divorce case, the Cook County Court

22   ordered a."

23             MS. PETERSEN:  Yes.  I'm sorry.  Yes, but I'm also

24   getting -- I'm also getting an echo.  Let me -- sorry.

25             So he's got an ongoing divorce case.  As part of that

1    divorce case, the Cook County judge ordered that a bar called

2    Da Vinci's, the contents of that bar be seized by the divorce

3    receiver -- (audio interruption and audio feedback)

4              THE COURT:  What was that?

5              THE CLERK:  I don't --

6              MS. PETERSEN:  Your Honor, I think that Mr. Kowalski

7    is logged in on his computer and on the phone, and it's causing

8    an echo.

9              THE COURT:  Okay.  I think that's probably it,

10    Ms. Petersen.  (audio interruption and audio feedback)

11              Mr. Kowalski, if you're logged in on both your

12    computer and your phone, turn one of them off, please.

13              Are you muting those people?

14              THE CLERK:  I'm muting everybody and --

15              MS. PETERSEN:  Unable to hear, your Honor.  I'm sorry.

16    I can only hear a beep --

17              THE COURT:  Do Number 14 maybe?

18              THE CLERK:  That's him, though.

19              THE COURT:  Oh, that's him?

20              THE CLERK:  I think that's him.  Otherwise, we're all

21    muted.

22              THE COURT:  Okay.  Let's try again, Ms. Petersen, see

23    if that helped.

24         (Pause in proceedings.)

25              THE COURT:  You don't hear me?  Am I muted?

1           THE CLERK:  I don't think so -- oh, goodness gracious.

2           MS. PETERSEN:  I'm sorry, your Honor.  If you can hear

3    me, I'm unable to hear you.

4       (Pause in proceedings.)

5           THE CLERK:  I have to call back in.  I'm sorry.

6           THE COURT:  Is there a chat function on this thing?

7    No?

8           THE CLERK:  There is, at the very bottom right.

9           THE COURT:  Oh, I see it.

10      (Pause in proceedings.)

11          THE COURT:  Do you want me to turn off?

12          THE CLERK:  No, I'm good.

13      (WebEx platform re-started.)

14          THE CLERK:  That was my error, your Honor.  I'm sorry.

15          THE COURT:  It's not your fault.

16          THE CLERK:  We're back on, your Honor.

17          THE COURT:  Okay.  I think I'm back on.

18          Okay.  Ms. Petersen, can you start over with the

19   divorce court issue?  And let's see if we can hear you better

20   this time.

21          MS. PETERSEN:  Yes, your Honor.  Thank you.

22          And if anyone can't hear me, just please raise your

23   hand.

24          So defendant -- let me go back and begin again just so

25   everyone can hear.

1           The defendant has an ongoing divorce proceeding in

2    Cook County that's -- there's -- that is separate from this

3    case.

4           As part of that case, a receiver was appointed.

5           And also as part of that case, the judge in Cook

6    County ordered that the receiver take possession of the

7    contents of a bar named Da Vinci's.  This is a bar in which

8    family members of Mr. Kowalski have an ownership interest,

9    though I believe in this court Mr. Kowalski has said he had no

10   ownership interest in the bar.

11          When the divorce receiver took custody of the contents

12   of the bar, they were served by a grand jury subpoena, by us,

13   and we received records -- some records related from

14   Mr. Kowalski from that bar.  It's roughly eight or nine bankers

15   boxes and a thumb drive.

16          Those -- that took place -- the divorce receiver's

17   possession of Da Vinci's took place in fall of 2020.  And I

18   know that Mr. Kowalski keeps saying that his discovery was

19   seized during that -- during that incident, but we reproduced

20   to him all discovery in January of this year.  So any discovery

21   that, if it was discovery there, it has been reproduced to him.

22          As for those boxes and the thumb drive, we employed --

23   we employed a filter team.  Mr. Kowalski has asked for copies

24   of those back.  The thumb drive is being copied by the filter

25   team, and I think it's being sent to him today.  The boxes were

1    sent offsite for copying.  And when that's done, we're going to

2    send Mr. Kowalski a complete set of those records in paper form

3    and in electronic form.  That is ongoing.  As soon as we have

4    it -- in fact, I think we're going to have the vendor send the

5    copies directly to him.  So as soon as they're done, he'll get

6    a copy of that stuff back.

7            THE COURT:  Okay.  So that's on its way as well,

8    Mr. Kowalski.

9            And that's a subpoena --

10           THE DEFENDANT:  Your Honor, that's not enough.

11           THE COURT:  That's what?

12           THE DEFENDANT:  Moreover, that's not even close to

13    being enough.

14           Let me explain.  When something is in the possession

15    of a receiver, it's not really in his possession.  It's in the

16    possession of the Court.  So any subpoena should have been

17    forwarded to Judge Lopez of the Cook County Circuit Court

18    Domestic Relations.  And, secondly, how -- why is this receiver

19    working in tandem with the prosecution team?  He's a divorce

20    receiver.  He works for Cook County.  He's a governmental

21    officer.  He's operating under color of law.  At that point, he

22    needed a search warrant to go into my attorney's office.  I

23    don't care whether the office is in a bar, if the office -- and

24    it is an office, and it is in a bar.  And if -- it's not in the

25    bar, it's in the back portion, and it's clearly identified as

1    an office.  And this Court has recognized that even if a

2    client -- a defendant is in the MCC, he has privacy rights to

3    converse with his attorney.  There is -- the Sixth Amendment

4    has been wholly tromped.  We -- I had a right to have counsel.

5    And my counsel is my sister Janet, and she is a licensed

6    attorney, and she can counsel me.  She has that right.  She's

7    earned that right, as I have.  And so, consequently, all the

8    searching through and conversing and working with this receiver

9    -- does the prosecution team really need to use my wife's

10   receiver to help them in this case?  It makes everything --

11   there's an appearance of impropriety here.

12          And how come they didn't go to the Cook County Court

13   for this information?  Why do they need to work through a

14   receiver?  He has no right to do anything with this property

15   whatsoever.  Once he touched property, that's in the possession

16   of the Cook County Circuit Court.  It's not in his possession.

17   So whatever pretensions he has about being a divorce police

18   officer or, you know, whatever, he needs to abide the law, as

19   well as the prosecution team does.  I have a Sixth Amendment

20   right to counsel.  You can't just come through here and lay my

21   defense bare, my defense plan, my -- my attorney's impressions.

22   Please (audio feedback) to me --

23          THE COURT:  Okay --

24          THE DEFENDANT:  This is terrible.

25          THE COURT:  Well, now, hold on.

1        If you think that it was improperly seized, then

2   you're a lawyer, you know what to do about evidence that's

3   improperly seized.  You remind me regularly that you're a very

4   good lawyer.  So if you think there's a reason to suppress that

5   evidence, you need to file that motion.

6        In the meantime --

7        THE DEFENDANT:  I --

8        THE COURT:  No.

9        A third-party subpoena was issued, and it was complied

10  with.  And it wasn't issued to the Circuit Court of Cook

11  County.  It was issued to the receiver.  You have the same

12  rights to issue trial subpoenas as they do, and you can also

13  issue a subpoena.  They're providing you, because it is joint

14  return of early trial subpoenas, they're providing you with

15  what they received as part of that.  And so the -- so far, the

16  process that has been presented to me is proper.  If you think

17  it was not -- if you think it was improper, you have to file

18  the appropriate motion and not just simply claim that there's a

19  problem.

20       Now, as far as the --

21       THE DEFENDANT:  Your Honor --

22       THE COURT:  -- rest of the discovery --

23       THE DEFENDANT:  -- I filed this motion in January.

24       THE COURT:  Excuse me?

25       THE DEFENDANT:  I filed a motion in January.  I want

1     to say it's January 23rd.

2         THE COURT:  I have I don't know how many motions in

3     front of me right now because they have been coming in fast and

4     furious from you, and I am trying to resolve some of them

5     without having to go into significant briefing.  And one of

6     them is the motion to compel discovery, which is Docket 303.

7         And that particular docket number, according to what I

8     am hearing from the government's response, is that they are

9     providing you and have provided you with this information, have

10    recognized their obligation, which is ongoing, to provide you

11    any discovery that would be pursuant to *Brady versus Maryland*,

12    and they are doing so.  And that is precisely the type of

13    process that is in any criminal case.

14        So as far --

15        THE DEFENDANT:  Your Honor --

16        THE COURT:  -- as the -- as far as your current motion

17    to compel, it's denied.

18        And the government will continue to work with you

19    regarding discovery.

20        Now, as far as the motion to quash the grand jury

21    subpoena, I just want to hear from the government as far as

22    their response, and I'll then hear from you, Mr. Kowalski.

23        MS. PETERSEN:  Yes, your Honor.

24        Sorry, I'm flipping -- so grand jury subpoena was

25    served on Mr. Kowalski.  He filed the motion to quash in front

1    of your Honor.  That is not, unfortunately, not the appropriate

2    venue because Judge Pallmeyer supervises the grand jury and,

3    you know, any sort of motion regarding the grand jury are to be

4    brought in front of her.

5            There's a local rule -- I'm sorry, I cited it in my --

6    in my response 305 that I'm looking at a blacked-out copy that

7    I filed probably, but -- so, first of all, I think it should be

8    denied just because this is the improper venue for that.

9            And, you know, it's served on Mr. Kowalski as -- if we

10   went to the merits of it, it's served on Mr. Kowalski as

11   custodian of record for several business entities seeking

12   business records, like, you know, rent receipts, income

13   statements, that type of thing.  So there's no sort of

14   privilege involved here.  We're not seeking privileged

15   information.  We're seeking business records.  And it's proper

16   to serve, you know, Mr. Kowalski as the custodian of records

17   for those businesses in which he has or had an ownership

18   interest.

19           THE COURT:  Okay.  My concern, Mr. Kowalski, with this

20   motion is two-fold.

21           One, under the case law of *United States versus White*,

22   which is the case you cited from the Seventh Circuit, you

23   should be seeking these documents from the chief judge who

24   monitors the grand jury.

25           But, secondly, my concern is that I haven't seen how a

1   business record can be privileged in this context.

2          So can you let me know why you believe there's a

3   privilege here?

4       (No response.)

5          THE COURT:  Did we lose him?

6          THE DEFENDANT:  Well, I -- I wasn't prepared this

7   morning to argue this morning.  I thought it was just a hearing

8   on the bond motion.

9          THE COURT:  You've asserted that they're privileged.

10  And you're a lawyer.  Why do you think they're privileged?  How

11  are business records privileged?

12         THE DEFENDANT:  Well, there's obviously a Fifth

13  Amendment freedom from -- from -- not to incriminate

14  yourself --

15         THE COURT:  Well, you're going to --

16         THE DEFENDANT:  -- for one.

17         THE COURT:  -- have to research that one because if

18  that's going to be your position, you'll have to set that

19  forward with case law.  There's -- it's not that -- it's not

20  that simple to say that a business record can incriminate you

21  and you get to shield yourself from it.

22         Was he subpoenaed for them or was the business

23  subpoenaed for him -- for them, Ms. Petersen?

24         MS. PETERSEN:  They were served on him as custodian of

25  records for the business.

1          THE COURT:  Yes.  Yes.  You're going to have a problem

2     with that one, Mr. Kowalski.

3          But, again, I'll let you supplement whatever you want

4     as far as filing that.  You'll have to do the research.

5          All right.  Let's talk about the bond conditions and

6     the motion for return of seized property.  All right?

7          Mr. Kowalski, go ahead.  You can start with the

8     modifying of the bond conditions.

9          THE DEFENDANT:  For number one, I would like to be

10    able to have some witnesses.  The list that is attached to the

11    bond condition is over -- overbroad.  And I would like to know

12    every witness that have seen that -- that's been related to

13    this case is on my bond conditions, and I would like to see

14    these people, and I would like to secure witnesses.  It's a

15    very fundamental right, and to have a fair trial, I need to

16    (indecipherable)

17         COURT REPORTER:  I'm sorry --

18         THE DEFENDANT:  Secondly, I would like to go home.

19         COURT REPORTER:  Mr. Kowalski --

20         THE DEFENDANT:  I don't belong here --

21         THE COURT:  Mr. Kowalski, my court reporter can't

22    understand, so you have to hold on a minute.  You're very

23    garbled.

24         The last thing that she has is:  "I would like to see

25    these people, and I would like to secure witnesses.  It's a

1    fundamental right.  And to have a fair trial, I need to."

2            You can continue.

3            THE DEFENDANT:  I need to secure (audio feedback)

4            THE COURT:  You need to do what?

5            THE DEFENDANT:  I need to secure witnesses.

6            THE COURT:  Meaning you need to interview them?

7            THE DEFENDANT:  Absolutely.

8            THE COURT:  Okay.  Who do you want to interview?

9            THE DEFENDANT:  Everybody.

10           THE COURT:  What does that mean?

11           THE DEFENDANT:  Don't think I should need (audio

12   feedback)

13           THE COURT:  All --

14           THE DEFENDANT:  For instance, on the bond conditions,

15   it lists the entire OCC.  There's quite a few people that have

16   been identified in the discovery that's been provided, and I

17   would like to go to each and every one of those persons and

18   interview them.

19           THE COURT:  Okay.  Let me hear a response from the

20   government.

21           MS. PETERSEN:  Yes, your Honor.

22           There is -- Mr. Kowalski is correct that he's

23   currently prohibited from directly contacting witnesses.  And

24   when he was released back in December, there was an attachment

25   to his bond conditions setting forth a list of people and

1   entities who are witnesses.  I think -- it's either Docket 207

2   or 208, I'm not sure which, because they're sealed, but that's

3   where it is.

4           18 USC 3142(B)(i)(B)(v) explicitly contemplates, you

5   know, barring contact between a defendant and witnesses, you

6   know, for a variety of reasons:  To prevent witness tampering,

7   obstruction, to prevent harassment, that type of thing.

8           Now, I understand we're in a different sort of

9   situation here because Mr. Kowalski is representing himself.

10          As it currently stands, he is allowed to contact the

11  people listed in Exhibit A, so he has to -- if he's going to

12  contact them, Mr. Chiphe needs to be on the phone or be there

13  in person.  That was the Court's sort of oral ruling on this

14  issue, as far as I recall.  So he is allowed to contact them.

15  He's just not allowed to contact them without Mr. Chiphe on the

16  line.

17          I also note that many of the people and entities in

18  Exhibit A are represented by counsel.

19          Yesterday, I FedEx'd to Mr. Kowalski a list of who is

20  represented by counsel, who their counsel is, and who their

21  counsel's phone number are, to assist him and Mr. Chiphe in

22  contacting those witnesses, you know, as he knows, if they're

23  represented, as a lawyer, he can't contact them directly

24  anyway, but he would need to contact their lawyers.

25          When we think about his right to contact people prior

1    to trial, the Seventh Circuit has said that, you know, what --

2    what -- when it becomes a constitutional problem is when the

3    government artificially restricts a defendant or defense

4    counsel's ability to speak with a witness.  That's *U.S. versus*

5    *Agostino*, 132 F.3d 1183, at page 1191, Seventh Circuit, 1997.

6    And it only is a constitutional issue if the government

7    essentially instructs a witness not to cooperate with the

8    defendant.

9              That's not the situation we're in here.

10             He has not articulated why having Mr. Chiphe on the

11   phone with him, you know, restricts his right to contact these

12   witnesses or restricts his right to talk to them prior to

13   trial.

14             We think it's a good accommodation that, you know,

15   prevents or help -- could help prevent, you know, some of the

16   concerns raised in 3142 with contacting witnesses, but he's

17   still allowed to contact any of them he wants and see if

18   they're willing to talk to him and to try to talk to them prior

19   to trial.

20             So I think -- you know, I don't think this is causing

21   any kind of Sixth Amendment constitutional issue, the bond

22   conditions as they stand.

23             THE COURT:  Okay.  So, Mr. Kowalski, all you have to

24   do is make sure that you're on the phone with Mr. Chiphe, your

25   standby counsel.

1          THE DEFENDANT:  Your Honor, respectfully, I don't wish

2     to do it with Mr. Chiphe.  I've been granted the right to

3     represent myself.  I don't want to share my confidences with

4     Mr. Chiphe.  I don't want to develop my trial strategy with

5     Mr. Chiphe.  I don't want to be held back by Mr. Chiphe's

6     schedule.  I want to get to the truth of the matter, and which

7     I need witnesses to do that.  So they are artificially stopping

8     me from doing everything.  If I've got to hold Mr. Chiphe's

9     hand as I'm talking to everybody, that's not what I want.

10         I'm sorry, the confidence I had with Mr. Chiphe has

11    been shattered.  And I don't think that I have to be -- he has

12    to be thrust upon me in that capacity.

13         I'm sorry, Imani, you've been very helpful.  I don't

14    want to denigrate you.  But I want to interview these people on

15    myself.  I don't want anything to be taken back to the

16    government.  I think enough of that has happened already.

17         I think I have every right to contact witnesses,

18    secure witnesses, and discuss this case with people.

19         I -- this -- this order -- these bond conditions serve

20    as a gag order where I can't talk to anybody unless I have

21    Imani next to me?  I don't think so.  He -- that's not the --

22    what a standby counsel is for.  I'm not asking him to counsel

23    me.  And I don't think he needs to be privy to any conversation

24    I have with somebody.

25         Thank you, Judge.

1    THE COURT:  Well, you forfeited your right to do that

2    because of your previous behavior in reaching out to witnesses

3    when you were not permitted to reach out to witnesses in the

4    case, attempting to have them talk to you and learn your

5    version of what occurred, and that was a violation of your

6    bond.  And because of that violation of your bond, I have

7    included Mr. Chiphe in your conversations, not even as a

8    participant, but just to be with you on the calls.  And so I'm

9    not removing that condition of bond.

10   You may reach any witness you want.  Just have

11   Mr. Chiphe on the line.

12   And also, remember, you're an attorney.  You have an

13   obligation --

14   THE DEFENDANT:  Excuse me, your Honor --

15   THE COURT:  -- to go through another attorney if that

16   witness is represented by counsel.

17   THE DEFENDANT:  Your Honor, I wasn't anticipating

18   being on the telephone with these people.  I would like to go

19   right to the OCC office and have a direct conversation with

20   these people.

21   THE COURT:  Well, most people --

22   (Unintelligible crosstalk.)

23   THE COURT:  What's the OCC?

24   THE DEFENDANT:  Office of the Comptroller of the

25   Currency.  They're the regulators of these federal banks.  And

1    these are the auditors.  And it's especially troublesome,

2    but -- most of these auditors are only known by their code

3    names.  The one in particular is ABC Number 1, the assistant

4    deputy comptroller Number 1.  I would like to know who this man

5    is.  But he's the first stop on the list.  Who is this --

6            MS. PETERSEN:  Your Honor --

7        (Unintelligible crosstalk.)

8            THE DEFENDANT:  How can he --

9        (Unintelligible crosstalk.)

10           MS. PETERSEN:  May I address that briefly, your Honor?

11           THE COURT:  Go ahead.

12           MS. PETERSEN:  I just want -- I just want sort of the

13   record to be clear on this issue.

14           The government is not anonymizing names of witnesses.

15   The government provided to Mr. Kowalski a file -- a system that

16   was provided to us by the OCC that contains the records from

17   years' worth of exams and regulatory actions by the OCC.  And

18   it identifies the individual from the OCC who worked on each of

19   those issues and usually the documents that they worked on a

20   particular -- linked to their name.

21           So, you know, this allegation that we're hiding who --

22   the identities of these witnesses is not accurate.

23           THE COURT:  Well, and --

24       (Unintelligible crosstalk.)

25           THE DEFENDANT:  -- document.

1        COURT REPORTER:  Repeat --

2        THE COURT:  What did you say, Mr. Kowalski?

3        THE DEFENDANT:  I regret that I have not seen any

4   document tying ABC Number 1 as to his real identity.

5        THE COURT:  Ms. Petersen said she provided it to you,

6   so you can ask --

7        THE DEFENDANT:  Well --

8        THE COURT:  -- her where it is by Bates number or

9   something.  But that's not something that we fight about --

10        THE DEFENDANT:  I --

11     (Unintelligible crosstalk.)

12        THE COURT:  No, that's not something we fight about in

13   front of the Court.  You can talk with each other and say where

14   is that tool that I need to --

15        THE DEFENDANT:  Sure.

16        THE COURT:  -- identify Number 1 at the OCC.

17        But, more importantly, let's just talk about this idea

18   that you want to be in person with these individuals.

19        None of my cases going forward right now, criminally

20   or civilly, are doing in-person depositions or interviews.

21   That's civilly or criminally.  Everybody is working remotely.

22   Everybody is doing it through these systems.  This is why I'm

23   trying to get you to wake up into the 21st century and use our

24   system so that you can talk to people easily and communicate

25   with people easily.

1    It's much easier to arrange a video call, even through

2  FaceTime or some other easy platform, where you can talk with

3  these people.  And Mr. Chiphe will do what he's doing right

4  now.  He's sitting and standing by, available for you if you

5  have a question, but not interfering.  So you're able to do

6  that.  And that is not an interference with your Sixth

7  Amendment right.

8    (No response.)

9    THE COURT:  Are you there?

10    THE DEFENDANT:  I'm listening, Judge, yes.

11    THE COURT:  Oh, good.  Okay.  All right.  So go to the

12  motion for return of seized property.

13    What is the information that you believe needs to be

14  returned?  Currency removed from your pick-up truck, your

15  pick-up, your clothing, computer equipment, et cetera.  So let

16  me hear from the government about that.

17    MR. DANIEL:  Good morning, your Honor.  This is Jeremy

18  Daniel.

19    I'll just go through the items as listed in

20  Mr. Kowalski's motion.

21    The first is business records and client files

22  compiled over a 30-year career.  (audio interruption)

23    THE COURT:  Mr. Daniel, I think Gayle is having

24  difficulty.  Hang on.

25    COURT REPORTER:  Mr. Daniel, you were breaking up a

1     bit.  This is the court reporter.

2             The last thing I have is:  The first is business

3     records and client files compiled over a 30-year career.

4             MR. DANIEL:  Okay.  But I don't know if he's referring

5     to the records that were taken from Da Vinci's, the bar that

6     was discussed earlier, or other records.

7             The records of his that we have, as Ms. Petersen

8     indicated, we're in the process of copying, returning to him.

9             As far as the -- the next item is the seized iPhone.

10    There was an iPhone that was seized.  I believe it was from the

11    Sierra pick-up truck, pursuant to a search warrant.  That phone

12    has been searched.  We are in the process -- I believe the

13    items from that phone have been copied and returned to

14    Mr. Kowalski, through discovery.

15            As far as the phone itself, it is evidence.

16    There's -- there was an instance where Mr. Kowalski was

17    communicating with another individual to take items from an

18    office space that was on the property -- or in the possession

19    of the bankruptcy trustee, and those communications and

20    information on that phone are relevant to Mr. Kowalski's

21    bankruptcy fraud charges.

22            And so we believe that iPhone is evidence and should

23    remain in the possession of the United States pursuant to the

24    search and seizure warrant that was issued by a magistrate

25    judge here in this district.

1    As far as the seized computer equipment, this is

2    another item that was recovered from the GMC Sierra pick-up

3    truck.

4    The government has not obtained a search warrant for

5    that computer and does -- has not accessed the contents of that

6    computer.  I believe it's an Asus model desktop tower.  And

7    that is something that I expect the government could return to

8    Mr. Kowalski.

9    I do not know what the Crest Hill subdivision plan is

10   or where that document may have come from.  And so if

11   Mr. Kowalski, when he speaks, can address that, that would be

12   helpful.

13   As far as the clothing, I am not aware of any clothing

14   seized.  And, again, if Mr. Kowalski could specify what

15   clothing he's referring to, that would be helpful.

16   As far as the GMC Sierra pick-up truck, this was taken

17   into government custody on the night that Mr. Kowalski and

18   another individual accessed the Cermak office that was in the

19   possession of the trustee.

20   That day, Mr. Kowalski was arrested by the

21   U.S. Marshals, I believe, pursuant to a contempt order or a

22   warrant issued by the bankruptcy court.

23   The government took possession of the Sierra pick-up

24   truck.  We obtained a search warrant to search that pick-up

25   truck where we recovered the iPhone and a few other items that

1    I mentioned.

2            As far as the truck itself, we contacted the

3    bankruptcy trustee.  We identified the lienholder for that

4    truck.  And given Mr. Kowalski's position in the bankruptcy

5    court, that his assets were in the possession of the bankruptcy

6    trustee, we were instructed to release the Sierra pick-up truck

7    to the lienholder, which we did, so it's not -- no longer in

8    the government's possession.

9            As far as the currency removed from the pick-up truck,

10    there was currency that's currently in a safe, I believe at

11    FDIC offices, as evidence.

12            Part of the bankruptcy fraud that was committed in

13    this case were, while he was in the bankruptcy court,

14    Mr. Kowalski continued to collect rent and other monies that

15    were property of the bankruptcy estate, and because they were

16    property of the bankruptcy estate and not disclosed to the

17    bankruptcy court, they are evidence of bankruptcy fraud and,

18    therefore, properly in the custody of the United States at this

19    time, your Honor.

20            THE COURT:  Okay.  Mr. Kowalski, do you want to

21    respond to any of those?

22            THE DEFENDANT:  Well, yes.  I would like my iPhone

23    back.  Much of the -- all my pictures of my family, that's

24    really what I want off the phone.  If they've already taken the

25    phone and gleaned whatever they can from the phone, why can't I

1    have the phone back so I can have the pleasure of seeing my

2    child when he was born and then I can have our first trip to

3    Disneyworld and things of that nature, family pictures.  That's

4    what I want with the iPhone.  It hurts me not to have those

5    pictures.  I love my family.  The iPhone is precious to me

6    because of that.  If they have all the information they need

7    off the phone, I don't -- how does the phone help them?  I

8    don't know -- it's just a phone.  It's just a fungible phone.

9    They should provide that to me.

10           THE COURT:  It --

11       (Unintelligible crosstalk.)

12           THE COURT:  The prosecutor has said it's evidence and

13   that it is relevant evidence for the phone -- for the records

14   and that they've provided you with the back-up information from

15   your phone, so --

16           THE DEFENDANT:  Your Honor --

17       (Unintelligible crosstalk.)

18           THE COURT:  -- and it doesn't get returned.

19           I didn't hear what you said.

20           THE DEFENDANT:  I don't have any evidence of my -- I

21   don't have any of my family pictures.  I don't know what the

22   government is telling you.  It's not true.  I would love to see

23   my family pictures.  I yearn for those pictures.  They're a

24   precious part of my life.  And I like to see pictures of my son

25   being born.  If that's evidence in this case, I'm a little bit

confused.  The phone is a fungible iPhone.  I'll stipulate that it was an iPhone and that I had information on my iPhone.  May I have my pictures back?  I don't think that's -- they can have the iPhone.  I really want my pictures back.  They are precious to me.  I don't know how a picture of me at Disneyworld with my stepson are really pertinent to this case here.  It's kind of harassing me.

            THE COURT:  Okay.

            THE DEFENDANT:  I love my family.  I want to be with my family.

            THE COURT:  All right.  So --

            THE DEFENDANT:  And, you know, it's not about -- whatever the government -- can they just give me my pictures back?

            THE COURT:  Well, why don't you --

            THE DEFENDANT:  That's not too much to ask for.

            THE COURT:  Why don't you talk with them about that.  The phone is evidence.

            THE DEFENDANT:  Your Honor, they don't really want to talk to Bob.  They've been difficult to work with.  I hate bringing these discovery matters before you.  I know how tedious this is.  But they don't want to work with me, frankly.  I've been ostracized.  I guess -- I'm a defendant, but I've been an attorney for 30 years.

            THE COURT:  Receiving 350,000 --

1          THE DEFENDANT:  I --

2          THE COURT:  -- documents, and having them photocopy

3     documents that they have no obligation to photocopy for you, is

4     hardly ostracizing you.

5          THE DEFENDANT:  Your Honor, I've got two little piles

6     of documents here that have been photocopied.  This is not

7     exactly the boxes of millions and millions of paper.  And I

8     think 350,000 documents is a little bit of an overstatement.

9     And I don't want everybody's check whoever was at that bank.

10    This case has got some difficulties because it's not just

11    having the document, but the government has knowledge --

12    (indecipherable)

13         COURT REPORTER:  I'm --

14         THE DEFENDANT:  (indecipherable) -- looking at a

15    document that --

16         COURT REPORTER:  Mr. Kowalski?

17         THE DEFENDANT:  Real document that was submitted --

18    (indecipherable)

19         COURT REPORTER:  Mr. Kowalski?  This is the court

20    reporter.

21         The last thing I heard you say was:  "It's not just

22    having the documents, but the government has knowledge."

23         THE DEFENDANT:  Yes.  The government has acknowledged

24    that there's massive fraud and falsification and alteration.  I

25    need to know which of these documents are the fraud and the

1     altered ones.  Apparently, the government knows which ones they

2     are and they form the basis of the case.  But just by throwing

3     me a dump truck load of documents -- and I haven't seen any

4     (indecipherable) dump truck -- is not helpful.  It's really

5     disingenuous.  I need to be provided, pursuant to *Brady*, things

6     that are exculpatory in nature.

7             THE COURT:  Well, what is disingenuous is saying you

8     don't have any information when you're also saying they're

9     giving you a dump truck load of documents.

10            What is the Village of --

11            THE DEFENDANT:  No, the --

12        (Unintelligible crosstalk.)

13            THE COURT:  -- Crest Hill subdivision plan that you

14    believe the government has in their possession?

15            THE DEFENDANT:  It's exactly that.  There's a plan of

16    a subdivision that was in my vehicle at the time I was

17    arrested.

18            THE COURT:  And what did it look like?

19            THE DEFENDANT:  Looked like a plat of subdivision,

20    judge.

21            THE COURT:  Oh, like a rolled-up document?  A folded

22    document?  A -- in a folder?  What --

23        (Unintelligible crosstalk.)

24            THE COURT:  What?

25            THE DEFENDANT:  Exactly that.  It was a rolled-up

1    document.  It's more like a -- it's not quite an architectural

2    plan.  It's a -- it's the engineering plan.  It shows the

3    terrain and how the subdivision lots are laid out.

4            THE COURT:  Okay.

5            THE DEFENDANT:  It's much like a survey.

6            THE COURT:  All right.  And what is the clothing that

7    you think that you have in the government's possession or

8    control?

9            THE DEFENDANT:  It's -- I had clothing in there.  It's

10    hard to describe.  Jeans.  I had, you know, personal -- shirts,

11    things of that nature.  Where --

12            THE COURT:  Jeans --

13            THE DEFENDANT:  -- are they?

14            THE COURT:  -- shirts, and a coat did you say?  Or you

15    said clothing.

16            THE DEFENDANT:  Clothing (audio interruption)

17    underwear, everything.

18            THE COURT:  Okay.

19            THE DEFENDANT:  Shirts.

20            MR. DANIEL:  Your Honor, may I address this point?

21            THE COURT:  Sure, please.

22            MR. DANIEL:  Pursuant to the search warrant, there

23    were certain categories of information that we could retrieve

24    and seize from the vehicle.  We did that.  And clothing would

25    not have been one of the items listed in the Attachment A, and

1    so we would have left items like that in the pick-up truck.

2          The items taken from the pick-up truck, there were

3    some records.  There were some checks that the bankruptcy

4    trustee identified as payments from rental properties owned by

5    Mr. Kowalski or one of his entities.  There was cash.  There

6    was the iPhone.  There was the computer tower and a few other

7    items.  But personal effects such as clothing would not have

8    been within the purview of the Attachment A to the search

9    warrant and would have been left in the vehicle, so those are

10   not in the possession of the government.

11         THE COURT:  Okay.  So the Sierra pick-up truck was

12   returned to the lienholder, so they don't have it anymore.  And

13   that was pursuant to your bankruptcy.  So the truck is gone.

14         And they don't --

15      (Unintelligible crosstalk.)

16         THE COURT:  I'm sorry?

17         THE DEFENDANT:  It wasn't fair because I have --

18   (indecipherable) in that bankruptcy, (indecipherable) that

19   truck --

20         THE COURT:  I didn't hear what --

21         THE DEFENDANT:  And the government --

22         THE COURT:  I didn't hear --

23         THE DEFENDANT:  I have every right --

24         THE COURT:  I didn't hear what you said.  You said

25   that wasn't what?

 1          THE DEFENDANT:  That wasn't appropriate for them to

 2    tender my vehicle to the trustee or to the lienholder.  That

 3    was my vehicle.  If I wanted to maintain that vehicle, I have

 4    every right to -- in the bankruptcy court, I think it's

 5    called -- I could agree -- I could have kept the truck through

 6    the bankruptcy.  There's no reason to deprive me of that choice

 7    to keep that vehicle.

 8          THE COURT:  Okay.  So now you know where it is.  It's

 9    been given back to the lienholder.  So if you want to file some

10    type of request for return of that property in some other

11    fashion, you are a lawyer, and you know what you'll need to do.

12          They did not seize any clothing as part of their

13    search warrant.

14          And they're going to give you back the tower computer.

15    So you can make arrangements -- is that correct, Mr. Daniel?

16          MR. DANIEL:  Correct, your Honor.

17          THE COURT:  Okay.  And they're not giving you back the

18    iPhone.  It's business.

19          And they're giving you all of the documents and

20    information that was received through the subpoena to the

21    third-party receiver.

22          And they have been regularly giving you discovery of

23    what they seized through their -- through the business records.

24          So then I think that -- oh, and they don't have the

25    Crest Hill subdivision plan.  So maybe it wasn't in the --

1          THE DEFENDANT:  Should have --

2          THE COURT:  They should?

3          THE DEFENDANT:  (indecipherable)  My possessions

4     inside the truck --

5          MR. DANIEL:  Your Honor --

6        (Unintelligible crosstalk.)

7          THE DEFENDANT:  Pictures off the phone, at the very

8     least?  I don't think that's asking for a lot.  It's great

9     sentimental value to me.

10          MR. DANIEL:  Your Honor, I'll address two issues, if I

11    may.

12          The first is the Crest Hill subdivision plan.  If

13    those records were in the Sierra truck and they were taken by

14    the government, I don't know currently -- again, I'm aware of

15    checks and other rental-related items -- but if those items

16    were taken, we are in the process of copying any business

17    records that we've obtained from Mr. Kowalski, and they will be

18    turned over then or in that process.

19          As far as the iPhone, again, it was imaged, and those

20    images were released in discovery.  I can go back and

21    identify -- try and locate and identify the production numbers

22    for those records for Mr. Kowalski.

23          MS. PETERSEN:  Your Honor, those are Bates labeled

24    RKphone_001.  Originally produced in February 2020 and

25    re-produced in that January reproduction of this year.  So

1     that's the Bates range where he can find the things from the

2     iPhone.

3              THE DEFENDANT:  Your Honor, you know, these Bates

4     numbers, they sound really good, but I've found instances that

5     the Bates numbers do not coincide.  I've got two documents that

6     have different Bates numbers.  And the Bates system is

7     obviously overvaunted and -- I have one that -- as a matter of

8     fact, I just filed a motion on that.  It's -- the Bates system

9     is not working.  Whatever it is, it's not working.

10             THE COURT:  What's --

11         (Unintelligible crosstalk.)

12             THE DEFENDANT:  Moreover, many of the documents that

13    I've received are on disks, and I can't open the disk.  I'm not

14    sure why they couldn't give me the proper password for the disk

15    because I've got one of three that open.  The other two,

16    they're not opening.  I don't know if it's gamesmanship or -- I

17    don't know, but it should open.  The other disk opened.

18             And how come the Bates numbers are not working out

19    here?  How come there's two identical documents with different

20    Bates numbers?  It shouldn't be possible, but yet it is.  And I

21    submitted proof to the government that it is.  And I submitted

22    proof to your Honor as well.  And if the Bates system is to be

23    working, it should be working consistently.  There shouldn't be

24    any gaps or doors or anything in the Bates system.

25             THE COURT:  What I'm baffled at is that you told me a

1   few minutes ago that you had gone through all 350,000

2   documents; but now you clearly haven't gone through everything

3   because they've turned over these documents on the iPhone, they

4   turned over that source for the identifiers for the people in

5   the office that you're intending to interview.  So either

6   you're going through it or you're not having access to it, I

7   don't know which it is.

8          THE DEFENDANT:  Your Honor, I submitted a motion,

9   through Mr. Chiphe, to your Honor.  I have not been able to go

10  through these two disks.  I can't open them.  I've tried

11  numerous times on several different computers.  I can't open --

12         THE COURT:  Okay.  So I'm going to direct --

13      (Unintelligible crosstalk.)

14         THE COURT:  Hold on.  I'll direct the government to

15  have a conversation with him to see if we can get that opened

16  up for him in the next two weeks.  Okay?

17         Maybe your IT people can help him with whatever he

18  has.

19         Maybe when he gets his tower computer back, he'll be

20  able to use that as well.

21         MS. PETERSEN:  Yes, your Honor.

22         And the government filed leave to -- the defendant

23  raised these issues for the very first time in a reply that he

24  filed earlier this week.  He didn't bring up these issues

25  during our Rule 16 conference that he was having any difficulty

1    accessing the discovery.

2          In response, I sent him a letter that set out the

3    password and more information about where to find things on the

4    disk.

5          That letter is attached to our -- I'm sorry, motion

6    for leave to file sur-reply.

7          I sent it yesterday.  He might not have it yet.  But

8    I'm hoping that some of the information in that letter will

9    also help him find some of the things he's looking for.

10          THE COURT:  Okay.

11          MS. PETERSEN:  But we will also have a conversation

12    with him, your Honor.

13          THE COURT:  Okay.  That's great.  Thank you very much.

14          THE DEFENDANT:  Judge, I'll just say this whole "we"

15    conversation is not working, your Honor.  I found that meeting

16    very condescending and everybody was looking down on me rather

17    than trying to work through these issue.  This is very

18    tiresome.  And I want to look through the disks.  I'm going to

19    glean a lot of information out of that -- on the disk.  There's

20    going to be a flurry more of motions, I'm quite sure.  There's

21    no advantage to me to be holding back here.  My life is at

22    stake.  And, yes, there is going to be a pile of motions, get

23    information in discovery (indecipherable) --

24          COURT REPORTER:  Mr. Kowalski --

25          THE DEFENDANT:  I cannot believe -- I'm sorry.

1          THE COURT:  Okay.  I'm not going --

2          THE DEFENDANT:  Your Honor, I simply don't have any --

3    any -- any document I ever created in my entire life, I do not

4    have.  It's been taken from me by the government prosecution

5    team, whether that's the FDIC, the receiver, whether it's

6    counsel for FDIC, whether it's the divorce receiver.  I don't

7    have anything other than the discovery that I'm looking at.  So

8    I'm not quite sure -- I don't have any exculpatory information.

9    I am a meticulous recordkeeper, and now all my records of any

10   client I have ever had, my own records, are now in the

11   possession of some governmental entity.  So I'm not really

12   quite sure how I'm going to defend myself.  I have a case

13   that's a business record case, but I don't have any business

14   records because they've taken them from me.

15          Like when they went into my office, they had no order

16   to come into my office and change the locks and come in there

17   and take anything.

18          And I'm not sure why the government would be telling

19   you this, your Honor.  Please.  Don't believe all this

20   governmental hearsay.  I -- this is just not simply the truth.

21   They came into a law office and started changing the locks.

22   It's ridiculous.  Absolutely ridiculous.

23          THE COURT:  Okay --

24          THE DEFENDANT:  That I haven't --

25      (Unintelligible crosstalk.)

1          THE COURT:  Okay, I'm not going to --

2      (Unintelligible crosstalk.)

3          THE DEFENDANT:  -- (indecipherable) say is true.

4          THE COURT:  I am not going to do any more of these

5   statuses by telephone with you not being in front of me, either

6   by video or in my courtroom, because this long rant that you do

7   on the telephone is unhelpful to us getting to the bottom of

8   what needs to be done.

9          The government has acknowledged their obligation under

10  *Brady* to provide you with any exculpatory information.

11         They have acknowledged their obligation to provide you

12  with documents they've seized.

13         There is an ongoing process where they are doing so

14  and continuing to do so.

15         And today I'm satisfied, based upon their

16  representations, that that ongoing process is still working and

17  that they're giving you tools to figure out where those pieces

18  of information are.

19         You are capable of talking with them and asking them

20  information, and they will respond.

21         I can't tell you that you're going to have a cozy

22  conversation with the prosecutors who have charged you through

23  the grand jury with significant charges, but they do have an

24  obligation to provide you with the information that they have

25  to use against you in the case.  And I'm confident that that's

1    what's happening right now.

2              So I'm ending this status today.

3              Is there anything else that anyone needs to do with me

4    today before we leave?

5              THE DEFENDANT:  Yes.

6              MS. PETERSEN:  Yes, your Honor.

7         (Unintelligible crosstalk.)

8              MS. PETERSEN:  Go ahead, Mr. Kowalski.

9              THE DEFENDANT:  I would like to reside with my family,

10   your Honor.  There's no -- we've reconciled any differences

11   that we had.  The communication is open.  Natalie would like to

12   have me back home with my child.  I'd like to raise my family.

13   My stepsons need me.  They're in a difficult spot.  They're

14   going through junior high school.  I'd like to reside with my

15   family.  There's no reason to keep us apart.  There's no orders

16   of protection or anything.

17             Natalie -- attached to my motion for this matter is

18   Natalie's communication that she wants me back home.  I need to

19   be back home.  I'm dying here without my family.  I'm

20   withering.  And I want to be with my family.  That's all I live

21   for is to be a father.  And I've raised one family.  I want to

22   raise my second family.  My son needs me.  He's a terrible two.

23   He needs his father --

24        (Unintelligible crosstalk.)

25             THE COURT:  So is he visiting you?  Is Natalie

1    visiting you?  Is your child visiting you?

2          THE DEFENDANT:  Your Honor, that's not enough.  I --

3       (Unintelligible crosstalk.)

4          THE COURT:  I'm asking you a simple question:  Are

5    they visiting you?

6          THE DEFENDANT:  It's quite a burden for Natalie to

7    come here.

8       (Unintelligible crosstalk.)

9          THE COURT:  No, that's not what --

10      (Unintelligible crosstalk.)

11         THE COURT:  That's not my question.

12         Are they visiting you?

13         THE DEFENDANT:  It's not the same, Judge.  We don't

14   have any privacy here --

15      (Unintelligible crosstalk.)

16         THE COURT:  Can you answer my question, though?  Are

17   they visiting you?

18         THE DEFENDANT:  Yes.

19         THE COURT:  Okay.

20         THE DEFENDANT:  Every once in a while, yes.  Very

21   seldom, but, yes, I do -- I do have a chance to see Natalie.

22   And it's quite an imposition on Natalie.  And I want to be with

23   my family.  This is what I live for.  They need me.  There's no

24   right -- there's no reason to keep us apart.  Nothing

25   whatsoever.  You're just -- I'm just getting punished for no

1    particular reason.  I --

2         (Unintelligible crosstalk.)

3              THE COURT:  Well, the reason that we were keeping you

4    apart is because of your behavior with Natalie and Natalie's

5    very clear statement to Pretrial Services regarding you.

6              So maybe if they're not visiting you a lot, that says

7    something as well.  I don't know.  But they have permission to

8    see you --

9         (Unintelligible crosstalk.)

10             THE DEFENDANT:  No, Judge.  I've attached Natalie's

11   statement to my motion.  Natalie wants me to come home.

12   There's no -- there's -- there's no bad behavior towards me and

13   Natalie.  That's simply not the case.

14             THE COURT:  Okay.  What's the government's position --

15        (Unintelligible crosstalk.)

16             THE COURT:  -- regarding his motion?

17             MS. PETERSEN:  Your Honor, we're opposed to him living

18   again with Ms. Lira for the reasons that the Court articulated.

19             We saw -- I mean, back in October, we had a hearing

20   where we saw a video.  There was an altercation at their home

21   where Mr. Kowalski fled before the police arrived.  That

22   resulted in a -- the beginning of a protective order between

23   Ms. Lira and the defendant, though I understand she later

24   recanted it.  We are concerned that there is or was potential

25   domestic violence.  And, you know, to order a defendant to live

1    with someone where there might be abuse 24 hours a day just

2    increases the risk that there could be that type of violence

3    happening again.  And it just -- whatever -- whatever was

4    happening in that home obviously was not a good situation

5    because that sort of incident developed.  And it just doesn't

6    seem like a place that would be conducive to him complying with

7    his conditions of release.

8           I also want to remind the Court that the whole reason

9    he was released from custody back in December was so that he

10   could focus on his case and work on his case.

11          And so that's, you know, why he's -- why he's out and

12   that's, you know, what his focus should be.

13          THE COURT:  Okay.  Once --

14          THE DEFENDANT:  Your Honor, that's simply not the

15   case.

16          It's really funny that Ms. Petersen brings it up

17   because during the hearing, Natalie was ensconced and held

18   hostage in the Dirksen building by FDIC agents.

19          How dare they keep her from coming to the courtroom,

20   especially when during the proceeding, you had asked for

21   Ms. Lira to testify.  You wanted to hear from her.  What they

22   did is they held her hostage in a room at the Dirksen building

23   so she couldn't testify and that she couldn't tell you that she

24   wanted Bob home, that she wants Bob.  We're a family, for God's

25   sake.  And why -- why is asking -- she keeping us apart?  Why

1    did these agents have to take her hostage in the Dirksen

2    building that afternoon while I was led away in chains?  She

3    wanted to testify.  She wanted to be there.  They, by force,

4    kept her in a room in the Dirksen building.

5            Your Honor, I filed this motion back in January.  I

6    think it needs to be heard.  Simply -- I'm sorry if I'm

7    tirading here, but how dare they take Natalie and hold her

8    hostage while I'm being led away.

9            Your Honor wanted to hear from her, specifically said

10   that on the record.  And they're going to hold her in a room at

11   the Dirksen building and stop her from doing that?  That's

12   beyond outrageous.

13           I need a witness.  And Ms. Lira will say I want Bob.

14   And she said so in this motion.

15           Your Honor, please, let us be a family.  We want to be

16   together.  There's never been an instance of domestic violence

17   in our household.  The altercation that happened was between my

18   sister and Natalie's sister.  And that's not at our home.

19   Natalie -- that's not at our home.  Me and Natalie are fine.

20   We want to raise our child together.  We want to be a family.

21   And to keep us apart because the FDIC kept Natalie from getting

22   to you to tell you that is wrong.  We had to listen to the

23   Oak Lawn Police Department tell me about some hearsay

24   conversation.  You haven't been hearing directly from Ms. Lira.

25   Ms. Lira would have told you exactly what she wanted to say.

1    And she did so this -- she's accompanying my motion with her

2    own statement letting you know, Judge, that I'm welcome in our

3    house.  We are a couple.  We want to be married.  We want to

4    enjoy raising our child.  It's the most fundamental right that

5    we all have, the constitutional right to raise our family.

6    What Ms. Petersen says is -- why did they have to hold Natalie

7    hostage?  How come she couldn't come into the courtroom?

8    What -- why would they not want to -- let you hear from them?

9    What is so unique about this case that they can't let Natalie

10   Lira tell you that she wants to be -- she wants me to be her

11   guy.  We're a family.  We want to be married.  And keeping us

12   apart -- my sister and Natalie are not really on good terms.

13   To make Natalie have to come here -- and it's not a conducive

14   environment for our child.  We don't like this.  We want to be

15   a family.  We have our own home.  We don't want to be like --

16   we want to be together, Judge.  Please, I beg you, Judge.

17   Natalie has agreed with this.  And she's recanted.  Everybody

18   knows this.

19          And the minute she recanted, all of a sudden, she's

20   got all these FDIC agents on her, trying to convince her

21   otherwise, to convince her that, oh, Bob is a criminal

22   defendant and you -- you better move on from this guy.

23          That's not a lawful function of FDIC.  They sell

24   insurance.  What are these agents trying to convince Natalie

25   not to be with me?  Why is this part of the investigation?  Why

1    was Natalie part of the investigation?

2         Mr. Netols -- Netols said on the Thursday, Natalie has

3    recanted, we know she's recanted.

4         Why did that trigger FDIC, on the day before court,

5    come and -- come and see her and keeping her in the back seat

6    of a car for hours.  These investigational-type techniques are

7    just -- they're outrageous and egregious.  Why are they doing

8    this to Natalie?  Just because she -- she -- she wants to be my

9    wife?  And this is -- they want to pry us apart?

10        I love my family.  And she loves me, too.  Let us be

11   together.  Let us be a husband and wife.  We have a child

12   together.  He needs his father.  He looks like me.  He walks

13   like me.  I want to be with that son.  It's a joy.  Let me have

14   a joy while I fight this case.  Everything is just wrong about

15   this case, and they know it.  Please, Judge.

16        There's no reason for them to hold Natalie hostage in

17   the Dirksen building.  Where does this happen at?  This is like

18   a Serbia, Russia move.  Let's keep Natalie locked up in a room

19   here.  It's not right.  It's not -- it's wrong, for God's sake.

20   Let them -- let her come -- let her come to the Court and say

21   what she had to say.  Let Natalie have her day in court.  No,

22   we couldn't do that.  We had to have Agent Stevenson and Agent

23   Evans holding her in the room.  No, you can't go in there.  You

24   might testify.

25        It's wrong.  It's absolutely wrong.

1          Why do you want to keep us apart for?  It's a personal

2     vendetta going on here.

3          Please, let me be with my family.  There was never

4     any -- anything between me and Natalie.  Natalie has recanted.

5     Natalie has regretted filing whatever she filed.  Let us

6     reconcile.  We don't need to be kept apart.  Our son needs me.

7     Please, Judge.  If anything else, let me be a father.  I want

8     to be a father.  Please.  They should not have kept her apart

9     from me.

10          I beg you, your Honor.  Please.

11          THE COURT:  Motion is denied.

12          Ms. Lira told us that she did not want to testify for

13     you and was afraid.  So it is not anything --

14          THE DEFENDANT:  No, she didn't.  She wouldn't even get

15     to -- how did she --

16          THE COURT:  Mr. Kowalski --

17         (Unintelligible crosstalk.)

18          THE COURT:  Mr. Kowalski, motion is denied.

19          THE DEFENDANT:  She did not -- oh, my God.  She didn't

20     say anything of the sort.

21          THE COURT:  The Pretrial Services officer talked to

22     her and told me.

23          THE DEFENDANT:  That's double hearsay, for God's sake.

24     She recanted, both -- both with the Circuit Court of Cook

25     County, there is no order of protection --

1          THE COURT:  Motion is denied.

2      (Unintelligible crosstalk.)

3          THE DEFENDANT:  Double hearsay --

4          THE COURT:  Okay.  We're going to end this --

5      (Unintelligible crosstalk)

6          THE DEFENDANT:  Oh --

7          THE COURT:  -- today.

8          Ms. Petersen, did you have anything else?

9          MS. PETERSEN:  Yes, your Honor.  Very briefly.

10         Yesterday, defendant filed a motion, 315, that's

11 motion to modify protective order.  Not getting into the merits

12 of it, but he attached to it Exhibit C, which starts on page 18

13 of the motion.  This is a grand jury exhibit that's been

14 designated as sensitive pursuant to the protective order, so --

15 and it contains financial information of individuals other than

16 Mr. Kowalski, so I would ask that this motion be sealed.  And I

17 would ask that Mr. Kowalski be reminded that, you know, when he

18 receives discovery that's been designated as sensitive,

19 pursuant to the protective order, he is not to file it publicly

20 without leave of court.

21         THE COURT:  Okay.  Mr. Kowalski, you are reminded, you

22 are an attorney, they have to remain --

23         THE DEFENDANT:  What if --

24         THE COURT:  -- sealed if it is marked as sensitive.

25 We have rules for --

1          THE DEFENDANT:  Your Honor?

2          THE COURT:  -- what can be released on the public

3     record.

4          THE DEFENDANT:  Absolutely, Judge.  But you should be

5     admonishing Mr. Chiphe because you've allowed him and

6     authorized him and enabled him to file things for me.  For

7     certain, Mr. Chiphe knows the rules of the court, and he should

8     be doing things under seal if that (audio interruption)

9          THE COURT:  Okay.  Let us end today.

10          And the next status will either be in person or you

11    will figure out your WebEx because I'm not going to allow you

12    to go on and on and on on the phone like you do because it's

13    not appropriate behavior.

14          THE DEFENDANT:  I don't wish to.  I think it's harmful

15    to me.  I don't want to do this.  I'm indigent.  And if my

16    phone system is not up to -- I don't have the resources to do

17    anything.  I don't even have a piece of paper to work off of.

18    I got to borrow everything.  That's not how an indigent -- I

19    can't defend myself like this.  It's a joke.

20          THE COURT:  You have lots of paper that has been

21    turned over to you.

22          All right.  Work on your discovery.

23          THE DEFENDANT:  That doesn't mean I have to use --

24       (Unintelligible crosstalk.)

25          THE COURT:  Everyone have a good day.

1          THE CLERK:  Court is adjourned.

2          MS. PETERSEN:  Thank you, your Honor.

3       (Concluded at 10:17 a.m.)

4                    C E R T I F I C A T E

5       I certify that the foregoing is a correct transcript, to

6    the extent possible, of the record of proceedings in the

7    above-entitled matter given the limitations of conducting

8    proceedings via videoconference/teleconference.

9

10   */s/ GAYLE A. McGUIGAN*                    *May 4, 2021*
     GAYLE A. McGUIGAN, CSR, RMR, CRR
11   Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25