UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DISTRICT

| | |
|---|---|
| United States of America | ) |
| | ) |
| v. | ) No 19 CR 226-1 |
| | ) Hon. Virginia M. Kendall |
| Robert M. Kowalski, | ) |
| Defendant | ) |

## MOTION TO RECONSIDER BOND CONDITION ORDER OF APRIL 30, 2021

Now comes Robert M. Kowalski (Robert), pro se in support of his Motion to Reconsider Bond Condition Order of April 30, 2021 states as follows:

1.) The law generally leaves it up to judges to decide which bail conditions are reasonable. But there are limits. Bail conditions that unreasonably interfere with a defendant's constitutional rights are invalid. In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.

### BREAKING FAMILIES APART IS NOT REASONABLE

2.) "When a court determines that a release on recognizance will not assure a defendant's appearance or ameliorate any danger, it may release the accused, nonetheless, on the "least restrictive" condition or combination of conditions. Id. at §§ 3142(a)(2) & 3142(c).2..." *United States v. Karper*, 847 F.Supp.2d 350 (N.D. N.Y. 2011)

3.) Excess bail is banned as part of the panoply of integrated constitutional limitations on both the states and the national government in criminal cases, and in requiring due process for defendants accused of crimes. *United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987) Recognizing that federal bail provisions are subject to constitutional limitations of due process and excessive bail; *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979). "Conditions or

1

restrictions of pretrial detention ... implicate ... protection against liberty without due process of law".

4.) The Supreme Court has defined "excessive bail" under the Eighth Amendment as "bail set at a figure higher than an amount reasonably calculated to fulfill its purpose." *Stack v. Boyle, 342 U.S. 1, 5, 72 S. Ct. 1, 96 L. Ed. 3 (1951)*. See also *Salerno, 481 U.S. at 752-54, 107 S. Ct. 2095 (discussing Stack)*. To determine whether the government's requirement of bail would be excessive, the court compares the government's request against the interest it seeks to protect. Id. at 754, 107 S. Ct. 2095.

5.) The excess can be reflected in monetary terms or in other limitations on defendant's freedom such as curfews, house arrests, limits on employment, or electronic monitoring. *United States v. Scott, 450 F.3d 863, 866 n. 5 (9th Cir.2006)*.

6.) Robert's renewed Motion to alter the conditions of bond was denied based upon "inability to comply with Pretrial Services directives". This does not comport with the least restrictive conditions analysis required under 18 USC 3142 (c)(i)(B).

7.) Robert has posted $50,000 security in the form of a federal lien upon his sister's home. Additionally, to him being a lifelong resident of Cook County Illinois resident and an Illinois Attorney of thirty years. Robert's family all reside in the Chicagoland area.

8.) Robert cannot even look for work although he has a two-year-old child to support.

9.) Robert was the only defendant that was required to personally be physically present at the court. He was treated disparately by the court in contravention of his equal protection rights.

10.) The difficulty to comply with Pretrial services random arbitrary directive solely pertained to how transportation in which indigent Robert managed to arrive at court on April 30, 2021 was arranged. The pretrial Service officer does not seem to understand the inherent difficulties that indigency causes. Pursuant to 18 USC 1954(7) pretrial officers may assist persons released under this chapter in securing any necessary employment, medical, legal, or social services. The officer despite being advised relative to Robert's indigency and knowing of his attendant difficulties has not secured vital services to help.

11.) Rather, the agent discriminates unnecessarily against Robert as a result of his poverty. Extended separation from his own family has only exacerbated the lack of support necessary to easily comply with pretrial services directives for court travel or provide a firm schedule and itinerary.

12.) Robert contacted Pretrial Services relative to the impending court date and received their permission to travel to court. Broke Robert is not able to command, demanding others to help him, or call at a whim a uber without social services. It is Robert's sole obligation to be responsible and attend court. Unless Pretrial Services can offer to help Robert as a pretrial officer is authorized to do. There are no reasonable grounds to issue directives to restrain Robert or determine how and with whom he may arrange transportation. Especially when a failure to attend court could lead to dire consequences to Robert. His lack of resources and all difficulties that entails cannot be used as a means to punish Robert unnecessarily. Ultimately the only thing that Robert can depend on are his own two arthritic legs.

13.) The magistrate judge may impose any other condition "reasonably necessary" to assure the defendant's appearance or protect the community. 18 U.S.C. §3142

(c)(1)(B)(xiv). However, conditions must be relevant to the goals of assuring appearance and community safety. *United States v. Martin-Trigona*, 767 F.2d 35, 36 (2d Cir. 1985) (condition allowing psychiatric examination of defendant not related to purposes of Bail Reform Act). Punishing Robert through unreasonable bond conditions arising because of his dire financial circumstances is not contemplated.

14.) Robert's fiancé, Ms. Natalie J. Lira, testified at length. She unequivocally stated that: Robert was welcome at her family home, that she was not fearful of Robert, that she loved, missed, and needed Robert. Their two-year-old child Alexander similarly needs and misses his father's presence. Natalie fervently wished for their family to be reunited. There is no legitimate government reason to sever Robert from his family. Robert needs them too!

15.) Ms. Lira further testified to the extreme activities of FDIC Special Agents that interfered and prevented her from complying with subpoena to appear in court on October 21, 2020. She described how these special FDIC agents offered relationship advice suggesting that she abandon Robert because things were ominously **_"going to get worse for him"_**.

16.) The enforced separation has strained the emotional link between Robert's family members. This is causing risk of losing the family's home. The bond order interferes with rights to familial privacy, family integrity, intimate association secured by the 14th amendment in violation of the United States Constitution. There is a two-year-old son who desperately needs his father. Robert and Natalie wish to marry, enjoy, and share responsibilities raising their child. Marriage is fundamental to supporting a union of committed individuals and safeguards children and families.

17.) Excessiveness must be determined by looking both at federal and state law, but a rule of thumb is that term relates overall to reasonableness. In *United States v. Salerno*, 481 U.S.739 (1987) the Court stated as follows:

> The only arguable substantive limitation of the Bail Clause is that the Government's proposed conditions of release or detention not be "excessive" in light of the perceived evil. Of course, to determine whether the Government's response is excessive, we must compare that response against the interest the Government seeks to protect by means of that response. Thus, when the Government has admitted that its only interest is in preventing flight, bail must be set by a court at a sum designed to ensure that goal, and no more.

18.) Thus, to determine excessiveness, one must "look to the valid state interests bail is intended to serve for a particular individual and judge whether bail conditions are excessive for the purpose of achieving those interests. The state may not set bail to achieve invalid interests. While flight and public safety are valid interests, at least one federal court has held that setting bail at a level designed to prevent the arrestee from posting it is invalid, see *Wagenmann v. Adams*, 829 F.2d 196, 211-14 (1st Cir. 1987), and **bail as punishment would also undoubtedly be an invalid state interest**, nor in an amount that is excessive in relation to the valid interests it seeks to achieve."

19.) It is pure punishment to strip Robert of his family under these circumstances. Solely to assuage Pretrial Services for its unenlightened view of indigency and failure to provide social services.

20.) Robert's due process rights have been violated. The Court has held that the constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this nations history and traditions. *Meyer v. Nebraska*, 262 U.S. 390 (1923). There is a constitutional right to live together as a family, *Smith v. Organization of Foster Families*, 431 U.S. 816, (1977), and this right is not

5

limited to the nuclear family. In fact, any regulation that affects the ability to form maintain, dissolve, or resolve conflicts within a family is subject to rigorous judicial scrutiny.

## DEFENSE DOOMED WITHOUT ACCESS TO WITNESSES

21.) Pro-se Robert has an undeniable 6th Amendment Right to have compulsory process to have witnesses in his defense. This fundamental right to a fair trial is not meaningful if Pro-se Robert is entirely divested by his bond conditions of the ability to contact and interview anyone without fear of reincarceration. Phone conversations and zoom meetings are helpful but do not even come close to providing the meaningful access to witnesses that is required by the constitution. Being limited to access of witnesses is a complete hindrance.

22.) Present bond conditions unreasonably unconstitutionally impair Pro-Se Robert's access to pertinent witnesses contrary to the rights secured by the fifth, sixth, and fourteenth amendments. The list of individuals identified whom pro se Robert may not contact is voluminous. The blackout includes entire agencies of the United States government.

23.) Previously, Robert was incarcerated for delivering information to a supposedly grieving widow pertaining to an Illinois FOIA complaint for complete police investigation information for her husband's improbable suicide. This person was a long-time friend and family member of Robert. This witness had publicly loudly proclaimed her disbelief over the official conclusions of the death investigation. However, recent discovery relates this witness insisted that several loans were made on a personal basis, and many love letters were written to a special paramour. Moreover, she had discussed her recently deceased husband prior to his bizarre

6

demise in the past tense with her new flame. In particular, director of the bank Mr. Mahan disclosed upon examination before the FDIC on April 3, 2019 the following:

> At one point she (Theresa Gembara) wrote me a letter and she said, hey, I'm glad we're able to help. If anything ever happened to John, **_the loan is null and void_**. (see deposition of William Mahon April 3, 2019 page 101 line 10-13)

Apparently, the death of John was generally most unexpected except in certain no repayment circles? Certainly, it is reasonable that defendant be allowed access to this reluctant witness. In light of this comment is there any wonder why the funeral wailing Mrs. Gembara would not wish to discuss the improbable death of her husband.

24.) The Compulsory Process and Due Process Clauses thus require courts to conduct a searching substantive inquiry whenever the government seeks to exclude criminal defense evidence. After all, few rights are more fundamental than that of an accused to present witnesses in his own defense. *Chambers, supra, 410 U.S., at 302, 93 S.Ct., at 1049.* The exclusion of criminal defense evidence undermines the central truth-seeking aim of our criminal justice system, see *United States v. Nixon, 418 U.S. 683, 709, 94 S.Ct. 3090 3108, 41 L.Ed.2d 1039 (1974),* because it deliberately distorts the record at the risk of misleading the jury into convicting an innocent person. Surely the paramount value our criminal justice system places on acquitting the innocent, see, e.g., *In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970),* demands close scrutiny of any bond conditions preventing the jury from hearing evidence favorable to the defendant.

25.) The substantive limitation on excluding criminal defense evidence secured by the plain terms of the Compulsory Process Clause is also grounded in the general

7

constitutional guarantee of due process. See *Chambers v. Mississippi*, 410 U.S. 284, 298-302, 93 S.Ct. 1038, 1047-1049, 35 L.Ed.2d 297 (1973); see also *Rock v. Arkansas*, 483 U.S. 44, 51, 107 S.Ct. 2704 2709, 97 L.Ed.2d 37 (1987); *Crane v. Kentucky*, 476 U.S. 683, 690-691, 106 S.Ct. 2142, 2146-2147, 90 L.Ed.2d 636 (1986).

## **HEALTH ISSUES**

26.) On May 10, 2021 Robert was diagnosed with having suffered a transient ischemic attack (TIA) by Doctor William J. Pankau, MD. (See exhibit A). The doctor indicated lifestyle changes to help prevent a stroke that included increased exercise. The conditions in which Robert is held do not allow reasonable access to exercise. Consequently, Robert's competency to stand trial is being adversely affected.

Wherefore, the defendant, Robert M. Kowalski (Robert) moves this Honorable Court to enter an order.

A.) Allowing pro-se Robert unfettered access to witnesses listed on the bond order exhibit of December 23, 2020 in order to prepare for his defense.

B.) Modifying the bond condition order to allow Robert to have unrestricted access with all witnesses.

C.) Allowing reunification of Robert with his family including residence with his family.

D.) Allowing Robert, the ability to practice his Catholic faith.

E.) Allowing Robert, the ability to exercise and have reasonable excercise.

F.) Or providing such other and further relief as the court may deem equitable.

Respectfully Submitted,

*[signature]*

Robert M. Kowalski, Attorney at Law
1009 61st Street,
Lagrange Highlands, Illinois 60525 (708)307-4497

8

# AFTER VIEW SUMMARY 

**Robert Kowalski** DoB: 4/24/1962   5/10/2021 5:50 PM   OSF Care Station - Oak Lawn West 708-974-7600

## Instructions from William J Pankau, MD
Your personalized instructions can be found at the end of this document.

## What's Next
You currently have no upcoming appointments scheduled.

## My Immunization History   Never Reviewed
No immunizations on file.

## MyChart Activation Information
K8N68-K8HC6-6K4MJ
Expires: 6/24/2021 5:49 PM

Activate your OSF MyChart access code today! You can view your lab results, schedule your next visit, follow-up with your health care provider through the secure messaging feature and much more 24 hours a day, seven days a week! Please go to www.osfmychart.org to finish activating your account. We look forward to hearing from you through OSF MyChart!

**Additional Information**
If you have questions, please contact our OSF MyChart staff at (1-855-673-4325) or OSF Care Station - Oak Lawn West at 708-974-7600. OSF MyChart is not to be used for urgent needs. For medical emergencies, please dial 911 or go to the nearest emergency room.

## Today's Visit
You saw William J Pankau, MD on Monday May 10, 2021. The following issue was addressed: TIA (transient ischemic attack).

- Blood Pressure: 118/74
- BMI: 27.89
- Weight: 200 lb
- Height: 5' 11"
- Temperature (Oral): 98 °F
- Pulse: 70
- Respiration: 18
- Oxygen Saturation: 99%

## Your Medication List as of May 10, 2021 6:43 PM
You have not been prescribed any medications.

Robert Kowalski (MRN: 08168408) • Printed at 5/10/21 6:43 PM    Page 1 of 6   Epic

## COVID Vaccine Information

Our records indicate that you have not yet completed your COVID vaccine.

- To register for a COVID Vaccination at OSF, please use this link: https://www.osfhealthcare.org/covid19/vaccine/

- If you have already received your vaccine, please let your Primary Care Provider's office know the name and date of the vaccine received, so we can update your records.

# Instructions from William J Pankau, MD

Go directly to the emergency room at Christ Hospital. I gave report to the charge nurse at Christ ER at 6:35 p.m.

## What Is a TIA?

A TIA (transient ischemic attack) is an early warning that a stroke (also called a brain attack) is coming. A TIA is a temporary stroke. It causes no lasting damage. But the effects of a stroke, if it happens, can be very serious and lasting. If you think you are having symptoms of a TIA or stroke—even if they don't last—get medical help right away.



## Symptoms of TIA and stroke

Symptoms may come on suddenly and last for a few seconds or a few hours. You may have symptoms only once. Or they may come and go for days. If you notice any of the following symptoms, don't wait. Call 911 or emergency services right away.

- Weakness, numbness, tingling, or loss of feeling in your face, arm, or leg
- Trouble seeing in one or both eyes; double vision
- Slurred speech, trouble talking, or problems understanding others when they speak
- Sudden, severe headache
- Dizziness or a feeling of spinning
- Loss of balance or falling
- Blackouts

F.A.S.T. is an easy way to remember the signs of a stroke. When you see the signs, you will know what you need to call 911 fast.

F.A.S.T. stands for:

- F is for face drooping. One side of the face is drooping or numb. When the person smiles, the smile is uneven.
- A is for arm weakness. One arm is weak or numb. When the person lifts both arms and the same time, one arm may drift downward.

- S is for speech difficulty. You may notice slurred speech or trouble speaking. The person can't repeat a simple sentence correctly when asked.
- T is for time to call 911. If someone shows any of these symptoms, even if they go away, call 911 right away. Make note of the time the symptoms first appeared.

**StayWell last reviewed this educational content on** 3/1/2020

© 2000-2021 The StayWell Company, LLC. All rights reserved. This information is not intended as a substitute for professional medical care. Always follow your healthcare professional's instructions.

## Transient Ischemic Attack (TIA)

Your symptoms were caused by a TIA, or mini-stroke. Even though your symptoms have gone away, this condition is as serious as a full stroke. It means you are more likely to have a full stroke. About 1 in 3 people who have a TIA go on to have a full stroke. And 4% to 10% of those people will have the stroke within 2 days.

A TIA is caused when something decreases or blocks blood flow to a part of your brain. A TIA often happens when a blood clot travels to a blood vessel in the brain. The clot reduces or blocks blood flow. This causes the symptoms you had. After a short while, the clot dissolves. Blood flows again, and the symptoms go away. People with hardening of the arteries (atherosclerosis) are at higher risk for a TIA. So are people who have an irregular heartbeat called atrial fibrillation.

A TIA causes symptoms similar to a stroke, but they last less than 24 hours. A full stroke causes symptoms that last more than 24 hours and may be permanent. But even if your symptoms only lasted a short time, the TIA may have damaged your brain tissue. Once you have had a TIA, you are at risk of having a full stroke. You will need tests to look at the blood flow to your brain. The tests can also rule out other causes of your symptoms. The tests may include an ultrasound of the arteries in your neck and an evaluation of your heart. They may also include a CT scan of your brain, an MRI scan of your brain, or both. If your healthcare provider finds problems, he or she will recommend treatment with medicines, procedures, or both.

Your provider may prescribe medicines to reduce your chance of having another TIA and stroke. These may include medicines that prevent blood clots, such as antiplatelet medicines and blood thinners (anticoagulants). Your doctor may recommend other treatments. This may include a procedure to open up a blocked artery in your neck or a procedure to prevent blood clots from forming in the heart.

### Home care

These guidelines will help you take care of yourself at home:

- Take any medicines your doctor has prescribed as directed. These may include antiplatelet medicines or medicines for other conditions, such as high blood pressure or high cholesterol.
- A TIA is a serious event that puts you at risk of having a full stroke. Because of this, it's important to take steps to help prevent a stroke from happening. Your doctor will look at all of your risk factors when deciding on what other treatment you may need.

### Ways to reduce your risk for stroke

High blood pressure, diabetes, high cholesterol, heavy drinking, and smoking are risk factors for stroke and heart disease. You can control these by taking medicines and making diet and lifestyle changes. One way to help prevent a stroke is to take aspirin or a similar medicine every day. But don't take daily aspirin unless your healthcare provider tells you to.

Your provider will work with you to make lifestyle changes to help prevent a stroke.

**Diet**

Your healthcare provider will give you information about changes you may need to make to your diet. You may need to see a registered dietitian for help with diet changes. Changes may include:

- Eating less fat and cholesterol
- Eating less salt (sodium). This is especially important if you have high blood pressure.
- Eating more fresh fruits and vegetables
- Eating lean proteins, such as fish, poultry, beans, and peas
- Eating less red meat and processed meats
- Using low-fat dairy products
- Using vegetable and nut oils in limited amounts
- Limiting how many sweets and processed foods such as chips, cookies, and baked goods you eat
- Limiting how much alcohol you drink

**Physical activity**

Your healthcare provider may recommend that you get more exercise if you have not been as active as possible. He or she may suggest that you get 40 minutes of moderate to vigorous physical activity each day. You should do this at least 3 to 4 days a week. A few examples of moderate to vigorous exercise are:

- Walking at a brisk pace, about 3 to 4 miles per hour
- Jogging or running
- Swimming or water aerobics
- Hiking
- Dancing
- Martial arts
- Tennis
- Riding a bike

**Other ways to reduce your risk**

- **Weight management.** If you are overweight or obese, your healthcare provider will work with you to lose weight and lower your body mass index (BMI) to a normal or near-normal level. Making diet changes and increasing physical activity can help.
- **Smoking.** If you smoke, break the habit. Enroll in a stop smoking program to improve your chances of success.
- **Stress.** Learn how to manage your stress. This will help you deal with stress at home and at work.

**Follow-up care**

Call your doctor for an appointment in the next few days for another evaluation, or as advised. This is to make a plan for preventing another TIA or stroke. You may need to see a neurologist to follow up on your TIA. A neurologist is a doctor who specializes in treating brain and nervous system problems. You may need other tests or procedures.

If you had an X-ray, CT scan, MRI scan, or ECG (electrocardiogram), a specialist will review it. You'll be told of any new findings that will affect your care.

**Call 911**

Call 911 if any of these occur:

- Any of your TIA symptoms return
- New problems with speech, vision, walking, or weakness or numbness of the face or on one side of the body

- Severe headache, fainting spell, dizziness, or seizure

Use F.A.S.T. to help you remember the symptoms of a stroke:

- **F. Face drooping,** or numbness on one side. This may be more noticeable when you ask the affected person to smile.
- **A. Arm weakness or numbness.** The affected person may have trouble using or lifting one side.
- **S. Speech difficulty.** Speech may be slurred or hard to understand. The affected person may also use the wrong words.
- **T. Time to call 911.** Time is critical in treating a stroke. Call 911 as soon as you suspect a stroke has happened—even a small one. The sooner treatment is started the better, even if the symptoms go away.

**StayWell last reviewed this educational content on** 12/1/2019

© 2000-2021 The StayWell Company, LLC. All rights reserved. This information is not intended as a substitute for professional medical care. Always follow your healthcare professional's instructions.