```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3   UNITED STATES OF AMERICA,       )  Docket No. 19 CR 00226, 1-10
                                     )
 4                  Plaintiff,       )  Chicago, Illinois
                                     )  April 30, 2021
 5             v.                    )  9:31 a.m.
                                     )
 6   ROBERT M. KOWALSKI, JAN R.      )
     KOWALSKI, ROSALLIE C. CORVITE,  )
 7   JANE V. IRIONDO, ALICIA         )
     MANDUJANO, CATHY M. TORRES,     )
 8   JAMES R. CROTTY, BOGUSLAW       )
     KASPROWICZ, MIROSLAW KREJZA AND )
 9   MAREK MATCZUK,                  )
                                     )
10                  Defendants.      )
```

```
11                  TRANSCRIPT OF PROCEEDINGS
12          BEFORE THE HONORABLE VIRGINIA M. KENDALL

13   APPEARANCES:

14   For the Government:      UNITED STATES ATTORNEY'S OFFICE by
                             MR. BRIAN PATRICK NETOLS
15                           MS. MICHELLE PETERSEN
                             MR. JEREMY DANIEL
16                           Assistant United States Attorneys
                             219 South Dearborn Street
17                           Chicago, Illinois  60604

18   For Defendant           MR. ROBERT KOWALSKI, Pro Se
     Robert Kowalski:
19
     For Defendant           FEDERAL DEFENDER PROGRAM by
20   Robert Kowalski         MR. IMANI CHIPHE
     as standby counsel:     55 East Monroe Street, Suite 2800
21                           Chicago, Illinois  60603

22

23   Court Reporter:         GAYLE A. McGUIGAN, CSR, RMR, CRR
                             Official Court Reporter
24                           219 S. Dearborn Street, Room 2504
                             Chicago, IL 60604
25                           312.435.6047
                             gayle_mcguigan@ilnd.uscourts.gov
```

```
 1    APPEARANCES:   (Continued)

 2

 3    For Defendant              MR. WILLIAM SEAN STANTON (Via Video)
      Jan R. Kowalski:           53 West Jackson Boulevard, Suite 1062
 4                               Chicago, Illinois  60604

 5    For Defendant              FAEGRE DRINKER BIDDLE & REATH LLP by
      Corvite:                   MR. CARRIE ELIZABETH DELANGE (Via Video)
 6                               MR. DANIEL JOHN COLLINS
                                 191 North Wacker Drive, Suite 3700
 7                               Chicago, Illinois  60606-1698

 8    For Defendant              EKL WILLIAMS & PROVENZALE LLC
      Iriondo:                   MR. TERRY A. EKL (Via Video)
 9                               901 Warrenville Road, Suite 175
                                 Lisle, Illinois  60532
10
      For Defendant              HENDERSON PARKS LLC by
11    Mandujano:                 MR. COLIN QUINN COMMITO (Via Video)
                                 140 South Dearborn Street, Suite 1020
12                               Chicago, Illinois  60603

13    For Defendant              LAW OFFICES OF MARC M. BARNETT by
      Torres:                    MR. AARON ROSENBLATT  (Via Video)
14                               53 West Jackson Boulevard, Suite 1442
                                 Chicago, Illinois  60604
15
      For Defendant              KOPECKY SCHUMACHER ROSENBURG LLC by
16    Crotty:                    MR. JAMES L. KOPECKY  (Via Video)
                                 120 North LaSalle Street, Suite 2000
17                               Chicago, Illinois  60601

18    For Defendant              SHEPPARD LAW FIRM PC by
      Kasprowicz:                MR. ADAM JORDAN SHEPPARD  (Via Video)
19                               180 North LaSalle Street, Suite 2510
                                 Chicago, Illinois  60601
20
      For Defendant              SHILLER PREYAR LAW OFFICES by
21    Krejza:                    MR. BRENDAN SHILLER  (Via Video)
                                 601 South California Avenue
22                               Chicago, Illinois  60612

23

24

25
```

```
 1    APPEARANCES:  (Continued)

 2

 3    For Defendant            PISSETZKY LAW by
      Matczuk:                 MR. GAL PISSETZKY  (Via Video)
 4                             35 East Wacker Drive, Suite 1980
                               Chicago, Illinois  60601
 5
                               MR. LAWRENCE H. HYMAN  (Via Video)
 6                             111 West Washington Street, Suite 1025
                               Chicago, Illinois  60602
 7

 8

 9    Polish Interpreter:      MR. DEREK MONROE   (Via Video)

10

11    Pretrial Services        MS. CHRISTA GREEN (Via Telephone)
      Officers:
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (In open court.)

2              THE CLERK:  Case number 19 CR 226, Defendants 1

3     through 10, U.S. versus Robert Kowalski, Jan Kowalski, Rosallie

4     Corvite, Jane Iriondo, Alicia Mandujano, (audio feedback),

5     Cathy Torres, James Crotty, Boguslaw Kasprowicz, Miroslaw

6     Krejza, and Marek Matczuk.

7              THE COURT:  Okay.  I believe I have a Polish

8     interpreter somewhere.

9              THE CLERK:  You do, your Honor.

10             INTERPRETER:  I'm here.

11             THE COURT:  Thank you, sir.

12             Would you raise your right hand?

13             Do you swear to fairly and accurately interpret the

14    proceedings before you this morning?

15             INTERPRETER:  Yes, I do.

16         (Interpreter Derek Monroe duly sworn.)

17             THE COURT:  Okay.  All right.  I'm going to start with

18    those who are in my courtroom.

19             But before I do so, if you are not -- if you on the

20    call do not have your phone muted right now, please mute it

21    because it helps with the feedback.

22             Okay.  Let me start with the prosecutors.

23             MR. NETOLS:  Good morning, your Honor.  Brian Netols,

24    N-E-T-O-L-S, on behalf of the United States.

25             THE COURT:  It's very important that you speak right

1      at the microphones for everyone here.

2              MR. NETOLS:  Brian Netols, N-E-T-O-L-S, on behalf of

3      the United States.

4              THE COURT:  Good morning.

5              MS. PETERSEN:  Good morning.  Michelle Petersen for

6      the United States.

7              THE COURT:  Good morning.

8              MR. DANIEL:  Good morning, your Honor.  Jeremy Daniel

9      on behalf of the United States.

10             THE COURT:  Good morning.

11             MR. CHIPHE:  Good morning, your Honor.  Imani Chiphe,

12     standby counsel on behalf of Mr. Kowalski, who is just in the

13     courtroom, your Honor.

14         (Pause in proceedings.)

15             THE COURT:  We've called the case, Mr. Kowalski.

16         (Mr. Robert Kowalski approaches.)

17             DEFENDANT ROBERT KOWALSKI:  Good morning, your Honor.

18             THE COURT:  That's Mr. Kowalski.

19             Okay.  Good morning.

20             Let's start with Jan Kowalski.  Is she here?

21             MR. STANTON:  Bill Stanton, S-T-A-N-T-O-N, on behalf

22     of Jan Kowalski, who is present by video feed.

23             THE COURT:  Good morning.

24             And then for Rosallie Corvite, please?

25             MS. DELANGE:  Good morning, your Honor.  Carrie

1    Delange on behalf of Rosallie Corvite, whose presence is

2    waived.

3              THE COURT:  Jane Iriondo?

4              MR. EKL:  Good morning, your Honor.  Terry Ekl, E-K-L,

5    on behalf of (audio interruption).

6              COURT REPORTER:  I did not hear that, Judge.

7              THE COURT:  Yes.  Mr. Ekl, we have a very bad

8    connection.

9              Can you try saying that again, sir?

10             MR. EKL:  Terry Ekl, E-K-L, on behalf of Jane

11    Iriondo (audio interruption)

12             THE COURT:  Did you get that, Gayle?

13             COURT REPORTER:  I don't know about her presence --

14             THE COURT:  Is her presence waived?

15             MR. EKL:  She is present by WebEx, Judge.

16             THE COURT:  Mr. Ekl, did you waive her presence?

17             MR. EKL:  She's present on the WebEx.

18             THE COURT:  Are you here, Ms. Iriondo?

19             DEFENDANT IRIONDO:  Good morning, your Honor.  Yes,

20    Jane Iriondo, I'm here.

21             THE COURT:  Okay.  I see you now.  Thank you.

22             Alicia Mandujano, please?

23             MR. COMMITO:  Good morning, your Honor.  My name is

24    Paul Commito, last name C-O-M-M-I-T-O.  I represent

25    Ms. Mandujano.  Her appearance has been waived for today.

1          THE COURT:  Okay.  Good morning.

2          James Crotty?

3          MR. KOPECKY:  Good morning, your Honor.  Jim Kopecky,

4     K-O-P-E-C-K-Y -- (audio interruption)

5          COURT REPORTER:  I got his name only, Judge.

6          THE COURT:  We only got your name, according to the

7     court reporter, so please state that again.

8          Wait for the interpreter to finish.

9          MR. KOPECKY:  James Kopecky, K-O-P-E-C-K-Y, for James

10    Crotty.  And Mr. Crotty is also present (audio interruption)

11         THE COURT:  Good morning.  Is Mr. Crotty here?

12         MR. KOPECKY:  Yes, he is.  He's on the WebEx.

13         THE COURT:  Okay.  Say good morning, please, because

14    there's only so many screens that appear at once, so I would

15    like to see who he is.

16         I think you are muted.

17         DEFENDANT CROTTY:  Good morning, your Honor.

18         THE COURT:  Now I see you.  Thank you.  Good morning,

19    Mr. Crotty.

20         All right.  Boguslaw Kasprowicz -- no, let's see if I

21    get this right, Kasprowicz.

22         DEFENDANT KASPROWICZ:  Yes, good morning, your Honor.

23         MR. SHEPPARD:  Good morning, your Honor.  Adam

24    Sheppard on behalf of Boguslaw Kasprowicz, who is present

25    before this Honorable Court telephonically.

1          THE COURT:  Okay.  Good morning.

2          Good morning, Mr. Kasprowicz.

3          DEFENDANT KASPROWICZ:  Good morning, your Honor.

4          THE COURT:  Miroslaw Krejza.

5          DEFENDANT KREJZA:  Yes.  Good morning, your Honor.

6          THE COURT:  Good morning.

7          MR. SHILLER:  Good morning, your Honor.  Brendan

8  Shiller appearing on behalf of Mr. Krejza, who is also (audio

9  interruption) appearing on video WebEx.

10         THE COURT:  Marek Matczuk?

11         MR. PISSETZKY:  Good morning, your Honor.  Gal

12 Pissetzky and Lawrence Hyman for Mr. Matczuk.  He has been

13 excused for today's date.

14         THE COURT:  Good morning.

15         I also have Pretrial Services here I see.

16         PRETRIAL SERVICES OFFICER:  Good morning, your Honor.

17 Christa Green from Pretrial Services.

18         THE COURT:  Okay.  Let me first address, since it's an

19 issue regarding representation, the motion for withdrawal filed

20 by Mr. Shiller.

21         Mr. Shiller?

22         MR. SHILLER:  Your Honor, (audio interruption)

23         THE COURT:  Mr. Shiller -- Mr. Shiller, hold on, we

24 don't hear you well.  It's very garbled.

25         THE CLERK:  It might be helpful if the interpreter

 1    waits until they're done speaking to interpret.

 2            MR. SHILLER:  Judge, I have (indecipherable) federal

 3    litigation practice (audio interruption)

 4            MR. NETOLS:  It's the interpreter --

 5            THE COURT:  Mr. Shiller, Mr. Shiller, I have to change

 6    this for a moment.

 7            May I ask the interpreter, please, to wait until

 8    Mr. Shiller finishes speaking to interpret so that I can hear

 9    him, please.

10            Thank you.

11            INTERPRETER:  Okay, sure.

12            MR. SHILLER:  I'll try to speak in sentences instead

13    of paragraphs, Judge.

14            I no longer -- I have ceased my criminal defense and

15    civil rights practice.  I was removed from the CJA panel -- I

16    removed myself (indecipherable) in January --

17            COURT REPORTER:  Judge, I am not --

18            THE COURT:  Okay.  Hold on.  Hold on.

19            Gayle, he said he is no longer practicing his civil

20    rights practice, and he has removed himself from the CJA panel.

21            Okay, go ahead again, Mr. Shiller.

22            MR. SHILLER:  I was originally appointed during the

23    grand jury proceedings back last summer to represent Mr.

24    Krejza.  And at the time, there was a sincere possibility that

25    there could be a resolution within six to nine months and that

1    there may not be an indictment of Mr. Krejza.  But that did not

2    occur, and now we are looking at potentially years of

3    litigation.

4          And given that my practice is now almost entirely

5    transactional and cannabis compliance, I don't think I would be

6    in the best position over the years of litigation as criminal

7    law evolves to properly represent the defendant, Mr. Krejza.

8          Therefore, I'm requesting leave to withdraw and have a

9    different panel member or an actual panel member appointed to

10   represent Mr. Krejza going forward.

11         THE COURT:  Okay.  Mr. Shiller, I will grant your

12   motion to withdraw, except it will be contingent upon you

13   staying here this morning for this status.

14         MR. SHILLER:  Thank you, Judge.

15         THE COURT:  Mr. Krejza, I will appoint you a new panel

16   attorney, and that attorney will contact you next week

17   sometime.

18         DEFENDANT KREJZA:  Thank you, your Honor.

19         THE COURT:  Thank you.

20         Now, three matters of procedure as we move forward

21   with this case.

22         Next time, the interpreter and whoever he is

23   interpreting for must appear in court.  It is too difficult to

24   do this over WebEx with an interpreter.

25         Secondly, Ms. Kowalski, although you are sitting in

1    your car, you are in my courtroom, and so you don't eat your

2    breakfast in court.  So no eating or drinking while we are in

3    court.

4             And, third, if you're going to bring your child to

5    court, he must be quiet and not disturb the proceedings.  If he

6    does, he'll be asked to go out into the hallway.

7             Okay.  Now, if we can begin with the status from the

8    government, I would like to see if it's possible, after you

9    give your overall status, if you can give the status regarding

10   Mr. Shiller's client, who is the one with the interpreter, and

11   then we can let him go and make this a little bit smoother this

12   morning.  Okay?

13            MR. NETOLS:  Yes, your Honor.  And by the general

14   status, I understand you mean that --

15            THE COURT:  Into the microphone.

16            MR. NETOLS:  Sorry.  Deal with everyone except for

17   Robert Kowalski.

18            THE COURT:  That's correct.

19            MR. NETOLS:  Excellent, okay, that's what I -- your

20   Honor, the --

21            THE COURT:  No, the microphone.

22            MR. NETOLS:  Yes, your Honor.  I'm going to deal with

23   three issues.  The status of the ongoing investigation as it

24   would affect the scheduling court proceedings, discovery as to

25   the defendants; general issues on plea progress; and then

1    discovery as to all the defendants except for Mr. Kowalski.

2         THE COURT:  Okay.  So stop right there.

3         MR. NETOLS:  With respect to the status of the

4    investigation ongoing as it might affect court proceedings, the

5    investigation is continuing.  We do expect to add additional

6    defendants.  The progress should accelerate to the extent that

7    we have been in an extended grand jury which met only a

8    month -- one day a month.  We are going to switch to a new

9    grand jury which meets every week, which will allow us to issue

10   more subpoenas on different return dates and present more

11   witnesses.

12        So once -- we have to take the time to re-present the

13   case to a new grand jury, we should be moving much -- at a

14   quicker pace.

15        We are in cooperation discussions with five people who

16   have been charged, in addition to people who haven't been

17   charged.

18        Of the five that have been charged, our office is in

19   the process of reaching determinations as to the terms of plea

20   agreements, which would mean that in the relatively near future

21   we would expect to be having defendants coming in to enter

22   pleas.

23        We have charged a case as a result of this

24   investigation that was assigned to another judge, the Thompson

25   case.  And three of the defendants who are cooperating in this

1    case will likely testify in that case.

2              So your Honor will have to, you know, find a way to

3    evaluate their cooperation in the other proceeding.  We could

4    consider ordering transcripts, if that would work.

5              With respect to discovery as to defendants, except for

6    Robert Kowalski, I believe that's proceeding accordingly.  And

7    to the extent there have been issues with defense counsel,

8    we've been able to address their questions.  We've addressed

9    those questions without having to bring the Court into

10   discovery issues.

11             Finally, the only other individual issue is with

12   respect to Mr. Kasprowicz.  He is in the process of posting

13   California property for bond.  And I think we may need to hear

14   from -- or you may need to hear from his counsel as to how that

15   is progressing.

16             Otherwise, after I check with Ms. Petersen, I think

17   that's the end of the general status.

18        (Counsel conferring.)

19             MR. NETOLS:  And then I will -- I have nothing else

20   other than -- until Mr. Kasprowicz addresses the bond issue,

21   other than to suggest I believe Mr. Kasprowicz and Mr. Krejza

22   both need the interpreter.  And to the government's

23   understanding, from this point on, there won't be anything that

24   would involve those two defendants.  So, frankly, any

25   defendants other than Mr. Robert Kowalski.

1          THE COURT:  Okay.  Okay, Mr. Shiller, I know you will

2     be getting off the case, but is there any issue that your

3     client at this point needs to address with the Court?

4          MR. SHILLER:  To address with the Court, he has

5     expressed that he wants to make sure whoever is appointed has

6     sufficient time to catch up, and I assured him that your Honor

7     would, but there's no other specific issues.

8          THE COURT:  You can assure him that I will work with

9     his new attorney to make him get up to speed, and I will assess

10     whether he is up to speed each time we meet.

11          Okay.  Mr. Sheppard, is there anything that you need

12     to address with me regarding your client?

13          MR. SHEPPARD:  Your Honor, with respect to bond -- and

14     may I -- my client does not require the services of an

15     interpreter.  He did not have it at the arraignment either.

16          THE COURT:  Okay.  Well, then, if that is the case, is

17     it only Mr. Krejza who needed the interpreter this morning?

18          INTERPRETER:  That's right.

19          THE COURT:  Well, I will allow Mr. Shiller and

20     Mr. Krejza to be excused from the status, but first I'm going

21     to have another status hearing in one month.

22          Lynn, can you give me a date?

23          THE CLERK:  May --

24          INTERPRETER:  I'm sorry, what was the date?

25          THE CLERK:  I didn't give it yet.  Hold on just a

1    moment.

2            May 28 at 10:00 o'clock.

3            THE COURT:  Mr. Shiller, do you agree to the exclusion

4    of time?

5            MR. SHILLER:  No objection, your Honor.  Thank you.

6            THE COURT:  Okay.  Now, before I let the interpreter

7    and Mr. Shiller and Mr. Krejza leave, let me tell the

8    interpreter that normally the way this is done is that you are

9    muted, and you are talking on the telephone with the individual

10   who you're interpreting for so that we don't have this delay.

11           INTERPRETER:  Okay, I understand.  This is just --

12   just done on the video link, so I didn't know the particulars.

13           THE COURT:  Okay.  So check with the interpreter's

14   office on the procedure.  If you are unable to do it

15   simultaneously, then come to court, please.

16           INTERPRETER:  That's fine.  I can do it simultaneously

17   on the phone.  I was just told it's going to be video link, so

18   that's fine, I didn't know the particulars.

19           THE COURT:  Okay.  Thank you.  And you may be excused

20   now.

21           INTERPRETER:  Thank you.

22           THE COURT:  Thank you.  Have a good day.

23           Now let me go through, Mr. Stanton, is there anything

24   that you want to raise with me regarding your representation

25   with Ms. Kowalski?

```
1              MR. STANTON:  Not at this time, Judge.  Thank you.

2              THE COURT:  All right.  Do you agree to the exclusion

3    of time until May 28th?

4              MR. STANTON:  No objection.

5              THE COURT:  Thank you.

6              Mr. Collins, do you agree?

7              MR. COLLINS:  Yes, Judge.

8              THE COURT:  Do you have any issues regarding

9    Ms. Corvite?

10             MR. COLLINS:  I have no issues, Judge.

11             THE COURT:  Okay.  Then do you agree to the exclusion

12   of time?

13             MR. COLLINS:  Yes, I do.

14             THE COURT:  Thank you.

15             Mr. Ekl, any issues to raise with me regarding

16   Ms. Iriondo?

17             MR. EKL:  Judge, the only issue I have is on the next

18   status date, if your Honor would permit Jane to attend by WebEx

19   or waive her appearance.  She lives in Idaho.

20             THE COURT:  She can have her appearance waived.  It

21   will be a status regarding discovery.

22             Do you agree to the exclusion?

23             MR. EKL:  That's absolutely -- yes, I do, your Honor.

24             THE COURT:  Okay.  All right.  Anything else?

25             MR. EKL:  That's all.  Thank you very much.
```

```
1                    THE COURT:  Thank you.

2                    Mr. Henderson regarding Mandujano?

3                    MR. COMMITO:  Judge, Mr. Henderson is not present.

4      It's just me for today.

5                    THE COURT:  Oh, that's right.  Mr. Commito.  I'm

6      sorry.

7                    Do you have any issues to raises with me regarding

8      Ms. Mandujano?

9                    MR. COMMITO:  No, I do not.

10                   THE COURT:  Okay.  And do you agree to the exclusion

11     of time?

12                   MR. COMMITO:  I do, Judge, but I would ask the Court

13     one thing, is if possible to waive Ms. Mandujano's appearance

14     for the next court date?

15                   THE COURT:  Yes, it is.

16                   MR. COMMITO:  Thank you, Judge.

17                   THE COURT:  Thank you.

18                   Mr. Kopecky?

19                   MR. KOPECKY:  Yes, your Honor.

20                   THE COURT:  Any issues regarding Mr. Crotty?

21                   MR. KOPECKY:  No, only that I would also ask that his

22     appearance be waived for the next status, if that's okay.

23                   THE COURT:  That's fine.

24                   And do you agree to the exclusion of time, sir?

25                   MR. KOPECKY:  Yes.
```

1          THE COURT:  Okay.  Mr. Sheppard, you've got the issue

2    regarding bond, right?

3          MR. SHEPPARD:  Right, your Honor.  It's not really --

4    it's not a controversy.  The order regarding bond is that the

5    defendant would be on electronic home incarceration, which --

6    well, permission to work, but otherwise on a bracelet with a

7    curfew until he posts a property bond.  And the property in

8    question is in California.  It's been difficult getting the

9    filings in California -- the -- arrange the paperwork, first of

10   all, to be filed in California.  So we're not asking for any

11   type of bond modification.  He remains on the bracelet.  I told

12   Mr. Netols I would contact him regarding the property issue, so

13   I -- we're not asking for any bond modification, but that's

14   just the status.

15         THE COURT:  Okay.  Thank you for the update.

16         And do you agree to the exclusion of time until May

17   28?

18         MR. SHEPPARD:  Yes.

19         THE COURT:  Okay.  And then Mr. Hyman or Pissetzky --

20   who do I have?  Oh, there's Mr. Pissetzky.

21         MR. PISSETZKY:  You have both of us.

22         THE COURT:  Oh, you have both.  Great.  Okay.

23         Any issues regarding Mr. Matczuk?

24         MR. PISSETZKY:  No, your Honor, not at all.

25         THE COURT:  And do you agree to the exclusion of time?

```
 1            MR. PISSETZKY:  Yes.  No problem, Judge.

 2            It's May 28 at 9:30?

 3            THE COURT:  10:00 o'clock.

 4            MR. HYMAN:  10:00 o'clock.

 5            MR. PISSETZKY:  Oh, 10:00 o'clock.  Yes, no problem,

 6       Judge.

 7            THE COURT:  Okay.  Ms. Green, do you have any issues

 8       with these defendants that are here on the screen or have been

 9       discussed just now?

10            PRETRIAL SERVICES OFFICER:  Not these defendants, your

11       Honor, no.

12            THE COURT:  Okay.  All right.  Then all of you, you

13       may sign off.

14            And I will deal with the last defendant, Mr. Kowalski,

15       here in court.

16            Thank you.  Have a good day.

17            MULTIPLE SPEAKERS:  Thank you.

18            UNIDENTIFIED SPEAKER:  You, too.  Have a good weekend.

19            MR. ROSENBLATT:  Your Honor, Aaron Rosenblatt stepping

20       in for Marc Barnett on behalf of Cathy Torres.

21            Cathy Torres is also present via the court -- via

22       telephonic.

23            DEFENDANT TORRES:  Good morning, your Honor.  This is

24       Cathy Torres.

25            THE CLERK:  I missed one.
```

```
 1              THE COURT:  Did we miss one?

 2              MR. ROSENBLATT:  We have no issue, and we do waive

 3      time.  But you did not address us.

 4              THE COURT:  We certainly did not.  I'm really sorry

 5      about that.

 6              All right, Ms. Torres.  Hello, good morning.

 7              DEFENDANT TORRES:  Hello, good morning.

 8              THE COURT:  Okay.  And you don't have any issues to

 9      raise with me today, correct?  Your attorney, that is.

10              MR. ROSENBLATT:  No.  We also ask for, on behalf of

11      her, we would also ask that her appearance be waived on the May

12      28 status, if possible.

13              THE COURT:  Yes, it is possible.  And thank you.

14              And do you agree to the exclusion of time then?

15              MR. ROSENBLATT:  We do agree to the exclusion of time.

16      No objection.

17              THE COURT:  Okay.  Thank you.  And I'm sorry about

18      that.  We didn't have you on the list.

19              MR. ROSENBLATT:  No problem.

20              THE COURT:  Did I miss anyone else?

21              MR. ROSENBLATT:  You have so many people.  I figured I

22      would just keep quiet -- I would just keep quiet until I had a

23      good time to interrupt.

24              THE COURT:  Well, thank you.  You did well.

25          (Laughter.)
```

```
 1              THE COURT:  All right.  Have a good day.  Everyone
 2    stay well.
 3              Ms. Green, you can stay onboard.
 4              And let's turn this off.
 5              Okay.  All right.  So now let's address, from the
 6    government's perspective, what we have going with Mr. Kowalski,
 7    please.
 8              MS. PETERSEN:  Okay.  Yes, your Honor.
 9              Since our last status, Mr. Kowalski filed some
10    motions.  I thought I would address discovery first.
11              THE COURT:  Okay.
12              MS. PETERSEN:  After our last -- I think we were last
13    in front of you about two weeks ago.  And since that time, the
14    government has sent Mr. Kowalski another approximately 1,000 --
15    100,000 pages electronically.
16              We've also sent him -- let me find my Post-It -- over
17    1,000 paper pages, which are -- which is a reproduction of
18    what's electronic, as we've discussed in court before.
19              I have another over a thousand pages to give him today
20    in court, your Honor.  In fact, let me tender that right now.
21         (Documents tendered to the defendant.)
22              MS. PETERSEN:  I understand that discovery is in
23    transit to Mr. Kowalski right now.  FedEx attempted a delivery
24    yesterday, but no one answered the door, so it's back on the
25    truck.  And there's a couple -- it's broken up into pieces, so
```

1    some should arrive today.  I don't know when FedEx is going to

2    attempt delivery of what was undeliverable.  But it's on the

3    way to Mr. Kowalski.

4            THE COURT:  Well, aren't you on house arrest?

5            DEFENDANT ROBERT KOWALSKI:  Indeed I am, your Honor,

6    yes.

7            THE COURT:  Why didn't you answer the door?  Were you

8    not home?

9            DEFENDANT ROBERT KOWALSKI:  I was home, your Honor.

10   Ms. Green could attest to that.

11           THE COURT:  Why didn't you answer the door?

12           DEFENDANT ROBERT KOWALSKI:  Perhaps my door was not

13   knocked upon, your Honor.

14           THE COURT:  Okay.

15           DEFENDANT ROBERT KOWALSKI:  Certainly I'd like to see

16   some discovery.  I've been promised discovery since my case

17   began in March of 2019.

18           THE COURT:  Okay.  Ms. Petersen --

19           DEFENDANT ROBERT KOWALSKI:  Mr. --

20           THE COURT:  I'm not talking to you now.

21           Ms. Petersen?

22           MS. PETERSEN:  Another issue that Mr. Kowalski raised

23   before our last status was that he had some thumb drive or

24   thumb drives that he couldn't open.  The Court had ordered us

25   to confer about that.

1          I -- actually right before our last status, I had

2    given Mr. Kowalski a list of all the passwords.  He reported

3    that all thumb drives but one worked.

4          We did have a video -- well, we were on video.  He

5    could see us.  His video was not on.  We did have a

6    videoconference, I believe it was on April 27th, where we

7    discussed the thumb drives.

8          I told Mr. Kowalski -- prior to the conference, I had

9    asked Mr. Kowalski to identify the one drive that wouldn't

10   work.  He did not.

11         During the conference, I asked him to identify it and

12   explained how he could identify it for me.  He said he couldn't

13   do it during the conference, but he would email me which one it

14   was after the conference, which he hasn't.

15         He said he would bring it to me in court today, and I

16   don't know if he has it with him or not.

17         Yesterday or the day before, he emailed me and said

18   actually he wants all the thumb drives reproduced.  And I'm not

19   exactly sure why because as of the date of our videoconference,

20   he said all of them but one were working.

21         Additionally, prior to that videoconference, I asked

22   him to sort of send me an email with any other questions or

23   requests.

24         He raised some specific documents that he wanted and

25   some specific requests, and so I sent him a letter immediately

1    before our videoconference or the morning before our

2    videoconference outlining, you know, his -- some of his

3    questions and where what he was looking for was in the

4    discovery or telling him it would be coming this week or

5    telling him when it might come in the future.

6          So we're working to try to -- and also during that

7    videoconference, I shared my screen with Mr. Kowalski to show

8    him how to access a program that I thought was a little bit

9    hard to access which stored some OCC records.

10          So, you know, we're -- I want Mr. Kowalski to be able

11   to access the discovery, and we're trying to work towards

12   helping him do that.

13          Obviously, discovery is ongoing.  We have more to go.

14   But we are trying to keep it, you know, moving to him and

15   trying to point to him where things are in the discovery.

16          Even before our conference, he filed the discovery

17   motion, but some of those things I think that are addressed in

18   the motion I think we addressed during the conference, and

19   we're continuing to try to address them with him.

20          THE COURT:  Okay.  Now it's your turn, Mr. Kowalski.

21          DEFENDANT ROBERT KOWALSKI:  Your Honor, it's entirely

22   preposterous.  I was initially indicted in March of 2019.  And

23   I've been subsequently superseded indicted three times.  It's

24   time to -- let's bring it on.

25          Mr. Netols said there's millions of pieces of

1    discovery, and yet you're giving me a measly 300,000.  That's

2    barely 15 percent.  Oh, I got an extra hundred thousand, whoo,

3    I'm really going to be busy this weekend.  That's not nearly

4    enough.  Mr. Netols represented that he had two million pieces

5    of something.  And I'm not even getting like a quarter of that.

6            And we've been messing with this case -- this bank

7    closed in December of 2017, your Honor.  Please, the government

8    has this information.  They have it.  There's no reason why

9    they shouldn't tender it pursuant to *Brady*.

10           They probably want to give it to me a day before trial

11   or something to ambush me.  As an architect of a fair trial,

12   the government has an obligation to tender me this information.

13   I'm a poor indigent --

14           THE COURT:  How many of the hundreds of thousands of

15   pages that have been turned over to you have you read?

16           DEFENDANT ROBERT KOWALSKI:  I've read every one that I

17   could, but apparently some of these disks are defective that

18   they've provided.

19           THE COURT:  We already went through that during my

20   last conference, weren't -- didn't we go through any disks that

21   were problematic?

22           MS. PETERSEN:  You had ordered us to confer about

23   it --

24           THE COURT:  Yes.

25           MS. PETERSEN:  -- and we did so.  And as of our

1    discovery conference, which I believe was just earlier this

2    week, he said there was only one defective thumb drive.  And

3    I'm happy to take it from him and replace it or fix it or, you

4    know, whatever to make it work.

5                    DEFENDANT ROBERT KOWALSKI:  Judge --

6                    THE COURT:  Hold on.

7                    Where is the thumb drive that you said you would bring

8    to Court that's defective?

9                    DEFENDANT ROBERT KOWALSKI:  It's on my desk, your

10   Honor.

11                   THE COURT:  It's on your disk?

12                   DEFENDANT ROBERT KOWALSKI:  Desk.

13                   THE COURT:  Why didn't you bring it to court?

14                   DEFENDANT ROBERT KOWALSKI:  I was prepared to argue my

15   two motions, and I didn't think bringing a defective thumb

16   drive in here was going to be very important at all.

17                   THE COURT:  Well, it seems to be your highest priority

18   to be reviewing the evidence, and you said you would give it to

19   her so she could give you a new one.

20                   DEFENDANT ROBERT KOWALSKI:  It's not even that, your

21   Honor.  The receiver came into my office, a divorce receiver,

22   the divorce police force, task forcing with the government,

23   they took every piece of discovery I had been tendered prior to

24   October of 2019.  The discovery is a hodgepodge as a result.

25   It's not cohesive.  There's no continuity with the discovery.

1    I would like all the discovery to be tendered to me so

2    I can make sure I don't have things.

3    And, moreover, discovery I'm looking at is missing,

4    it's got placeholders.  The -- this vaunted, venerated Bates

5    system is not working.  And, moreover, 350 documents, when

6    there's millions out, is just a dribble.

7    THE COURT:  What did you say?  Vaunted, venerated?

8    DEFENDANT ROBERT KOWALSKI:  Yes, this vaunted,

9    venerated system.  The Bates numbering system is wrong.  And I

10   have instances where there's documents that are not numbered

11   correctly.  One document in one place is this way, the same

12   document, oh, it's a little bit different, the numbering is

13   off, and they're -- consequently, there's documents that are

14   not prepared there.  And that's exactly what the *Brady* --

15   THE COURT:  Well, most likely that's because they're

16   coming from different sources, right, so there's different

17   numbers on them?  Is that possible --

18   DEFENDANT ROBERT KOWALSKI:  I think that documents

19   should have the same number, regardless of its source.  If it's

20   in the system --

21   THE COURT:  Well, if it comes from one source and then

22   a different source provides it in their way, it would not have

23   the same system number.

24   DEFENDANT ROBERT KOWALSKI:  Judge, I want to believe

25   the government, too.  But documents should have the same number

1    of pages.  It should be consistent.  And it should flow.  And

2    it's not flowing here.

3              Why are they holding this back?

4              This bank closed three-plus years ago, almost

5    three and a half years now.

6              THE COURT:  What are you looking for?

7              DEFENDANT ROBERT KOWALSKI:  Your Honor, please.  I

8    want to have evidence that proves my innocence.

9              THE COURT:  Right, but what is that?  What is it

10   that --

11             DEFENDANT ROBERT KOWALSKI:  Let me explain --

12             THE COURT:  -- you say that they are holding back?

13             DEFENDANT ROBERT KOWALSKI:  Let me explain.  I'm glad

14   you asked me, Judge, because in the grand jury transcripts,

15   they talk about Ms. Mandujano and Ms. Corvite bringing up fake

16   loans to put on my name, to use my identity for their theft.

17             If I'm angry here, and if I sound angry, it's only

18   because everything I've worked for has been taken from me

19   because of this bank and because this OCC could not properly

20   audit this bank.  I'm an innocent man.  I've been --

21             THE COURT:  Calm down.

22             DEFENDANT ROBERT KOWALSKI:  -- wrongly charged.

23             THE COURT:  All right.  So are you saying that in the

24   discovery, you don't have evidence of the fake loans?

25             DEFENDANT ROBERT KOWALSKI:  No.  Quite the contrary.

1    We have a representation that was made to a grand jury --

2            THE COURT:  Okay.

3            DEFENDANT ROBERT KOWALSKI:  -- about these fake loans.

4            And it's not just that, your Honor.  I think the

5    government needs to go a step further because they know that

6    there's considerable massive fraud here.  I think the discovery

7    needs to reflect the massive fraud.  You just can't throw me a

8    truckload of documents, here, here you go.  This truckload of

9    documents, what was called a sloppy fraud by Special Agent

10   Stevenson, wasn't that sloppy if it snookered all these

11   auditing agencies for decades.

12           THE COURT:  All right.  Back to my question.  I said

13   what is it that you are looking for?  And you mentioned, first

14   of all, Ms. Mandujano and Ms. Commitay or Commito, their -- or

15   Corvite, is that it?  Had these fake loans.

16           Are you looking for those documents?

17           DEFENDANT ROBERT KOWALSKI:  It's not just that, your

18   Honor.  Obviously, yes.  But I'm also looking for ghost loans,

19   purported loans.  And they're in the records of this bank, your

20   Honor.  And that's exactly what the government doesn't want to

21   give me because they know exactly where I'm going to want to

22   go.  I'm going to want to go back to the bankruptcy court, and

23   I'm going to want to wave them in front of Judge Cox and say,

24   look, they ran this fraud right through the bankruptcy court.

25           This is not right --

1          THE COURT:  Okay.  We're --

2          DEFENDANT ROBERT KOWALSKI:  -- right here in the halls

3     of justice.

4          THE COURT:  We're doing a discovery discussion right

5     now.  Okay.

6          DEFENDANT ROBERT KOWALSKI:  This is my life, your

7     Honor, that's been taken from me.

8          THE COURT:  This --

9          DEFENDANT ROBERT KOWALSKI:  I'm sorry if I seem a

10    little bit upset.

11         THE COURT:  All right, hold on.

12         Ms. Petersen, anything on the fake loans or ghost

13    loans that has been turned over?

14         MS. PETERSEN:  We have turned over copies of loan

15    files for loans that were opened at the time of the bank's

16    failure, hundreds of them -- or a lot of them, I guess I -- I

17    don't want to quantify, but it's a lot of them.

18         And so, you know, he has copies of those loan files,

19    whether they were -- whether there was -- they were, you know,

20    performing, non-performing, he has copies of those.  And I'm

21    going to double-check them.  And if there's any missing, I'll

22    produce them to him, which I -- which I told him.

23         And so -- and I explained to him in my letter how to

24    find them in the discovery, how to find them by loan number,

25    how to find what the loan number is if you don't know what the

1   loan number is, and so those are things that he can look for

2   and find that he has in the discovery.

3         THE COURT:  Okay.  Mr. Netols, did you want to add

4   something, sir?

5         MR. NETOLS:  Just to clarify, your Honor.

6         THE COURT:  To the microphone, sir.

7         MR. NETOLS:  Yes, just to clarify.  And this is clear

8   in the indictment.  And Mr. Kowalski understands that.  He's

9   not being prosecuted based on the fact of the content of the

10  loan files.  He's being prosecuted based on our proof that he

11  received funds for which he was not required to pay and were

12  not real loans.  The fake loan files is how the bank made their

13  books balance so it wasn't obvious that they had been --

14  Mr. Kowalski and others had been embezzling money.  So the

15  content of the loan files is not the basis for how we're going

16  to prove that he received the money.  It's how we're going to

17  prove other people concealed that Mr. Kowalski and others

18  received the money.  We're going to prove it based on the

19  distributions of money to him.  Nothing to do with the loan

20  files.  He's not being prosecuted for lying on a loan.  He's

21  not being prosecuted by anything that's marked as a

22  distribution in that loan.  It's the actual cash out of the

23  bank to him.

24        THE COURT:  And so the loans that were opened at the

25  time of the bank collapse have been turned over?

1          MR. NETOLS:  Yes.

2          DEFENDANT ROBERT KOWALSKI:  No.  That's not even close

3    to being the case.

4          And, moreover, I'm being charged with $8 million.  And

5    it seems to come from two particular accounts.  Call them loan

6    snapshots.  How can you call something a loan before the grand

7    jury when it wasn't a loan, when you know it was fraud and

8    forged.  And the OCC, our U.S. Attorneys know this, the OCC

9    wrote a letter on December 5, 2017, talking about the massive

10   alterations and how the bank's records were unreliable.  Yes, I

11   want all those documents.  Because it's not embezzlement when

12   the bank is using your identity to pay off other loans in the

13   bank.  And that's exactly what Ms. Petersen presented to the

14   grand jury.  And that's exactly what's not right about this

15   whole thing.

16         You're going to put me in jail for money that the bank

17   used my identity for to pay somebody else's loan?  Totally

18   preposterous.  And that's not what this prosecution should be

19   about, Mr. Netols.  You know it's not right.  This is entirely

20   not right.

21         THE COURT:  Okay.

22         DEFENDANT ROBERT KOWALSKI:  I've been separated from

23   my family and incarcerated wrongfully over this massive fraud

24   that the OCC couldn't do.

25         So, yes, I want to see that loan.  I want to see all

1    the histories.  I want to see the loan ledgers from all these

2    transactions.

3          There's this other evidence that -- from these

4    transcripts before the grand jury about massive manipulation.

5    That's my case, your Honor.  Yes, I've been manipulated.  My

6    identity has been taken from me.  Everything I worked for has

7    gone by the boards because of this fraud that -- and to use

8    your word, your Honor, nobody has bothered to sort this out.

9    And even to this day, nobody has sorted this out.

10          I'm going to sort this out, and I'm going to present

11    this to a petit jury, and I will be found exonerated.

12          This is not right.

13          THE COURT:  Okay.  Now, getting back to discovery,

14    what is the ongoing process of discovery?

15          And Mr. Netols, do we actually have three million

16    documents that we need to turn over?  Or is that some reference

17    to what you have reviewed in preparation for this case?

18          MR. NETOLS:  I think Mr. Kowalski said one or two

19    million.  I will confess that, as far as number of documents

20    and gigabytes and whatever that I'm not the person in charge of

21    that.  I don't believe I ever said millions of --

22          THE COURT:  Okay.  Go ahead.

23          MS. PETERSEN:  So there's a couple different sort of

24    sources.  One large source that is sort of not yet turned over

25    are the electronic records of the bank, which includes all

1     the -- the things on their servers, emails, electronic

2     bookkeeping records.  That is going to be produced to

3     Mr. Kowalski.  Mr. Chiphe helped me procure a hard drive -- I

4     mean, he procured the hard drive on behalf of Mr. Kowalski.

5              THE COURT:  I appreciate that, Mr. Chiphe.  I know

6     that was a difficult challenge.  Thank you.

7              MR. CHIPHE:  You're welcome, your Honor.

8              MS. PETERSEN:  That is -- I don't have an exact

9     number, but it is hundreds of thousands of individual files or

10    documents.  Those are being housed in our LTSC, which I forget

11    what it stands for, but our large trial IT center down in

12    South Carolina.  They need to format that into a sort of system

13    that he can use, and then we'll burn it on that hard drive.  I

14    have been told the turn-around time for that is going to be

15    another month or possibly a little bit more.  That's,

16    unfortunately, out of my control because it's their LTSC.  But

17    once I have that, he will have that.  That is a lot of

18    documents, though many of them -- many, many of them are

19    probably not particularly helpful or relevant, but we're giving

20    them to him.

21             Additionally, we have things in hard copy, including

22    some of the records he's asked about, you know, business

23    records that may have belonged to him at some point.  We're

24    working on copying those and scanning those.

25             I know of particular interest was what was seized from

1    the Da Vinci Bar.  That was a thumb drive and eight or nine

2    boxes, I don't remember which.  The thumb drive has been

3    produced to him.  The boxes have been sent off site for

4    scanning because that's just faster than we could do it

5    in-house.  We have sort of limited support staff in the

6    pandemic.  That scanning process I know is ongoing.  Once

7    they're done, we're going to produce it to him as soon as it

8    comes back from the scanning center in total.  So that will be

9    soon, but I don't know how soon.

10           THE COURT:  Okay.  All right.  And you continue to

11   understand your obligations to turn over any *Brady* material to

12   the defense and the consequences of failing to do so, correct?

13           MS. PETERSEN:  Yes.  Yes, your Honor.

14           THE COURT:  All right.  So the discovery is ongoing --

15           DEFENDANT ROBERT KOWALSKI:  Wait a second, your Honor.

16   I didn't get to a chance to respond to counsel.

17           THE COURT:  Well, I didn't think you would know what's

18   going on with what she's doing with --

19           DEFENDANT ROBERT KOWALSKI:  I --

20           THE COURT:  -- third-party vendors scanning the

21   materials for you.

22           DEFENDANT ROBERT KOWALSKI:  I've heard this

23   third-party vendor mirage many times before.

24           My son back there in the courtroom is growing up

25   without me.

1          My speedy trial rights are being violated.

2          I'm saying bring it on already.  Don't be telling --

3     it's not -- it's disingenuous to tell the Court --

4          THE COURT:  Do you want to go to trial?  I'll give you

5     a trial.

6          DEFENDANT ROBERT KOWALSKI:  If I have the information,

7     I would love to.  But I don't want to be sandbagged --

8          THE COURT:  Yes, so --

9          DEFENDANT ROBERT KOWALSKI:  -- and I don't want to be

10    ambushed.

11         THE COURT:  All right.  Don't -- don't say -- don't

12    start saying speedy trial rights are violated if you're

13    excluding time --

14         DEFENDANT ROBERT KOWALSKI:  They absolutely are,

15    Judge.  We're --

16         THE COURT:  Well, then I'm ready.  Let's go.  Right

17    now.  You want a trial?

18         DEFENDANT ROBERT KOWALSKI:  I do want a trial, but not

19    like this.  I think there's *Brady* obligations.  The law is

20    clear.  I'm entitled to this information.  Like a gun-shooter,

21    do you want me to stand in the hallway and shoot it out with

22    them?  I'll do it.  Let's go right this minute.  This is not

23    right.

24         THE COURT:  Well, that's -- we don't do duels anymore.

25         DEFENDANT ROBERT KOWALSKI:  But that's what you're

1    asking me to do.  And I don't think it's appropriate, your

2    Honor.

3              THE COURT:  No, I'm not asking you to do that.

4              DEFENDANT ROBERT KOWALSKI:  If that's what's going to

5    bring me back to my family, I'm willing to do it.

6              THE COURT:  You have not been excluded from your

7    family.  You are required to stay in your home, and your wife

8    and your son can visit you every day any day they want.

9              DEFENDANT ROBERT KOWALSKI:  That violates every right

10   of association we ever have under the First Amendment.  That is

11   not my home, living with my sister.  My family is here to

12   support me.  That's where I belong.  I love my wife.  I love my

13   son.  Why am I being separated from -- there's no reason for me

14   to be separated from them --

15             THE COURT:  Well, your right to association doesn't go

16   to your association of your home.  And I'm not violating your

17   association with your wife and your child since you can see

18   them, as we know they're here today --

19             DEFENDANT ROBERT KOWALSKI:  That is contrary --

20             THE COURT:  -- in my courtroom, and they came in the

21   back door with you.

22             DEFENDANT ROBERT KOWALSKI:  That is contrary to my

23   right to associate our family.  Our family wants to be

24   reunited.  We need to live together.  My wife needs help with

25   our son.  I love to be with that boy.  That's what gives me

1    strength and solace to fight these outrageous charges.  There's

2    no reason, there's no order or anything to keep me and her

3    apart other than the lies that were told in this courtroom,

4    that the FDIC held Natalie hostage down the hallway.  And this

5    is especially egregious, your Honor.

6         If you might recall, on a particular Thursday, before

7    I was re-incarcerated, you asked to hear from Natalie.

8    Mr. Netols spoke and he said very eloquently Natalie has

9    recanted.  Did that stop the FDIC?  No.

10        They placed Natalie in a car on the following Monday

11   and interrogated her at length, in the back of an FDIC vehicle.

12   And I'm not sure what Natalie was going to tell them.

13   Mr. Netols knew that they had -- she had recanted.

14        Natalie came to court that day because your Honor

15   asked her to and because they made her and threatened her to

16   come.  Did she get into this courtroom?  No.

17        FDIC agents are not court officers, Judge, yet they

18   held her down the hallway in a room incommunicado so she

19   couldn't come here and testify.

20        You are listening to everybody talk hearsay about

21   Natalie, but no -- but Natalie was near steps away.  How dare

22   these FDIC people interrogate her.  How dare they come between

23   me and my wife and my family.  This is not legitimate, your

24   Honor.  This is like a gestapo tactic.  What in God's name gave

25   them the right to do this?  This is -- what does the government

1    care what my relationship is?  It's evil and immoral to come

2    between a man and his family.  It's not right.  What could

3    Natalie possibly have told them on that Monday that they didn't

4    know previously because Mr. Netols recited this, yet they knew

5    you wanted to hear from Natalie.  So what do they do?  We were

6    serenaded by the Oak Lawn Police Department.  We were serenaded

7    by a videotape.  We were serenaded, too, by Ms. Tiffany Minogue

8    (phonetic) of the Pretrial Services with stale information that

9    the government knew was stale and Mr. Netols knew had been

10   recanted, but yet to strip me from my family and keep Natalie

11   from testifying before your Honor.  They sequestered her in a

12   room down the hallway.  And Natalie is here right this moment

13   to tell you exactly that, Judge.

14           It's totally outrageous that you would strip me from

15   my family.  They've already stripped me from everything I've

16   worked for my entire career.

17           And, yes, I've been an attorney and a good man for

18   more than 30 years here, working like a dog on building

19   buildings, building a life for my family, and they strip it

20   away because of fake loans?

21           No, I can't abide this, your Honor.  Now you're going

22   to strip me from my family, too?  What's left to me, for God's

23   sake.

24           Why was she held up in the courtroom?  Are these FDIC

25   agents court officers?  I don't think so.  What business do

1    they have keeping her there?  And then -- they kept her there

2    so she couldn't testify.  And then they had the audacity to

3    give her 99 bucks as like a Judas fee for letting me go to jail

4    that day because you couldn't hear the truth because they kept

5    the witness away from you.  How much more outrageous is this?

6         What's wrong with my family?  Why can't I be with my

7    son?  That's all I desire in this entire world.  I've been an

8    attorney.  I've been a good man.  I don't have a criminal

9    record to speak of.  And I can't be with my family?  The family

10   I love?  No.  No, no.

11        I already lost one family because of this bank

12   nonsense, and now I'm going to lose a second because I can't

13   stay with them, for God's sake?

14        THE COURT:  I am going to give you --

15        DEFENDANT ROBERT KOWALSKI:  They're going to hold

16   Natalie hostage?

17        THE COURT:  I'm going to give you -- I'm going to give

18   you 10 seconds to calm down before I ask my deputies to come up

19   and flank you on either side because the level of angst that

20   you have in my courtroom every time is too extreme, and it

21   reinforces my decision that you should be on house arrest based

22   upon the incident that was conveyed to me in this courtroom

23   both by video and by testimony and by my Pretrial Services

24   officer.

25        That emotion level is extreme, it is not normal, and

1     it makes me worried about putting you with your wife and your

2     child.  That was what happened in the first place.

3            I have all of these deputies in the back because of

4     your behavior, because it is so different from anyone else who

5     comes into court respectfully conveying concerns and

6     respectfully working towards resolution.

7            I am here to aid you in getting the discovery, to aid

8     you in getting to a speedy trial, to protect your

9     constitutional rights.  But your behavior is continually

10    disrupting that process.

11           Do you understand that at all?

12           DEFENDANT ROBERT KOWALSKI:  Your Honor, I don't

13    understand any of that.  What man would not cry out in pain

14    from not being -- being taken away from his family.  This is my

15    family.  This is the love of my life.  I want to be with my

16    son.  And, yes, I'm crying bad here.  I am really upset about

17    this.  Dang tootin' right.  If I wasn't the righteous man that

18    I am, I wouldn't maybe care.  But I really do care.  I love my

19    family.  And it's wrong for us to be apart.  It's immoral.

20    It's unethical.  And, yes, I have to scream it out to the top

21    of my lungs.  It's not right.

22           Please, your Honor, let my family be reunited.

23    There's no reason to keep us apart other than the evil that the

24    FDIC has perpetuated.

25           If I'm such a threat, we could have heard that from

1    Natalie's own lips.  But, no, Natalie was kept away.  In the

2    very halls of justice, they're playing games with people,

3    locking them away.  What a joke.  This is not right.  These are

4    the halls of justice and in God we trust.

5                THE COURT:  Ms. Green, was it you that talked with

6    Natalie when I originally made my decision to put Mr. Kowalski

7    under house arrest at his sister's house?

8                PRETRIAL SERVICES OFFICER:  No, your Honor, it was

9    not.

10                THE COURT:  Okay.  So I don't have that Pretrial

11   Services officer here with me.  All right.

12                Is there a pending new renewed motion for his bond?

13                MS. PETERSEN:  There is, your Honor.

14                THE COURT:  Okay.  May I have your response to it,

15   please?

16                MS. PETERSEN:  Yes, your Honor.

17                I mean, this is basically the same bond we talked

18   about last time -- and, actually, just let me back up to make

19   the record clear.

20                When we had that hearing, I think it was back in

21   October, there was a protective order in place between Ms. Lira

22   and Mr. Kowalski, so the marshals asked us to help keep them

23   separated.

24                At the beginning of that hearing, my recollection is

25   that I told your Honor she's here, the government is not going

1    to call her, but she is here.  You know, defendants --

2    Mr. Kowalski and Mr. Chiphe could have called her if they

3    wanted to.

4            But moving on to the bond motion, we continue to

5    oppose it for the reasons that were discussed in that October

6    bond hearing up until now.

7            And I think actually Ms. Green has an update that

8    Mr. Kowalski has continued to not communicate with her about

9    his travel, which continues to be a problem, and shows he's not

10   ready for a loosened restriction on his bond.

11           THE COURT:  Ms. Green, can you fill me in, please?

12           PRETRIAL SERVICES OFFICER:  Yes, your Honor.

13           I'll start by staying general.  Our office's policy

14   for people on location monitoring is that all schedule requests

15   need to be submitted on Monday before 3:00 o'clock for the

16   entire week, a rule of our program that Mr. Kowalski is very

17   aware of.

18           He sent me a text at about 4:00 o'clock this Monday

19   stating that he needed movement for court on Friday.  And I

20   asked him what time he needed to leave and how he was getting

21   to court.  And he responded to me on Tuesday that he didn't

22   know what his plans were going to be.  So I informed him that

23   by the end of the day Tuesday, he needed to let me know how he

24   was getting to court and what time he was asking to leave.  And

25   he said respectfully he didn't know.  So I again texted him on

1    Wednesday, and there was no response.  So my last communication

2    with Mr. Kowalski was Tuesday afternoon.  I then received a

3    text message from him this morning at 7:28 stating that he got

4    a ride to his girlfriend's house, then we are going together to

5    court, leaving in 10 minutes.

6        So within 15 minutes, I responded to Mr. Kowalski, who

7    had already left his house without talking to me, and I told

8    him that last-minute request, 10 minutes before he wanted to

9    leave the day of court is unacceptable.  And it was not

10   acceptable either that he was getting a ride to his

11   girlfriend's house.

12       So through GPS mapping, I did see that Mr. Kowalski

13   left his house this morning and went to an address on

14   Springfield Avenue in Midlothian.  I'm not sure whose house

15   that is.  He was there for over just 20 minutes and then

16   proceeded to court.

17       This morning I did ask him several times via text,

18   asked him on at least four occasions who was taking him to

19   court and, you know, why he had to go to Natalie's house first,

20   and there was no response.

21       Now, he did respond to me about other things this

22   morning, but continued to ignore that part of it.

23       So I'm concerned -- and I will add this as well, your

24   Honor.  One of the things he said to me when I said he

25   shouldn't have waited until this morning 10 minutes before

1    leaving to ask for a schedule was, sorry, I didn't have any

2    option, we are going to court as a family.  Further, I have no

3    resources to draw upon.

4            So our office is concerned, your Honor, that

5    Mr. Kowalski, you know, first of all, is not following the

6    rules of the program about scheduling.  You know, and I

7    understand reasonably that sometimes if you don't have a car

8    and you have to rely on other people, you know, you may not

9    have it, but I would expect that Mr. Kowalski would be keeping

10   in touch with me and letting me know, you know, who he was

11   waiting on and why.  So certainly if he would have asked me to

12   leave Court at that -- for that hour, and to go all the way to

13   his girlfriend's house, which is in the, I think the address in

14   Midlothian, that's the opposite direction of court, I would

15   have never allowed someone on home incarceration to do that.  I

16   would have said his ride would have needed to pick him up, and

17   he should have went directly to court.

18           So I am concerned about what happened this morning.

19           THE COURT:  Well, his sister who he lives with is

20   sitting in a car right now looking at me, so it looks like she

21   could have given you a ride to court.

22           DEFENDANT ROBERT KOWALSKI:  Was that a question,

23   Judge?  Because you're absolutely wrong, your Honor.  Her son

24   had a court date.  If you notice her background, she's in

25   Bridgeview at the Bridgeview courthouse.

```
 1                THE COURT:  She's in a car.
 2                DEFENDANT ROBERT KOWALSKI:  She's with her son at the
 3    Bridgeview courthouse, Judge.  I'm sorry, her son takes
 4    precedence over a brother.  I'm sorry.  Moreover, her son is a
 5    handicapped --
 6                THE COURT:  Looks like she's in a car alone to me.
 7                All right.  So let's get to the situation at hand.
 8                DEFENDANT ROBERT KOWALSKI:  It's not just that, Judge,
 9    if I might continue?
10                THE COURT:  No, I'll continue now.
11                I took you out of jail for the sole purpose of you
12    wanting to work on your case.  It was a tough call because I
13    put you in jail based upon a number of concerns that I had for
14    your failure to follow my pretrial court orders.  Now you're
15    continuing to disrespect the Pretrial Services officer by not
16    putting in proper requests, by going to places that you're not
17    permitted to go to, and by not doing so in a timely fashion.
18                DEFENDANT ROBERT KOWALSKI:  May I explain, Judge?
19                THE COURT:  Not yet.
20                And so I am still concerned about your pretrial
21    behavior, and I'm still concerned about whether or not you
22    understand and will follow my court orders.
23                Now you may speak.
24                DEFENDANT ROBERT KOWALSKI:  I think usually the judge
25    hears testimony.  It sounds like you just rendered a decision,
```

1    Judge.  And I don't think that's fair.

2           I think, first of all, I'm the only defendant here in

3    the courtroom, and I think I'm entitled to equal protection

4    under the law.  I think if I'm here, I think everybody else

5    should be here.  It's quite an inconvenience for me to come.

6    It's not a joke, Judge.  I'm entirely indigent by this.  I

7    don't have resources.  The only reliable means of

8    transportation are these two shoes that I have here, and that's

9    it.  I'm entirely indigent.  And I don't think you should be

10   basing your indigency and I don't think Ms. Green should be

11   basing her decisions based upon what I don't have available.

12          Ms. Green did not bring me up a government-issued

13   vehicle to take me to court.  I am entirely indigent.  And I'm

14   entirely dependent upon other people's goodwill.

15          And, I'm sorry, I cannot base a representation to

16   Ms. Green how I'm going to do something when those

17   representations aren't solid.

18          And it's not fair.  I want to be with my family.  If I

19   was with my family, we wouldn't be having this conversation

20   either.  I'm being stripped of my family.  Ms. Green has

21   treated me as if I have a vehicle, which I did my whole life,

22   Judge.  I would be here -- I wouldn't be having this

23   conversation.  But I'm entirely indigent.  I've been stripped

24   of everything I worked for.  What does the Court expect from

25   me?  Have you ever been indigent, Judge?  It's not easy.  It's

1    not like you can go to Starbucks every morning.  I have these

2    two feet.

3              Yes, my sister has to take care of her son who has his

4    own legal problems at the Bridgeview courthouse.

5              I'm not trying to be problematic, but I think

6    Ms. Green could adapt herself to my circumstances, which are

7    quite stark.

8              And I can't compel -- I can't pick up the phone and

9    call Uber.

10             I don't think the Court is being very fair to somebody

11   who just doesn't have any resources whatsoever.

12             And it's very difficult to even defend this case.  I

13   don't have any resources --

14             THE COURT:  I can put you right back in the MCC where

15   they'll feed you, care for you, you'll have no expenses

16   whatsoever, and you can review all of your documents and all of

17   your work there.  That was the decision that I made to get you

18   out so that you could defend your case.  But you think that

19   Pretrial Services must comport to your schedule and to your

20   behavior and to your condition, and you've got it wrong.  You

21   are required to comport with their rules.  And your failure to

22   follow their rules will end you up back in jail.

23             Do you understand that?

24             DEFENDANT ROBERT KOWALSKI:  Your Honor, I understand

25   very well what the MCC consists of, yes.

1          THE COURT:  Okay.  All right.  I am not releasing you

2     to live in a different location based upon all that I have been

3     listening to regarding your inability to follow the Pretrial

4     Services' directions.  You have to show me something much more

5     than defiance of those directions and orders for me to even

6     consider changing what is already a generous situation for you

7     after I had placed you in custody in the first place.

8          And, by the way, the reason you are the only person

9     here is because you forfeited your right to appear on the

10    telephone because you just monopolize the entire status for all

11    10 or 11 defendants, so no one gets anything done while you

12    monopolize the call.  And you defiantly refuse to show yourself

13    on the screen for WebEx where I could control you as well, even

14    though your sister is sitting here clear as day on WebEx waving

15    to me, very clearly, you could be doing that --

16          DEFENDANT ROBERT KOWALSKI:  How?

17          THE COURT:  -- and we could have this phone call.  But

18    every time I've scheduled it, you've told me you can't.

19          DEFENDANT ROBERT KOWALSKI:  That's correct, Judge.

20    And I think, again, you're holding my indigency against me.

21    I'm lucky to have a phone.  It's not the phone that I would

22    like to have.  You can't hold things against me simply because

23    I'm poor now, because the FDIC --

24          THE COURT:  Ms. Green, aren't you doing video chats

25    with him?

1          PRETRIAL SERVICES OFFICER:  That is correct, your

2     Honor.

3          THE COURT:  How are you doing them?

4          PRETRIAL SERVICES OFFICER:  Through the app.

5     Google Duo.

6          THE COURT:  There's no indigency issue here.  If

7     Google Duo can be used on your phone, Cisco can be used on your

8     phone.

9          DEFENDANT ROBERT KOWALSKI:  Duo is not WebEx.  I'm

10    sorry.

11         THE COURT:  It's --

12         DEFENDANT ROBERT KOWALSKI:  I'm an older fellow.  I'm

13    not as computer literate as the younger --

14         THE COURT:  It's just a different platform.  If you've

15    got a camera and a microphone and you can do Google Duo, you

16    can do this.

17         You're being defiant and refusing to follow my court

18    order.

19         My law -- excuse me, courtroom deputy has provided you

20    with direction upon direction upon direction on how to log in.

21    She told you she would help you log in.  But you keep telling

22    me that you don't have the ability because you're poor.  And

23    that is false.  You have the ability if you're talking to

24    Ms. Green on Google Duo, so don't play that game with me.

25    Don't.

1        DEFENDANT ROBERT KOWALSKI:  There's one other thing

2    with the bond conditions, Judge, is these bond conditions do

3    not allow me to obtain and present witnesses.

4        I can't -- like the government has hundreds of people,

5    badge-wielding members.  I have nothing, and I'm stuck in a

6    house where I can't leave.

7        THE COURT:  But that man behind you who got you that

8    hard drive is the one, if you want to subpoena someone, he

9    knows how to help you get that done.

10        DEFENDANT ROBERT KOWALSKI:  Quite an assumption,

11    Judge, that you just made.  I don't have any hard drive or

12    anything from Mr. Chiphe.  And it's part of the problems why I

13    had to file a motion to lose Mr. Chiphe.  He's not getting the

14    job done.

15        The biggest part of your irritation with me, you're

16    busy -- last time we were before you, you had admonished me

17    about certain filings, a filing that was not made under seal.

18        Well, guess who is making the not sealed -- sealing

19    things?

20        And then pointedly and adroitly you question, why are

21    you giving me this motion to quash subpoena?  It should be

22    before Chief Judge Pallmeyer.  Well, guess again.  Now, we had

23    Mr. Chiphe here, who is with the Federal Defender Program, who

24    should be very -- if anybody, he should know exactly how to

25    file something because that's all they do is defend federal

1    inmates.  I kind of understand why the doors at the MCC are

2    like full.  They're like blowing off over there.  They can't

3    even file things properly?  And you asked me to have him file

4    things to help me.  Geez, Judge, thanks, that was a great help.

5         It's not right.  If they can't file things for me,

6    what kind of representation is that?  You know --

7         THE COURT:  You know, Mr. --

8         DEFENDANT ROBERT KOWALSKI:  -- an attorney in

9    Illinois --

10        THE COURT:  Mr. Kowalski, every time I have challenged

11   you about having your own -- representing yourself, you have

12   told me that you don't even need another attorney because

13   you're smarter than any other attorney in defending yourself.

14   You yourself have said that, and --

15        DEFENDANT ROBERT KOWALSKI:  No.

16        THE COURT:  -- because you're on home arrest, I gave

17   you a standby counsel so standby counsel could aid you in doing

18   things outside of your house that maybe you couldn't do.

19        Now you stop speaking for a moment, and I'm just going

20   to turn to Mr. Chiphe.

21        DEFENDANT ROBERT KOWALSKI:  Your Honor, I object to

22   him speaking --

23        THE COURT:  No, I'm talking to Mr. Chiphe --

24        DEFENDANT ROBERT KOWALSKI:  -- and I have a reason why

25   I have an objection.

1      THE COURT:  He's my court-ordered standby counsel, so

2  he's --

3      DEFENDANT ROBERT KOWALSKI:  Mr. Chiphe filed something

4  under seal.  And that seal, whatever conversation he had with

5  the Court, I think I'm entitled to know the contents of that

6  before Mr. Chiphe responds.

7      THE COURT:  Mr. Chiphe, go ahead, please.

8      And if you could speak into the microphone, it would

9  be really helpful.

10      Thank you, sir.

11      You can come up.

12      MR. CHIPHE:  Thank you.

13      Your Honor, Mr. Kowalski filed a couple motions with

14  regarding dismissing me and our office as standby counsel and

15  made a number of claims.

16      Just kind of concerning the hard drive issue, we just

17  discussed that in court, the hard drive was provided to the

18  government, they would then download the documents onto the

19  hard drive, then we'll receive the hard drive, and they'll

20  provide that to Mr. Kowalski.

21      THE COURT:  Which came from the Federal Defender's

22  money.

23      MR. CHIPHE:  Exactly, which we paid for, your Honor.

24      THE COURT:  Right, right.  Which is a lot.

25      MR. CHIPHE:  It is.

1        Now, with regards to the -- I think Ms. --

2   Mr. Kowalski mentioned the filing about documents -- an

3   attachment to a document he filed, I don't know, your Honor, I

4   get --

5        THE COURT:  I know, I have many filings.

6        MR. CHIPHE:  -- ten motions a week from Mr. Kowalski

7   to file.

8        And so a lot of his exhibits -- I'll say, first of

9   all, as standby counsel -- and I'm currently standby counsel

10  for a client who is being detained in Kendall County.  And that

11  case is before Judge Wood.  And what that client does is he

12  drafts his motions, and he mails them in to the Clerk of Court,

13  the Clerk of Court files the motions, and then we notice them

14  up.  And so a client who is detained I think down in Livingston

15  or Kendall files his own motions and drafts them and files

16  them.  But that's neither here nor there, let's deal with

17  Mr. Kowalski.

18       And so as standby counsel, ordinarily one wouldn't

19  edit the motions that are being filed by someone who is

20  representing themself.  And so I think the motion where he

21  should have filed it in front of Judge Pallmeyer, I didn't edit

22  it, I didn't read it, I would be -- if I read every motion that

23  Mr. Kowalski emailed me, I would essentially be representing

24  him full-time, for -- that would be the only case I'd be

25  dealing with.  And so we didn't.

1    If the Court -- I think we did, though, earlier this

2  week or last week, I said, you know, he's attaching all this

3  stuff, he got admonished in court about attaching something, so

4  I had my assistant, we said, listen, you know, let's look and

5  see, then we -- he scanned it.  We had to make sure -- we were

6  able to see it was marked sensitive, which all -- you know, so

7  I went back and read the protective order again, which

8  Mr. Kowalski has, and it says that all documents that should be

9  filed under seal will be marked sensitive, so Mr. Kowalski has

10  that.  But we then -- I did decide to read the motion.  We did

11  file it under seal.

12    We're getting a lot of motions from him.  We're filing

13  them.  You know, I don't think the Court has ordered us to

14  edit, to review, to read his motions.  All the Court has asked

15  us to do is file them.  And that's what we're trying to do.

16    THE COURT:  That's exactly right.  So when he's

17  representing himself, the only time that you're required to do

18  anything is when he seeks out and says can you get -- help me

19  with the subpoena or whatever.  Unless you asked him how to

20  file, and you are an officer of the Court, you've litigated in

21  this courtroom, you know the rules of the Court, you know what

22  can be attached to -- as an exhibit or not.  So don't blame

23  Mr. Chiphe for your error in what you gave him to file.

24    MR. CHIPHE:  And one other thing.

25    DEFENDANT ROBERT KOWALSKI:  May I respond?  I would

1  like to respond before judge renders a decision.

2          THE COURT:  Hold on.

3          Go ahead.

4          MR. CHIPHE:  And, you know, I'll say, your Honor,

5  we -- of course, we don't have a position one way or the other

6  with regards to whether court removes us as standby counsel.

7  Just regard concerning the subpoena issues, my understanding, I

8  think it's usually the case, that we probably have reciprocal

9  subpoena power in this case.  That's normally the case.  If

10  Mr. Kowalski wants to file subpoenas, I think courts provided

11  funds for him to get an investigator to serve subpoenas, so ...

12          DEFENDANT ROBERT KOWALSKI:  I have not got -- I'm not

13  an attorney, your Honor.  My license has been suspended because

14  of this case.  I'm not thinking that I'm an attorney.  And one

15  of the motions that Mr. Chiphe has repeatedly failed to respond

16  to or file for me is a motion for subpoenas.  Yes, I need some

17  subpoenas.  It would be really helpful.  It would help level

18  the playing field.  I don't think -- as Mr. Chiphe indicated,

19  he's standby counsel.  By not filing things for me, he's

20  compromising my due process rights.  He's compromising my

21  defense.  And, repeatedly, he will not file this.

22          THE COURT:  Why don't you get an attorney then?  Why

23  don't you let me appoint you an attorney instead of saying that

24  you can do it better?  You know --

25          DEFENDANT ROBERT KOWALSKI:  I have never said that.

1          THE COURT:  -- that you need an attorney.

2          DEFENDANT ROBERT KOWALSKI:  Pardon me, Judge.

3          THE COURT:  Okay.  Yes, you did.

4          DEFENDANT ROBERT KOWALSKI:  No, I have not.  I've been

5    an attorney for 30 years.  And much of that time, I've been a

6    member of the general bar of this court.  I have not said

7    anything bad about Mr. Chiphe.  Whatever I said is based upon

8    his record of non-performance.  I think the minimal competency

9    that an attorney should have in his position is to file

10   something.  And if Mr. Chiphe can't, for whatever reason, I

11   think he has a duty to inform his client.  And he has failed to

12   do that.  I need these subpoenas.  I need witnesses.  And I

13   don't really trust Mr. Chiphe.  The bond that we've had, our

14   attorney-client bond, has been shaken.  I don't trust him.  I

15   don't like having to come to his office to lay out my defense

16   strategy.  And that's exactly what this Court is asking me to

17   do.  And that's entirely inappropriate.  I'm entitled the right

18   under the Sixth Amendment to compel witnesses.  Not the

19   witnesses that Mr. Chiphe wants to let me file my subpoenas.

20   And, yes, I'm being very careful.  Maybe -- maybe the judge

21   could authorize me just to issue subpoenas, and I could -- I

22   wouldn't have to barrage him.  I don't want to tire him with

23   these motions.

24         My life is at stake.  His life is good.  He's in a

25   good-looking blue suit.  I'm in some clothes that I've been

1    wearing for three days because I'm indigent.  And I don't think

2    that's fair.  I think I'm due some witnesses, especially since

3    the Court incarcerated me because I contacted an unnamed

4    witness.

5            And that's a big problem, too, in this case, Judge.

6    Your bond order is overly broad.  Everybody who was ever

7    connected with this bank -- we got whole United States

8    departments that I can't contact.  And that's a real

9    obstruction for me.

10           It's like I know where the justice is, I know where

11   the witness cheese is, but I can't touch it because the FDIC is

12   going to take the witnesses down the hallway -- it's not a

13   chess game where the government can just take the witnesses off

14   the board.

15           THE COURT:  Ms. Petersen, don't we have already an

16   early return of trial subpoenas, or am I mistaken?

17           MS. PETERSEN:  I don't know if we do or not, but we --

18   with reciprocal discovery, we can.

19           THE COURT:  Yes.  Right.  Okay.

20           MS. PETERSEN:  That's fine with the government.

21           THE COURT:  So I'll grant the order of early return of

22   trial subpoenas with reciprocal discovery.

23           Is that a problem, Mr. Netols?

24           MR. NETOLS:  I just want to request, if it would be

25   possible, and in other similar situations the government has

1    asked that we get notice of the subpoenas that are filed at the

2    time they're filed in the event that there's something --

3             THE COURT:  Yes.

4             MR. NETOLS:  -- that might make sense for us to object

5    before the responses are produced.

6             THE COURT:  That's fine.

7             DEFENDANT ROBERT KOWALSKI:  I object to that, too,

8    Judge.

9             I don't think the government needs to know -- I don't

10   know exactly who they're going to be bringing before the grand

11   jury.

12            I don't think the government needs to be fore-alerted

13   what I'm trying to do to defend myself.

14            THE COURT:  Yes, so you don't have a right to know

15   what's going on before the grand jury, and I don't even have

16   the right to know.  That is the executive branch's

17   prerogative --

18            DEFENDANT ROBERT KOWALSKI:  Exactly.

19            THE COURT:  -- so --

20            DEFENDANT ROBERT KOWALSKI:  The government doesn't

21   have the right to know what Bob is doing --

22        (Unintelligible crosstalk.)

23            THE COURT:  Well, that's a different situation.

24            DEFENDANT ROBERT KOWALSKI:  What, so they can send an

25   FDIC agent to put that prospective witness in the back of a

1    vehicle?

2              THE COURT:  I just am getting off of this conspiracy

3    theory of locked-up witnesses and everything else.  We are not

4    going there.

5              DEFENDANT ROBERT KOWALSKI:  If you would only hear

6    from the witness, Judge, maybe you wouldn't say that.

7              Please, I think a finding is due of this, especially

8    in the egregious conduct of the government taking a witness and

9    holding them hostage down the hallway, not letting them go to

10   the bathroom without the gentleman accompanying Natalie.

11             THE COURT:  Do you want to call her as a witness?

12             DEFENDANT ROBERT KOWALSKI:  I would like to, yes.

13             THE COURT:  All right.  Go ahead.

14             DEFENDANT ROBERT KOWALSKI:  I call Natalie Lira.

15        (Ms. Lira approaches.)

16             THE COURT:  Come up here and sit on the witness stand,

17   please.

18             You can sit down.

19             Raise your right hand.

20             Do you swear the testimony you're about to give will

21   be the truth, the whole truth, and nothing but the truth, so

22   help you God?

23             THE WITNESS:  Yes.

24             THE COURT:  Okay.  You can take your mask off.

25             THE WITNESS:  Okay.

Lira - Direct by Defendant Robert Kowalski

1    THE COURT:  And you can take one of those little white

2  covers and put it over the microphone.

3              NATALIE LIRA, DEFENDANT'S WITNESS, SWORN

4                        DIRECT EXAMINATION

5  BY DEFENDANT ROBERT KOWALSKI:

6  Q    For the court record, Natalie, what's your name?

7  A    Natalie Lira.

8  Q    Natalie, are you fearful of me?

9  A    No.

10 Q    Would you like me to come home, Natalie?

11 A    Yes.

12 Q    Does my son miss me?

13 A    Yes.

14 Q    How is he behaving as a terrible two?

15 A    Out of control.

16 Q    Is he potty-trained?

17 A    Not yet.

18 Q    Does he miss his dad?

19 A    Yes.

20 Q    Does he really miss his dad?

21 A    Yes.

22 Q    You were here that day that I was re-incarcerated, where my

23 bond was revoked.

24          Isn't it true that you came here that day?

25 A    I was here with my cousin.

Lira - Direct by Defendant Robert Kowalski

1    Q    Isn't it true that you were met in the lobby of this

2    building, the hall of justice, by two FDIC agents?

3    A    When I walked in, yes.

4              THE COURT:  Okay.  No leading.  Just ask her

5    questions.  Open-ended.  You're a lawyer.

6    BY DEFENDANT ROBERT KOWALSKI:

7    Q    The agents accompanied you?

8    A    Agents Stevenson and his partner.  I'm not -- I can't

9    remember his name.  There's two men, though, that greeted us,

10   as soon as we entered the building, 'cause Kelly texted me that

11   she couldn't be there to greet me when I got there.  She said

12   that Agent Stevenson and his partner would be there when I got

13   there, and they were as soon as I walked in.

14             And they took me and my cousin upstairs, and we went

15   into a room, and then to a different room.  And then I asked

16   about where's Robert, I'm supposed to be in court.  Kelly told

17   me I was supposed to be in court, that the judge subpoenaed me

18   to be at court.  And he told me that I would have to wait here

19   with him and his partner and my cousin until the judge calls

20   me.

21             And eventually I asked again after two hours or so,

22   and he gave me the same response, telling me the judge does not

23   need you yet and we got to keep you here until the judge is

24   ready to talk to you.  And I asked him, but I was supposed to

25   be in the courtroom, why ain't I in there?  And he -- he still

Lira - Direct by Defendant Robert Kowalski

1    said like you have to stay with me.  And I asked if I can use

2    the bathroom.  And that's when I knew it was kind of serious

3    because he followed us to the bathroom, and then escorted us

4    right back to the room when I was done.

5    Q    So the agents allowed you to leave?

6    A    Only if it was for the bathroom, and they would have to go

7    with us.

8    Q    These agents, were they court officers?  Did they display

9    any identification as such?

10   A    No.  Just when I walked in, he told me, hi, I'm Agent

11   Stevenson, and he told me his partner's name, and that was --

12   that was it.

13   Q    What room did they take you to?

14   A    It was like all -- I believe maybe it was on this floor,

15   but -- I'm not sure exactly what floor it was.  It was

16   somewhere in this building.  It was.  But, Robert, I don't know

17   which room or what floor it was.

18   Q    Was there compensation issued?

19   A    Was there conversation?

20   Q    Was there compensation provided to you?

21   A    Oh, yes.  I told him that my cousin drove me to court,

22   would there be any way, you know, she can -- he said, yeah,

23   he's like the witnesses, they get a check for their mileage

24   that they use here and back home, and we will provide that with

25   you.  And he took us downstairs, me and my cousin, and we went

Lira - Direct by Defendant Robert Kowalski

1    into some room.  A woman was at a desk.  And she gave me a

2    slip, and I signed, and I wrote down how much mileage was used

3    to come here and how -- approximately how much would be used

4    back.  And I later on did receive a check from them.

5    Q    Was that the first time you saw an FDIC special agent?

6    A    No, because I don't know if Kelly is FDIC or -- oh, she

7    came with an FDIC agent that day that she talked to me in her

8    car, but the lady was an FDIC agent she said.

9    Q    And this agent was alone?

10   A    No.  She was with Kelly.

11   Q    And they escorted you into the back seat of their vehicle?

12   A    They let me sit in the front seat, and the lady from FDIC

13   sat in the back, and I sat in front with Kelly.

14   Q    How long did this conversation last?

15   A    Maybe three and a half, four hours.

16   Q    What were the contents of this conversation?

17   A    They wanted to keep bringing you up, and they kept asking

18   me the same questions.  I kept giving them the same response,

19   but I feel like they wanted a different response, that's why

20   they kept asking me the same questions.  And basically they

21   were there to just alert me that, you know, this is going to

22   keep happening.

23   Q    Did you feel intimidated at any time?

24   A    I did.

25   Q    But that wasn't the first time that you saw Kelly and

Lira - Direct by Defendant Robert Kowalski

1    her -- her agent.

2    A    No.   It's -- when I lived at 6821, Kelly and an agent came

3    to my house, and we were talking outside because I didn't want

4    them coming inside in front of my kids.   I didn't want my kids

5    thinking anything bad or being more scared because it looked

6    bad enough with Robert not being at home.   So I asked to speak

7    to them outside.   And we did so for about 20 minutes.   But they

8    asked if they can come inside.   And I asked them not to because

9    my kids were in there, from the beginning I told them.   But he

10   said that he was cold and that he's not used to Chicago

11   weather, if he could please come inside.   And I said that was

12   fine.

13         THE COURT:   I'm not sure what the relevance of any of

14   this is regarding her interactions and interviews with law

15   enforcement when the question is whether she is an appropriate

16   place for him to be residing on his bond.   So I don't know

17   where you're going.

18         The original questions about her testimony -- her

19   being present and available for the detention hearing is fine;

20   but, otherwise, I don't think anything else is relevant.

21         DEFENDANT ROBERT KOWALSKI:   I'm speaking towards the

22   witness's fear and the fear is intimidation by the governmental

23   agency.

24         THE COURT:   But that's a whole different situation.   I

25   mean, the situation I have is fear of you and what happened

Lira - Cross by Petersen

1   with you and why I detained and why you're not living with her.

2   So I'm cutting off the testimony now.

3           DEFENDANT ROBERT KOWALSKI:  I want -- if you may

4   recall that day, we heard from Tiffany Minogue (phonetic), and

5   she was giving you hearsay information of something --

6           THE COURT:  Which I can take in in a detention

7   hearing.  But, more importantly, I am ruling right now that it

8   is irrelevant to go any further.

9           And you may now cross-examine.

10          MS. PETERSEN:  Thank you, your Honor.

11                        CROSS-EXAMINATION

12  BY MS. PETERSEN:

13  Q    Ms. Lira, back in the fall, there was a fight that took

14  place at your house, correct?

15  A    Yes.

16  Q    And the police were called?

17  A    By someone, yeah.

18  Q    And they arrived and took statements from you and other

19  people about that fight?

20  A    Right.

21  Q    And Mr. Kowalski was there the night of the fight, right?

22  A    Right.

23  Q    And his sister Jan?

24  A    Yes.

25  Q    And there was both a physical altercation and yelling,

Lira - Cross by Petersen

1    correct?

2    A    Yelling, yes.

3    Q    And as a result of that, after that altercation took place,

4    you filed for a protective order, correct?

5    A    I was scared that his sister was going to come and take my

6    child away, so I thought I did what was best at the time.  And

7    not only that, I was in a fight that day before the incident

8    took at my house and -- I was in a fight before that and, you

9    know, I -- I was upset.  I let my emotions get the best of me

10   because I was in a fight before that.

11   Q    But that protective order wasn't against Jan Kowalski; it

12   was against Robert Kowalski.  Right?

13   A    I tried to get one against Janet, but I got denied.

14   Q    So you -- the one against Jan got denied, but you were able

15   to get one against Robert Kowalski at least for a little bit,

16   right?

17   A    I didn't want to.  But my mom told me that, you know, since

18   they're attorneys, they might try to come and take the baby,

19   and that scared me because -- that did.

20   Q    And you were worried that Robert and his sister would come

21   and take your baby back then?

22   A    Yes.

23   Q    Okay.  And so there was some fear back then, right?

24   A    Mostly because of his sister.  I don't think she likes me,

25   and I don't like her either.  And I don't know what her

Lira - Cross by Petersen

1    intentions are, but I know what Robert's are.  And he's been
2    always a good father.  Always.  I have no complaints.  Never.
3    I've never had to call the police on him.  I've never ever
4    wanted to do anything bad to harm him or make matters worse.  I
5    know where we stand.  It's unfortunate that that happened, but
6    it did, and I'm sorry that it did.
7    Q    Now, if Mr. Kowalski were to come and live with you, is
8    that -- is that in Midlothian on Springfield Avenue?
9    A    It's Crestwood, not Midlothian.
10   Q    Okay.  Where is it that -- where are you currently
11   residing?
12   A    In Crestwood.
13   Q    In Crestwood?
14   A    Yes.
15   Q    On what street?
16   A    Springfield.
17   Q    Who else lives in that residence with you?
18   A    It's me, my twin boys that are going to be 14 next month,
19   and my son Alexander Great.
20   Q    No other adults?
21   A    No.
22   Q    Whose house is that?
23   A    My father's.
24   Q    Is Mr. Kowalski currently providing you any kind of funds
25   to support you or your son?

Lira - Examination by The Court

1    A    No, he's not.

2              MS. PETERSEN:  Court's indulgence, one second.

3         (Counsel conferring.)

4              MS. PETERSEN:  No further questions, your Honor.

5              THE COURT:  Okay.  I have some questions.

6              I'm sorry.  It's hard to see me with all of my camera

7         stuff up for trial.

8                            EXAMINATION

9    BY THE COURT:

10   Q    So the house that you are living in, is your father alive?

11   A    Yes, he is.

12   Q    So is there a mortgage on it?

13   A    Yes.

14   Q    He pays it?

15   A    We do.

16   Q    Who is we?

17   A    I do, I -- with my child support.

18   Q    Okay.

19   A    For my twin boys.

20   Q    You pay the mortgage.

21             And then how are you paying for everything else?

22   A    I receive assistance for my baby.  It's WIC.  So we get

23   free food.  We're provided with that.  Also I get assistance

24   for me and my twin boys for food.  So I -- basically, I -- I

25   was living off my child support and my unemployment as well

Lira - Redirect by Defendant Robert Kowalski

1   that I have proof of.

2   Q   So you're living off of unemployment, assistance for the

3   14-year-olds, and the baby, which is what, the WIC program?

4   A   Yes.

5   Q   And then child support for the others, and your father --

6   no, you pay the mortgage with that.

7   A   Yeah, I -- I do that with the child support checks.

8   Q   All right.  You were never called as a witness on that day,

9   were you, that you sat with the agents?

10  A   No, I wasn't.

11  Q   Okay.  All right.  Do you want to ask some questions,

12  Mr. Kowalski?

13                   REDIRECT EXAMINATION

14  BY DEFENDANT ROBERT KOWALSKI:

15  Q   The order of protection is still active?

16  A   No.  It's been vacated.

17  Q   Is it true that it was vacated at your request?

18  A   Yes.

19          THE COURT:  Okay.  You can step down and --

20          THE WITNESS:  Thank you.

21          THE COURT:  -- be excused.

22     (Witness excused.)

23          THE COURT:  So I don't see any of this theory being

24  supported that she was somehow held hostage by two agents down

25  the hall.  She was subpoenaed as a witness, and they were

1     waiting with her until she was going to be called, and you

2     never called her.

3              What is that -- what's the problem with that?

4              DEFENDANT ROBERT KOWALSKI:  That's the truth.  It's

5     all the more reason to dismiss Mr. Chiphe, because he had a

6     duty to call Natalie Lira, and he failed to do so.  He was the

7     attorney at that point --

8              THE COURT:  Well, after he had heard from the Pretrial

9     Services officer that she conveyed to me that she was --

10             DEFENDANT ROBERT KOWALSKI:  Yes --

11             THE COURT:  -- still afraid of you at that time --

12             DEFENDANT ROBERT KOWALSKI:  Your Honor --

13             THE COURT:  -- when the protective order was pending.

14             DEFENDANT ROBERT KOWALSKI:  Mr. Chiphe allowed a lot

15    of hearsay to enter.  He could have maybe perhaps called her,

16    but he told me she wasn't available, so --

17             THE COURT:  And how are you going to do your job if

18    you get rid of Mr. Chiphe?  How are you going to do all of the

19    filings and all of the work that you need to do?

20             DEFENDANT ROBERT KOWALSKI:  An attorney is obligated

21    to represent his client zealously.  And Mr. Chiphe has done so.

22    I think he lacks competency to continue to represent me.  I

23    think if I screw up my own case --

24             THE COURT:  He's not representing you.  He's not

25    representing you.  You didn't want anyone to represent you.

1          DEFENDANT ROBERT KOWALSKI:  I don't want him to

2     represent me, your Honor.  I think standby counsel is --

3          (Unintelligible crosstalk.)

4          THE COURT:  He doesn't represent you.  He doesn't.

5          DEFENDANT ROBERT KOWALSKI:  He represents me as a

6     standby counsel.

7          THE COURT:  No, he does not.  As standby counsel, all

8     he is there for is a consult.  You can say to him what about

9     this or what about that or can you help me with this --

10         DEFENDANT ROBERT KOWALSKI:  Your Honor --

11         THE COURT:  If you just say to him by email, like I

12    saw here, can you file this motion to dismiss you, and he

13    follows that direction and files it, he's doing what he's

14    supposed to do as stand by --

15         DEFENDANT ROBERT KOWALSKI:  Judge, I find it very

16    difficult.  The -- Mr. Chiphe has filed a response.  And I

17    don't have that response.  It's under seal.  I think due

18    process requires that I'm allowed to see that.

19         THE COURT:  Have I seen a response under seal?

20         DEFENDANT ROBERT KOWALSKI:  Just indicated something.

21    Mr. Chiphe also said something about hard drives.  I haven't

22    seen any hard drive from Mr. Chiphe --

23         THE COURT:  Yes, because if you'd listen here in

24    court, you would hear what he said.

25         He bought the hard drive for you for discovery.  He

1    turned it over to the government so that the government can

2    load it up and provide it to you.

3              That is what I heard today.  Did you hear that today?

4              DEFENDANT ROBERT KOWALSKI:  I did not hear that,

5    Judge --

6              THE COURT:  That is what the --

7              DEFENDANT ROBERT KOWALSKI:  -- because I don't have

8    any discovery at all --

9              THE COURT:  Here.

10             DEFENDANT ROBERT KOWALSKI:  -- since the last court

11   date.  I'm not sure what FedEx truck it's on, but it didn't

12   make its way to my door.

13             THE COURT:  Because you didn't answer the door.

14             DEFENDANT ROBERT KOWALSKI:  I can't be chasing trucks

15   down the street.  I don't think Ms. Green would appreciate

16   that.

17             THE COURT:  I think just answering the doorbell is all

18   you need to do.

19             DEFENDANT ROBERT KOWALSKI:  Your Honor, that's not the

20   situation I'm living in.

21             THE COURT:  Okay.  What?  That you can't answer the

22   doorbell?

23             DEFENDANT ROBERT KOWALSKI:  That's not the kind of

24   house it is, your Honor.  There's more than one door in the

25   house.  And how are you presuming that the FedEx guy even

1   knocked on the door?  That's quite an assumption, Judge.  You

2   don't think I don't want the discovery?  Do you think I want to

3   have my address being --

4        (Unintelligible crosstalk.)

5            THE COURT:  Okay.

6            DEFENDANT ROBERT KOWALSKI:  -- for discovery.

7            THE COURT:  Okay.  I have a sentencing that was set to

8   begin four minutes ago, so we're going to end this status, once

9   again, with the understanding that the hard drive has been

10  turned over, which clearly is reflected here by Mr. Chiphe's

11  comments to the -- to me, and that he's given it to the

12  government.  And you're loading it up.  That you have the

13  documents from the bar being off to a third-party vendor being

14  copied, and those are going to go over when those are done.

15  And that you have these large bank electronic records that are

16  going to be loaded, and that's also through an off-site

17  discovery process, and so those are ongoing.

18            And, once again, you have acknowledged your

19  obligations under *Brady* that you're turning anything over that

20  fits under that description and that you understand the

21  consequences of it.

22            So discovery is being appropriately handled.  And it

23  will continue to go on.

24            I will take under advisement the motion to withdraw

25  Mr. Chiphe.

1              And I'll take under advisement your new motion to,

2        once again, leave house arrest.

3              I'm not ruling on those today.

4              And I'll start working on the myriad motions that you

5        filed to dismiss the indictment or counts of the indictment or

6        whatever else is in there because there's many of them.

7              DEFENDANT ROBERT KOWALSKI:  Your Honor, the

8        information that the government took was not taken from a bar.

9        It was taken from my attorney's office.  And I think that's a

10       huge difference.  It wasn't at a bar.  It was in an office that

11       the attorney utilized at a place called Da Vinci's.

12             And it's outrageous that the divorce police are

13       helping the government here.

14             I'm sorry, my ex-wife's bitterness shouldn't play any

15       role in my guilt or innocence here.

16             THE COURT:  Okay.  All right.  We're going to be done

17       for today.

18             Do you have anything else you have to tell me about?

19             Mr. Daniel, we haven't heard from you all day.  Is

20       there anything you want to add?

21             MR. DANIEL:  Briefly, your Honor.

22             Last time at the last status, there was the issue of a

23       computer tower --

24             THE COURT:  Right.

25             MR. DANIEL:  -- that was to be returned to

1    Mr. Kowalski.  That tower is currently, I believe, in

2    Arlington, Virginia, and we're working to have it shipped back.

3    I'm told it might take another week or two to get it back --

4            THE COURT:  Okay.

5            MR. DANIEL:  -- because of the staffing at that

6    facility.

7            THE COURT:  Okay.

8            MR. DANIEL:  There are also some items that -- some

9    boxes that are -- some are being imaged, some items in those

10   boxes can be returned to Mr. Kowalski.  I don't know if he's

11   prepared to receive them today.  It's probably a 4 by 6 area.

12   It's like eight boxes that can go back to him that we, instead

13   of imaging, we're just going to return to him.  In those boxes,

14   there were two items that were -- that we came across.  One was

15   a driver's license and the other a passport.  The driver's

16   license I believe can be returned to him.  The passport I would

17   recommend going to Pretrial Services.

18           THE COURT:  Pretrial Services, yes.

19           All right.  Go ahead.  I'm -- for the record, he's

20   returning your driver's license.

21           For the record, he has four to six boxes for you.  Do

22   you want to take them today?

23           Do you have a car today?

24           DEFENDANT ROBERT KOWALSKI:  I'd like to try to.  But,

25   your Honor, I would like my photographs, but -- I don't have

1    any photographs of my family that were on that iPhone that we

2    discussed, and those pictures are a treasure to me.

3            MS. PETERSEN:  Your Honor, the images from the iPhone

4    were produced to him back in January.  It's on a thumb drive,

5    and I've told him repeatedly which Bates label he can find it

6    at.

7            THE COURT:  Okay --

8            DEFENDANT ROBERT KOWALSKI:  These thumb drives are

9    defective, Judge.  I want to look at my discovery, and I'm

10   being forestalled by this defective thumb drives that I have.

11           THE COURT:  Okay.  Bring me every single thumb drive

12   that you claim is defective, all right?

13           DEFENDANT ROBERT KOWALSKI:  Yes, Judge.

14           THE COURT:  Okay?  Or -- well, I guess it's difficult

15   for you to come in.  Is that what you're saying?  So you can

16   give them -- Mr. Chiphe, could you collect them possibly?

17           MR. CHIPHE:  Your Honor, what we can do is I can talk

18   to one of our investigators, and we can try to arrange --

19           THE COURT:  Maybe your investigator can pick them up

20   and then deliver them to the government.  They can look to see

21   if they're defective.  My guess is probably not.  If they're

22   not, then we will have another discovery meeting --

23           DEFENDANT ROBERT KOWALSKI:  Judge, it's quite obvious

24   how they're defective.  The little prongs on the back of them

25   are not there, so it's not -- it's -- they're defective.

1          THE COURT:  Are they the kind that you have to push

2     out?

3          MS. PETERSEN:  The only thumb drives my office has,

4     they look like a credit card, and it has a little like piece

5     that comes out that's part of a USB and it plugs in and -- but

6     my understanding is they were all working except for one

7     earlier this week.  So if --

8          THE COURT:  Well --

9          MS. PETERSEN:  -- one is defective, we will replace

10    it, but I'm not sure that they are.

11         THE COURT:  What is the answer?  Why is it in the

12    early part of the week they're all fine except for one, and now

13    today they're all defective?  What's the truth?

14         DEFENDANT ROBERT KOWALSKI:  The truth is I cannot

15    access these devices, Judge, and I would like to.

16         And, moreover, the discovery I've been tendered is so

17    incoherent --

18         THE COURT:  I'm not going back with the discovery.

19    I'm just on one thing.  I'm just on the drives right now.

20         DEFENDANT ROBERT KOWALSKI:  They don't work, Judge.

21         THE COURT:  Okay.  Then let me be so kind as to ask

22    your standby counsel to have an investigator pick them up,

23    deliver them to the U.S. Attorney's Office, to one of the three

24    trial attorneys here, and then you can take a look at them and

25    see if they're defective, and we'll go from there.

1           MR. NETOLS:  At the risk of one more thing, for

2      purposes that Mr. Kowalski keeps mentioning that matters were

3      taken from his attorney's office.

4           We've tried to do a taint review.  We obviously don't

5      want to traipse in the areas that we don't -- but he doesn't

6      provide us information.  We would ask, if the Court could

7      inquire, what's the name of his attorney so when we go through

8      the documents we can know whether these documents --

9           THE COURT:  Oh, okay.  So a taint review, as you

10     probably know, is that these lawyers here will not be able to

11     look at anything that was from your attorney, and they review

12     it for attorney-client privileged material.

13          They cull that out and they don't give it to those

14     attorneys for prosecution.

15          So in order to do that, the taint team, which will be

16     another group of attorneys who will be walled off from them,

17     need to know who your attorney is so that they can make sure

18     that they are culling out attorney-client privilege.

19          So who is your attorney?

20          DEFENDANT ROBERT KOWALSKI:  The first thing, Judge,

21     the taint team is a little late for that because we've already

22     had a governmental official fishing through the attorney's

23     office.

24          THE COURT:  Right, so they collect it, and then they

25     give it to a taint team --

1          DEFENDANT ROBERT KOWALSKI:  My licensed attorney --

2          THE COURT:  What --

3          DEFENDANT ROBERT KOWALSKI:  -- of Illinois, her name

4     is Janet R. Kowalski.

5          THE COURT:  Oh.  Your sister.

6          DEFENDANT ROBERT KOWALSKI:  Naturally, yes, who is an

7     attorney.

8          THE COURT:  And she's back on the call.

9          DEFENDANT ROBERT KOWALSKI:  Moreover, this -- this

10    divorce police officer, this receiver, he's --

11         THE COURT:  All right.  Anything else that -- I have

12    to get to my --

13         MR. NETOLS:  Nothing else, Judge.  That's all we need

14    for purposes of moving forward.

15         MS. PETERSEN:  Your Honor, we would ask that time be

16    excluded for Mr. Kowalski until the next status --

17         THE COURT:  Yes.

18         MS. PETERSEN:  -- which I believe is on May 28th --

19         THE COURT:  May 28th.

20         Do you agree to the exclusion of time?

21         DEFENDANT ROBERT KOWALSKI:  Absolutely not, Judge.  I

22    want to bring this on.  Bring their fake loans on.  I --

23         THE COURT:  Okay.  So you're not agreeing to the

24    exclusion of time until May 28.

25         DEFENDANT ROBERT KOWALSKI:  This case has gone on for

1    way too long already.  My son is going to be in eighth grade

2    before this thing is over.  Bring on the discovery, guys.

3            THE COURT:  All right.  So if you're not going to

4    agree to the exclusion of time, then the clock begins to tick,

5    and you have to be ready to go to trial.

6            Are you ready to go to trial?

7            DEFENDANT ROBERT KOWALSKI:  I will be, Judge.  Sure.

8    Bring it on.  Let's go.

9            MS. PETERSEN:  Your Honor, I would ask that time be

10   excluded over his objection because he has several pending

11   pretrial motions.

12           THE COURT:  Yes, there's -- I have a number of

13   pretrial motions.

14           MS. PETERSEN:  Additional ones were filed earlier this

15   week.

16           THE COURT:  Hold on just a second because I had the

17   docket up.

18           THE CLERK:  ECF is down, your Honor.

19           THE COURT:  Oh, it's not working.

20           THE CLERK:  It's not working.

21           MS. PETERSEN:  Your Honor, he filed a motion to

22   dismiss --

23           THE COURT:  Let me go to CEO.  We'll use a

24   different -- I can't get my --

25           THE CLERK:  I saw it.

1          THE COURT:  Did you see it?  Here it is.

2          THE CLERK:  It kind of juts around.

3          THE COURT:  Thank you.

4          MS. PETERSEN:  As one example, he filed a motion to

5    dismiss April 26th.

6          THE COURT:  Okay.  Hang on a second.

7          DEFENDANT ROBERT KOWALSKI:  Your Honor, I'm very

8    concerned that exhibits from my motion have been taken off by

9    Mr. Chiphe.  I'm not even sure if the Court is viewing

10   everything that I wanted to present.

11         THE COURT:  Mr. Chiphe would not remove exhibits.

12         Mr. Chiphe, did you remove exhibits from any filings,

13   sir?

14         MR. CHIPHE:  No, your Honor.

15         THE COURT:  Thank you.

16         MR. CHIPHE:  A question, and I remember him filing

17   something in one of the motions, I decided I'll read this

18   motion.  He filed something.  I called, talked to him about it,

19   and wanted to make sure he really wanted to file the motion

20   that he had sent.

21         THE COURT:  Understood.

22         DEFENDANT ROBERT KOWALSKI:  I -- find my life is very

23   funny, and this is a reason why I can't work with Mr. Chiphe.

24   He thinks I'm a joke.

25         THE COURT:  Okay.

1          DEFENDANT ROBERT KOWALSKI:  And I don't like being

2     indigent any more than anybody else does.  And for him laughing

3     at me while my life is at stake --

4          THE COURT:  Are you on any benefits, too?  Are you on

5     unemployment or any other kind of benefits that are provided?

6          DEFENDANT ROBERT KOWALSKI:  Yes, your Honor.  I do

7     have a Link card, yes --

8          THE COURT:  Okay.  So you've got some funds.

9          All right.  Let's start with the fact that your motion

10    to not exclude time, denial of it, is going -- the motion to

11    exclude time is going to be granted over objection because of

12    the numerous pretrial motions that I have to review before we

13    get to trial.  And that is an excludable time under the Speedy

14    Trial Act.  So I have to review them and rule on them.  So time

15    until I rule on all of those will be excluded.  But right now

16    I'll just exclude it until May 28.  All right?

17         Have you been responding to the most lately filed

18    ones, or are you waiting until I ask you for a response?

19         MS. PETERSEN:  We have not -- the ones that were filed

20    this week, I know we have not responded to --

21         THE COURT:  I know that Mr. -- I think I have a bunch

22    of responses from the earlier motions.

23         MS. PETERSEN:  We did -- I know a couple weeks ago, we

24    filed -- we would have filed responses to some with -- before

25    the Court asked us to, but I know there are some that are

1   un-responded to.

2           THE COURT:  All right.  I'll take a look and see if I

3   need responses --

4           DEFENDANT ROBERT KOWALSKI:  It's not just that, Judge.

5   A response or reply from the government was provided under

6   seal, and Mr. Chiphe didn't think I needed to see that.  So I

7   would like this motion or this response to be provided to me.

8           THE COURT:  Well --

9           DEFENDANT ROBERT KOWALSKI:  I think that my standby

10  counsel has a duty to me to do --

11          THE COURT:  Aren't you on the docket?

12          DEFENDANT ROBERT KOWALSKI:  It's a sealed motion.

13          THE COURT:  Yes, but a party gets to see a sealed

14  motion.

15          DEFENDANT ROBERT KOWALSKI:  I'm unable to.

16          MS. PETERSEN:  Your Honor, everything I file in this

17  case as it relates to Mr. Kowalski, I send him a copy of in the

18  mail.

19          THE COURT:  Okay.  Thank you.  All right.  We're going

20  to go --

21          DEFENDANT ROBERT KOWALSKI:  I don't have it.  I don't

22  have whatever this is.

23          THE COURT:  Okay.  Thank you.  We're going to the

24  sentencing.

25          You're excused until I see you again on May 28th.

1          THE CLERK:  Your Honor, I have to end the WebEx.

2     Ms. Kiriklakis, the probation officer, will be calling in on

3     the other line.

4          THE COURT:  Thank you, Deputies.

5        (Concluded at 11:15 a.m.)

6                    C E R T I F I C A T E

7        I certify that the foregoing is a correct transcript of the

8     record of proceedings in the above-entitled matter.

9

10    */s/ GAYLE A. McGUIGAN*                    *May 12, 2021*
      GAYLE A. McGUIGAN, CSR, RMR, CRR
11    Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25