```
 1                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3   UNITED STATES OF AMERICA,        )  Docket No. 19 CR 00226-1
                                      )
 4                  Plaintiff,        )  Chicago, Illinois
                                      )  June 22, 2022
 5            v.                      )  9:49 a.m.
                                      )
 6   ROBERT KOWALSKI,                 )
                                      )
 7                  Defendant.        )

 8             TRANSCRIPT OF PROCEEDINGS - Status Hearing
 9            BEFORE THE HONORABLE VIRGINIA M. KENDALL

10
     APPEARANCES:
11

12   For the Government:      UNITED STATES ATTORNEY'S OFFICE by
                              MS. MICHELLE PETERSEN
13                            MR. JEREMY DANIEL
                              MR. JEFFREY SNELL
14                            Assistant United States Attorneys
                              219 South Dearborn Street, 5th Floor
15                            Chicago, Illinois  60604

16
     For the Defendant:       MR. ROBERT KOWALSKI, Pro Se
17

18   For the Defendant        MR. STEVEN ROBERT SHANIN
     as Standby Counsel:      53 West Jackson Boulevard, Suite 920
19                            Chicago, Illinois  60604

20

21   Also Present:            Special Agent Robert Batz, FHFA OIG
                              Mr. Robert Steele, MCC
22

23   Court Reporter:          GAYLE A. McGUIGAN, CSR, RMR, CRR
                              Official Court Reporter
24                            219 S. Dearborn Street, Room 2504
                              Chicago, IL 60604
25                            312.435.6047
                              gayle_mcguigan@ilnd.uscourts.gov
```

 1          (Proceedings heard via videoconference.)

 2               THE CLERK:  This is Lynn, Judge Kendall's courtroom

 3     deputy.

 4               Can you hear us?

 5               THE DEFENDANT:  Yes, I can.

 6               THE CLERK:  19 CR 226, Defendant 1, U.S. versus Robert

 7     Kowalski.

 8               Please present yourself, starting with the

 9     United States.

10               MS. PETERSEN:  Good morning, your Honor.  Michelle

11     Petersen for the United States.

12               I'm at the MCC in the room with Mr. Kowalski

13     (inaudible) using the iPad.

14               And I also see on the video Mr. Daniel -- Jeremy

15     Daniel and Jeff Snell for the United States.

16               THE COURT:  Okay.  I -- did you get everything she

17     said, Gayle, or were you having a little trouble?  Did

18     everything work out?

19               COURT REPORTER:  I do have everyone identified.  It is

20     not the greatest sound connection -- (audio interruption)

21               I am hearing an echo now.

22               THE COURT:  Okay.  All right.  Let's see how we do.

23               Everyone watch Gayle.  She'll put her hand up if, for

24     some reason, she doesn't hear something that you're saying so

25     that we can do this correctly.

1              Good morning, Mr. Daniel.

2              Good morning, Mr. Snell.

3              And good morning, Mr. Kowalski.  Good morning --

4              THE DEFENDANT:  Good morning, Judge.

5              THE COURT:  So my original plan was to monitor this

6      discovery situation to make sure that you have access to all of

7      the materials that you're going to need for trial.  And I

8      thought we would do it here; but then I was told that the

9      computer works off of the networks at the MCC, and so it was a

10     futile effort for me to do that because it might not work in

11     the courtroom.  So that's why Ms. Petersen is there with you.

12             And what we're going to do is go through the different

13     documents and media that you received, the different programs

14     that you are using to open them, the different platforms, and

15     we're going to see if there's any difficulties.

16             Let me ask you, Ms. Petersen, did you bring anyone

17     with you from the IT Department?

18             MS. PETERSEN:  (Inaudible)

19             THE COURT:  Okay.  That's not working.  I'm sorry.

20     That's not working.  I've got to get you closer to the

21     microphone.

22             MS. PETERSEN:  I have a microphone.  I think the

23     problem is that Mr. Kowalski also has a microphone.

24             Is this better?

25             THE COURT:  So much better, yes.

1          MS. PETERSEN:  Yes.  Special Agent -- (inaudible)

2          COURT REPORTER:  I'm sorry.  I did not hear that.

3          MS. PETERSEN:  I can get someone from the MCC to

4     assist me.  I'm sorry, I don't -- I'm not familiar --

5          THE CLERK:  If you muted Mr. Kowalski while

6     Ms. Petersen is talking, maybe we'll try that.

7          Ms. Petersen, do you want to try again?

8        (Pause in proceedings.)

9          THE CLERK:  Looks like they're working on it.

10         THE COURT:  Are you using the same microphone as

11    Mr. Kowalski?

12         MS. PETERSEN:  I don't believe so.  We each have

13    separate microphones, right?  I believe (inaudible) but we are

14    seated close to each other.

15         THE CLERK:  My suggestion would be, Judge, when one of

16    them is speaking, the other one has to mute.

17         THE COURT:  Okay.  So, Gayle -- I mean, Lynn believes

18    that if you are speaking, Ms. Petersen, then Mr. Kowalski mutes

19    his and vice versa.

20         Do you have Kowalski -- Mr. Kowalski muted right now

21    or not?

22         THE CLERK:  I have two iPads that are on our system,

23    iPad 17 and iPad 18.  I don't know who has which one.

24         THE COURT:  It looks like Mr. Kowalski has 17 because

25    he's looking at it, right?

1          How come we can't see you?

2      (Pause in proceedings.)

3          MS. PETERSEN:  I'm sorry, my video got turned off.

4          THE COURT:  Ms. Petersen -- there.  Perfect.  Now say

5  something.

6          MS. PETERSEN:  Okay.  Yes, your Honor.  I'm sorry.  I

7  forgot -- yes, who is here in the room with me.

8          Special Agent Robert Batz, B-A-T-Z, FHFA OIG.  And

9  he's a special agent on the case that has computer forensic

10  training.  And he's accompanied me on our previous trips to the

11  MCC.

12          THE COURT:  Wonderful.  And whatever that just did, it

13  works great, so -- the way you're doing it.  I can see

14  Mr. Kowalski.  And when it's his time, then you mute, and then

15  he will unmute, okay?

16          So let me ask you, Ms. Petersen, what you think is the

17  best way to go about doing this.  You know better than I what

18  you provided and the different formats that it's in.

19          MS. PETERSEN:  Yes.  Well, when I was here in

20  November, I checked all the devices, and we gave the Court a

21  report about that.  So I think we can start from the devices

22  that were tendered after that date, unless the Court wants

23  to --

24      (Unintelligible crosstalk.)

25          THE COURT:  Great idea.

1          MS. PETERSEN:  -- which I can do as well (inaudible)

2          COURT REPORTER:  I'm sorry.  Ms. Petersen is breaking

3    up.

4          Judge, I'm -- just to offer a suggestion, if the WebEx

5    is going in one room on two devices, that sometimes is the

6    problem, if they're both logged on in the same room on two

7    devices.

8          MS. PETERSEN:  I was told that -- (inaudible)

9          COURT REPORTER:  I did not understand that, what Ms.

10   Petersen --

11         THE COURT:  "I was also told that the reception in

12   this room isn't great, and that might be also part of the

13   problem."

14         I don't think I can get them into two rooms, though,

15   Gayle, because she needs to be going through the materials.

16         MS. PETERSEN:  I could -- I'm not allowed to bring my

17   phone into the MCC -- (inaudible)

18         THE COURT:  Let's ask them if they have a phone that

19   you can use, and then we mute you and use the prison phone.  We

20   do that with change of pleas sometimes, but I don't know here,

21   if you're in the same room that you do that in, okay?

22         MS. PETERSEN:  Mr. Steele is here with me, Robert

23   Steele.  He said we can use his cellphone.

24         THE COURT:  Okay.  Thank you, Mr. Steele.  I

25   appreciate that.  Let's give that a try.

```
 1              He said -- I don't know if you heard that.
 2   "Mr. Steele is in the room with me, and he said we can use his
 3   phone."
 4              MS. PETERSEN:  We might -- we might -- we need the
 5   code, your Honor.
 6              THE COURT:  That's okay.
 7              THE CLERK:  Tell me when you're ready.
 8              650-479-3207.  The access code, 1806984009.
 9         (Pause in proceedings.)
10              THE COURT:  While they're waiting, I don't think that
11   we put you on the record, Mr. Shanin, as standby counsel.
12              MR. SHANIN:  Steven Shanin, standby counsel, present.
13              THE COURT:  Thank you.
14              MR. SHANIN:  Thank you.
15              MS. PETERSEN:  Your Honor, I'm here by phone.
16         (Pause in proceedings.)
17              MS. PETERSEN:  This is Ms. Petersen again.
18              I think that solved the feedback problem.  Has it?
19              THE COURT:  Why don't you speak and let's see how
20   Gayle does.  Say something you already told us.
21              MS. PETERSEN:  Special Agent Robert Batz is in the
22   room with me.
23              COURT REPORTER:  It's some improvement.
24              THE COURT:  Okay.  So let's give it a try, Gayle.
25   Okay?
```

1           All right.  So I like Ms. Petersen's proposal, which

2    is that, since I had a report in November on the devices after

3    she had had her visit, let's now go through the materials that

4    have been given to you since November, to make sure everything

5    is working properly.

6           So I'm going to turn first to Ms. Petersen, and you

7    can tell me -- we can go one by one with the materials that

8    were provided, okay?

9           So unmute yourself.

10          Mr. Kowalski, if you're talking, you're muted right

11   now.  And I'm talking with Ms. Petersen, okay?  So hold on.

12          MS. PETERSEN:  Yes, your Honor.

13          I think we would start -- the first that I'd like to

14   start with is from November 22nd, '21.  It's labeled

15   (inaudible)

16          COURT REPORTER:  I'm sorry, November 22nd, '21?

17          MS. PETERSEN:  Yes.  It's labeled USB 5.

18          Mr. Kowalski does say he wants to make a record.

19          THE COURT:  Okay.  All right.  So mute yourself.

20          Mr. Kowalski, unmute yourself, and you can make a

21   record now.

22      (Pause in proceedings.)

23          THE CLERK:  I sent the request to --

24          THE COURT:  Hold on just a second.  I have a question

25   about this.

1          Yesterday, I was informed that we didn't think this

2   would work based upon the servers in the courthouse being

3   different from the servers at the MCC.

4          Can you explain that to me?

5          Because this, of course, will work better in person,

6   if it's possible.

7          So tell me what the problem is, if you could, please.

8   And that is for Ms. Petersen.

9       (Pause in proceedings.)

10         THE CLERK:  We can't hear you, Ms. Petersen.

11         Star six -- yeah.

12         MS. PETERSEN:  I was told yesterday that the -- some

13  of the security programs on the computers at the MCC are tied

14  to the --

15         COURT REPORTER:  I'm sorry.  "Some of the security

16  programs on the computers at the MCC are tied to the."

17         MS. PETERSEN:  Being on the network, on the -- they

18  run from the network.  And so the MCC had informed me that

19  their IT person thought that if the computer is off the

20  network, it might not work right.

21         THE COURT:  So we don't have the programs on our

22  network, is the concept.  All right.

23         THE DEFENDANT:  There's no network here.  There's no

24  network whatsoever.  It's a stand-alone computer.

25         THE COURT:  Mr. Kowalski, go ahead and make your

1    record.

2            Speak slowly for Gayle, please.

3            THE DEFENDANT:  Your Honor -- (inaudible)

4            COURT REPORTER:  I'm sorry.  I'm not hearing Mr.

5    Kowalski.

6            MS. PETERSEN:  Everything else in this room --

7    (inaudible)

8            THE COURT:  This isn't going to work.

9            Gayle, if you go over there, I'm not going to get

10   realtime from you, and I can't hear.  Right?

11           COURT REPORTER:  Judge Kendall, if I have internet

12   access at the prison, you will be able to have the realtime

13   feed.

14           THE COURT:  Okay.  All right.  Mr. Steele, can you

15   arrange that my court reporter come join you, please?

16           MR. STEELE:  Sorry, your Honor.

17           THE COURT:  I can't hear you -- there you go.  Say it

18   again.  What did you say?

19           MR. STEELE:  (Inaudible)

20           THE COURT:  I can't hear him.  Yes, you can?  Yes?

21           MR. STEELE:  I can hear you.  Yes.

22           THE COURT:  Okay.  You can help her get over there?

23   If I send her over right now, you can help her get in and get

24   to the room where you are?

25           MR. STEELE:  Yes.  We can work that out.  (Inaudible)

1          THE COURT:  I didn't hear whatever he said, but, yes.

2          Okay.  Gayle, I'll send someone with you to help carry

3   your stuff.  And go ahead and head over there.  And I'll wait

4   for a call from -- or an email from the government once

5   everybody is set up.  Okay?

6          COURT REPORTER:  Yes, Judge.

7          THE COURT:  Thank you.

8      (Recess at 10:04 a.m.)

9      (Proceedings heard at the MCC beginning at 11:11 a.m.)

10          MS. PETERSEN:  We'll proceed this way.  We'll just

11   kind of hold this phone and speak into it loudly, if that -- if

12   you think that will work.

13          THE COURT:  Yes.  It sounds like it's working fine.

14          I'd like to know from Gayle if she's having any

15   difficulties.

16          COURT REPORTER:  Judge, as long as they put the phone,

17   when you speak, close to me, then it should be fine.

18          THE COURT:  So two things.

19          First and foremost, while we are on WebEx, we are in

20   the courtroom live, and there is a feed coming through the

21   entire time.

22          And so when you're talking with each other at the MCC,

23   at your house, at your office, Judge Kendall is listening to

24   everything you say.

25          So in the future, you might consider more carefully

```
 1    your discussions with either the prosecutor or anyone else
 2    because the feed is on.  Okay?
 3              That's number one --
 4              MS. PETERSEN:  Your Honor, we're going to pause for
 5    one second because when I put the phone next to Gayle, it makes
 6    it hard for Mr. Kowalski to hear.  It's just not loud enough.
 7    So I just asked the MCC if they could go get a device for
 8    Mr. Kowalski to listen on because I want to make sure he's
 9    hearing what you're saying.
10              THE COURT:  Okay.
11        (Pause in proceedings.)
12              MS. PETERSEN:  Can he have just headphones, with his
13    muted, with headphones so he can hear?
14              Thank you so much.
15        (Pause in proceedings.)
16        (Headphones provided to the defendant.)
17              THE COURT:  Mr. Kowalski, can you hear me?
18              THE DEFENDANT:  Yes, I can.
19              THE COURT:  Okay.  I will say again what I said a
20    moment ago, just in case you could not hear.
21              I said that while we are on the WebEx, we are in my
22    courtroom live, and there is a live feed coming through the
23    entire time, even when I turn my camera off.  And so when you
24    are talking with each other at the MCC, even if you are talking
25    with someone as if you were in your home or in your office, I
```

1   can hear everything you say.

2          So in the future, you should consider more carefully

3   your discussions with either the prosecutor or anyone else

4   because the feed is on.  That's number one.

5          Secondly, we're going to pick up where we left off,

6   which is that we're going to go through the materials that were

7   sent over in November after Ms. Petersen's visit to the MCC,

8   after the point where she went through the materials.

9          And so before we begin that, what we're going to do is

10   allow Mr. Kowalski to make his statement that he wanted to

11   make, and then we're going to start working with the devices.

12          Mr. Kowalski, what did you want to say?

13          THE DEFENDANT:  Good morning, Judge.

14          I want to say several things.

15          One, I'm very troubled that this is part of more *Brady*

16   suppression.  As Ms. Petersen, the prosecutor, noted, on

17   November 22nd, 2021, she was here at the MCC with her staff,

18   which included agents from FDIC and HUD.  And at that time,

19   they noted there were certain problems with the discovery.

20   That, between 11-22 to 6-22, equals seven months, seven months,

21   that I've been deprived of discovery.

22          They're making a mockery of this process.  They're

23   here with great fanfare solving a very simple problem that

24   should have and could have been accomplished much sooner.

25          They knew this discovery was problematic then.  Why

1   are they tying up my limited precious time and the Court's time

2   now with all this technobabble and last-minute heroics?

3           They don't improve in anything.  I'm not the first

4   criminal defendant.  They should know what the BOP standards

5   are.  These are universal, national -- national-wide standards.

6           In all this time, this discovery has been essentially

7   suppressed.  I've been unable to use it in a comprehensive

8   manner.  It's outrageous.

9           It's much too late now to harness this discovery

10  information.  We have -- still don't have all the discovery.

11  And this is significant because we are 90 days away from a

12  trial.  And this huge manure pile of fraudulent bank documents

13  remains a mathematical impossibility to review.

14          Further, access to this computer is largely denied to

15  me regularly.  I'm kicked off by other attorneys here who are

16  counseling their clients.  And then, this last Friday, I was

17  advised by Ms. Bowers (phonetic), the assistant warden, that I

18  need to review information in the unit in front of everybody.

19          I'm not just -- just seeing that -- this information,

20  the deliverance, as it were, is not enough.

21          I can't organize a defense here.  This particular room

22  is a torture chamber.  These few hours already I spent in here

23  today, my ears are ringing.  I have no space in my cell to

24  organize a defense.  I have no files.  I have no tools of an

25  adequate defense.  I need a printer, paper, investigation,

1    spreadsheet.  A few witnesses would be real nice.  I need

2    access to Illinois law, bankruptcy law.

3             I simply can't manage a case here.

4             And, further, all this --

5             COURT REPORTER:  I'm sorry.  Repeat that, Mr.

6    Kowalski.  "I simply can't manage a case here."

7             THE DEFENDANT:  I said:  I simply can't manage a case

8    here.

9             I've been exposed to numerous lockdowns and enforced

10   idleness, which has affected my health.  There's no opportunity

11   to exercise here.  And I'm simply doomed.  And this is not the

12   way justice -- this is a mockery.

13            Thank you, Judge.

14            THE COURT:  Okay.  Let me address a number of things.

15            You have -- the first point that you made, that you

16   have not had access to materials for six months and now they're

17   coming in, that it's a big show, to put on a technical show for

18   you is inaccurate.

19            You have filed over 50 motions since that November

20   22nd date referring to numerous documents within the discovery,

21   referring to numerous reports within the discovery.  So it is

22   not accurate that you haven't had access to discovery.

23            Secondly, the efforts that the Court has made to give

24   you access to discovery while you're at the MCC is

25   unprecedented.  It has never been given to any inmate at the

1    MCC to the level that you have been receiving it.

2           Thirdly, the "show" that you are talking about is not

3    a show by the government.  It is the Court.  It is

4    Judge Kendall.  Every time you come in, you tell me you cannot

5    access things.  I want to make sure that's accurate.  If it's

6    accurate, it's something.  If it's not accurate, which I think

7    is probably true because you're filing lots of things based

8    upon your review of documents, then I want to know.  If there's

9    anything that can't be opened, we'll fix it for you.

10          It is not accurate that you don't have access to

11   bankruptcy law or a printer because I've given you standby

12   counsel.  He can give you anything you ask him to do in that

13   regard.  He can give you copies of things.  He can get you

14   bankruptcy law.  He is an experienced defense attorney.  And he

15   is there to answer your questions and do things like that.  He

16   has access to a printer.  He has access to the bankruptcy laws.

17          So none of your concerns are correctly on the record

18   before me.  Now --

19          THE DEFENDANT:  May I respond, Judge?  I have a few --

20          (Unintelligible crosstalk.)

21          THE DEFENDANT:  May I -- may I respond to your Honor?

22   I think there's a few misunderstandings.

23          THE COURT:  No.  We've got a job to do here today, and

24   we've already spent over an hour with the technical aspect.

25   The job we're doing today is to make sure you can open your

1    discovery.

2           Ms. Petersen, you may begin.  Tell me, what is the

3    first thing that was provided, in what format, and let's see if

4    it works.

5           MS. PETERSEN:  Okay, your Honor.

6           The first thing that was provided since my November

7    visit was a flash drive.  It was produced on or about

8    November 22nd, 2021.  It's referred to in the filings as USB 5.

9    I have it in front of me.  I'm going to put it in the computer

10   and enter the password.

11          I'm going to set the phone down one second so I can do

12   that.

13      (Pause in proceedings.)

14          MS. PETERSEN:  Your Honor, would you like me to flip

15   the camera so you can sort of see the screen?  Or do you want

16   to see me?

17          THE COURT:  I'd like to be able to verify it

18   independently.  So, yes, that would be helpful.

19          MS. PETERSEN:  Yes, your Honor.

20          I will flip -- I will flip the iPad around.  I'm going

21   to have to angle it a little bit.  This is the, sort of, lock

22   screen -- or the --

23          THE COURT:  Your camera is not on.

24          MS. PETERSEN:  Oh.

25          THE COURT:  I don't see a camera on for you -- there

1    you go.

2              MS. PETERSEN:  Sorry.  It turns -- sorry.

3          So I just put the first thumb drive in.  The first

4    thing to do is enter the password.  Let me look up what the

5    password is and enter it.

6          (Pause in proceedings.)

7              MS. PETERSEN:  Okay.  I entered the password.  And

8    we're just waiting a second for the files to open.

9          (Pause in proceedings.)

10             MS. PETERSEN:  Okay.  I can now see the folder

11   structure.

12             This production was -- has three folders in it.  These

13   are all items that Mr. Kowalski had difficulty opening when I

14   was here in November, and they were reproduced to him in a

15   different format, unzipped or otherwise modified in a format

16   that he should be able to open them.

17         (Defendant laughs.)

18             THE DEFENDANT:  It shut off.  Again.

19             MS. PETERSEN:  The computer --

20             THE DEFENDANT:  In two hours, it goes down.

21             MS. PETERSEN:  The computer just turned off, and it is

22   turning back on.

23             THE DEFENDANT:  Yay.

24             MS. PETERSEN:  I suspect it's because we've been in

25   here for two hours or some amount of time.

1              THE DEFENDANT:  Imagine downloading something for over

2       an hour and then having this thing turn off after an hour.

3              I'm sorry.

4              MS. PETERSEN:  Okay.  So we're just waiting for it to

5       restart, your Honor.

6              Hold on one second.

7          (Pause in proceedings.)

8              MS. PETERSEN:  So the computer has now restarted.  I

9       estimate that took less than two minutes.

10             And I'm going to re-put that same thumb drive in.

11      This is the November 22nd, 2021, thumb drive.

12         (Pause in proceedings.)

13             MS. PETERSEN:  And, I'm sorry, I have to hold the

14      screen by my hand, your Honor, so I'm sure it's a little bit

15      shaky.  I am now going to unlock the thumb drive.

16             I'm sorry.  I have to put this down.

17             AGENT BATZ:  Do you want me to hold that?

18             MS. PETERSEN:  I'm going to have Special Agent Batz

19      help hold this up.

20             Okay.  So we're waiting for the thumb drive to unlock.

21      Last time it probably took less than two minutes.

22         (Pause in proceedings.)

23             MS. PETERSEN:  Okay.  Now it is open.

24             There's three folders.

25             The first folder is marked "10/15/20."  This is a

1    reproduction of some materials that Mr. Kowalski had difficulty

2    opening.  And I'm going to just open the first PDF file and see

3    if it opens.

4         (Pause in proceedings.)

5              MS. PETERSEN:  It's still trying to open.  It says 25

6    minutes are remaining.  So let's cancel this and try again.

7              THE DEFENDANT:  Yay.

8         (Defendant laughs.)

9              MS. PETERSEN:  Mr. Kowalski is laughing and clapping.

10             THE DEFENDANT:  This is the fixed one, is it not,

11   Ms. Petersen?

12             MS. PETERSEN:  Yes.  This is the one -- this was

13   previously provided to Mr. Kowalski in a zipped format that was

14   slow to open.  So this is all now unzipped.

15             THE DEFENDANT:  Clearly.

16        (Pause in proceedings.)

17             MS. PETERSEN:  Okay.  So we got an error.

18             I will now try to open -- "The system cannot read from

19   the specified device."

20             Okay.  So the first set of folders does appear to be

21   having some problems.  I do not know why.

22             THE DEFENDANT:  Take your time.  I got plenty of time

23   in here.  It's 90 days until trial.

24             MS. PETERSEN:  I will mark this down as something that

25   we can work to fix.  I don't know why they're not opening, but

1    they are not.

2         Hold on.

3         THE DEFENDANT:  Oh, my God.  I think I was right about

4    something.

5       (Defendant laughs.)

6         MS. PETERSEN:  So we're going to now get back into the

7    thumb drive.

8       (Pause in proceedings.)

9         MS. PETERSEN:  I'm now going to open the second

10   folder, which is RCFL_OO2.

11        Large portions of this folder were provided to

12   Mr. Kowalski in paper format so he could review them in paper

13   format, and those were provided to him several months ago.

14        This is a dump of a phone, so it is large.  It's

15   marked "RCFL_OO2."  So it is possible this one will take some

16   time to open.

17      (Pause in proceedings.)

18        MS. PETERSEN:  This one also appears to be slow to

19   open.  It's a PDF.  So that's some kind of issue with this

20   computer that I've been continuing to work with the MCC to try

21   to resolve.  But, again, this one was provided to

22   Mr. Kowalski -- big portions of this were provided to him in

23   paper format.  Because of the size of the report, I did suspect

24   it would be slow to open.

25        Okay.  The third file is RECV.  This is a reproduction

1    of the boxes that were taken from the --

2             THE DEFENDANT:  Is it fair to say that was strike two?

3             MS. PETERSEN:  This is a reproduction of files that

4    were provided to the government by the divorce receiver.  When

5    I was here in November, that thumb drive did not work.

6             And this also, when I open up the file folder

7    structure, I am not seeing the files.  But hold on.

8             It appears that there's an error with this, so let me

9    try it again.

10            (Pause in proceedings.)

11            THE DEFENDANT:  Your Honor, how am I supposed to be

12   able to cope with this alone?

13            Ms. Petersen is far more -- she's from a different

14   generation.  She's got -- much more computer savvy than me.

15   This is an impossible task for me.

16            And, moreover, this computer here is the finest in the

17   MCC.

18            MS. PETERSEN:  Your Honor, I'm going to go back to the

19   RCEV folder and see if it will open.  If not --

20            THE DEFENDANT:  They shouldn't be asking to see if it

21   should open.  They should know it should open.  It shouldn't

22   be -- this is a BOP.  They're all over the country.  How come

23   the prosecutor can't figure this out?  How come there's this

24   element of doubt?

25            MS. PETERSEN:  This time the file structure is

1    available and the files are available, so I went to open the

2    first file.

3            When I was here in November, PDF files did open on the

4    devices.

5            THE DEFENDANT:  They're deliberately doing this just

6    to thwart my review of this.  This is outrageous.

7            Your Honor, if you were -- you see the camera.  This

8    is what I have to deal with every day.  This is -- I'm not

9    making this up.  This is -- my life is at stake.  And this is

10   the best the government could give me, is nothing?  Come on.

11   After seven months?

12           Pardon me if I get a little hysterical, but I'm facing

13   zero to 30.  And they can't give me just some basic

14   information?  Who knows what's on here.  It could be just a

15   bunch of nothing.  Yes, I can see some things, but I'd like to

16   turn over every stone.  And this is what *Brady* provides to me.

17   And that's why we should have had an order under the Due

18   Process Protections Act.  They're playing with this -- the

19   Court.  They're playing with their obligations loose and fast.

20   They're playing with the divorce court.  They don't know what

21   they're doing.  This is like the Wild West.

22           As a matter of fact, I don't even know why they have a

23   HUD agent here.  Doesn't he have program operating

24   responsibilities that don't include helping the prosecution?

25   Isn't HUD doing anything?

1            MS. PETERSEN:  Your Honor --

2            THE COURT:  Okay.  I'm just trying to get to the

3     bottom of the technology right now, see what's opening and

4     what's not.  So far, I have two documents -- two files that are

5     not able --

6            (Defendant laughs.)

7            THE DEFENDANT:  It stopped.

8            (Defendant laughs.)

9            MS. PETERSEN:  Okay.  Your Honor -- Mr. Kowalski,

10    would you please --

11           THE DEFENDANT:  Please what?

12           MS. PETERSEN:  Sit.  Just please don't get close to

13    me, okay?

14           THE DEFENDANT:  I'm trying not to.  I'd like to step

15    out, actually.  It seems like we got some time here to kill.

16           MS. PETERSEN:  Okay.  So this is not working.  This is

17    a PDF.  And I'm not sure, your Honor, why it is not working.

18    PDF were working --

19           THE DEFENDANT:  It's the two of us here.  I have no

20    idea why it's taken seven months, and they still don't know

21    what they're doing.

22           MS. PETERSEN:  So I will mark down that this is also

23    not working.

24           It appears that PDFs, in general, might not be opening

25    on this computer.  And so I will need to talk --

1      THE DEFENDANT:  No.  PDFs, generally, do open.  But

2  I'm not sure what -- how they encoded this to make sure that I

3  couldn't open it.

4      This is outrageous.

5      MS. PETERSEN:  Your Honor, just, for the record, this

6  was not deliberate.  This was my attempt to provide them in a

7  manner that they're working and --

8      THE DEFENDANT:  It's seven months of nothing.  It's

9  not acceptable to lock me in a cage for months and not give me

10  the tools I need to free myself.

11      Deliverance is inside here, and the prosecution knows

12  this.

13      MS. PETERSEN:  Okay.  I took out the USB --

14      THE DEFENDANT:  Could Mr. Shanin -- could maybe

15  Mr. Shanin come here and help us?  Because he seems like he's

16  got the answer.

17      MS. PETERSEN:  Your Honor, I took out USB Number 5.

18  That one is having problems.  We will address that.

19      Next up is USB Number 6.

20      USB Number 6 is a flash drive that was produced about

21  January 3rd, 2022.

22      Let me open it up and put it in the computer.

23      THE DEFENDANT:  Your Honor, there's glitches

24  throughout this entire presentation and this entire production.

25      I would rather see them take everything, fix it, and

1    bring everything back in one uniform submission instead of this

2    ad hoc, on a circus or farce -- I don't know what you call

3    it -- after seven months -- it's making me angry here.

4              THE COURT:  (Inaudible)

5              COURT REPORTER:  I'm sorry, Judge Kendall --

6              THE COURT:  We're just trying to determine what's

7    going on.

8              THE DEFENDANT:  Even if I could see this, what am I

9    supposed to do with this information that I can't use and

10   harness?

11             I need to print stuff out.  I can't call Mr. Shanin

12   24/7.  I just can't work this way.

13             And, moreover, these abnormally long down-times that

14   you'll see it experiencing, I can't -- the computer shuts off

15   in two hours.  It thwarts my efforts to download.

16             THE COURT:  Mr. Kowalski --

17             COURT REPORTER:  I need to hear the judge.

18             THE COURT:  -- it's not helping.  It is -- your tirade

19   isn't helping.  I'm trying to get to the bottom of this for

20   you.  This is the way I've chosen to do so.  You've said these

21   things to me for many months.  I'm looking into it for you now.

22   This is an opportunity for me to get to the bottom of it.

23   Okay?  So just be patient.  Let me determine, right now, USB 5

24   is not working for you, and I need to get to the bottom of it.

25             USB 6 now.  Okay?

1          MS. PETERSEN:  So this is --

2          THE DEFENDANT:  Thank you, Judge.  I'm sorry.  I am

3     hyperventilating a little bit.  This is very -- this is dear to

4     my life.

5          MS. PETERSEN:  Okay, your Honor --

6          THE COURT:  Take it easy.  This is to find out what

7     we've got, what's working and what's not, so just take it easy

8     and we'll get to the bottom of it.  That's why I'm doing this,

9     okay?

10          MS. PETERSEN:  So this is USB 6.  I put in the

11     password.  I can see the file structure.

12          The first thing is just a folder containing indexes.

13     And I'm opening an index right now.

14          Okay.  So this is -- the first thing I opened -- which

15     is in the first folder of this, which contains indexes --

16     opened.  It's a PDF.

17          Next is a folder marked "Discovery Part 1 through

18     4" -- I'm sorry, Part -- I'm going to open Part 1.  I'm opening

19     up a "PDF" folder in Part 1.  And that also is operable.

20          There's also a native -- some natively produced

21     documents.

22          THE DEFENDANT:  Ruh-roh.

23          MS. PETERSEN:  I'm going to open -- this one is a

24     bitmap image.  And it opens.

25          So these -- these folders and these sub-folders and

1    the data is accessible.

2           I know there are some types of file extensions that

3    Mr. Kowalski is unable to open.  And when that happens, we

4    produce them to him natively, but we've also reproduced them to

5    him in PDF format when pos -- when possible, I mean, unless

6    it's a video.

7           So there are some things on here that probably do not

8    open, but they have been reproduced to him in PDF format.

9           So I -- unless your Honor wants me to open a few more

10   files, I was going to move on and go to Part 2.

11          THE COURT:  I think you should go to Part 2.  I'm

12   satisfied with that one.

13          MS. PETERSEN:  Okay.  So I'm now opening -- this is

14   Part 2.  Part 2 has -- I'm opening just the first thing in

15   Part 2.  It's a PDF.  And it opens.

16          Part 3 -- sorry.  Part 3 also has a folder labeled

17   "PDFs."  And when I opened the first PDF in Part 3, it opens.

18          Part 4.  Part 4 contains some documents that were

19   previously produced to Mr. Kowalski in native format that I

20   converted into PDFs for him after seeing the difficulties he

21   had in November.

22          I'm opening the first folder that's labeled "November

23   17th, 2021, reproduction."  And the first PDF opens.

24          I'm now going to open Part 5.  Part 5 of this

25   production -- let me double-check my notes here.  Give me one

1   second, your Honor.  I'm sorry.  I've got a lot of paper in

2   front of me.

3       (Pause in proceedings.)

4       MS. PETERSEN:  Now, Part 5 of this, when we -- at the

5   bank was found a, sort of, binder containing a number of disks

6   that were believed to be back-up bookkeeping disks.  I believe

7   these disks are probably largely duplicative of other discovery

8   that were provided to him, but we copied these disks and gave

9   them to him.

10      THE DEFENDANT:  Yeah, they're called a second set of

11  books.

12      (Defendant laughs.)

13      MS. PETERSEN:  The first time we produced them zipped,

14  and they did not work, when I was here in November.  This is a

15  reproduction.  And -- hold on.  It's a program that needs to

16  run.  So hold on.  I just need to look at the instructions.  I

17  sent Mr. Kowalski instructions on how to open it.

18      (Pause in proceedings.)

19      MS. PETERSEN:  Because this -- these disks were

20  self-executing programs, it is possible that they will not

21  function on this computer, but let me try.

22      So I'm opening the self-executing program, and I'm

23  getting an error message.

24      These are -- Mr. Kowalski has been provided the

25  bookkeeping records of Washington Federal, the data from their

1    core system.  And I believe that these are just back-ups of

2    that data.  But when I try to run it, I am getting an error.

3    I'm going to write down what that error message is so that I

4    can talk to MCC staff about why these do not open.  And these

5    were produced in the same format the government received them.

6            So hold on, your Honor.  One second.

7        (Pause in proceedings.)

8            MS. PETERSEN:  So on USB 6, the item that does not

9    work are these disks.  The other items are operable.

10            Unless your Honor wants to see anything else on this

11    flash drive, I will move on to the next one.

12            THE COURT:  So far we have portions of this that are

13    working, but one is not.  Is that an accurate assessment?

14            MS. PETERSEN:  That's correct.  There's -- it looks

15    like there's five parts to this discovery.  Part 1 through 4

16    worked.  Part 5 is what is getting this error message.

17            THE COURT:  Got it, got it.  Okay.  Thank you.

18            You can move on.

19            MS. PETERSEN:  I will now move on to -- I apologize,

20    your Honor.

21            THE DEFENDANT:  Your Honor, this is very typical.

22    There's glitches throughout the discovery.  It's a hit-or-miss

23    proposition, and that's what I'm concerned about.

24            THE COURT:  I understand.  I understand.

25            MS. PETERSEN:  Okay.  So next up, I'm going to take

1     this flash drive out and put it back in its little folder.

2               Next up is USB 7.  This is a flash drive.  It was

3     produced on or about February 23, 2022.

4               Hold on, your Honor.  I was going to open up this

5     discovery that's open -- okay.

6          (Pause in proceedings.)

7               MS. PETERSEN:  So, again, we're at USB 7.

8          (Pause in proceedings.)

9               MS. PETERSEN:  USB 7, when I enter the password, it

10    opens.  It has three folders.

11              Folder 1 contains a PDF.  That's the index to some of

12    this discovery.  It's operable.

13              There's also a zip folder.  And I'm just going to

14    verify that that zip folder opens.

15              Okay.  It says this zip file folder will take an hour

16    to open.  I don't know if that's accurate.  But I can reproduce

17    this to Mr. Kowalski in unzipped format so it will open faster

18    for him.

19              THE DEFENDANT:  I just don't know why -- I don't

20    know -- these same problems that happened before, I'm not sure

21    why it wasn't -- back in November.

22              I know Ms. Petersen is trying, but these -- these

23    glitches -- if I had my bond, I would be able to communicate

24    with Ms. Petersen more effectively to resolve these issues.

25              MS. PETERSEN:  I'm going to -- I'm not going to let

1     this run for an hour.  I'm just going to cancel it.  I've made

2     a note to reproduce Folder 1.

3              Folder 2 contains -- these are reprod -- much like

4     with the last thumb drive we saw, for some of the native files

5     that could not be opened when I was here in November, we

6     converted them to PDFs.

7              The first folder is labeled "Repro of 1/3/2022 files."

8     And that opened.

9              The second is a folder labeled "Repro of 7/7/21 file."

10    I'm just going to open the first file.  And that is also a PDF.

11    And it is also operable.

12             THE DEFENDANT:  What is it, though?  It's just a

13    space-filler.  It's nothing.

14             MS. PETERSEN:  These are files from Washington

15    Federal's computers.

16             THE DEFENDANT:  But it's nothing, though.  It can't be

17    a file if there's nothing in there, if it's just put in there

18    just to bedevil me.

19             MS. PETERSEN:  Folder 3.  Folder 3 is a -- the

20    contents of a jump drive that were provided to the government

21    by Jim Crotty.

22             Hold on.  I got an error message, so I'm going to

23    start over.

24             THE DEFENDANT:  Oh, man.

25             MS. PETERSEN:  Now, these -- this was produced to

1    Mr. Kowalski natively in the same format we received it, which
2    means it's not just PDFs, it's got other types of files.  I
3    later converted a number of these files to PDF and gave them to
4    Mr. Kowalski.  We're going to see that in a later thumb drive.
5            Okay.  So this is getting an error message.  I'm going
6    to do it one more time, just to make sure it's the whole thing.
7            But, again, a number of these have been converted to
8    PDF and given to Mr. Kowalski.  So -- sorry, your Honor.  I
9    apologize.  I dropped the --
10           THE DEFENDANT:  But it's not helping.  Thanks.
11   Two-hour down time?  Come on.
12           MS. PETERSEN:  There's a zip file in this as well.
13           THE DEFENDANT:  It's almost as if they didn't want me
14   to open it.  Come on.
15           MS. PETERSEN:  I am making a note that it -- looks
16   like it takes about 35 minutes to open.  So it does appear to
17   be operable.  But that is a long time, and so I will reproduce
18   this to Mr. Kowalski in an unzipped format --
19           THE DEFENDANT:  Seven months in a solitary cell is a
20   long time, too, Ms. Petersen.
21           MS. PETERSEN:  I will reproduce this to Mr. Kowalski
22   in an unzipped format so he can access this quicker.
23           And that is the contents of USB 7.
24           And unless your Honor wants to see any other part of
25   USB 7, I will move on to the next device.

1          THE COURT:  You can move to the next one.

2          MS. PETERSEN:  Okay.  I'm going to take this out.

3       (Pause in proceedings.)

4          MS. PETERSEN:  Okay.  Next up is Hard Drive Number 3.

5    This is a hard drive that was produced to Mr. Kowalski on

6    March 23rd, 2022.

7          I'm sorry, there was a --

8          THE DEFENDANT:  A cable?  There it is.  I think you

9    have it.

10         MS. PETERSEN:  Sorry, your Honor.  I had to get a

11   cable.

12         Okay.  So I'm plugging it in.

13         I'm going to enter the password.

14      (Pause in proceedings.)

15         MS. PETERSEN:  Okay.  It opened.  I can see the folder

16   in here.  There's three folders:  Folder 1, 2, and 3.

17         So I'm opening Folder 1.  I'm opening the first

18   folder -- well, first of all, I'm going to make sure the index

19   opens.

20         The index is a PDF.  And it opens.

21         I'm opening the first folder marked "non-sensitive."

22   I'm opening the PDFs folder.  And the first document, which is

23   a PDF, opens.

24         I'm also opening the "natives" folder.  There's a PDF

25   in the "natives" folder.  The PDF in the "natives" folder

1    opened.

2           There are images of flip -- a flip phone from John

3    Gembara in this first folder.  I'm just opening it to make sure

4    that the -- they work.

5           It appears that, perhaps, the software to open --

6    these are forensic image -- not forensic images, but they're

7    computer images.  And I'm just trying to see if the contents

8    will open.  The zip file opens.  I can see it.

9           Okay.  The PDF extraction report does open for the

10   first phone in here.

11          For the other phones, the reports that are in Internet

12   Explorer format also work.

13          So it does appear that these flip phone records are

14   accessible.

15          So this is Folder 1.  And I was going to move on to

16   Folder 2, unless your Honor wants to see anything else in

17   Folder 1.

18          THE COURT:  No, that's okay.

19          MS. PETERSEN:  Okay.  So moving on to Folder 2, Folder

20   2 also has a folder marked "sensitive" and "non-sensitive."

21   That's how the discovery is delineated per the protective

22   order.

23          I'm opening the first folder, which is

24   "non-sensitive."

25          The first thing in there is a PDF, and it does open.

1          I'm going to go back to the "natives" file.  I opened

2    a Rich Text Format, RTF, file, and it did open.

3          There's some other folders and -- file folders in

4    here.  I'm opening up a video in a folder marked "Cermak_001."

5    In it is an operable video.  It's in an MP4 format.

6          So it appears that the PDFs and the natives in this

7    folder are working -- or at least are generally working,

8    without clicking every single one of them.

9          I will move on to Folder Number 3, unless your Honor

10   wants to see anything else in Folder Number 2.

11          THE COURT:  No, you can go to 3.

12          MS. PETERSEN:  Okay.  Folder Number 3.

13          THE DEFENDANT:  Your Honor, it hurt my ears to hear

14   about "generally" opening.

15          THE COURT:  Is it not opening, in your opinion?

16          THE DEFENDANT:  It just seems, from what everybody

17   else can see here, it's a bit hit or miss.

18          THE COURT:  When you were sitting there in the room,

19   did you see it open?

20          MS. PETERSEN:  You have to put your headphone on so

21   you can hear.

22          THE COURT:  You saw the video, right, of the last

23   thing?

24          Today, I want to make sure that we get anything that

25   is not operable to you.

1    So far -- I'm making a list, as is the prosecutor, to

2    make sure that we have everything.

3    THE DEFENDANT:  Hang on a second.  No, this -- this

4    process is inherently flawed because Ms. Petersen is not able

5    to open every file.  And as I may have mentioned, it's -- it's

6    very much hit or miss.  And, generally, the PDFs open; but, all

7    of a sudden, you have some that don't.

8    So unless we turn over every rock, which I would like

9    to do, we can't determine -- and this -- this process is kind

10   of futile because we can't spend the time to go through

11   everything.  There are millions of files.

12   MS. PETERSEN:  Your Honor, if I may, the first time I

13   was here, we did test all the different file types, you know,

14   that kind of were in the discovery.  Some opened; some did not

15   open.  And, you know, Special Agent Batz wrote a report listing

16   the file types that were not opening.  And when we encounter,

17   in the discovery, those file types, Mr. Kowalski is given --

18   given them natively in case they do open, but we do convert

19   them to PDF so that we -- we know that PDFs are a format that

20   work.

21   So, yes, there are some file types that do not work,

22   but we have been trying to work to convert those to PDF.  And

23   that's been, you know, a process -- a rolling process.

24   That's how we're resolving those issues with known

25   problems with different file types.

1       THE DEFENDANT:  Your Honor, I recognize that this is a

2  big challenge for the government to produce all this

3  information; but, at the same time, "trying" and "generally" is

4  not the -- what comports with their *Brady* obligation.  It's

5  their obligation.

6       THE COURT:  Well, remember, I think we need to go back

7  to some of the information regarding what is covered in *Brady*

8  and what is not.

9       Remember, they have an obligation to turn over 3500

10 material to you.  They have an obligation to turn over any time

11 there's a statement of yours or property of yours, anything

12 that you will be -- I've asked them to turn over the relevant

13 documentation*.  Brady* covers what would be helpful to you for

14 your defense.

15      And so it appears to me, and has always appeared to

16 me, that there is a significant amount of information that is

17 being provided to you regarding the collapse of this bank that

18 may not even be relevant to the prosecution, may not even be

19 something that they're relying on.  And they're providing it to

20 you because, first, you asked for it; and, secondly, it's

21 something that they have seized as part of their investigation.

22      So kind of clumping it all into *Brady* all the time

23 doesn't help us too much.

24      We want you to be able to have the materials that you

25 need to prepare a defense, and that's what this whole exercise

1    is about.

2              MS. PETERSEN:  Okay.  So I'm now to Folder 3.

3    Folder 3 contains files that were found on the computers at

4    Washington Federal.  They were initially produced natively.

5              So there's a folder labeled "PDFs."  I'm just clicking

6    on it to open it.

7              It is taking a second to open, so I'm just waiting.

8         (Pause in proceedings.)

9              MS. PETERSEN:  It is now opened.  I'm opening the

10   first folder and its sub-folders.

11             The first thing we see is a PDF labeled "user_001,"

12   followed by a bunch of zeros and then a 1.  The first -- and

13   that PDF opens.

14             I will now go back to the "natives" folder and open

15   that folder.  These are non-PDFs that were found on Washington

16   Federal computers that were provided to Mr. Kowalski.

17             I'm clicking the first folder.  Some of these are PDFs

18   as well.

19             Well, let me just open the first -- the first PDF is

20   opening -- or it's not opened yet, but it's in the process of

21   opening.

22             Okay.  It has opened.  I'm looking to see if I can

23   find -- okay.  So I'm now in folder "native 000066."  This

24   first thing is an XML-type file.  User_0012869583.  And it

25   opened when I clicked on it.

1          So these -- it does appear that this file structure is

2    working, both the PDFs and the natives.

3          And I will move on to the next -- there's only three

4    folders.  We've looked at all three.  So I will move on to the

5    next device, unless your Honor wants to see anything else here

6    on -- this -- sorry, this is Hard Drive 3.

7               THE COURT:  No, that's fine.

8               MS. PETERSEN:  Okay.  So I will unplug Hard Drive 3.

9               THE DEFENDANT:  Well, wait a second here.  These PDFs

10   generally open, but the other files generally do not.

11         Maybe we could try one of those.

12              THE COURT:  Documents -- (inaudible)

13              COURT REPORTER:  I'm sorry, Judge.  This is the court

14   reporter.

15         I did not hear what you just said.  The defendant just

16   said, "Maybe we could try one of those."

17              THE COURT:  I didn't hear what you said, so -- it

18   doesn't matter because I did not hear what you said.

19         She said that the PDFs open, but other files generally

20   do not.  And then I began to speak, which is that I'm aware of

21   that, the PDFs appear to open.  The zip folders need to be

22   turned into non-zipped folders, and certain programs are not

23   working.

24              MS. PETERSEN:  Okay.  I will proceed to the next

25   discovery item then, which is Disk Number 2.

1        So just, your Honor, give me a minute to get the hard

2    drive out and to get Disk Number 2 in.

3        This is a disk that was produced on March 30th, 2022.

4    It's, like, a CD.  It's a disk.  In disk format.  Okay.

5        I am closing all the various things we have open.

6    (Pause in proceedings.)

7        MS. PETERSEN:  I put the disk in the computer.  It's

8    just taking a second to read it, and then I will put the

9    password in.

10    (Pause in proceedings.)

11        MS. PETERSEN:  Okay.  I'm putting the password in.

12        Okay.  I can see the folder.  I'm opening just the

13    very first -- there's one folder, and then there's one

14    sub-folder marked "sensitive."  I'm opening up the very first

15    item in here.  It's a PDF marked "1B-7," and it is operable.

16        And I believe everything on this particular disk is a

17    PDF.

18        So I will move on to the next device, unless your

19    Honor wants to see anything else on Disk 2.

20        THE COURT:  No.  It does appear, and as Mr. Kowalski

21    said, the PDFs are working.

22        All right.  Keep doing this work.  I am going to make

23    sure that this is transcribed by Gayle.  Continue taking this

24    down, and everyone continue doing exactly what you're doing.  I

25    have to go to another hearing.  And I want this all on the

1    record.  And then when I come back, review what exactly did not

2    work and what did.

3         Mr. Kowalski, be cooperative, please.  This is all

4    going to stay on the record.

5         Okay.  Keep going.

6         MS. PETERSEN:  Yes, your Honor.  Thank you.

7         I'm removing the disk.  This was Disk 2.

8         I'm now going to put in the next discovery device.

9    This is USB 8.  And this was a flash drive produced on or about

10   May 2nd, 2022.

11        So I put it in.  I'm going to enter the password.

12     (Pause in proceedings.)

13        MS. PETERSEN:  Okay.  I put in the password, and it

14   opened.

15        These -- there are two -- there's some PDFs, but then

16   there's two file folders, "PRODO001R" and "PRODO002R."

17        These are both productions of materials that were

18   previously produced to Mr. Kowalski.  These are ones that have

19   been converted out of a file type he could not open into a PDF

20   format.

21        So I'm opening up the first folder, "PRODO01R," as in

22   rainbow.

23        Okay.  In it, we see folders marked "natives" and

24   "PDFs."

25        These files are also being included in the native

1    format in case he can't open them, but they are -- the "PDF"

2    folder contains the PDF version.

3          I'm opening up the very first file in Folder 1.

4    "WFBS001-00020463," then "_0001."  And it is a PDF that opens.

5          I am next going to go back up to the other folder,

6    "PROD002R."  I'm going to open up that folder to make sure that

7    it opens.

8          Okay.  It opened.

9          I'm now going to open the "PDF" folder.

10         I'm opening up the first file folder.  I'm opening up

11   the very first PDF user, "USER_001, 1739640_0001."  That's a

12   PDF.  And it is operable.

13         THE DEFENDANT:  No, it's not.  That's not legible for

14   anything.  Why is it even in there?  Just to bedevil me again?

15   That's not right.

16         MS. PETERSEN:  The PDF opens.  It appears, to me, to

17   be --

18         THE DEFENDANT:  Gibberish.

19      (Defendant laughs.)

20         MS. PETERSEN:  It appears to be maybe an Excel that is

21   converted to -- to a PDF because there's some commas delineated

22   in the different --

23         THE DEFENDANT:  Ms. Petersen, please, nobody can

24   understand that.  That's incomprehensible.

25         MS. PETERSEN:  So those are the two folders.  And the

1    PDFs open.

2          THE DEFENDANT:  But they don't open to anything.

3    It's, like, come on.  Why is it even in there if I can't

4    decipher what it is?

5          MS. PETERSEN:  Okay.  I'm going to move on to the next

6    flash drive.

7          This is a flash drive that was produced on June 8th,

8    2022.  So this is USB 9.

9          I'm going to put it in the computer.  I'm going to

10   enter the password.

11         Now, there's one folder.  When I open it, it has

12   Part 1 of 3, Part 2 of 3, and Part 3 of 3.  So I'm going to

13   start with the folder marked "Part 1 of 3."

14         I'm going to open up the first folder, which is marked

15   "non-sensitive."  This is in the "natives" folder.  This is a

16   media file.  I'm going to see if it opens.

17     (Pause in proceedings.)

18         MS. PETERSEN:  This is a video.  And it is opening,

19   but it says it will take about an hour to open.  But because it

20   is a video, I'm not sure if it can be produced in any other

21   format.  It might be -- just be something that is slow to load.

22         I'm going to stop -- I'm going to write that down,

23   though I'm not sure there's a technical fix for this one.

24     (Pause in proceedings.)

25         MS. PETERSEN:  Okay.  I'm going to go in the "images"

1    folder to make sure that those open.

2              The first one, ATT_002-000001, is operable.

3              I'm going to move on then to Part 2 of 3.

4              Part 2 of 3 has a -- in the "natives" folder, there is

5    an audio file, an MP3.  And I just started it, and it is

6    operable.  It's playing sound.  It's labeled "1009.MP3."

7              So that native is working.

8              I'm also going to try to open up a PDF out of the

9    "images" folder.

10             The first one is FTBank_008-000001.  It's a PDF.  And

11   it is operable.

12             Next up is Part 3 of 3.  Opening up Part 3 of 3 now.

13             Okay.  Part 3 of 3 -- I'm sorry.  Let me check my

14   notes to see what Part 3 of 3 is.

15             Part 3 of 3 is a folder that contains, again, another

16   time that the government converted to PDF those files that had

17   been provided by Mr. Crotty in the jump drive that wouldn't

18   work.

19             Here are those same files produced in an unzipped

20   format, both natively and converted to PDF.

21             So I'm opening up the native file first.  The first

22   file is JCjump_001-0000001.  It's an HTML document.  And it is

23   operable.

24             THE DEFENDANT:  There's nothing on there.

25             MS. PETERSEN:  It opened --

1       THE DEFENDANT:  Come on.

2       MS. PETERSEN:  -- and it showed what was stored, which

3  appears to be the home screen of a Harland document.

4       THE DEFENDANT:  A screen?  That's not a document.

5       MS. PETERSEN:  The second -- and, again, these are --

6  were produced to Mr. Kowalski in exactly the same format they

7  were provided to us by Mr. Crotty first, and then they were

8  converted to PDF.

9       So I'm looking, first, at the part that was natively

10  produced.

11      The next thing is an image, GIF image, JCjump_OO1,

12  followed by a bunch of zeros and a 2.  And that image is

13  operable.  It's a logo when you open it.

14      THE DEFENDANT:  That's a lot of help.

15      MS. PETERSEN:  So that is operable.

16      I now want to check the --

17      THE DEFENDANT:  How about we check the funky files,

18  besides the PDFs?

19      MS. PETERSEN:  What file in particular would you like

20  me to open?

21      THE DEFENDANT:  The funky ones that aren't --

22      MS. PETERSEN:  Mr. Kowalski, you can look at the

23  screen.  What one would you like?

24      THE DEFENDANT:  I'm a little nearsighted, so I just

25  kind of -- I don't want to ...

1          MS. PETERSEN:  Okay.  Mr. Kowalski has asked me to

2    open a "funky" file, and I'm not sure exactly what he means by

3    that, but I will open up --

4          THE DEFENDANT:  Anything that's not really a PDF.

5          MS. PETERSEN:  Okay.  I'll open up JCjump_001-0000025.

6    It's an Office Open XML document.  And it is operable.  It

7    opens up with the document.

8          I will open up -- next try to open up

9    JCjump_001-000330.  This is a Word file.  I know when I was

10   here in November, Mr. Kowalski had some problems opening Word

11   files.

12         And this one, similarly, it -- it opens up with some

13   content, but the formatting is off.

14      (Defendant laughs.)

15         MS. PETERSEN:  But this was converted to PDF and

16   produced to him in that format as well.

17         THE DEFENDANT:  Can we clarify the content is entirely

18   gibberish?  There is nothing intelligible on that document.

19      (Defendant laughs.)

20         MS. PETERSEN:  So I will go to the -- okay.  So I will

21   now go to the PDF versions.  I'm clicking the "PDF" folder.

22         So these are the documents converted to PDF.  I'm

23   going to open up that same document that we just looked at,

24   that did not work, that opened up in -- with the formatting

25   problems --

1          MR. STEELE:  Michelle.  Michelle.

2          Mr. Kowalski, I would ask that you not scratch on the

3     door.  Remember, this is technically considered the court

4     proceeding, and I ask you to stay -- pay attention and to not

5     engage in that behavior.  Is that okay?  Respectfully?

6          (Defendant nods.)

7          MR. STEELE:  Thank you.

8          MS. PETERSEN:  Okay.  So I'm going to open up that

9     file that we just looked at that had some formatting problems

10    and had some, as Mr. Kowalski said, "gibberish" in it when we

11    opened it, JCjump_001-0000330.  There's also a version with the

12    same name that's a PDF version in the "images" folder, that's

13    been converted to PDF, and I opened it.  And it is no longer

14    gibberish.  It's in a normal document-looking format where

15    Mr. Kowalski is able to see it and read it.

16         So -- okay.  That is all three parts of this disk.

17         The other thing I think that we should look at, while

18    we're here, is that when I was here in November, Mr. Kowalski

19    did not bring with him a disk that was produced back in June of

20    2021.  He indicated at the time that that disk was operable,

21    but I wasn't able to check it to verify that.  So I will now do

22    so.

23         This disk contains a flash drive that was provided to

24    him by the filter team.  So it is not a disk where I have

25    reviewed the contents.  I'm merely going to put it in and make

1    sure that it opens, that the password works.  Beyond that, I'm

2    not going to look at the files because I don't want to

3    accidentally --

4         THE DEFENDANT:  Maybe Ms. Petersen should step out of

5    the room and allow the HUD agent to do that.

6         MS. PETERSEN:  That's fine.  Would you prefer if he

7    did it?

8         THE DEFENDANT:  Clearly.

9         MS. PETERSEN:  Okay.  All right.  So I will step

10   out -- or at least step away.  I don't know if I'm allowed to

11   step out of the room, but I will step to the other side and not

12   look.  And I will let Special Agent Batz open it to make sure

13   that it's operable -- hold on.  The password is, of course,

14   written on it.  So let me pull that out for you.

15        I will write the discovery -- the password down for

16   you.  Sorry.

17       (Pause in proceedings.)

18        MS. PETERSEN:  The first letter is capitalized there.

19        Okay.  So I'm going to give this back to Special Agent

20   Batz.  I'm going to walk to the other side of the room.  And,

21   Mr. Batz, if you want to narrate that it opens or doesn't open

22   for the record.

23       (Pause in proceedings.)

24        AGENT BATZ:  I entered the password, and it opened.

25        MS. PETERSEN:  Okay.  Go ahead.  If you want to maybe

1   take --

2           AGENT BATZ:  Do you want to try to open it further?

3           THE DEFENDANT:  Not particularly.  You're the expert.

4   I don't mean it in a sarcastic tone either, by the way.

5           MS. PETERSEN:  Okay.  If you want to take it out, I

6   won't look, and I will come back over.

7           I'll switch places again.

8       (Pause in proceedings.)

9           MS. PETERSEN:  So those are --

10          THE CLERK:  Hold on.  This is Lynn, Judge Kendall's

11  courtroom deputy.

12          I know I can't get ahold of Gayle right now, but I

13  just wanted to let her know that we do have a 2:00 o'clock

14  hearing that someone is covering for her in case this goes

15  over.  Okay?

16          Thank you.

17          MS. PETERSEN:  Okay.  Thank you.

18          So that -- that has gone through all the discovery

19  devices that have been produced since November.

20          Mr. Kowalski, did I miss any of them?

21          THE DEFENDANT:  I'm not -- how could I possibly judge

22  what you've missed because you haven't gone through even

23  1 percent of everything.

24          MS. PETERSEN:  But is there any device that's been

25  produced since November that I didn't open?  Am I missing -- I

1    don't see any in front of me.

2          THE DEFENDANT:  I'm not aware of -- I mean, I think

3    there's more thumb drives.  There's quite a few more thumb

4    drives.

5          MS. PETERSEN:  The remaining thumb drives that I see

6    in front of me are -- one is from July 7, 2021.  We went

7    through that one in November.

8          One is from October 26, 2021.  We went through that

9    one in November.

10          And I see in front of me three hard drives.  We went

11    through Hard Drive 3 today.

12          We did not go through Hard Drive 1 or 2 because Hard

13    Drive 1 was produced in June 2021, and we went through that one

14    in November.

15          And Hard Drive -- I'm sorry, that was Hard Drive 1.

16          Hard Drive 2 was produced in September 2021, and we

17    also went through that one back in November.

18          I don't see any other devices here.

19          THE DEFENDANT:  No.  You gave me -- there's many more

20    thumb drives.

21          How many do you have there?

22          MS. PETERSEN:  There's these two --

23          THE DEFENDANT:  No, there's -- I think you gave me a

24    letter with an index that there's at least seven thumb drives.

25          MS. PETERSEN:  We went through -- there are one, two,

1    three, four, five, six -- one, two, three, four, five, six

2    thumb drives in front of me.  Hold on.

3            There's six thumb drives in front of me.  One thumb

4    drive was -- is not here.  That was Thumb Drive Number 1.

5            LAW CLERK:  I think there's one under the papers.

6            MS. PETERSEN:  Oh, sorry.

7            THE DEFENDANT:  Ah-ha.

8            MS. PETERSEN:  There's another one.  So there's one,

9    two, three, four, five, six, seven thumb drives -- wait a

10   minute.  One, two, three, four, five, six, seven.

11           The first thumb drive that I provided to you back in

12   June of 2021 is no longer in your possession because it was

13   completely inoperable, so I took it back --

14       (Defendant laughs.)

15           MS. PETERSEN:  -- and replaced it.

16           But -- hold on.  Let me make sure that we're not

17   missing another one.

18           Okay.  So Thumb Drive 1, the government took back in

19   its possession.

20           Thumb Drive 2, July -- USB 2, July 7, 2021, is here.

21           USB 3, 10/26/2021, is here.

22           USB 4, which is from November 17, 2021, is not here.

23   So it must be maybe down in your cell.  It is a thumb drive

24   that we went through at the first -- in that November meeting,

25   but I don't see it in the stack here.

1          Do you still have it?

2          THE DEFENDANT:  I can't even begin to hazard a guess.

3     It is clearly not here.  I thought that was everything.

4          MS. PETERSEN:  Okay.  So you're not sure if you still

5     have the USB --

6          THE DEFENDANT:  I'm not sure if I ever had that,

7     whatever it is that you're suggesting.

8          MS. PETERSEN:  It's a thumb drive that I brought with

9     me during our November meeting, and you verified that it

10    worked.

11         THE DEFENDANT:  I don't think you understand the

12    difficulties of organizing a defense here, at all.  I have a

13    very limited space to work in.  And mountains of paperwork that

14    you sent me are not really helpful.  I can't -- I can't

15    organize a defense.

16         MS. PETERSEN:  Okay.  So Mr. Kowalski can't find --

17    doesn't know if he still has USB Number 4.  He did have it back

18    in November.  But I'm putting it on the list.  I will just burn

19    him a new one, just to be super sure that he has access to

20    those documents.  So that's USB Number 4.

21         USB Number 5.  We went through USB Number 5 today.  It

22    is November 22, 2021.

23         USB 6, we went through today.  That is January 3,

24    2022.

25         USB 7, we went through today.  February 23rd, 2022.

```
 1              USB 8, we went through today.  May 2nd, 2022.

 2              And USB 9, we went through today.  June 8th, 2022.

 3              So that -- I see everything in front of me that I

 4    think Mr. Kowalski should have, except for USB Number 4, which

 5    I put on my list to reproduce to him.

 6              The only -- that -- so we've now gone through all of

 7    that.  I know -- I think we're going to wait for the judge to

 8    come back.

 9              THE DEFENDANT:  No, we haven't.  There's -- there's

10    glitches on these and particularly this thing.  Quite a few of

11    the files are password-protected.

12              MS. PETERSEN:  So Mr. Kowalski is indicating -- he's

13    pointing to -- hold on -- this is Hard Drive 2, saying that a

14    number of files are password-protected.

15              The files were produced to Mr. Kowalski, sort of, as

16    we received them from the bank.  Some of the files in the

17    bank's computers are password-protected, and the government

18    cannot open them either.  So --

19         (Defendant laughs.)

20              MS. PETERSEN:  So that could explain some of what he

21    is finding.

22              THE DEFENDANT:  But you -- but you knew of this months

23    ago.  And how come you didn't bring it to my attention?  It's

24    outrageous.

25              You got me looking at stuff as if I can open it.  It's
```

1    being presented that it's a real document that I can look at,

2    and you know it's false?  That's not right.  That's the essence

3    of suppression.

4          How would anybody in this room like to be in a

5    circumstance, There is something good on there you can see.

6    Oh, but you don't get a password, and we don't got it either.

7    Ha-ha.  This is -- and you got people from the bank that are

8    cooperating with you.  How can you -- ask them for their

9    cooperation so you have a few passwords.  Come on now.

10         MS. PETERSEN:  Okay.  I'm going to --

11         THE DEFENDANT:  I want to step out of here.  I'm

12   just -- just troubled, just hearing that.

13         MR. STEELE:  Mr. Kowalski.  Thank you.

14         THE DEFENDANT:  I'd like to step out.  I don't think

15   there's any purpose of continuing here.

16         MR. STEELE:  Mr. Kowalski.

17         THE DEFENDANT:  I think we need a recess.  I need a

18   recess.

19         MS. PETERSEN:  For the record, I put the hard drive

20   in, and I was going to ask Mr. Kowalski to show me what he's

21   talking about so I can try to assist him.

22         THE DEFENDANT:  But you already know what I'm talking

23   about.  You just indicated you've got knowledge of it.  It's

24   outrageous that you are sitting here playing with me like this.

25         Please, I got a hamburger waiting for me somewhere.

1    There's no sense of being here.  You're just playing with me.

2    You're playing with the Court.

3              You know that they're password-protected.  Why do we

4    got to look at them and -- just to show you what you already

5    know?

6              You're just playing with me like a -- like a cat

7    playing with a half-dead hamster.

8              MS. PETERSEN:  For the record, I am happy to help

9    Mr. Kowalski, if he wants to show me the files, to see if I can

10   help him open them.

11             THE DEFENDANT:  But you already know that we can't, so

12   why are we wasting our time like this for?  There's other

13   things I want to do that don't consist of looking at files that

14   I know already that I can't open and that you know I can't

15   open.

16             MS. PETERSEN:  Okay.

17             THE DEFENDANT:  That's -- that's not part -- no,

18   that's not part of the prosecutor's obligation to be the

19   architect of a fair trial is to give me things that they know I

20   can't open and present them as if I can.  No.

21             MS. PETERSEN:  Okay.

22             THE DEFENDANT:  And you're working with people from

23   the bank that have the passwords, and they've cooperated.  And

24   I've seen their plea bargains.

25             MS. PETERSEN:  The other thing that I would like to

1    do, if Mr. Kowalski doesn't want to go through that hard drive,

2    is that the thumb --

3         (Defendant laughs.)

4         MS. PETERSEN:  The thumb drive --

5         THE DEFENDANT:  But you already know I can't go

6    through the thumb drive because it won't open.

7         MS. PETERSEN:  The thumb drive that completely did not

8    work, I have my computer, and I have an idea for a fix that

9    might -- I might be able to fix it on site.  So let me --

10        THE DEFENDANT:  Oh, that's just great.

11        MS. PETERSEN:  Give me --

12        THE DEFENDANT:  I'll just wait another seven months

13   while I languish here in solitary confinement.  That sounds

14   really fair.  That's the American way.  Give somebody -- give a

15   defendant something that he can't access.  It might be the

16   meaning of life and death for me.  But yet you won't give me

17   the password?  You won't give me the code to open up that --

18   that exculpatory gold that will vindicate me?  It's wrong.

19        MS. PETERSEN:  Okay.  So USB 5 did open with the

20   password, but then there was some difficulty in actually

21   opening the file on --

22        THE DEFENDANT:  Let's go back to the white one, the

23   big white one.  There's things in there that take hours to

24   open, which means I haven't opened them.  And they're the

25   things you don't want me to open, like Mr. Gembara's cellphone,

1    to find the phone call that led to his demise.

2              MS. PETERSEN:  Okay.  Mr. Gembara's cellphone was

3    reproduced to you in paper format and in another format --

4              THE DEFENDANT:  The paper format is missing the call

5    that came into him, Ms. Petersen.  He received a call that

6    fateful Friday.

7              MS. PETERSEN:  Okay.  I --

8              THE DEFENDANT:  It's not on there.  And you gave me

9    some records that are homemade garbage records.

10             MS. PETERSEN:  I am now going back to USB 5.

11             THE DEFENDANT:  The prosecution is making up --

12   Excel -- how about giving me the real records from -- was it

13   Verizon?  I'd like the real stuff.

14             MS. PETERSEN:  I'm going back to USB 5 because I'm

15   going to see if I can maybe shorten the file name --

16             THE DEFENDANT:  Ms. Petersen, there is a serious,

17   suspicious death in this case, yet you won't let me have that

18   information?  You won't let me draw that water from the well?

19             MS. PETERSEN:  I am now -- I put USB --

20             THE DEFENDANT:  You've got me in here so I can't

21   self-advocate, and I can't investigate.

22             MS. PETERSEN:  I'm just taking a pause and putting

23   the -- the thumb drive that we had the most problems with,

24   USB 5, into my computer and see if I can --

25             THE DEFENDANT:  Wait a second.  This is a court

1    proceeding.  This isn't a time for you to, like, make up for

2    what you should have done seven months ago here.  I have other

3    things I need to do.  My time is precious.  I don't have a

4    staff of people.

5          (Pause in proceedings.)

6              MS. PETERSEN:  Is that your Honor?

7              Yes, your Honor, so --

8              THE COURT:  Yes, I am back here.

9              MS. PETERSEN:  Yes.

10             Just to catch you up, we have gone through all the

11   devices, and we were just taking a quick break.  I was trying

12   to see if I could get that one device, USB 5, that was having

13   the most problems, to work in my computer, to see if I can fix

14   it on site, but it looks like I'm not going to be able to.  So

15   we were just giving a pause to see if I could do that.

16             Otherwise, we've gone through the rest.  And I can

17   give you an update, or I don't know if you were going to skim

18   through the realtime.

19             THE COURT:  So what are we on?

20             MS. PETERSEN:  There are -- we ended with USB 9.  That

21   was the last -- the last of the discovery devices.  So I think

22   you only missed 8 and 9.  8 and 9 had files that were PDFs that

23   were operable.  It had some natives that were also operable.

24   And we opened up one native that opened up, sort of, with some

25   strange formatting, but I showed Mr. Kowalski where that had

1    also been reproduced to him as a PDF.  And when we opened it in

2    the PDF format, it was operable.

3             THE DEFENDANT:  Wait a second.  We had a little bit of

4    a revelation here a few moments ago when Ms. Petersen

5    acknowledged that she knows that she's given --

6             THE COURT:  I can't hear you.  I can't hear you.

7             THE DEFENDANT:  We had a little revelation here a few

8    minutes ago where Ms. Petersen acknowledges that she's given me

9    documents that are password-protected, knowing that they're

10   password-protected, but she won't give me the passwords.

11            I -- if I'm mischaracterizing this testimony, the

12   court reporter is here.

13            This is wholly outrageous that they're protecting

14   documents.  They're giving something to me that they know I

15   can't open, and there's no chance of me ever opening, and just

16   to torment me here.  This is outrageous.

17            If they're giving me something, it needs to open and

18   not be password-protected.

19            Pardon me, Judge.

20            MS. PETERSEN:  Your Honor, would you like me to

21   respond?

22            THE COURT:  Please.

23            MS. PETERSEN:  So Mr. Kowalski is being provided a

24   huge swath of files from Washington Federal's computers,

25   emails, things from the server, things from desktops.

1          Some of those items are password-protected,

2    particularly some email communications that bank employees had

3    with others or that, you know, came into the bank, had an

4    attachment that was password-protected.  For a bunch of those,

5    we don't have the password, and we don't have an ability to

6    open them.  But when -- you know, when we provided that email

7    in discovery, for example, that password-protected attachment

8    is still there.  So there are some documents that Mr. Kowalski

9    would be unable to open.  We are also unable to open them.

10         But they are part of those productions of things from

11   the Washington Federal computers and hard drives.

12         THE COURT:  Okay.  All right.  So I understand that

13   you were yelling, and I needed to have Mr. Steele stepping in

14   to calm you down after I left, hoping that you would be able to

15   go through this calmly with your -- with an understanding that

16   we'll get you what you need if these things don't work.

17         My understanding of things that don't work are USB 5

18   needs to be reproduced in a viewable format.

19         Part 5 --

20         COURT REPORTER:  I'm sorry.  Excuse me, Judge Kendall.

21   This is Gayle.

22         The last thing I heard you say was, "My understanding

23   of things that don't work are USB 5 needs to be reproduced in a

24   viewable format."

25         THE COURT:  USB 6, Part 5, needs to be reproduced in a

 1    viewable format.

 2            Anything that was zipped needs to be unzipped and

 3    reproduced.

 4            And then is USB 7 working?

 5            MS. PETERSEN:  USB 7 had two zip files, your Honor.

 6    The first one -- and let me just go back and confirm.

 7            The first zip files were native files that were

 8    produced to Mr. -- to the government by Jim Crotty.  Those were

 9    reproduced in an unzipped format and with -- with some

10    converted to PDFs so that Mr. Kowalski could see those.  So

11    that one has been resolved.  That was Folder 1.

12            Folder -- I'm sorry.  That might not have been

13    Folder 1.  Give me one second, your Honor.

14            One of those zips has been resolved between Folder 1

15    and Folder 3, and one has not been.

16            And I apologize.  Give me one second.  I can tell you

17    which is which, if you prefer.

18            THE COURT:  I think it was 3.

19            MS. PETERSEN:  I think 3 was the Jim Crotty jump

20    drive.  So that one has been resolved.  And I think Folder 1 is

21    the one that needs to be resolved from USB 7.

22            THE COURT:  Okay.  So what is your proposal for

23    getting these in a viewable format for him?

24            MS. PETERSEN:  Some of these will be easier, your

25    Honor -- I mean, many of these are just -- USB 5 is just --

1    it's got a bunch of PDFs on it that just won't open.  So I

2    think that's just making a new thumb drive for him.

3           For the one on USB 7 that is zipped, that is slow to

4    open, we'll just unzip that.

5           The thing that I think is going to be the most

6    challenging is USB 6.  Those CDs that came from the vendor,

7    the -- their bookkeeping CDs, they're in a proprietary format

8    that we are unable to convert -- I mean, it's a program that

9    you have to run, and then you type in, like, what particular

10   report you want to see, and it pops up on the screen.  But we

11   have not identified a way to sort of extract that some other

12   way for him.

13          I do think -- he also has, like, sort of, in PDF

14   format, unzipped bookkeeping records from the bank's core

15   system.  That's the same system that would have produced those

16   back-up disks.

17          So I'm not sure, ultimately, that that's any, sort of,

18   new information for him.  But I don't, at least as I sit here

19   now, have a suggestion on how to get those in a viewable format

20   for him because there's no real way to, like, extract the data

21   that I'm aware of.

22          But I'm happy to go back and sort of talk to our

23   computer people and try to figure out if there's another

24   solution.

25          THE COURT:  Okay.  Is it possible that he is ordered

1    over here, if you give him, in whatever format it is that it

2    can be viewed in, and standby counsel can be there if he wants

3    anything printed or something like that?  Can he do something

4    like that?

5           MS. PETERSEN:  It would have to be -- I think that

6    that could be done.

7           (Unintelligible crosstalk.)

8           MS. PETERSEN:  It would have to be on a non-MCC

9    computer because there's some -- and I can also talk to the IT

10   Department at the MCC.

11          I think -- the problem is that the disk has to run a

12   program, and the security software here is blocking it, which

13   makes some sense.

14          But, yes, I think there would be a way for either him

15   to look at it at Mr. Shanin's computer or look at it on some

16   other computer over -- when he's brought to court or over in

17   the courthouse.

18          So, yes, that would be a work-around.

19          THE COURT:  Okay.  Okay.  So I think that's what I'll

20   do for Disk Number 6.  See if you have a computer at the U.S.

21   Attorney's Office that you can use.  If not, I'll get one from

22   the court.  We will arrange a time that -- with Mr. Shanin's

23   schedule, and I'll order him over to my courtroom.  And after I

24   am done with my court day, we can sit in the courtroom going

25   through it.  And if he wants copies or something, Mr. Shanin

1    can aid him in getting that.  Okay?

2              MS. PETERSEN:  Okay.

3              The only other thing that, sort of, occurred while you

4    were gone, your Honor, is I did just kind of go through an

5    inventory of all the devices to make sure they were all here

6    that he should have.

7              USB Number 4 is not in this room with us.  It was

8    produced to him back in November.  It was a thumb drive that we

9    went through during the November meeting, so he did have it at

10   one point.  He indicated that he thinks it is now missing or

11   gone.  And I want --

12             THE DEFENDANT:  Wait a second.  I didn't say that.  I

13   don't -- I'm not even acknowledging that I received such a

14   thing.

15             MS. PETERSEN:  Okay.  Or -- in any event --

16             THE DEFENDANT:  Slow down.

17             MS. PETERSEN:  -- it's not here, and so I want to -- I

18   definitely want to make sure he has a full set of discovery, so

19   I'm going to reproduce that thumb drive to him as well when

20   we're doing the rest of these, just to make sure his set is

21   complete.

22             THE COURT:  Okay.  All right.  Can I give you two

23   weeks to turn this material over to him?

24             THE DEFENDANT:  Judge, this -- I'm holding up this

25   drive that has all these protected -- password-protected files.

1   I should have these --

2                    THE COURT:  I can't hear you.

3                    THE DEFENDANT:  I should have access to all these

4   password-protected files.

5                    The prosecution is cooperating with all the people

6   that -- who created these files.  So where -- where is the --

7   we need the information here.  My vindication could be on these

8   password-protected files.  And there's a lot of them.  This --

9   this contains a huge number of documents.  I'm totally

10  flabbergasted that they give me this information, knowing that

11  I can't access it.  That's not fair.  That's not what *Brady*

12  stands for.

13                   MS. PETERSEN:  Your Honor, while you were gone, I did

14  offer to have him show me what he's talking about, to make sure

15  that there's not a technical problem, but he declined.

16                   THE DEFENDANT:  I did not decline.  Do you want to

17  see -- that is so disingenuous.

18                   Ms. Petersen acknowledged, "Yeah, I know about those

19  files, and, yeah, they're password-protected, and we can't get

20  into them either, ha-ha."

21                   My vindication could very well be on those files.  And

22  she knows they exist, and she's aware of it.  She's got an

23  obligation to do more than what she has, which is, essentially,

24  nothing.  Like give it to me as, like, if I'm stupid here?  I'm

25  just going to be, "Okay, okay, Prosecution."

1          They have an obligation to give me this information.

2     And they have all these people who are cooperating, all these

3     dirty dogs who have pled guilty before your Honor.  You have

4     one man who is thirsting for vindication, and we can't provide

5     me this information?

6          It's outrageous.

7          Thank you.

8          THE COURT:  Okay.  Ms. Petersen, where are the

9     password-protected files that he's referring to?

10         MS. PETERSEN:  Well, there are some files that -- for

11    example, if the -- you know, if an outside vendor sent an email

12    to a Washington Federal employee, or the other way, they might

13    have sent it encrypted, as an encrypted attachment.  And

14    those -- some of those attachments, the government is unable to

15    open.

16         THE DEFENDANT:  Some of them?  There's a huge -- a

17    swarm of these things.

18         MS. PETERSEN:  So, you know, we can't open them, and,

19    you know, nor can Mr. Kowalski.  There is a --

20         THE DEFENDANT:  No, it's not Detente.  We're not in

21    the Soviet Union right now.  This is not Detente.

22         I have -- there's an obligation to provide this

23    information that they know exists.  They can't be hiding stuff

24    up and suppressing.  "Oh, we just don't have a password now,

25    sorry.  Sorry, Spike."  Come on.

1          MS. PETERSEN:  There are some files for which we have

2     been able to unlock them.  It's a relatively small number.  And

3     he will get that in his next discovery production.  But there

4     are others that are, you know, either encrypted in a way that

5     we can't un-encrypt or we don't know the password.

6          So, yes, there are some files --

7          THE DEFENDANT:  Huge numbers of -- it's a huge number

8     of these things.

9          THE COURT:  Well, I don't know.

10         THE DEFENDANT:  Neither do I, Judge.  I don't know

11    what to say either about this revelation.

12         THE COURT:  Mr. Kowalski --

13         COURT REPORTER:  I need to hear the judge.

14         THE COURT:  Mr. Kowalski, I need --

15       (Unintelligible crosstalk.)

16         THE DEFENDANT:  I'm sorry.  I'm sorry.  You're right.

17       (Unintelligible crosstalk.)

18         THE COURT:  -- what you need while you're talking,

19    okay?

20       (Defendant laughs.)

21         THE COURT:  I'd like you to give me a status report on

22    this issue of the encrypted files as far as the scope, the

23    size, and the issue, so that I can better decide whether they

24    are the Holy Grail -- as Mr. Kowalski worries they might be --

25    or whether they are something else, so that I can take the next

1    steps that might need to be taken to get those open.  So I will

2    require that in two weeks.

3              And then is it too -- is it too unrealistic for just

4    two weeks for the other materials to be fixed for him?

5              MS. PETERSEN:  I -- I don't know, your Honor.  I am

6    out of the office all next week, which should not slow it

7    down --

8              THE COURT:  Oh.

9              MS. PETERSEN:  -- but it will depend -- it will

10   depend, somewhat, on how fast the paralegals can work getting

11   those reproduced.  So I can -- I don't want to say for sure I

12   can do it in two weeks, but I will certainly endeavor to do so.

13             I would ask for slightly more time on that status

14   report because that might require me to ask IT to pull that

15   data about the number of password-protected files.  I'm not

16   sure how -- I just don't know how fast that can be done.

17             THE COURT:  I'll say three weeks then --

18         (Unintelligible crosstalk.)

19             THE DEFENDANT:  Your Honor, I probably have access

20   to --

21             COURT REPORTER:  I'm sorry, I can't hear the judge.

22   Judge Kendall?  Judge Kendall?  Excuse me, Judge Kendall.

23   Judge Kendall, this is Gayle.  Everything you just said, I did

24   not hear.  The last thing I heard you say was:  "I'll say three

25   weeks then."

1          THE COURT:  Okay.  I will say three weeks for your

2     report.  And in that report, you can also give me a status

3     regarding everything that has been reproduced and what, if

4     anything, the things that still need to be reproduced.

5          And then I will have a status four weeks from now.

6          So, Lynn, if you can give me a date, please.

7          THE CLERK:  I'll look at the calendar real quick, your

8     Honor.

9          We can do July 20th at 10:00 o'clock.

10          THE COURT:  Okay.  July 20th at 10:00 o'clock.

11          I'm going to exclude time.  And I know Mr. Kowalski

12     does not want me to.  But since we are going through an extreme

13     volume of evidence and technical issues with it, it is in the

14     interest of justice to do so, plus I think we have some

15     (inaudible) motions that are still pending on the docket.

16          Okay.  Mr. Kowalski, I'll see what I can do to get

17     everything ready for you.  But with the materials that you have

18     that are working, work with those.

19          Mr. Steele, thank you for your cooperation in a

20     complicated matter.  I appreciate that.

21          Mr. Shanin, thank you for your help.  And I will

22     schedule the time for you to come over and review that

23     proprietary software as soon as I check my schedule as to when

24     that is appropriate.

25          Okay.  Thank you.  Have a good day.

1          MS. PETERSEN:  Thank you, your Honor.

2          THE CLERK:  Court is in recess until 2:00 o'clock.

3   Please log off.

4       (Concluded at 12:48 p.m.)

5                    C E R T I F I C A T E

6       I certify that the foregoing is a correct transcript of the

7   record of proceedings in the above-entitled matter.

8

9   /s/ GAYLE A. McGUIGAN                      July 5, 2022
    GAYLE A. McGUIGAN, CSR, RMR, CRR
10  Official Court Reporter