THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | No. 19 CR 226-1 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| ROBERT KOWALSKI, | ) | |
| | ) | |
| *Defendant*. | ) | |

## MEMORANDUM OPINION & ORDER

To say that Defendant Robert Kowalski is a prolific filer is a significant understatement. Kowalski has peppered the docket with nearly daily motions in his criminal case since it began. Aside from the written motions, Kowalski has been excluded from the larger group of defendants in this case in order to have personal discovery updates on a near monthly basis. Those status hearings generally run for a minimum of one hour. Kowalski often presents oral requests for relief aside from his written requests. The vast majority of his motions have focused on three basic areas: discovery concerns, release from pretrial detention, and accusations against the government for alleged Brady violations. To date, the Court has ruled on 69 motions filed by Kowalski. Before the Court are 90 more pending motions. That brings his total number of motions to date to 159 which is 153 more than all thirteen other defendants combined.

Because so many of the motions are duplicative to previous motions filed, the Court now informs Kowalski that any new motion he files that has already been ruled upon, will be dismissed with solely a reference to the docket entry of the previous ruling and the Court will not address the matter further. The deadline for the filing of any pretrial motions was 7/15/22. No further pretrial motions will be considered after that date. For ease of record, each motion is

1

addressed with its accompanying docket entry number.  The following 90 motions are denied in part and granted in part.

## HISTORY OF STATUS HEARINGS BEFORE THE COURT

The Court has attempted to keep this case on track throughout the pandemic and the multitudinous allegations by Mr. Kowalski.  Once the Court detained Mr. Kowalski for his numerous violations of pretrial release and failure to follow court orders, Kowalski began spouting a litany of allegations against the prosecutors, his stand-by counsel, and the Court.  In order to address the voluminous discovery and to protect the rights of the defendant, the Court has kept a short leash on the discovery process by having nearly monthly statuses during which the Court can be assured that discovery is being turned over and that Kowalski has the means to review it.  During these status hearings, the Court has taken an active role in ensuring that information is continually being provided to the defendant by ordering regular status reports from the prosecutors and reviewing line by line any requests that Kowalski has for discovery. The Court has also ordered counsel for the MCC to appear in order to ensure that the defendant had access to the materials being provided.  Counsel for the MCC informs the Court that no other defendant in the MCC has the ability to review discovery in the manner that Kowalski has.  His hours for review have been extended beyond that of any other inmate and he has access to his own room with a computer to review the materials.

During these monthly status hearings, which are done solely for Kowalski and no other defendant, Kowalski spews allegations for minutes on end, rarely answering the questions asked of him by the Court.  If the word "pivot" is the word of the pandemic, it is one which Kowalski has perfected throughout his years before the Court.  If the Court confirms that one batch of documents has been turned over, then Kowalski pivots to accusations that it cannot be viewed on

the computer the Court has provided. If the Court determines through a hearing that certain documents, in fact, have been able to be viewed on the computer, then Kowalski pivots to allege that he has not had access to the computer. If the Court then determines through a hearing with the legal counsel of the MCC that Kowalski has had access but has failed to use it, then Kowalski pivots to allege that he needs a printer. If the Court directs the AUSAs to provide certain documents in hard copy, then Kowalski pivots to allege that he cannot possibly prepare his defense on his own. If the Court provides him counsel, then Kowalski pivots to allege that counsel is useless, and he wants to represent himself. If the Court allows counsel to withdraw and provides him with new standby counsel, then Kowalski pivots to refuse to work with standby counsel. If Kowalski demands a speedy trial and the Court sets one (after three years of this pivoting), then Kowalski says the Court is depriving him of his rights because he cannot be prepared. Every step that Kowalski takes is a step to either have this Court recuse herself from the case or to prepare an appeal of this Court's rulings—which he has done to date 10 times.

In the interest of making a complete and accurate record of the outlandish number of filings, most of which have been ruled upon during these monthly sessions, the Court will now set forth written rulings on each as well. These truncated rulings, however, are merely a rehashing of the many rulings made over the past few years of the pretrial period and the transcripts of those hearings supply further support and analysis.

## MOTIONS TO COMPEL SPECIFIC INFORMATION

[Dkt. 399] Kowalski seeks to compel the identity of Assistant Deputy Comptroller #1 whose audit work at the bank, according to Kowalski, did not reveal the fraud that led to the bank's collapse even though he had been auditing the bank for ten years. Kowalski believes that ADC#1 is a critical witness to his defense without citing to any theory of defense that might

include his testimony. Whether the fraud went undetected for years prior to its discovery does not negate whether Kowalski knowingly engaged in a fraud. In fact, the Indictment charges that the coconspirators concealed their actions in various ways which would support the conclusion that the auditors did not previously uncover the fraud. *See, e.g.,* Dkt. 534 at ¶¶ 3-6, 29, 32-40, 41-46. The Government must prove beyond a reasonable doubt that Kowalski engaged in the fraud scheme charged in the Fourth Superseding Indictment and evidence that auditors were unable to discover that fraud or were even negligent in failing to discover that fraud does not negate any elements of the case charged. Without a proffer of how ADC#1's testimony could offer anything other than jury nullification; this motion is denied without prejudice. *See United States v. Wade*, 962 F.3d 1004 (7th Cir. 2020) (affirming grant of government motion *in limine* where proffered evidence was insufficient to establish a defense and would instead "invite jury nullification," recognizing that while "every jury has the *de factor* power of nullification due to the unreviewable nature of a judgment of acquittal, a defendant has no right to argue for the jury to disregard the law.")

[Dkt. 412] Kowalski seeks loan ledgers and "snapshot" files that were shown to the grand jury by AUSA Petersen. The Court has reviewed the discovery process for months during which the government prosecutors have not only provided Kowalski with these files but have also gone to the Metropolitan Correctional Center to show him how to access these files. Therefore, this motion is dismissed as moot.

[Dkt. 422] Kowalski seeks information regarding a particular loan for the property located at 27 Chicago Avenue in New Buffalo, Michigan. This loan was allegedly "dumped" into Kowalski's name even though the loan was in the name of Edward Drozd. This loan has been written up in the press, according to Kowalski, as having to do with a "sweet deal" with

politically connected individuals. He seeks all information regarding this loan and the Daley/Thompson's role in it and their interactions with the bank. He also seeks the names of those individuals contained in Exhibit 39 whose names were changed. The prosecutors have stated that the information has been turned over to Mr. Kowalski, so this motion is also moot.

[Dkt. 504] Kowalski claims that the FNESTRA 2 files are purportedly the annual loan files but that September to December of each year is missing. The Court directs the AUSAs to discuss the issue with the Defendant to tell him where the allegedly missing sections are missing; and of not, explain the file format to him. Motion granted.

[Dkt. 617] Defendant moved to compel the documents that he was having difficulty with opening on the laptop at the MCC. The Court held numerous hearings and determined which items were inaccessible and now the Government has provided those items to him so his motion is dismissed as moot.

[Dkt. 661] Defendant moved for more recent loss calculations and the Government provided that to him. This motion is dismissed as moot.

[Dkt. 711] [Dkt. 782] Kowalski moves for certain cell phone data. The Court will address this in the hearing on 8/17/22.

### MOTIONS TO DISMISS FOR BRADY VIOLATONS AND/OR PROSECUTORIAL MISCONDUCT

[Dkt. 350] Kowalski seeks information regarding the death investigation of John Gembara and seeks to have his indictment dismissed because he claims that prosecutors have denied him the information regarding the investigation. The police report from Park Ridge and a report of the items retrieved from the home have all been provided to Kowalski. The AUSAs have stated that they have no further information to provide and therefore this motion is moot. Kowalski has failed to present any theory of defense where Gembara's suicide would be relevant

5

to his defense. The Court is at a loss as to why his suicide could aid any defense that Kowalski might present to the current charges against him This case will be tried before a jury on the current charges pending and not on any collateral matters such as the death of Gembara.

Throughout the motion practice, Kowalski continuously calls any material that he wants "brady" material. It is important to give Kowalski a primer on what *Brady* material is and what it is not. *Brady* held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)). *Strickler* states there are three components to a true *Brady* violation: 1) the evidence must be favorable to the accused; 2) that evidence must have been suppressed by the State; 3) prejudice must have ensued. 527 U.S. at 281-82. The defendant has the burden of establishing a *Brady* violation but cannot show a violation based on mere speculation or unsupported assertions that the government suppressed evidence. *U.S. v. Jumah*, 599 F.3d 799, 808-09 (7th Cir. 2010); *see also U.S. v. Andrus*, 775 F.2d 825, 843 (7th Cir. 1985). Simply because Kowalski spins a conspiracy theory where he believes certain documents exist, does not make that unknown and possibly non-existent material *Brady* material. Also, irrelevant material that cannot form a basis for supporting a theory of defense is not *Brady* material.

Here, Kowalski believes that other materials are in existence regarding the death of Gembara. The Government has stated it has turned over what it has. Nothing in that material to

date has supported any theory of defense to the charges against Kowalski and further appear to be irrelevant to the charges. As such, it cannot constitute Brady material. The motion is denied.

[Dkt. 352] Kowalski seeks to have the body of John Gembara exhumed and he seeks a court order for the process. As usual, Kowalski proffers no theory whatsoever as to how the exhumation of Gembara's body would lead to discoverable evidence that he could use to support his defense. Although his colorful conspiracy theories abound, not one supports the idea that an autopsy of Mr. Gembara is relevant to his defense. Instead, he seeks to create more emotional distress to Mr. Gembara's family by continually bringing his death into the case as somehow connected to his arrest and charges. This Court has already detained Kowalski for his numerous pretrial violations which included contacting Gembara's widow. The motion is denied as irrelevant.

[Dkt. 411] [Dkt. 620] Kowalski seeks a speedy trial, discovery that he believes he is owed pursuant to *Brady v. Maryland*, to be released, and to dismiss the indictment for all of the foregoing. Kowalski's requests for a speedy trial inevitably are followed by the same emotional plea that he could not possibly be prepared for trial because the Government has failed to turn over all of the material owed to him. It is important to note that much of what Kowalski seeks in discovery is not *Brady* material and, in fact, is irrelevant to the elements of the charges in this case. *Harris v. Kuba*, 486 F.3d 1010, 1016 (7th Cir. 2007) ("Brady does not require that police officers or prosecutors explore multiple potential inferences to discern whether evidence that is not favorable to a defendant could become favorable."); *see also Carvajal v. Dominguez*, 542 F.3d 561, 568 (7th Cir. 2008) (concluding that evidence was not exculpatory because "too many inferences have to be made to reach that conclusion"). This is because Kowalski cannot help but believe that there are forces linking his bankruptcy case, his divorce case, and this criminal case

together. Often he seeks material from other matters including a bankruptcy case and FDIC proceedings, which the AUSAs have provided to him in spite of the irrelevance of the materials. The Court has monitored discovery like a hawk for two years and is confident that Kowalski has the materials he needs, has the ability to review the materials, and has had time to review the material. If he chooses not to review the material, that choice is his own and cannot constitute a violation on the part of the Court or the prosecutors. *See United States v. Farr*, 297 F.3d 651, 657 (7th Cir. 2002) ("[W]e refuse to even consider, much less adopt, a rule that might suggest that a trial court should tolerate a calculating and mischievous defendant and grant indefinite continuances to a defendant who refuses to cooperate with his attorney."); *see also U.S. v. Avery*, 208 F.3d 597, 603 (7th Cir. 2000) ("[T]he situation about which [the defendant] now complains was brought about entirely by his own actions. His decision to dismiss his lawyer on the eve of trial and proceed pro se was a decision he made at his own peril."); *see also U.S. v. Egwaoje*, 335 F.3d 579, 587–88 (7th Cir. 2003) ("A district court's exercise of its discretion in scheduling trials and granting or denying continuances is 'almost standardless.'" (citations omitted)). The Court first set a trial date in August 2019 (Dkt. 72), has moved it three times (Dkts. 83, 91, 460) and has had this date set since April 2022. Kowalski cannot have it both ways. Either he can have a speedy trial which requires that he prepare for it; or he can have time to review discovery and the Court can give him time to do it. Kowalski has had more than three years to review materials. *United States v. Larson,* 417 F.3d. 741, 746 (7th Cir. 2005) ("[Defendant] is hardly in a position to complain about a delay because he was the one who asked for it. . . . [he] precipitated the delay by insisting on proceeding *pro se* on the eve of trial in a relatively complicated white collar case. . . . It also warrants mentioning that the purpose of the Speedy Trial Act is to protect the defendant from excessive pre-trial delay and incarceration by the government and to protect

the public's interest in the speedy resolution of justice. The Act was certainly not meant to hamstring a defendant by pushing him into trial unprepared, which 'skews the fairness of the entire system,' *Barker v. Wingo,* 407 U.S. 514, 532, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), or to permit opportunistic behavior by defendants who request continuances for their benefit and then seek to have the accompanying delay count against the 70-day limit.")  Instead, Kowalski simply seeks to make an appellate issue by claiming that he does not have the discovery (which he does), that he cannot review the discovery (which he can), that he does not have access to the discovery (which he has), and that he cannot be ready for trial because of the foregoing.  None of his allegations are supported in fact and therefore any delay in the speedy trial clock has been of his own making.

The Court also notes that Kowalski has appealed this Court's pretrial rulings 10 times. Each time he appealed; the speedy trial clock was tolled for the appeal until it was denied. 18 U.S.C. § 3161(h)(1)(C) ("delay resulting from any interlocutory appeal" is excluded from speedy trial clock calculations); *United States v. Loud Hawk*, 474 U.S. 302, 316, 106 S.Ct. 648, 88 L.Ed.2d 640 (1986) ("A defendant who resorts to an interlocutory appeal normally should not be able upon return to the district court to reap the reward of dismissal for failure to receive a speedy trial.") All appeals to date have been dismissed. Dkts. 404, 414, 495, 497, 678, 708, 710, 759.  Again, the tolling of the speedy trial clock was of his own making.  The motion is denied.

[Dkt. 481] [Dkt. 747]  Kowalski alleged at the end of 2021 that he had been provided with "scant" discovery and that only a "small fraction . . . has trickled out of the USAO." Dkt. 481 at 1, 3.  The Government had provided to defendant a hard drive containing over 1,400,000 separate native files containing electronic records relating to Washington Federal (including

email messages and other items from Washington Federal's servers). The Government has already provided him with hundreds of thousands of pages of materials in .pdf format. Some of the files provided to Kowalski in the fall of 2021 had previously been provided to him in discovery, including over 500,000 check images and bookkeeping records, which were provided to Kowalski in June 2021. Additionally, approximately 2,400 email communications between Kowalski and others were provided to him in discovery, and other native files, that were previously tendered to defendant. See, e.g., Dkts. 395, 448. The Government at that time continued to process and produce discovery to him on a rolling basis. Kowalski alleged that he had difficulty accessing the native files because the Government "deliberately" provided him with native files that are "utterly indecipherable." Dkt. 481 at 1. The Government had provided the native files in the same format the Government had received them from their source, including files in word, excel, and outlook formats. In order to aid him in his review, the Government also provided defendant with various indexes and explanatory letters to assist him in reviewing files. When Defendant first alleged that he could not open certain files, the government sent him a letter asking him to identify which files failed to open so that those files could be reproduced. Kowalski never told them. Then when the AUSA went to the MCC to determine which files would not open, Kowalski refused to meet with her. As a result, the Court ordered a status hearing where the Court could observe which files, if any, did not open. During that hearing, the vast majority of files opened and the few that did not were identified so that the Government could reproduce them; which it has now done, months ago. The Government is not required to go through such lengths to aid Kowalski in his defense. *See Anderson v. City of Rockford*, 932 F.3d 494, 504–05 (7th Cir. 2019) ("Evidence is suppressed for Brady purposes if the . . . 'evidence was not otherwise available to the defendant through the exercise of reasonable

diligence.'" (quoting *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001)); *see also U.S. v. Gray*, 648 F.3d 562, 567 (7th Cir. 2011) ("[The government] is under no duty to direct a defendant to exculpatory evidence [of which it is unaware] within a larger mass of disclosed evidence." (internal quotation omitted)). Yet, they have provided him with indexes, letters, and hands-on demonstrations to help him with the discovery.  It is once again important to note that the vast majority of the material is not material that the Government intends to rely on its case in chief and is being requested by Kowalski.  There is no Brady violation in the manner in which the Government has supplied material to him in discovery.  Motion is denied.

[Dkt. 499] [Dkt. 514]  Kowalski moves the Court to order the Government to give him "all original [Washington Federal] files for Robert and his forensic examiners review." The government responds that it will make records available for defendant to review and will arrange for defendant to be brought to the U.S. Attorney's Office to review those files. Additionally, on December 2, 2021, the Government sent Kowalski a letter notifying him that he could contact the Government directly to set up an appointment to review the records. Defendant further requested that this Court order the Government to "immediately" deliver the original documents to "his cell at the MCC." Dkt. 499 at 3. The Court will not order the government to do this because the government is required to maintain the integrity of the documents. Kowalski can make an appointment with the AUSAs if he wants to review the original Washington Federal documents which he will need to do with a law enforcement agent present, in order to maintain the integrity of the documents as well as the chain of custody for these documents.  Defendant admits the Government previously offered to make the original records available for review, including in October 2020. Dkt. 499 at 1.

In his more recent motion, Kowalski further requests that this Court "enjoin[ ] prosecution member FDIC-R[eceiver] from using these altered [Washington Federal] documents in collateral Federal Court proceedings." Dkt. 514 at 4. As will be discussed below, the FDIC is not a party to this litigation. Kowalski will need to challenge the documents in other matters in those matters, not here, Although the FDIC-OIG was a part of the investigative team in this case, the FDIC is not part of the prosecution team. The AUSAs have obtained documents from the FDIC via subpoena. Kowalski can do the same if he chooses. Motions to compel production of original documents are denied as described above.

Kowalski also states that he was not provided discovery related to two cases: a bankruptcy case, *Melgoza v. Washington Federal Bank for Savings* (In re Melgoza), 10-B-53264 (N.D. Ill.) and a district court case, *Doherty v. FDIC*, 18-cv-0703 (N.D. Ill.). The Government is not a party to either case and does not possess records related to the identified litigation. However, the Government has previously provided defendant with discovery from Washington Federal's records regarding the loans that were the subject of two court cases identified by defendant. On or about October 15, 2021, the government provided to defendant approximately 1,000 pages, in hard-copy format, of records related to those loans. These records had all been previously provided to Kowalski electronically and were reproduced in paper to aid in defendant's review of those materials. The Government has provided voluminous discovery to Kowalski. Additionally, as a courtesy to Kowalski, the Government did print out approximately 400 pages from PACER regarding the *Doherty* lawsuit and provided it to him in hard-copy form. This was not done pursuant to Federal Rule of Criminal Procedure 16, as this was a public record and not a record that was in the Government's possession.

12

[Dkt. 502]  This motion was filed in early November 2021and sets forth the accusations that the materials being provided to him are not accessible and therefore he is being deprived of access to the discovery.  This motion triggered a number of actions by the Court including requiring the AUSA and an agent to go to the MCC to see if the materials could be accessed. That led to certain materials being reproduced.  Other materials that took too long to load were also reproduced in a new format.  This back and forth lasted approximately six months during which time the Court monitored which items needed to be replaced with new working data.  The monthly status hearings and the AUSA's status reports document each and every item in detail which is not needed here.  Suffice it to say, that the materials have been provided in a working format.  There are three critical points to make about the discovery that was accessed with difficulty:  1)  Kowalski always had a trove of documents to review other than those he could not access at any given time.  He himself admits that he could read the pdfs, of which tens of thousands were provided to him. In short, he had plenty of discovery he could be reading and working on while the replacement data was being reproduced.  The final court hearing on July 20, 2022, when the Court went through the data herself is an example of this. Out of the 14 data drives accessed at the prior hearings, only 2 needed to be reproduced and mostly because the program accompanying the data was slow.  2)  Much of the data that was being reproduced had already been produced previously.  *See* Dkts. 395, 448, 518, 629, 681, 694, 753 (Government Status Reports).  3) Much of the data that was being reproduced was NOT *Brady* but rather voluminous bank records that the Government did not intend to present in its case.  4) All of the critical 3500 material was accessible and provided to him months if not years in advance of trial. The Court is confident that the procedure employed ensured that Kowalski's constitutional rights were protected and that he would be prepared for trial.  Of course, Kowalski needed to review

the discovery provided. If he failed to do so, the Court can only lead a horse to water, she cannot make him drink. *Anderson v. City of Rockford*, 932 F.3d 494, 504 (7th Cir. 2019) ("This '*Brady* rule,' the Court has explained, is not intended 'to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur.'" (quoting *U.S. v. Bagley*, 473 U.S. 667, 675 (1985))).

[Dkt. 513] Kowalski moved the Court to compel the "FDIC prosecution member [to] provide all material that supports their $27.2 million dollar bankruptcy claim." Dkt. 513 at 3. The Government first responds that the FDIC is not part of the prosecution team. Yet, as part of the investigation, the government agrees that it received from the FDIC via subpoena certain materials related to Washington Federal. The Government has turned over the materials obtained from the FDIC. The government states that it does not possess any additional records from the FDIC related to the FDIC's computation of the bankruptcy claim. The bankruptcy claims and voluminous exhibits supporting the FDIC's bankruptcy claims are all publicly available on PACER. In spite of it not being part of their obligation, and as a courtesy to Kowalski, the Government printed Docket Entries 20-1, 22-1, and 22-2 from defendant's bankruptcy case and delivered them to the defendant at the Chicago MCC. The total number of printed pages for the three docket entries was approximately 1,017. Those pages were delivered to the defendant on or about November 19, 2021, along with a printed copy of the docket. *See* Dkt. 546.

Kowalski also seeks materials obtained from Park Ridge Police Department in December 2017, when the president of Washington Federal, Individual A, was found dead in a bank customer's house in Park Ridge, Illinois. Kowalski seeks "[a]all material that was removed from Park Ridge," which he described as "[Washington Federal] financial documents determined to have been at the scene of a death investigation by the Park Ridge Police Department." The

14

Government has provided all documents that it has received from the Park Ridge Police Department and does not possess any additional records described in defendant's motion to compel. Defendant's Motion to Compel Brady Violations (Dkt. 513) is denied

[Dkt. 571] Kowalski again seeks all Brady material alleging that he has not received it. The Court's active role in monitoring all of the discovery belies this accusation. Each of the hearings has been specifically aimed at various discovery accusations on the part of defendant. The Court is confident from these hearings that any Brady material has been provided. *See United States v. Morris*, 957 F.2d 1391, 1403 (7th Cir. 1992) ("Mere speculation that a government file may contain Brady material is not sufficient .... A due process standard which is satisfied by mere speculation would convert Brady into a discovery device and impose an undue burden upon the district court.") (quoting *United States v. Navarro*, 737 F.2d 625, 631 (7th Cir. 1984)). Motion is dismissed as moot.

[Dkt. 585] [Dkt. 586] Kowalski seeks material that supports the superseding indictment in this case. First and most importantly, the indictment is a speaking indictment, and to the extent that Kowalski wants to know how the fraud was committed, he can read those charges. Second, he has been given all of the 3500 materials of those witnesses interviewed by the Government. Third, he has been given the plea agreements of those witnesses who have confessed to their role in the fraudulent conduct. Therefore, he has an effective roadmap by which to read the discovery material. The Government is not required to give him more or to walk him through the discovery. *See U.S. v. Gray*, 648 F.3d 562, 567 (7th Cir. 2011) ("[The government] is under no duty to direct a defendant to exculpatory evidence [of which it is unaware] within a larger mass of disclosed evidence." (internal quotation omitted)). In this case, the AUSAs have gone above and beyond the turning over of discovery and have provided

15

Kowalski with letters telling him how to locate certain documents, a table of contents of the materials, and a description of each batch of materials that is sent to him. This is more than sufficient. *Id*. Motions are denied.

[Dkt. 626] Kowalski next moves to dismiss the indictment for prosecutorial misconduct in the grand jury. Specifically, Kowalski received summary charts created by a government witness who summarized loss amounts that the Government intends to use at trial. These amounts are substantially less than the amounts that were presented to the grand jury. Kowalski asserts that the larger amount that was presented to the grand jury shows that the prosecutors merely used that larger amount to inflame the passion of the grand jurors with false and misleading information. This false information given to the grand jury caused them to wrongfully indict him.

The prosecutors are required to present the elements of each crime to the grand jury in order to receive a true bill. All they need to do is show that there was probable cause that the elements of the crime have been met as to each defendant. *See Kaley v. United States*, 571 U.S. 320, 328 (2014) ("An indictment fair upon its face, and returned by a properly constituted grand jury ... conclusively determines the existence of probable cause to believe the defendant perpetrated the offense alleged."). Loss can be an element of a crime but the exact loss need not be determined. It is sufficient if there is a loss. Therefore, a change in loss amount cannot constitute improper conduct. *See, e.g., United States v. Vincent*, 416 F.3d 593, 600 (7th Cir. 2005). ("To secure an indictment for mail or wire fraud, the government was required to show probable cause to believe that the defendant: (i) participated in a scheme to defraud; (ii) acted with intent to defraud; and (iii) used the mail or wires in furtherance of the fraudulent scheme. The government was not obligated to prove that [the victim] lost all, or even a portion,

of the entrusted money). *United States v. Dick,* 744 F.2d 546, 550 (7th Cir. 1984) (proof of pecuniary loss is not an element of mail fraud). The AUSAs have stated to the Court that they will be seeking a lower loss amount against Kowalski at trial. It is a discretionary and strategic call on the part of the Justice Department to choose which evidence they intend to present to the jury to meet their burden. Motion to dismiss for prosecutorial misconduct in the grand jury is denied.

[Dkt. 677] Here Kowalski seeks a roadmap to the Government's case in chief. He claims he needs a list of all of the fraudulent documents that the Government alleges because he cannot find them. Again, the 80-page speaking indictment walks him through the allegations and the 3500 material and plea agreements further walk him through the charges. There is no requirement that the Government do more. Motion denied.

[Dkt. 698] [Dkt. 786] Defendant seeks to compel what he continually calls Brady material and wants the Government to walk him through the discovery. There is no such obligation on the part of the government to take such extraordinary steps for the benefit of the defendant. Yet, the Government has taken many steps to assist him in locating relevant documents in the discovery productions, including the following as set forth in their response: "1) The government has provided defendant with letters explaining where in the discovery to find certain records, and has offered to answer additional questions from defendant regarding the discovery productions. See, e.g., Dkts. 395, Ex. A; 695, Ex. A. 2) The government has provided defendant with detailed charts analyzing certain loans associated with defendant, including tracing all transactions which were recorded in Washington Federal's books and records as a credit or debit to that loan account. Defendant has been provided with the supporting documentation for those transactions. The charts identify instances where a payment was made

17

to a third-party (and likely for the benefit of someone other than defendant) and recorded as a distribution to defendant's account. 3) The government has also provided defendant with various charts related to concealment of assets from the bankruptcy trustee, along with the supporting documentation (such as copies of checks, etc.). Additionally, the government has provided defendant with all copies of his tax returns as well as draft tax loss computations. 4) With each discovery production, the government has provided defendant with a discovery index. See Dkt. 698 at 10. At defendant's request, he is provided both with a paper copy of the indexes and an electronic text-searchable copy of the indexes. Documents that the government obtained from third-parties (other than Washington Federal) have bates-prefixes that reflect the source of the documents. The indexes enclosed with discovery often contain additional descriptive information about the documents, including date, document type, the name of the individual/entity for whom the records are associated, and additional description of the records. Sample portions of an index reflecting the index header, and an index entry, are displayed below for a document obtained from JP Morgan Chase: 5) For the electronic items obtained from Washington Federal's computers and servers, the government has performed keyword searches of relevant terms (like "Piorun," the name of one of defendant's entities) and provided defendant with an index reflecting the items that contain that keyword. The government has also offered to do additional keyword searches for defendant. To date, defendant has not requested the government perform any additional keyword searches. 6) The government has provided to defendant grand jury transcripts and exhibits where law enforcement agents described each of the allegations in the indictment. With respect to the overt acts in Count One, the transcripts and exhibits contain not only a description of the act, but supporting documents. These transcripts are organized by date (with the transcript and exhibits together with one bates-prefix), clearly labeled on the discovery

indexes with bates-prefixes beginning with "GJ" or "GJURY." The grand jury transcripts allow defendant to identify records that support the allegations in the indictment. For example, in defendant's motion, he points to Paragraph 47(o) in the Fourth Superseding Indictment, an overt act which alleges that in February 2015, co-defendant Alicia Mandujano reduced the balances of two loans associated with defendant Kowalski by $2.3 million by inflating the balances of thirteen other loans associated by Kowalski by the same amount. Dkt. 698 at 6. Defendant was provided with a grand jury transcript that described the February 2015 transactions. He was also provided with Washington Federal's bookkeeping records related to the transactions, which were marked as grand jury exhibits. Defendant was provided this transcript and exhibits in paper format at his residence in March 2021 and was provided with this transcript and exhibits again in June 2021 at the Chicago MCC. Although he claims to have not received discovery regarding this allegation, defendant filed a motion specifically referencing this particular grand jury transcript, including quoting from a passage where the February 2015 transactions were described. Dkt. 304 at 5. 7) The government has produced voluminous early § 3500 material, including reports of interview of witnesses along with any exhibits that accompany those interview reports. In those reports, witnesses often describe various Washington Federal records – including the alteration of those records – and the documents referenced by the witnesses are attached to the reports as exhibits. 8) The FDIC-R team who was at Washington Federal at the time of failure retrieved various documents from the employees' offices and other common spaces at Washington Federal. Those records were later provided to the government and produced to defendant. The FDIC-R team also created a detailed index, which was provided to the government and has been provided to defendant. A sample portion of that index is displayed below, identifying some of the items found in what was labeled by FDIC-R as Box 1: As

indicated in the index, these records were found in Jane Tran's office. The government has provided to defendant a separate spreadsheet that identifies the bates-range that corresponds to each of the boxes that FDIC-R collected, so defendant can find these items by bates-range. This detailed index will help defendant locate items taken from Washington Federal's physical records. 9) The government has photographed examples of records that appear to be altered, including records where a piece of paper containing what appeared to be a signature was taped onto another document. Those photographs have been provided to defendant." This is more than any AUSA is required to do to direct a Defendant to relevant materials. Defendant also has a Santiago proffer that is 31 pages long. This proffer similarly describes the crime in elaborate detail. Motion is denied.

## MOTIONS TO DISMISS THE INDICTMENT

[Dkt. 417] This motion to dismiss the indictment for prosecutorial misconduct is essentially an allegation that the evidence that the government has presented cannot possibly be true. Kowalski alleges that the OCC should have known of the fraud and that the amounts of money attributable to him are erroneous because they are fraudulent. He fails to allege any misconduct on the part of the prosecutors; merely his disbelief in the allegations and the materials presented. There is no substantiation for his accusation, and it is therefore denied.

[Dkt. 549] Kowalski moves to dismiss the indictment based on prosecutorial misconduct, specifically the FDIC-OIG "impersonation" of law enforcement. The Court addresses this in its Order contained herein regarding his motion to suppress. The FDIC-OIG officers are law enforcement officers and therefore his motion is denied.

[Dkt. 652] Kowalski seeks to dismiss the indictment because the word "purported" is used within the indictment 22 times. He asserts that the word has no common meaning and

therefore makes the indictment confusing and fuzzy. He further alleges that the word purported violates the Illinois Statute of frauds, the Illinois Credit Agreements Act, and the UCC. The word as defined by the Oxford English dictionary means: "appearing or stated to be true, though not necessarily so; alleged." Of course, the fourth superseding indictment in this case alleges a scheme of fraudulent loans being given to various individuals with no expectation that they would be repaid but rather as a way of embezzling money from the bank. Therefore, the use of the term purported when attached to the word loan is perfectly appropriate because the loan appears to be a true loan but in fact it is alleged that it is not. There is nothing confusing about the use of the word and the scheme is described in exacting detail in the charging document. This is sufficient to put Kowalski on notice of the charges against him. *United States v. Hausmann*, 345 F.3d 952, 955 (7th Cir. 2003) ("A valid indictment must (i) state each element of the alleged offense, (ii) provide the defendant with information adequate for the preparation of his defense, and (iii) provide sufficient basis for a judgment that would bar any subsequent prosecution for the same offense. . . . 'The test for validity is not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards.'") (quoting *United States v. Allender,* 62 F.3d 909, 914 (7th Cir.1995). This motion to dismiss is denied.

[Dkt. 688] Kowalski seeks to have the indictment dismissed because the does not believe the elements of the charges have been met. Of course, he has requested a jury trial to challenge the Government's charges and he will have an opportunity to put he Government to its burden of proof at that time. Accusations that the elements have not been met do not rise to the level of dismissing an indictment. The charges were returned by a grand jury and now it is time for Kowalski to challenge them at trial. Motion denied.

[Dkt. 692] Kowalski moves to dismiss Counts One and Seven of the Indictment alleging that he cannot embezzle his own funds. The Court orders the Government to respond to this motion on or before 8/23/22.

[Dkt. 734] Kowalski seeks to have the indictment dismissed against him for prosecutorial misconduct in the grand jury. He claims that the prosecution presented false testimony to the grand jury in the form of the various bank records that show the scheme – essentially because the bank records were falsified, they have used false evidence to indict. Because the witnesses who testified about the scheme relied in these "false" bank records, Kowalski assumes that they presented false statements to the grand jury. First, as noted above, the prosecutor is obligated to present the evidence that shows the elements of the crime and here the falsified bank records show the conspiracy to embezzle funds from the bank. Essentially, he believes that exculpatory evidence of bank records that are not falsified should have been presented to the grand jury so that they would have known his version of the story. The Supreme Court put to rest the idea that the prosecutor has such a duty in *United States v. Williams*, 504 U.S. 36, 112 S. Ct. 1735, 1745 (1992). In rejecting the proposition that the prosecutor must present all evidence beneficial to the defense, the Court stated:

> Imposing upon the prosecutor a legal obligation to present exculpatory evidence in his possession would be incompatible with this system. If a "balanced" assessment of the entire matter is the objective, surely the first thing to be done—rather than requiring the prosecutor to say what he knows in defense of the target of the investigation—is to entitle the target to tender his own defense. To require the former while denying (as we do) the latter would be quite absurd. It would also be quite pointless, since it would merely invite the target to circumnavigate the system by delivering his exculpatory evidence to the prosecutor, whereupon it would *have* to be passed on to the grand jury—unless the prosecutor is willing to take the chance that a court will not deem the evidence important enough to qualify for mandatory disclosure.
>
> . . . .
>
> We reject the attempt to convert a nonexistent duty of the grand jury itself into an obligation of the prosecutor. The authority of the prosecutor to seek an indictment has

22

long been understood to be "coterminous with the authority of the grand jury to entertain [the prosecutor's] charges." *United States v. Thompson,* 251 U.S., at 414, 40 S.Ct., at 292. If the grand jury has no obligation to consider all "substantial exculpatory" evidence, we do not understand how the prosecutor can be said to have a binding obligation to present it.

*Id.* at 52-53.

Further, even if the Court were to accept for purpose of argument that the government presented evidence that it knew to be inaccurate, the Court could dismiss the indictment "only if it is established that the violation substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." *United States v. Brooks,* 125 F.3d 484, 497 (7th Cir. 1997) (quoting *Bank of Nova Scotia v. United States,* 487 U.S. 250, 256, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988)) (internal quotations omitted); *see also United States v. Geisler,* 143 F.3d 1070, 1072 (7th Cir. 1998). In other words, "[a] district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." *Brooks,* 125 F.3d at 497 (quoting *United States v. Mechanik,* 475 U.S. 66, 78, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986)).

Here, Kowalski alleges that false testimony was given because the witnesses relied on false records. Yet, he has failed to show how any of the alleged discrepancies would have mattered to the grand jury. Anything other than the records presented to the grand jury would have little to no relevance to the conspiracy and embezzlement charges *Id.* Kowalski's motion to dismiss the indictment based on prosecutorial misconduct is denied.

[Dkt. 744] The Court will address this in the hearing on 8/17/22.

## **MOTIONS FOR RELEASE**

[Dkt. 492] [Dkt. 498] [Dkt. 570] [Dkt. 622] [Dkt. 623] [Dkt. 653] [Dkt. 668] [Dkt. 680] [Dkt. 714] [Dkt. 769] [Dkt. 781] [Dkt. 785] Kowalski's recurrent theme for release focuses on

Krista Greene, a seasoned Pretrial Services Officer, who was monitoring Kowalski during his pretrial release. Kowalski, unfortunately, could not follow the Court's orders and was finally revoked after many violations showing that he had little respect for the Court's orders and for Ms. Greene's role in maintaining them. At one point in the pretrial release period, Kowalski stated that he might be hiring Beau Brindley as his defense counsel. Brindley and Greene communicated, and Greene expressed her concern that Kowalski could not follow the Court's orders and was contacting witnesses that he was not permitted to have contact with. The Court had already expressed concern that Kowalski's bond might be revoked and had warned him on a number of occasions of that real possibility. Greene informed Brindley that she believed she could recommend that Kowalski remain on bond if Brindley could control him – essentially ensure that he would follow his bond conditions. Kowalski takes issue with this and believes this was improper on the part of a Pretrial Services Officer. Yet, it is not uncommon for a defense attorney to speak directly with a Pretrial Services Officer; in fact, it happens regularly. Often defense counsel seek to have conditions of release expanded, for example, to have their client travel for a wedding or funeral. These communications are then conveyed in the motion wherein defense counsel will inform the Court that he has spoken to the Pretrial Services Officer, and she has no objection to the motion. Brindley spoke to Greene during a time when he was intending to represent Kowalski and was getting the lay of the land from Greene. It was perfectly appropriate for Greene to inform him that if Kowalski could follow the Court's orders on supervised release, essentially if Brindley could ensure that he do so, that she would not object to allowing him to remain on supervision. All of this was for naught, however, because Brindley did not come on board to represent Kowalski. Instead, Kowalski continued to violate

the conditions that this Court warned him to follow and as a result he was detained. Nothing occurred that was improper regarding his detention. These motions are denied.

[Dkt. 500] Kowalski sought to have the "inhumane conditions of detainage" stopped and for sanctions. In this motion, Kowalski complains that he does not have the three hours per day at the library that Mr. Robert Steele [BOP Attorney Advisor] from the MCC said that he is permitted to have; that the MCC is very cold; and that Mr. Steele took some of his computer devices after court to see if they were working and therefore could have tampered with them. Overall, he claims that the conditions of confinement are such that he cannot prepare for his case. To the extent that Kowalski complains of his placement in solitary confinement, again this is a condition that is of his own making. Kowalski continues to complain that he is being brought back to isolation but the policy at the MCC during the pandemic at that time was that anyone who was brought out of the facility must remain isolated from the rest of the population for two weeks before being returned to general population. Kowalski continues to complain that he does not receive the discovery and that the government is not producing materials to him. As such, the Court has had regular, monthly status hearings to ensure that he had the material. He is permitted to stay at the MCC and not be brought to court; yet Kowalski refuses to conduct the hearings via WebEx, instead demanding that he be brought to court. This Court informed him that each time he comes, he will need to be isolated for two weeks. He is well-aware that this is a condition of his request, and he still demands to be brought over.

As for Mr. Steele's access to his discovery, Mr. Steele has set up an office for Kowalski with all of his materials and a computer. He is required to make certain that all items are safe within the facility, and he has assured the Court that he is going above and beyond the usual treatment of pretrial detainees. Finally, if Kowalski believes that his pretrial conditions are not

Constitutional, then he should first file a grievance with the MCC and exhaust his administrative remedies and if not satisfied, he can file a section 1983 claim in a separate lawsuit. This motion is denied.

[Dkt. 517] [Dkt. 587] [Dkt. 683] [Dkt. 689] [Dkt. 767] Kowalski seeks to be released to prepare for his defense. Kowalski is presently detained after his pretrial release was terminated due to multiple violations of the conditions of release. Once again, this is a path that Kowalski has created himself and one which the Court repeatedly warned him could happen. It is best to review the history of his release and violations to understand the many chances he was given before he was detained.

On March 10, 2019, Kowalski was charged by criminal complaint with bankruptcy fraud and was later indicted. (Dkts. 1, 37). There is currently a fourth superseding indictment, in which he is charged with bankruptcy fraud, filing false tax returns, failing to file tax returns, aiding, and assisting the embezzlement of bank funds by bank employees, and conspiring to embezzle bank funds and falsify bank records, in violation of 18 U.S.C. §§ 152(1) and (8); 157(1), (2), and (3); 371; and 656, and 26 U.S.C. §§ 7203 and 7206(1). Dkt. 534. On October 30, 2018, the Executive Committee of the United States District Court for the Northern District of Illinois issued an order requiring Defendant to sign in upon entering the Dirksen building and to be escorted by a representative of the United States Marshal while inside. *In re Robert M. Kowalski*, 18 CV 7228, Dkt. 1. According to the Executive Committee's order, it "became aware" that Defendant "has been loud and disrespectful of the court and court personnel," "has become verbally combative with judges," and "often refuses to follow court procedures or respect the authority of the judge." *See id.* The Executive Committee's findings are consistent with Defendant's conduct before this Court where Kowalski repeatedly interrupts the Court and other parties, at times with a raised

voice, and continues to filibuster until the Court demands that he stop. Initially, Kowalski was detained by the bankruptcy court (from March to June 2019) for failure to comply with that court's order and was held in contempt.

In June 2019, the U.S. Marshals informed the Court that Kowalski had been released, and the Court imposed its prior conditions of pretrial release, including location monitoring and a prohibition on contacting any witnesses or victims. Dkt. 66. He posted a $50,000 secured bond, secured by property owned by his sister and co-defendant Jan Kowalski. *Id.* Meanwhile, between July 2019 and November 2019, on three separate occasions, Defendant was held in contempt and incarcerated by state-court judges, including judges related to his ongoing divorce proceeding. Dkts. 68, 72, 73, 77, 80. This Court repeatedly admonished him that his conditions of release require him to comply with *all* court orders, including orders by state-court judges. Dkts. 75, 80. On June 15, 2020, on Defendant's motion, this Court modified his conditions of release to remove the electronic location monitoring requirement. Dkt. 109. Shortly thereafter, on October 14, 2020, Pretrial Services filed a violation report outlining numerous bond violations and describing Defendant's adjustment under supervision as "poor." Dkt. 158. Pretrial Services reported that Defendant had moved out of his residence without notifying Pretrial Services; that Pretrial Services was unable to get into contact with him, including because he had disconnected his phone; and that he had failed to appear for scheduled mental health sessions, even though mental health treatment was a condition of release. *Id.* Additionally, Pretrial Services reported that, during a routine criminal history check on Defendant, an officer had learned that an order of protection had been filed against him by his girlfriend N.L., and Kowalski had not reported the order to Pretrial Services. *Id.* When Pretrial Services contacted

N.L., she told Pretrial Services that she did "not want to have any contact with the defendant" and that she was "fearful for her safety and the well-being of her minor age children." *Id.*

On October 20, 2020, the government filed a motion to revoke Kowalski's bond due to the violations in the Pretrial Services report regarding his contact with a witness – a condition of release was that he have no contact with witnesses. Dkt. 163. Specifically, Defendant sent two written communications to a former Washington Federal employee (who is also the widow of Washington Federal's former president, who was found dead in a bank customer's home). Dkt. 163; Dkt. 164, Exs. A-1 and A-2. In one of the letters, Defendant requested that the witness "meet with me" and provided his phone number. Dkt. 164, Ex. A-1. In both communications, Kowalski asked the witness to stand by him in attempting to determine the cause of her husband's death.

On October 21, 2020, the Court held an in-person evidentiary hearing regarding the alleged release violations. Dkts. 165, 234. Defendant (through counsel) admitted that he failed to attend mental health counseling sessions as directed by Pretrial Services, that he moved from his residence without telling Pretrial Services, and that he contacted Individual A's widow. Dkt. 234 at 12-14, 49-50. The Court found that Defendant had "improper contact" with Individual A's widow in violation of his conditions of pretrial release. Additionally, based on evidence presented, the Court found—over Defendant's objection—that Defendant left the scene of an incident with N.L. to avoid having to report contact with law enforcement. Specifically, Officer William O'Connor from the Oak Lawn Police Department testified at the hearing that, on the evening of October 5, 2020, he was dispatched to a three-flat building in Oak Lawn. Dkt. 234 at 29-30. When he arrived, N.L. told Officer O'Connor that Defendant (who was not present) and his sister Jan Kowalski (who was lying injured in the driveway) tried to push their way into her

28

apartment, and that Defendant struck N.L. in the face. *Id.* at 31- 32. Officer O'Connor observed blood and scratches on N.L.'s face; the government also submitted pictures of N.L. from that evening showing a facial abrasion. *Id.* at 31; Dkt. 363, Ex. C-2. According to Officer O'Connor, N.L. also told him that Defendant had pushed and hit her during earlier incidents of domestic violence. Dkt. 234 at 32. The government introduced a copy of the order of protection obtained by N.L. following this incident, as well as a video depicting part of the incident, which did not capture Defendant striking N.L. but did reflect that Defendant left the scene upon police being called. Dkt. 363, Exs. D-1 and D-2, E-1. N.L. did not testify at the hearing. However, in subsequent interviews, N.L. has made contradictory statements. Prior to the October 2020 hearing, N.L. was interviewed by law enforcement and recanted some of her earlier allegations of abuse. Dkt. 233 at 12. Then, at a later hearing regarding Defendant's place of residence, N.L. testified that she was not fearful of Defendant and that she wanted Defendant to live with her. Dkt. 343 at 61. On cross examination, N.L. stated that she had sought the order of protection because she was scared that Defendant and his sister would take away her son. *Id.* at 66-67. After viewing the phone video of the altercation, the Court observed: "[Y]ou left your sister lying allegedly unconscious on the pavement because you had to get out of there before the police came because it is a condition of your release to report any and all contact with law enforcement." *Id.* At the conclusion of the hearing, the Court found that Defendant had violated a number of his pretrial release conditions, including:  1) moving residences without telling Pretrial Services;  2) failing to keep in regular contact with Pretrial Services; 3) failing to attend mental health counseling; 4) making contact with a witness; 5) leaving the scene of the N.L. incident to avoid having to report contact with law enforcement; and 6) being held in contempt of court by the judge in Defendant's pending divorce case. Dkt. 234 at 45-48, 53-54. The Court

then explained: "What's most critical about all [the violations] is that there's a very prevalent pattern of lack of respect for the Court's supervision or the Court's rules. And it can be in bankruptcy, it can be in the divorce proceedings, it can be here. So, I am not finding that you should have some kind of electronic monitoring. You are a danger to the community for those people you've contacted. And you are also a risk of flight. And so, I'm going to order that you be detained." Dkt. 234 at 53-54.

After numerous requests to be released, on December 23, 2020, the Court gave Kowalski another chance and released him from custody to home confinement at Jan Kowalski's residence, and imposed other restrictive conditions of release. Dkt. 206, 207, 208, 336. The Court, addressing Defendant, explained that Defendant's decision to proceed pro se (which he elected to do after his bond was revoked in October 2020, Dkt. 167, 173) played a part in its release decision: "I am trying to balance right now your constitutional right to defend yourself and the interest of the community and protect the community from you. And right now, there's an ever-so-slight chance that it's balanced in your . . . favor in that if I can fashion conditions that keep you in a position where you're able to prepare for your trial because you don't have an attorney and you're doing it on your own and I can keep you away from the public, I believe that I'll be able to balance those concerns." Dkt. 336 at 11. The Court warned Defendant that if he violated any of his conditions of release, he would be "returned to the MCC." *Id*. at 15. The Court further explained that Defendant's previous counsel, Imani Chiphe from the Federal Defender Program, would serve as standby counsel, be available to consult on discovery, and assist with court filings. *Id*. at 16. By February 2021, Defendant had already violated the terms of his pretrial release. In a violation report dated February 10, 2021, Pretrial Services outlined five occasions between December 2020 and February 2021 on which Defendant had left his home without permission.

Dkt. 240. Pretrial Services also reported that Defendant repeatedly unplugged and/or moved his location monitoring equipment after being instructed not to move the equipment. *Id*. The Court admonished Defendant in open court. Dkt. 260. On April 30, 2021, the Pretrial Services officer reported to the Court that Defendant was "not following the rules of the [home incarceration] program about scheduling" and that, earlier that day, Defendant had gone to N.L.'s residence without permission. Dkt. 343 at 44-45. The Court again admonished Defendant but did not revoke his bond, warning him that he was "continuing to disrespect the Pretrial Services officer by not putting in proper requests [for movement], by going to places you that you're not permitted to go" and stating the Court's concern that Defendant was not willing to "follow my court orders." *Id*. at 46. On May 27, 2021, Pretrial Services filed another violation report, alleging that Defendant was not complying with Pretrial Services' location monitoring program, including by submitting frivolous requests to go to the grocery store for "essential" items and not following the rules about when and how to request movement away from his home. Dkt. 356. The Pretrial Services Officer reported that Defendant refused to speak with her on the phone and that their communication had "grown increasingly more combative over the past month," with Defendant making "statements of complete unwillingness to follow directives or program requirements" and "threaten[ing] legal actions if his demands are not met." *Id*. The officer concluded, "[D]efendant appears to be unwilling to comply with the requirements of the Location Monitoring Program, directives from Pretrial Services Office and the Order Setting Conditions of Release." *Id*. Defendant (acting pro se) responded that Pretrial Services' rules were "arbitrary polic[ies]" and that he had "no desire to be left at the unfair mercy of an agent that is able to change the bounds of her supervision almost at will." Dkt. 359 at 3. Defendant claimed that Pretrial Services prevented him from filing an appeal of the Court's denial of his request to

modify his bond conditions, including his request to live with N.L., and that "[f]aced with having to choose between reunification of his family, Robert [Defendant referring to himself in third person] is unwilling to follow arbitrary capricious directives that contravene this Court's orders and thereby prevent any hope of reunification with his family." *Id*. at 5. At an in-person hearing on June 2, 2021, the government sought Defendant's pretrial detention under 18 U.S.C. § 3148 because the Court had previously found Defendant violated his conditions of release and his pattern of behavior demonstrated that he was unlikely to abide by his conditions of release. Dkt. 372 at 3-4. The Pretrial Services officer described at the hearing her communications with Defendant over the past month, which had "grown increasingly more combative. He's talking over me. He's yelling at me. He's threatening legal action if I don't meet his demands. And just refusing to comply with any of our directives." Dkt. 372 at 10. The officer explained that she did grant Defendant permission to travel to the courthouse to file the aforementioned bond appeal on May 27, 2021, but that Defendant was required to give her details about his transportation plans by 11 a.m. that day and failed to do so. *Id*. at 19-20. Asked by the Court, "[I]s it your office's position that he cannot be monitored?" the Pretrial Services officer responded, "It is, your Honor." *Id*. at 22. The Court granted the government's motion to revoke Defendant's bond pursuant to § 3148, finding "probable cause to believe that [Defendant has] violated [his] pretrial release." Dkt. 372 at 22. The Court explained to Defendant: [Y]ou are failing to cooperate with your pretrial services officer. . . . And you have indicated in both your filing and in court that you should not have to pay attention to her directions because she is not someone that you need to do that for for various reasons. . . . [Y]ou've misrepresented that . . . she's blocked your access to the Seventh Circuit when, in fact, she was cooperative with you in giving you that access. *Id*. at 22-23. The Court also explained that Defendant had a number of other violations of his

32

conditions of release, and further found that Defendant had violated the protective order governing discovery. *Id*. at 24. Defendant remains in pretrial custody ever since.

A protective order is in place in this criminal matter due to the financial and other sensitive information regarding Washington Federal customers. Dkt. 157 at 5. In spite of this, and in spite of agreeing to the order and being an attorney, Kowalski has publicly filed documents marked as "sensitive" in this Court and the Court of Appeals, in violation of the superseding protective order in this case. *See, e.g.*, Dkt. 315; *United States v. Robert Kowalski*, 21-1771, Dkts. 5, 17. Prior to the June 2, 2021 hearing, this Court clearly warned Kowalski not to violate that protective order. Dkt. 337 at 55-56.

Now that Kowalski is detained after being given two chances to prove that he could comply with the Court's orders and he could not, he wants the Court to release him in order for him to review discovery. He claims that he cannot review discovery and yet day after day, he files motions citing to the discovery he has reviewed.[1] The Court has conducted multiple hearings on Defendant's circumstances to ensure that the Metropolitan Correction Center (MCC) and the government are doing everything reasonably possible to ensure Defendant has the resources to review discovery and prepare for trial. With the exception of days that the MCC goes into lockdown or similar security posture, Defendant is provided 3 hours per day, 7 days per week, of time outside his cell for what the MCC calls "law library" time. During "law library" time, Defendant can access discovery desktops, which contain legal research items such as statutes and caselaw. Defendant can also use the discovery desktops to access the discovery that has been tendered to him by the government in this case. As the government has previously reported, the vast majority of the file types (spreadsheets, word documents, PowerPoints, outlook

---

[1] *See* Dkts. 380, 391, 398, 399, 402, 411, 412, 413, 416, 417, 418, 419, 420, 421, 422, 424, 430, 431, 481, 488, 489, 491, 492, 498, 499, 500, 501, 502, 503, 504, 512, 513, 514, 519, 520, 525, 540, 661, 685, 698, 786.

emails, image files, and pdfs) that have been provided in discovery are operable on the discovery desktops. *See* Dkt. 518. In addition to his law library time, Defendant is also provided a laptop computer from approximately 8:00 AM to 4:00 PM, Monday through Friday, to review discovery in his cell. Initially, Defendant was provided a power cord with the laptop, but the MCC discontinued providing the cord to Defendant after comments he made in the fall of 2021, concerning use of the cord to harm himself. (Dkt. 511 at 22). As a result, while Defendant has the laptop for 8 hours per day, 5 days per week, it may not be possible for him to use the laptop for 8 straight hours because of battery life limitations and the MCC's need to recharge the battery outside of Defendant's cell for his protection. Although he has repeatedly complained of an inability to access discovery documents on the computers at the MCC, a deputy warden from the MCC has worked with him to identify which file formats are inaccessible, and the Government spent more than 3 hours with Defendant on November 18, 2021, trying to identify and resolve any access issues that then-existed. *See* Dkt. 518. At that meeting, the Government tested the electronic media devices previously provided to Defendant and determined that nearly all of the file types comprising the discovery were accessible on the MCC equipment. A small number of files were found to be inaccessible, and accessibility to many of those files was resolved at the meeting or shortly thereafter.

In addition to the resources Defendant is provided within the MCC, the Court has provided him with standby counsel and repeatedly pointed out to him that his very experienced standby counsel is available to help with filings and research. Defendant has repeatedly disclaimed any desire to accept assistance from standby counsel.

As for his detention, Kowalski repeatedly violated the conditions of his pretrial release and behaved in an uncooperative and menacing manner towards the Pretrial Services Officer. He

34

made it quite clear that he had no intention of complying with any condition of release that he determined "arbitrary and capricious" and that he did not believe that the Pretrial Officer has any authority to enforce restrictions on him. He also made it clear through his actions on pretrial release that he is a threat to the community. Based on his prior inability to comply with the most basic of conditions of release, the Court has no faith that he will abide by any restrictions in the future. Even his courtroom behavior since the revocation of his pretrial release has provided no reason to believe that if released, he will comply with conditions and pose no threat to others. Instead, he has frequent outbursts challenging the authority of the Court, his conditions of confinement, and the charges against him. He refuses to accept any help provided to him in the form of experienced trial counsel who is ready and willing to aid him should he reach out.

Defendant has chosen to represent himself after being warned repeatedly of the risk in doing so. Of course, he has a right to do so. *Faretta v. California*, 422 U.S. 806, 820 (1975). He also has a due process right to access to courts, *see Lewis v. Casey*, 518 U.S. 343, 351 (1996), which extends to pretrial detainees. *United States v. Moya-Gomez*, 860 F.2d 706, 743 (7th Cir. 1988). But "[t]he Constitution does not require that prisoners (literate or illiterate) be able to conduct generalized research, but only that they be able to present their grievances to the courts…" *Lewis*, 518 U.S. at 360. There is no authority for the proposition that a defendant proceeding pro se has an absolute constitutional right to pretrial release in order to prepare for trial. In circumstances where a detainee is representing themself against criminal charges, courts seek to balance the reasonable preparatory needs of the pro se detainee, without jeopardizing the security of the institution. Ironically, Kowalski frequently cites to *Faretta* claiming that this Court is violating his "*Faretta* rights." *See* Dkts. 623, 653, 668, 683. Yet the *Faretta* Court recognized that when self-representation is being used as a tactic to disrupt the orderly

proceedings, then the Court can terminate that right. *Faretta*, 422 U.S. 806 at 834, n. 46 ("the trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct.") *See, e.g., United States v. Beckwith*, 987 F. Supp. 1345, 1346 (D. Utah 1997) (discussing balancing and permitting defendant (who also had standby counsel) access to law library for 2 hours per day for 5 days to conduct research for defense to bank robbery and firearm charges). Indeed, a *pro se* defendant does not necessarily have a constitutional right to use of a law library if other alternative resources are available. *See United States v. Chapman*, 954 F.2d 1352, 1362 (7th Cir. 1992) ("This court has consistently held that when a defendant (pretrial detainee) is offered the assistance of appointed counsel and refuses the same, no constitutional right exists mandating that the prisoner in the alternative be provided access to a law library should he refuse the services of court-appointed counsel") (internal quotations omitted); *see also, United States v. Hester*, No. 08 CR 848, 2011 WL 124212, at fn. 2 (N.D. Ill. Jan. 14, 2011) (Dow, J.) (rejecting detainee's argument about lack of sufficient library access at the MCC noting: "(1) Defendant has standby counsel, (2) the Court has urged Defendant to reconsider whether he would like to have counsel—appointed or retained—as the case moves forward, and (3) all of [Defendant's] submissions to this Court have been thoroughly researched and capably presented.")

This Court has ensured that the MCC has made numerous accommodations for Kowalski to facilitate his preparation for trial, including providing up to 21 hours per week of law library time outside his cell when he can use a computer to review discovery and conduct legal research, and the use of a laptop within his cell for up to an additional 40 hours per week (depending on battery life limitations). While Defendant has technical difficulties in accessing a very limited number of the documents produced in discovery, the MCC and the Government have endeavored

to resolve these issues and have in fact resolved many of them. Additionally, the government has provided Defendant with paper copies of discovery indexes and specific documents he has requested and will continue to accommodate any reasonable requests he makes in the future. Lastly, and perhaps most important to Defendant's professed desire to prepare his defense, Defendant has access to very experienced standby counsel who can assist him with filing, access to filed documents on PACER, legal research, and document review—a valuable resource that Defendant has expressed an unwillingness to use at recent hearings. Standby counsel can also help to arrange interviews with any witnesses who agree to speak with defendant. Courtesy copies of all of the Government's filings are provided to Kowalski in a printed format at the MCC.

"[T]he Constitution does not entitle a criminal defendant to interview potential witnesses or take their depositions before trial." *Linder v. United States*, 937 F.3d 1087, 1090 (7th Cir. 2019), cert. denied, 141 S. Ct. 159, 207 L. Ed. 2d 1097 (2020). As a result, Defendant's claim that his incarceration violates his right to compulsory process fails. The same is true of Defendant's claim that his incarceration interferes with his access to witnesses. Defendant can contact witnesses with the assistance of standby counsel. *See United States v. Agostino*, 132 F.3d 1183, 1191 (7th Cir. 1997) ("[T]he inability of a defendant to interview witnesses is a constitutional problem only if the state artificially restricted the defendant's ability to obtain evidence.") Kowalski's various motions for release are denied.

## MOTIONS SEEKING SPECIFIC TOOLS TO PREPARE DEFENSE

[Dkt. 520] [Dkt. 684] Theses motions request the use of a copy service to make hard copies of certain documents that Kowalski wishes to use at trial. The Court has repeatedly told Kowalski that he may give a list of documents to his standby counsel who can get them printed

37

for him.  Kowalski has refused to work with his current standby counsel, Mr. Steven Shanin, however, and so once again, this is a situation of his own making.  The motion to make copies of certain documents in preparation for trial is granted.  Kowalski shall tell Mr. Shanin what he needs to be in hard copy format and Mr. Shanin may use CJA funds to make copies for him.

[Dkt 524]  This motion seeks 22 specific items from the Government which the Government has either turned over already or does not have. The following materials, according to the Government, have all been tendered to Defendant and a letter explaining where to find them was also provided to him:  (Dkt. 695)

1. All records relating to the records of the FDIC professional liability investigation.

2. The identity of and all information pertaining to those 17 WFB accounts of John F. Gembara identified by Mr. Fong. Included but not limited to Gembara Ins Agency as well.

3. All agreements of Robert to assume WFB loans and mortgages.

4. "OMIT LIST" prepared by Jane Tran (Iriondo).

5. All Financial Records removed from the Park Ridge Police Department custody pertaining to the death scene investigation of John F. Gembara by Special Agents of FDIC.

6. List of Questions OCC auditors gave to John Gembara (2017)

7. The identify of all WFB depositors who were not 100% whole by FDIC for their lost deposits.

8. Loan Payment histories OCC obtained from Ms. Torres, November 2017.

9. All Information for all of John Gembara's phone accounts including home numbers.

10. All R.E. Tax payments and negative escrow payments made through "Ghost Loan Accounts" 18362-18370.

Other items that Kowalski seeks in this motion are not in the Government's possession, but he may use a trial subpoena to obtain them. The Court is satisfied with the written response from the government that the items he is seeking that are available to him have been provided to him. (Dkt. 695 and Ex. A thereto). The motion is thus dismissed as moot. The Court notes that this motion was filed eight months ago, once again demonstrating that Kowalski in truth has been accessing files and reviewing them in order to make such a detailed request.

[Dkt. 540] In this discovery motion, Kowalski seeks to have all fabricated documents identified by the government and to essentially require the government to abide by its *Brady* obligations. The Court is doing just that. Through the multiple hearings on discovery, the Court is ensuring that Kowalski has all of the discovery. The Court is assured that the discovery has been tendered and that the Defendant has received numerous letters and directions in the form of a table of contents to direct him as to where various documents are located. This is above and beyond what the prosecutor is required to do. *United States v. Gray*, 648 F.3d 562 (7th Cir. 2011) ("The government is not obliged to sift fastidiously through millions of pages (whether paper or electronic). It is under no duty to direct a defendant to exculpatory evidence [of which it is unaware] within a larger mass of disclosed evidence.") (internal quotations omitted).

[Dkt. 593] Kowalski seeks to have a listing of thirty-three items in the indictment identified for him. In reality, he is seeking a bill of particulars alleging that he does not know what the false loans are. The Court has denied the motion for a bill of particulars because this speaking indictment and the evidence supporting it have been provided to defendant. To the extent that the Government intends to rely on specific loan files at trial, the Court directs the Government to provide defendant with a list of those files on or before 9/12/22. This will narrow the amount of review that defendant needs to do prior to trial.

[Dkt. 599]  Kowalski has a laundry list of items that he is seeking from the Government. This is not filed as a motion and therefore will not be addressed as such.  The Defendant and the Government shall speak to determine what, if anything, is in the Government's possession that has not yet been given on the list.

[Dkt. 609]  Kowalski seeks certain items that the Government has already turned over. See Dkt. 666.  Motion is denied as moot.

[Dkt. 614] [Dkt. 657] [Dkt. 665] In these motions, Kowalski is seeking various tools that he believes he is entitled to in order to prepare for his defense.  He seeks:  1) a computer; 2) a computer with spreadsheet capacity so he can compare exhibits; 3) a color printer; 4) Illinois law access; 5) internet access; 6) a printer and toner; 7) bankruptcy law access; 8) cell phone to contact witnesses; 9) access to Robert's own records; 10) calculator; 11) filing cabinets; 12) access to public records PACER; and 13) all other materials that are customarily used to prepare for a defense.  It is important to understand the space that has been provided to Kowalski.  He has been given a room with a computer and table to review his discovery.  He has been given stand-by counsel to aid him.  He has been given monthly status hearings to review the discovery issues with the Court.  He has access to a law library.  He has access to prison telephones. Therefore, there are no items that he requests that he does not have the ability to use.  He can seek to obtain various laws through the library and through his standby counsel.  He can use his standby counsel to contact witnesses, make copies of documents for him, and provide cases or law that he may need.  *United States v. Moya-Gomez*, 860 F.2d 706, 740 (7th Cir. 1988) ("The appointment of standby counsel is a well-recognized safeguard when a defendant elects to proceed *pro se* and one that should be employed on a regular basis."); *see also* "Obligations of

Stand-By Counsel," American Bar Association, Standards for the Defense Function, Standard 4-5.3.[2] Motion is denied.

[Dkt. 752] The Court directs the Government to provide the Court with a status report from the MCC regarding defendant's access to his computer on or before 8/25/22.

[Dkt. 772] Kowalski seeks to have the Government identify the fraud for him and to provide him with all Brady material that he believes they are hiding. The Court has continually held statuses for Kowalski to ensure that he is getting his discovery and the AUSAs have repeatedly informed the Court that they are aware of their Brady obligations and will turn over any material pursuant to that obligation as it becomes available. Nothing more is required. *United States v. Warren*, 454 F.3d 752, 759 (7th Cir. 2006) ("As the district court recognized, [the defendant] is simply unable to point to any specific evidence, exculpatory or otherwise, withheld by the government. Without that, his *Brady* claim fails to get off the ground.")

## MOTIONS SEEKING TO MODIFY PROTECTIVE ORDER

[Dkt. 349] [Dkt. 413] [Dkt. 416] [Dkt. 625] Kowalski seeks to modify the Superseding Protective Order Governing Discovery to allow him to disseminate discovery materials, including a law enforcement report of an interview of a judge, and materials obtained from Illinois Attorney Registration and Disciplinary Commission ("IARDC") files of Robert and Jan Kowalski. Pursuant to the governing order, the materials were marked as "sensitive", but Kowalski wants to give the law enforcement report of the judge's interview to the "Judicial Inquiry Board," the "Illinois Supreme Court," in "a proceeding to vindicate Robert's civil rights," and/or to allow the document to be used in "Robert's Divorce [case]." Dkt. 416 at 4. Defendant argues that he should be allowed to disclose the information from the IARDC to the Illinois Supreme Court because of alleged wrongdoing by a judge who filed complaints regarding the

---

[2] *Available at* https://www.americanbar.org/groups/criminal_justice/standards/DefenseFunctionFourthEdition/.

Kowalski's to the IARDC. Dkt. 413 at 6. Once again, the two proposed uses that Kowalski has set forth have nothing to do with his criminal case and do not support any theory of the defense. Pursuant to the order that he agreed to abide by, he is permitted to use this material in preparation of his defense and to show possible defense witnesses but not to disseminate the materials to third parties for completely unrelated reasons. Kowalski has the misconception that his criminal discovery is somehow like civil discovery that he can use in other litigation, but that is precisely why the protective order is in place. The motions to modify the protective order are denied.

[Dkt 611] Kowalski seeks to have the trial loan balances provided to the media. The trial loan balances contain the names, addresses (often residential addresses), and social security numbers of hundreds of Washington Federal customers who have not been charged with any wrongdoing. The protective order properly restricts this type of sensitive information from public access. Even the "blurry" version of the trial loan balance described by defendant contains text that is still somewhat legible. The protective order does not prevent defendant from using these trial loan balances as part of his defense, including in sealed filings or at trial (provided it is redacted in accordance with Federal Rule of Criminal Procedure 49.1). The motion is denied.

[Dkt. 702] [Dkt. 741] Kowalski again seeks to modify the protective order in this case. This time he seeks to turn over material from his divorce proceeding that he believes shows a vast judicial conspiracy. This material is not relevant to the matters being charged and Defendant may not breach the Protective Order to use the evidence for his own personal civil lawsuit. Motion is denied.

## MOTIONS TO RECONSIDER

[Dkt. 787] Kowalski seeks to have this Court reconsider its recusal order entered in Dkt. 778. The same false accusations are contained in the motion to reconsider and therefore it is denied.

[Dkt. 491] Kowalski seeks to have this Court reconsider the order regarding his access to the law library. This motion is one of many that the Court has held repeated hearings on. Specifically, the Court has made certain that the MCC is allowing Kowalski access to his discovery materials and the library. The status hearings have consistently assured the Court that Kowalski's access has been unprecedented at the MCC. Further, Kowalski is told at each status that he can always ask his standby counsel for help with the law—something he refuses to do. The Seventh Circuit has "consistently held that when a defendant (pretrial detainee) is offered the assistance of appointed counsel and refuses the same, no constitutional right exists mandating that the prisoner in the alternative be provided access to a law library should he refuse the services of court-appointed counsel." *U.S. v. Chapman*, 954 F.2d 1352, 1362 (7th Cir. 1992) (also rejecting an ineffective assistance of counsel claim and observing that "the record reflects that [defendant] repeatedly refused to cooperate with standby counsel…and that the district court cautioned [defendant] that he was squandering a valuable resource."); *see also U.S. v. Byrd*, 208 F.3d 592 (7th Cir. 2000) ("The short answer to his complaint [that defendant was denied access to a law library] is that when a person is offered appointed counsel but chooses instead to represent himself, he does not have a right to access to a law library.")

[Dkt. 667] Defendant moved this Court to reconsider the denial of his judicial estoppel claim. The motion is denied because of Defendant's fundamental misunderstanding of the difference between the FDIC-OIG's investigation that led to these criminal charges and the

regulatory role of the FDIC in general. Discrepancies between the two do no negate the charges returned by the grand jury.

## MOTION FOR BILL OF PARTICULARS

[Dkt. 595] Kowalski seeks to obtain a Bill of Particulars to be sufficiently appraised of the charges against him and alleges that the Fourth Superseding Indictment is too vague to do so. To the contrary, the Fourth Superseding Indictment in this case is 82 pages long and is a speaking Indictment. (Dkt. 534). It explains in detail the alleged conspiracy and scheme charges. The charging document explains the process of the crime, the manner in which it was conducted, and by whom. The Government has further provided hundreds of thousands of pages of documents to support the charges. The indictment is not required to "detail every factual nugget necessary for conviction", nor is it required to "allege in detail the factual proof that will be relied on to support the charges." *United States v. Smith*, 230 F.3d 300, 306 (7th Cir. 2000). The Fourth Superseding Indictment, which Mr. Kowalski had formally read to him in its entirety in Court (Dkt. 583), lays out the elements of the charged offenses, gives sufficient notice of those charges to allow Kowalski to prepare a defense, gives the time and place of his allegedly criminal conduct, and cites to the applicable statutes. No more is required. *United States v. Vaughn*, 722 F.3d 918, 927 (7th Cir. 2013). Kowalski's constitutional right to know the charges against him may also be fulfilled by the Government turning over the information supporting the charges. The Seventh Circuit has "recognize[d] the importance of ensuring that a defendant has sufficient information about his charges to allow him to prepare an adequate defense, but [] have also explained that a bill of particulars is unnecessary if the information the defendant seeks is readily available through alternate means such as discovery." *Vaughn*, 722 F.3d at 928. Based on

the amount of detail in the Fourth Superseding Indictment and the extensive discovery provided

to Kowalski in this case, his Motion for a Bill of Particulars (Dkt. 595) is denied.

## MOTIONS TO SUPPRESS

[Dkt. 512] Kowalski seeks suppression of all evidence obtained from three search

warrants, based on his belief that a special agent from the FDIC-OIG is not a law enforcement

agent. An agent from the FDIC-OIG was the affiant on multiple search warrants executed as part

of the Government's investigation into the failure of Washington Federal. In his November 23,

2021, Motion to Suppress, Kowalski argues that the three searches are unreasonable because the

warrants were not supported by oath or affirmation of a duly authorized law enforcement officer

as required by the 4th Amendment.

The Inspector General Act of 1978 (the "Act"), 5 U.S.C. Appendix § 1, et seq. directly

provides law enforcement authority to the FDIC-OIG. The Act (through amendment by the

Homeland Security Act of 2002, 107 P.L. 296) enables the Attorney General to authorize

Inspectors General (and qualified personnel working under their direction) to, among other

things, seek and execute search warrants. See 5 U.S.C. Appendix § 6(f)(1) ("In addition to the

authority otherwise provided by this Act, each Inspector General, any Assistant Inspector

General for Investigations under such an Inspector General, and any special agent supervised by

such an Assistant Inspector General may be authorized by the Attorney General. The Act also

provides law enforcement authority to the Inspector General of other agencies, including the

Department of Treasury and the Department of Housing and Urban Development. See 5 U.S.C.

Appendix § 6(f)(3). Law enforcement agents from Department of Treasury – OIG and

Department of Housing and Urban Development – OIG also participated in the investigation of

Washington Federal. Attorney General Ashcroft authorized qualifying personnel in offices of

presidentially appointed Inspectors General (including the FDIC-OIG) to exercise the powers set forth in § 6(f)(1)2 in a December 8, 2003, memorandum. (See Exhibit A, 12/8/2003 Guidelines for Offices of Inspector General with Statutory Law Enforcement Authority memorandum, §§ III and V.) In swearing out the three search warrants at issue here, the FDIC-OIG Special Agent was performing his duties with powers provided by Congress and authorized by the Attorney General of the United States. Defendant's Motion to Suppress is denied.

[Dkt. 503] Kowalski seeks to enjoin the FDIC for its investigation for the same reasons as he sought to suppress evidence obtained by them. For the reasons denying his motion to suppress (Dkt. 512), the motion to enjoin (Dkt. 503) is also denied.

[Dkt. 519] Kowalski argues in this motion that a particular document was "extremely pixelated" and argues that this material was bring provided to him in this format to conceal exculpatory Brady material. This Court addressed the particular loan balance sheet that Kowalski believes is altered and the AUSA has provided him with another version of the balance but explained the reason for the blurry nature of the document. *See* Dkt. 658 at 2-3. The material has been provided to him and if he believes he can use it to his defense, he may. He cannot, however, assume that merely because it was difficult to read that there is material being hidden from him. This was addressed in open court and is therefore dismissed as moot.

[Dkt. 690] In this motion, Kowalski seeks to exclude what he calls unreliable evidence. This argument is also woven throughout many of his motions. In a nutshell, Kowalski asserts that because the bank records were manipulated as part of the fraudulent scheme, they cannot be used against him because they are not accurate. Of course, this would mean that any misrepresentation contained within a document could not be presented to the jury in any fraud case. The Government is required to present evidence to support the elements of the charges and

they presented the altered bank documents to show the conspiracy to embezzle. Kowalski can argue against them at trial if he so chooses but that does not make them inadmissible. Nor can they be overly prejudicial if they are in fact the evidence of the crime. *United States v. Thomas*, 986 F.3d 723, 728 (7th Cir. 2021) ("Direct evidence of a crime is almost always admissible against a defendant" and is not "other act evidence." *United States v. Gorman*, 613 F.3d 711, 717 (7th Cir. 2010); *United States v. Bradford*, 905 F.3d 497, 506 (7th Cir. 2018) ("Evidence that 'tend[s] to prove the elements of the offense' does not violate Rule 404(b)."). Motion is denied.

## MOTIONS REGARDING CONDITIONS OF CONFINEMENT

[Dkt. 539] [Dkt 594] [Dkt. 621] [Dkt. 686]  Kowalski seeks to enjoin the lockdown practices at the MCC. This motion was filed in the last month of 2021 when the MCC had lockdown due to the COVID-19 pandemic. The pandemic required the MCC to isolate those who were ill with the virus from others and often required the facility to go on lockdown.  These lockdowns were done for the safety of all pretrial detainees.  They were temporary and Kowalski was able to return to his discovery review when they were completed.  *See, e.g., Matter of Extradition of Carr*, 2020 WL 4816052, at *6 (N.D. Ill. Aug. 18, 2020) (noting that additional challenges that COVID-19 prison lockdown posed for defendant's participation in defense preparation not persuasive to meet extraordinary standard for extradition bail); *c.f. Donald v. Pruitt*, 853 Fed. App'x 230, 234 (10th Cir. 2021) (denying that COVID-19 restrictions on in-person meetings and accessing prison law library for several weeks prevented habeas petitioner from timely filing motion). For many months now, Kowalski has been able to work at the discovery and therefore his motion is denied.  Further, to the extent that he wants to complain of unconstitutional conditions, he is required to exhaust his administrative remedies by filing a

grievance through the facility's grievance process. If he does not receive a satisfactory response, he can file a separate civil rights lawsuit if he believes it has merit. *See* Prison Litigation Reform Act of 1995, 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."); *Ross v. Blake*, 578 U.S. 632, 638-39 (2016) (holding that PLRA requires inmates to exhaust all available administrative remedies before pursuing litigation).

## MOTION TO DISQUALIFY

[Dkt. 489]   Kowalski has moved numerous times to have the Court recuse herself for bias. In this motion he cites to eleven reasons that he believes show bias: 1) the Court's awareness that the bank president committed suicide which he believes came from an extrajudicial source such as the press; 2) the Executive Committee's order requiring US Marshal escort when entering the federal building "exerts a prejudicial extrajudicial pull" on the Court's decisions; 3) the prosecutors reliance on a billboard posted in a previous case which included the language "Indict Castillo" and a picture of a noose which was an attempt to make the Court believe that Kowalski is a judge hater; 4) the Court's previous ruling in *Kowalski v. Boliker*, 893 F.3d 987 (7th Cir. 2018) within which he believes the Court was chastised for her actions with Kowalski and therefore the Court has "robe rage payback"; 5) his belief that the Court is hostile to him; 6) the pretrial publicity regarding a related case regarding Patrick Daley Thompson; 7) the Court's reliance on the Pretrial Service Officer's reports and recommendations; 8) the Court's original bond restrictions; 9) the Court's order regarding bond revocation and detention; 10) the Court's alleged effort to prevent his defense by jailing him; and 11) the Court ordering a mental evaluation of the defendant.

None of the allegations made by Kowalski rise to the level of recusal under the statute. 28 U.S.C. 455(a). The vast majority of the allegations are Kowalski's indignation at the Court's rulings such as his bond and his subsequent detention.  Judicial rulings cannot form the basis for recusal without more. *Thomas v. Dart*, 39 F.4th 835, 844 (7th Cir. 2022) ("By itself, an adverse judicial ruling does not provide a valid basis for questioning a judge's impartiality."); *see also United States v. Perez*, 956 F.3d 970, 975 (7th Cir. 2020) ("In addition, a judge's 'ordinary efforts at courtroom administration' or docket management are 'immune' from claims of bias or partiality.")   As for his accusation that the Court somehow received outside information regarding the death of Mr. Gembara, the defendant himself spouted about the death within the first appearances before the Court and the Court reviewed discovery material *in camera* at the request of the Government before it was turned over.  There was no outside material relied upon; but more importantly, that information did not impact any ruling or action by the Court so it can hardly be deemed prejudicial.  As for the matter involving Judge Castillo and the billboard, that information was provided to the Court during a detention hearing to show the lengths that the defendant goes to when he is frustrated with a court's rulings and that action required the intervention of U.S. Marshals showing that the defendant has little respect for judges or the judicial process.  As for the Patrick Daley Thompson matter, the case was assigned to a different judge and the only person who has ever brought it up was Mr. Kowalski himself and so it cannot possibly be the basis for recusal.

[Dkt. 768] Finally, Kowalski's accusation that this Court would take some umbrage based on the language in a Seventh Circuit opinion is merely frivolous argument.  After sixteen years on the bench, the Court is perfectly capable of being given direction from the appellate court and coming back wiser from the benefit of it.  This Court dismissed the *Boliker* case after

allowing the defendant an opportunity to argue his response on the record in open court for 30 minutes. Finding that there was no basis to keep the case after that argument, the Court dismissed. The rule requires the Court to give the defendant an opportunity to respond—it does not require such a response be in writing. Regardless, after reading the response that was filed, that the Seventh Circuit said should have been allowed, the Seventh Circuit agreed with this Court and affirmed the dismissal. The written response mirrored the oral argument in court. Nothing in the *Boliker* opinion has caused this Court to have feelings against Mr. Kowalski.

## MOTIONS REGARDING FDIC

[Dkt. 676] Kowalski moves to stay all FDIC civil proceedings related to Washington Federal Bank loans while this criminal matter proceeds because he alleges that the FDIC is acting in bad faith. First, this motion is inappropriately filed before this Court. Each court "has broad discretion to stay proceedings as an incident to its power to control its own docket." *See Clinton v. Jones*, 520 U.S. 681, 706 (1997); *Trippe Mfg. Co. v. Am. Power Conversion Corp.*, 46 F.3d 624, 629 (7th Cir. 1995). Although he cites no specific case in his motion to stay, the Court assumes Kowalski is referring to *Doherty v. Washington Federal Bank for Savings et al.*, Case No. 18-CV-00703. *Doherty* was reassigned to this Court on May 27, 2022, over two months after Kowalski submitted this motion to stay. (Dkt. 676). Despite both matters being before her, the Court will not unilaterally stay a civil suit in response to a motion by someone who is not even a party to the case. While there are circumstances where a court may stay parallel civil litigation "if the interests of justice require it," those circumstances are not proven here. *Chagolla v. City of Chicago*, 529 F. Supp. 2d 941, 945 (N.D. Ill. 2008) (citing *United States v. Kordel*, 397 U.S. 1, 12 n. 27 (1970)). When a party faces the decision of whether to claim the privilege against self-incrimination in a civil proceeding while a parallel criminal proceeding is

ongoing, a court may stay the civil proceeding.  Still, such circumstances do not require a stay. *Chagolla*, 529 F.Supp. 2d at 945; *see also United States v. Certain Real Property, Commonly known as 6250 Ledge Road, Egg Harbor, Wis.*, 943 F.2d 721, 729 (7th Cir. 1991) ("[A] stay contemplates special circumstances and the need to avoid substantial and irreparable prejudice. The very fact of a parallel criminal proceeding . . . d[oes] not alone undercut [a defendant or claimant's] privilege against self-incrimination, even though the pendency of the criminal action force[s] him to choose between preserving his privilege against self-incrimination and losing the civil suit.")  (quoting *United States v. Little Al*, 712 F.2d 133, 136 (5th Cir. 1983)) (internal quotations marks and citations omitted).  Kowalski has not asserted a concern based on the Fifth Amendment, and nothing before the Court suggests he would be forced to make such a decision absent a stay of proceedings.  Kowalski is not a party to the civil proceeding, and therefore can preserve the privilege not to self-incriminate without risking loss in the suit.  The motion is denied.

## MOTION FOR RETURN OF PROPERTY

[Dkt. 697]  Kowalski seeks the return of an Asus computer tower, $9,900 in currency, and various items that were seized from his truck with a search warrant.  The Government reports that it is no longer in the possession of the computer because it was turned over to a forensic examiner employed by the Federal Defender Program on defendant's behalf, pursuant to an order of this Court intended to facilitate the defendant's access to a copy of the files on the tower computer. See Dkt. 574. As the tower computer is no longer in the possession of the government, the government cannot return the computer to defendant. *See Stevens v. United States*, 530 F.3d 502, 503-04 (7th Cir. 2008) (no relief is available under Rule 41(g) if the government no longer possesses the property). The Government intends to turn over the $9,900

in currency to the bankruptcy court because the trustee believes the funds to be part of the bankrupt estate. Kowalski can challenge that issue in the bankruptcy court. Defendant also seeks return of the following items: (1) Alcatel cell phone; (2) "I" phone; (3) various items seized from the truck. For the cell phones, defendant has been provided with the reports of forensic examination for the phones. For the other items, defendant has been provided in discovery with photocopies of those items. The government retains the phones and the documents because they contain evidentiary value, and some of these items may be marked as exhibits for trial. Because defendant has been provided with copies of these records, he will be able to utilize the copies to prepare his defense. Defendant has not articulated a reason that the copies of the records are insufficient for trial preparation. Accordingly, defendant's motion for return of these records should be denied. *See In re Search of 2847 East Higgins Road, Elk Grove Village, Ill.*, 390 F.3d 964, 968 (7th Cir. 2004) (defendant's Rule 41(g) motion was properly denied for records seized pursuant to a search warrant, when the government provided defendant "access to the records" to make copies or to conduct other examinations if he desired). Motion to return property is denied.

## MOTION TO PROCEED IFP ON APPEAL

[Dkt. 674] Kowalski seeks to proceed *in forma pauperis* on appeal of the Court's denial of his recusal motions and motions for release. (Dkts. 635, 643, 645). A party may commence an appeal without prepayment of fees under 28 U.S.C. § 1915(a) if he is indigent and the appeal is taken in good faith. Federal Rule of Appellate Procedure 24 sets forth similar requirements. Under Rule 24(a)(1), a party who wishes to proceed *in forma pauperis* on appeal must attach an affidavit that (1) shows that the party cannot pay the filing fee; (2) "claims an entitlement to redress;" and (3) "states the issues that the party intends to present on appeal." Fed. R. App. P.

52

24. To establish good faith, which is required by both § 1915(a)(3) and Rule 24(a)(4)(B), a party seeking leave to appeal in forma pauperis must demonstrate to the district court that a reasonable person could suppose that the appeal has some merit. *Walker v. O'Brien*, 216 F.3d 626, 632 (7th Cir. 2000); *see also Lee v. Clinton*, 209 F.3d 1025, 1026 (7th Cir. 2000).

There is no good faith basis to appeal this Court's refusal to recuse because there is no basis for recusal. As the Court noted above, much to the chagrin of defendant, the Court does not have any personal animosity against him. The Court has gone above and beyond all other defendants in this case and most others to ensure that his constitutional rights are being protected. His special treatment at the MCC, the special hearings regarding evidence, and this Court's patience in listening to his many minutes of argument are evidence that the Court is impartial. Although Kowalski believes that the Court has animus due to his prior case because he believes that the Court was chastised by the Seventh Circuit, this Court has never had a problem with accepting the appellate court's direction in opinions and legal rulings cannot form the basis for recusal. Finally, as noted above, all of the other motions for recusal are simply fanciful stories that Kowalski has made up to delay his trial and they are frivolous. Motion to proceed in forma pauperis on appeal is denied.

## MISCELLANEOUS MOTIONS

[Dkt. 362] The Government moves to supplement the record on appeal. This appeal was dismissed and therefore the motion is moot.

[Dkt. 360] Kowalski moved to quash grand jury subpoenas issued to him for various entities of which he is alleged to be the record keeper. *Braswell v. United States*, 487 U.S. 99, 108-10 (1988) ("[A] corporate custodian such as petitioner may not resist a subpoena for corporate records on Fifth Amendment grounds. … the Court has consistently

recognized that the custodian of corporate or entity records holds those documents in a representative rather than a personal capacity. Artificial entities such as corporations may act only through their agents, *Bellis, supra,* 417 U.S., at 90, 94 S.Ct., at 2184, and a custodian's assumption of his representative capacity leads to certain obligations, including the duty to produce corporate records on proper demand by the Government. Under those circumstances, the custodian's act of production is not deemed a personal act, but rather an act of the corporation. Any claim of Fifth Amendment privilege asserted by the agent would be tantamount to a claim of privilege by the corporation—which of course possesses no such privilege.") Therefore, Kowalski cannot object on any Fifth Amendment privilege ground.

Kowalski claims that any materials that the Government seeks contain attorney client privileged materials that the Government has already seized. This attorney client privilege dance has played out in the courtroom over months of discovery statuses where the AUSAs have correctly followed the procedure for reviewing materials where some of them may be privileged. The trial attorneys have walled themselves off from a taint team of attorneys who have reviewed the materials for any privileged materials. *See, e.g.,* Department of Justice U.S. Attorney Manual 9-13.420, "Searches of Premises of Subject Attorneys." (describing "procedures to be followed to ensure that the prosecution team is not "tainted" by any privileged material inadvertently seized during the search.") The Court gave Kowalski more than one deadline to inform the Government about any client materials within the files that are protected, and he failed to do so. Finally, at a recent status, he identified two clients. The Government has agreed to protect any materials that are privileged as to these clients through the taint team. The motion to quash the subpoenas is denied.

54

[Dkt. 398] Kowalski seeks to have the Court appoint him a forensic accountant to aid him in his defense. He wants the forensic accountant to ferret out the fraud that is contained within the documents. The Court has provided Kowalski with stand-by counsel who can review the bank records to determine their accuracy. Kowalski has failed to present a theory of defense that the forensic accountant could support. The speaking indictment explains in detail how the fraud was allegedly conducted and the witness statements that have been provided to Kowalski further explain the scheme. This should be sufficient to aid him in his defense without the need for an accountant. *U.S. v. Boros*, 636 Fed. App'x 688, 691 (7th Cir. 2016) (finding that denial of funds for a forensic accountant could not be abuse of discretion where the defendant did not identify a plausible defense and also observing that "[p]reviously in dictum we have questioned whether a defendant who chooses to represent himself has any right to investigative assistance."); *see also U.S. v. Winbush*, 580 F.3d 503, 509 (7th Cir. 2009) ("[A] district court should satisfy itself that the defendant has a plausible defense before granting a request for expert assistance.") Motion denied.

[Dkt. 488] Kowalski seeks to have the Executive Committee order that was entered by then-Chief Judge Ruben Castillo in October 2018 vacated. The order required that Kowalski be escorted while in the building due to his previous loud and disruptive behavior. This Court has no jurisdiction over the Executive Committee's order; and regardless, that order is now moot based on Kowalski's detention. Motion to vacate the Executive Committee order is dismissed for lack of jurisdiction.

## CONCLUSION

The previous 90 motions are denied in part and granted in part as set forth above. No further pretrial motions will be permitted. The date for the filing of motions *in limine* for the jury trial is past.

Virginia M. Kendall
United States District Judge

Date: August 17, 2022