```
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION

 3    UNITED STATES OF AMERICA,         )   Docket No. 19 CR 00226-1
                                        )
 4                     Plaintiff,       )   Chicago, Illinois
                                        )   February 13, 2023
 5             v.                       )   9:15 a.m.
                                        )
 6    ROBERT KOWALSKI,                  )
                                        )
 7                     Defendant.       )

 8                               VOLUME 1-A
 9             TRANSCRIPT OF PROCEEDINGS - Jury Trial
         BEFORE THE HONORABLE VIRGINIA M. KENDALL, and a Jury
10

11    APPEARANCES:

12
      For the Government:     UNITED STATES ATTORNEY'S OFFICE by
13                            MR. BRIAN P. NETOLS
                              MR. JEREMY C. DANIEL
14                            MS. KRISTIN M. PINKSTON
                              Assistant United States Attorneys
15                            219 South Dearborn Street, 5th Floor
                              Chicago, Illinois  60604
16

17    For the Defendant:     MR. ROBERT KOWALSKI, Pro Se

18
      For the Defendant      MR. STEVEN R. SHANIN
19    as Standby Counsel:    53 West Jackson Boulevard, Suite 920
                             Chicago, Illinois  60604
20

21
      Court Reporter:        GAYLE A. McGUIGAN, CSR, RMR, CRR
22                           Official Court Reporter
                             219 S. Dearborn Street, Room 2504
23                           Chicago, IL 60604
                             312.435.6047
24                           gayle_mcguigan@ilnd.uscourts.gov

25
```

1

2                                   I N D E X

3                                                                      Page

4    Jury Selection                                                     11

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          (In open court.)

 2          (Judge Kendall attends to other matters.)

 3          THE COURT:  I will come back on the trial issue for

 4    the parties.  There's one motion I haven't ruled on.  It's

 5    Mr. Kowalski's motion about "takeover."  So when I come back,

 6    I'd like to talk with you about that.

 7          (Judge Kendall attends to other matters.)

 8          THE COURT:  Do you have the printouts of the rulings?

 9    You can give them to Mr. Kowalski in case he didn't get them

10    last night.

11          (Document tendered to Mr. Kowalski.)

12          (Judge Kendall attends to other matters.)

13          THE CLERK:  19 CR 226, U.S. versus Robert Kowalski.

14          MR. DANIEL:  Good morning, your Honor.  Jeremy Daniel,

15    Kristin Pinkston, and Brian Netols on behalf of the

16    United States.

17          THE COURT:  Good morning.

18          MR. KOWALSKI:  Good morning, your Honor.  Robert

19    Kowalski.

20          THE COURT:  Good morning.

21          Okay.  There's one outstanding motion that I

22    believe -- Mr. Kowalski has a motion *in limine* to keep out this

23    term "takeover."

24          If you could respond to that.  I wasn't sure whether

25    you were going to use it or not.
```

1          MR. DANIEL:  Yes, your Honor.

2          The government did file a response last night, Docket

3     Number 886, but I'll argue the motion now.

4          The Court should deny this motion for two reasons:

5          One, it's an accurate term.  The context here is that

6     the defendant would contact customers of the bank who were

7     behind on their mortgage, and he would present them with

8     paperwork purporting to act on behalf of the bank where the

9     customers would do a deed-in-lieu-of-foreclosure transaction,

10    meaning they would give the property or the collateral back to

11    the bank and the bank would release the loan.  But instead of

12    giving the property back to the bank, the defendant would

13    divert it to himself, usually in the name of a land trust.

14    Defendant wouldn't pay the bank for the property, and the

15    defendant would not take over the loan.  He'd just take over

16    the property.

17          THE COURT:  Okay.

18          MR. DANIEL:  The definition of "takeover" is to assume

19    control of, and that's what he did.  So it's an accurate term.

20          Then we get into the second point, which would be it's

21    a factual question for the jury.  The government contends that

22    the defendant took over these properties by diverting it to

23    himself instead of having the property returned to the bank.

24    Defendant contends that it's a lawful transfer through a

25    deed-in-lieu process.

1          It's the jury who will decide which is which.

2          Finally, your Honor, with respect to the term

3    "takeover," I think the defendant kind of trips himself up in

4    his own motion.  He -- it's necessary for him to add adjectives

5    to it, to describe it as "hostile" and "nefarious," just to

6    import some sinister meaning to the word "takeover," which

7    suggests the term itself, standing alone, has no sinister

8    meaning.  And if you look at its plain and ordinary meaning, it

9    just means to assume control of, which is a mouthful.

10   "Takeover" is an accurate, shorter, more concise way to refer

11   to it.

12          THE COURT:  Okay.  Mr. Kowalski?

13          MR. KOWALSKI:  Well, this indictment charges purported

14   loans.  And there's a specific way in the Illinois Mortgage Act

15   that provides for taking over loans.  It's called assuming a

16   mortgage.  And it's basically a statute of frauds.  You need to

17   have a signature of the lender, and you need to have a

18   signature of the borrower.

19          If I took over a loan, well, they would have a

20   signature somewhere, which they don't.  I -- it's not a

21   takeover.  Takeover is maybe a street term, I'm taking over a

22   street corner.  But I think it's just entirely prejudicial and

23   doesn't comport with the law.  The law is we need a signature,

24   and there's no foundation for these takeovers.

25          "Takeovers" is something maybe kids would talk about.

1    But as a term of art used in a courtroom, it doesn't comply

2    with what I did as an attorney.  And I am a licensed attorney.

3    These -- many of these transactions were deed in lieu of

4    foreclosures.

5            And, yes, many of them went into a land trust.  And a

6    land trust is not an entity.  It's an instrument that allows

7    property to be conveyed.  It assists that.  It's unique to

8    Illinois.

9            So I don't know about taking over.  I clearly was

10   working for the bank.  I met clients at the bank.

11           So I don't know what Mr. Daniel is saying.  I'm an

12   attorney.  You can't take my hat off.  I've always been an

13   attorney.  I've been an attorney for 30 years.

14           And we need to comply with the Illinois Mortgage Act.

15           Thank you.

16           THE COURT:  Okay.  So those are all factual

17   allegations to defend against their charges.  But the term

18   "takeover" to me doesn't have any prejudicial impact.  In fact,

19   the idea that it is just take control over property, if that's

20   the way it's going to be used, certainly does not in any way --

21           MR. KOWALSKI:  But the problem with that is it implies

22   that there's an obligation to pay a loan, which there is not.

23   So you're saying I'm taking it over.  Well, it wasn't quite

24   taking over somebody's obligation, even though my identity was

25   used to pay everybody's loan in that bank who didn't make a

1    loan payment.

2         THE COURT:  Well, you can cross on that.  You

3    certainly can cross on that.

4         MR. KOWALSKI:  It's prejudicial when you say it's

5    taken over.

6         THE COURT:  Yes, I don't think so.  So the motion is

7    denied.

8         I believe that's the last one.

9         I didn't have -- I ruled on the other motions without

10   the benefit of your response.  I'll see if there's anything

11   else I need to supplement.

12        MR. KOWALSKI:  Your Honor, I have the Chromebook.

13        It's ridiculous that an impoverished man should have

14   to face jail because his doddering standby counsel, who is

15   supposed to aid him, didn't aid him, gave him something that --

16        THE COURT:  Okay.  I've dealt with the Chromebook

17   before.

18        Now, for trial, take off your coat please, unless you

19   get cold.  There's a closet right behind Mr. Shanin, and you

20   can hang it there.

21        And Lynn and Claire, you go ahead and get the jury.

22        We have --

23        MR. KOWALSKI:  The Chromebook has never worked for me,

24   your Honor.

25        THE COURT:  Okay.  We have --

1          MR. KOWALSKI:  I think I'm due a basic tool of a

2     defense, and that is to be able to look at the discovery.  It's

3     given to me for the exculpatory value of it.

4          THE COURT:  Okay.

5          MR. KOWALSKI:  And I can't see it because my

6     standby -- the man who is there to aid me --

7          THE COURT:  Go ahead, please.

8          MR. KOWALSKI:  It's outrageous.

9          THE COURT:  There's 68 jurors that are going to be

10    brought up.  We're going to bring 35 of them in the courtroom.

11          So those of you sitting on this side of the courtroom,

12    if you can move over this way, it would be helpful to me

13    because I'm going to put the jurors on that side.

14          MR. KOWALSKI:  Judge, what can I do with this garbage

15    Chromebook that's -- that doesn't -- it's not compatible with

16    the way the government --

17          THE COURT:  There's been so much discovery handed over

18    to you --

19          MR. KOWALSKI:  I'm an impoverished man.  I should have

20    something that meshed with the --

21          THE COURT:  Okay.

22          MR. KOWALSKI:  -- government's discovery.

23          This man is the most venerable, knowledgeable attorney

24    ever created.  He's a senior mentoring board man.  And he gives

25    me something that was his kid's Chromebook from school, for

1    God's sake?

2            THE COURT:  Okay, go --

3            MR. KOWALSKI:  And I have to face jail because he

4    couldn't do his job?

5            THE COURT:  Okay.

6            MR. KOWALSKI:  And he's your specially chosen one

7    here?

8            THE COURT:  Okay.

9            MR. KOWALSKI:  It's clearly outrageous.  I'm not sure

10   what he was instructing at University of Chicago, but this

11   could never have accessed the government's discovery.

12           THE COURT:  Okay.

13           MR. KOWALSKI:  It's outrageous.

14           THE COURT:  Go ahead and hang up your coat and get set

15   up at the table.

16           Mr. Shanin, you can stay at the back table so that

17   you're available for him if he has any questions during

18   *voir dire.*

19           I want to review with you the way that we do the

20   sidebars, which is that you get these headphones.  I will turn

21   on the white noise.  And then once you have the headphones on,

22   you just go very close to the microphone and speak like this.

23           I don't want any yelling or, you know, loud noises

24   during that because that's the private sidebar where someone

25   might be answering questions of a private nature or something.

1        MR. KOWALSKI:  Judge, we -- I need a continuance, and

2   I need some real hardware that lets me access the

3   government's --

4        THE COURT:  No, it's denied.

5        MR. KOWALSKI:  This is outrageous.  How could he

6   possibly have given me some used Chromebook that --

7        THE COURT:  Okay.  Go hang up your coat --

8        MR. KOWALSKI:  -- wouldn't access anything.

9        THE COURT:  -- and get ready for the jury.

10       MR. DANIEL:  Your Honor, two administrative or

11  logistical items.

12       I previously tendered to the defendant a copy of the

13  response that the government filed last night.  I couldn't

14  overnight it FedEx because --

15       THE COURT:  Sure.

16       MR. DANIEL:  -- it was Sunday.

17       I'm handing him a copy of the amended witness list.

18       The government also filed then, rather than delay and

19  sending stuff through the mail, since Mr. Kowalski hasn't been

20  amenable to receiving things electronically, each day I'll

21  bring up any edits or additions to the exhibit list on a disk

22  and hand them to him in court.

23       THE COURT:  I appreciate that.  Thank you.

24     (Object tendered to Mr. Kowalski.)

25       MR. KOWALSKI:  Oh, come on.  I can't even access it.

Jury Selection

1    How can you give it to me with a straight face?  This is

2    ridic -- this does not work for this.  This is a joke.  I

3    have --

4            THE COURT:  Mr. Shanin, will you take the discovery

5    there from Mr. Daniel for me, please?

6        (Object tendered to standby counsel.)

7            MR. KOWALSKI:  I have -- I printed out a thing.  This

8    is not compatible --

9            THE COURT:  Okay.  This is --

10           MR. KOWALSKI:  -- with the government --

11           THE COURT:  -- my third direction.  Go get your coat

12   hung up and get seated at the table.  And we'll be bringing in

13   the jurors shortly.

14           LAW CLERK:  All rise.

15       (Recess at 9:50 a.m., until 10:08 a.m.)

16           THE CLERK:  Is it all right to bring them in?

17           THE COURT:  It is.

18           THE CLERK:  We have 35 to start.

19       (Prospective jurors enter courtroom.)

20           THE CLERK:  We'll see if we can fit them all on this

21   side, your Honor.  Doesn't look like it, though.

22           THE COURT:  Then maybe the first row.

23           THE CLERK:  We'll have one person in the front row,

24   unless you want to --

25           THE COURT:  You know, let her go all the way over by

Jury Selection

1    the TV, over there.

2            You're fine?  Okay, very good.  Thank you.

3            Please be seated everyone.

4            Good morning, Ladies and Gentlemen.  My name is

5    Judge Kendall.  And welcome to the Northern District of

6    Illinois, to federal court.  It is a pleasure to be back up and

7    running doing jury trials on a regular basis after a little bit

8    of a slow-down.  But you might be happy to know we never really

9    stopped.  We've been doing jury trials for a while, but we're

10   finally back where we can all sit together and be in the jury

11   room again together.

12           Today we're going to be selecting a jury for a

13   criminal trial.  This trial is expected to take a minimum of

14   four weeks, possibly up to six weeks.

15           We have brought you in today with the understanding,

16   based upon your response to my questionnaire, that you're

17   capable of sitting that long.

18           If, for some reason, something has changed during the

19   time that you answered that questionnaire and the time that

20   we're sitting here today, it's incumbent upon you to let me

21   know that.  I'm not going to be asking you about complications

22   or difficulties.  You just raise it with me when I talk with

23   you.  Okay?

24           Today we're going to choose individuals who will sit

25   as a jury of peers, which is part of our Constitution, the

Jury Selection

1    right to have a trial by a jury of one's peers, and it's a

2    fundamental one to our system of criminal justice here in the

3    United States that has endured for over 100 years.

4         We believe in a system that requires that each person

5    be judged by people drawn from all segments of our society,

6    literally a jury of one's peers.

7         You know, you might not be surprised, or you might be

8    surprised, to know that this is a system that is not used

9    around the world.  There's only a few countries that have a

10   jury system like we have.  But our system has been very

11   successful, and it's an important part of our legacy.  And if

12   you are fortunate enough to be chosen as a juror in this case,

13   you will be fulfilling a civic duty that is part of our rights

14   as citizens of the United States.

15        Now, in addition to the right to a trial by jury,

16   there are other laws and other fundamental principles that

17   apply to a criminal case.  And this is a criminal case.  So I'm

18   going to go through some of those with you.

19        This case began with the filing of an indictment.  And

20   an indictment is merely the formal manner in which charges are

21   brought.  It is not evidence of guilt, and it creates no

22   inference of guilt.

23        The defendant here is presumed to be innocent of all

24   charges, and the presumption of innocence stays with him until

25   the jury that is selected begins to deliberate after all of the

Jury Selection

1    evidence is in.

2           The government here will have the burden to prove the

3    defendant guilty beyond a reasonable doubt.  And the defendant

4    is not required at all to prove his innocence, to present any

5    evidence, or to testify in his own behalf.

6           Now, as the judge, it will be my job to determine the

7    law as it applies to this case and to rule on the evidence that

8    you can consider.  So for those of you who will be selected as

9    jurors, it will be your absolute duty to accept my instructions

10   as to the law that I'm going to give you both orally throughout

11   the trial and in writing at the end of the trial.

12          Now, as jurors, if you are selected, it will be your

13   duty to determine what the facts are after you have heard all

14   of the evidence.

15          If you become convinced that the defendant is guilty

16   of the charges in the indictment beyond a reasonable doubt, it

17   will be your duty to find him guilty.

18          And if you are not convinced that the government has

19   proved the defendant guilty beyond a reasonable doubt, it will

20   be your duty to find him not guilty.

21          In making your determination, you must do so only on

22   the basis of the evidence that is presented to you within the

23   four corners of this courtroom and that is admitted into the

24   trial and the applicable law that I instruct you on.

25          The government and the defendant are each both

Jury Selection

1    entitled to fair consideration of the evidence.  And matters of

2    sympathy, prejudice, publicity, or occurrences outside of the

3    courtroom cannot constitute any part of the basis for your

4    verdict.

5            Is there anyone here that has been called in to my

6    courtroom today that has any difficulty with any of those

7    principles that I just set forth for you?

8        (No showing of hands.)

9            THE COURT:  Okay.  Lynn, would you please swear in

10   this jury?

11           THE CLERK:  Of course, your Honor.

12           THE COURT:  My courtroom deputy is going to swear you

13   in because your answers to my questions need to be the truth

14   when I talk to you about whether you can serve on the jury.

15           Go ahead.

16           THE CLERK:  Please stand and raise your right hands.

17       (The venire was sworn.)

18           THE COURT:  Ladies and Gentlemen, this case is called

19   United States of America versus Robert Kowalski.

20           And I'm going to turn to the government first to

21   introduce the team members they have at their table.

22           Mr. Daniel, please?

23           MR. DANIEL:  Good morning.  My name is Jeremy Daniel.

24   I'm an Assistant United States Attorney.  With me are my

25   colleagues, Kristin Pinkston and Brian Netols, who are also

Jury Selection

1    Assistant United States Attorneys.  On the other side of the

2    table are our case agents, Jason Gibson, Jacob Evans with the

3    FDIC, and Kelly Popovits with HUD-Office of Inspector General.

4              Thank you.

5              THE COURT:  Okay.  Thank you.

6              And here on the other side is Mr. Kowalski, the

7    defendant.

8              Mr. Kowalski?

9              MR. KOWALSKI:  Good morning.  I'm Robert Kowalski.

10   I've been an attorney, I've been Bob the builder, I do

11   development work, and I had been a customer at this bank for --

12   since 1972 when my parents made a mortgage payment.  And this

13   bank failed not because of me, because of other issues

14   pertaining to their auditing procedures --

15             COURT REPORTER:  I'm sorry, I cannot hear the --

16             THE COURT:  He said, "The bank failed not because of

17   me but because of other issues," and then I didn't hear the

18   end.

19             Okay, Ladies and Gentlemen, Mr. Kowalski has chosen to

20   represent himself in this matter.  He is permitted to do so if

21   he wants to do so.  The fact that he is representing himself

22   should not impact you in any way or your decisions in any way.

23             Now, do any of you know any of the people that the --

24   at the prosecutor's table or Mr. Kowalski?

25             (No showing of hands.)

Jury Selection

1          THE COURT:  Okay.  Mr. Shanin, can you please stand

2    and introduce yourself?

3          MR. SHANIN:  Thank you, your Honor.

4          Good morning.  My name is Steve Shanin.  I'm appointed

5    as standby counsel in case Mr. Kowalski has any technical

6    questions that he needs answered.

7          THE COURT:  Okay.  Thank you.

8          So I appointed Mr. Shanin just in case Mr. Kowalski

9    wants to inquire or seek some advice or help during the course

10   of this trial.  He also is an attorney and a defense attorney,

11   and so he will be available to him throughout the course of the

12   trial.

13         Now, the defendant, Robert Kowalski, has been charged

14   with bankruptcy fraud, aiding and abetting, embezzlement, and

15   failure to file tax returns.

16         The defendant has pleaded not guilty to the

17   indictment, and he is presumed to be not guilty of the charges

18   in this indictment.

19         Have any of you heard anything about this case?

20     (No showing of hands.)

21         THE COURT:  Okay.  Now, I have a long list of

22   witnesses.  These are people that may be called as witnesses

23   throughout this case.

24         Please listen to the names carefully.  And if you

25   think you might know one of them, then you just raise your

Jury Selection

1    hand, and then we'll inquire further when we talk to you.

2              So just listen to this list, please.

3              Rosa Angeles.

4              Special Agent Robert Batz.

5              Connie Boudreau.

6              Adam Brief.

7              Peter Caggiano.

8              Darin Campbell.

9              Joseph Cohen.

10             Cheryl Cook.

11             Deputy U.S. Marshal Christopher Dammons.

12             Special Agent Jacob Evans.

13             Greg Gajewski.

14             Edward Gausselin.

15             Thomas Germershausen.  Or Germershausen.

16             Special Agent Jason Gibson.

17             Katie Gleason.

18             Haydee Gonzalez.

19             Toni Gonzalez.

20             Catrina Goodman.

21             Jeffrey Gutman.

22             Brian Hawkins.

23             Matt Hendricksen.

24             Brenda Honorable.

25             Andrew Hunt.

Jury Selection

1        Jane Iriondo.

2        Arturo Jaros.

3        Boguslaw Kasprowicz.

4        Special Agent Jayna Kaydel.

5        Cynthia Kearns.

6        Sharon Kelley.

7        Allison Kotsay, IRS.

8        William Kowalski.

9        Maria Larry.

10       Rick Lexby.

11       Billy Lyons.

12       John Madonis.

13       Alicia Mandujano.

14       Candice Manyak.

15       Special Agent James McDonald.

16       Mike McPherson.

17       Special Agent Joe Moriarty.

18       Nicholas Najjar.

19       David Nelson.

20       Celestino Ojeda.

21       Martha Padilla.

22       Gus Paloian.

23       Dharmesh Panchal.

24       Parker Pearson.

25       Damian Perry.

Jury Selection

1              Natalie Reagan.

2              Joseph Piekarz.

3              John Pollick.

4              Special Agent Kelly Popovits.

5              Whitney Ridges.

6              Ray Rivard.

7              Benito Romero.

8              Cesar Sanchez.

9              Jorge Sanchez.

10             Martin Sanchez.

11             Ali Smelko.

12             Marilyn Tzakis.

13             Christopher Wehrman.

14             Tory Windorski.

15             Special Agent Kyle Young.

16             Michael Zupancic.

17             Do any of you know any of those people or think you

18     might?

19         (A showing of a hand.)

20             THE COURT:  Thank you.

21             Please stand and tell me your name.

22             JUROR:  Margaret Largay.

23             THE COURT:  Okay.  Who do you think you might know?

24             PROSPECTIVE JUROR:  I believe I know Rosa Angeles and

25     Connie Brandt.

Jury Selection

1        THE COURT:  Okay.  Thank you very much.  I'll -- when

2   we talk to you, I'll ask you some more about that.  Thank you.

3        Okay.  Ladies and Gentlemen, the sole purpose of what

4   I'm doing here today is to seek fair and impartial jurors.

5   That's why we're going to ask you questions.

6        I've given you a questionnaire to help you follow

7   along.  And you'll see, as we do the questioning, how this

8   works.

9        You must be truthful in your answers to me so that

10  each side can have a fair trial.  That's what makes this system

11  work appropriately.

12       So there's a few things I want to tell you about your

13  answers.

14       When I ask you whether you or someone close to you or

15  a family member, what I'm doing is looking a little bit beyond

16  just you.

17       So, for example, you live with a husband or a spouse

18  or an adult child or a mom.  Those adult people, they might

19  have some influence over the way you think or analyze things,

20  so I ask you about those individuals.  And I also ask you

21  about -- you know, because they're in your household.

22       I also ask you about them when it comes to the

23  question regarding your interaction, if any, with the criminal

24  or civil judicial system.

25       So I want to explain that one question, which is

Jury Selection

1    Question 15.  I ask you the question:  Have you or a close

2    friend or member of your immediate family been a party to or a

3    witness in a civil lawsuit, an administrative action, or a

4    criminal case?

5              Now, I want to explain all of those things to you.

6              First of all, a civil action is a lawsuit.  And the

7    result of a civil action is money.  And it can be anything as

8    simple as a divorce, a fence dispute with a neighbor.  It can

9    be as complicated as a corporate lawsuit.  It can be a patent

10   lawsuit.  In a civil case, you're either the person suing

11   someone, say, for a car accident, or you're the person being

12   sued.  That's the plaintiff and the defendant.  Okay?

13             But you can be also part of that case by being a

14   witness.  Maybe you testified or were deposed.  "Deposition"

15   and "depose" are words that we use when a lawyer has

16   interviewed you as part of a case.  So you could be a witness.

17   You could be an expert.  Maybe you are -- have some special

18   skill and you testified in a case regarding expertise.

19             Those are ways that you can be a part of a civil case.

20             When it comes to a criminal case, the plaintiff is now

21   a prosecutor.  And the charges are being brought by a part of

22   the state or the federal government.  So it will say, for

23   example, the State of Illinois versus John Smith or the

24   United States of America versus Jane Smith, something like

25   that.  So you can be a prosecutor or you can be a defense

Jury Selection

1    attorney on those two sides.  You can also be a defendant, so

2    you could be someone who was charged with a crime.  Even if you

3    were acquitted, even if the charges were dropped, we would

4    still need to know about that.

5          Now, you could also be a victim in a criminal case.

6    You could be the person that was harmed, right?  You could be

7    the person who testified, because you saw someone being harmed.

8    And, again, you could be an expert.  Those are all ways in

9    which you can be part of a criminal case.

10          And then in an administrative hearing, it's something

11    that is between an administrative law judge and you.  So, for

12    example, maybe a Social Security benefits case or the Equal

13    Employment Opportunity Commission, the EEOC, where you're

14    filing a case regarding employment, or OSHA, which is a

15    workplace safety.  Those are all types of administrative

16    hearings, okay?

17          Now, I'm asking whether you've been involved in those

18    things, but I also ask whether you or someone close to you,

19    like a family member, has been involved in those things.  And

20    think about why that is.  Maybe you personally weren't, but

21    maybe your best friend had someone in her family murdered and

22    you went every day to the trial and you supported her.  You

23    have a lot of exposure to the criminal courts.  You have a lot

24    of exposure to the system.  And you would have some opinion

25    about how that exposure played out in your mind.  That's why I

Jury Selection

1    ask the other questions that goes a little bit further than

2    you.

3              Also when I ask these questions, there may be an

4    answer that you don't want to say publicly.  For example, maybe

5    your son was the person involved in a criminal case because he

6    was charged and convicted of dealing drugs.  All you have to

7    do, if you have a private answer like that, is to say to me,

8    "Judge, I'd like to answer that question at sidebar."  That's

9    the magic term, "sidebar."  And then we do that privately with

10   the lawyers and me and not in front of everyone else.

11             If you were a victim of a crime, maybe you were a

12   victim of a rape and you don't want the whole world to know

13   that, understandably, you can simply ask for a sidebar.

14             Now, there's one other area where you can ask for a

15   sidebar, and I'm going to explain that to you.  If your answer

16   to any of my questions causes you to have what I would call

17   "strong feelings" in the answer, I want you to tell me those

18   feelings at sidebar and not in front of anyone else.  And I'm

19   going to give you an example.

20             If I were to ask you, "Do you have strong feelings" --

21   or "Do you have any feelings about the police and law

22   enforcement?"  Here's two examples of strong feelings.

23             On the one hand, you might say, "I do.  My father is a

24   police officer, my sister is a police officer, my uncle is a

25   police officer, my brother is a police officer.  They work very

Jury Selection

1    hard.  They're under a lot of scrutiny and pressure right now.

2    And I have strong feelings about that."

3            On the other hand, you might say, "I have strong

4    feelings about police.  I'm a person of color.  I've been

5    pulled over three or four times for no reason whatsoever.  I

6    don't trust the police.  I don't believe they're doing the

7    right job."  Right?

8            Two very strong opposing feelings.  I don't want you

9    to tell me those feelings in the open courtroom.  I want you to

10   reserve that for sidebar when I talk to you privately.

11           Why?  Because your strong feelings can impact those

12   listening to you.  And I don't want your strong feelings to

13   spread to others that don't have those right now.  Right?

14           We're looking for fair and impartial jurors.

15           So just tell me.  I'm not telling you to withhold

16   them.  Please, I want to hear them.  Just tell me those at

17   sidebar.  Okay?

18           The way that this is going to work is that my

19   courtroom deputy is going to take 16 of you and put you in the

20   jury box, and we're going to go through this process of

21   questioning you.

22           And as you come up to my witness stand for the

23   questions, I'll have an opportunity for you to put on these

24   headphones that I have.  So you'll put these on.  And then we

25   have some white noise where nobody else can hear, but we can

Jury Selection

1   hear you.  And we'll talk to you -- that's the private part of

2   our questioning.  Okay?

3          Remember, the only thing I want is fair and impartial

4   jurors.  Just be straight with me, be honest with me, and we'll

5   see whether you can be that person.  Okay?

6          Lynn, can you please put some people in the jury box?

7          THE CLERK:  Of course.

8          First person is James Hertz.

9          Mr. Hertz -- do you want them this way, your Honor,

10  again?

11         THE COURT:  Yes, please.  That's the way I like them.

12         THE CLERK:  You're going to take a seat right here.

13         Edward Collins-Fanner.

14         David Melendez.

15         And then you probably want to come in this way.  It's

16  a little easier.

17         Shani Settles.

18         So David, then Shani.

19         Steven Giovanetto.

20         Frances Verenski.

21         Margaret Largay.

22         So we have Steven, Frances, and then Margaret.  Okay.

23         Kathryn Kuenster.

24         James Passolano.

25         You're going to take that very last seat there.

Jury Selection

1          James, if you want to come around that way -- either

2     way.  Just a little easier maybe for some people to go that

3     way.

4          Jessica Centeno.

5          Sarah Eisinger.

6          Linda Sargent.

7          So, Jessica, take the second seat.  You're going to

8     have to go that way.

9          And then we'll have Sarah -- wait, you're not Sarah,

10    are you?  Okay, so wait.  Just step down for just a moment,

11    please, and we'll get Sarah in, and then you, Linda, okay?

12    Thank you so much.

13         Jessica Paski.

14         Michael Konrad.

15         So let's get Jessica in first, Mr. Konrad.  So if you

16    want to wait there for a moment.

17         Jessica, and then Michael.

18         David Parcheta.

19         And Luis Alvarez.

20         THE COURT:  Okay.  Mr. Hertz, while he's climbing into

21    the box there, I'm going to ask that you sit up here for me,

22    please.

23         PROSPECTIVE JUROR:  Okay.

24         THE COURT:  Thank you.

25       (Approaching.)

Jury Selection

1          THE COURT:  And you're going to show everybody in the

2    courtroom how easy this is.  Okay?

3       (Laughter.)

4          THE COURT:  And how painless it is.

5          All right.  Sir, please state your full name.

6          PROSPECTIVE JUROR:  James Gilbert Hertz.

7          THE COURT:  How old are you?

8          PROSPECTIVE JUROR:  66.

9          THE COURT:  Where do you live?

10         PROSPECTIVE JUROR:  I live in Frankfort.

11         THE COURT:  Okay.  And, by the way, for those of you

12   who live in the city, you don't need to give me an address or

13   anything.  Give me the suburb if you're in a suburb.  But if

14   you're in the city, give me one of those neighborhoods.  You

15   know, I'm in Pilsen, I'm in Lakeview, whatever neighborhood

16   you're in.

17         And who do you live with?

18         PROSPECTIVE JUROR:  My wife Janet and occasionally a

19   20-year-old grandson because we live closer to his college than

20   his parents do.

21         THE COURT:  That's nice.

22         And what does your wife do?

23         PROSPECTIVE JUROR:  She's a retired labor and delivery

24   room nurse.

25         THE COURT:  And the son, he's just in -- I mean the

Jury Selection

1    grandson is in school?

2          PROSPECTIVE JUROR:  Yeah.  He's majoring in

3    agricultural economics at Joliet Junior College.

4          THE COURT:  Okay.  So you must be from down there; is

5    that right?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  So it's an interesting thing for all of

8    you to know that -- this seal is the seal for the Northern

9    District of Illinois.

10          For those of you who may have served in Cook County

11    court or Lake County, et cetera, Will County court, those are

12    just pulling jurors from that little area.  We pull jurors from

13    the top 18 counties of the state.  So you have people coming in

14    and serving their civic duty who take a long time to get here,

15    which is always so admirable to me that they do so.

16          And it looks like you came all the way from Frankfort;

17    is that right?

18          PROSPECTIVE JUROR:  Yes.

19          THE COURT:  How long did it take you?

20          PROSPECTIVE JUROR:  About 50 minutes.

21          THE COURT:  Oh, that's not too bad, actually.

22          Okay.  So you are married.

23          Do you have any adult children?

24          PROSPECTIVE JUROR:  Five.  I raised four stepchildren,

25    and then we have a fifth together.

Jury Selection

1    THE COURT:  Can you tell me about what they are all
2  doing in life right now?
3    PROSPECTIVE JUROR:  Yeah, the oldest is a daughter.
4  She's a part-time dental hygienist, married to a carpenter.
5  They have two children, 18 and 20.
6    Number two, she's an interior designer, married to a
7  carpenter.  They have two natural children who are 12 and 15,
8  and they're hoping to adopt a foster child who is five.
9    The third one is a boy.  He's 40.  He is an
10  electrician, married to a stay-at-home mom during the day, and
11  she's a country singer at night in her father's band.  They
12  have four boys, all under the age of five and under.
13    THE COURT:  Oh, they're busy.
14    PROSPECTIVE JUROR:  Yeah.  And I baby-sit a lot.
15    (Laughter.)
16    PROSPECTIVE JUROR:  Number four, she works on mergers
17  and acquisitions with I think it's PricewaterhouseCoopers.
18  She's married to a Chicago police officer, lives in the city.
19    And then our fifth one, who is quite a bit younger,
20  he's 25.  He sells security systems for large companies for
21  internet security.  And he's also a part-time guitar instructor
22  as he majored in classical guitar performance.  He's married to
23  a woman who is getting her master's at University of Missouri,
24  Kansas City.  She's an intern at, besides college, an intern at
25  the Lyric Opera of Kansas City.  She's an opera singer.

Jury Selection

1          THE COURT:  Wow, so there's musical background there,

2     right?

3          PROSPECTIVE JUROR:  All except me.

4        (Laughter.)

5          THE COURT:  Except you.

6          PROSPECTIVE JUROR:  Yeah.

7          THE COURT:  What is your highest level of education?

8          PROSPECTIVE JUROR:  I've got both -- I've got a

9     Juris Doctor law degree, and I've got an MBA with majors in

10    finance and management strategy.

11         THE COURT:  What do you do for a living?

12         PROSPECTIVE JUROR:  I've been retired for four and a

13    half years.

14         THE COURT:  What did you do before that?

15         PROSPECTIVE JUROR:  For 15 years prior to that, I was

16    an in-house attorney with the National Insurance Crime Bureau.

17    We liaison between the insurance industry and law enforcement,

18    mostly on prosecuting organized crime, you know, involving the

19    insurance industry.

20         THE COURT:  So have you ever worked with the U.S.

21    Attorney's Office here?

22         PROSPECTIVE JUROR:  We had agents that worked with

23    U.S. Attorneys.  I provided legal advice to the organization.

24    So not directly.

25         THE COURT:  Okay.  So did you ever attend any trials

Jury Selection

1    that were part of the U.S. Attorney's Office here?

2           PROSPECTIVE JUROR:  No.

3           THE COURT:  Okay.  Have you served in the military?

4           PROSPECTIVE JUROR:  No.

5           THE COURT:  Okay.  How long did you do that job?

6           PROSPECTIVE JUROR:  That one was for 15 years, but I

7    practiced law for 38 years.

8           THE COURT:  Where did you practice?

9           PROSPECTIVE JUROR:  I was first in-house corporate

10   counsel for Roper Corporation in Kankakee, which was at the

11   time a Fortune 500 manufacturer.

12          And then for roughly 17 years, United Insurance

13   Company in the city.

14          Three years with Ilona Financial, which is an Irish

15   holding company for insurance companies.

16          And then 15 years or so with the National Insurance

17   Crime Bureau.

18          THE COURT:  Okay.  When you were with them, were you

19   supervising individuals?

20          PROSPECTIVE JUROR:  Part of my career, yes.

21          THE COURT:  Okay.  What do you like to do in your free

22   time?  Sounds like you're doing a lot of baby sitting, but

23   other than that?

24          PROSPECTIVE JUROR:  I do that.  Basically, my -- well,

25   wife and I being retired, I bicycle, run, I weightlift, try to

Jury Selection

1   stay in shape.  And we travel.

2            THE COURT:  Okay.  Where is your favorite place to

3   travel to lately?

4            PROSPECTIVE JUROR:  Our most recent, last fall, was we

5   went to Scotland and Iceland for almost a month.

6            THE COURT:  Was that nice?

7            PROSPECTIVE JUROR:  Oh, it was beautiful.

8            THE COURT:  Great.

9            Where do you get your news from?

10           PROSPECTIVE JUROR:  I subscribe to *Barron's* and

11  *Forbes*.

12           THE COURT:  Okay.

13           PROSPECTIVE JUROR:  The -- basically the internet.

14           But in terms of like -- for example, with my wife with

15  her medical background, anything medically-related, I rely upon

16  her.

17           THE COURT:  Okay.  So what do you do when you're on

18  the internet?  What type of use of the internet do you have?

19           PROSPECTIVE JUROR:  Well, basically, in a sense, I'm

20  trying to make my investments last for the rest of my life.

21           THE COURT:  Okay.

22           PROSPECTIVE JUROR:  But -- you know, so I'm quite

23  interested in doing that.

24           But -- and with an MBA in finance, I'm interested in,

25  you know, financial issues.

Jury Selection

1          THE COURT:  Okay.

2          PROSPECTIVE JUROR:  So that's what I spend a lot of

3     time, you know, researching because I'm looking for companies

4     to invest in.

5          THE COURT:  Okay.

6          PROSPECTIVE JUROR:  But general news, like -- I'm as

7     curious as anybody else what was shot down over the weekend.

8          THE COURT:  Right.

9          PROSPECTIVE JUROR:  And so I don't have a clue, but

10    it's -- trying to do some searches to see what the answer is.

11         THE COURT:  Okay.  Now, do you use social media at

12    all?

13         PROSPECTIVE JUROR:  Yes.  I'm on Facebook.

14         THE COURT:  Are you on Twitter or Instagram or

15    Snapchat, any of those?

16         PROSPECTIVE JUROR:  No.  The only two I'm on are

17    Facebook and Strava.

18         THE COURT:  Okay.

19         PROSPECTIVE JUROR:  Strava is for your workouts.

20         THE COURT:  And do you belong to any groups, clubs, or

21    organizations?

22         PROSPECTIVE JUROR:  Basically running clubs and bike

23    clubs --

24         THE COURT:  Okay.

25         PROSPECTIVE JUROR:  -- and church.

Jury Selection

1          THE COURT:  Okay.  Do you have any position of

2    authority in any of those?

3          PROSPECTIVE JUROR:  No.

4          THE COURT:  Okay.  Have you ever served on a jury

5    before?

6          PROSPECTIVE JUROR:  No.

7          THE COURT:  No?

8          PROSPECTIVE JUROR:  No.

9          THE COURT:  Have you or a close friend or family

10   member ever been involved in a civil lawsuit?

11         PROSPECTIVE JUROR:  Yes.

12         THE COURT:  Tell me about that.

13         PROSPECTIVE JUROR:  Well, before I met my wife, both

14   of us had been divorced.

15         When I was a practicing attorney, I had a disgruntled

16   litigant sue me.

17         THE COURT:  Okay.

18         PROSPECTIVE JUROR:  30-some years ago.

19         THE COURT:  Okay.

20         PROSPECTIVE JUROR:  That case was dismissed.

21         Was your question also a family member?

22         THE COURT:  Yes.

23         PROSPECTIVE JUROR:  One of our daughters was divorced

24   and remarried.

25         THE COURT:  Okay.  Have you ever been involved in

Jury Selection

1    criminal litigation?

2              PROSPECTIVE JUROR:  Not -- not personally and no

3    member of the family except for the son -- son-in-law who is a

4    Chicago police officer.

5              THE COURT:  Oh, right.

6              So you never did any work in the criminal area of law.

7              PROSPECTIVE JUROR:  Other than advising on the

8    National Insurance Crime Bureau in terms --

9              THE COURT:  Oh, right, that's --

10             PROSPECTIVE JUROR:  -- of what I mentioned before.

11             THE COURT:  Got it.

12             PROSPECTIVE JUROR:  Criminal law was not -- never my

13   specialty.

14             THE COURT:  Okay.  Have you ever been involved in an

15   administrative hearing?

16             PROSPECTIVE JUROR:  Numerous.

17             THE COURT:  Okay.  Like what?

18             PROSPECTIVE JUROR:  I've handled lots of EEOC claims.

19   I used to do labor arbitrations.  Unemployment hearings.  I'm

20   trying to -- I can't recall all of them.  But I probably

21   handled, for the defense, 300 EEOC charges over my career.

22             THE COURT:  Do you have any philosophical or religious

23   beliefs that would prevent you from sitting in judgment of

24   another?

25             PROSPECTIVE JUROR:  No.

Jury Selection

1          THE COURT:  Okay.  Do you have any relatives or close

2     friends who are lawyers?

3          PROSPECTIVE JUROR:  Other than I used to be, that's

4     about it.

5          THE COURT:  And then the other question was about

6     private investigators.

7          PROSPECTIVE JUROR:  No private investigators.

8          THE COURT:  So, of course, we know you've had legal

9     training.  Where did you go to law school?

10          PROSPECTIVE JUROR:  Southern Illinois University.

11          THE COURT:  Now, is there anything that you've heard

12     so far about this case like the status of the parties or

13     anything else you've heard that might impair your ability to be

14     fair?

15          PROSPECTIVE JUROR:  No.

16          THE COURT:  Okay.  Now, this case has a number of

17     different law enforcement agencies involved, as you have heard.

18     There's the Federal Deposit Insurance Corporation-Office of

19     Inspector General, OIG.  The Internal Revenue Service Criminal

20     Investigation.  United States Department of Housing and Urban

21     Development-Office of Inspector General.  The United States

22     Department of Treasury-Office of Inspector General for

23     Treasury.  The Federal Bureau of Investigation.  The Federal

24     Housing Finance Agency.  Office of Inspector General for the

25     Chicago Housing Authority.  And the Office of the Inspector

Jury Selection

1    General for -- that's CHA.  And the United States Marshals.

2          Do you have any friends, family, or know anyone

3    involved in all of those organizations?

4          PROSPECTIVE JUROR:  Not currently.  But when I was

5    with the National Insurance Crime Bureau, a lot of our

6    investigative agents were former FBI officials.  And when I was

7    first hired, our CEO was the former deputy director of the FBI

8    under President Clinton.

9          THE COURT:  Okay.

10         PROSPECTIVE JUROR:  And so I worked with a lot of --

11   because when people retire from the FBI, frequently they want

12   to get a second job, and so we would hire --

13         THE COURT:  Because they can do so much earlier than I

14   can.

15         PROSPECTIVE JUROR:  I'm sorry?

16         THE COURT:  Because they can do so much earlier than I

17   can.

18         PROSPECTIVE JUROR:  Yes.  And then they can get a job

19   that also pays them for their investigative capabilities.

20         THE COURT:  Okay.  Do you have any connections to

21   Washington Federal Bank --

22         PROSPECTIVE JUROR:  No.

23         THE COURT:  -- for Savings?

24         PROSPECTIVE JUROR:  I'm sorry.  No.

25         THE COURT:  Okay.  All right.  Let me turn to the

Jury Selection

1    prosecutors.

2              Would you like to answer -- would you like to ask any

3    sidebar questions?

4              MR. DANIEL:  No, your Honor.

5              THE COURT:  All right.  Mr. Kowalski, would you like

6    to ask some sidebar questions of him?

7              MR. KOWALSKI:  No.

8              THE COURT:  Okay.  All right.  Now, that's how easy

9    that was, right?

10             So to the extent that you can answer some without

11   being prompted, that's fine, and I'll pick up what you didn't

12   mention, and we'll just go through the jury box like that.

13             And you may sit back there again.

14             And maybe you want to get out before he sits down so

15   it's easier for you.

16             There you go.  Thank you.

17             Good morning.

18             PROSPECTIVE JUROR:  Hello.

19             THE COURT:  What is your name, please?

20             PROSPECTIVE JUROR:  Edward Collins-Fanner.

21             THE COURT:  Okay.  And how old are you, sir?

22             PROSPECTIVE JUROR:  34.

23             THE COURT:  Where do you live?

24             PROSPECTIVE JUROR:  River North.

25             THE COURT:  Who do you live with?

Jury Selection

1          PROSPECTIVE JUROR:  My fiancee.

2          THE COURT:  And what does your fiancee do?

3          PROSPECTIVE JUROR:  She is a commercial furniture

4     salesperson.

5          THE COURT:  Commercial -- oh, okay.

6          And do you own or rent?

7          PROSPECTIVE JUROR:  Rent.

8          THE COURT:  Do you -- are you single?

9          PROSPECTIVE JUROR:  Divorced.

10          THE COURT:  Divorced, okay.  So you have one lawsuit

11     in your background, right?

12          PROSPECTIVE JUROR:  (Nods affirmatively.)

13          THE COURT:  Okay.  Do you have any children?

14          PROSPECTIVE JUROR:  Yes.

15          THE COURT:  How old are they?

16          PROSPECTIVE JUROR:  Eight.

17          THE COURT:  Okay.  Well, they're not working outside

18     of the house, so I'm not very concerned.

19          What is your educational background?

20          PROSPECTIVE JUROR:  I have a Master's of Science in

21     Accounting and a Bachelor's of Business Administration in

22     Finance.

23          THE COURT:  Where did you get those?

24          PROSPECTIVE JUROR:  University of Houston and St.

25     Edward's University in Austin.

Jury Selection

1          THE COURT:  Okay.  So a Texan?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  Have you served in the military before?

4          PROSPECTIVE JUROR:  No.

5          THE COURT:  What is your employment for the last five

6    years?

7          PROSPECTIVE JUROR:  I've been in accounting, so --

8    currently as a controller.  Previously as just consultants

9    and -- just general corporate accounting.

10         THE COURT:  Okay.  Who do you work for?

11         PROSPECTIVE JUROR:  CDL 1000.

12         THE COURT:  What was it?

13         PROSPECTIVE JUROR:  CDL 1000.

14         THE COURT:  Oh, okay.  Do you supervise people in that

15   job?

16         PROSPECTIVE JUROR:  Yes.

17         THE COURT:  Have you been there for at least five

18   years?

19         PROSPECTIVE JUROR:  No.

20         THE COURT:  Where did you work before that?

21         PROSPECTIVE JUROR:  Prior to CDL, I was consulting for

22   a period of time.  Then I was with Medline.

23         THE COURT:  Okay.  What do you like to do in your free

24   time?

25         PROSPECTIVE JUROR:  Travel.  Get around the town.

Jury Selection

1        THE COURT:  Okay.  So what's getting around the town?

2        PROSPECTIVE JUROR:  Dinner, drinks, different

3    entertainment.

4        THE COURT:  Yes, different -- there's a lot of great

5    places here in Chicago, right?

6        PROSPECTIVE JUROR:  Yeah.

7        THE COURT:  What do you like to watch on TV?

8        PROSPECTIVE JUROR:  I'm not really much of a TV

9    person.  But we might, my fiancee and I, we might watch some

10   *Married At First Sight* or something along those lines,

11   relationship.

12       THE COURT:  Do you read?

13       PROSPECTIVE JUROR:  Occasionally.

14       THE COURT:  What do you like to read?

15       PROSPECTIVE JUROR:  Generally, like psychology style

16   books or just random stuff, you know, *Reddit* threads or those

17   types of things.

18       THE COURT:  Do you use social media sites?

19       PROSPECTIVE JUROR:  Just Instagram.

20       THE COURT:  Instagram?

21       Anything else?

22       PROSPECTIVE JUROR:  *Reddit*.

23       THE COURT:  *Reddit*.  Okay.

24       Do you belong to any groups or clubs or organizations?

25       PROSPECTIVE JUROR:  A couple of business associations

Jury Selection

1    and financial executive groups.

2              THE COURT:  What's that called?

3              PROSPECTIVE JUROR:  So Financial Executives

4    International.  Treasury Management Association of Chicago.

5    Greater -- the Greater River North Chamber.

6              THE COURT:  Okay.  Do you have any positions of

7    authority with those groups?

8              PROSPECTIVE JUROR:  No.

9              THE COURT:  Okay.  Have you ever served on a jury

10   before?

11             PROSPECTIVE JUROR:  I have.

12             THE COURT:  When was that?

13             PROSPECTIVE JUROR:  That was last, I want to say,

14   April or May of last year.

15             THE COURT:  Really.

16             PROSPECTIVE JUROR:  Yes.

17             THE COURT:  That's rare.  We don't usually get someone

18   that quickly.

19             Where was the jury?  What town or --

20             PROSPECTIVE JUROR:  It was Cook County, out in

21   Maywood.

22             THE COURT:  So it was a criminal case?

23             PROSPECTIVE JUROR:  Yes.

24             THE COURT:  Did you reach a verdict?

25             PROSPECTIVE JUROR:  Yes.

Jury Selection

1          THE COURT:  Were you the foreperson?

2          PROSPECTIVE JUROR:  No.

3          THE COURT:  Okay.  Now, let's talk about your

4    interaction with the justice system.

5          Other than the divorce, any civil lawsuits within you

6    or your family or close friends?

7          PROSPECTIVE JUROR:  No.

8          THE COURT:  How about criminal cases?

9          PROSPECTIVE JUROR:  No.

10          THE COURT:  Any administrative hearings?

11          PROSPECTIVE JUROR:  No.

12          THE COURT:  Okay.  Now, do you hold any philosophical

13    or religious beliefs that would prevent you from sitting in

14    judgment of another person?

15          PROSPECTIVE JUROR:  No.

16          THE COURT:  Do you have any close friends or relatives

17    who are lawyers?

18          PROSPECTIVE JUROR:  No.

19          THE COURT:  Do you have any legal training?

20          PROSPECTIVE JUROR:  No.

21          THE COURT:  Okay.  Is there anything about the case,

22    the identity of the parties, that would cause you to be unfair

23    or impartial?

24          PROSPECTIVE JUROR:  No.

25          THE COURT:  Okay.  Do you want me to list those

Jury Selection

1    organizations -- I mean, those law enforcement agencies again,

2    or did you listen through that list last time --

3              PROSPECTIVE JUROR:  Yeah, I listened through it.

4    Never interacted with any of them.

5              THE COURT:  Okay.  So do you have any connections to

6    Washington Federal Bank for Savings?

7              PROSPECTIVE JUROR:  No.

8              THE COURT:  All right.  Do the prosecutors want to do

9    any follow-up?

10             MR. DANIEL:  No, your Honor.

11             THE COURT:  Any follow-up, Mr. Kowalski?

12             MR. KOWALSKI:  Yes.  I'm curious if the juror --

13   proposed juror would know anything about the OCC or some of the

14   auditors that were involved with Washington Federal Bank, like

15   Bansley & Kiener, or any of the other consultants, or any of

16   the Department of Treasury people that have audited and

17   reviewed this bank?

18             PROSPECTIVE JUROR:  No.  Not to my knowledge.

19             THE COURT:  Anything else?

20             MR. KOWALSKI:  No.  Thank you.

21             THE COURT:  All right.  Well, thank you very much.

22             PROSPECTIVE JUROR:  I've been -- I guess since I

23   completed the --

24             THE COURT:  Yes, you have an issue?

25             PROSPECTIVE JUROR:  Yes.

Jury Selection

1         So the company that I currently -- that I work for is

2     undergoing a bit of a restructure and trying to raise capital.

3     And so as a key person on the executive team there, it's

4     something just to consider.

5             THE COURT:  Okay.  So it will be difficult for you to

6     sit for this period of time?

7             PROSPECTIVE JUROR:  Possibly.

8             THE COURT:  Okay.  All right.  We'll follow up if we

9     have to with you in a little bit, okay?

10            PROSPECTIVE JUROR:  Okay.

11            THE COURT:  Thank you very much.

12            Okay.  Mr. Melendez, please.

13            Good morning.

14            PROSPECTIVE JUROR:  Good morning.

15            THE COURT:  Okay.  State your full name.

16            PROSPECTIVE JUROR:  David Melendez.

17            THE COURT:  Can you take your mask off so we can see

18    you?

19            Thank you very much.

20            And your age?

21            PROSPECTIVE JUROR:  50.

22            THE COURT:  And where do you live?

23            PROSPECTIVE JUROR:  Aurora.

24            THE COURT:  Who do you live with?

25            PROSPECTIVE JUROR:  My parents.

Jury Selection

1          THE COURT:  Okay.  What do mom and dad do?

2          PROSPECTIVE JUROR:  They're retired.

3          THE COURT:  What did they do?

4          PROSPECTIVE JUROR:  My mom was a housewife, and my dad

5    worked at Caterpillar.

6          THE COURT:  Okay.  What do you do?

7          PROSPECTIVE JUROR:  I'm a caregiver, and I'm a

8    disabled vet.

9          THE COURT:  So a caregiver for one of your parents?

10          PROSPECTIVE JUROR:  Both of them.

11          THE COURT:  Oh, for both of them.  Okay.

12          And tell me about the disabled vet status.  Will it be

13    difficult for you to sit through the day?  We usually go from,

14    like, 9:30 until 5:00.  We take regular breaks.  But is there

15    any issue with that?

16          PROSPECTIVE JUROR:  I don't believe so.

17          THE COURT:  Are you working?

18          PROSPECTIVE JUROR:  I do work.

19          THE COURT:  What do you do?

20          PROSPECTIVE JUROR:  I'm a production analyst.

21          THE COURT:  What does that mean?

22          PROSPECTIVE JUROR:  I support the production

23    supervisors within a manufacturing facility.

24          THE COURT:  Okay.  What facility is that?

25          PROSPECTIVE JUROR:  Handi Foil in Naperville.

Jury Selection

1          THE COURT:  In Naperville?

2          PROSPECTIVE JUROR:  Uh-hum.

3          THE COURT:  And you have served in the military.

4          PROSPECTIVE JUROR:  I have.

5          THE COURT:  What was your highest rank?

6          PROSPECTIVE JUROR:  E-4.

7          THE COURT:  Were you discharged honorably?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Okay.  Have you been working at that

10  factory for at least five years?

11          PROSPECTIVE JUROR:  No.

12          THE COURT:  What did you do before that?

13          PROSPECTIVE JUROR:  I was a logistical manager.

14          THE COURT:  Where did you do that work?

15          PROSPECTIVE JUROR:  For DSC Logistics.  And our client

16  was IKEA.

17          THE COURT:  Okay.  What's your highest level of

18  education?

19          PROSPECTIVE JUROR:  I have a Bachelor's degree.

20          THE COURT:  Where did you get that?

21          PROSPECTIVE JUROR:  NIU.

22          THE COURT:  Okay.  What is your marital status?

23          PROSPECTIVE JUROR:  Single.

24          THE COURT:  Do you have any children?

25          PROSPECTIVE JUROR:  No.

Jury Selection

1          THE COURT:  Okay.  What do you like to do in your free
2    time?
3          PROSPECTIVE JUROR:  Socialize, catch up with friends,
4    watch sports.
5          THE COURT:  So when you socialize, what are you doing?
6          PROSPECTIVE JUROR:  We bowl, movies.  Just normal
7    stuff.  Music.
8          THE COURT:  What kind of movies do you like?
9          PROSPECTIVE JUROR:  I'm into comedy.
10         THE COURT:  Comedy?
11         What kind of -- I just -- you said movies -- oh, what
12   kind of music do you like?
13         PROSPECTIVE JUROR:  Everything.  I like pop,
14   everything on the radio right now.  Nothing specific.
15         THE COURT:  Do you read?
16         PROSPECTIVE JUROR:  On occasion.  Not like books, but
17   just the normal stuff.
18         THE COURT:  Are you on the internet?
19         PROSPECTIVE JUROR:  Like a normal -- yeah,
20   occasionally, yeah, do all the normal stuff on the internet.
21         THE COURT:  Are you on social media?
22         PROSPECTIVE JUROR:  Facebook.
23         THE COURT:  Facebook?  Anything else?
24         PROSPECTIVE JUROR:  No.
25         THE COURT:  Where do you get your news from?

Jury Selection

1           PROSPECTIVE JUROR:  Just news sites, general news

2    sites.

3           THE COURT:  Things that pop up with Facebook or --

4           PROSPECTIVE JUROR:  No, no, no.

5           THE COURT:  -- do you go to other places --

6           PROSPECTIVE JUROR:  No, I specifically --

7           THE COURT:  Oh, you specifically -- any site in

8    particular?

9           PROSPECTIVE JUROR:  I just look at all the normal

10   cites.  CNN, *Sun-Times*, *Chicago* -- you know, normal newspapers.

11          THE COURT:  What groups, clubs, or organizations do

12   you belong to?

13          PROSPECTIVE JUROR:  None.

14          THE COURT:  Okay.  Have you read anything about this

15   case?

16          PROSPECTIVE JUROR:  No.

17          THE COURT:  Okay.  Have you served on a jury before?

18          PROSPECTIVE JUROR:  No.

19          THE COURT:  Okay.  Have you or a close friend or

20   family member been involved in a civil lawsuit?

21          PROSPECTIVE JUROR:  No.

22          THE COURT:  How about a criminal lawsuit?

23          PROSPECTIVE JUROR:  Friends, family.

24          THE COURT:  Okay.  Do you want to tell me about those?

25          PROSPECTIVE JUROR:  They've just been criminal cases,

Jury Selection

1    like, you know, charged with whatever, you know, family members
2    of mine and friends.
3            THE COURT:  Like what?
4            PROSPECTIVE JUROR:  Let me see.  I think probably like
5    theft or something like that, you know, normal stuff like
6    that -- not normal, but, like, theft, I think, maybe, friends.
7            THE COURT:  Okay.  Who is the family member that was
8    charged with theft?
9            PROSPECTIVE JUROR:  My nephew.
10           THE COURT:  Your nephew?
11           PROSPECTIVE JUROR:  Yeah.
12           THE COURT:  Did he get jail time for that?
13           PROSPECTIVE JUROR:  Yes.
14           THE COURT:  Did you go visit him?
15           PROSPECTIVE JUROR:  No.
16           THE COURT:  Did you think that he was wrongfully
17   charged, or was it just a thing that happened that he did?
18           PROSPECTIVE JUROR:  That's not my -- that's not my
19   thing, so -- he went through the process.
20           THE COURT:  He went through the process.
21           PROSPECTIVE JUROR:  Yeah.
22           THE COURT:  Anyone else?  You said family members.
23   You said plural.  Anyone else?
24           PROSPECTIVE JUROR:  No.  Not that I can think of.
25   Just him.

Jury Selection

1        THE COURT:  No?

2        PROSPECTIVE JUROR:  Yeah.

3        THE COURT:  Anything about your nephew going through

4   that process that might make you look differently at these

5   prosecutors here?

6        PROSPECTIVE JUROR:  No.

7        THE COURT:  Or at Mr. Kowalski?

8        PROSPECTIVE JUROR:  No.

9        THE COURT:  Okay.  So any administrative hearings that

10  you've experienced?  Did you have to do maybe a disability

11  thing?

12       PROSPECTIVE JUROR:  I did like a -- I think I've done,

13  like, unemployment hearing where I was the supervisor, you

14  know, on the phone.

15       THE COURT:  Did you have to go through any disability

16  hearings like for Social Security Disability or anything like

17  that?

18       PROSPECTIVE JUROR:  Not yet.  I'm in the process, but,

19  yeah.

20       THE COURT:  Got it.  Okay.

21       Do you hold any philosophical or religious beliefs

22  that would prevent you from sitting in judgment of another?

23       PROSPECTIVE JUROR:  No.

24       THE COURT:  Okay.  Any friends or family members who

25  are lawyers?

Jury Selection

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  And do you have any legal training

3     yourself?

4          PROSPECTIVE JUROR:  No.

5          THE COURT:  Did you hear that list of entities that I

6     mentioned?

7          PROSPECTIVE JUROR:  Yes.

8          THE COURT:  Do you know anyone involved in those

9     things or have any interaction with those people?

10          PROSPECTIVE JUROR:  No.

11          THE COURT:  Is there anything that you've heard so far

12     today that you think might cause you to be impartial?

13          PROSPECTIVE JUROR:  No.

14          THE COURT:  And do you know -- or do you have any

15     connections at all to the Washington Federal Bank for Savings?

16          PROSPECTIVE JUROR:  No.

17          THE COURT:  Okay.  Does the government want to follow

18     up?

19          MR. DANIEL:  Just one, your Honor.

20          There's a question as to whether his service on the

21     jury would affect his ability as caretaker for his parents.

22          THE COURT:  Thank you.

23          PROSPECTIVE JUROR:  No.

24          THE COURT:  You think -- you would be able to have

25     someone take care of them?

54

Jury Selection

1      PROSPECTIVE JUROR:  Uh-hum.

2      THE COURT:  Okay.  Mr. Kowalski?

3      MR. KOWALSKI:  No, I have no questions.

4      THE COURT:  Okay.  Thank you.

5      All right.  You can step down.

6      And next we have Shani Settles, right?

7      PROSPECTIVE JUROR:  Yes.

8      THE COURT:  Thank you.

9      THE CLERK:  It's very tight back there.

10      THE COURT:  It's tight in there.  I'm sorry.  I think

11   maybe you're probably the last one to go this way, and then

12   maybe it's easier to go that way, right?

13      Good morning.

14      PROSPECTIVE JUROR:  Good morning.

15      THE COURT:  Please state your full name.

16      PROSPECTIVE JUROR:  Shani Solama (phonetic) Settles.

17      THE COURT:  Your age, please?

18      PROSPECTIVE JUROR:  44.

19      THE COURT:  Where do you live?

20      PROSPECTIVE JUROR:  Park Forest, Illinois.

21      THE COURT:  Who do you live with?

22      PROSPECTIVE JUROR:  Just myself.

23      THE COURT:  No animals?

24      PROSPECTIVE JUROR:  I have a pet.

25      THE COURT:  What kind?

Jury Selection

1        PROSPECTIVE JUROR:  Great Dane.

2        THE COURT:  That's a big pet.

3    (Laughter.)

4        PROSPECTIVE JUROR:  Yes.

5        THE COURT:  Right?

6        PROSPECTIVE JUROR:  Yes.

7        THE COURT:  Okay.  What's the Great Dane's name?

8        PROSPECTIVE JUROR:  Blue.

9        THE COURT:  Blue.

10       PROSPECTIVE JUROR:  Uh-hum.

11       THE COURT:  That's a good name.

12       Do you own or do you rent?

13       PROSPECTIVE JUROR:  I rent.

14       THE COURT:  Your marital status?

15       PROSPECTIVE JUROR:  Single.

16       THE COURT:  Do you have any children?

17       PROSPECTIVE JUROR:  I do not.

18       THE COURT:  What's your educational background?

19       PROSPECTIVE JUROR:  Ph.D.

20       THE COURT:  What is that in?

21       PROSPECTIVE JUROR:  It's in -- it's a mouthful.

22   Women's, Gender, and Sexuality Studies from Emory University.

23       THE COURT:  Emory?

24       PROSPECTIVE JUROR:  Uh-hum.

25       THE COURT:  Oh, so what do you do?

Jury Selection

1        PROSPECTIVE JUROR:  Not that.

2    (Laughter.)

3        THE COURT:  Did you -- what did you say?

4        PROSPECTIVE JUROR:  Not that.

5        THE COURT:  Not that.

6        PROSPECTIVE JUROR:  I used to teach religious studies,

7    but I made a switch to farming -- yeah, yeah.  And I'm

8    currently on sabbatical.

9        THE COURT:  Oh, okay.  So where do you -- are you

10   farming where you are, or do you have --

11       PROSPECTIVE JUROR:  I was -- I was a Director of Farm

12   Operations for a non-profit in Chicago.

13       THE COURT:  Interesting.

14       PROSPECTIVE JUROR:  I was with them for three years,

15   and I quit at the end of December.

16       THE COURT:  What was the name of that organization?

17       PROSPECTIVE JUROR:  Growing Home.

18       THE COURT:  Oh, yes.  And what did you do before that?

19       PROSPECTIVE JUROR:  Farming.

20       THE COURT:  Really?  What do you farm?

21       PROSPECTIVE JUROR:  Organic vegetables.

22       THE COURT:  Okay.

23       PROSPECTIVE JUROR:  And I also did animal husbandry.

24       THE COURT:  I actually had an expert animal husbandry

25   person on the stand in the last year, which was -- educated me

Jury Selection

1    about it.  I had no idea.

2           All right.  So you don't supervise anybody in your

3    farming, I take it?

4           PROSPECTIVE JUROR:  I did.

5           THE COURT:  You did when you were at the --

6           PROSPECTIVE JUROR:  Yeah.  So I was over two

7    departments initially.  One was Employment Training, and the

8    other one was Farm.  And then -- so I was Director of

9    Operations, and then I became Director of Farm Operations

10   specifically.  And then I supervised a team of, like, seven.

11          THE COURT:  Okay.  All right.  What do you like to do

12   in your free time?  Because farming is the job now, right?

13          PROSPECTIVE JUROR:  Yeah, still farming.  Love to

14   hike.  Love like any creative anything.  I minored in art when

15   I was in college, so still love to do that kind of thing.

16          THE COURT:  What kind?

17          PROSPECTIVE JUROR:  A lot of mixed media.  I do some

18   charcoal.  I'm starting to get into fiber arts.  And I started

19   leather working like about maybe four years ago.

20          THE COURT:  Oh, interesting.  Okay.

21          So what do you like to read?

22          PROSPECTIVE JUROR:  Everything.

23          THE COURT:  Yes.

24          PROSPECTIVE JUROR:  Like non-fiction, so I -- I tend

25   to, like, read sci-fi, romance.  When it's, like, downtime

Jury Selection

1     stuff, that's what I tend to focus on.

2              THE COURT:  Right.

3              PROSPECTIVE JUROR:  When it's me wanting to do

4     academic, more theory-based reading, I'm tending towards like

5     critical race theory, women's studies, psychology.

6              THE COURT:  Do you read different books at the same

7     time?

8              PROSPECTIVE JUROR:  No.

9              THE COURT:  Oh.  That's what I do.

10             Okay.  So what do you do on the internet?

11             PROSPECTIVE JUROR:  Not much.

12             THE COURT:  Not much?

13             PROSPECTIVE JUROR:  I mean --

14             THE COURT:  Any social media?

15             PROSPECTIVE JUROR:  Like I'm on Instagram, but I'm not

16    on it socially.

17             THE COURT:  All right.  Do you watch TV?

18             PROSPECTIVE JUROR:  Yes.

19             THE COURT:  What do you watch?

20             PROSPECTIVE JUROR:  Lots of sci-fi.  Netflix.  You

21    know, videos that come up on Prime Video.

22             THE COURT:  So what's your latest series you're

23    watching?

24             PROSPECTIVE JUROR:  I just watched something called

25    *Creamerie* on Hulu.  It's an Australian show about

Jury Selection

1    apocalyptic --

2            THE COURT:  Was it good?

3            PROSPECTIVE JUROR:  It was.

4            THE COURT:  My son got me into that one with the

5    zombies right now, you know?  The zombie fungus or whatever?

6        (Laughter.)

7            THE COURT:  That's a sci-fi.

8            What's it's called?

9            UNIDENTIFIED SPEAKER:  *Last of Us*.

10           THE COURT:  Yes, *Last of Us*.  That's right.

11           Do you belong to any groups, clubs, or organizations

12   other than what you've just told me?

13           PROSPECTIVE JUROR:  I do.

14           THE COURT:  What else?

15           PROSPECTIVE JUROR:  So two are farm-based, and then

16   one is CERT out of New Lenox.

17           THE COURT:  What was it?  I didn't hear.

18           PROSPECTIVE JUROR:  CERT.  It's an emergency response

19   team.

20           THE COURT:  What do you do?

21           PROSPECTIVE JUROR:  So you're trained in just

22   first-aid response.  If there's ever any kind of natural

23   disaster, we would be called upon to assist the police and fire

24   departments.

25           THE COURT:  Have you done that yet?

Jury Selection

1      PROSPECTIVE JUROR:  No.

2      THE COURT:  But you're trained to do it.

3      PROSPECTIVE JUROR:  I'm trained.

4      THE COURT:  Okay.  Have you served on a jury before?

5      PROSPECTIVE JUROR:  I have.

6      THE COURT:  When was that?

7      PROSPECTIVE JUROR:  It was before 2014, in Georgia.

8      THE COURT:  And was it civil or criminal?

9      PROSPECTIVE JUROR:  It was civil.

10      THE COURT:  Did you reach a verdict?

11      PROSPECTIVE JUROR:  We did.

12      THE COURT:  Were you the foreperson?

13      PROSPECTIVE JUROR:  I was not.

14      THE COURT:  Have you or a close friend or family

15  member been involved in a civil lawsuit?

16      PROSPECTIVE JUROR:  Yes.

17      THE COURT:  Tell me about that.

18      PROSPECTIVE JUROR:  I'm aware of two.  The first, my

19  dad was previously married before my mother.

20      THE COURT:  Could you move that a little closer to you

21  so I can hear?  Yes, that's better.  Thank you.

22      PROSPECTIVE JUROR:  Sure.

23      So the first one was my father was married --

24      THE COURT:  Okay.

25      PROSPECTIVE JUROR:  -- prior to marrying my mother, so

Jury Selection

1    there was a divorce.

2            And the second one involves my half-brother, and I

3    would like to go to sidebar for that.

4            THE COURT:  Okay, that's fine.  We'll do that at the

5    end, okay?

6            So any criminal cases?

7            PROSPECTIVE JUROR:  Yes.

8            THE COURT:  Should we do sidebar for that?

9            PROSPECTIVE JUROR:  Yes.

10           THE COURT:  Okay.  Any philosophical or religious

11   beliefs that would prevent you from sitting in judgment of

12   another?

13           PROSPECTIVE JUROR:  No.

14           THE COURT:  Okay.  Any friends or relatives who are

15   lawyers?

16           PROSPECTIVE JUROR:  No.

17           THE COURT:  Any legal training yourself?

18           PROSPECTIVE JUROR:  No.

19           THE COURT:  Okay.  Did you listen to that list of

20   entities that I mentioned?

21           PROSPECTIVE JUROR:  Yes.

22           THE COURT:  Do you have any interaction with any of

23   them?

24           PROSPECTIVE JUROR:  No.

25           THE COURT:  Any interaction at all with Washington

Jury Selection

1    Federal Bank?

2              PROSPECTIVE JUROR:  No.

3              THE COURT:  Okay.  Let's do a sidebar.  The way you do

4    it is you're going to put the microphone -- I mean, I'm sorry,

5    the headphones on, and then you get really close like this,

6    okay?

7         (At sidebar outside the hearing of the venire.)

8              THE COURT:  Okay.  Ms. Settles, we'll start with the

9    civil case.

10             Oh, you need your headphones.

11             Can you hear me?

12             Hold on a second.  Technical difficulties.

13             THE CLERK:  Try it now maybe.

14             THE COURT:  Can you hear me?

15             Turn it off for a second.

16        (Sidebar proceedings concluded.)

17             THE COURT:  Can you check that out?

18             I know the microphone is working because it -- is it

19    her?

20             THE CLERK:  I don't know.

21             THE COURT:  Let me check.

22             THE CLERK:  Let's try it now.

23        (At sidebar outside the hearing of the venire.)

24             PROSPECTIVE JUROR:  Can you hear me okay?

25             THE COURT:  Now I can.  Thank you.

Jury Selection

1          Okay.  Ms. Settles, tell me about the civil case.

2          PROSPECTIVE JUROR:  My father was employed at Ludeman

3    Center in Park Forest as part of a union, and there was an

4    action suit of some kind.  It was when I was younger.  I don't

5    know details.

6          THE COURT:  So he was part of a plaintiffs' group

7    or --

8          PROSPECTIVE JUROR:  I think so.

9          THE COURT:  And was it something that was talked about

10   at home?

11         PROSPECTIVE JUROR:  I was so young, I don't remember.

12         THE COURT:  Okay.  All right.  So anything about that

13   case, though, that would impact the way you look at the parties

14   here?

15         PROSPECTIVE JUROR:  No.

16         THE COURT:  What's the criminal matter?

17         PROSPECTIVE JUROR:  My half-brother, he was accused of

18   rape.

19         THE COURT:  Okay.  When was this?

20         PROSPECTIVE JUROR:  It was before 2001.  I don't know

21   when.

22         THE COURT:  Okay.  How old was he at the time?

23         PROSPECTIVE JUROR:  I have no idea.

24         THE COURT:  Does he live with you at the time?

25         PROSPECTIVE JUROR:  No.

Jury Selection

1          THE COURT:  Okay.  And what happened as a result of
2    the accusation?
3          PROSPECTIVE JUROR:  Nothing.  He was not charged.
4          THE COURT:  Oh, was there a criminal case?
5          PROSPECTIVE JUROR:  I believe so.
6          THE COURT:  And then they didn't charge it?
7          PROSPECTIVE JUROR:  No.  He was innocent.
8          THE COURT:  Oh, I see.  How do you know he was
9    innocent?
10          PROSPECTIVE JUROR:  The family said he was.
11          THE COURT:  Okay.  Got it.
12          All right.  Anyone in the government want to follow up
13    with this?
14          MR. DANIEL:  Just whether there was anything about
15    that experience that left her with a positive or negative view
16    of either the government or the criminal justice system?
17          THE COURT:  You can answer that.
18          PROSPECTIVE JUROR:  No.
19          THE COURT:  Mr. Kowalski?
20          MR. KOWALSKI:  No, nothing.
21          THE COURT:  Okay.  Thank you.  You can take them off
22    now.
23      (Sidebar proceedings concluded.)
24          THE COURT:  So that's the way sidebar works.  It's not
25    too bad.

Jury Selection

1     All right.  Thank you very much.  You can step down.

2     And I'll see Mr. Giovanetto.

3     There we go.  Craziness.

4     Good morning.

5     PROSPECTIVE JUROR:  Good morning.

6     THE COURT:  Please state your full name.

7     PROSPECTIVE JUROR:  Steven Giovanetto.

8     THE COURT:  Your age?

9     PROSPECTIVE JUROR:  65.

10    THE COURT:  Where do you live?

11    PROSPECTIVE JUROR:  Volo.

12    THE COURT:  Where is that?

13    PROSPECTIVE JUROR:  About -- it's northwest suburbs.

14    THE COURT:  So is that Volo Bog where the birds --

15    PROSPECTIVE JUROR:  That's -- yeah, Volo Bog.

16    THE COURT:  Yes, I've been there because I'm a birder.

17    PROSPECTIVE JUROR:  It's a great place.

18    THE COURT:  Okay.  Who lives with you?

19    PROSPECTIVE JUROR:  My wife.

20    THE COURT:  What does she do?

21    PROSPECTIVE JUROR:  She's a principal secretary at a

22    grade school.

23    THE COURT:  And do you have any adult children?

24    PROSPECTIVE JUROR:  Two.

25    THE COURT:  What are they up to?

Jury Selection

1          PROSPECTIVE JUROR:  My daughter, she's married.  Lives

2     here in the city.  She's a BCBA.  She works with autistic kids.

3     Her husband works for Ferrara Candy Company.  He's a Director

4     of Operations.

5          My son lives in -- just north of Orlando, and he works

6     for a church ministry.

7          THE COURT:  What ministry is that?

8          PROSPECTIVE JUROR:  Ligonier.

9          THE COURT:  Okay.  And what is your educational

10    background?

11         PROSPECTIVE JUROR:  I have a Bachelor's in Biology and

12    an MBA in Finance.

13         THE COURT:  What have you been doing for the last five

14    years?

15         PROSPECTIVE JUROR:  The last year, I've been doing

16    nothing.  Newly retired.

17         THE COURT:  Nice.

18         PROSPECTIVE JUROR:  Before that, I was working for a

19    pharmaceutical company, helping get COVID drugs approved.

20         THE COURT:  Which company?

21         PROSPECTIVE JUROR:  Catalent.

22         THE COURT:  And were you doing that for about five

23    years or --

24         PROSPECTIVE JUROR:  No, it was for three years.

25    Before that, I worked for a biopharmaceutical company, which I

Jury Selection

 1   was a part owner in and we sold.  And so I ran out my contract
 2   and then left.
 3              THE COURT:  Okay.  Have you ever served in the
 4   military?
 5              PROSPECTIVE JUROR:  No.
 6              THE COURT:  All right.  So what do you do in
 7   retirement?
 8              PROSPECTIVE JUROR:  Actually, I re-did my basement.
 9   We just bought a home.  So been basically doing a lot of
10   nothing.  Reading.  Enjoying --
11              THE COURT:  What do you like to read?
12              PROSPECTIVE JUROR:  I like mystery.  I like -- like
13   period pieces.  I like -- I'm quite interested in the
14   Renaissance period kind of thing.  I like to read a lot of
15   biographies.  Abraham Lincoln, I just about read everything
16   that's written about him kind of a thing, so --
17              THE COURT:  We're going to celebrate his birthday
18   soon.
19              PROSPECTIVE JUROR:  Yeah.
20              THE COURT:  What do you watch on TV?
21              PROSPECTIVE JUROR:  Sports and a lot of how-to
22   programs.
23              THE COURT:  Yes, I would imagine if you knew how to do
24   your basement, right?
25              PROSPECTIVE JUROR:  Yeah, I -- you know, I'm in -- I'm

Jury Selection

1    also a woodworker.  I build furniture, you know, as a hobby

2    kind of a thing.

3              THE COURT:  Okay.

4              PROSPECTIVE JUROR:  So I'm always watching other

5    people do, to learn.

6              THE COURT:  Where do you get your news from?

7              PROSPECTIVE JUROR:  I don't get a lot.  It would

8    probably be the internet.  Usually, it's kind of like -- like

9    when the balloon situation was taking place, I just find it

10   interesting to find out something.  I'm not a big one to watch

11   news on TV.

12             THE COURT:  But you found out about the balloon

13   somehow, so --

14             PROSPECTIVE JUROR:  Yeah.  I mean, people were talking

15   about it, so I read about it on the internet, like, you know --

16             THE COURT:  I get it.  Okay.

17             PROSPECTIVE JUROR:  I'm more interested in why didn't

18   it get shot down earlier and all that kind of stuff, but

19   that's, you know ...

20             THE COURT:  Okay.  What about TV shows or -- do you

21   watch TV shows?

22             PROSPECTIVE JUROR:  There's -- I like -- there's a

23   bunch of, like, how-to's.  There's things like -- there's one

24   called *The Craftsman*.  It's just about the life of a guy who is

25   a pretty interesting craftsman kind of thing, and those type

Jury Selection

1    of, you know --

2              THE COURT:  Okay.

3              PROSPECTIVE JUROR:  -- some remodeling things.

4              THE COURT:  Do you belong to any groups or clubs or

5    organizations?

6              PROSPECTIVE JUROR:  My church and -- I'm a board

7    member of my church.  I'm a board member of a couple of small

8    little religious, you know, training groups.

9              THE COURT:  Have you ever served on a jury?

10             PROSPECTIVE JUROR:  Yes, for a half a witness, if that

11   makes any sense.

12             THE COURT:  It does.  Did it end then?

13             PROSPECTIVE JUROR:  Yeah, they -- you know, it was

14   quite -- it ended.  They went to recess for lunch.  And then

15   after that, the judge came out and talked to us about the

16   process and basically said that this is pretty common.  The

17   whole hope is that the two parties would come to agreement --

18             THE COURT:  And they did.

19             PROSPECTIVE JUROR:  -- and they did.

20             THE COURT:  So it was a civil case then?

21             PROSPECTIVE JUROR:  It was a civil case.

22             THE COURT:  Okay.  So you never got to deliberate.

23             PROSPECTIVE JUROR:  No.

24             THE COURT:  Okay.  Have you or a close friend or

25   family member been involved in a civil lawsuit?

Jury Selection

1           PROSPECTIVE JUROR:  No.

2           THE COURT:  In a criminal case?

3           PROSPECTIVE JUROR:  No.

4           THE COURT:  Administrative hearing?

5           PROSPECTIVE JUROR:  No.

6           THE COURT:  Do you have any philosophical or religious

7      beliefs that would prevent you from sitting in judgment of

8      someone else?

9           PROSPECTIVE JUROR:  No.

10          THE COURT:  Do you have any close friends or relatives

11     who are lawyers or private investigators?

12          PROSPECTIVE JUROR:  My nephew is an attorney.

13          THE COURT:  Okay.

14          PROSPECTIVE JUROR:  He's kind of a corporate attorney.

15          THE COURT:  Do you have any legal training?

16          PROSPECTIVE JUROR:  Not really.  Part of my MBA, I

17     mean, but -- and I did a lot of -- we had a lot of patent, you

18     know, work when I was in more of a research kind of a thing.

19          THE COURT:  Okay.

20          PROSPECTIVE JUROR:  And so worked a lot with patent

21     attorneys to get things patented and sometimes to defend, but I

22     was never in a trial more than just an expert kind of

23     witness --

24          THE COURT:  Were the patents pharmaceutical patents?

25          PROSPECTIVE JUROR:  They were pharmaceutical, medical

Jury Selection

1    device.

2              THE COURT:  Okay.  Got it.

3              So I had that list of entities.  Did you listen to

4    that list --

5              PROSPECTIVE JUROR:  Yeah.

6              THE COURT:  -- carefully?

7              PROSPECTIVE JUROR:  I don't really have any exposure

8    to --

9              THE COURT:  What about any experience at all with

10   Washington Federal Bank?

11             PROSPECTIVE JUROR:  No.

12             THE COURT:  From what you've been hearing here today,

13   is there anything that you think would cause you to be

14   impartial?

15             PROSPECTIVE JUROR:  I don't think so.

16             THE COURT:  Okay.

17             Would you like to follow up, Mr. Kowalski?

18             MR. KOWALSKI:  Yes.  Are you familiar with the

19   SkipperBuds or have any association or dealings with the

20   SkipperBuds in Volo?

21             PROSPECTIVE JUROR:  SkipperBuds?  I'm familiar.  I

22   think they moved.  They were on Route 12.  They're just a --

23   they're a boat manufacturer or boat sales group or something

24   like that.  I'm not -- I'm familiar enough to have driven past

25   it.

Jury Selection

1          MR. KOWALSKI:  Okay.  Thank you.

2          PROSPECTIVE JUROR:  Yeah.  I live in a boating

3     community, but I don't have a boat, so it's kind of one of

4     those weird things.

5          (Laughter.)

6          THE COURT:  Any follow-up from the government?

7          (Counsel confering.)

8          MR. DANIEL:  Two things, your Honor.

9          To follow up on the SkipperBuds issue, one of the

10    witnesses who will testify in this case is an employee there.

11         THE COURT:  Okay.

12         MR. DANIEL:  And so it would be if the prospective

13    juror has gone in or knows any employees --

14         THE COURT:  What is the name of that person?

15         MR. DANIEL:  Tory Windorski.

16         THE COURT:  Do you know Mr. Windorski?

17         PROSPECTIVE JUROR:  No.  Again, I mean, you can't

18    drive through Volo, in that whole area, without going past --

19    I've only driven past the business.  I've never gone in.  And I

20    don't -- I don't know any of the employees there.

21         MR. DANIEL:  And then the second follow-up would be, I

22    don't know if the Court asked Question 17 regarding

23    philosophical, religious beliefs that would prevent the

24    prospective juror from sitting in judgment of another person.

25         PROSPECTIVE JUROR:  Yeah, I think you did ask, but I

Jury Selection

1    don't have any.

2              MR. DANIEL:  Okay.

3              THE COURT:  Okay.  Anything else from the questions

4    they asked?

5              MR. KOWALSKI:  No, thank you.

6              THE COURT:  Okay.  You can step down then and be

7    excused.

8              And I will see Frances Verenski.

9              Hello.

10             PROSPECTIVE JUROR:  Hi.

11             THE COURT:  Good morning.

12             PROSPECTIVE JUROR:  Good morning.

13             THE COURT:  Please state your name and your age.

14             PROSPECTIVE JUROR:  Frances Agnes Verenski.  I am 43.

15             THE COURT:  Where do you live?

16             PROSPECTIVE JUROR:  Grayslake.

17             THE COURT:  Who do you live with?

18             PROSPECTIVE JUROR:  I live with my mother and one of

19   my sisters.

20             THE COURT:  What does your mom do?

21             PROSPECTIVE JUROR:  She's retired.  She used to be a

22   store manager for a camera company.  It was Helix Camera.  And

23   then they kind of -- they got bought out, and then she just

24   retired.

25             THE COURT:  Is that right?  Helix isn't in existence

Jury Selection

1    anymore?

2          PROSPECTIVE JUROR:  No, they aren't.

3          THE COURT:  And what does your sister do?

4          PROSPECTIVE JUROR:  She is one of the lead managers at

5    a Target in Wisconsin.

6          THE COURT:  Okay.  And what do you do?

7          PROSPECTIVE JUROR:  I am a -- technical title is Dean

8    and Student Service Administrative Assistant.  So I'm the

9    assistant to our principal.  I work at a school.  So I'm the

10   assistant to the principal and our Director of Student Services

11   and Special Education.

12         THE COURT:  What school is that?

13         PROSPECTIVE JUROR:  Prairie Crossing Charter School.

14         THE COURT:  Is it grammar school, high school?

15         PROSPECTIVE JUROR:  It is an elementary school.  It's

16   a K through 8.

17         THE COURT:  K through 8, okay.

18         And how long have you been with them?

19         PROSPECTIVE JUROR:  This is year 20 for me.

20         THE COURT:  Okay.  Well, that's more than five, going

21   back.

22         What's your marital status?

23         PROSPECTIVE JUROR:  I am single.

24         THE COURT:  Any children?

25         PROSPECTIVE JUROR:  No.

Jury Selection

1          THE COURT:  And what's your educational background?

2          PROSPECTIVE JUROR:  I have a Master's in Social Work

3     from Loyola.

4          THE COURT:  Okay.  I forgot to ask you, do you own or

5     rent your home?

6          PROSPECTIVE JUROR:  I -- well, my mom owns the home.

7          THE COURT:  Have you ever served in the military?

8          PROSPECTIVE JUROR:  No.

9          THE COURT:  With your position there at the school,

10    are you supervising other people?

11         PROSPECTIVE JUROR:  Not technically supervising.  It's

12    more of an -- I work with people.  I don't -- my role is not a

13    supervise position.

14         THE COURT:  Got it.  Okay.

15         What do you like to do in your free time?

16         PROSPECTIVE JUROR:  I love baking and cooking,

17    spending time with my nieces.  When the weather is nice,

18    getting outside.  You know, I have a garden in the back.

19    Taking my dogs for a walk.  Stuff like that.

20         THE COURT:  What kind of dogs do you have?

21         PROSPECTIVE JUROR:  I have two miniature poodles.

22         THE COURT:  And when you have time on the internet,

23    what do you like to do there?

24         PROSPECTIVE JUROR:  Well, I do spend a lot of the time

25    on the internet for work, but it's primarily like ordering

Jury Selection

1    stuff, sending emails, everything like that.  So when I get

2    home, I don't want to do a lot of screen time.  I've had a

3    lot -- you know, but when I do, it's usually like -- I am on

4    Facebook, so I'll check that, you know, see what family is

5    doing and whatever.  See that -- I get my news from WGN and ABC

6    from that.  But then it's primarily then any other stuff is

7    like playing games like Sudoku and stuff like that.

8             THE COURT:  Yes, your wind-down time.

9             PROSPECTIVE JUROR:  Oh, yes.

10            THE COURT:  Do you watch TV?

11            PROSPECTIVE JUROR:  Occasionally, it will be on,

12   but -- like I'll usually watch -- my favorites right now are

13   *Good Doctor* and the *Chicago* one shows.

14            THE COURT:  Do you read?

15            PROSPECTIVE JUROR:  Occasionally, fiction.  Just, you

16   know, just general fiction.  Nothing really specific.

17            THE COURT:  Do you belong to any groups or clubs or

18   organizations?

19            PROSPECTIVE JUROR:  Just my nieces' school's PTA.

20            THE COURT:  Okay.  Are the nieces you're referring to

21   the children of the sister in the house?

22            PROSPECTIVE JUROR:  No.

23            THE COURT:  Another family member --

24            PROSPECTIVE JUROR:  Another sister, yes.

25            THE COURT:  Another sister.  Okay.

Jury Selection

1          And have you served on a jury before?

2          PROSPECTIVE JUROR:  I have, about 15 years ago.  It

3    was county, Lake County.  It was for restitution.  We just had

4    to decide how much someone had to pay the other person.

5          THE COURT:  Okay.  And did you serve as the foreperson

6    on that jury?

7          PROSPECTIVE JUROR:  No.

8          THE COURT:  Did you come to a conclusion?

9          PROSPECTIVE JUROR:  Yes.

10         THE COURT:  Okay.  Have you ever been involved in a

11   civil lawsuit?

12         PROSPECTIVE JUROR:  No.

13         THE COURT:  In a criminal matter?

14         PROSPECTIVE JUROR:  No.

15         THE COURT:  In an administrative hearing?

16         PROSPECTIVE JUROR:  No.

17         THE COURT:  Has anyone close to you been involved in

18   those things?

19         PROSPECTIVE JUROR:  No.

20         THE COURT:  Okay.  Do you hold any philosophical or

21   religious beliefs that would prevent you from sitting in

22   judgment of another person?

23         PROSPECTIVE JUROR:  No.

24         THE COURT:  Do you have any relatives or friends who

25   are lawyers?

Jury Selection

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  Any legal training yourself?

3          PROSPECTIVE JUROR:  No.

4          THE COURT:  Okay.  Anything about the case that you

5    think might cause you to be impartial?

6          PROSPECTIVE JUROR:  Not to my knowledge.

7          THE COURT:  Did you listen carefully to that list that

8    I had?

9          PROSPECTIVE JUROR:  I did.

10          THE COURT:  Any involvement?

11          PROSPECTIVE JUROR:  No.

12          THE COURT:  Any involvement with Washington Federal?

13          PROSPECTIVE JUROR:  No.

14          THE COURT:  Okay.  Mr. Kowalski, do you want to follow

15    up?

16          MR. KOWALSKI:  No.

17          THE COURT:  Okay.  Does the government want to follow

18    up?

19          MR. DANIEL:  No, your Honor.

20          THE COURT:  Okay.  You can be seated.  Thank you.

21          And that leads me to Margaret Largay.

22          PROSPECTIVE JUROR:  Good morning.

23          THE COURT:  Good morning.  Please state your full name

24    and your age.

25          PROSPECTIVE JUROR:  Margaret Louise Largay.  I'm 65.

Jury Selection

1            THE COURT:  Where do you live?

2            PROSPECTIVE JUROR:  Lake Forest.

3            THE COURT:  Who do you live with?

4            PROSPECTIVE JUROR:  Now I live alone.  I lost my

5    mother and my dog this summer.

6            THE COURT:  Oh, I'm sorry.  That's a shame.

7            PROSPECTIVE JUROR:  Yeah.

8            THE COURT:  What kind of dog did you have?

9            PROSPECTIVE JUROR:  Portuguese water dog.

10           THE COURT:  Don't you think it's time to get another?

11           PROSPECTIVE JUROR:  Eventually.

12           THE COURT:  Right, Gayle?

13       My court reporter lost her dog, and we're pushing her

14   to get another dog.

15       (Laughter.)

16           PROSPECTIVE JUROR:  I'll get one.

17           THE COURT:  Yes.  It's hard, isn't it?

18           PROSPECTIVE JUROR:  Yes.

19           THE COURT:  What is your marital status?

20           PROSPECTIVE JUROR:  Divorced.

21           THE COURT:  Do you have any children?

22           PROSPECTIVE JUROR:  I have an adult son.

23           THE COURT:  What does he do?

24           PROSPECTIVE JUROR:  He is a legislative aide for

25   Senator Steve Daines, who is a senator from Montana.

Jury Selection

1           THE COURT:  Okay.  And what's your educational
2   background?
3           PROSPECTIVE JUROR:  I have a Bachelor's in History,
4   and then I also had -- did graduate studies in Art History.
5           THE COURT:  Art History, okay.
6           Have you ever served in the military?
7           PROSPECTIVE JUROR:  No.
8           THE COURT:  Where have you been working the last five
9   years?
10          PROSPECTIVE JUROR:  I was a senior vice president and
11  trust officer at First Midwest Bank.  We recently merged with
12  Old National Bank.
13          THE COURT:  Right.  They've got the big billboard now
14  on the expressway.
15          PROSPECTIVE JUROR:  Yeah.  I miss my old bank.
16          THE COURT:  Are you still working there then?
17          PROSPECTIVE JUROR:  No.  I retired at the first of the
18  year.
19          THE COURT:  Oh, just recently.
20          PROSPECTIVE JUROR:  Yeah.
21          THE COURT:  Okay.  So what do you like to do in your
22  retirement?
23          PROSPECTIVE JUROR:  Well, I haven't had time to do
24  really anything, but --
25          THE COURT:  What's the plan for retirement?

Jury Selection

1          PROSPECTIVE JUROR:  The plan is that I'm moving out of

2    the house that I shared with my mother because I was taking

3    care of her.

4          THE COURT:  Right.

5          PROSPECTIVE JUROR:  I'm renovating my house.  And I

6    hope to move there.  And then I hope to travel.

7          THE COURT:  Nice.

8          Is your house located in Lake Forest?

9          PROSPECTIVE JUROR:  Yes.

10         THE COURT:  Okay.  What do you like to do as far as

11   watching TV?

12         PROSPECTIVE JUROR:  Well, I don't watch a lot of TV.

13         THE COURT:  Okay.

14         PROSPECTIVE JUROR:  I mean, I just worked so ...

15         THE COURT:  Are you on the internet at all?

16         PROSPECTIVE JUROR:  Virtually not at all.

17         THE COURT:  Any social media?

18         PROSPECTIVE JUROR:  No.

19         THE COURT:  None at all.  Okay.

20         Do you belong to any groups, clubs, or organizations?

21         PROSPECTIVE JUROR:  A number.  I'm a member of the

22   Women's Organization for the United Way of Lake County.  I'm a

23   board member for the College of Lake County Foundation Board.

24   I do a lot with Catholic Charities.  And then I belong to a

25   couple of private clubs, one of which I'm a board member.

Jury Selection

1          THE COURT:  Okay.  Have you served on a jury before?

2          PROSPECTIVE JUROR:  I have.

3          THE COURT:  When was that?

4          PROSPECTIVE JUROR:  In the '80s.

5          THE COURT:  In the '80s?

6          PROSPECTIVE JUROR:  Yeah.

7          THE COURT:  Was it civil or criminal case?

8          PROSPECTIVE JUROR:  It was civil, in Lake County.  And

9   I was not the foreperson.  But after a lot of testimony, the

10  judge ended up throwing it out.

11         THE COURT:  Oh, okay.  So you never got to deliberate.

12         PROSPECTIVE JUROR:  We did not.

13         THE COURT:  Have you ever been involved in a civil

14  case?

15         PROSPECTIVE JUROR:  Yes.

16         THE COURT:  What was that?

17         PROSPECTIVE JUROR:  A divorce, and then proceedings

18  pertaining to a child years later.

19         THE COURT:  So those can be very challenging.

20         PROSPECTIVE JUROR:  They were.

21         THE COURT:  Is there anything about those proceedings

22  that might impact the way you look at these lawyers or the

23  justice system?

24         PROSPECTIVE JUROR:  No, I don't think so.

25         THE COURT:  Okay.  You think you can be fair to

Jury Selection

1    everyone here?

2            PROSPECTIVE JUROR:  I think so.

3            THE COURT:  Okay.  Any other civil matters?

4            PROSPECTIVE JUROR:  No.

5            THE COURT:  Criminal cases?

6            PROSPECTIVE JUROR:  No.

7            THE COURT:  Administrative hearings?

8            PROSPECTIVE JUROR:  No.

9            THE COURT:  Okay.  Now, do you have any philosophical

10   or religious beliefs that would prevent you from sitting in

11   judgment of someone?

12           PROSPECTIVE JUROR:  No, I don't think so.

13           THE COURT:  Okay.  Any legal training at all?

14           PROSPECTIVE JUROR:  I have no legal training per se,

15   but many lawyers and judges in our family.

16           THE COURT:  Okay.  Tell me about all those lawyers and

17   judges.

18           PROSPECTIVE JUROR:  My grandfather was on the

19   Appellate bench here in Chicago.  My uncle was on the Circuit

20   bench.  Another uncle was a partner at Lord, Bissell & Brook.

21           THE COURT:  Okay.

22           PROSPECTIVE JUROR:  I have a cousin who is a lawyer

23   now.

24           THE COURT:  Okay.

25           PROSPECTIVE JUROR:  So a lot of lawyers.

Jury Selection

1          THE COURT:  A lot of legal minds out there.

2          PROSPECTIVE JUROR:  Yeah.

3          THE COURT:  Okay.  Any of them in particular work in

4  the area of criminal prosecution or defense?

5          PROSPECTIVE JUROR:  No.

6          THE COURT:  Okay.  And, of course, in the -- the

7  Appellate Court would certainly have criminal cases going up,

8  but what about the other ones at the Circuit Court level?  They

9  weren't on the criminal bench?

10          PROSPECTIVE JUROR:  I don't think so.

11          THE COURT:  Okay.  Now, I had that list of different

12  entities.  Did you listen to that?

13          PROSPECTIVE JUROR:  Yes, I did.  And my cousin's

14  husband was the special agent in charge for the FBI here in

15  Chicago.

16          THE COURT:  Okay.  Who is that?

17          PROSPECTIVE JUROR:  His name is Herbert Lawrence

18  Collins.

19          THE COURT:  Okay.  And do you know this person well?

20          PROSPECTIVE JUROR:  Very well.

21          THE COURT:  And does he talk about his cases?

22          PROSPECTIVE JUROR:  Well, he's not in the Bureau

23  anymore.  He's retired from it.

24          THE COURT:  Okay.

25          PROSPECTIVE JUROR:  But we've talked about many of his

Jury Selection

1    cases for many years.

2              THE COURT:  So I have, as you heard, an FBI agent

3    sitting with the prosecutors now.

4              PROSPECTIVE JUROR:  Yeah.

5              THE COURT:  But Mr. Kowalski is entitled to a fair

6    trial.  He's entitled to a presumption of innocence.

7              Do you think that, even in spite of this person that

8    you knew well in the FBI, that you can give him a fair trial,

9    looking at him and giving him that presumption?

10             PROSPECTIVE JUROR:  Yes.

11             THE COURT:  Okay.  What about any interactions at all

12   with Washington Federal Bank?

13             PROSPECTIVE JUROR:  None, your Honor.

14             THE COURT:  Okay.  So let's go -- you had two people

15   that you had mentioned that you might know.

16             PROSPECTIVE JUROR:  Yes.

17             THE COURT:  I'm going to have you first start with the

18   first one.  Who was that?

19             PROSPECTIVE JUROR:  That was Rosa Angeles.

20             THE COURT:  The other one?

21             PROSPECTIVE JUROR:  Connie Brandt.

22             THE COURT:  Do you want to ask any follow-up questions

23   on that?

24             MR. DANIEL:  No follow-up questions at this time, your

25   Honor.

Jury Selection

1    THE COURT:  Okay.  Mr. Kowalski, do you want to ask
2    any questions?
3            MR. KOWALSKI:  I'm not sure who Rosa Angeles or Connie
4    Brandt are.
5            THE COURT:  Were they listed?
6            MR. DANIEL:  They are witnesses, your Honor.
7            THE COURT:  How do you know Rosa Angeles?
8            PROSPECTIVE JUROR:  Rosa Angeles was a colleague of
9    mine at Old National Bank or First Midwest Bank.  She was the
10   head of our land trust group.
11           And Connie Brandt was a mortgage officer, also at
12   First -- First Midwest, Old National Bank.
13           THE COURT:  Do you still work with them?
14           PROSPECTIVE JUROR:  Well, I did until the end of the
15   year.
16           THE COURT:  Oh, I see.
17           PROSPECTIVE JUROR:  So I worked with them a lot, for a
18   number of years.
19           THE COURT:  Okay.  Any follow-up from either of you?
20           MR. KOWALSKI:  Yes.  You worked as a land trust
21   officer?
22           PROSPECTIVE JUROR:  No.  I was not a land trust
23   officer.  I was a trust officer and senior vice president of
24   the bank.
25           MR. KOWALSKI:  First Midwest has acquired or by merger

Jury Selection

1    several banks.  Can you tell me which banks may have been

2    merged or -- into First Midwest Bank?

3             PROSPECTIVE JUROR:  There were 23 banks, I believe,

4    that merged initially to form First Midwest.  I don't know all

5    of them, but -- because it happened over a number of years,

6    when branch banking laws were first introduced back in the

7    '80s.  And then, subsequently, First Midwest acquired a number

8    of banks, maybe five or six in the years that I was there.  And

9    then in the past couple of years, we merged with Old National

10   Bank.

11            MR. KOWALSKI:  But you were doing some trust work, but

12   they weren't land trusts.

13            PROSPECTIVE JUROR:  Well, some of my clients did have

14   land trusts.

15            MR. KOWALSKI:  Are you knowledgeable about land

16   trusts?  It's part of the -- it's part of this case.

17            PROSPECTIVE JUROR:  I know some.  Enough to be

18   dangerous, I think, but not a lot.

19        (Laughter.)

20            MR. KOWALSKI:  One other question.  What part of Lake

21   Forest are you from?

22            PROSPECTIVE JUROR:  I live in East Lake Forest.

23            MR. KOWALSKI:  Okay.  Thank you.

24            THE COURT:  Anything else?

25            All right.  Then you can step down.  Thank you.

Jury Selection

 1          And our next witness -- our next prospective juror is

 2    Kathryn -- is it Kuenster?

 3          PROSPECTIVE JUROR:  Kuenster, like Ken, the Barbie

 4    doll, and you stir something.

 5          THE COURT:  I didn't hear you.  I'll let you -- when

 6    you come up, you can tell me.

 7          PROSPECTIVE JUROR:  It's Kuenster, like Ken, the

 8    Barbie doll, and you stir something.

 9          THE COURT:  Got it.  I bet you've said that a lot.

10          Where do you live?

11          PROSPECTIVE JUROR:  In Oak Park.

12          THE COURT:  Who lives with you?

13          PROSPECTIVE JUROR:  I own a two-flat with my husband

14    and my sister.  And my mom, my sister, my husband, and our two

15    kids live with us.

16          THE COURT:  Oh, nice.

17          How old are you?

18          PROSPECTIVE JUROR:  52.

19          THE COURT:  Okay.  What does your husband do?

20          PROSPECTIVE JUROR:  He just got laid off --

21          THE COURT:  Oh, sorry.

22          PROSPECTIVE JUROR:  -- on Wednesday, but he was a

23    Director of Engineering.  So I would like to discuss being off

24    for six weeks because -- for four weeks, I could do, because my

25    work pays for three weeks of jury service.  And then they said

Jury Selection

1     I could take a week of vacation.  But I don't think another two

2     weeks would work.

3             THE COURT:  Right, yes.  Let me have a sidebar just

4     with the lawyers, not with you, okay?  And we'll see what --

5     because I'll check with them about the length of the trial.

6       (At sidebar outside the hearing of the venire.)

7             THE COURT:  So how long do you think the case is going

8     to last you?

9             MR. DANIEL:  The government's evidence, your Honor, is

10     it's expected to take about two and a half weeks, possibly at

11     the high end three weeks.

12             THE COURT:  What do you think?  Are you going to have

13     a lot of defense case or cross?

14             MR. KOWALSKI:  Yes.  Yes, I anticipate that.

15             THE COURT:  So you think it will go over that time,

16     right?

17             MR. KOWALSKI:  Yes.

18             THE COURT:  What are your thoughts, lawyers, on

19     whether we should let her go?  This is new development for her

20     that she's had her husband laid off.

21             MR. KOWALSKI:  It seems to be the fair thing to do.

22             MR. DANIEL:  Government has no problem excusing her,

23     your Honor.

24             THE COURT:  Okay.  Thank you.

25       (Sidebar proceedings concluded.)

Jury Selection

1    THE COURT:  Okay.  Based on the newly unfortunate
2    evidence that your husband is laid off and you have to be doing
3    some work for that family, we're going to let you get off this
4    panel, okay?  Because it's going to possibly go longer than
5    that.
6    PROSPECTIVE JUROR:  Okay.
7    THE COURT:  And I think that's going to be difficult.
8    Okay?
9    PROSPECTIVE JUROR:  Okay.
10   THE COURT:  So we'll let you -- you can take a seat in
11   the jury box for now.  And then when we're done, Lynn will talk
12   with you about letting go.  Okay?
13   PROSPECTIVE JUROR:  Okay.  So I have -- the notice
14   that I got says I have to call in every day for four weeks.  Do
15   I still continue to call in?
16   THE COURT:  Yes.
17   THE CLERK:  They do not, no, once they're finished
18   today.
19   THE COURT:  Okay.  All right.  No.  That's --
20   PROSPECTIVE JUROR:  Thank you.
21   THE COURT:  Okay.  Sorry about that --
22   PROSPECTIVE JUROR:  Sorry.
23   THE COURT:  -- with your husband.
24   James Passolano.  There he is.
25   PROSPECTIVE JUROR:  Good morning.

Jury Selection

1          THE COURT:  Good morning.  Your name, please, and your
2    age?
3          PROSPECTIVE JUROR:  James Passolano, 60.
4          THE COURT:  Where do you live?
5          PROSPECTIVE JUROR:  Manhattan.
6          THE COURT:  Okay.  Who do you live with?
7          PROSPECTIVE JUROR:  I live alone with my dog and fish.
8          THE COURT:  Okay.  So now I've got to find out what
9    kind of dog you have.
10          PROSPECTIVE JUROR:  I have a silver Lab.
11          THE COURT:  Okay.  What's that dog's name?
12          PROSPECTIVE JUROR:  Grace.
13          THE COURT:  Of course.  Gracie, right?
14          PROSPECTIVE JUROR:  Right.
15          THE COURT:  "Good night, Gracie."  Do you say that to
16    her every night?
17          PROSPECTIVE JUROR:  Yeah.
18          THE COURT:  Yes, you knew it.
19       (Laughter.)
20          THE COURT:  Do you own or do you rent?
21          PROSPECTIVE JUROR:  I own.
22          THE COURT:  Okay.  What's your marital status?
23          PROSPECTIVE JUROR:  Divorced.
24          THE COURT:  Do you have adult children?
25          PROSPECTIVE JUROR:  Yes.

Jury Selection

1              THE COURT:  Tell me about them.

2              PROSPECTIVE JUROR:  Sidebar.

3              THE COURT:  Okay.  And have you served in the

4      military?

5              PROSPECTIVE JUROR:  Yes, I have.

6              THE COURT:  What was your service?  What was the

7      highest rank when you left?

8              PROSPECTIVE JUROR:  E-4.

9              THE COURT:  And were you discharged honorably?

10             PROSPECTIVE JUROR:  Yes, ma'am.

11             THE COURT:  What have you been doing for the last five

12     years?

13             PROSPECTIVE JUROR:  I just retired in August.  Prior

14     to that, I worked for the University of Chicago as Director of

15     Design Construction and Facility Operations for the Science

16     Division.

17             THE COURT:  What is that?

18             PROSPECTIVE JUROR:  I worked for the Dean.  And I

19     oversaw all the renovation and new construction of our science

20     buildings.  And I also oversaw facility operations,

21     maintenance, operations.  Basically I'd just do whatever

22     complaints I got from the faculty.

23             THE COURT:  Right.  You wore a lot of hats.

24             What's your educational background?

25             PROSPECTIVE JUROR:  I have a degree in electrical

93

Jury Selection

1    engineering.  Bachelor's degree from Illinois Institute of
2    Technology.
3            THE COURT:  You worked there for at least five years
4    before you retired?
5            PROSPECTIVE JUROR:  I worked there since 1996.
6            THE COURT:  Oh, that's more than five years.
7            So what do you like to do now?
8            PROSPECTIVE JUROR:  Now I like to hike.  Long walks
9    with the dog.  Hiking.  Camping.  I'm looking at doing some
10   projects around the house.  Looking at plans on the internet to
11   build -- I don't know if you know what they are -- teardrop
12   campers.  It's a small -- it looks like a teardrop.  It's a
13   camper.
14           THE COURT:  That you put on a truck or something?
15           PROSPECTIVE JUROR:  Yeah.  You tow it.  I'd like to go
16   travel the country --
17           THE COURT:  Right.
18           PROSPECTIVE JUROR:  -- national parks.
19           THE COURT:  So Gracie has got some traveling in her --
20           PROSPECTIVE JUROR:  Oh, yes.
21           THE COURT:  Do you watch TV?
22           PROSPECTIVE JUROR:  Yeah.  I stream some series.  Last
23   one I did was *Tulsa King*.  And then like *Band of Brothers*.
24   Like Discovery Channel.  Working for the Science Division, I
25   got into physics and astronomy, so I watch the Discovery

Jury Selection

1    Channel a lot.

2              THE COURT:  Okay.  Do you read anything?

3              PROSPECTIVE JUROR:  Bible.  Some books on religious

4    topics.

5              THE COURT:  Okay.  Do you go on any social media

6    sites?

7              PROSPECTIVE JUROR:  Pinterest.  I'm on Pinterest,

8    looking at different -- you get free plans for, like, if I'm

9    building an Adirondack chair or, like I said, these campers,

10   you get plans and ideas from that.

11             THE COURT:  So you can work with wood as well then,

12   right?

13             PROSPECTIVE JUROR:  I wouldn't say I work well with

14   it.  I work with it.  I'm a butcher with it, but ...

15        (Laughter.)

16             THE COURT:  Okay.  Do you belong to any groups, clubs,

17   or organizations?

18             PROSPECTIVE JUROR:  Just church.

19             THE COURT:  Do you have a position at the church?

20             PROSPECTIVE JUROR:  No, I don't.

21             THE COURT:  Okay.  Have you served on a jury before?

22             PROSPECTIVE JUROR:  No, I haven't.

23             THE COURT:  All right.  Have you or a close friend or

24   family member been a party to or a witness in a civil lawsuit?

25             PROSPECTIVE JUROR:  No.

Jury Selection

1      THE COURT:  Criminal case?

2      PROSPECTIVE JUROR:  My younger brother was an

3  assistant DA in Will County for Glasgow.

4      THE COURT:  Okay.  How long was that?

5      PROSPECTIVE JUROR:  That was in the late '90s to the

6  early 2000s.  He was only assistant DA for three years.

7      THE COURT:  What does he do now?

8      PROSPECTIVE JUROR:  He works for an insurance

9  company -- health insurance company.  He's VP for Billing

10  Integrity.

11      THE COURT:  Okay.  Do you have any philosophical or

12  religious beliefs that would prevent you from sitting in

13  judgment?

14      PROSPECTIVE JUROR:  No.

15      THE COURT:  Any legal training yourself?

16      PROSPECTIVE JUROR:  No.

17      THE COURT:  Any friends who are lawyers other than

18  that brother -- brother-in-law, right?

19      PROSPECTIVE JUROR:  Brother.

20      THE COURT:  Oh, brother.  Okay.

21      PROSPECTIVE JUROR:  No.

22      THE COURT:  Did you hear that list of --

23      PROSPECTIVE JUROR:  Yes.

24      THE COURT:  -- entities?

25      Do you have any interaction with them?

Jury Selection

1        PROSPECTIVE JUROR:  No.

2        THE COURT:  All right.  What about with Washington
3    Federal Bank?

4        PROSPECTIVE JUROR:  No.

5        THE COURT:  Okay.  Let's do your sidebar then.

6      (At sidebar outside the hearing of the venire.)

7        THE COURT:  Okay.  So you said you wanted to talk to
8    me about your children.

9        PROSPECTIVE JUROR:  Yes.  Following my divorce, I
10   haven't had any contact with my children.  It was a difficult
11   divorce.  And kind -- you know, it's personal and hurtful, and
12   I didn't want to bring it up in front of the public.

13       THE COURT:  I understand that.

14       So since it was so contentious and challenging for
15   you, do you think that you can sit here and give both sides
16   your open mind and listen to the evidence and not have any
17   feelings from that previous experience impact you?

18       PROSPECTIVE JUROR:  I can.  It wasn't a difficult
19   divorce in the court.  It was what my wife told to my kids.  My
20   kids were pretty young at the time.  And they just, you know,
21   didn't want to have anything to do with me.

22       THE COURT:  Yes.  Sorry about that.

23       PROSPECTIVE JUROR:  No problem.

24       THE COURT:  Any follow-up, Mr. Daniel?

25       MR. DANIEL:  No, your Honor.

Jury Selection

1         THE COURT:  Any follow-up, Mr. Kowalski?

2         MR. KOWALSKI:  No.  I fully empathize.

3         PROSPECTIVE JUROR:  Thank you.

4         THE COURT:  Thank you.

5     (Sidebar proceedings concluded.)

6         THE COURT:  Okay.  You can step down.  Thank you.

7         PROSPECTIVE JUROR:  Thank you.

8         THE COURT:  My next person -- I've got to get my list

9  here.  Come on up.

10        Jessica, right?

11        PROSPECTIVE JUROR:  Yes.

12        THE COURT:  Jessica Centeno.  Please state your name

13  and your age.

14        PROSPECTIVE JUROR:  Jessica Centeno, 37.

15        THE COURT:  Where do you live?

16        PROSPECTIVE JUROR:  Willowbrook, Illinois.

17        THE COURT:  And who do you live with?

18        PROSPECTIVE JUROR:  My husband and two children.

19        THE COURT:  Do you own or do you rent?

20        PROSPECTIVE JUROR:  We own.

21        THE COURT:  What does your husband do?

22        PROSPECTIVE JUROR:  He is a lift machinist.  He works

23  on forklift machinery.

24        THE COURT:  What do you do?

25        PROSPECTIVE JUROR:  I'm a project manager.

Jury Selection

1           THE COURT:  For what?

2           PROSPECTIVE JUROR:  Cintas Corporation.

3           THE COURT:  What does that mean?

4           PROSPECTIVE JUROR:  So we develop national programs

5    for a variety of industries -- airlines, hotels -- and I manage

6    the implementation of new clients and redesigns of existing

7    clients.

8           THE COURT:  And the children, are they little?

9           PROSPECTIVE JUROR:  Yes.

10          THE COURT:  How old are they?

11          PROSPECTIVE JUROR:  My son is nine, and my daughter is

12   six.

13          THE COURT:  Okay.  So have you ever served in the

14   military?

15          PROSPECTIVE JUROR:  No, ma'am.

16          THE COURT:  Have you been with that company for at

17   least five years?

18          PROSPECTIVE JUROR:  Yes.

19          THE COURT:  What do you like to do when you have free

20   time?

21          PROSPECTIVE JUROR:  I like to work out, walk outside,

22   and spend time with my family and my children.

23          THE COURT:  What kind of workout do you like?

24          PROSPECTIVE JUROR:  I'm a member of Beach Body, so I

25   do a lot of home weightlifting and different programs.

Jury Selection

1          THE COURT:  Okay.  Do you watch TV?

2          PROSPECTIVE JUROR:  A little.

3          THE COURT:  What do you like to watch?

4          PROSPECTIVE JUROR:  I like *Yellowstone* and *Handmaid's*

5     *Tale* are a couple shows that I follow.

6          THE COURT:  That you've been watching now?

7          PROSPECTIVE JUROR:  Uh-hum.

8          THE COURT:  Do you read?

9          PROSPECTIVE JUROR:  Yes.

10         THE COURT:  What do you like to read?

11         PROSPECTIVE JUROR:  I do a mixture of, like, emotional

12    intelligence, parenting-type style books.  But then I also have

13    recently gotten into, like, fae fantasy.  I don't know.  It's

14    just a new genre of books that I was introduced to, and I've

15    been enjoying it.

16         THE COURT:  Okay.  Are you on social media?

17         PROSPECTIVE JUROR:  A little, yeah.  Facebook and

18    Instagram, I have accounts.

19         THE COURT:  Do you tweet?

20         PROSPECTIVE JUROR:  No.

21         THE COURT:  Okay.  What groups, clubs, or

22    organizations do you belong to, if any?

23         PROSPECTIVE JUROR:  Just my church.

24         THE COURT:  Okay.  Have you served on a jury before?

25         PROSPECTIVE JUROR:  No, ma'am.

Jury Selection

1      THE COURT:  Have you been involved in a civil lawsuit
2  before?
3      PROSPECTIVE JUROR:  No.
4      THE COURT:  Has anyone close to you been involved in
5  one?
6      PROSPECTIVE JUROR:  Not that I'm aware of.
7      THE COURT:  How about a criminal case?
8      PROSPECTIVE JUROR:  Yes.
9      THE COURT:  Do you want to talk to me about it openly
10  or do you want to --
11      PROSPECTIVE JUROR:  We can sidebar.
12      THE COURT:  We'll do sidebar.
13      Do you have any philosophical or religious beliefs
14  that would prevent you from sitting in judgment?
15      PROSPECTIVE JUROR:  No.
16      THE COURT:  Okay.  Any friends who are lawyers?
17      PROSPECTIVE JUROR:  No.
18      THE COURT:  Do you have any legal training?
19      PROSPECTIVE JUROR:  No.
20      THE COURT:  Do you have any involvement with
21  Federal -- I mean Washington Federal Bank?
22      PROSPECTIVE JUROR:  No.
23      THE COURT:  And what about that list of entities that
24  I mentioned?  Any involvement or interaction with any of them?
25      PROSPECTIVE JUROR:  No, ma'am.

Jury Selection

1          THE COURT:  Okay.  Let's do your sidebar then.

2      (At sidebar outside the hearing of the venire.)

3          THE COURT:  I think this was about -- can you hear me?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  I think this was about a criminal case.

6  What's that about?

7          PROSPECTIVE JUROR:  So there's two.  I was involved

8  when I was very young.  And somebody who entered my home, and

9  he didn't -- he just, like, groped me, touched me.  And I don't

10  know what ended up fully happening.  We ended up going to the

11  police station.  And I did show up to court, but I wasn't,

12  like, deposed or put on a witness stand or anything like that,

13  so ...

14          THE COURT:  How old were you?

15          PROSPECTIVE JUROR:  Like 13.

16          THE COURT:  Okay.  When it happened, did the police

17  treat you fairly?

18          PROSPECTIVE JUROR:  Yes.

19          THE COURT:  Okay.  And then -- do you ever know what

20  happened to him?

21          PROSPECTIVE JUROR:  He didn't show up, so there was a

22  bond put out for his arrest, but I don't know what happened

23  after that.

24          THE COURT:  You don't know.  Okay.

25          PROSPECTIVE JUROR:  Huh-uh.

Jury Selection

1          THE COURT:  So pretty traumatic.

2          PROSPECTIVE JUROR:  Uh-hum.

3          THE COURT:  Would that impact looking at the lawyers

4    here in this case?

5          PROSPECTIVE JUROR:  No.

6          THE COURT:  You think you can put that aside?

7          PROSPECTIVE JUROR:  Yes.

8          THE COURT:  I'm really sorry that happened.

9          PROSPECTIVE JUROR:  Thank you.

10          And then my brother was involved in a case as well.

11          THE COURT:  Tell me about that.

12          PROSPECTIVE JUROR:  He was young, and he was involved

13    in, unfortunately, drugs and theft.

14          THE COURT:  Okay.  So was he convicted?

15          PROSPECTIVE JUROR:  Yes.

16          THE COURT:  Did he serve time in jail?

17          PROSPECTIVE JUROR:  He did.

18          THE COURT:  How long?

19          PROSPECTIVE JUROR:  I'm foggy on the exact time, but

20    it was I think over a year.

21          THE COURT:  How old was he at the time?

22          PROSPECTIVE JUROR:  He was only 17, but he was charged

23    as an adult.

24          THE COURT:  As an adult, okay.

25          When he was in prison, did you visit him?

Jury Selection

1       PROSPECTIVE JUROR:  We did.

2       THE COURT:  Where was he imprisoned?

3       PROSPECTIVE JUROR:  In DuPage.

4       THE COURT:  DuPage County Jail?

5       PROSPECTIVE JUROR:  Uh-hum.

6       THE COURT:  Okay.  When you talk about that case

7  around the dinner table, if you ever do, is there a sense of

8  whether he was wrongfully charged or whether it was just

9  something that occurred that he actually did?

10      PROSPECTIVE JUROR:  Yeah, he fully takes

11 responsibility for his actions.

12      THE COURT:  Okay.  All right.  Mr. Kowalski, do you

13 want to follow up with any of those issues?

14      MR. KOWALSKI:  No, thank you.

15      THE COURT:  Okay.

16      MR. DANIEL:  No, your Honor.

17      THE COURT:  Okay.  You can step down then.  Thank you.

18      PROSPECTIVE JUROR:  Okay.  Thank you.

19    (Sidebar proceedings concluded.)

20      THE COURT:  Okay.  That leads me to Sarah Eisinger.

21 Good morning.

22      PROSPECTIVE JUROR:  Good morning.

23      THE COURT:  All right.  Ms. Eisinger, please tell me

24 your full name and your age.

25      PROSPECTIVE JUROR:  Sarah Elizabeth Eisinger, age 35.

Jury Selection

1           THE COURT:  Where do you live?

2           PROSPECTIVE JUROR:  Glenview.

3           THE COURT:  Who do you live with?

4           PROSPECTIVE JUROR:  Live with my husband and my two

5    children.

6           THE COURT:  Do you own or do you rent?

7           PROSPECTIVE JUROR:  We own.

8           THE COURT:  So what does your husband do?

9           PROSPECTIVE JUROR:  He is an account manager for a

10   furniture manufacturing company.

11          THE COURT:  Okay.  What do you do?

12          PROSPECTIVE JUROR:  I am a senior trade analyst for a

13   biopharmaceutical company.

14          THE COURT:  What does that mean?

15          PROSPECTIVE JUROR:  Basically, any of our products

16   that are in our rare disease and inflammation business units, I

17   have to look at the orders, approve them, compare them against

18   contractual obligations for days on hand, channel inventory,

19   sell-outs.  And then I do all the gross sales analysis for

20   those products as well.

21          THE COURT:  Got it.  She's a speed-talker, Gayle.

22        (Laughter.)

23          THE COURT:  How old are the children?

24          PROSPECTIVE JUROR:  Five and seven.

25          THE COURT:  Okay.  What is your educational

Jury Selection

1  background?

2          PROSPECTIVE JUROR:  I have a Bachelor's in Psychology

3  and Sociology and a Master's in Industrial Organizational

4  Psychology.

5          THE COURT:  Okay.  Have you ever served in the

6  military?

7          PROSPECTIVE JUROR:  No.

8          THE COURT:  Okay.  And have you been working that job

9  for at least five years?

10          PROSPECTIVE JUROR:  I've been there a little over

11  three.

12          THE COURT:  Where did you work before that?

13          PROSPECTIVE JUROR:  Prior to that, I was at Aon

14  Consulting.  And I was working as a Project Support Specialist

15  for Employee Culture and Engagement for the North America

16  Division.

17          THE COURT:  Okay.  What do you like to do in your free

18  time?

19          PROSPECTIVE JUROR:  Not a whole lot of free time.

20  Cooking, reading, TV.

21          THE COURT:  When you get the remote and not the kids,

22  what do you put on?

23          PROSPECTIVE JUROR:  I am big into *Dateline*, *48 Hours*,

24  *Snapped*, *Buried in the Backyard*, kind of stuff.

25          THE COURT:  Okay.  Do you go on social media?

106

Jury Selection

1      PROSPECTIVE JUROR:  I do go on Facebook once in a

2  while and post.  I do have a Twitter.  I think I have an

3  Instagram, *Reddit*, but I'm not active really.  I kind of just

4  watch what other people post.

5      THE COURT:  So you don't tweet or re-tweet?

6      PROSPECTIVE JUROR:  Right, yeah, not really.

7      THE COURT:  And do you read?

8      PROSPECTIVE JUROR:  I'm trying to get back into it.

9      THE COURT:  Okay.  What groups, clubs, or

10  organizations do you belong to?

11      PROSPECTIVE JUROR:  Belong to my church.  And then I

12  am a parent volunteer with the Girl Scouts for my daughter.

13      THE COURT:  Okay.  I had Girl Scout cookies come

14  around my house this weekend.

15      PROSPECTIVE JUROR:  Yep.

16      THE COURT:  Lots of little Girl Scouts in the

17  neighborhood, working.

18      Have you served on a jury before?

19      PROSPECTIVE JUROR:  No, I have not.

20      THE COURT:  Okay.  Have you ever been involved in a

21  civil case?

22      PROSPECTIVE JUROR:  Not civil.

23      THE COURT:  How about criminal?

24      PROSPECTIVE JUROR:  People I know.

25      THE COURT:  Do you want to tell me about that?

107

Jury Selection

1    PROSPECTIVE JUROR:  Sidebar.

2    THE COURT:  Okay.  And any administrative hearings?

3    PROSPECTIVE JUROR:  No.

4    THE COURT:  Okay.  Do you have any philosophical or

5    religious beliefs that would prevent you from sitting in

6    judgment of someone?

7    PROSPECTIVE JUROR:  I don't believe so.

8    THE COURT:  Okay.  Any friends or family members who

9    are lawyers?

10   PROSPECTIVE JUROR:  My grandpa is a lawyer in Wayne

11   County, Michigan.

12   THE COURT:  What kind of law does he do?

13   PROSPECTIVE JUROR:  He does criminal and civil.

14   THE COURT:  Okay.  Is that -- where is Wayne County?

15   PROSPECTIVE JUROR:  Detroit.

16   THE COURT:  Have you any legal training yourself?

17   PROSPECTIVE JUROR:  No.

18   THE COURT:  Okay.  You listed -- listened to that list

19   I gave to everyone earlier?

20   PROSPECTIVE JUROR:  Yeah.

21   THE COURT:  Any involvement in any of those?

22   PROSPECTIVE JUROR:  My best friend works for the FBI,

23   but no involvement other than that.

24   THE COURT:  Who is your best friend?

25   PROSPECTIVE JUROR:  Jennifer Green.

Jury Selection

1          THE COURT:  And so when you're with Ms. Green, are you
2     talking about her cases?
3          PROSPECTIVE JUROR:  Never.
4          THE COURT:  Never?  Okay.
5          Having a best friend that's in law enforcement, do you
6     understand that Mr. Kowalski here is entitled to have his
7     presumption of innocence held throughout the entire trial?
8          PROSPECTIVE JUROR:  I do.
9          THE COURT:  Okay.  And nothing about the fact that you
10    have this friend in law enforcement -- in the FBI would make
11    you favor the government over Mr. Kowalski?
12         PROSPECTIVE JUROR:  I don't believe so.
13         THE COURT:  Okay.  You would give him a fair trial.
14         PROSPECTIVE JUROR:  Yes.
15         THE COURT:  Okay.  Do you know anything about
16    Washington Federal?
17         PROSPECTIVE JUROR:  I do not.
18         THE COURT:  Okay.  Let's have a sidebar on that one
19    issue.
20       (At sidebar outside the hearing of the venire.)
21         THE COURT:  Okay.  It's my understanding you had a
22    criminal case with someone.
23         PROSPECTIVE JUROR:  So people close to me have.  I was
24    a competitive gymnast for 15 years.  And five-plus of my
25    teammates were victims in the Larry Nassar lawsuit.  And at

Jury Selection

1    least four of them gave impact statements at his trial.

2            THE COURT:  Well, I'm very sorry to hear that.  That's

3    tough.

4            So did you go to that and listen?

5            PROSPECTIVE JUROR:  I did not because I had just

6    started a new job here in Illinois, so I did not make it home

7    for that.

8            THE COURT:  Understood.

9            Did you watch their testimony?

10           PROSPECTIVE JUROR:  I did.

11           THE COURT:  Now, do you think that they were given

12   appropriate treatment in the courtroom?

13           PROSPECTIVE JUROR:  In the courtroom, yes.

14           THE COURT:  Okay.  Now, when you say in the courtroom,

15   it sounds to me like somebody else may not have given them

16   appropriate -- was it law enforcement?

17           PROSPECTIVE JUROR:  Just the whole process to get to

18   the courtroom and how long it took, while he was still seeing

19   all of us, when there were allegations already out there.

20           THE COURT:  Right.  Who do you blame for that?

21           PROSPECTIVE JUROR:  It's hard not to blame law

22   enforcement a little bit, but also just the gymnastics system

23   for -- they really kind of put it out there to protect him and

24   his status.

25           THE COURT:  Right, yes.

Jury Selection

 1            PROSPECTIVE JUROR:  And didn't let a lot of the

 2    information get to law enforcement that they should have.

 3            THE COURT:  Understood.

 4            Well, now, these law enforcement officers weren't

 5    involved at all in the investigation or lack of investigation

 6    into Mr. Nassar, but do you think that you can look at them and

 7    treat them fairly and open-mindedly?

 8            PROSPECTIVE JUROR:  I believe I can, yeah.

 9            THE COURT:  Okay.  Any follow-up questions from

10    Mr. Kowalski?

11            MR. KOWALSKI:  No.

12            THE COURT:  Any follow-up questions?

13            MR. DANIEL:  No, your Honor.

14            THE COURT:  Okay.  You can step down then.  Thank you.

15            PROSPECTIVE JUROR:  Thank you.

16        (Sidebar proceedings concluded.)

17            THE COURT:  Okay.  Next in line is Linda Sargent.

18    Good morning.

19            PROSPECTIVE JUROR:  Good morning.

20            THE COURT:  Please state your name and your age.

21            PROSPECTIVE JUROR:  Linda Marie Sargent.  I'm 59.

22            THE COURT:  Okay.  And where do you live?

23            PROSPECTIVE JUROR:  I live in Palos Park.

24            THE COURT:  Who lives with you?

25            PROSPECTIVE JUROR:  Just me.

Jury Selection

1    THE COURT:  Just you.

2    PROSPECTIVE JUROR:  Yeah.

3    THE COURT:  Do you own or do you rent?

4    PROSPECTIVE JUROR:  Own.

5    THE COURT:  No dogs or cats?

6    PROSPECTIVE JUROR:  No.  I'm thinking of maybe getting

7  a dog.

8    THE COURT:  Okay.  We're going to get on the dog -- on

9  the dog bandwagon --

10    PROSPECTIVE JUROR:  I love dogs, I just don't want

11  one --

12    THE COURT:  -- for you.

13    If you are selected as a jury -- juror, you will

14  hopefully be fortunate enough to meet the two courthouse dogs

15  that we have here.  They're Bernese Mountain Dogs, and they --

16    PROSPECTIVE JUROR:  Oh, nice.

17    THE COURT:  -- visit all of the juries in the building

18  and keep them --

19    PROSPECTIVE JUROR:  Nice big dogs.

20    THE COURT:  Yes, big, fluffy things.

21    What is your marital status?

22    PROSPECTIVE JUROR:  Divorced.

23    THE COURT:  Do you have children?

24    PROSPECTIVE JUROR:  No.

25    THE COURT:  No children.

Jury Selection

1        What is your educational background?

2        PROSPECTIVE JUROR:  High school, plus one year of

3   secretarial school, which is Fox College.

4        THE COURT:  Have you served in the military?

5        PROSPECTIVE JUROR:  No.

6        THE COURT:  And what have you been doing for the last

7   five years?

8        PROSPECTIVE JUROR:  Working for Hamilton Partners.

9   I've been working for them for I believe it's coming up to 15

10  years in March.

11       THE COURT:  Okay.  What do you do for them?

12       PROSPECTIVE JUROR:  So I'm an assistant property

13  manager.  I help our property manager manage three commercial

14  buildings.  Two are in Arlington Heights and one is in

15  Palatine.

16       THE COURT:  Okay.  When you are not doing that, what

17  do you like to do in your free time?

18       PROSPECTIVE JUROR:  Catch a little TV.

19       THE COURT:  What do you watch if you can catch a

20  little?

21       PROSPECTIVE JUROR:  I do like *Yellowstone*.  I do like

22  *Law and Order* and *Chicago Fire* and *Chicago PD*.  I don't know.

23  *Gilmore Girls*.  I know that's not currently on, but --

24       THE COURT:  Doesn't matter, if that's what you like to

25  watch, right?

Jury Selection

 1          Do you go on the internet?

 2          PROSPECTIVE JUROR:  On occasion.

 3          THE COURT:  Are you on social media?

 4          PROSPECTIVE JUROR:  I have a Facebook account, but I

 5     really don't do anything except for friends or family, comment

 6     on that.

 7          THE COURT:  Where do you get your news from then?

 8          PROSPECTIVE JUROR:  TV.  I like to watch Fox.

 9          THE COURT:  Okay.  And do you belong to any groups or

10     clubs or organizations?

11          PROSPECTIVE JUROR:  Actually, I'm on the board for our

12     association right now.  I've been on the board for seven years.

13          THE COURT:  So your homeowners association?

14          PROSPECTIVE JUROR:  Correct.

15          THE COURT:  Got it.  Okay.

16          Have you ever served on a jury?

17          PROSPECTIVE JUROR:  I have.  And I was trying to think

18     of what year.  I believe it might have been in the '90s, early

19     '90s.

20          THE COURT:  Where did you serve?

21          PROSPECTIVE JUROR:  It was at the Daley Center.  And

22     it was something to do with a real estate management company,

23     which I was surprised because I was working --

24          THE COURT:  In real estate management.

25          PROSPECTIVE JUROR:  -- in real estate management, so I

114

Jury Selection

1    was surprised that they did keep me as a juror, but they did.

2              THE COURT:  And in that, did you deliberate?

3              PROSPECTIVE JUROR:  Yes.

4              THE COURT:  And did you reach a verdict?

5              PROSPECTIVE JUROR:  We did.

6              THE COURT:  And were you the foreperson?

7              PROSPECTIVE JUROR:  I was not.

8              THE COURT:  Okay.  So have you or a close friend or

9    family member been involved in a civil lawsuit?

10             PROSPECTIVE JUROR:  Actually, I had a lawsuit against

11   me, but it was settled.  It was about a car accident.

12             THE COURT:  Oh, okay.  Anything about that experience

13   that might impact the way you look at the lawyers or this case?

14             PROSPECTIVE JUROR:  No, not that I can think of.

15             THE COURT:  When was that?

16             PROSPECTIVE JUROR:  I want to say maybe 11 years back.

17             THE COURT:  Did the insurance company get involved

18   with it, though?

19             PROSPECTIVE JUROR:  Really -- yeah, I mean, insurance

20   company was involved.

21             THE COURT:  Yes.  Were you deposed?

22             PROSPECTIVE JUROR:  It didn't go to a trial like this

23   kind of trial.  It went to a -- I don't know, bench trial is it

24   called?

25             THE COURT:  Maybe.

115

Jury Selection

1      PROSPECTIVE JUROR:  Where just -- I contested the

2 ticket.  And I showed up and so did the other party.  And after

3 that, then I had to go see my attorney.  I was deposed, and

4 they saw theirs.  And, meanwhile, everything got settled.

5      THE COURT:  It got settled.  Okay.  And you don't

6 think that's going to impact the way you look at this.

7      PROSPECTIVE JUROR:  No.

8      THE COURT:  Okay.  Do you have any -- oh, any

9 involvement in criminal cases?

10      PROSPECTIVE JUROR:  No.

11      THE COURT:  Okay.  Do you have any philosophical or

12 religious beliefs that would prevent you from sitting in

13 judgment of another?

14      PROSPECTIVE JUROR:  No.

15      THE COURT:  Okay.  Any friends or family members who

16 are lawyers?

17      PROSPECTIVE JUROR:  No.

18      THE COURT:  Do you have legal training?

19      PROSPECTIVE JUROR:  I do not.

20      THE COURT:  Okay.  You listened to all of those

21 entities.

22      PROSPECTIVE JUROR:  Right.

23      THE COURT:  Have you had interaction with them with

24 your job?

25      PROSPECTIVE JUROR:  I have not.

Jury Selection

1          THE COURT:  None of those?

2          PROSPECTIVE JUROR:  No.

3          THE COURT:  Have you ever had any interaction with

4    Washington Federal Bank?

5          PROSPECTIVE JUROR:  None.

6          THE COURT:  All right.  Do you want to follow up at

7    all?

8          MR. DANIEL:  No, your Honor.

9          THE COURT:  Do you want to follow up at all?

10          MR. KOWALSKI:  Yes, please, your Honor.

11          THE COURT:  You may.

12          MR. KOWALSKI:  Coincidentally, you indicated you're

13    from Palos Park?

14          PROSPECTIVE JUROR:  Correct.

15          MR. KOWALSKI:  The dead banker in this case was

16    from --

17          MR. DANIEL:  Objection.

18          MR. KOWALSKI:  -- one of the Palos --

19          THE COURT:  I sustain the objection.  We haven't --

20    we're not talking about that right now.  So if you want to ask

21    if she knew the individual without using the descriptive,

22    that's fine.

23          MR. KOWALSKI:  Yes.  The gentleman's name was John

24    Gembara.  He was from that general area.

25          PROSPECTIVE JUROR:  I don't know him.

117

Jury Selection

1          MR. KOWALSKI:  You were involved with -- commercial
2     property manager.  I mean, what -- did that consist of working
3     with whatever lender is active on those properties or --
4          PROSPECTIVE JUROR:  I don't have anything to do with,
5     like, the financial things.  It's more the -- managing those
6     properties that we're over.  So I have no clue what that --
7     that would be someone above me, working with financial things,
8     like a partner or someone else.
9          MR. KOWALSKI:  Were you -- are you familiar with a
10    gentleman by the name of David Andrews?
11         PROSPECTIVE JUROR:  No.
12         MR. KOWALSKI:  Thank you very much.
13         PROSPECTIVE JUROR:  You're welcome.
14         THE COURT:  Anything?
15         MR. DANIEL:  No, your Honor.
16         THE COURT:  Okay.  You can step down then.  Thank you.
17         PROSPECTIVE JUROR:  Thank you.
18         THE COURT:  We have Jessica Paski, please.
19    Good morning.
20         PROSPECTIVE JUROR:  Good morning.
21         THE COURT:  Please state your name and your age.
22         PROSPECTIVE JUROR:  Jessica Paski, 34.
23         THE COURT:  Where do you live?
24         PROSPECTIVE JUROR:  I live in Lakeview.
25         THE COURT:  Who do you live with?

Jury Selection

1         PROSPECTIVE JUROR:  My fiance.

2         THE COURT:  What does he do?

3         PROSPECTIVE JUROR:  He's a financial analyst for a

4    financial company.

5         THE COURT:  Okay.  What do you do?

6         PROSPECTIVE JUROR:  I work at a law firm.  I'm in

7    Human Resources.  I'm a senior HR generalist.  I hire staff.

8         THE COURT:  Okay.  Who -- what law firm is it?

9         PROSPECTIVE JUROR:  Skadden.

10         THE COURT:  Okay.  And do you own or rent your place

11    where you live?

12         PROSPECTIVE JUROR:  I rent.

13         THE COURT:  Okay.  And your marital status?

14         PROSPECTIVE JUROR:  Single.

15         THE COURT:  Single right now.

16         Do you have any children?

17         PROSPECTIVE JUROR:  No.

18         THE COURT:  What's your educational background?

19         PROSPECTIVE JUROR:  I have a Bachelor's from Michigan

20    State University in HR and a Master's from DePaul in HR.

21         THE COURT:  Have you been at Skadden for the last five

22    years?

23         PROSPECTIVE JUROR:  Uh-hum, six.

24         THE COURT:  Okay.  So when you work in the HR

25    department, you probably don't have much interaction regarding

Jury Selection

1  legal matters, right?

2          PROSPECTIVE JUROR:  Nope.

3          THE COURT:  So you've never worked on a criminal case

4  at all?

5          PROSPECTIVE JUROR:  Huh-uh.

6          THE COURT:  Okay.  What do you like to do in your free

7  time?

8          PROSPECTIVE JUROR:  I like to be active.  I foster

9  cats.  I volunteer at a -- at a -- the Catcade in Lakeview.  I

10  like to read.  I like to socialize with my friends.  Travel.

11          THE COURT:  So how many cats are in your house right

12  now?

13          PROSPECTIVE JUROR:  Just one.

14          THE COURT:  Oh, just one?

15          PROSPECTIVE JUROR:  Yeah.

16          THE COURT:  So when you foster, you give them up then,

17  right?

18          PROSPECTIVE JUROR:  Yeah.

19          THE COURT:  Okay.  So you watch them for a while and

20  then you give them up?

21          PROSPECTIVE JUROR:  Yeah.

22          THE COURT:  What do you like to read?

23          PROSPECTIVE JUROR:  I mostly read fiction.  I've been

24  in a book club before, so it's just all -- all kinds of things,

25  but I only read non-fiction, if it's about someone that I'm

Jury Selection

1    interested in, like I'm reading the Matthew Perry book right
2    now --
3              THE COURT:  Okay.
4              PROSPECTIVE JUROR:  -- but mostly fiction.
5              THE COURT:  What's your favorite book you've read
6    lately?
7              PROSPECTIVE JUROR:  I have a Kindle, so I always
8    forget what they're called.
9              THE COURT:  I know, I have a hard time when people ask
10   me that question, too, because --
11             PROSPECTIVE JUROR:  I always forget what they're
12   called.
13             THE COURT:  Are you on the internet?
14             PROSPECTIVE JUROR:  I am.  I have Instagram.  That's
15   what I -- I usually am on Instagram.  I have a Facebook.  I
16   technically have a Twitter account, but I'm not on it.  I don't
17   even have the app.
18             THE COURT:  What groups, clubs, or organizations do
19   you belong to?
20             PROSPECTIVE JUROR:  I am a former member of the
21   Chicago Spartans, which is an MSU alumni group.  I'm still very
22   involved -- even though I'm not technically on the board
23   anymore, I'm still very involved with their events.  And I'm a
24   member of SHRM.
25             THE COURT:  What's that?

Jury Selection

1    PROSPECTIVE JUROR:  That is -- oh, geez.  Society of

2  Human Resources Management.

3    THE COURT:  Oh, okay, a professional organization.

4    PROSPECTIVE JUROR:  Yeah.

5    THE COURT:  Where do you get your news from?

6    PROSPECTIVE JUROR:  My fiance is usually the one that

7  is watching the news, so he's usually in charge of that.  And I

8  feel like it's usually ABC or CBS.  I do get an email from an

9  organization called *theSkimm*, which is just like a high level

10  of news.  So I read that on occasion.  But that's pretty much

11  it.  Probably like Instagram if I -- if I see something.

12    THE COURT:  Have you served on a jury before?

13    PROSPECTIVE JUROR:  No.  I've been summoned, but I've

14  never served.

15    THE COURT:  Have you or a close friend or family

16  member been involved in a criminal case?

17    PROSPECTIVE JUROR:  No.

18    THE COURT:  A civil case?

19    PROSPECTIVE JUROR:  No.  I mean, both my parents were

20  divorced before I was born, and my brother has been divorced.

21    THE COURT:  Okay.  Do you have any philosophical or

22  religious beliefs that would prevent you from sitting in

23  judgment of someone?

24    PROSPECTIVE JUROR:  No.

25    THE COURT:  Do you have any relatives or friends who

Jury Selection

1    work with lawyers or private investigators?

2            PROSPECTIVE JUROR:  No.

3            THE COURT:  Okay.  Have you any legal training

4    yourself?

5            PROSPECTIVE JUROR:  No.  I work closely with, you

6    know, with lawyers at a law firm, but we don't discuss any

7    legal matters.

8            THE COURT:  Okay.  You listened to that list of

9    entities that I mentioned, correct?

10           PROSPECTIVE JUROR:  Uh-hum.

11           THE COURT:  Have you had any involvement with any of

12   them?

13           PROSPECTIVE JUROR:  No.

14           THE COURT:  Okay.  Do you have any involvement or

15   interaction at all with Washington Federal Bank?

16           PROSPECTIVE JUROR:  No, but I do want to mention just

17   before, because I know you said you wouldn't bring this up, I

18   am getting married in May, so -- I understand that this is only

19   supposed to be up to -- or it could be more than four weeks, so

20   I just -- it's on a Friday.  So I just know that, as we get

21   closer to May 12th, there will be more things coming up, and I

22   know that all can be rearranged --

23           THE COURT:  I have a lot of other trials to fill in

24   after this one before May 12th, so that will not be a problem.

25           PROSPECTIVE JUROR:  Okay.

Jury Selection

```
 1              THE COURT:  I guarantee that.

 2              Do you have any follow-up, Mr. Daniel?

 3              MR. DANIEL:  No, your Honor.

 4              THE COURT:  Any follow-up, Mr. Kowalski?

 5              MR. KOWALSKI:  No, Judge.

 6              THE COURT:  Okay.  You can step down.  Thank you.

 7              That brings me to Michael Konrad.

 8              Good morning.

 9              PROSPECTIVE JUROR:  Good morning.

10              THE COURT:  What's your name and how old are you, sir?

11              PROSPECTIVE JUROR:  My name is Michael Christopher

12      Konrad, and I'm 56 years old.

13              THE COURT:  Where do you live?

14              PROSPECTIVE JUROR:  I live in Plainfield, Illinois.

15              THE COURT:  That's pretty far, right?

16              PROSPECTIVE JUROR:  It's a hike.

17              THE COURT:  If you -- if you leave early enough, it's

18      probably not bad, right?

19              PROSPECTIVE JUROR:  Right.

20              THE COURT:  How long did it take to get here?

21              PROSPECTIVE JUROR:  Gosh.  Probably scooted out of the

22      house about 6:15.  I got here a little early.  Took the train.

23              THE COURT:  Excellent.  Oh, the train.  That's the

24      best way then, right?

25              PROSPECTIVE JUROR:  Yeah.
```

Jury Selection

1          THE COURT:  Who do you live with?

2          PROSPECTIVE JUROR:  I live with my fiancee and her

3    15-year-old son.

4          THE COURT:  What does she do?

5          PROSPECTIVE JUROR:  She is a financial analyst for

6    Nicor.

7          THE COURT:  For what?

8          PROSPECTIVE JUROR:  Nicor.

9          THE COURT:  What do you do?

10         PROSPECTIVE JUROR:  I am a financial controller for

11   BP's Whiting refinery.

12         THE COURT:  A financial wedding, huh?

13         PROSPECTIVE JUROR:  Financial control -- oh, yes, it

14   would be, yes.

15         THE COURT:  So both finance people.

16      (Laughter.)

17         THE COURT:  Do you own or do you rent?

18         PROSPECTIVE JUROR:  Own.

19         THE COURT:  Do you have any other children other than

20   the 15-year-old that she has?

21         PROSPECTIVE JUROR:  Yes.  I have a son from my first

22   marriage, who is 25.  He's an engineer in Wisconsin.  And I

23   have a younger son, who is 20, who is a college student at

24   Marquette.

25         THE COURT:  Okay.  And where is -- what town in

Jury Selection

1    Wisconsin is the engineer?

2         PROSPECTIVE JUROR:  The engineer is in Wauwatosa, and

3    the Marquette --

4         THE COURT:  And Marquette.  It's close by.

5         PROSPECTIVE JUROR:  Yeah.

6         THE COURT:  What is your educational background?

7         PROSPECTIVE JUROR:  So I have an undergraduate and

8    graduate degree in economics from George Mason.

9         THE COURT:  Okay.  And what is your employment for the

10   last five years?

11        PROSPECTIVE JUROR:  I've been the controller at the

12   Whiting refinery.

13        THE COURT:  For the whole time.

14        PROSPECTIVE JUROR:  Yeah.

15        THE COURT:  Have you ever served in the military?

16        PROSPECTIVE JUROR:  I did serve in the military from

17   1994 to 2000.  I was discharged honorably and finished as a

18   sergeant.

19        THE COURT:  Okay.  Let me ask you about what you like

20   to do now in your free time.

21        PROSPECTIVE JUROR:  I don't seem to have a lot of free

22   time.  So a lot of that is consumed with work-related activity.

23   But when I do, I enjoy -- I get to travel a little bit, and

24   enjoy exercising.  I have a wonderful little dog I recently

25   adopted named Ava, who is -- magnificent Ava takes me driving.

Jury Selection

1          THE COURT:  Ava?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  What kind of dog is Ava?

4          PROSPECTIVE JUROR:  Ava is a Swiss Mountain Dog of

5   some type.

6          THE COURT:  She's like a Bernese Mountain --

7          PROSPECTIVE JUROR:  She -- yes.  Couldn't figure out

8   why she kept climbing the furniture.

9          THE COURT:  Yes.

10         PROSPECTIVE JUROR:  Started to read up on that.

11         THE COURT:  How many pounds does Ava weigh?

12         PROSPECTIVE JUROR:  Ava is about 30 pounds.

13         THE COURT:  Oh, that's a small Swiss Mountain Dog.

14         PROSPECTIVE JUROR:  It is.

15         THE COURT:  Is it an Entlebucher?  No?

16         PROSPECTIVE JUROR:  Oh, my goodness, I -- that sounds

17  like the name.

18         THE COURT:  I think that's what she is.

19         PROSPECTIVE JUROR:  It looks like a little mini

20  Doberman.

21         THE COURT:  Exactly, right.  Okay.

22         Do you watch TV?

23         PROSPECTIVE JUROR:  I enjoy movies every now and then.

24  So I was thinking about it as you were asking people.  The last

25  movie I watched was *The Menu*.

Jury Selection

1         THE COURT:  The what?

2         PROSPECTIVE JUROR:  *The Menu*.

3         THE COURT:  Was it good?

4         PROSPECTIVE JUROR:  Actually, I recommend it, yeah.

5    It was good.

6         THE COURT:  Do you read?

7         PROSPECTIVE JUROR:  I do.  I'll, you know, read

8    business- or industry-related articles on -- you know, it could

9    be Bloomberg or CNBC.  I have a copy of a Dostoyevsky novel

10   that I've been staring at and pretending to enrich myself --

11        THE COURT:  Most people do just stare at Dostoyevsky

12   novels --

13       (Laughter.)

14        PROSPECTIVE JUROR:  Haven't done anything with it.

15        THE COURT:  I have a few of those myself.

16        Do you go on the internet for social media?

17        PROSPECTIVE JUROR:  I thought about that.  I have a

18   LinkedIn account for just professional --

19        THE COURT:  Sure.

20        PROSPECTIVE JUROR:  -- colleagues.  And I have a

21   Twitter account, but I've never actually tweeted.

22        THE COURT:  Okay.

23        PROSPECTIVE JUROR:  I don't know if that counts.

24        THE COURT:  Do you belong to any groups, clubs, or

25   organizations?

128

Jury Selection

1          PROSPECTIVE JUROR:  Nothing recently, no.  I've been
2   on an economic advisory task force a couple years ago, but I --
3   right now --
4          THE COURT:  Where do you get your news from?  All the
5   financial sites or other places?
6          PROSPECTIVE JUROR:  Primarily, you know.
7          THE COURT:  Have you served on a jury before?
8          PROSPECTIVE JUROR:  I have not.
9          THE COURT:  Have you been involved in a civil lawsuit?
10         PROSPECTIVE JUROR:  Well, my divorce, I suppose,
11  counts.
12         I -- probably when we get to the some of the federal
13  entities --
14         THE COURT:  You might have some interaction.
15         PROSPECTIVE JUROR:  Just a little sidebar, yeah.
16         THE COURT:  Okay.  Any criminal cases in your family
17  or with you?
18         PROSPECTIVE JUROR:  No.
19         THE COURT:  Okay.  Can you -- do you have any legal
20  training?
21         PROSPECTIVE JUROR:  Business law classes, but
22  nothing --
23         THE COURT:  Okay.  With the graduate degree?  Is that
24  right?
25         PROSPECTIVE JUROR:  I actually passed the CPA, and so

129

Jury Selection

1    I, you know, just basic Robinson-Patman, stuff like that.

2             THE COURT:  Do you have any friends who -- friends or

3    family members who are lawyers?

4             PROSPECTIVE JUROR:  Not friends or family members, no.

5             THE COURT:  Okay.  I'll ask you about that list of

6    people.

7             Have you ever had any involvement with Washington

8    Federal?

9             PROSPECTIVE JUROR:  I have not.

10            THE COURT:  Let's get a sidebar regarding all of those

11   entities then.

12        (At sidebar outside the hearing of the venire.)

13            THE COURT:  Okay.  So what did you want to tell me?

14            PROSPECTIVE JUROR:  So I recently facilitated a

15   payment to the Department of Treasury in settlement of a civil

16   matter between BP Products North America and the federal

17   government.

18            THE COURT:  So you were working with the IRS or who?

19            PROSPECTIVE JUROR:  It would have been the DOJ and

20   Indiana Department of Environmental Management as well.

21            THE COURT:  So that was something that you did as part

22   of your work, right?

23            PROSPECTIVE JUROR:  Yes.

24            THE COURT:  Okay.  So do you think that you would, as

25   a result of that -- well, who were you representing when you

Jury Selection

1    were in that --

2              PROSPECTIVE JUROR:  I represented no one.  I worked

3    with our counsel to help settle, just -- I literally

4    facilitated a wire.

5              THE COURT:  Okay.

6              PROSPECTIVE JUROR:  It was --

7              THE COURT:  But if you were to say which side of that

8    you were on --

9              PROSPECTIVE JUROR:  That would have been the defense.

10             THE COURT:  All right.  So anything with the IRS

11   agents here or with Department of Justice attorneys here that

12   would cause you to be unfair?

13             PROSPECTIVE JUROR:  I don't have any bias or opinion,

14   no.

15             THE COURT:  Mr. Kowalski, do you want to ask him any

16   questions?

17             MR. KOWALSKI:  Just a general question, about the --

18   because you're an accountant.  Do you know any of the

19   accountants or the agencies that audited Washington Federal?

20             PROSPECTIVE JUROR:  I do not.

21             THE COURT:  Anything?

22             MR. DANIEL:  Just to confirm with the prospective

23   juror, your Honor, that it sounds like the investigation and

24   the legal process played out and, at the end, he was contacted

25   to issue whatever the settlement the parties had worked out

Jury Selection

1    with.

2              PROSPECTIVE JUROR:  That's accurate.

3              THE COURT:  Okay.  All right.  Thank you very much.

4         (Sidebar proceedings concluded.)

5              THE COURT:  You can step down.

6              And let's have David Parcheta, if I'm saying that

7    right.

8              Good afternoon.

9              PROSPECTIVE JUROR:  Hello.

10             THE COURT:  Please tell me your name and how old you

11   are.

12             PROSPECTIVE JUROR:  David Parcheta.  I'm 66 years old.

13             THE COURT:  Where do you live, Mr. Parcheta?

14             PROSPECTIVE JUROR:  Lake Zurich, Illinois.

15             THE COURT:  Who do you live with?

16             PROSPECTIVE JUROR:  I'm divorced.  I rent.  Live by

17   myself.

18             THE COURT:  Okay.  No animals in the house?

19             PROSPECTIVE JUROR:  I used to have two Labs, a

20   chocolate and a yellow Lab.  They passed.

21             THE COURT:  Oh, boy.  So we've got to work on this,

22   all these people that need to get some animal companions.

23             What do you do?

24             PROSPECTIVE JUROR:  I'm retired.  Small business

25   owner, entrepreneur.  Work part-time right now currently.

Jury Selection

1    THE COURT:  So where do you work right now?

2    PROSPECTIVE JUROR:  Right now, I do not work anywhere.

3    THE COURT:  Okay.  Tell me about the business

4    ownership.  What did you own?

5    PROSPECTIVE JUROR:  It was called Brilliant Sky Toys

6    and Books.  We had three locations.  We sold high-end

7    educational toys.

8    THE COURT:  Okay.  And I love when someone says

9    they're an entrepreneur because I want to know what that means.

10   What is the entrepreneur side?  Tell me what that would be.

11   PROSPECTIVE JUROR:  Well, just like this, my past

12   experience right now was we opened up an X-Golf.  I ran into a

13   partner there.  And it's a virtual indoor golf where you can

14   play any of the courses in the world without having to lose a

15   ball.

16       (Laughter.)

17   THE COURT:  Okay.

18   PROSPECTIVE JUROR:  I helped the guy do that.  Hired

19   everything.  I just try to always keep busy.

20   THE COURT:  Do you have any adult children?

21   PROSPECTIVE JUROR:  Yes.  I have three.  Two beautiful

22   girls, a beautiful son.

23   THE COURT:  What do they all do?

24   PROSPECTIVE JUROR:  My son, he's a chemical engineer,

25   but he chose to sell real estate down here in Chicago.  Works

Jury Selection

1    out of a realty firm here with my son-in-law.

2              THE COURT:  Do you know what the name of the firm is?

3              PROSPECTIVE JUROR:  Telos.

4              THE COURT:  And what about your daughter?

5              PROSPECTIVE JUROR:  My oldest one, she's 39.  She used

6    to run my toy stores.  Now she works as a general manager for

7    Starbucks.

8              THE COURT:  Okay.

9              PROSPECTIVE JUROR:  Then my other daughter, she's a

10   stay-at-home mom in Hinsdale.

11             THE COURT:  So you have grandchildren.

12             PROSPECTIVE JUROR:  Yes.

13             THE COURT:  How many grandchildren?

14             PROSPECTIVE JUROR:  I got two.

15             THE COURT:  Okay.  What's your educational background?

16             PROSPECTIVE JUROR:  Bachelor of Science, Business

17   Administration, and partway through my MBA.

18             THE COURT:  Where did you get those degrees?

19             PROSPECTIVE JUROR:  FSU.

20             THE COURT:  And have you ever been in the military?

21             PROSPECTIVE JUROR:  No.

22             THE COURT:  What do you like to do in your free time?

23             PROSPECTIVE JUROR:  I work out a lot.  I'm a member of

24   Lifetime there.  Do that five, six days a week.

25             THE COURT:  Uh-hum.

Jury Selection

1          PROSPECTIVE JUROR:  I golf.  Play with the kids.

2          THE COURT:  Okay.

3          PROSPECTIVE JUROR:  Grandkids.

4          THE COURT:  When you watch TV, do you put on any

5    particular shows or movies?

6          PROSPECTIVE JUROR:  I usually get the local and

7    national news or -- watch that.  And then if there's some

8    special coming on, like someone had mentioned *Yellowstone*.  I

9    got hooked up into that series.  A lot of sports.

10         THE COURT:  Okay.  What's your favorite Chicago team?

11         PROSPECTIVE JUROR:  Oh, the Bears.

12         THE COURT:  I like the way you say it.

13         And are you on social media?

14         PROSPECTIVE JUROR:  Not so much.  I was on Facebook.

15   Got hacked.  I can't get on.  I haven't been able to get on

16   with my password for the last year and a half.  No Twitter.

17   No.  I try to avoid it as much as possible.

18         THE COURT:  Okay.  What groups, clubs, or

19   organizations do you belong to?

20         PROSPECTIVE JUROR:  When I was a small business owner,

21   Lake Zurich Chamber of Commerce, Barrington Chamber of

22   Commerce, those kind of things, to help the business.

23         THE COURT:  Have you ever served on a jury before?

24         PROSPECTIVE JUROR:  Never.

25         THE COURT:  Have you ever been involved in a civil

Jury Selection

1    lawsuit?

2              PROSPECTIVE JUROR:  Yes.  Had a bankruptcy, you know,

3    due to economic conditions.  My divorce.  And also had a DUI.

4              THE COURT:  Okay.  Any criminal cases?

5              PROSPECTIVE JUROR:  I guess that's a DUI, right?

6              THE COURT:  Yes, that was a criminal matter.

7              PROSPECTIVE JUROR:  I'm in the process right now.  I

8    just went to the hearing, and I'm going to get my license back.

9              THE COURT:  Okay.

10             PROSPECTIVE JUROR:  Now all I have to do is pay a

11   bunch of fees.

12             THE COURT:  So when you have gone through those

13   proceedings, either through the DUI or the bankruptcy, anything

14   about those that would impact the way you would look at the

15   lawyers here in this case or the parties?

16             PROSPECTIVE JUROR:  Not really.  I had great lawyers.

17   They did their job.  I did my job.  And it's just something

18   that happened that I've got to deal with.

19             THE COURT:  Okay.  Do you have any philosophical or

20   religious beliefs that would prevent you from sitting in

21   judgment?

22             PROSPECTIVE JUROR:  No, ma'am.

23             THE COURT:  Okay.  Do you have any legal training

24   yourself?

25             PROSPECTIVE JUROR:  No.  Just MBA-level business

Jury Selection

1    administration, business law.

2            THE COURT:  Do you have any friends who are lawyers?

3            PROSPECTIVE JUROR:  No.

4            THE COURT:  Okay.  But you've used lawyers in those

5    instances --

6            PROSPECTIVE JUROR:  Yes.

7            THE COURT:  -- you mentioned.

8            Now, I gave a long list of those different entities.

9    Do you know anyone in those places?

10           PROSPECTIVE JUROR:  No, ma'am.

11           THE COURT:  Okay.  What about any involvement with

12   Washington Federal Bank?

13           PROSPECTIVE JUROR:  No.

14           THE COURT:  Okay.  Mr. Kowalski, do you have any

15   follow-up for him?

16           MR. KOWALSKI:  Very little.  I'm just rather curious,

17   in light of -- this case has an element of bankruptcy.  Were

18   you treated fairly by your creditors?

19           PROSPECTIVE JUROR:  Pardon?

20           MR. KOWALSKI:  Did your creditors treat you fairly?

21           THE COURT:  Did your creditors treat you fairly?

22           PROSPECTIVE JUROR:  I'm not sure.  I don't know

23   what -- what the question really is.  I mean, they just did

24   their job.  I did my job.  And we closed the case.

25           MR. KOWALSKI:  Thank you.

                              Jury Selection

 1              THE COURT:  Any follow-up?

 2              MR. DANIEL:  If I may ask, your Honor, what chapter of

 3    bankruptcy he filed under, if he knows?

 4              PROSPECTIVE JUROR:  I think it was 7, Chapter 7.

 5              THE COURT:  Any other follow-up?

 6              MR. DANIEL:  Yes.

 7              He mentioned that a relative has been selling real

 8    estate.  If he can give a time frame for that.

 9              PROSPECTIVE JUROR:  It's been over seven years, so the

10    bankruptcy is off my credit record.

11              MR. DANIEL:  Oh, no, I meant the selling real estate.

12    You mentioned that you had a relative --

13              THE COURT:  I think it was a son.  I think it was your

14    sons are in the realty company?

15              PROSPECTIVE JUROR:  Oh, yeah.  He works at Telos.

16              MR. DANIEL:  How long have they been working there or

17    selling real estate?

18              PROSPECTIVE JUROR:  Probably going on three years.

19              MR. DANIEL:  Nothing further, your Honor.

20              THE COURT:  Anything else on that, Mr. Kowalski?

21              MR. KOWALSKI:  No.  Thank you, your Honor.

22              THE COURT:  Okay.  You can step down.  Thank you.

23              And the next person is Mr. Luis Alvarez.

24              PROSPECTIVE JUROR:  Good morning.

25              THE COURT:  Good morning.  Please state your name and

Jury Selection

1    your age.

2         PROSPECTIVE JUROR:  Excuse me.  Luis Alvarez, 31.

3         THE COURT:  Where do you live?

4         PROSPECTIVE JUROR:  I live in Round Lake Beach.

5         THE COURT:  Who do you live with?

6         PROSPECTIVE JUROR:  My husband and my two cats.

7         THE COURT:  And your two cats.  All right.

8         And do you own or do you rent?

9         PROSPECTIVE JUROR:  We own.

10        THE COURT:  I don't even know if you ask what kind of

11   cat, right?  They're --

12        PROSPECTIVE JUROR:  Short-hair.

13        THE COURT:  Short-hair.

14        What are their names?

15        PROSPECTIVE JUROR:  Spooky and Sir Einstein.

16        THE COURT:  Oh.

17        PROSPECTIVE JUROR:  Does not live up to his name.

18     (Laughter.)

19        PROSPECTIVE JUROR:  At all.

20        THE COURT:  Do you have any children?

21        PROSPECTIVE JUROR:  No.

22        THE COURT:  Okay.  What's your educational background?

23        PROSPECTIVE JUROR:  High school and one year of

24   college.

25        THE COURT:  All right.  Where did you go?

139

Jury Selection

1           PROSPECTIVE JUROR:  Truman.

2           THE COURT:  And have you ever served in the military?

3           PROSPECTIVE JUROR:  No, I have not.

4           THE COURT:  All right.  What have you been doing for

5      the last five years?

6           PROSPECTIVE JUROR:  I work -- I'm a server.  I work

7      for Yolk.  I work in the city.

8           THE COURT:  For what?  I didn't hear.

9           PROSPECTIVE JUROR:  It's called Yolk.

10          THE COURT:  Yolk?

11          PROSPECTIVE JUROR:  Yeah.

12          THE COURT:  Okay.

13          PROSPECTIVE JUROR:  I trained everybody there.

14          THE COURT:  Okay.  So you supervise then.

15          PROSPECTIVE JUROR:  Yes.

16          THE COURT:  How long have you been at Yolk?

17          PROSPECTIVE JUROR:  Six years.

18          THE COURT:  Six years?

19          And what do you like to do in your free time?

20          PROSPECTIVE JUROR:  I've been watching *The Last Of Us*.

21     Just -- I take one of my cats out with me.

22          THE COURT:  Really?

23          PROSPECTIVE JUROR:  Yeah, she likes to go for walks

24     with me.

25          THE COURT:  Like on a leash.

Jury Selection

1          PROSPECTIVE JUROR:  On a leash, yeah.

2          THE COURT:  That's wild.

3          PROSPECTIVE JUROR:  It took a while, but -- not much

4   to go through that.  I love, like, anything horror, like horror

5   games and shows.

6          THE COURT:  Horror?

7          PROSPECTIVE JUROR:  Yeah.

8          THE COURT:  Okay.

9          PROSPECTIVE JUROR:  But yeah.

10          THE COURT:  That's why you're watching *The Last of Us*,

11   right?

12          PROSPECTIVE JUROR:  Yeah.  It's pretty good.

13          THE COURT:  So you watch horror movies, I take it,

14   too?

15          Do you read horror books?

16          PROSPECTIVE JUROR:  No.

17          THE COURT:  Okay.  Are you on social media?

18          PROSPECTIVE JUROR:  I have Facebook, but I don't post

19   anything.  I have Twitter, but I don't tweet.  I have Pinterest

20   for recipes and tattoo ideas.

21          THE COURT:  Type -- what?

22          PROSPECTIVE JUROR:  Tattoo.

23          THE COURT:  Tattoo ideas.

24          PROSPECTIVE JUROR:  I have a ton of tattoos, yeah.

25          THE COURT:  Oh, okay.  So you're a tattoo aficionado,

Jury Selection

1    shall we say.

2              PROSPECTIVE JUROR:  Yeah.  It's starts with one, and

3    just can't stop.

4              THE COURT:  Okay.

5              PROSPECTIVE JUROR:  Instagram, I only post, like,

6    travel pictures.

7              THE COURT:  Okay.  Where do you get your news from?

8              PROSPECTIVE JUROR:  My Google home, like, every

9    morning.  Just say, "Hey, Google, good morning."  And she just

10   tells me the news.

11             THE COURT:  Okay.  That's easy, right?

12             PROSPECTIVE JUROR:  Yeah.

13             THE COURT:  What groups, clubs, or organizations do

14   you belong to?

15             PROSPECTIVE JUROR:  None.

16             THE COURT:  Have you ever served on a jury?

17             PROSPECTIVE JUROR:  No.

18             THE COURT:  Okay.  Have you been involved in a civil

19   lawsuit?

20             PROSPECTIVE JUROR:  No.

21             THE COURT:  Or a criminal case?

22             PROSPECTIVE JUROR:  No.

23             THE COURT:  Administrative hearing?

24             PROSPECTIVE JUROR:  No.

25             THE COURT:  Has anyone close to you been involved in

Jury Selection

1   those things?

2           PROSPECTIVE JUROR:  Yes.

3           THE COURT:  Do you want to tell me about it?

4           PROSPECTIVE JUROR:  Can we do it on sidebar?

5           THE COURT:  Sure.

6           Do you hold any philosophical or religious beliefs

7   that would prevent you from sitting in judgment?

8           PROSPECTIVE JUROR:  No.

9           THE COURT:  Do you have any legal training?

10          PROSPECTIVE JUROR:  No.

11          THE COURT:  Any friends who are lawyers?

12          PROSPECTIVE JUROR:  No.  I have one friend.  She works

13  for Lake Forest.  She's a dispatcher.

14          THE COURT:  She's a dispatcher?

15          PROSPECTIVE JUROR:  Yeah.

16          THE COURT:  Okay, she's in --

17          PROSPECTIVE JUROR:  For Lake Forest.

18          THE COURT:  -- law enforcement, okay.

19          PROSPECTIVE JUROR:  Yeah.

20          THE COURT:  You heard that list of entities that I

21  described.

22          Have you had any interaction with them?

23          PROSPECTIVE JUROR:  No.

24          THE COURT:  What about with Washington Federal Bank?

25          PROSPECTIVE JUROR:  No.

Jury Selection

1          THE COURT:  Let's have your sidebar then.

2      (At sidebar outside the hearing of the venire.)

3          THE COURT:  Okay.  Tell me about the criminal case.

4          PROSPECTIVE JUROR:  So this actually had to do with my

5  husband.  This was maybe seven years ago.  It was a lawsuit.

6  It was based of -- he was part of an Explorer program.  And

7  somebody -- one of the Explorers basically accused him.  And

8  all the charges were dropped because of lack of evidence and

9  everything.  So they interviewed, like, everyone else in the

10 Explorer program, and everyone in the program denied everything

11 that went on, so all the charges were dropped on him.  And this

12 was finalized maybe about five years ago.

13         THE COURT:  Okay.  So was he charged criminally?

14         PROSPECTIVE JUROR:  No.

15         THE COURT:  It was a civil lawsuit then.

16         PROSPECTIVE JUROR:  Yes.

17         THE COURT:  Okay.  And it was one of the young people

18 that he had in the Explorer program?

19         PROSPECTIVE JUROR:  Correct.

20         THE COURT:  Accused him of sexual misconduct?

21         PROSPECTIVE JUROR:  Correct.

22         THE COURT:  So he had to get a lawyer, I take it,

23 right?

24         PROSPECTIVE JUROR:  Oh, yeah.  This went on for a bit,

25 yeah.

Jury Selection

1          THE COURT:  So it probably impacted your family life

2   for quite some time, correct?

3          PROSPECTIVE JUROR:  He was -- yeah.  He was -- he was

4   a police officer for 25 years, and that led to him retiring

5   completely out of the police.  And now he manages a bar.

6          THE COURT:  So it had a big impact on him.

7          PROSPECTIVE JUROR:  Yeah.  Oh, yeah.

8          THE COURT:  So do you think that he was treated fairly

9   by law enforcement?

10          PROSPECTIVE JUROR:  100 percent.

11          THE COURT:  Okay.  Do you think that his defense

12   attorney was good?

13          PROSPECTIVE JUROR:  Yes.

14          THE COURT:  And you think he was wrongfully accused.

15          PROSPECTIVE JUROR:  Oh, 100 percent.

16          THE COURT:  Okay.  So now that -- would that impact

17   the way you look at these lawyers and law enforcement officers

18   here?

19          PROSPECTIVE JUROR:  Not at all.

20          THE COURT:  Would it impact the way you look at

21   Mr. Kowalski?

22          PROSPECTIVE JUROR:  Not at all.

23          THE COURT:  Okay.  Any follow-up, Mr. Kowalski?

24          MR. KOWALSKI:  No.  Thank you, Judge.

25          THE COURT:  Any follow-up?

Jury Selection

1           MR. DANIEL:  No, your Honor.

2           THE COURT:  Okay.  You can step down.

3           PROSPECTIVE JUROR:  Thank you.

4       (Sidebar proceedings concluded.)

5           THE COURT:  Okay, Ladies and Gentlemen.  What we're

6   going to do now is let you have a lunch break.  And the way I'm

7   going to do that is to tell you to come back here at about

8   1:00 o'clock.

9           There is a cafeteria on the 2nd floor if you don't

10  want to leave the building.  My courtroom deputy will also give

11  you a little map of all of the food places that are around the

12  courthouse.  There is like a food court right at Adams and

13  Dearborn, which is just kiddy corner from our building, if you

14  wanted to go in there.

15          Come on back at 1:00, and we'll pick up our jury

16  service at that time.

17          Yes?

18          PROSPECTIVE JUROR KUENSTER:  I --

19          THE COURT:  You don't need to come back.  We're going

20  to have Lynn talk to you when you're done.

21          And, lawyers, please stay put because I have something

22  to talk with you about, okay?

23          But all of the others, you may leave.

24          MR. DANIEL:  Your Honor, typically, will the Court let

25  the prospective jurors know that the lawyers and the parties

Jury Selection

1    aren't going to speak to them should we pass in the hallway?

2             THE COURT:  I usually do that once they're impaneled.

3             Just don't talk to everybody, okay?  They have got

4    obligations to stay impartial for me.

5        (Exit prospective jurors.)

6             THE COURT:  Okay.  All the jurors are out, right?

7             All right.  Does the government have any for-cause

8    motions that you would like to make at this time?

9             MR. DANIEL:  I think it's appropriate for the

10   government to inform the Court and Mr. Kowalski about Juror --

11   Prospective Juror Number 7, Margaret Largay.

12            THE COURT:  Yes.

13            MR. DANIEL:  She worked at First Midwest Bank.  She

14   knows Rosa Angeles.  That witness worked at First Midwest Bank

15   in the land trust.  She will call and testify -- or we are --

16   will call her to testify about her work at First Midwest Bank.

17   And so that's, essentially, as I understand her anticipated

18   testimony would be that Mr. Kowalski called First Midwest Bank,

19   scheduled a land trust to be opened, but then never opened the

20   land trust.  And her testimony will be it's in the logbook that

21   he called, but there's no record of the trust ever being

22   completed.

23            THE COURT:  Okay.  Mr. Kowalski, do you have a motion?

24            MR. KOWALSKI:  Yes.  It seems like there's

25   considerable conflict, yes.

Jury Selection

1          THE COURT:  Yes.  Okay.  So I will strike her for

2     cause.

3          And any other motions from the government?

4          MR. DANIEL:  No, your Honor.

5          THE COURT:  Do you have any motions for cause with

6     this group of 16, Mr. Kowalski?

7          MR. KOWALSKI:  No, I do not.

8          THE COURT:  Okay.  I'll see you then at 1:00 o'clock,

9     everyone.

10          THE CLERK:  All rise.  Court is in recess until

11     1:00 o'clock.

12       (Lunch recess taken at 12:20 p.m.)

13                    C E R T I F I C A T E

14       I certify that the foregoing is a correct transcript of the

15     record of proceedings in the above-entitled matter.

16

17     */s/ GAYLE A. McGUIGAN*                    *June 15, 2023*
       GAYLE A. McGUIGAN, CSR, RMR, CRR
18     Official Court Reporter

19

20

21

22

23

24

25