UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ROBERT M. KOWALSKI | No. 19 CR 226-1<br><br>Honorable Virginia M. Kendall |

**GOVERNMENT'S RESPONSE TO
DEFENDANT'S MOTION TO VACATE [Dkt. 1194]**

The UNITED STATES OF AMERICA, by and through its attorney, MORRIS PASQUAL, Acting United States Attorney, responds to Defendant's Motion to Vacate (the "Motion") [Dkt. 1194] as follows. Essentially, Defendant seeks reconsideration of this Court's order denying Defendant release pending sentencing. Defendant puts forth no new evidence or changed circumstances that support such a motion; instead, he misquotes selected portions of the August 3, 2023, transcript and manufactures a factual inaccuracy to accuse the government of misconduct. The Court was provided information consistent with witness statements and other evidence, and there is no basis for revisiting the denial of release.

On August 3, 2023, a hearing was held to consider Defendant's Motion for Release on Bond Prior to Sentencing (the "Bond Motion") [Dkt. 1105]. The Bond Motion was filed by, and presented by, Defendant's then-counsel, James A. McGurk, and made a number of arguments in an attempt to satisfy Defendant's burden under 18 U.S.C. § 3143(a) of establishing by clear and convincing evidence that Defendant is unlikely to flee or pose a danger if he were to be released pending sentencing, as

the Bond Motion requested. Following detailed presentations from the parties, the Court denied the Bond Motion, explaining:

> THE COURT: Okay. All right. So we start with the statute, as I must, and I think you're both using the correct one. We're in 3143(a). And it reads: "Except as provided in paragraph 2, the judicial officer shall order that a person who has been found guilty of an offense and who is awaiting imposition or execution of a sentence, other than a person for whom the applicable guideline promulgated does not recommend a term of imprisonment, be detained unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released."
>
> So with that in mind, we need to look at whether there's clear and convincing evidence that he would not flee or pose a danger to the community.
>
> And the government is correct that we have a very long history of non-compliance with the pretrial release orders. He started out his case not listening to the bankruptcy court judge. There was a contempt of court finding, and that was why he was in prison in the first place.
>
> However, this long history of non-compliance actually, as was just set forth by the prosecutor through this lengthy docket, shows that he could not comply with the most basic conditions of supervised release each time he was out.
>
> And so the fact that he did not work with Pretrial, even though Pretrial was trying to help him to comply with those conditions, is disturbing. It shows me that he is incapable of maintaining those conditions while he's on release.
>
> I can tell from the past that he's failed to work with Pretrial Services. And he is now facing a much more serious situation, in that before he believed that he had the ability to defend against these charges, and a jury of 12 determined that he's guilty beyond a reasonable doubt. With that in mind, he's facing some significant time. And that does change the perspective as to whether he would be interested in sticking around or not. This is the most he's ever faced. This is the most significant sanction he's faced in all of these proceedings, whether they be divorce or bankruptcy, now his criminal sentence, as you can see from working with him, this potentially high sentence.
>
> So with that long history of non-compliance, I do think he is likely to flee if released. I also don't think that staying with the fiancée's -- with the fiancée in a house owned by the father is a very good place for him to be based upon

> this rather -- rather odd background where first there was the protective order, then it was removed, then things were okay, and then things were not okay. So there's some kind of rocky road back there that I don't think is a safe place for him to be.
>
> And, most importantly, I think that based upon his own personality here before the Court, it's very volatile. It's a very mercurial personality and often explosive. And with that explosive nature, I also know of this incident where he had a firearm and used it to his advantage to get into property that he was not allowed to be into, and that he also has had this incident where, when he had an interaction, which was on video, he fled from the -- from when the police were showing up.
>
> So with all of that, I just don't have any comfort level that he is not a danger to the community. Certainly there isn't clear and convincing evidence that he would not either pick up a weapon again or use a weapon in some way to his advantage. And certainly there's a much greater risk of flight when you realize what he's facing now.
>
> But it is his own long history of non-compliance that is the main reason that shows that he just cannot comply with my court orders for a number of different times where I've given him release.
>
> So with those stakes changing now, I deny the motion for release, and he will remain incarcerated until sentencing.
>
> And you'll have to work with him, as you have many times before with other incarcerated defendants getting ready for trial.

(8/3/23 Hrg. Tr. attached as Exhibit A at 16:8-19:3.) Having terminated Mr. McGurk as his counsel subsequent to the August 3 hearing, Defendant now seeks through his *pro se* Motion to vacate the Court's ruling citing the Fifth and Fourteenth Amendments of the United States Constitution, and Rule 60(b) of the Federal Rules of Civil Procedure.

Defendant's Motion makes essentially one argument – the prosecutor "argue[d] that [Defendant] possessed a <u>FIREARM</u> while knowing that was a lie" (Motion at 1) (emphasis in original) and the result was to "so infect[] the bond hearing with

3

unfairness as to make the resulting denial of bond pending sentencing a denial of due process." (Motion at 4.) Defendant's argument is factually unfounded; the government did not represent that Defendant possessed a firearm, and the government accurately relayed information that it had gathered from a witness regarding the use of a firearm to access the bankruptcy estate's property.

During the August 3 hearing, after citing the protective order that Defendant's fiancée had previously sought against him before withdrawing it, and an altercation involving members of defendant's family and his fiancée's family, the government referred to an incident that occurred on February 21, 2019, at the premises of 1918 W. Cermak Rd. in Chicago, where Defendant was with an individual (Individual F) who brandished a firearm to enable Defendant to gain access to the 1st floor retail space of 1918 W. Cermak, which was then under the administration of Defendant's bankruptcy trustee:

> [A]s laid out in the [criminal] complaint, and I believe discussed at trial, there was a firearm involved when [Defendant] and another individual went to the -- to a property that was then controlled by the bankruptcy estate and used a firearm to gain access to the building and take property out of it.
>
> THE COURT: What are the circumstances of that? Remind me.
>
> MS. PETERSEN: The bankruptcy trustee had taken over properties owned by the defendant and changed the locks because they were then property of the bankruptcy estate. He and another individual went to that property. *The other individual -- not Mr. Kowalski, but they were together -- displayed a firearm to a worker at the -- at the building*, gained access unlawfully, it was not their building to enter, and the maintenance worker reported they saw -- that he and the other individual went into the -- into the building and came out holding an item that the maintenance worker believed to be a hard drive, but we never -- I don't think we ever figured out exactly what it was.

4

(Exhibit A at 13:15-14:9 (emphasis added).)

In his Motion, Defendant goes to great lengths to dramatize what he falsely *claims* the government said, and in doing so, demonstrates his complete awareness of the actual *evidence* concerning the events that occurred on February 21, 2019 at 1918 W. Cermak. Defendant was aware of the contents of the report of interview with the maintenance worker (Witness G) who alleged that Individual F displayed a firearm in his waistband in the course of demanding access to the building, and the fact that iPhone video footage exists which, while not started until after the firearm was displayed, corroborates other verifiable aspects of Witness G's account, and is inconsistent with Individual F's statements to the Bankruptcy Court on March 6, 2019. (A redacted copy of the maintenance worker, Witness G's, interview report is attached as Exhibit B, and a publicly available transcript of the bankruptcy hearing from March 6, 2019 is attached as Exhibit C.[1])

In his interview, Witness G described that he was at the 1918 W. Cermak premises on February 21, 2019, to meet a locksmith who was to change the locks on the 1st floor retail space. After the locks on that space had been changed, and Witness G was getting ready to leave, an individual appeared at the front door and began knocking. He identified himself as "Frank" and said he was an attorney for "Jan [Kowalski]" and said he needed come into the space to take pictures. Witness G allowed Frank in to take pictures, then use the restroom, and Frank thereafter left through the front door and entered a Chrysler 300 sedan.

---

[1] *See* Case No. 18 B 09130, Dkt. 523.

After Frank left, Witness G secured the front door and then exited the building through the rear door, where his van was parked. As Witness G began driving his van west down the alley, a red truck pulled in the alley heading east and blocking his forward progress. Then, the same Chrysler 300 sedan that Frank had gotten into earlier pulled up behind Witness G's van, preventing Witness G from backing out of the alley. According to Witness G:

> A white male with glasses exited the red truck and approached [Witness G]. The white male said something to the effect of "I'm Bob (Bob LNU); I need you to help me." [Witness G] recalled Bob LNU was very nervous and spoke very nicely to [Witness G]. Bob LNU told [Witness G] he needed to get into the office because he had very important things he needed to take out. [Witness G] recalled Bob LNU was almost crying and at some point said something to the effect of "Please, don't make things harder." Frank LNU then approached [Witness G] and Bob LNU and told Bob LNU something to the effect of "I'll deal with him" and directed Bob LNU to get back to his truck.
>
> Frank LNU was still wearing the same black coat and red scarf. Frank LNU then pulled the right side of his coat back and to the side, and displayed to [Witness G] a gun that was tucked into Frank LNU's waistband on his right side. Frank LNU said something to the effect of "Hey, you don't want problems." Frank LNU did not take the gun out of his waistband, and [Witness G] could only see the handle sticking out of Frank LNU's waistband. [Witness G] recalled the gun was small and stated he believes the gun might have been a .22 handgun. [Witness G] noted that he has seen guns before.
>
> [Witness G] recalled Frank LNU began to get more aggressive and said something to the effect of "You're not going to stop me." Frank LNU told [Witness G] "I need you to pull your car back in" and directed [Witness G] to move his van back to his previous parking spot. [Witness G] recalled Frank LNU was very serious, so [Witness G] did as he was instructed.
>
> [Witness G] did not see Bob LNU go back to his truck. [Witness G] observed Frank LNU and Bob LNU walk to the exterior back door of the Cermak property. [Witness G] noted that Bob LNU had keys for the exterior back door and unlocked it.
>
> After [Witness G] pulled his van back into its parking spot, [Witness G] acted like he was trying to find his set of keys, in an attempt to hide the fact

6

that he was turning on the video recording device on his cell phone. After successfully turning on his cell phone's video recording device, [Witness G] exited the van and walked to the exterior back door of the Cermak property where Frank LNU and Bob LNU were waiting. [Witness G] informed the interviewing agents that after turning on his cell phone's recording device, he attempted to hold his phone in a position to record Frank LNU and Bob LNU as best he could, without being obvious.

[Witness G], Frank LNU, and Bob LNU entered the Cermak property and walked through the rear common space to the rear door of the first floor retail space. [Witness G] unlocked the rear door of the first floor retail space and opened it. Bob LNU was in front and pushed the door open, reached in, and grabbed a black device which [Witness G] opined looked like a computer hard drive. [Witness G] noted that the black device was sitting on top of a stack of documents, located just inside the door to the left, next to some men's clothing and men's shoes. [Witness G] recalled noticing that it appeared to him that Frank LNU was texting somebody at this time.

Bob LNU did not say anything after he took the black device. Bob LNU exited the Cermak property through the rear door and walked back to the red truck. [Witness G] observed Bob LNU reverse the truck and travel west down the alley. Frank LNU said "thank you" to [Witness G] and walked back to the gray Chrysler 300. [Witness G] observed the gray Chrysler 300 travel east down the alley.

(Exhibit B, pp. 2-3.)

In his Motion, Defendant references his familiarity with the iPhone video recording made by Witness G. (*See* Motion, p. 2) ("1.) There is an Iphone[sic] video… it clearly does not show a weapon"). Defendant also references his familiarity with Witness G's Interview Report. (*See* Id.) ("[The] report, in fact, details how Robert 'SPOKE NICELY' with the worker" (emphasis in original).) The Motion also acknowledges that Individual F was present with Defendant, stating: "Robert was not alone that evening. He was in the company of another attorney. Who had likewise been locked out of his law office, [Individual F], Esq. Certainly, this well known respected attorney would corroborate that no guns were present." (Id.)

7

Defendant's selective presentation of facts in his Motion concerning the iPhone video (which didn't begin to record until after the firearm was shown) and the manner of his statements to Witness G (while characterized as "nervous," "very nice[]", and "almost crying" were accompanied by a plea to "[p]lease, don 't make things harder") provide a rather incomplete picture of reality. And Defendant's suggestion that Individual F would "corroborate that no guns were present" is accurate insofar as Individual F testified to the Bankruptcy Court on March 6, 2019, that no guns were present. (*See* Exhibit C at 26:5-27:9.) But Individual F's statements to the Bankruptcy Court regarding his presence at 1918 W. Cermak on February 21, 2019, generally strain credibility, beginning with the origin story of how he came to visit the premises that evening:  he was passing through the neighborhood with a friend and "saw two individuals drinking and watching soccer on the TV, because there's a big open window, and there's a TV." (Exhibit C at 16:23-25.) According to Individual F, his actions in visiting were not coordinated with Defendant:

> Q. Were you in communications with Bob that night before he came up out of nowhere?
>
> A. I called him to tell him the deal with the marshal's office. And then I also called him and I -- well, I never spoke to him. I text him.
> And I say, hey, there is somebody here at your office. Are these your guys? Because they said they're your guys. And I don't know who they are.
> And there was some kind of sign, Blue something or other, By You, or I forget the name of it. And I sent him a copy of it. And I said this doesn't seem kosher.
> And then I -- a number called me. I didn't recognize the number. I didn't pick up. Then that number called again and I picked up, and it was Bob. And I said, should I call the police? This is very strange.
> *And all of a sudden out of nowhere I see Bob's truck come out -- which I was surprised about because I had heard he was in Florida.*

> And I asked Bob where he was, and he said I'm in far, far, far away land where Shrek is, or something. That was his answer to me. So I didn't know he was being there, so I was surprised.
> I didn't come in with him. *It wasn't coordinated*. I didn't know anything. I don't know what -- anything about anything. There was no quarter million dollars anywhere.

(Exhibit C at 22:24-24:2) (emphasis supplied.) Individual F's claims of "surprise" at seeing Defendant's truck appear and lack of coordination are difficult to reconcile with video footage, a still image of which is printed below, showing Witness G's van being blocked in the alley by Defendant's red truck to its front and the Chrysler 300 sedan to its rear. While Individual F was not driving the Chrysler 300, the timing of the two vehicles converging in the alley with Witness G's van blocked in the middle is truly remarkable absent coordination, particularly since Witness G was the individual possessing the keys required to enter 1st floor space.



9

The same camera also captured an individual that appears to be Individual F in the alley (prior to Witness G's return to the premises to unlock the 1st floor retail space), which is difficult to reconcile with Individual F's claims to have entered the structure of 1918 W. Cermak once – and only once – on February 21, 2019.[2]



---

[2.] Q. Did you physically enter the building with [Defendant] that evening on February 21st?
A. I physically entered the back foyer.
Q. With the [Defendant]?
A. No, the gentleman -- the gentleman let us in. This drunk gentleman let us. It's the same incident. There's not two incidents. It's all within the same period of time. I didn't come once and come again.
Q. *You were physically in the building but left the building, correct?*
A. *I was in the foyer.*
Q. You were in the foyer.
　　*You left the building, were outside, and then a second time you entered the building again?*
A. *No, I stayed in the foyer.*
Q. *You were in the foyer the whole time?*
A. *Or the -- yeah, the back little area.*
　　Well, I also went -- I went to the restroom, and I grabbed the mail, and then I was in the foyer. And Bob drives up.

(Exhibit C at 21:13-22:9) (emphasis added.)

10

Witness G's iPhone video later shows Individual F and Defendant inside the structure, standing next to each other, while Witness G unlocks the door to the 1st floor retail space. A still image is below, with Defendant in the front and Individual F in the back:



At the conclusion of this video, as Individual F and Defendant are exiting the building, Witness G says, "you scared me, man" – a statement consistent with Individual F brandishing a firearm before Witness G started recording the video.

Although Defendant claims throughout his Motion that the government represented to the Court on August 3, 2023, that he (Defendant) possessed a firearm during the February 21, 2019, incident, Defendant appears to have known full well that was not the case when he signed and filed his Motion. Defendant quoted from the August 3 hearing transcript (posted to the docket on August 22, 2023, at Dkt. 1125) in his Motion (submitted in an envelope post-marked September 19, 2023). (*See*

11

Dkt. 1194, p. 5.) But he didn't quote any statement from the government. Instead, he misquoted the Court to have said: "*Most Importantly*, I also know of this incident where he had a firearm and used it to his advantage to get into a property that he was not allowed to be into." (Motion, p. 3.) While Defendant correctly and precisely quoted part of a sentence (the non-italicized portion of the foregoing (*see* Exhibit A at 18:10-12)), he added the "Most Importantly" qualification to the beginning of the quote, thereby overstating the significance of the Court's reference to Defendant having the firearm (as opposed to Individual F) with respect to the ruling on bond.

Defendant's Bond Motion was denied because he failed to demonstrate by clear and convincing evidence that he is not a flight risk and not a danger to the community. The instant Motion is sophistry that presents no evidence or rationale to vacate the Court's determinations under 18 U.S.C. § 3143(a) and should be denied.

October 12, 2023

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney

By: */s/ Jeffrey S. Snell*
MICHELLE PETERSEN
BRIAN NETOLS
KRISTIN PINKSTON
JEFFREY SNELL (SAUSA)
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, IL 60604

12

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that in accordance with Fed. R. Crim. P. 49, Fed. R. Civ. P. 5, LR 5.5, and the General Order on Electric Case Filing (ECF), that the GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO VACATE will be mailed to the defendant at the following address on or before the next business day after filing:

Robert M. Kowalski
#499069
Jerome Combs Detention Center
3050 Justice Way
Kankakee, Illinois 60901

                                                */s/ Jeffrey S. Snell*
                                                JEFFREY SNELL
                                                Special Assistant United States Attorney
                                                219 South Dearborn Street, 5th Floor
                                                Chicago, IL 60604