UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

OCT 20 2023

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA )
)
v. ) No 19 CR 226
)
ROBERT M. KOWALSKI, )
defendant ) Hon. Virginia M. Kendall, Judge

## REPLY IN SUPPORT OF MOTION FOR A NEW TRIAL

Now Comes Robert M. Kowalski, ROBERT, for his Reply in support of Motion for a new trial states as follows:

### "CHROMEBOOKING"

Finally, Robert can agree with the prosecution. Clearly an INCREDIBLE yet sordid tale has unfolded. One that resets our universal sense of justice back to a darker time from almost one hundred years ago. When impoverished men in Alabama were routinely sent packing off to jail. Given their day in court without having any real chance to prepare for it. Powell v. Alabama, 287 U.S. 45 (1932). This case features extreme Constitutional deprivations. All designed to target the Right of an indigent defendant to construct a meaningful defense where his liberty was at stake, merely to advantage powerful prosecutorial forces. Under any measure of reckoning those six months immediately preceeding trial are a CRITICAL period to prepare a

defense. Fortunately, the record here is crystal clear and replete with the machinations of what standby counsel and prosecution engaged into ensure that equal Justice was not afforded to a poor defendant.

On April 7, 2022 the trial court observed, upon appointment of standby Counsel Shanin that: "it wanted everyone to recognize that [defendant] has the TOOLS to go forward to trial". Nevertheless, a brazen CHROMEBOOKING scheme was perpetuated. This involved both standby counsel and prosecutors working in concert to countermand the trial court's own orders that would have ensured Robert possessed minimal tools to build a defense. Their scheme was finally uncloaked in open court, but not until the trial had begun. In lieu of an compatible discovery review device, the one that the court's own order envisioned. They cleverly supplied a device of such limited compatible functionality that it could NEVER operate the government's standard discovery. These deviously crafty fellows provided Robert a computer that in the words of the AUSA had to be placed into "DEVELOPER MODE"; for a total reprogramming to allow it to operate as the court anticipated.

Precedent is clear. Defendant's who knowingly, willingly, and intelligently waive their right to assistance must be allowed to conduct their own defense. Faretta v. California, 422 U.S. 806 (1975). District Courts are not permitted to foist counsel upon competent defendants. United States v. Nichols, 19-2266 (7th Cir 2023). Standby Counsel acts

only to "Protect the rights of accused persons foolishly trying to represent themselves" and to vindicate the process itself "by promoting fairness in the criminal justice system. Mayberry v. Pennsylvania, 400 U.S. 455 (1971). Standby Counsel may serve to overcome routine obstacles that hinder effective pro se representation. McKaskle v. Wiggens, 465 U.S. 168 (1984).

It is indisputable, framed neatly by his APOLOGY, that Standby Counsel Shanin failed to perform competently within the scope of the duties assigned to him by the trial court. Neither does it follow that Standby Counsel Shanin may SHIRK his responsibility with impunity. Counsel does not evade the obligation to adhere to the rules of professional conduct when appointed as Standby Counsel. And while the Sixth Amendment does not set a baseline standard for Standby Counsel's performance the Due Process Clause does! State v. Rohwedder, 436 P3d 324 (Utah App 2018). When Standby Counsel is appointed, the attorney assumes particular duties in assisting a self-represented defendant, and counsel must discharge those duties. Id. In this matter Standby Counsel discharged more APOLOGIES than duties.

## TRIAL BY ASSURANCE

On August 17, 2022 this court issued an order relative to discovery. (See Docket # 792). Wherein it stated:

"The Court has taken an active role in ENSURING that information is CONSTANTLY being provided

to the defendant by ordering regular status reports from prosecutors. The Court has monitored discovery like a HAWK for two years and is confident that Kowalski has the materials, he needs, has the ability to review the materials, and had time to review the materials. The Court has Kept a short leash on the discovery process by having nearly monthly statuses during which the Court "CAN BE ASSURED" that discovery is being turned over and that Kowalski has the MEANS to review it."

Despite the trial court's best efforts all these glib, back slapping, snakeoil-like assurances have NOT panned out, with glaring examples culminating in the wanton CHROMEBOOKING debacle.

## "MANY OPERATE"?

On May 5, 2022 the Court held a two-hour hearing where the defendant, government, a court reporter, and a judicial law clerk assembled at the MCC-Chicago. Reporting to the court the openability of EACH purportedly inoperable device. In its response the government recalled that: "MANY of which were found to be operable." (Transcript Docket # 1072, R 745). This half truth rather glosses over the omnipresent difficulties that inspired the unusual setting of the hearing. Even then, the prosecution could not help restrain itself from continuing to furnish less than candid reassurance.

This typically half truthful recitation glosses over the painful obvious. The plain meaning of "MANY" does not constitute "ALL". A cup is still only half full, when it is ALSO half empty. This inchoate partial state of affairs is hardly a TRIUMPH worthy of celebration, nor does it comport with the government's obligation under Brady. Particularly, after the discovery had been "ROLLING OUT" for three years. Despite some seven months passage after First ascertaining that a substantial problem existed with their discovery, (See status Report November 26, 2021; Docket # 518), the exact same blackout access problems still persisted on May 5, 2022. Notwithstanding ASSURANCES-A-PLENTY, rather than sharing the widely expected victory lap with the court, this hearing degenerated into a continuing demonstration of the continual dysfunction that has engulfed governments discovery obligation. The conclusion of the extraordinary Jail-side hearing concluded with the government's EDSEL discovery vehicle being pushed again back into the REPAIR garage. From whence, it has never emerged back into the light of day.

The government's oral assurances are not worth the paper they are written on. Creating a voluminous file that is unduly onerous to access raises serious Brady issues. The government may not hide material in a file of which it is actually aware in the hope defendant will never find it, indicates bad faith of the government. The prosecution here accomplished far worse. It deterred the court from

supervising discovery processes by providing a series of false reports accompanied by those all so soothing ASSURANCES to clip the wings of our discovery HAWK tribunal. Then it shifted its obligation to produce usable discovery back upon the defendant. It demanded that Robert submit detailed lists of defective discovery material. In the manner of a school teacher handing out extra homework assignments. A formidable task when the non-performing files amount to hundreds of thousands out of a grand total of roughly 1.5 million. An impossible task while one is incarcerated without access to a discovery review device.

The government's demanding conduct would entail a defendant must simultaneously defend themselves and do the government's job. This dooms the defendant to wear himself out by wasting its efforts repairing defective discovery. The government does not have to sift through its discovery to locate exculpatory information. Likewise, a hard pressed defendant does NOT have a duty to trouble shoot the government's oft brokendown discovery. Neither does a defendant have to be compelled to review discovery while stationed in the prosecutor's office. Defendant's due process Rights include an unhampered place to construct their defense, beyond the encroachment of governmental actors.

Brady obligations are absolutely shredded where government tenders millions of electronic documents. Then coyly meddles taking positive "ASSISTING" steps to ensure that a helpless impoverished defendant can NEVER gain access thereto. Simply as a result of his poverty and what has indisputably been demonstrated in open court to consist of misleading information; Robert was deprived the key tool of an adequate defense. One that the trial court determined was absolutely necessary. It should go without saying, that the government may not hide Brady material of which it is actually aware in a huge file in the hope that the defendant will never find it. This scenario would indicate that the government was acting in bad faith in performing its obligations under Brady. United States v. Skilling, 554 F3d 529 (5th Cir 2009). Here, it is clear that governmental actions passed well beyond the realm of merely lighting prayer candles for hope. They manipulated the process by ASSISTING with masquerading as the "COMPUTER GEEK SQUAD" before the trial court. Where they provided misleading dissemination of false technical information. Knowing the whole time that defense preparation would be compromised as a result.

## CLASSICAL BRADY

On August 17, 2022 the government informed a blindsided trial court, who ironically had just finished authoring an order (Doc #792) moments before stating, it was confident that the government had complied with its Brady obligation, that: "It had MISTAKENLY NOT TURNED OVER a second batch of FDIC documents. (See Docket #793). Further, elaborating that AUSA determined that these contained relevant and incriminating material. In fact, what they deemed a TROVE consisted of "over 100,000 files that are relevant to the case with at least 1000 files that the government intends to USE as part of its case in chief". Certainly, it is not inconceivable this hoard of material may well have amounted to millions of individual documents, not an inconsiderable total by anyone's reckoning. Also, AUSA Netols noted that an additional "10,000 files" that are [Attorney-Client] priveleged need to be reviewed". The trial court specifically recognized the "need to give KOWALSKI the tools he needed for his defense". (See Docket #793).

## PROMISE OF BRADY SHATTERED

Had the trial court entered the order required under the Due Process Protections Act, The government would have been far less likely to play loose with a defendant's Constitutional rights to present a complete defense. Robert never had a chance to learn what all this relevant and incriminatory material consisted of. This set up a trial by ambush. These tools the court knew Robert absolutely needed to ACCESS electronic discovery were not forthcoming.

Consequently, Robert was convicted solely out of his poverty and his attorney-client priveleged confidences.

Brady held that suppession by the prosecution of evidence by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment. Brady v. Maryland, 373 U.S. 83 (1963). It is indisputable, the prosecution admitted having the "mistakenly not turned over" Trove was both "Relevant but incriminating". This is the very definition of materiality that Brady requires. Strickler v. Greene, 527 U.S. 263 (1999). Justice is not seen to be done when the defendant is aetificially cheated out of the only means to present his case. Electronic Brady material can not be considered tendered when a defendant is left with no means to access the materials whatsoever.

## UNPRECEDENTED EXCEPTIONAL CIRCUMSTANCES

In these circumstances, organs of the state foisted upon Robert, obstensibly to ASSIST him, through dubious methods have trammeled Robert's pro-se right to present his own defense. Which have placed the trial court upon the CHARYBDIS of shirking its constitutional duty to ENSURE the defendant ONLY represents himself with full awareness that the excercise of that right is fraught with danger. United States v. Sandles, 23 F 3d 1121 (7th Cir 1994). Tragically, the trial courts own effoets rebounded. Those officers of the court most trusted, twisted trial court orders into a perilous snare that

ENSURED the excercise of the FARETTA right without being accompanied by the safeguard of Brady, could only become a foolish choice.

## CHEATERS NEVER PROSPER

How can Justice be done where a Standby Counsel misappropriated the only device the trial court deemed absolutely necessary to build an adequate defense. And then he collaborated "ASSISTING" as the trial court termed it at Docket # 826, alongside the government to deceive the tribunal. Relative to an unusable "CHROMEBOOK", substituted in lieu of a capable discovery review instrument. (See Group Exhibit A). There has not been one reported case, since FARETTA itself was decided back in 1975, where an ethically challenged Standby Counsel has interfered with defense preparation, to such an abrogating extreme. As is aptly demonstrated in the record here, including the trial court's own docket recollections, the conduct of Standby Counsel can be plainly be described as nothing less than sabotaging the defense of a helpless vulnerable indigent man. All for what he thought would gain him an upgraded new 2020 laptop.

## ROLE OF STANDBY COUNSEL

IN FARETTA v. California, 422 U.S. 806 (1975), the Court recognized a defendant's Constitutional right to conduct his own defense. Also, that a trial court may appoint Standby Counsel to be an AID to ASSIST the pro-se defendant in his defense. The appointment of Standby

counsel is a well recognized SAFEGUARD when a defendant elects to proceed pro-se and one that should be employed on a regular basis. United States v. Maya-Gomez, 860 F2d 706 (7th Cir 1988). Likewise, the Seventh Circuit recognized the limitation of this assistance meant that: "Standby Counsel's primary duty is not to INTERFERE with a defendant's Faretta right". Simpson v. Battaglia, 458 F3d 585 (7th Cir 2006).

The Court elaborated on the interplay of the role of standby counsel and a criminal defendant's right of self-representation Noting the FARETTA right serves two objectives: Preserve a defendant's dignity and autonomy and occasionally present the best possible defense. McKaskle v. Wiggens, 465 U.S. 168 (1984).

Standby Counsel may assist a pro-se defendant in OVERCOMING routine procedural or evidentiary obstacles to the completion of a specific task. However, Standby counsel may not substantially INTERFERE with any significant tactical decisions. McKaskle v. Wiggens, 465 U.S. 168 (1984). Trial court's retain broad discretion to determine the scope of Standby Counsel's involvement. It has been well recognized that Standby Counsel "SHALL" perform any other case related actions at the courts instruction. United States v. Sims, 19 CR 30034-SMY (SDIL 2019).

## CHROMEBOOK GAMESMANSHIP

ROBERT's difficulties began on October 6, 2022; when Standby Counsel Shanin presented him with a "CHROMEBOOK" laptop. Privately he explained how he had deleted his personal history within, cleaning out his closet as it were. The District Court at Docket # 815 duly noted its expectations: "Standby Defense Counsel provided defendant Kowalski with a "CHROMEBOOK" he can UTILIZE. One that Robert soon learned upon inspection, would prove unable to perform its intended function under any circumstance. Regardless of which government electronic discovery: thumbdrive, compact disc, flash drive, or terra byte storage device was inserted into the CHROMEBOOK the following message appeared:

"This file is designed for a P.C. using windows software. This is not compatible with your drive which runs CHROME O.S."

(See Docket # 1041, Transcript page 317, February 13, 2023)

(Also Docket # 820, Attachment to Motion)

Not one "CHROMEBOOK" with their distinctive "CHROME O.S." operating system, that ever rolled off an assembly line, could have ever allowed review of the government's discovery material. Not really surprising at all. Because the CHROMEBOOK's, CHROME O.S, is inherently INCOMPATIBLE with the governments MICROSOFT WINDOWS OPERATING SYSTEM based BRADY discovery material.

Robert immediately filed a motion, requesting trial court supervision relative to the experienced difficulties. (Docket # 820). He was met during the next scheduled November 18,

2022 status hearing by an alerted forewarned combined Standby Counsel/ Prosecution tag team. A helpful government during open court furnished Robert a sheet listing of several "FREEONES" downloadable websites to cure the problem. While they helpfully assured the trial court without candor, that a quickee download was guaranteed to cure the "CHROMEBOOK" deficiencies. Docket entry at # 826 relates: "Standby Defense Counsel and Government offered to ASSIST defendant Kowalski in utilizing the CHROMEBOOK previously provided." The persuaded trial court chided Attorney Kowalski for his lack of compliance with ABA required computer competency. Meanwhile, Standby Counsel stood mute under circumstances where he had a clear duty to advise the court.


Predictably, Roberts CHROME operating system versus MICROSOFT WINDOWS operating system incompatibility malaise persisted unabated. Robert soon learned the exceedingly simple, yet profound monumental problem could not be solved with any quickee "FREEONES" download. Particularly where, Robert lacked those special advanced tools and technical knowledge to kick the "CHROMEBOOK" down into a developer mode reprograming. Which would have required breaking into the computer case with attendant risk of destroying the equipment. Robert again advised the trial court by motion of his continued inability to access the Brady discovery material. This difficulty was in the nature of a total discovery blackout, not a partial glitch.

Nevertheless, at the subsequent status hearing of December 21, 2022, Robert's motion for AID was again denied. Standby Counsel Shanin stepped up to persuade the trial court, assuring that he had provided an appropriate discovery review device. The trial court observed at docket # 837 that:

> "the court has already supplied defendant with a CHROMEBOOK and his standby counsel has checked to see if documents can be accessed on it and has CONFIRMED with the court that it is working and discovery is viewable"

Standby Counsel did not accept responsibility. Rather he made knowingly false representations to the trial court. While he knew the whole time, that the new device he purchased with Criminal Justice Act funds was maintained in his own possession for his exclusive usage. This is confirmed by his entries in this docket that demonstrate reimbursement was had for a new computer. which was actually delivered directly to his own residence. While other sundry supplies (i.e. paper and printer) were routed to Robert's domicile. The older 2012 Shanin legacy "CHROMEBOOK" in Robert's possession remained inoperative for critical discovery review purposes. Robert continued to plead with the trial court for a serviceable discovery review device by filing renewed motions for FARETTA supervision. For instance rather than be enabled to prepare a defense, an absolutely desperate for help Robert resorted to filing a motion to enjoin noncompetent Standby Counsel representation. (See docket # 838). Predictably,

this motion was denied at Docket # 866. After the prosecution filed their response in support of their pal Standby Counsel at Docket # 845.

## CHROMEBOOK SCHEME UNRAVELS

Finally, the non-responsive inoperative "CHROMEBOOK" was brought directly to the courtroom on February 13, 2023, the first day of trial. A weary of this issue tribunal directed:

> "Mr Shanin, Could you come over here and grab the CHROMEBOOK for me? BECAUSE WE HAD THIS CONVERSATION BEFORE!
>
> (Transcript Doc # 1041 at page 317)

Thereupon the trial court demanded that the "CHROMEBOOK" was immediately demonstrated, as a test to determine if it could indeed operate the government's discovery. Standby Counsel was united with the government team in a PAS DE DEUX partnership performance fashion, as they worked feverishly over their joint "CHROMEBOOK" project together, for seventeen minutes, as the record supports, before conceding defeat. Admitting to the bamboozled trial court, as they could no longer deny the obvious, confirming that further efforts on the non-functional, dead upon arrival "CHROMEBOOK" were futile. Upon conclusion of the frenzy of testing the trial court inquired of the duo:

## "DO YOU HAVE SOMETHING TO REPORT?"

Whereupon Standby Counsel Shanin responded first:

"I believe we do, your honor. The way I see, it is the hard drive that I got the discovery on was unencrypted. And so when I ran it everything opened fine. I had no problem with it. I DIDN'T UNDERSTAND that the files Mr Kowalski got -- [the governments Brady Discovery] -- and it was -- NEVER -- I don't believe it was brought up in court. They were encrypted. And a CHROMEBOOK CANNOT OPEN an encrypted file with a McAfee encryption that the government uses to encrypt the files. Not having encrypted files, I DIDNT UNDER-- I DIDNT KNOW THERE WAS A PROBLEM. IF I CAUSED ANY OF THIS I APOLOGIZE"
(Transcript Doc # 1041 at page 332)

Then the AUSA made his report:

"So looking at this Chromebook, does not allow you to open an exe. file. And this is what I've learned in the last few minutes based on a quick internet search. And SO IT DOESN'T ALLOW YOU TO OPEN the .exe files"
(Transcript Doc 1041 at page 333)

Continuing to elaborate:

"So its -- the unencrypted files are available and accessible through the CHROMEBOOK. He would have to download -- or -- as I understand it, he would have to put the CHROMEBOOK into DEVELOPER MODE and download an app to be able to operate the .exe." ID.

He further reasoned:

"If the Court thinks back to twenty years ago with the Apple computer when you had to download a separate program to run windows. I guess that's the problem now with this .exe file and the CHROMEBOOK," Id.

THE AFTERMATH

After months of frantic pleading with the Court over the incompatible CHROMEBOOK, the truth had finally emerged, or at least part of it. Our experienced Standby Counsel, the one with vast experience, JUST DIDNT UNDERSTAND how the government's electronic discovery operated. One has to believe it was his first Rodeo. This nor any CHROMEBOOK ever manufactured would NEVER, could NEVER operate ANY of the government's Microsoft windows based electronic discovery whatsoever. A visibly

irked frustrated trial court, upon learning that Standby Counsel Shanin had disregarded its routine order entrusted to him, immediately took action. It ordered Standby Counsel Shanin to procure overnight a second computer. One that possessed a Microsoft Windows Operating system, compatible to allow pretrial defense preparation at Criminal Justice Act expense, for a second time. However, as all this transpired on February 13, 2023, the first day of trial, the failure of Standby Counsel Shanin to abide a court order did NOT AID, ASSIST, or HELP the indigent FARETTA defendant. Rather, it foreclosed any meaningful pretrial preparation thereby creating an insurmountable hurdle of prejudice for the defense. The tribunal eventually resolved the long running "CHROMEBOOK" imbroglio issue in Robert's favor. However, it is axiomatic that pretrial preparation can not begin on the second day of trial.

## FREEDOM FOR A LAPTOP

Robert's due process and FARETTA rights were abrogated when he was tried without having had any opportunity, much less a meaningful one, to prepare his defense. Despite timely and reasonable requests, indigent Robert was isolated from any means to prepare. The trial court's own orders, which recognized the legitimacy of Robert's need and would have provided possible avenues of preparation through a discovery review instrument were NOT heeded. After Robert elected to represent himself, these governmental organs not only affirmatively failed to provide defense resources, but

also materially impeded use of the minimal tools for which the trial court tried to ensure. It is simply egregious that Standby Counsel Shanin whose only purpose was to safeguard defendant's rights and the integrity of the court, misappropriated the one vitally needed defense tool for his sole benefit. Then falsely assured the trial court all was well, while later contritely admitting that: "I didn't understand" the nature of the government's electronic Brady material.

Apart from the belated self-serving apology, neither the prosecution nor standby counsel Shanin offer any justification for their interference. Collectively, they misrepresented "CHROMEBOOK" capabilities for months to the trial court. A defendant who excercises his right under FARETTA, to conduct his own defense does not subject himself to the possibility that he will have no opportunity to prepare his defense. The Right guaranteed by the Sixth and Fourteenth Amendments to reject a lawyer and represent oneself is premised upon the right of the defendant to make a meaningful defense. The Sixth Amendment does not provide merely that a defense shall be made for the accused. It grants to the accused personally the right to make his defense. The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails. Faretta v. California, 422 U.S. 806 (1975). The accused in this case, who made every effort to prepare a defense and was THWARTED in those efforts, was denied his "Right to make his defense". ID

Standby Counsel Shanin's lack of understanding and hollow apologies only add insult and an element of hypocrisy to the injury.

## "HE JUST DIDN'T UNDERSTAND"

Typically, Standby Counsel provides behind the scenes technical assistance to the defendant. United States v. Geddes (D UTAH 2022). When it was apparent immediately that his old machine was not up to the task of allowing discovery review, Standby Counsel did not honestly step forward to accept responsibility. Rather, his AID, ASSIST, and HELP coming at the expense of a helpless indigent, was reminiscent of those cringing solicitors General of the Crown all bent on twisting the law to obtain conviction, that the Colonists detested and distrusted. Faretta v. California, 422 U.S. 806 (1975). There is something specially repugnant to Justice in using rules of practice in such a manner as to debar a prisoner from defending himself, especially when the professed object of the rules is to provide for his defense. Id.

Court appointed counsel was never meant to be an ALBATROSS tied around a defendant's neck. INSTEAD he was intended to be a means through which a defendant ignorant of the intricate mechanics of the law, could effectively present his own defense. Wiggens v. Estelle, 681 F2d 266 (5th Cir 1982). But a trial court should take care to prevent the use of standby counsel as an

to distort the system, "which a skillful standby counsel could manipulate to create reversible error", United States v. Fields, 49 F3d 1024 (4th Cir 1995). The trial court took positive steps forward to insure that impoverished Robert had a fair opportunity to present his defense. However, Standby Counsel and his government team assistants took two steps backwards with their campaign of interference. See Docket # 826. To insure that Robert could not mount any substantial defense to meet the government's case, the hallmark of our Justice system.

## HOLE IN THE STANDBY BACKSTOP

In a criminal trial, which is essentially a fact finding process, No aspect of such advocacy could be more important than the opportunity to <u>MARSHALL</u> the evidence for each side before submission of the case to judgment. Herring v. New York, 422 U.S. 853 (1975). Consequently, when Standby Counsel Shanin declined to honor his duty through provision of the trial court ordered basic tool of an adequate defense, the resulting prejudice to Robert precluded a fair trial. Standby Counsel Shanin's sudden lack of computer literacy detached Robert from millions of individual documents; including those 100,000 inculpatory ones with attorney-client priveleged files: "<u>MISTAKENLY NOT TURNED OVER</u>" by the prosecution. Standby Counsel interference affected the FARETTA defendant's ability to excercise judgment, undermining the integrity of the trial.

The fact remains that once the defendant is deprived of assets he otherwise would have, [ensured by trial court order Doc#793] he is artificially stripped of his right to join issue with the government as he chooses. United States v. Maya-Gomez, 860 F2d 706 (7th Cir 1988). Without access to his resources, his options are limited. Id. A criminal trial is not a sacrifice of unarmed prisoners to gladiators. United States ex Rel Williams v. Twomey, 510 F2d 634 (7th Cir 1975). When Standby Counsel Shanin, a safeguard, disappeared with the vital discovery instrument needed to facilitate the defense of an impoverished self represented man; he effectively seated the defendant's lip's on critical matters thereby sealing his fate as well. A man should not be consigned to jail out of his poverty only because he could not afford a Microsoft Windows Compatible laptop or because his standby Counsel did not understand limited Chromebook functionality.

## STANDBY MR MAGOO

Standby Counsel's input was not unsolicited. However, his performance of the solitary simple mundane task entrusted by the trial court order to him was inexcusably more like Mr Magoo, wreaking havoc wherever he went. What was contrived as a protection should not have been turned into fetters, Faretta v. California, 422 U.S. 806 (1975). An older seasoned man with fifty years experience as an attorney, Standby Counsel Shanin had once been lauded by the Seventh Circuit; "as being far more active than the usual standby counsel." United States v. Oreye, 263 F.3d

669 (7th Cir 2001). The tribunal noted that: "Mr Shanin is an extremely experienced attorney with vast courtroom experience". (See Docket # 890). Robert was humbled to have a man as knowledgeable as Professor Shanin appointed to serve as standby. However, his puzzling departure from the standard he set over a routine matter is as curious as it is suspicious.

Like for many of us from an earlier generation, computer issues are at times befuddling. Still active as ever, standby counsel Shanin cleverly converted his routine task into a personal financial opportunity. He devised a "win-win" scheme, [or so he thought], to foist his old 2012 "CHROMEBOOK" laptop off onto his indigent client. Not really understanding the dreadful consequences his fateful choice entailed. While he purchased himself some sweet new computing hardware with Criminal Justice Act funds, as receipts filed in our docket confirm. Regrettably, his not so lofty ambitions of a dreamy petty WINDFALL PROFIT foundered on the rather obvious reef of "operating system" technological incompatibility. He failed to ensure that the [CHROMEBOOK] limited functionality device he provided defendant was compatible with any external drives upon which discovery had been or would be exchanged by the government.

Everyone would agree, it is indisputable, with a firm and definite conviction that a serious mistake has been made. Standby counsel Shanin's profuse apology, coming on the heels of his earlier assuring confirmations, left no doubt

whatsoever that a structural error had occurred. One could easily understand the older gentleman, Standby Counsel Shanin's chagrin. His old 2012 "CHROMEBOOK" operates as well as any "CHROMEBOOK" ever could. It was not abused. As long as one is simply, only surfing the WEB, it functions. The complicated part is that all these NEW-FANGLED contraptions which look the same on the outside, lack the functionality inside.

Like Michael Jordan or now perhaps LeBron James, an attorney after fifty years of serving clients should be able to retire at the height of his prowess. Respected as a pillar of the legal community. NOT REVILED as a bungler who helps usher persons to jail, after depriving [swindling] poor persons out of their defense. Because of a simple mistake, perhaps induced as a matter of his age and generation, entailed profound dreadful consequences. The government should never have intervened to exact undue advantage from Standby Counsel Shanin's technical gaffe dementia for tactical gain contrary to their own Brady obligations.

## FULLEST PROTECTION OF CONSTITUTIONAL RIGHTS

It is the SOLEMN DUTY of a federal judge before whom a defendant appears to make a thorough inquiry and to take ALL STEPS necessary to ensure the FULLEST protection of this [self representation] constitutional right at EVERY stage of the proceeding. United States v. Von Moltke, 332 U.S. 706 (1948). The trial court recognized

that when a state brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense. Ake v. Oklahoma, 470 U.S. 68 (1985). Which derives from a belief that justice cannot be equal where, simply as a result of his poverty, a defendant is denied the opportunity to participate meaningfully in a judicial proceeding in which his liberty is at stake. ID.

Accordingly, the trial court recognized that a criminal trial is fundamentally unfair if the state proceeds against an indigent defendant without making certain that he has "access to the raw materials integral to the building of an effective defense". Britt v. North Carolina, 404 U.S. 226 (1971). In view of its duty, the tribunal made a permissable adjustment to assist the pro-se defendant in overcoming a routine obstacle standing in the defendant's achievement of his own clearly indicated goals. Savage v. Estelle, 924 F2d 1459 (9th Cir 1990).

Standby Counsel is appointed to serve as an AIDE to a smooth and efficient administration of JUSTICE and to facilitate a speedy trial. United States v. Knox, 19-190-9 (WD PA 2021). Typically, standby counsel's presence is to steer a defendant through basic procedures of trial. It was reasonable and well within the trial court's discretion to entrust and delegate performance of a mundane technical task, that it deemed necessary to protect the

integrity of its processes to the safeguarding backstop of its Standby Counsel Shanin. Who could have ever anticipated his departure from the well-defined role or the devastation it wreaked. The trial court was absolutely THUNDERSTRUCK that all of Standby Shanin's prior smug confident assurances had been proven false. Nevertheless, pressing on, in the knowledge of this Standby imposed calamity, violated Roberts due process and Faretta rights.

## CRITICAL STAGE

Supreme Court cases have long recognized that the period from arraignment to trial was "perhaps the most critical period of the proceedings". Powell v. Alabama, 287 U.S. 45 (1932). It found that: defendants were not accorded right to counsel in any substantial sense when the defense lawyers were not given adequate time to prepare for trial". Id. Here, this self represented defendant was entirely excluded from access to a voluminous complex discovery. Which included his own business records, attorney-client privileged communications, and potentially exculpatory Brady materials; during those six critical months preceding trial. When an organ of the state, in the form of NOT UNDERSTANDING Standby Counsel Shanin unilaterally denied the FARETTA defendant the opportunity to prepare a defense. The proceeding was CONVERTED into a SHAM and nothing more than a formal compliance with the Constitution's requirement. Schmidt v. Foster, 891 F3d 302 (7th Cir 2018). No one can effectively or otherwise mount a defense while cut off from voluminous

discovery, in a case deemed complex. Further, during that time there was a literal deluge of discovery forthcoming from the government that escaped review.

The Sixth Amendment secures to a defendant who faces incarceration the right to counsel at ALL "critical stages" of the criminal process. Iowa v. Tovar, 541 U.S. 77 (2004). To deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself. The right to counsel attaches at earlier critical stage in the criminal justice process "where the results might well settle the accused's fate and reduce the trial to mere formality". Maine v. Moulton quoting United States v. Wade, 388 U.S. 218 (1967). The Sixth Amendment is not satisfied when no "actual assistance for the accused's defense is provided and as a result, the prosecution's case is not tested against "the crucible of meaningful adversarial testing". United States v. Cronic, 446 U.S. 648 (1984). This Standby Counsel/Prosecution joint venture foiled Robert's every attempt to meet the government's case which is the hallmark of our justice system.

## PROSECUTORIAL EXPLOITATION

An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: "the United States wins its point whenever justice is done its citizens in the courts". Brady v. Maryland, 373 U.S 83 (1963). A prosecution that withholds evidence... helps shape a trial that bears heavily on a defendant casts

the prosecutor in the role of an architect of a proceeding that does not comport with the standards of justice. Id.

On November 18, 2022 the trial court recorded at Docket # 826: "Computer was turned over to defendant Kowalski in open court. Standby Defense Counsel and Government offered to ASSIST defendant Kowalski in utilizing the CHROMEBOOK previously provided."

When the government acts in misleading ways, it may not enforce the law if to do so would harm a private party as a result of government deception. United States v. Pennsylvania Industrial Chemical, 441 U.S. 645 (1973). As an architect of a fair trial the government has built something of a [crooked] Leaning Tower of Pisa. The Tower computer referenced by Docket # 826, turned over by the government to demonstrate their good faith was also dead on arrival. It lacked the monitor, cables, keyboard, and mouse. The absence of these materials poses an insurmountable hurdle for an indigent man locked away in home incarceration. (living on a Link card) Critically, government assistance relative to the much vaunted CHROMEBOOK continued in the same vein. While obstensibly offering to "ASSIST", their representations of quickee "FREEONES" downloadable fixes have proven slippery, illusory, and ultimately completely misleading like a mirage. Leaving Robert unable to present a defense, mired in a much worse state than he otherwise should have been without their Assistance.

## STANDBY GRINCH WHO STOLE FREEDOM

The trial court has repeatedly encouraged Robert to avail himself of Standby Counsel resources. Observing in its rulings: "Kowalski is told at each status that he can always ask his Standby Counsel for HELP with the law - something he refuses". (See Docket #792). Likewise, the Seventh Circuit has regularly echoed these same sentiments noting that a defendant who refused to cooperate with standby Counsel was "squandering a valuable resource". United States v. Chapman, 952 F2d 1352 (7th Cir 1992). Indeed a "FASTCASE" search query returned 7,526 hits. of reported cases for the phrase "STANDBY COUNSEL". Obviously, this total does not include those presumably more numerous non-reported proceedings. Unanimously and unsurprisingly, these cases recite the role of standby Counsel in terms of AID, ASSIST, and HELP. In fact, there has not been a single reported case that reflects a Standby Counsel GONE WILD. Except perhaps a Standby Counsel trying too hard to help an embattled, floundering defendant.


## "A CHROMEBOOK CANNOT OPEN"

In light of this historical background, the documented conduct that Standby Counsel Shanin engaged in is nothing short of an alarming discordant anomaly. The first chance Standby Counsel Shanin received to demonstrate his mettle; he failed epicly to abide the only court order entrusted to him. Creating, the rendition of unanticipated results with drastic consequences for the defense. He traded in

Robert's freedom for a new laptop computer. Bearing out the time honored American belief that: "the law conspires against one where an attorney is forced upon an unwilling defendant. Faretta v. California, 422 U.S. 806 (1975), Shady Standby Counsel Shanin's aberrant wrongdoing has literally "imprisoned a man in his privileges and calls it Constitution." Adams v. United States ex rel McCann, 317 U.S. 269 (1942).

## "I DIDN'T KNOW THERE WAS A PROBLEM"

Despite Robert's constant protestations to the contrary, Standby Counsel Shanin purposefully engaged in a prolonged deliberate campaign of illegality. That targeted an indigent Faretta defendant's right to a fair trial. The transcripts of court proceedings and docket clearly show the trial court was DECEIVED. Consequently, where it was undermined it could not fulfill its duty to safeguard the invoked Faretta right. It is a nearly universal conviction on the part of our people that forcing representation on an unwilling defendant is contrary to his basic right to defend himself if that is what he truly wants. Faretta 422 at 817. It is hard to accept that a Senior mentoring Standby Counsel possessing VAST experience had never handled government's standard electronic discovery material previously. He had to know that his grand kids old 2012 school CHROMEBOOK would never work and provided it regardless.

## CULTURE OF ASSURANCES

The AUSA repeatedly ASSURED that ALL the discovery worked. Then demonstrated that, in fact, it did not. (SEE Docket # 1072). The AUSA ASSURED that ALL discovery was provided; the trial court opined that it was confident that it had. Then they admitted to an omission of the Not inconsiderable sum of 110,000 files. (See Docket # 792). The AUSA and their Standby Attorney cohort ASSURED, No CONFIRMED, that a Kid's CHROMEBOOK could perform ALL the work of a Microsoft Window operating system Laptop. (See Dockets # 826, # 837). Then they APOLOGIZED on the first day of trial when it was proven beyond ALL doubts that indeed, a CHROMEBOOK could NOT. (See Docket # 1041). They cast about to lay blame for their fiasco, rather than accepting responsibility for their lack of candor. Thereupon, AUSA and Standby Counsel ASSURED that ALL that encryption was the issue. (See Docket # 1041 at page 332) Knowing the whole time that the CHROMEBOOK itself produced a preprogramed message stating that:

"This file is designed for a P.C. using windows software. This is NOT compatible with your drive which RUNS CHROME O.S." (See Docket # 1041 at page 317 and Docket # 820, Attachment to motion)

In light of this demonstrated track record devoid of truth, there is No good reason for a court that likens itself to a discovery HAWK, (Docket # 792), has to fall into line as a DUCK would with this history of misleading patently proven false representations.

## BEGUILING ASSURANCES

After all these confident sounding ASSURANCES have gone awry under dodgy circumstances, there is absolutely no doubt that a new trial is warranted. That the United States prosecuting attorneys overstepped the bounds of propriety and fairness which should characterize the conduct of such officers in the prosecution of a criminal offense is clearly shown by the record. Berger v. United States, 295 u.s. 3 (1935). It is as much the prosecutor's duty to refrain from improper methods calculated to produce a wrongful conviction as it is to bring about a just one. Id. All of these glib assurances that had been proved false, collectively precluded defense preparation. The resulting pretense of a trial which in truth was but used as a means of depriving a defendant of liberty through a deliberate DECEPTION of the court. Such ASSURING contrivance by the government to procure a conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is obtaining of a like result by intimidation. Brady v. Maryland, 373 U.S. 83 (1963).

Wherefore Robert respectfully request this court enter an order granting a new trial.

Respectfully Submitted

Robert M. Kowalski

Robert M. Kowalski

#499069, Jerome Combs Detention Center

3050 Justice Way, Kankakee, Illinois

Robert M.
# 499069
Jerome Combs Detention Center
3050 Justice Way
Kankakee, Illinois 60901


$2.79
US POSTAGE
FIRST-CLASS
062S0001443178
FROM 60901

RECEIVED

OCT 20 2023

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

CLERK OF THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
219 SOUTH DEARBORN STREET
CHICAGO, ILLINOIS

60604


10/20/2023-10

Legal Mail                    Legal Mail

This Correspondence is from
a detainee from:
Jerome Combs Detention Center
3050 Justice Way
Kankakee, IL 60901