**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| v. | ) | 19 CR 226-1 |
| | ) | |
| ROBERT KOWALSKI, | ) | Judge Virginia M. Kendall |
| | ) | |
| *Defendant*. | ) | |

## MEMORANDUM OPINION

On March 10, 2023, a jury convicted Robert Kowalski on conspiracy to embezzle and aiding and abetting embezzlement; bankruptcy fraud; and tax crimes. (Dkt. 939). Kowalski has since filed numerous post-trial motions, including the two at issue here: a motion for a new trial, (Dkt. 971), and a motion for judgment of acquittal, or in the alternative, a new trial, (Dkt. 993). Kowalski does not challenge the sufficiency of the Government's evidence presented at trial. Instead, he focuses his ire on the allegedly deceitful actions of his standby counsel, a technological mishap involving a Chromebook, and his apparent inability to access and review discovery. For the following reasons, Kowalski's motions [971, 993] are denied.

### DISCUSSION

**A. Motion for a New Trial**

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." *United States v. Foy*, 50 F.4th 616, 622 (7th Cir. 2022) (quoting Fed. R. Crim. P. 33(a)). A jury verdict is not overturned lightly, however. *See United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994). A motion for a new trial is granted only in "the most extreme cases," *United States v. Linwood*, 142 F.3d 418, 422 (7th Cir. 1998), and "only if there is

a reasonable possibility that the trial error had a prejudicial effect upon the jury's verdict," *United States v. Maclin*, 915 F.3d 440, 444 (7th Cir. 2019). This is not an extreme case.

### I.  Standby Counsel Steven Shanin and the Chromebook

From the beginning of this case, Kowalski has insisted on representing himself. On March 11, 2019, Judge Gilbert appointed Imani Chiphe to serve as Kowalski's counsel in his criminal case. (Dkts. 13, 14). After the case was transferred to this Court, Kowalski filed a motion to withdraw his appointed attorney, arguing that his bankruptcy proceeding was "inextricably linked" to his criminal case and Chiphe was unqualified to represent Kowalski in both matters. (Dkt. 57 at 3; *see also* Dkts. 47, 51). The Court corrected Kowalski: Chiphe was not representing him in his bankruptcy proceeding. Rather, Chiphe only informed the bankruptcy court about the status in the criminal case and that Kowalski would be invoking his Fifth Amendment right not to incriminate himself. Thus, the Court denied the motion to withdraw because Kowalski did not have sufficient facts to support it. (Dkt. 64).

On November 10, 2020, Kowalski again filed a motion to allow withdrawal of his Court-appointed counsel and proceed *pro se*. (Dkt. 167). This time, the Court conducted a *Faretta* hearing to determine his ability to litigate the case and to warn him of the risks of self-representation. (Dkt. 173). Although granting his motion, the Court found it prudent to have Chiphe serve as Kowalski's standby counsel. (*Id.*) For a period, Chiphe assisted Kowalski in filing motions and requesting computer and printer access. Then, in a span of a week in April 2021, Kowalski filed two motions to dismiss his standby counsel for ineffective assistance of counsel. (Dkts. 319, 327). He argued that Chiphe and the Federal Defender Program were not forwarding the discovery to Kowalski, filing motions in the wrong court, and possibly colluding with the Government to thwart Kowalski's preparation. (Dkt. 319 at 1–3). The Court denied his motions and reminded Kowalski

that he did not have a right to standby counsel and could not argue that Chiphe was ineffective when Kowalski elected to proceed *pro se*. (Dkt. 335). Afterward, Kowalski's disdain for Chiphe grew to the point where Kowalski refused to work with Chiphe at all and the Court considered providing Kowalski with a new standby counsel. (Dkt. 1071 at 24:19–25:13). On April 15, 2022, the Court appointed Steven Shanin to that role. (Dkt. 701). And soon after, Kowalski's grudge against Shanin began and has been a recurring theme in this case.

To start, Kowalski argues that Shanin "abdicated his role as a well recognized [sic] safeguard, a backstop, for the defendant's right to counsel." (Dkt. 993 at 2). He accuses Shanin of "[c]hoosing petty profiteering of a new upgraded computer at the expense of [Shanin's] duty to assist an accused [Kowalski] fighting for his freedom." (*Id.*; *see also* Dkt. 971 at 4). That "profiteering" refers to the Chromebook incident. In late 2022, Kowalski requested a computer to review discovery in preparation for his trial. Instead of purchasing a new laptop, Kowalski claims that Shanin allegedly misappropriated CJA funds to buy himself a new computer and gave Kowalski an old "2013 model Chromebook…one that would never work under any circumstance." (Dkt. 993 at 3; *see also* Dkt. 971 at 3, 5). After the first day of trial, the parties attempted to open some discovery files on the Chromebook but ran into technological issues. Seizing that moment, Kowalski writes that the "Chrome Operating System is inherently incompatible with the government's Microsoft Windows operating system based discovery." (Dkt. 993 at 3). Moreover, Kowalski accuses Shanin and the Government of colluding and engaging "in a candorless [sic] campaign of misinformation" about the Chromebook's functionality. (*Id.* at 2; *see also* Dkt. 971 at 8). The Court ordered Shanin to procure a second laptop with Microsoft Windows operating system, but Kowalski asserted that his "pretrial defense preparation cannot occur after trial has begun." (Dkt. 993 at 4).

3

Thus, Kowalski contends that his due process[1] and *Faretta* rights were violated: "he was tried without having had *any opportunity*…to prepare his defense." (*Id.* at 4 (emphasis added); *see also* Dkt. 971 at 5 ("[T]he failure of standby counsel Shanin to comply with court order precluded any pretrial preparation whatsoever.")). Shanin's alleged interference left the standby counsel "in sole de facto control of the organization and potential content of the defense," "preventing [Kowalski] from making or formulating tactical decisions." (Dkt. 993 at 6; *see also* Dkt. 971 at 7). Changing targets, Kowalski asserts that the Government's *Brady* obligations were "absolutely shredded where government tenders millions of electronic documents" but takes active steps to ensure Kowalski could "never gain access" to them. (Dkt. 1219 at 7; *see also* Dkt. 993 at 4 ("Robert had been denied pretrial access to all discovery material including *Brady* materials."); Dkt. 971 at 7 ("Prosecution team ensured…that their *Brady* discovery material provided would remain hidden in plain view.")). He "made every effort to prepare a defense and was thwarted in those efforts." (Dkt. 993 at 6; *see also id.* at 10 ("During the critical period of pretrial between August 17, 2022 until February 14, 2023[,] an indigent *Faretta* defendant was deliberately left bereft of any capacity to prepare his defense.")). Therefore, as a victim of Shanin's and the Government's machinations, Kowalski believes that the Court should have continued the trial date.

Behind this loud rhetoric, Kowalski's position is straightforward: the Court should grant a new trial because (1) he was unable to access and review discovery in preparation for his defense; (2) Shanin interfered with Kowalski's representation; and (3) the Court erred in denying his

---

[1] Kowalski asserts violations under the Fifth, Sixth, and Fourteenth Amendments. Kowalski fails to articulate a basis for a Fourteenth Amendment due process violation. As the federal government is the other party in the case, only the Fifth Amendment Due Process Clause applies. *See Massey v. Wheeler*, 221 F.3d 1030, 1036 n.1 (7th Cir. 2000) ("The Fourteenth Amendment creates a due process right against the states, ('[N]or shall any State deprive any person of life, liberty, or property without due process of law') while the Fifth Amendment guarantees due process by the federal government.").

motions to continue the trial. But here is the rub: there are no facts to support Kowalski's arguments.

### a. Discovery

The Court will first address Kowalski's broad assertion that he suffered a due process violation because he was unable to access and review discovery. A scan of the docket's timeline exposes his claims as frivolous and factually baseless:

- On May 7, 2019, the Court issued a protective order governing the discovery production to Kowalski. (Dkt. 50).

- On April 16, 2021, the Government stated that they produced, and re-produced, all electronic and written discovery to date, including Washington Federal's business records and Kowalski's personal records. (Dkt. 337 at 9:20–11:5). They further outlined in a letter where Kowalski could find documents in the productions and offered to provide additional assistance. (*Id.* at 10:7–12). Discovery was being produced on a rolling basis. (*Id.* at 10:13). Kowalski attested that he had "gone through everything." (*Id.* at 11:22).

- On June 24, 2021, the Government informed the Court that they had sent Kowalski all the discovery to date. (Dkt. 377).

- On July 8, 2021, the Government stated that they had re-produced previously tendered discovery, made additional discovery productions, and provided correspondence and summary charts detailing where to locate certain documents and evidence in the productions. (Dkt. 395).

- On July 12, 2021, the Court confirmed that the Government provided an external hard drive and thumb drive containing the above discovery. (Dkt. 401). The Court also requested the Metropolitan Correctional Center (MCC) to provide Kowalski with more computer time in the law library. (*Id.*)

- On July 26, 2021, the MCC extended Kowalski's law library time to three hours a day and provided him an additional hour in the quarantine unit to review discovery. (Dkt. 415). The Government tendered to Kowalski "a number of paper copies of discovery so he can review things in his cell when he's not allowed computer time." (Dkt. 423 at 2:24–3:2). An IT specialist also verified that Kowalski could access the hard drive's files. (Dkt. 415).

- On October 1, 2021, the Government stated that since July 2021, Kowalski had at least three hours a day, seven days a week, to use the MCC's designated computers, review discovery, and access other electronic legal materials. (Dkt. 448 at 1). In addition, since

September 15, 2021, Kowalski was provided with his own discovery laptop that he could take to his cell to review discovery. (*Id.*) Moreover, the Government ran keyword searches and generated indexes to help Kowalski navigate the productions. (*Id.* at 2).

- On November 18, 2021, the Government visited Kowalski to resolve any technological issues that could impede his review of discovery. (Dkt. 518 at 1). To date, the Government provided seven discovery media devices to Kowalski: one disc, four thumb drives, and two hard drives. (*Id.* at 2). Kowalski did not bring the disc to the meeting but advised that it was operable. (*Id.*) Five of the six devices were accessible, and the Government replaced the inaccessible device on November 22, 2021. (*Id.* at 3). The parties found that almost all the discovery files were accessible either on the MCC's desktop or Kowalski's laptop. (*Id.* at 2–3). For the few inaccessible files, the Government sought to replace them. (*Id.* at 4). Furthermore, at Kowalski's request, the Government provided a printed copy of all the discovery indexes and the FDIC claims against him. (*Id.* at 6).

- On December 10, 2021, the Government invited Kowalski to review physical records at the United States Attorney's Office. (Dkt. 1201, Ex. C). Kowalski did not respond to the offer. (Dkt. 1201 at 16).

- On February 18, 2022, the Government advised the Court that they had turned over materials cited in Kowalski's motions to compel discovery. (Dkt. 654).

- Starting March 15, 2022, the MCC allowed Kowalski to use the discovery review room, which contained a desktop computer, from 8:00AM to 3:15PM, Monday through Friday, plus the three hours of library time each evening. (Dkt. 694 at 1). The entry logs showed Kowalski using the room multiple times between March 15, 2022 and April 5, 2022. (*Id.* at 2).

- On March 21, 2022, Kowalski told MCC staff that he had trouble accessing the discovery materials. (*Id.*) The Government sent a letter to Kowalski asking him to identify which files were inaccessible. (*Id.*) On April 5, 2022, the Government visited Kowalski and offered to fix any problematic files. (*Id.* at 3). But he "declined to allow the government to check the devices and asked the government to leave." (*Id.*)

- On April 6, 2022, the Government stated that since the February 18, 2022 status hearing, they had provided additional discovery productions, including a red weld folder with "draft schedules showing the transfer of funds related to defendant's bankruptcy charges." (*Id.* at 4). The Government, again, re-produced previously tendered discovery to Kowalski in digital and physical formats. (*Id.* at 5).

- On May 5, 2022, the Court ordered Kowalski to provide a list of flash drives or documents that he could not access to the Government by May 20, 2022. (Dkt. 719). Kowalski never responded. (Dkt. 731).

- On June 22, 2022, one of the Court's law clerks, the court reporter, and the Government visited Kowalski and again, reviewed the functionality of all the devices and files. (Dkt. 745). Some files were inaccessible, and the Government was ordered to produce them in a different format, such as converting the native files to PDFs. (Dkt. 764).

- On July 20, 2022, Kowalski asserted that he had been denied access to the MCC's discovery area for weeks. (Dkt. 765). The MCC informed the Court that Kowalski had not requested access to the discovery area and no correctional officer denied him access. (*Id.*)

- In the summer of 2022, the Government and Shanin arranged to have Kowalski transported to the United States Attorney's Office on July 27, 2022 to review physical and electronic records and resolve any inoperable discovery devices. (Dkt. 1074 at 45:3–21). But Kowalski refused the invitation. (*Id.* at 49:20–50:1). The Government further attested that the discovery devices were accessible on their computers. (*Id.* at 45:15–19).

- On July 21, 2022, the Government again invited Kowalski to the United States Attorney's Office to review discovery. (Dkt. 794-2). Kowalski did not respond. (Dkt. 1201 at 17). As a courtesy, the Government also provided Kowalski a printed copy of the Seventh Circuit pattern criminal jury instructions and a real estate treatise. (Dkt. 794-1).

- On August 17, 2022, the Government notified the Court that they had mistakenly not turned over a second batch of FDIC documents. (Dkt. 793). To ensure Kowalski had sufficient time to review this batch, the Court reset the trial date to February 13, 2023. (*Id.*) Moreover, Kowalski was released from custody so he could better prepare for trial. (*Id.*) The Court instructed the MCC to allow Kowalski to take all his case materials, including the physical and electronic discovery, upon his release. (Dkt. 915 at 41:6–18). The Government reminded Kowalski that he could retrieve his personal computer tower, with Microsoft Windows operating system, from the Federal Defender's office. (*Id.* at 48:14–17).

- On October 6, 2022, the Government reported that discovery production was ongoing. (Dkt. 815). Shanin also provided a Chromebook for Kowalski to review discovery and confirmed that the discovery was accessible. (*Id.*; Dkt. 917 at 10:6–10). The Court further verified that Kowalski's smartphone had a hot spot for Internet connection. (Dkt. 815). The Government repeated its standing offer for Kowalski to visit the United States Attorney's Office, review discovery, and discuss any outstanding discovery issues. (Dkt. 917 at 11:7–23). The Government again reminded Kowalski to reach out to the Federal Defender's office to retrieve his personal computer tower. (*Id.* at 7:5–8:18).

- On November 18, 2022, the Government reported that they had provided Kowalski and Shanin an index of all discovery produced to date. (Dkt. 826). Moreover, the

Government retrieved and returned to Kowalski his personal computer tower. (Dkt. 918 at 5:16–6:14).

- On December 21, 2022, Kowalski stated that he did not have a monitor, mouse, and keyboard. (Dkt. 837). The Court instructed Shanin to see if he could procure or purchase the necessary equipment. (*Id.*; Dkt. 878 at 49:4–23).

It is important to note, that much of the discovery provided to Kowalski was not even material that was required to be provided to him pursuant to the criminal rules of discovery. Often Kowalski was seeking loan files or documents that were not charged in the case and were not relevant to any defense; nor could Kowalski articulate any specific defense when asked by the Court. In spite of this, the Court held regular status hearings to provide him with the requested material, brought the Warden of the MCC to court to discuss expanding his ability to view his discovery, and directed the government to visit him at the MCC to determine what problems he was having with accessing the discovery. No other defendant at the MCC was provided this amount of time or attention over the months that Kowalski remained detained. Yet Kowalski still claims he "was denied pretrial access to all discovery material, including *Brady* materials" and had no "opportunity, much less a meaningful one, to prepare his defense." (Dkt. 993 at 4; *see also id.* at 5, 10–11, 16–17). That is simply not reality. The Government and the Court have gone to extraordinary lengths to provide Kowalski access to discovery. As his blanket assertion goes nowhere, Kowalski's specific examples—(1) an inability to review discovery on his Chromebook during the six months before the start of trial and (2) the Government's failure to produce *Brady* evidence—also fail.

Kowalski's fixation on the alleged malfunctioning Chromebook is misplaced. He has not cited, and the Court has not found, any persuasive authority to suggest that the Constitution entitles a *pro se* defendant to a computer. If a defendant rejects the right to counsel, as is the case here, then "other alternative rights, like access to a law library, do not spring up." *United States v. Sykes*,

614 F.3d 303, 311 (7th Cir. 2010) (citation omitted); *see also United States v. Moya-Gomez*, 860 F.2d 706, 743 (7th Cir. 1988) (rejecting the argument that a *pro se* defendant has a constitutional right to a law library, interpreter, typewriter, and "access to other defense attorneys and codefendants to discuss his case"); *U.S. ex rel. George v. Lane*, 718 F.2d 226, 232 (7th Cir. 1983) (stating that a defendant who invokes his right to refuse counsel does not "have a constitutional right to access to a computerized legal research system, paralegal training or a full-fledged law school education"). Following that logic, Kowalski's Chromebook was a privilege, not a right. It cannot serve as a basis for a due process violation. *See Moya-Gomez*, 860 F.2d at 743.

But even then, Kowalski mischaracterizes the Chromebook's shortcomings. Kowalski argues that the Chromebook's operating system was "inherently incompatible with the government's Microsoft Windows operating system based discovery." (Dkt. 993 at 3). In truth, the problem was more discrete: the Chromebook could open unencrypted files but not encrypted ones. (Dkt. 1041 at 332:11–333:15). The parties were aware of this problem. The Government previously stated that the Department of Justice policy required encrypting discovery, but they were using different encryption methods to ensure Chromebook compatibility. (Dkt. 918 at 7:13–18). The Government asked Kowalski to identify which encrypted devices were incompatible and needed to be remedied, but he never responded. (*Id.*)

Conveniently, Kowalski neglects to mention the thousands of *unencrypted* discovery files, (*see, e.g.*, Dkt. 878 at 3:4–8; Dkt. 918 at 12:25–13:11; Dkt. 1074 at 26:9–27:5); the thousands of pages in printed discovery (*see, e.g.*, Dkt. 1070 at 12:1–13; Dkt. 1074 at 29:3–9); and the numerous opportunities to review physical records at the United States Attorney's Office. *See, e.g.*, *United States v. Shaw*, 824 F.3d 624, 630 (7th Cir. 2016) (observing no evidentiary concerns in denying hard copies of discovery to defendant when he had limited access to prison computer and was

invited to review discovery in courthouse). And during this six-month period prior to trial, Kowalski could have used his personal computer tower with Microsoft Windows operating system—which the Court repeatedly reminded Kowalski to retrieve—to review any discovery, even encrypted ones.[2]

Fighting the conclusion, Kowalski cites to Supreme Court cases noting that the Government must provide an indigent prisoner "with the basic tools of an adequate defense or appeal." *See Britt v. North Carolina*, 470 U.S. 68, 77 (1985); *Ake v. Oklahoma*, 404 U.S. 226, 227 (1971). But that broad language is not the holding in those decisions, and the Supreme Court has warned not to "transform narrow decisions into broad ones by framing their holdings at a high level of generality." *Bergman v. Howard*, 54 F.4th 950, 960 (6th Cir. 2022) (citing *Nevada v. Jackson*, 569 U.S. 505, 512 (2013)) (cleaned up). *Britt* and *Ake* limited their holdings to an indigent criminal's right to transcripts of prior proceedings and an expert psychiatrist, respectively. Neither case suggests that a laptop is a basic tool for an adequate defense, especially when Kowalski had other means of reviewing discovery.[3]

Next, Kowalski misunderstands the law in *Brady v. Maryland*. There, the Supreme Court held that the "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). To sustain a *Brady* violation, Kowalski needs to show that the Government has evidence that is "(1) favorable, (2) suppressed, and (3) material to the defense." *United States v. Johnson*, 43 F.4th 771, 783 (7th Cir. 2022) (citations omitted). The underlying assumption is that the defendant must point to specific evidence that plausibly fits a *Brady*

---

[2] The Court authorized Shanin to purchase any computer accessories for Kowalski. (Dkt. 878 at 49:4–23).

[3] The Seventh Circuit has also declined to establish a standard to determine "what tools are necessary to ensure due process under *Ake*." *United States v. Fitzgerald*, 6 F. App'x 408, 409–10 (7th Cir. 2001).

violation. *United States v. Jumah*, 599 F.3d 799, 808–09 (7th Cir. 2010) (holding that "a defendant cannot demand a new trial based on mere speculation or unsupported assertions that the government suppressed evidence (cleaned up)); *see also United States v. Morris*, 957 F.2d 1391, 1403 (7th Cir. 1992). But Kowalski fails to identify any. Rather, he categorizes all discovery material as *Brady* evidence. (*See, e.g.*, Dkt. 792 at 6).[4]

For example, he takes umbrage with the fact that the Government forgot to produce a second batch of FDIC documents, implying that there was a devious plot to thwart his preparation. (Dkt. 1219 at 8). But Kowalski does not articulate how such information is favorable to his defense or material, as defined under *Brady*.[5] And the evidence was not suppressed—the Government admitted to its oversight and produced it, and the Court reset the trial date to provide Kowalski with sufficient time to review. *See, e.g.*, *United States v. Barr*, 960 F.3d 906, 916 (7th Cir. 2020) ("If a defendant receives relevant evidence—albeit late—and is left with time to make use of it, that evidence has not been suppressed.").

To the extent Kowalski argues that he could not find the *Brady* evidence in the voluminous discovery, the Government is under no obligation to "'sift fastidiously' through millions of pages (whether paper or electronic)" of discovery and direct Kowalski to exculpatory evidence. *United States v. Gray*, 648 F.3d 562, 567 (7th Cir. 2011) (quoting *United States v. Warshak*, 631 F.3d 266, 297 (6th Cir. 2010)). Still, as a courtesy, the Government provided indexes, summary charts, and explanatory letters to help Kowalski navigate through the productions.

---

[4] The Court has previously commented that much of what Kowalski seeks in discovery is irrelevant to the charges in his case. (Dkt. 792 at 7).

[5] Kowalski believes *Brady* evidence is material if it is "relevant but incriminating." (Dkt. 1219 at 9). He is wrong. Evidence is material under *Brady* if "there is a reasonable probability that, had evidence been disclosed, the result of the proceeding would have been different." *Johnson*, 43 F.4th at 784 (quotation omitted).

Kowalski had four years to prepare for trial. While there were bound to be technological and logistical difficulties when producing thousands of discovery files across this span of time, the Court and the Government moved to resolve them at every step of the way. He was afforded unprecedented access to the MCC's law library and computer room. The Government produced, and re-produced, discovery in digital and physical formats and provided indexes for keyword searches and explanatory letters to help Kowalski navigate through the productions. On multiple occasions, the Government met with Kowalski to demonstrate how to review and access the discovery devices and urged him to reach out to the Government if he faced further difficulties. The Government repeatedly invited Kowalski to review physical records at the United States Attorney's Office—an invitation he never once accepted. The Court set nearly monthly status hearings to ensure the Government and Kowalski were in frequent communication and to resolve any discovery-related issues. In the six months prior to the start of trial, the Court released Kowalski from custody and provided him with a laptop and his personal computer tower to review encrypted and unencrypted devices and files. And while now exclaiming that he could never access discovery, the dozens of discovery-related motions that he filed say otherwise.[6] In sum, Kowalski's cries of wolf fall flat when confronted with the record.

### b. Standby Counsel Shanin

Kowalski displays a palpable dislike towards his standby counsel Shanin. First, Kowalski accuses Shanin of misappropriating CJA funds to buy himself a brand-new laptop while giving Kowalski an old "2013 model Chromebook" that belonged to Shanin's child. (Dkt. 993 at 3). Kowalski then paints a conspiracy where Shanin and the Government worked to collectively "mispresent[] the Chromebook capacities for months to the trial court." (*Id.* at 5). According to

---

[6] *See, e.g.*, Dkts. 380, 391, 398, 399, 402, 411, 412, 413, 416, 417, 418, 419, 420, 421, 422, 424, 430, 431, 481, 488, 489, 491, 492, 498, 499, 500, 501, 502, 503, 504, 512, 513, 514, 519, 520, 525, 540, 661, 685, 698, 786, 801, 836.

Kowalski, he "would have been able [to] accomplish discovery review had Standby Counsel not interfered by withholding the court ordered instrument required of him." (*Id*. at 6). Finally, Kowalski criticized Shanin for interfering with Kowalski's right to self-representation while abdicating "[Shanin's] role as a well recognized [sic] safeguard, a backstop, for the defendant's right to counsel." (*Id.* at 5).

The problem with Kowalski's theory is that his allegations are conclusory and speculative. He has produced no evidence to show that Shanin purchased a new laptop, kept it, and gave an old Chromebook to Kowalski. Indeed, Shanin tendered an Amazon purchase order for the Chromebook that refutes Kowalski's contentions. (Dkt. 869; Dkt. 919 at 19:13–19). Further, he cites no evidence that the Government and Shanin colluded to deny Kowalski discovery access. The record is replete with instances where the Government and the Court worked tirelessly to accommodate Kowalski's discovery request and review. And beyond the Chromebook accusation, Kowalski has not explained how Shanin interfered with his right to self-representation. He makes vague references that Shanin prevented Kowalski from "making or formulating tactical decisions," (Dkt. 993 at 6), but provides no specific instances. Rather, "it was [Kowalski] who examined witnesses, conducted *voir dire*, determined which witnesses he wanted to subpoena, and filed hundreds of pretrial motions." (Dkt. 1201 at 22).

Kowalski has made his position clear: he has repeatedly refused to work with any counsel, representative or standby, (*id.* at 23 (collecting record cites)) and he believes he is the best attorney to represent himself. His actions show that he has remained firmly in the driver's seat of his defense. But by the same token, Kowalski cannot then argue that he "did not receive any form of assistance of counsel during this absolutely critical pre-trial period." (Dkt. 993 at 6). There is no right to standby counsel. *Simpson v. Battaglia*, 458 F.3d 585, 597 (7th Cir. 2006). And when a

standby counsel is appointed, the concern is whether they do too much, not too little. *Id.* Therefore, Kowalski's claim that he was left adrift with no help from Shanin "cannot give rise to an ineffective assistance of counsel claim under the Sixth Amendment." *Id.*; *see also United States v. Chapman*, 954 F.2d 1352, 1363 (7th Cir. 1992) ("[A] defendant who chooses to represent himself cannot later claim ineffective assistance of counsel.").

### c. Motion to Continue Trial

Lastly, Kowalski argues that the Court's denials of his motions to continue the trial, (Dkts. 868, 887), amount to a constitutional violation. He recycles the same arguments—the Chromebook issue and his general inability to review discovery—to assert that he did not have an adequate opportunity to prepare for his defense.

"In deciding whether to grant a continuance, courts should consider: (1) the amount of time available for preparation; (2) the likelihood of prejudice from denial of the continuance; (3) the defendant's role in shortening the effective preparation time; (4) the degree of complexity of the case; (5) the availability of discovery from the prosecution; (6) the likelihood a continuance would have satisfied the movant's needs; and (7) the public interest, including fairness and harm to victims and inconvenience to the district court in light of its pending case load." *United States v. Dickey*, 52 F.4th 680, 685 (7th Cir. 2022). But the courts are not mandated to provide "a rigid recitation and analysis of each point before a continuance may be denied." *United States v. Williams*, 576 F.3d 385, 389 (7th Cir. 2009).

In denying Kowalski's motions to continue, the Court highlighted the case's significant history. Kowalski had four years to prepare for trial. *See Dickey*, 52 F.4th at 686 (noting that the defendant had two-and-a-half years to prepare for trial when affirming the district court's denial of the motion for continuance). In that timespan, the Court reset the trial date five times. (*See, e.g.*,

Dkts. 83, 91, 460, 696, 793). Kowalski asserts that he "steadfastly maintained his right to a speedy trial," (Dkt. 993 at 16), but he abandoned that right by filing over 200 pre-trial motions, appealing over a dozen Court orders, and demanding more discovery and more time to prepare. Kowalski can hammer at the Chromebook's technological issues, but he neglects to mention the extensive steps the Government and the Court took to make discovery available to him: allowing extended hours of access to the MCC's law library with a designated computer; providing a Chromebook for unencrypted files; returning his personal computer tower to review any discovery; converting and modifying discovery files to avoid technological issues; visiting Kowalski in the MCC to resolve discovery-access problems; and inviting Kowalski to the United States Attorney's Office to review physical records.

In truth, Kowalski had the means and the opportunities to prepare for his defense. Any shortcomings in his preparation rest entirely upon his own shoulders. *See United States v. Volpentesta*, 727 F.3d 666, 678 (7th Cir. 2013) ("We are particularly reluctant to find an abuse of discretion where, as in this case, a court denies a continuance to a defendant who decides to proceed *pro se* but then complains of not being prepared for trial.").

## B. Motion for Judgment of Acquittal

"A jury verdict will only be overturned 'if, after viewing the facts in the light most favorable to the government, there was insufficient evidence to convict.'" *United States v. Perryman*, 20 F.4th 1127, 1133 (7th Cir. 2021) (quoting *United States v. Jett*, 908 F.3d 252, 273 (7th Cir. 2018)); *see also* Fed. R. Crim. P. 29. This is no easy feat. *See id.* ("We have described this challenge for the defendant as an uphill battle, a momentous task, a heavy burden, and a nearly

insurmountable hurdle…" (cleaned up)). The defendant bears the burden of establishing that no reasonable jury could find him guilty beyond a reasonable doubt. *United States v. Moore*, 572 F.3d 334, 337 (7th Cir. 2009) (emphasis added). "Such a challenge leads to a reversal only if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010) (cleaned up).

In his briefings, Kowalski does not argue that the Government's evidence was insufficient to convict him for his offenses. Therefore, the Court denies Kowalski's motion for judgement of acquittal. *See Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 704 (7th Cir. 2010) (explaining that it is not the court's "responsibility to research and construct the parties' arguments" (cleaned up)).

But the Court notes that the Government has presented sufficient evidence to support Kowalski's conviction. Throughout the trial, the Government introduced bank account statements, tax returns, communications, and witness testimonies to show bankruptcy fraud, conspiracy to embezzle and aiding and abetting embezzlement, and tax crimes.

Starting with the bankruptcy fraud, the Government had to prove that Kowalski intended to defraud and concealed assets during his bankruptcy proceeding. Candice Manyak and Kathryn Gleason, former trial attorneys for the U.S. Trustee's Office, testified that Kowalski lied about his assets in his bankruptcy filings. (*See generally* Dkts. 1044–45). For example, Kowalski stated that Mountain Duck Properties LLC was his daughter's entity, but in a lawsuit against his daughter, Kowalski attested that he was the rightful owner of Mountain Duck Properties. (Dkt. 1044 at 609:18–610:3, 615:9–19). On May 2, 2018, Kowalski claimed that his company Burros Blancos LLC had no assets, stating that the "last distribution from [a] real estate sale was more than a year before" in March 2017. (Dkt. 1045 at 643:2–7). But the company's April 2018 bank statement showed a deposit of $113,929.77 from a title company in relation to a real estate sale. (*Id.* at

643:20–646:1). The trustee in Kowalski's bankruptcy proceeding also testified that he discovered Kowalski was funneling money to his sister's IOLTA bank account and sought to recover that money to satisfy creditors. (*Id.* at 744:16–747:21). By following the paper trail of various banking transactions, Agent Kelly Popovits found that after Kowalski filed for bankruptcy, he concealed $554,798.25 from the trustee. (Dkt. 1052 at 1479:14–18). As the Government argued, to say that Kowalski did not intend to defraud the bankruptcy proceeding almost beggars belief in light of the extensive lying and concealment.

Next, the jury found Kowalski guilty of conspiracy to embezzle and aiding and abetting embezzlement. They heard testimony that John Gembara, the former President of Washington Federal, abused his position to embezzle millions of dollars. Alicia Mandujano, a loan servicer at the bank, testified that Gembara instructed her to falsify loan records for his friends, so they never had to make loan payments. (Dkt. 1052 at 1514:16–1518:24). As Gembara's friend, Kowalski benefited from the scheme—his companies Piorun Properties LLC and Indomitable LLC did not make loan payments and Washington Federal even covered the real estate taxes associated with his outstanding loans. (*Id.* at 1520:2–1525:2). Washington Federal also made "essentially a $100,000 deposit into" Piorun Properties's bank account where transaction entries showed Kowalski spending that money. (Dkt. 1058 at 2282:5–2283:12).

But the benefits were not limited to cash—Gembara also gave Kowalski properties. For example, Benito Romero agreed to resolve his outstanding loans by signing over his investment properties to the bank. (Dkt. 1049 at 1163:6–20). But Washington Federal never received those properties. Instead, Romero transferred the properties' deeds to Trust Number 2681, where Kowalski was the sole beneficiary. (*Id.* at 1169:8–1171:25; Dkt. 1056 at 2076:6–25, 2079:15–20, 2080:15–19). In sum, Richard Lexby, the Government's financial investigator, found that

17

Kowalski received about $8.7 million in relation to the Washington Federal embezzlement scheme. (Dkt. 1058 at 2306:16–23; Dkt. 1071 at 3332:12–20). Urging the jury to apply common sense, the Government argued that Kowalski must have known about the embezzlement if he was taking money and property from the bank and paying nothing back. (Dkt. 1701 at 3314:7–20).

Lastly, the Government produced sufficient evidence for the jury to conclude that Kowalski committed numerous tax crimes. To start, Kowalski did not complete his 2013–15 income tax returns. During that period, Kowalski received $991,000 as compensation from a settlement agreement; Washington Mutual wired $100,000 to Kowalski's entity Piorun Properties; and Piorun Properties collected $185,307 in rent. (Dkt. 1049 at 1153:3–1156:24; Dkt. 1058 at 2282:24–2283:4, 2361:23–2362:5, 2376:4–7). As a practicing attorney, Kowalski should have known that he had to report all income (even if ill-gotten), and yet, he failed to do so. (Dkt. 1058 at 2356:18–2357:6, 2376:22–25). Moreover, between 2015 and 2017, Kowalski misrepresented his tax returns by claiming that he paid alimony to his ex-wife, Martha Padilla. But as Padilla and her divorce attorney testified, they never sought a court order requiring Kowalski to pay any spousal maintenance. (Dkt. 1056 at 1993:7–21, 2000:4–8).

In short, the above summary is only a taste of the voluminous evidence the Government presented across the month-long trial. Therefore, the Court finds that there was sufficient evidence for a reasonable jury to find Kowalski guilty beyond a reasonable doubt.

## CONCLUSION

For the foregoing reasons, Kowalski's motions for judgment of acquittal and for a new trial are denied. [971, 993]

Virginia M.  Kendall
United States District Judge

Date: February 6, 2024