UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA )
)
v. ) No 19 CR 226
)
ROBERT M. KOWALSKI, )
defendant ) Virginia M. Kendall, Judge

## DEFENDANT KOWALSKI'S SENTENCING MEMORANDUM

Now Comes Robert M. Kowalski, (ROBERT), pursuant to local Rule 32.1 submits the following sentencing memorandum:

## BACKGROUND

On July 25, 2024, the government's supplemental version of the offense confirmed what Robert has long maintained:

"For loans that were secured by COLLATERAL the loan paperwork itself had a number of deficiencies and irregularities that would make enforcement against COLLATERAL difficult if not impossible: backdated notes, FORGED SIGNATURES ETC"

Several implications arise from this admission. Foremost Robert is NOT part of a conspiracy where it remained a necessity to FORGE his signature. Second, forged promissory notes do not evince legitimate debt obligations. Thus,

the government had no lawful right to pursue what it recognized as impossible collection based on Washington Federal Bank (WFB) FRAUD. Third, where inclusion of COLLATERAL value did not suit its purposes, the government knew its trial exhibits contained a deceptive misleading material omission. Most importantly, in the context of sentencing, a loss calculation of $8.7 million is more than adequately secured by collateral valued at over twelve million dollars, at the time of WFB failure. Consequently, there is no basis for any actual or intended loss that Robert sought to inflict.

In a recent decision pertaining to a failed bank, one federal appellate court recognized: "But that loan was fully paid and accounted for ZERO loss according to governments own calculations. It was also SECURED by collateral worth twice the amount of the loan itself. It is thus HARD to see how Lonich - who [like Robert] did not even work at the bank - can be said to have caused the bank's downfall, especially given the other potential causal factors at play". United States v. Lonich, 23 4th 881 (9th Cir 2022). Likewise, Robert did not work for WFB. Robert's loans were secured by collateral worth many times the value of the loans themselves. Indisputably, Robert repaid many loans. Thus it is hard to see how Robert caused the downfall of Washington Federal Bank.

## "SPECIAL BANK TREATMENT"

In comparison to Robert's WFB experience, Lonich had it relatively easy at Sonoma Valley Bank (SVB), as in one dimensional or conventional. Evidently, SVB directors, officers, and employees; unlike WFB did not create: 1.) Inflated loan balances, 2.) Fake loans, 3.) false loan histories, 4.) fraudulent loan files, 5.) forged promissory notes and loan documents, 6.) manipulate a CPA's audit confirmation slips, 7.) provide false trial loan balances and call reports, 8.) falsified appraisal reports, 9.) utilize "Bifurcated" double entry accounting to inflate loan accounts, 10.) Rerecord false documents to revive paid mortgages, 11.) include paid off loans as current, 12.) "Changed customer" lists, 13.) forced interest payments, 14.) Negative escrows, 15.) "Realignment" of others debts using Robert's collateral, 16.) and use of Robert's identity to pay defaulted loans of other WFB customers, amongst other unsafe practices. (See exhibit A.). Suffice it to say, upon discovery of WFB's fraudulent scheme, the OCC deemed the books and records altered and unreliable. Notwithstanding, the posted warnings of "GREAT CAUTION". Prosecution forensic analyst merely reconstituted the WFB fraud to secure conviction without meticulous verification.

## 1. FACTUAL CORRECTIONS:

Defendant has reviewed the P.S.R and requests the following corrections:

   A.) Robert is an innocent man wrongly accused, and a victim of WFB. Then used by prosecution member FDIC-R/FDIC-OIG as a means to collect on a fidelity bond.

2

B.) Ultimately, the only "favorable treatment" WFB accorded were those predatory mortgage lending practices Robert indisputably experienced born out of unsound banking.

C.) Robert repaid loans, completed homes, and provided ample valuable collateral for ALL his financial obligations.

D.) ALL government trial exhibit loss summaries are rife with inaccuracy. Innumerable government forensic analysts could not discern that plainly, WFB maintained a practice of "BIFURCATION" (double booking) relative to its administration of New construction financing. Wherein, WFB considered the entire amount of the New construction loan mortgage as impossibly disbursed as a beginning balance. However, in fact, WFB advanced its construction loan funding in a different manner. It administered construction draws in a line of credit fashion incrementally using "journal entries". The confusing part of all this unconventional bookkeeping, is that WFB attributed its accounting for these advances through other unrelated mortgage loans of Robert.

E.) The altered unreliable chaotic nature of WFB accounting meant that entrys relating to each respective loan were craftily accounted for, shifted, elsewhere.

F.) Since uncorrected false loan histories proliferated, the government analyst could not appreciate the collateral character of 22 mortgages of real estate that had been pledged as additional security for Robert's contingent letter of credit (L.O.C) obligations. And equally important that certain of these were later themselves refinanced with the proceeds, over

3

a million dollars, returned to the coffers of WFB. Moreover, the government team, including FDIC-R/FDIC-OIG, has been fascinated by the prospect of collection upon inflated loan balances, shown by false loan documents and equally fraudulent loan histories. Although the OCC director of special services determined these records had been altered and as a result were UNRELIABLE. It is outrageous these "PURPORTED-GHOST LOAN ACCOUNTS" the indictment cited, only represented Robert's effort to honorably secure his looming potential debt in a commercially reasonable manner.

G.) That Robert is, in fact, NOT responsible to pay others L.O.C. indebtedness. Especially, where these other WFB customers repaid their debt as well.

H.) It is not possible as a matter of law to embezzle collateral or rents thereof. Neither by plain definition was ever entrusted to the care of WFB.

I.) Without an executed SURETY agreement Robert is NOT legally obligated to pay debts of others.

J.) Attorney Kowalski may represent clients desirous of resolving mortgage foreclosure issues. Through use of deeds in lieu of foreclosure as provided by Illinois statute. (See ILCS 735, 5/15-1401). Robert represented WFB in the course of no fewer than forty such distressed transactions. Not all were resolved with deeds in lieu. Thirty of which were successfully marketed and SOLD. Those remaining were a manifestation of WFB dysfunction, not the absence of Robert's work ethic.

4

K) Robert was <u>NOT</u> cited for eleven traffic offenses.

L) Robert did <u>NOT</u> decline to discuss his criminal history. Rather, there simply is <u>NO</u> such history to discuss.

M.) Robert rarely consumes alcohol, and when he imbibes it is typically social, and certainly not to excess with the <u>PURPOSE</u> of drunkenness. Further, the drinking age in Wisconsin was 18, while Robert attended Marquette University many years ago.

N) Robert is <u>NOT</u> a gambler. On one occasion he was invited to a business related function at the former Arlington Park racetrack.


## 2. <u>SENTENCING</u>

When imposing a sentence, a district court must first calculate the advisory guideline sentencing range and then select a sentence within or outside the range in light of the factors set forth in 18 U.S.C. 3553(a). United States v. Robinson, 435 F3d 699 (7th Cir 2006). The primary directive of 18 U.S.C. §3553(a) is to impose a sentence that is "sufficient", but not greater than necessary to achieve the purposes of sentencing.

A. Sentencing Pursuant to Guidelines:

1. Under the guidelines, the calculations are as follows:

<u>BASE OFFENSE LEVEL</u>

a. Pursuant to Guideline U.S.S.G. §2B1.1 the base level is 7.

b. The government and probation have previously reccomended an 22 level enhancement under U.S.SG, §2B1.1(b)(1)(L); because the total loss of approximately $34 million is greater than $25 million, but less than $65 million.

Defendant vehemently disagrees this calculation is accurate. However, the defense will address loss under § 3553(a), utilizing an actual loss calculation results in a zero, -0- (Negative) level enhancement.

## UNSAFE UNSOUND BANKING PRACTICES

The government has not proven that Robert was responsible for the WFB implosion failure fiasco. Indeed, the United States Department of the Treasury Inspector General in his material failure report dated November 6, 2018; determined that MASSIVE FRAUD of WFB president Gembara and his employees were responsible for the failure. Likewise, the Office of the Comptroller of the Currency (OCC) director of special services in her interim results of December 15, 2017; concurred. She explicitly stated: we determined the WFB books and records are inaccurate, and there was a breakdown of internal controls that resulted in a loan fraud scheme ORCHESTRATED by bank employees. This included "FORCED PAYMENT" advances where amounts were added to loan balances, that resulted in inflated loan balances. President Gembara CREATED false loan documents, loan payment histories, and loan files.

Having one's business engulfed, enmeshed, and then devoured by predatory lender (WFB), was hardly BENEFICIAL. Collectively, every single WFB fraud maneuver that was ultimately discovered by OCC was foisted upon Robert. His identity and valuable mortgaged collateral being subsumed by WFB intent upon fraud.

6    1.) "forced payment" of others loan obligations was routinely

added to Robert's balances.

2.) Every mortgaged Real Estate parcel, totaling 22, pledged to WFB as collateral to secure Robert's obligations was transformed into a hideous "GHOST LOAN ACCOUNT". Ultimately, this practice amounted to $27,200,000 not $8,700,000.-

3.) Payment upon Robert's Letter of Credit indebtedness was not credited.

4.) WFB accounted for Robert's construction financing loans using a "BIFURCATED", double counting method. Where first, the entire mortgage loan balance for the new construction was considered advanced as a beginning balance. Then actual funding was actually advanced through unrelated accounts.

5.) Payments properly consisting of expenses to WFB were instead accounted for as LOANS to Robert.

6.) Curiously, the indictment at paragraph 47(o) recited how WFB employee Mandujans manipulated loan accounts, associated with Robert to benefit WFB fraud.

7.) It is implicit that altered unreliable records impeded the OCC's ability to conduct their bank safety audit examination of WFB.

8.) FDIC-R / FDIC-OIG, without meticulous regard for accuracy, began debt collection of what they knew to be fraud laden. They pursued collection recklessly regardless of the authenticity of their claim.

C.   BREAKDOWN OF INTERNAL CONTROLS

Mr. Kowalski disagrees that he should receive a two level enhancement because there were ten or more victims. Depositors were not the only ones victimized. Robert, a mortgage loan customer, is the largest victim by any measure. As a CORRECTED benefit analysis would have demonstrated. Also, Roberts role as a victim was disclosed directly in the indictment at paragraph 47(o). Which discussed how WFB employee Mandujano utilized Robert Mortgage loan accounts to conduct forced maneuvers chronicled by OCC, that concealed WFB financial condition.

There was a genuine fear at FDIC of enhanced losses. Once the true cause of WFB President John Gembara's death leaked out, and became widely known. It would have triggered a bank run. In fact, at John's wake of December 7, 2017; all that was disclosed, cryptically, was that he died suddenly. As indeed, the rope wheal around his neck confirmed, he had. Thus, FDIC-OIG agents interacted with a City of Park Ridge Police department death investigation, as police reports detail. In order to manipulate a "Federal" silence until WFB officially failed. Designed to limit FDIC exposure to large CD customers who might otherwise withdraw their oversized deposits. Such interference prompted Park Ridge Detective Leury Garcia to call WFB in the aftermath to deliver a warning. Consequently, the number of victims was ARTIFICIALLY inflated.

d. Mr Kowalski disagrees that he should receive a two level enhancement because of bankruptcy misrepresentation pursuant to U.S.S.G § 2 B1.1 (b)(9)(B). The government has not cited much less proven any.

e. Mr Kowalski disagrees that he should receive a two level enhancement for engaging in conduct consisting of sophisticated means. USSG § 2 B1.1 (b)(10)(C). Robert's position of trust, as an attorney, did not contribute in any substantial way to facilitating the crime. There has been no finding that defendant was responsible for WFB failure. His collateral, asset based lending relationship with WFB precluded any "reasonably forseeable pecuniary harm". Notably Roberts activities included repayment of WFB obligations.

The application of the sophisticated means enhancement refers to especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. Typically, this conduct includes use of fictitious entities, corporate shells, or offshore accounts. Robert did not falsify documents, use falsified appraisals, fraudulent mortgages or fabricated documents. To the contrary, on July 25, 2024; in its supplemental version of the offense the government acknowledged how WFB directed its fraud AGAINST Robert and his collateral. Specifically, "it backdated notes, forged signatures, etc". Relative to Robert, this et cetera consisted of special "Changed

Customer Lists". Where his identity and property equity was preyed upon to pay, $27.2 million, debts of others. WFB manipulated Robert's address so that bank statement and accountant confirmations were deliberately kept secret from him.

f. Mr Kowalski disagrees that he should receive a four level enhancement for jeopardizing the safety and soundness of WFB. U.S.S.G § 2B1.1 (b)(17)(B)(i). One affects a financial institution when it exposes the institution to a new or increased risk of loss. United States v. Schlager, 17 CR 00030 (NDIL ), Robert completed homes, repaid loans, and provided good and valuable consideration in the form of collateral as security for his projects. That WFB used this security to create accounting "GHOST LOAN ACCOUNTS" was never contemplated, Shark tank bank, WFB, is not a real victim. As a result of the fraud orchestrated by the whole cast of its employees, directors, and officers. Through such unclean hands WFB can not be said to be a victim. Rather the bank became a predator.

g. Mr Kowalski disagrees that he should receive a three level enhancement for a supervisory role. U.S.SG. §3B1.1(b). Robert was not an employee, officer, or director of WFB. This substantially overstates his actual role in the offense, which was subsidiary (as in a victim). Robert's brother was a partner in every enterprise, not an employee. William commonly arranged his own financing at WFB.

Most recently he did exactly that for his developments at 1819 W 19th Street, and 1342 W. Cullerton. (See FYNF 001-000002 to 000318). William possessed a skillset that Robert lacked. Notably as a construction engineer and a licensed Real Estate broker. Similarly, Robert's former wife, Martha Padilla, a licensed attorney in her own right, followed her own counsel pertaining to her purchases. Independently, Martha forged her own relationship with WFB.

h. Mr Kowalski disagrees that he should receive a two level enhancement for use of a special skill. U.S.S.G § 3 B. 1.3. This enhancement creates a new offense. Simply, it is NOT possible to convert, as in embezzlement of collateral. Because the property secured by a WFB mortgage remained the property of another, not WFB. (See United States v. Big Crow, 327 F3d 685 (8th Cir 2003). A mortgage only represents a security interest, not possessory ownership interest, that lender WFB maintained in the property. Indisputably, this security interest remained inviolate.

I. The offense level is reduced two levels because Robert is a zero point offender under U.S.SG § 4(c) 1.1 (a).

J. The offense level is properly reduced four levels because Robert's participation was minimal under U.S.SG § 3B1.2(a). Under this section, the defendants lack of knowledge or understanding of the scope and structure of the enterprise is indicative of a role as a minor participant. United States v. Gaston, 68 F3d 1466 (2nd Cir 1995). Robert completed homes, provided repayment, and pledged ample

11

WFB, however, developed other ideas. They employed elaborate subterfuge to prevent Robert from learning of their fraud based scheme. This included: 1.) reproducing Robert's signature on promissory notes, 2.) forging accountant confirmation documents for Robert's loans, and 3.) changing his mailing address for all correspondence. Instead, his address was directed to other members of the fraud ring, not only to prohibit Robert from learning of derogatory information; but to allow perpetuation of their ghost loan account creations. Also, WFB maintained OMIT LIST using his identity. While burdening Robert's mortgage loan accounts with debt from forced interest payments of other defaulted borrowers. They deemed this routine practice as a "CHANGED CUSTOMER LIST". See Government trial exhibit 33.

WFB's abusive ways are presented in stark reveal at paragraph 47(o) of the indictment itself. Which shows how WFB employee Mandujano manipulated Robert's loan balances for her own purposes. Stuffing Robert's loan accounts full with others defaulted debts. Thus, Robert's business was alternately plundered; held hostage under siege from "GHOST LOAN ACCOUNTS". These practices did not BENEFIT Robert, as he is a victim. WFB bestowed $27.2 million of others debt upon Robert. It was essential to the WFB scheme that Robert was kept out of the loop, as it were. In fact, even after Robert repaid his mortgage debt and releases were recorded. WFB had a practice to reassert the paid off mortgage by recording fraud

purporting to reinstate a paid off mortgage.

A mitigating role adjustment is warranted to the degree to which the defendant stood to benefit from the criminal activity. United States v. Vuan Tam, 82 F 4th 536 (7th Cir 2023). Further a downward departure on a defendants offense level due to his minor role in the offense is proper where the defendant is substantially less culpable than the average participant in the conspiracy. U.S.S.G. § 3 B1.2 cmt app N 3(A). Recently, the Seventh Circuit discussed those five factors identified by the sentencing commission in its opinion:

1.) The degree to which the defendant UNDERSTOOD the scope of the activity.

2.) The degree to which the defendant PARTICIPATED in planning or organizing the criminal activity.

3.) The degree defendant EXCERCISED decision making authority.

4.) The nature and extent defendant PARTICIPATED in the commission of the criminal action.

5.) The degree defendant stood to benefit from the criminal activity. United States v. Vuan Tam, 82 F4th at 539.

THESE FACTORS AS APPLIED TO ROBERT:

1.) The WFB scheme was shrouded within the accounting moves of the bank. Where it was hidden from the prying eyes of regulators: OCC, Federal Reserve, Federal Home Loan Bank and FDIC. WFB employed extraordinary measures to prevent Robert from learning of the crime

it hatched using his pledged collateral. This included forgery, false appraisals, preparation of falsified loan documents, and misdirection of all mailed statements/correspondence to others. Also, WFB ensured that its own internal CPA and specialized auditor consultants would remain unaware.

2.) Robert had <u>NO</u> ability, authority, or access to direct entrys into WFB records, organize, or plan for such. Exclusively, WFB bank employees worked under the direction of President Gembara.

3.) Robert had absolutely NO decision making authority. This conclusion is underscored where WFB failed to deliver on its credit agreement to extend new construction financing for 1946 and 1948 N. Bissell respectively. Essentially and literally leaving Robert in the hole created from new foundation. When WFB reniged on its mortgage loan, Robert was left to contend with excavation, demolition, foundation and permit fee expenses. Yet despite <u>NOT</u> advancing any funding, WFB asserted an amount due of $1,823,991. relative to this site. (See Exhibit OCC *). Government trial exhibit 900 concurred that Robert did NOT receive any such WFB benefit for these Bissell sites.

### SPECIAL TREATMENT APPLIED TO ROBERT

4.) Robert did not participate in criminal activity. Rather his hard earned extensive real estate portfolio was ravaged by WFB practices leaving him victimized:

    A.) The government did not credit him for loan repayment.

B.) The government (still perplexed) did not detect the unusual BIFURCATED nature of WFB's tangled accounting. Where WFB considered numerous (7) construction loans disbursed as a beginning balance. However, actual funding was accounted for elsewhere. This created a duplicate set of bookkeeping.

C.) The government did not credit Robert for the value of his considerable Real Estate portfolio pledged to WFB as a collateral security for letter of credit contingent debt.

D.) Government trial exhibits each contained unconnected error stemming from altered unreliable WFB records.

E) The government did not give credit for legitimate services rendered to WFB.

5.) Robert can not said to have benefited from unfunded mortgage loans or being buried beneath $26,098,519.[19] of fraudulent debt. (See Exhibit ). Which made it impossible to sell, refinance, or manage his real estate based business. WFB having manipulated the equity of redemption inherent in any mortgage. For instance, pledged collateral at 2648 W. Luther had a reasonable mortgage value of $93,750 based upon appraisal. (See Exhibit ). However, at the date of WFB failure, all of these forced interest payment and accounting maneuvers foisted by defendant Mandujano for benefit of WFB inflated the loan balance to an untenable $899,082.[93]. Id. WFB operated its PONZI scheme at Roberts detriment. Ironically, government trial Exhibit 957 tacitly acknowledged that $18,500,000.⁻ of pure fraud was forced upon Robert.

~~purporting to renegotiate a paid off mortgage.~~

## B. THE § 3553 (a) FACTORS FAVOR A NON-GUIDELINES SENTENCE

Since Booker, the guideline range is but one factor of many to be considered under 18 U.S.C. § 3553 (a). See Booker, 543 U.S. at 249 (relying on § 3553 (a)(1)'s text stating that courts will consider "the nature and circumstances of the offense and the history and characteristics of the defendant". United States v. Ranum, 353 F Supp 2d 984 (E.D. Wisc 2005).

## 1. NATURE OF THE OFFENSE

Depositors were not the only customers victimized by unethical business practices of the WFB president and his complicit minion employees. WFB assumed control of Roberts building business through manipulation of the equity of redemption inherent in a mortgage of real estate. WFB created ghost loan accounts out of Robert's mortgaged properties. In other words, WFB impaired record title by the issuance of inflated false payoff letters. Without the lenders consent, it is impossible to procure title insurance to sell or borrow against real property. Thus Roberts home building activities ground to a halt. Thereupon, WFB directed a series of covert PREDATORY accounting measures against his properties that inflated balances artificially as they consumed Robert's equity.

This under any definition, was hardly a BENEFIT to the owner Robert. Could anyone have possibly imagined that the WFB scheme would reach such proportions; that it would

burden Robert's home building business with at least $27.2 million dollars of debt originating from other bank customers. WFB formalized what became a routine scheme of what was constituted as a "CHANGED CUSTOMER LIST". (See Govt trial exhibit 33). Wherein Robert's identity was inserted in place of defaulted borrowers.

It has been widely reported that WFB president, John Gembara, took his own life rather than accept responsibility for his crimes. Also, it is significant that the whole WFB apple; directors, officers, and employees heretofore pled guilty for their roles in their scheme.

There is no question the government's "FREE MONEY" analysis of FDIC-OIG Agent Evans is flawed. Repayment was repeatedly had from Robert. While no less than twenty-two brick and mortar properties were pledged as collateral for his WFB contingent obligations. Wrongfully, WFB accounting moves tangled up this good, valuable, and voluminous real estate portfolio into a veritable ghost loan forest. That caused so much confusion for OCC and later FDIC-R. Who failed to abide the warnings of "SERIOUS CONCERN" over altered unreliable WFB records, that OCC cautioned. Thus, by according reliability to WFB accounting maneuvers, that fooled OCC auditors for years, have produced a foul wrongful conviction. Yet another individual has been victimized on account of inherently defective fraud records.

17

Here the prosecution team is improperly led by the salty prime victim FDIC. Which is akin to having a jilted private bill collector, team FDIC-R/FDIC-OIG leading a VIGILANTE criminal investigation. This conclusion is reinforced where FDIC-R/FDIC-OIG's expectation of collection upon a multi-million dollar fidelity bond, hinged on allegations of Gembara dishonesty with scapegoat Robert. Such a private prosecution is anathema to every purpose underlying enforcement of criminal law, our traditions, legal precedent, and good sense. Especially, where the Supreme Court has left no doubt. "But the FDIC is not the United States". O'Melveny + Myers v. F.DIC, 512 U.S. 79 (1994). Nevertheless, FDIC-OIG's engaging in riding shotgun within the "PROGRAM OPERATING RESPONSIBILITIES" of private entity FDIC-R were ULTRA VIRES when committed.

2.    A NEGATIVE INTENDED LOSS AMOUNT

Mr Kowalski DOES in fact dispute the calculation of actual and intended loss. Suffice it to say, despite having ample time and cautioning warning over the unreliable, altered nature of WFB records, (See OCC interim Results of 12/5/17). In a search purely focused upon benefit, the government forensic analysts just could not sort legitimate commercial activity out of a massive fraud morass. Undoubtedly, due to pressure asserted by Rabid FDIC-R/FDIC-OIG team; and tainted by false testimony from "PAID WITNESSES". They reached conclusions relative to Roberts loan transactions without meticulous verification of these self same disavowed

WFB fraudulent, altered, and unreliable records. Consequently, not one of the government's summary benefit trial exhibits, presented to the jury was free from fraud.

It is reasonably clear that courts should calculate loan losses by taking the outstanding balance of a loan (at the time the offense is discovered); and subtracting the collateral (again at the time the offense is discovered). United States v. Downs, 123 F3d 637 (7th Cir 1997). Under the sentencing guidelines, Robert's sentence is dependant on the actual or intended loss caused by his role in the WFB fraud. The actual loss is: "the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan. U.S.SG§2B1.1 App Note 8(b). United States v. Kipta, 212 F3d 1049 (7th Cir 2000). Upon application of pledge collateral security, Robert's conduct did not cause a real loss to WFB. Nor did Robert's pledge of substantial voluminous collateral, pose an interim risk to WFB as the lender. Thus, Robert did not provide either actual or intended loss.

Typically, the loss is the value of the contractual performance that Robert intended to omit. However, collateral and the pattern of made repayments, contradicts any argument that a loss was planned. That WFB misused Roberts collateral and identity in their covert accounting scheme did not make Robert a willing participant therein. Robert did not __JOIN__ the criminal activity. Rather, the

GHOST LOAN ACCOUNT scheme over laid and predatorily consumed the value Represented by the equity in his collateral. Defendants intent to avoid loan repayment is not evidenced by a history replete with sold homes, happy customers, loan repayment, and supported by actual ample collateral.

Roberts successful home building activity was not in furtherance of criminal activity. A defendant's base offense level could be adjusted on the basis of all ACTS and omissions. U.S.S.G § 1.31.3. Attorney Kowalski served a valuable to WFB through his work of Resolving distressed properties A/K/A non-performing mortgages. He WORKED on no less than forty properties that were WFB collateral for defaulted mortgages, Restoring EVERY ONE to commercial viability. He participated in the selling process of thirty of these former shipwrecks.

## UNCORRECTED GOVERNMENT EXHIBITS

Prosecution expert analyst Lexby fabricated then testified from what consisted of uncorrected fraud. Each government trial exhibit from No 900 through 957 further perpetuated WFB fraud as follows:

A.) The government failed to reconcile the "BIFURCATION" double booking, accounting methods WFB employed to enhance its balance sheet, Relative to it administration of construction loan funding. This flaw encompassed $3,217,000. from the construction of seven new homes.

B.) The government failed to appreciate the collateral nature of 22 properties that were pledged (mortgaged)

to WFB as security for contingent letter of credit
obligations. Instead, these assets were collectively,
colorfully termed "PURPORTED LOANS" or "GHOST LOAN ACCOUNTS".
Simply, the good and valuable consideration provided by this
real estate portfolio secured repayment of potential letter
of credit debt. It was not a loan in a conventional sense.
The value of this collateral package approximated
$12,000,000.

c.) The government failed to credit that substantial
repayment was made toward letter of credit indebtedness,
$1,077,000. As certain secured properties were
subsequently refinanced. Due to their fundamental
character misunderstanding, compounded by the
defective quality of the altered unreliable WFB
accounting records.

D.) The government failed to credit repayment of letter of
credit debt appearing upon Government Trial Exhibit
. Owed by paid witness Jorge Sanchez, A/K/A Fargo
Corporation; for a project relating to 212 N. Halsted
that was ACTUALLY repaid. See Washington Federal
loan No 05-024251 in the amount of $405,000. (See
1B-058-LOAN SETTLEMENT STATEMENTS 0000091). Also,
Note Fargo closing documents of 212 N. Halsted showing
repayment. (RKBOX_055-000558 through 000580). Further,
Robert can not be responsible as a surety for the
debts of other individuals, in the absence of a
written signed agreement. (740 ILCS 80/0.01 West 2016).

e.) <u>LINCOLN PARK DEVELOPMENT</u>

The government failed to ascertain that the loans associated with the Bissell Street new development were repaid. The haphazard accounting advanced by Government trial exhibit 900 is patently wrong. The items appearing as, WFB check Nos 13955, 13956, 13957, and 13958 payable to Chicago Title were actually part of the earnest money deposit for a transaction that did not close. These amounts were returned to WFB. WFB CK No 12947 payable to Nancy Quintana for $10,000 pertained to a sale credit of WFB collateral of another borrower at 6232 N. Keating. WFB CK No 12939 pertained to an expense related to the completion of 2425 W Winona, a deed in lieu new home property, in the amount of $8,008.$^{64}$ payable to ABT. Another, $25,454 of Bissell sale proceeds wound up in the accounting in loans #18362 and #18370 as depicted by Government trial exhibits 914 and 916. Consequently, Government Trial exhibit 900 proves these Bissell Street properties should have been free and clear of WFB mortgage encumbrances.

The underlying mortgages, properly, should have been Released. Nevertheless, this did not suit the purposes of WFB's ponzi scheme. On May 18, 2017, WFB issued three wrongful fraudulent payoff letters:

   i.) 1742 N. Bissell, Loan #21892, $923,550.$^{86}$(RKBOX_058-002366)

   2.) 1746 N. Bissell, Loan #21923, $989,942.$^{50}$(RKBOX_058-002368)

   3.) 1748 N. Bissell, Loan #21907, $1,036,787.$^{02}$(RKBOX_058-002370)

                     Total   $2,950,280.$^{38}$

These fraudulent WFB mortgage payoff letters effectively sealed any hope of Robert selling, borrowing against, or further improving HIS properties. There was "NO BENEFIT to Kowalski. As WFB's predatory manipulation of the equity of redemption consumed the entire value of the property, that Robert worked to create.

F.) The government failed to grasp that expenses reimbursed by WFB for work services performed on its WFB other real estate owned (O.R.E.O), (deed in lieu), properties; were cleverly erroneously accounted for by WFB as if they constituted "LOANS to Robert. This became a considerable amount, as attorney Kowalski's prolific work product extended to at least forty distressed properties having delinquent WFB loans. Thirty of these were subsequently resold with WFB recouping the sale proceeds from this WORK. In fact, the last ten were completed, readied for sale. Except WFB would no longer cooperate with the sale. Evidently, in fear of disrupting their frail Ponzi scheme. This is evidenced by the abortive sale of 5301 W Leland to the Espinoza family. WFB a victim of its own fraudulent success, would not cooperate with payoff letters to complete the sale of its own O.R.E.O property at fair market value.

G.) The government failed to ascertain that the Expellianrmus! boat check of its trial exhibit 906 had actually been spread over two of Robert's loans, including his own home. And at least $31,000 had been repaid as a result

H.) Payment of Real Estate taxes to the Cook County Treasurer by WFB, did not entrust or place Robert

in lawful possession of others funds that he converted to his own use. Payment of Real Estate taxes did not BENEFIT Robert. While WFB engaged in predatory lending that effectively prevented Robert, the true owner, from excercising dominion over HIS own property. Inflated fraudulent loan payoff letters prohibited Robert from selling or dealing with HIS property as HE saw fit. WFB manipulated de facto control over Robert's property, wiping out the owners equity therein. As one example, a property at 6555 S. Greenwood was pledged as collateral, mortgage # 23603 in the amount of $80,000 in 2010. At the failure of WFB the purported amount of this mortgage mushroomed into a gigantic $899,409.[24]. This compromised the heart of Robert's building business. Why build anything if it can not be sold. When WFB paid Real Estate taxes, it was solely to BENEFIT Further perpetuation of its WFB scheme. Additionally, Robert was not legally obligated to pay real estate taxes of others

I.) Unpaid RENT cannot be converted, as in embezzlement, because the assets remain Robert's assets and have never became the property of another. (See United States v. Big Crow, 327 F3d 685 (8th Cir 2003). The character of back rent remains a debt under any circumstance. Further, 18 U.S.C § 656 requires that such money had been "entrusted to the care and custody of WFB". Clearly, such rent was paid to the landlord, not entrusted to WFB.

J.) Upon failure of WFB, FDIC-R presented Robert with a bill for $26,524,799. (See Interv_002-000007). This

24

subsequently Rose further in an inflated FDIC bankruptcy claim in the amount of $27,200,000. The difference between these amounts and the benefit testified to within the government's trial exhibit 957. Indisputably, can only be as a NEGATIVE BENEFIT in the not inconsiderable sum of $17,782,117.[89] This destroyed Robert's equity of redemption in his long established business. As it was swallowed by WFB in a deluge of fraudulent debt.

K.) FDIC-R procured a settlement from the bankruptcy trustee in Robert's proceeding, 18 BK 9130.

L.) William NOT Robert Kowalski was the proprieter of Market Street Properties, LLC. Government trial exhibit errs in assigning Willrams proceeds to Robert.

M.) Robert has been accused in these crimes solely to benefit FDIC-R/FDIC-OIG collection of a fidelity bond claim. Simply because FDIC determined that a personal nexus to WFB president John F. Gembara needed to be established to ensure collection of a $1,250,000 fidelity bond and insurance policies.

N.) This tribunal previously observed that this was a case where payment was not made NOR Repayment expected. But the Record supports that new homes were built, substantial repayments were in fact had, and that all of Robert's business obligations were securely backed by "brick and mortar" collateral. As a matter of law, Robert can not aid or abet embezzlement within the context of a debtor-creditor relationship. WFB's administration of its construction financing, in a line of credit fashion did not constitute

25

embezzlement. Neither did the sketchy internal accounting moves employed by WFB to shroud its perilous financial condition from its regulators create an embezzlement relationship.

In the case of the usual commercial loan, if the borrower breaches the conditions of a loan agreement, the lender may for example, accelerate payment according to the terms of the loan agreement, but the borrower is NOT SUBJECT to prosecution for theft, embezzlement, or conversion. United States v. Kristofic, 847 F2d 1295 (7th Cir 1988). Government forensic analyst Lerby's misguided one dimensional myoptic focus, without first ascertainment of all facts, fixated on BENEFIT only. Precluded meticulously conducted analysis globally of a larger, more complex tangled web of WFB accounting practices. Consequently, these inherently flawed government trial exhibits represent lies. The government may not use false evidence, including false testimony to obtain a conviction is implicit in any concept of ordered liberty. Napue v. Illinois, 360 U.S. 264 (1959). Analyst Lexby failed to produce one government trial exhibit that was reconciled from the underlying WFB fraudulent accounting. These errant summary charts, government trial exhibits are teeming with error, were provided to probation officers without correction.

A convicted offender has a constitutional right to a fair sentencing process. Hicks v Oklahoma, 447 U.S. 343 (1980). The loss calculation of a P.S.R. that this sentence will be based upon is tainted from unconnected, unreliable, altered

WFB fraud material. These government trial exhibits merely repackaged WFB fraud to perpetuate yet another fraud on the court and a hapless defendant. The Court has held that convicted defendants have a due process right to be sentenced on the basis of ACCURATE information. United States v Tucker, 404 U.S. 443 (1972); quoting Townsend v. Burke, 334 U.S. 736 (1948). Under Townsend and Tucker a sentence must be set aside where the defendant can show that false information was part of the basis for the sentence. The two elements of that showing are, First that information before the sentencing court was INACCURATE, and Second the sentencing court relied on the information, U.S. ex rel Welch v. Lane, 738 F2d 863 (7th Cir 1984). With the prosecution, including its thirsty Fidelity bond collecting member FDIC-R/FDIC-OIG, clinging to hopes that WFB records deemed altered and unreliable would somehow lead to a pot of buried WFB gold. A fair sentencing relying on such INHERENTLY inaccurate material is impossible.


Under any measure of loss reckoning, Robert is the largest WFB victim. That Bob the Builder has been prosecuted for his home building crimes, is a sad testament to the government's lack of thorough analysis. Driven from a fatuous obsessive need to collect upon a quick money Fidelity Bond fix. Robert certainly did not anticipate any actual or intended losses to WFB in view of the enormous collateral used to secure his debt obligations. Which perversely allowed WFB to prey on and victimize its customer. With ghost loan accounting methods that added up to $27,200,000. These engulfed his identity

and business. The Seventh Circuit has held that: "the determination of intended loss ... focuses on the CONDUCT of the defendant and the objective financial risk to victims caused by that conduct. United States v. Lane, 323 F3d 568 It is quite clear the value of Robert's voluminous collateral portfolio did not imperil WFB. Ironically, its only because of the accounting maneuvers that WFB applied this collateral is why Robert has been prosecuted. The tangled, unreliable, and altered WFB fraud records have exacerbated difficulties in sorting everything out. Robert did not cause the failure of WFB, quite the contrary.

3. LOSS TABLE OVERSTATES AMOUNT OF LOSS OR SERIOUSNESS OF OFFENSE

Robert did not have any defaulted loans at WFB. Rather, WFB utilized Robert's collateral, as paragraph 47(o) of the indictment chronicled, to foist false accounting upon. WFB employees inflated and deflated balances of Robert's accounts at whim as their needs arose. In the course thereof, WFB employees forged Robert's signature on promissory notes and on their C.P.A's audit confirmation correspondence. WFB changed Robert's mailing address so that he would not receive any statements reflecting the WFB fraud. WFB employees created "CHANGED CUSTOMER" lists. wherein defaulted mortgage payments of others were made by reducing equity from Robert's collateral. (See Govt trial exhibit 33). Also, WFB employees created negative escrow lists for Real estate taxes. That were deemed paid by recourse to Robert's solid collateral. WFB employees placed Robert's mortgages on an omit list.

The P.S.R. calculated loss based on the total amount of loss FDIC allegedly sustained because of WFB's collapse. The jury did not determine whether Robert caused WFB failure. How could Robert be responsible for WFB failing when he did not work at WFB and where the failed bank actually defrauded him. The guidelines require that a defendant's sentence "be based on all harm that resulted from the acts or omissions of the defendant. United States v. Lonich, 23 F 4th 881 (9th Cir 2022). After being victimized by WFB, Robert did not cause any harm to WFB. In fact, during the waning days of WFB fraud scheme its president and employees recorded documents called certificates, reasserting claims to mortgages long since repaid. These were recorded as Cook County doc's 1732134035, 1732134034, and 1732134036. FDIC refused to release these resurrected fraud certificates until compelled to do so by court order.

4. <u>INCARCERATION WOULD HAVE HARSH EFFECT ON INNOCENT FAMILY</u>

Robert's youngest child Alexander especially misses daddy. Vulnerable Alexander suffers from autism. His active acute form of this handicap poses quite a challenge for his lone mother, Natalie. Alexander struggles without his father's patient presence. Robert wants nothing more than to be a father for his young son and equally trying, at times, step sons. Robert's extended absence has already wreaked extraordinary hardship upon Alexander who struggles with speech, as he is NON-verbal.

5. Robert has no criminal history whatsoever.

6. Robert does not suffer from substance abuse issues or with gambling.

7. Robert has been an attorney for thirty four years. He graduated from Creighton University School of Law.

8. Robert has endured harsh conditions of confinement. This included ten months of unremiting covid-inspired covid lockdown incarceration

9. At Robert's age a guidelines enhanced sentence equals a death sentence for an individual who scarcely received a traffic citation.

There is no question that, the inclusion of loss amounts from the other co-defendants overstates Robert's relative culpability. In fact, governments email attorney/client exhibits L2, L3, and L5 reflect Roberts DISMAY over the unfinished status of Krezja's and Matchuk's new homes:

L-2 "Is there any reason why these Million dollar homes are being treated like so much garbage". (Matczuk)

L-3 A.) "There is no way that obtuse moron will sell that property for what he thinks it may be worth. Frankly, he will perceive that it is not in his best interest to sell the property at all if he has NO PROCEEDS" (Krezja)

B.) "Also there is no good reason why Shrek has not finished. I reinstated permits four years ago... why does he refuse to finish" (Matczuk)

L-5 "Sorry, it pains me that these homes are deteriorating and the owner does not seem to have any regard... these beached whales must be resolved? (Krezja)

Roberts perplexed consternation is understandable, insomuch as he WORKED to facilitate completion of these homes, by reinstatement of building permits and prosecution of real estate tax appeals. Certainly, had Robert learned of the futility of such measures, such aid would have never occurred.

Clearly, the odd apathy of WFB president Gembara toward a serious issue sparked concern. Especially as exhibit L-2 relates that at the same time, Robert was engaged with "hoisting plywood to complete a WFB property at 2712 W. North Avenue". It was inconceivable

to anyone laboring over plywood, that Matczuk and Kryza were actually rewarded for ineptness. Robert having no access to confidential WFB bookkeeping to learn of these financial details.

## MICHAELANGELO SHREK

The unusual, interminable nature of two custom new construction homes, does not transform the endeavor into embezzlement. Perhaps Mr Matczuk was simply applying a european business or a poor businessman caught in a market downturn. It is indisputable that each and every home this man almost, ninety percent finished was a product of a loan agreement. This created a debtor-creditor relationship not embezzlement. Money was borrowed to Mr Matczuk not entrusted to him. The loan proceeds became his property <u>NOT</u> WFB's. In the case of the usual commercial loan, if the borrower breaches the conditions of the loan agreement, the lender may for example accelerate payment according to the terms of the loan agreement, but the borrower is <u>NOT SUBJECT</u> to prosecution for theft, embezzlement, or conversion. United States v. Kristofic, 847 F2d 1295 (7th Cir 1988).


There is no doubt that Marek Matczuk worked extensively for WFB. Each morning for over a decade, his three man crew spent several hours at the bank washing windows, snow shoveling, parking lot maintenance, landscaping, etc. So detailed was this work, it appeared that each sliver of mulch was manicured. Also, he participated in extensive remodeling work upon WFB distressed OREO properties.

including 3219 S. Lituanica, 3518 S. Union, and 926 W 36th St.
There is some indication that WFB President Gembara
considered Matczuk his bodyguard. Thus, no one can say
that he did not <u>EARN</u> a fee, for all services rendered.
Work is not indicative of embezzlement. Minimally, his work
product must be separated out of embezzlement and Mr Matczuk
compensated for the value it represents.

## NOT FOR FAINT OF HEART

Home building in Chicago is more of an art, not an exact
science as Mr Krejza soon learned. Porus concrete block
that was not substantial or up to specification, scuttled
completion of this builder's homesites. Product liability
litigation ensued that further stalled construction, consumed
valuable time, and ultimately garnered Krejza a small
settlement but little relief. This misfortune did not create
an embezzlement.

## REFUND DUE ROBERT

Analyst Lexby's conservative forensic approach focused on
actual cash "<u>OUTFLOW</u>" is accurate and reliable for that
purpose alone. He did not ascertain the purposes behind such
disbursement. The implications of his <u>VERIFIED</u> conclusions
meant that <u>NO MONEY FLOWED</u> out of WFB into Robert's
otherwise free and clean collateral. His summary charts
amply demonstrated that once a "<u>GHOST LOAN ACCOUNT</u>"
was examined. Beneath the veneer remained the solid
unimpaired collateral of Robert. Likewise, "purported loans"

are the very same collateral accounts manipulated at the whim of WFB employee Mandujano, recounted at paragraph 47(c) of the indictment. Neither <u>PURPORTED NOR GHOST</u> can be truly called a LOAN in the absence of any funding advanced whatsoever.

The disappointing portion of what amounts to a half analysis, is that evidence (key pieces) of WFB's accounting misapplication were unearthed, in plain view, and identified as such by the analyst in his exhibits. Nevertheless, after having recovered unequivocal nuggets of information. The hired gun contractor forensic analyst would not reassemble a complete puzzle that conflicted and contradicted with his prosecution team employer's litigation strategy. The government Loss calculation <u>MUST BE REDUCED DOWNWARD AS FOLLOWS</u>:

1.) <u>GX 900 BISSELL DEVELOPMENT</u>:

Government Agrees NO significant amount of embezzled funds were "distributions" from any loan associated with 1742 N Bissell. (Docket # 1513 page 10). So how and where were the funds advanced that enable construction

Amount claimed due: $295,650.$^{28}$

Less: WFB CK# 12939 ABT    ($8,008.—)   2425 W Winona

WFB CK# 12947 N. Quintana ($10,000.—)   Purchaser 6232 N. Keating

WFB CK# 13955 Chgo Title ($45,000.—)  ⎫
WFB CK# 13956 Chgo Title ($55,000.—)  ⎪  Downpayment strict
                                      ⎬  Joint order escrow
WFB CK# 13957 Chgo Title ($50,000.—)  ⎪  for 2000 S. Western.
                                      ⎪  Did NOT CLOSE
WFB CK# 13958 Chgo Title ($50,000.—)  ⎭  FUNDS RETURNED

Bissell Payoff credited to #18362 #18370    $ 19,932. –

Bissell Payoff credited to #18362 #18370    $ 5,523. –

Total Loan Outstanding    $ 52,187.$^{28}$

2.) GX 902   FULTON MARKET STREET

   A.) Calculate Loss from Robert's activities not william's

     See Docket # 1507, page 4; where government agreed that

     William was 100% owner of Market Street Properties, LLC

   B.) Payoff WFB letter dated June 16, 2016

   Amount claimed due:   $ 640,877.$^{68}$

   Less Market Street Properties $ 766,653.$^{88}$

       Total   ($ 125,776.$^{20}$)

3.) GX 904   LIBERTY MUTUAL Letter of credit

   Amount claimed due   $ 655,000. –

   Less Refinance 1843 S. Mag ($ 266,775.$^{11}$)

   Less Refinance 6442 S Maryland ($ 342,109.$^{38}$)

   Less Refinance 4126 S. Calumet ($ 125,936.$^{53}$)

       Total   ($ 79,821.$^{02}$)

4.) GX 906 "EXPELLIARMUS!"

   Washington Federal Downpayment   $ 190,000. –

   Less amounts repaid 1512 W Polk   ($ 31,000. –)

     Amount outstanding   $ 159,000. –

5.) GX 908   EVERGREEN BANK Letter of credit

   Amount claimed due   $ 1,700,000. –

   Amount repaid Loan # 024251 ($ 400,000. –) Jorge Sanchez

Less Amount   ($ 400,000.⁻)   G. Gajewski

Less Refinance 4041 Calumet ($ 151,702.³⁵)

$ 748,297.⁷⁰

6.) GX 910 REAL ESTATE TAXES

Amount of taxes claimed for Robert's Benefit   $ 543,814.⁻

  Less: Property of WFB Customers    $ 256,632.¹⁵

Canalport: Property sold with Taxes paid at closing $ 21,481.⁶⁴

Maryland: Property refinanced with Taxes paid at closing $ 61,451.⁷⁶

      OTHER   $ 17,434.⁵⁸

Total paid pursuant to loan agreement   $ 186,813.⁸⁷

7.) LARGEST PORTION OF GOVERNMENTS LOSS CALCULATION

GX 912 - 914 - 916

Accts # 18362 and # 18370

  # 18362       $ 2,409,743.⁹⁹

  # 18370       $ 2,307,595.⁰²

    total     $ 4,717,339.⁰¹

Less: Construction Loans paid for

(Canalport, Bissell, Maplewood)   $ 3,217,000.⁻

Gitano Payoff LN# 024837    $ 22,179.⁹³

Parkway Bank CK# 24837    $ 50,000.⁻

7/2/15 Money advanced for Cermak   $ 20,000.⁻

Reimbursement Oreo expenses   CA $ 1,500,000.⁻

    total   $ 51,839.⁹⁹

## SUMMARY

| | | | |
|---|---|---|---|
| 1.) | GX 900 | BISSELL | $ 52,187.$^{28}$ |
| 2.) | GX 902 | FULTON MARKET | ($ 125,776.$^{20}$) |
| 3.) | GX 904 | LIBERTY MUTUAL LOC | ($ 79,821.$^{02}$) |
| 4.) | GX 906 | "EXPELLIARMUS!" | $ 159,000.$^{-}$ |
| 5.) | GX 908 | EVERGREEN BANK LOC | $ 748,297.$^{70}$ |
| 6.) | GX 910 | REAL ESTATE TAXES | $ 186,813.$^{87}$ |
| 7.) | GX 912-914-916 | | ($ 51,839.$^{99}$) |
| | | | $ 868,861.$^{64}$ |

Less : Montilla Lots Not conveyed     ($35,000.$^{-}$)

Gitano Overpayment     ($160,000.$^{-}$)

Amount OUTSTANDING     653,861.$^{64}$

Less Retained Collateral     ($13,339,041.$^{-}$)

Less FDIC Recovery

Public trust in community banks is eroded when government regulators allow abusive lending practices consume property of its customers in a predatory scheme. Then they fail to sort out the fraud their negligence allowed to take root, to suit their needs, relative to collection of FIDELITY BONDS. Most importantly connected government exhibits show that Robert did not cause any reasonable pecuniary economic harm or sought to inflict damage. The governments scarry "Ghost LOAN ACCOUNTS" have proven to actually consist of Robert's brick and mortar substantial collateral pledge for WFB financial security. Analyst Lerby Verified no funds left WFB from collateral based accounts. Robert did not accumulate $27.2 million of WFB debt. Neither did he embezzle $8,742,681.$^{41}$

Conversely, at WFB failure Robert had outstanding loans that amounted to $653,861.64 supported by collateral valued at $13,339,041. This does not support any notion that Robert is a criminal.

Robert respectfully requests that this court impose on defendant a below guidelines sentence of 1 day. A sentence that is sufficient but not greater than necessary to meet sentencing goals outlined in 3553(a).

Respectfully Submitted,

Robert M. Kowalski

ROBERT M. KOWALSKI

# 53527-424

Metropolitan Correctional Center

71 W. Van Buren Street

Chicago, Illinois 60605