

FILED
8/26/2024
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT
MCP
MR

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA )
)
v. ) No 19 CR 226
)
ROBERT M. KOWALSKI, )
defendant ) Judge Virginia M. Kendall

## MOTION TO RECONSIDER

Now Comes Robert M. Kowalski, (ROBERT), for his motion to reconsider this court's denial on August 12, 2024; of defendant's motion to compel recusal pursuant to 28 U.S.C. 455(a)+(b), the due process clause of the Fifth Amendment, and the First Amendment states as follows:

## "THREATENING FEDERAL JUDGES"

(Trial transcript Vol 10 A 2-27-23; pages 2125-26, lines 23-24 + 2-8)

On August 12, 2024; this courts order held: (DKT#1463; August 12, 2024)

"In short, the Court does not hold contempt,
a grudge, a personal bias, or some deep-
seated antagonism against Kowalski"

In light of a recent history full of violence directed against Federal Judges, perhaps it is understandable this tribunal has reacted negatively toward Robert. Whom it had genuinely found to have been "threatening Federal Judges" with a noose.

1.

This Court denied Robert's recusal motion. Without first conducting the requisite analysis under 28 U.S.C. 455(a)+(b). The analysis is not simply whether the judge considers herself biased. Rather, to a reasonable well informed observer, does it appear that Judge Kendall is biased under the presented circumstances. We do not suggest that Judge Buckio [Kendall] would be prejudiced against Nettles [Robert]. In Re Nettles, 394 F3d 1001 (7th Cir 2005). "The issue is appearances", Id. Further, while ostensibly claiming a lack of bias, this trial court's remarks of August 16, 2024; certainly now clash with its earlier pronouncements.

## AVENGING ANGEL JUSTICE

Liberties themselves depend upon an untrammeled judiciary whose passions are not even unconsciously aroused and whose minds are not distorted by EXTRAJUDICIAL considerations. Bridges v. California, 314 U.S. 252 (1941). Of course freedom of speech and of the press are essential to the enlightenment of a free people and in restraining those who wield power. Id. Particularly, should this freedom be employed in comment upon the work of the courts who are without many influences ordinarily making for humor and humility, twin antidotes to the corrosion of power. Bridges, 314 U.S at 284.

There are few characteristics of a judiciary more cherished and indispensable to justice than the characteristic of IMPARTIALITY. United States v. Greenspan, 26 F3d 1001 (10th Cir 1994). Congress has mandated that justice must

2.

be impartial, but also that it must reasonably be perceived to be impartial. Id. Likewise, the Seventh Circuit recognized: the issue [recusal] is appearances. In Re Nettles, 394 F3d 1001 (7th Cir 2005).

Section 455 (a) of Title 28 of the United States Code requires a Federal Judge SHALL disqualify herself in any proceeding in which her impartiality might reasonably be questioned. Section (b)(1) further provides that any Justice, Judge, or magistrate Judge of the United States SHALL disqualify themselves where she has a personal bias or prejudice concerning a party or personal knowledge of disputed evidentiary facts concerning the proceeding. Such prejudice may stem from either personal or EXTRAJUDICIAL sources, or arise during the course of current or prior proceedings. Burley v. Gagacki, 834 F3d 606 (6th Cir 2006).

After five long years of scorched earth litigation, the root cause of Judge Kendall's animosity toward Robert is finally understandable; Notwithstanding the unreasonable unlawful Nature thereof. And it has nothing to do with his "MERCURIAL" personality. (See Doc# 1125). From the moment this case came to be assigned, this tribunal knew it labored, as a victim under an intense personal bias with prejudice against Robert emanating from the Nature of an extrajudicial source [Billboard]. The publication of a cartoon with a Noose image, however, boiled over her anger.

3.

As a consequence, she opted to relinquish her impartial duty. Rather, reacting as only one victimized would under such anger inciting circumstances. She decided to embrace and relish the role of a judicial retaliator against the one she perceived to be the perpetrator (Robert), whom she earnestly believed had brazenly, criminally threatened a heinous form of lynching murder upon Federal judges as a group, with a hangman's noose no less.

The problem with this vigilante style of judging is that it does not comport with Constitutional guarantees of: First Amendment Freedom of Speech, Fifth Amendment due process and indictment clauses, and the Sixth Amendment right to learn of the nature of the charged crime. It is axiomatic that due process has a requirement of a fair trial in a fair tribunal. In Re Murchison, 349 US 133 (1955). Further, a trial must proceed before a judge with no actual bias against the defendant. Bracey v. Gramley, 520 U.S. 899 (1997). The Court's precedents set forth an objective standard, that requires recusal when the liklihood of bias on the judge is too high to be Constitutionally tolerable. Caperton v. A.T. Massey Coal Co., 556 U.S. 868 (2009). Here, a reasonable observer would think there was a significant risk that the judge will resolve the case on a basis other than on the merits. Hook v. McDade, 89 F3d 384 (7th Cir 1990). More importantly, a judge SHALL not preside over a criminal case in which she is the victim. IN RE Nettles, 394 F3d 1001 (7th Cir 2005).

4.

Instead of maintaining the decorum essential to the administration of justice, a raging victimized District Court judge permitted herself to make personal and condemnatory remarks about the criminal defendant before her. Such remarks are wholly incompatible with the demands of justice. Offut v. United States, 348 U.S. 11 (1954), Judge Kendall's commentary could be understood to demonstrate clear prejudgment of Robert's guilt. The record here supports this case has been presided over by a judge, who had for all intents and purposes sided against him, and expressed open outraged hostility toward him, while cheering on government forces. Our tribunal maintained in her <u>OWN WORDS</u> how she and all similarly situated, in their capacities as federal judges NDIL, were threatened with a foul <u>MURDER!</u>

## LAW ENFORCEMENT INTERVENTION

All this rancor originated from a highway billboard published publicly with leaflets. It contained a message critical of a Federal Judge. The trial court attributed the threatening message entirely to the defendant. In her ruling of August 17, 2022; a fear stricken judge allowed her innermost thoughts become known. Wherein she confirmed her understanding of the inherently dangerous, menacing, nature of the billboard expression: (See Dkt #792)

"Required the intervention of the U.S. Marshals showing that the defendant [ROBERT] has little respect for judges or judicial processes"

## GENUINE THREATS EQUAL RECUSAL

The Seventh Circuit considered a Federal Judges duty to Recuse in a like situation involving "FHREATS", in connection with a foiled bombing plot on the Dirksen Federal Courthouse. In Re Nettles, 394 F3d 1001 (7th Cir 2005). The Nettles panel, in an opinion authored by Justice Posner, held that: a threat that appeared to be GENUINE and not motivated by a desire to Recuse warrants recusal. Id. Here, similar to Nettles, since no criminal proceedings against Robert were then pending in the Northern District of Illinois, his [threatening] actions could not have been taken with Recusal, or some tactic that might delay or derail a case against him in mind. Nettles 394 at 1003. Judge Kendall's own Recollection of the billboard event characterized her subjective genuinely held knowledge of disrespectful Robert, as "THREATENING FEDERAL JUDGES" and the troubling implications thereof required U.S. Marshal intervention.

The fear this expression inspired later in the colloquy grew in her estimation, into a full-fledged ongoing VENDETTA against Judges. Confirms beyond any doubt her substantive belief of the genuine nature of the serious danger posed by Robert through his threats. Because the issue of recusal under § 455 focuses around appearances to a REASONABLE OBSERVER. The Seventh Circuit concluded that Recusal of Judge Bucklo and every other judge in the entire Northern District of Illinois was appropriate under those same THREATENING circumstances. Further, in an abundance

of caution the Seventh Circuit also recused itself. Id.

During argument on February 27, 2023; for the issuance of trial subpoena to former District Court Chief Judge Castillo. The tribunal reemphasized she harbored evidence of a deep seated antagonism or favoritism as would render fair judgment impossible. This arose in connection with Judge Kendall's Knowledge which derived from an EXTRAJUDICIAL source. Namely, an I-55 highway billboard, website, and leaflets that lampooned and otherwise criticized Judge Castillo as a caricature. The cute cuddly robed lion Judge caricatures, of the parody depiction, could not reasonably be understood as describing actual facts about former Chief Judge Castillo; or actual events in which he participated. Nor did it constitute a call to arms other than "INDICT CASTILLO". Which represents a most quintessential unique American political message. Clearly, there was no implication that a Noose held in the lion's paw (not around a neck) of the cartoon pop art robed lion figure encouraged harm to anyone, much less a federal judge. Neither with the benefit of hindsight of history, did the critical billboard inspire any disruption of court activities, whatsoever. Nonetheless, from Judge Kendall's unique perch on the bench perspective, the cartoon noose represented an "ANYTHING BUT INHERENT THREAT".

## CHEERING FOR CONVICTION

Thereupon, the tribunal launched into a prejudice strewn inflamed commentary:

( Volume 10 A, February 27, 2023; page 2123 lines 25 and page 2124 1-8)

A.) The Court: "Part of me would "LOVE" to have you bring Judge Castillo in for two Reasons":

"One, you would not be able to answer a non-- I mean, ask a non-leading question, a who, what, when, and how question."

"You would say: Isn't it true, Isn't it true, Isn't it true."

"AND EVERYTHING would be SUSTAINED!"

## SHOWED INTEREST IN OUTCOME

"But the other part of me that would LOVE to have him before me is that on cross-examination, maybe the prosecutors would like to bring up YOUR BILLBOARD."

## TRUE PERSONAL BIAS

( Volume 10 A, February 27, 2023; page 2125 lines 9-19)

B.) The Court: YOUR BILLBOARD with a NOOSE!

Mr Kowalski: Yes, I want to hear about the billboard, too, your Honor. I want to hear about F.B.I Agents tearing this billboard down. That billboard, "IMPEACH CASTILLO" didn't say to harm Judge Castillo. It said impeach him, which is a political act.

THE COURT: WITH A NOOSE!

MR Kowalski: And here you are reacting against that BILLBOARD against me in court.

THE COURT: WITH A NOOSE!

8

## ALL JUDGES FEEL THREATENED

( Volume 10 A, February 27, 2023; Pages 2125-26, lines 23-24 + 2-8)

C.) The Court: "There is nothing -- there is nothing, on a billboard with a NOOSE, that -- to one of the judges in the Northern District of Illinois that is anything but a THREAT. And if this jury would like to find out about you THREATENING FEDERAL JUDGES, how do you think they're going to handle it?"

## MENACE CONTINUES

( Volume 10 A, February 27, 2023; Page 2126 lines 9-3)

D.) The Court: "I've been trying desperately to keep your SHENANIGANS away from the jury so you can get a fair trial, and I've done a good job keeping it nice and clean, for them"

"But you can't go subpoening the former Chief Judge so you can have your little VENDETTA out there!"

## KNEW EXACTLY WHAT HE WOULD SAY

( Volume 10 A, February 27, 2023; Page 2128 lines 1-4)

E.) THE COURT: "If he were to be here the things that he [Judge Castillo] would be able to say on redirect -- or cross, rather, would be HARMFUL to you. And I'm trying to protect you from that"

## GENUINE THREAT IDENTIFIED

( Volume 10A, February 27, 2023; Page 2133, lines 23-25)

F.) THE COURT: "I'm quite confident that case law in the Seventh Circuit says that the presence of a <u>NOOSE</u> inherently -- inherently -- is a <u>THREAT</u>."

## JUDICIAL RETALIATION

The foregoing deeply seated antagonistic judicial statements sizzle from a long harbored <u>EXTRAJUDICIAL</u> source, a 2018 highway billboard. The remarks collectively evidence animus of a hostile trial court responding to a personal grievance, with copious <u>SPLEEN</u> being vented toward the accused. The Tribunal's own harsh commentary, firmly establishes how severely the <u>EXTRAJUDICIAL</u> source of a political free speech cartoon publication negatively influenced the trial court's <u>IMPARTIALITY</u>. The trial court's sincere <u>IRE</u> turned fiery as the judge understood the political speech criticism pertained directly to herself, as well as former and present cherished judicial colleagues. Thus, the tribunal is seen to have directly punished Robert, over the <u>CONTENT</u> of his free speech, with only the spiteful vengence one cruelly victimized can muster. Paying Robert back with interest, for his insolent seditious political beliefs and association with the political action committee that sponsored the politically inspired critical message. No one cruelly slandered is likely to maintain that calm detachment necessary for fair adjudication. Mayberry v. Pennsylvania, 400 U.S. 455 (1971).

## PREJUDGMENT OF GUILT

Due process guarantees of the U.S. Constitution are trammeled by the trial court's own admissions it was <u>NOT IMPARTIAL</u> as:

1.) The trial court declared how it planned to <u>SUSTAIN</u> every prosecution objection well in advance of any testimony.

2.) The trial court determined how it would rule <u>PROSPECTIVELY</u>, to protect a fellow judge by not allowing direct examination of defense witnesses

3.) The trial court displayed intimate advance knowledge of details concerning what such judicial testimony would consist of from her colleague; and that: "It would be harmful to you". This sort of preview reflects the tribunal engaged in extensive <u>Exparte Communication</u> [gossip] relative to the Billboard.

4.) The trial court illuminated how it would delight in, "<u>LOVE</u>", allowing prosecutors introduce evidence it considered harmful to the defense, i.e. "bring up your billboard". Demonstrating the trial judge had chosen sides, joining interests with prosecution prejudicially against a defendant.

5.) The trial court demonstrates having been negatively influenced by knowledge of an <u>EXTRA JUDICIAL</u> source of threatening material.

6.) The trial court confirmed that it is emotionally embroiled with the defendant. Showing how powerful antipathies have been stirred. Where it describes her desire to "LOVE" disabusing Robert by a jury conviction to assuage judges as individuals immune from criticism.

11.

7.) The trial court found that any billboard displaying a cartoon "NOOSE" was "ANYTHING BUT A THREAT" to "ALL" the District Court Judges. That in fact, Robert had been criminally THREATENING federal Judges. Implying that a coordinated Judicial retaliatory response was not just warranted, but ongoing privately. Without giving the accused notice of the change NoR opportunity to respond.

8.) The trial court determined Robert has an ongoing little VENDETTA against District Court Judges. It formed this opinion simply on the basis of a carricature free speech billboard containing politically based criticism.

9.) The trial court, having taken the image out of context, Repeatedly concluded that the mere presence of a cartoon NOOSE in the paw of a Judicially Robed lion character meant, without more, that Robert intended to mount a LYNCHING attack upon all Federal Judges.

10.) The trial court on the basis of EXTRAJUDICIAL material deprived a vital witness to the defense.

## CAN NOT RECEIVE FAIR SHAKE

Regardless of the fact that there was No credible legitimate threat posed to anyone, much less federal Judges. That is not what Judge Kendall genuinely believes. The carricatures, star chamber symbolism, and bright "INDICT CASTILLO" labeling belies any such exaggeration. Apparently, those U.S. Marshals dispatched out to climb the billboard, and tear it down, were convinced and well satisfied No further threat was presented. Once the provocative offensive

political free speech content was censored.

But the next time seditious Robert and his judicial watchdog clients might be more careful and succeed in their critical aims. A reasonable observer would think that a Federal Judge who works in the Northern District of Illinois would want Robert convicted and given a long sentence (300 months a veritable life sentence), rather than to be set free either forthwith or sooner, rather than later, to make yet another emboldened, brazen, cheeky, and worse still, seditious attempt to criticise a victimized Federal Judiciary. Based upon the powerful negative reaction of this trial court, it would certainly appear to a reasonable observer that judges who considered themselves so cruelly THREATENED; might therefore repeatedly rule against Robert on evidentiary and procedural issues, regardless of the merits. Particularly, since the legend of the highway lion cartoon billboard tall tale has evidently been improved upon by this tribunal, and undoubtedly others with each retelling and subsequent passage of time.

The bottom line here is that the trial court learned of what it deemed a legitimate ACTUAL grisly death threat, made against a judicial colleague. Which it then expanded into a greater threatening offense targeting ALL Federal Judges NDIL. Under circumstances that made it quite unlikely that the threat was intended as a

13

device to obtain a recusal. A traumatized trial judge took the NOOSE image threat very seriously, and choose to accelerate and manipulate court procedures in order to reduce the grisley NOOSE risk to herself and the entire federal judiciary NDIL as she perceived it. Under such circumstances, it is obvious that a reasonable person could question the judges impartiality. Even if this judge were one of those remarkable individuals who could ignore the personal implications of such a THREAT, the public reasonably could doubt her ability to do so.

After such death threats, the trial court implemented measures that made it obvious that the judge took the threat seriously. These contributed to an appearance that the trial court was prejudiced against Robert. United States v. Greenspan, 26 F3d 1001 (10th Cir 1994). Receipt of a threat from an extrajudicial source decreases the risk that the defendant is attempting to manipulate the process and accordingly "has a higher potential" where the judges impartiality might be reasonably questioned. Id. The principal indicium of whether a judge's impartiality might reasonably be questioned "we think is whether judicial action subsequently taken by the judge with respect to the defendant in wake of her discovery of the plot or threat does or does not appear to be impartial".

## EFFECT ON THE JUDGE

It is beyond doubt that the trial court took the <u>NOOSE</u> threat seriously, and then hustled Robert off into captivity. So he could be monitored more closely and his "shenanigans" [billboard] punished. (Vol 10 A, Page 2127, line 9). Bond Revocation was fashioned as punishment, in lieu of a contempt of court proceeding stemming from the extrajudicial source [billboard]. Evidenced as follows, the true rationale is displayed in stark reveal:

(Volume 10 A, February 27, 2023; page 2128, lines 16-19)

Mr Kowalski: Excuse me, the prosecution has used that [billboard] as a basis to Revoke my bond. That's part of this proceeding.

The Court: And this jury doesn't even know that!

Tossing Robert into a solitary MCC-Chicago cell complete with mind warping four concrete walls, was hardly conducive to defense preparation. The Resulting trial was more reminiscent of unarmed prisoners against well equipped gladiators, Scant opportunity presented itself to Review a complex case consisting of several haystacks containing millions of electronic files of Brady material in a Covid locked down MCC-Chicago. Where there was no means to investigate or organize a defense. Likewise, upon release standby Counsel provided a useless "Chromebook" to Review discovery. The court allowed provision of the proper instrument on the second day of trial, too late for pretrial preparation. Not surprising, when the trial court shared its intention

15

to sustain in advance government objections and that questioning on direct examination would be limited to leading questions. While hopefully expressing that prosecutors would "BRING UP" the extrajudicial source [billboard].

## GENUINELY MISUNDERSTOOD MALAPROPISM

(Volume 10A, February 27, 2023; Page 2133 lines 23-25)

The Court: "I'm quite confident that case law in the Seventh Circuit says the presence of a NOOSE inherently-- inherently -- is a THREAT!"

Judge Kendall's "INHERENT", NOOSE THREAT analysis is out of sync with the precedent of the Court and Seventh Circuit. In view of the true threat doctrine which provides:

"A true threat is a serious statement expressing
an intention to do an act which under the
CIRCUMSTANCES would cause apprehension in
a reasonable person, as distinguished from idle
or careless talk, exaggeration or something said
in a careless manner. United States v. Parr,
545 F3d 491 (7th Cir 2008).

Similarly, in Porter v. Erie Foods, 576 F3d 629 (7th Cir 2009), the Seventh Circuit found: the CONTEXT of the [NOOSE] was a consideration. The supporting evidence here makes it abundantly clear that the billboard was not calculated as a threat. Rather, it was meant to EXPOSE a troubling practice of the District Court Executive Committee NDIL, to issue AWARENESS based orders stemming from SECRET

proceedings without due process. In fact, the Seventh Circuit also independently discerned the UNUSUAL nature of these orders. In Re Shalaby, 20-2689 (7th Cir 2022). Its carricature format, star chamber evocative background, website, literature, and prominent labeling of the bold "INDICT CASTILLO" theme from end to end of the BILLBOARD militates against the conclusion of a harm inducing THREAT.

Rather, in the context of a political protest, a judicially robed lion judge AND a NOOSE placed in its paw together, EQUALS a metaphor for a "HANGING JUDGE". Relative to such a motivated judge, this implies "one bent on conviction". For example, the Supreme Court once noted how Judge Parker earned the reputation of a "hanging judge". Coleman v. Balkcom, 451 U.S. 949 (1981). In fact, one Federal District Court Judge Roettgar observed: he was unpopularly known around the campfires of MCC-Miami as the "hanging judge" (amongst other names) as a result of the imposition of long sentences. United States v. Heath, 840 F. Supp 129 (SD FLA 1993). In the context of a message relative to a hanging judge, with its historical underpinnings, the inclusion of a NOOSE was amply artistically warranted under the circumstances.

Here, however, adoption of the language [artistic license] chosen was one of a number of possible interpretations of an event "that bristled with ambiguities" and descriptive challenges for the illustrator. *Time, Inc v. Pape*, 401 U.S. 279 (1971). The choice of such expression though reflecting a misconception, does not place the speech beyond the outer limits of the First Amendment's <u>BROAD</u> protective umbrella. *Bose Corp v. Consumers Union*, 466 U.S. 485 (1984). Under the District Court's analysis, any individual using a malapropism might be liable, simply because an intelligent speaker would have to know that the term [NOOSE] was inaccurate in context, even though he did not realize his folly at the time. *Id.* Indeed, the [cartoon] statement in this case inherently represents the sort of inaccurate ambiguity that is commonplace in the forum of robust debate to which the New York Times rule applies. *Time, Inc.*, 401 U.S. at 292. Realistically ... some error is inevitable due to the difficulties of sorting out fact from fiction. *Id.* This has undoubtedly been amplified here by the political cartoon format.

## MARKED PERSONAL FEELINGS

We live in a time when <u>THREATS</u> against Federal Judges are not uncommon. Despite security measures, <u>THREATS</u> against Federal Judges have taken a deadly turn. The tribunal could hardly be blamed for having a heightened sensitivity to her own substantial well marked security

CONCERNS. Nevertheless, Judge Kendall's worst fears do not TRUMP freedom of political expression. Especially, in a society that LOVES LIBERTY, where freedom thrives in the land of the BRAVE. Thus, it is disturbing that Attorney Kowalski was locked up (punished) for his political expression. By a fearful sensitive Judge, reacting against what appeared subjectively to her to Represent a genuine THREAT. That, in Reality, was First Amendment protected speech.

This combination of absurd unconstitutional circumstances created a serious objective Risk of actual bias that required Judge Kendall SHALL Recuse. The Record leaves one with an abiding impression that the trial Judge permitted herself to become personally empassioned, where she expressed in her own words, "LOVE", describing just how embroiled she had genuinely become with the issue. Most telling is that Judge Kendall Revealed a personal interest in protecting her own well-being and the Judiciary as a whole. An interest she specifically Relished loving to accomplish. Indisputably, Judge Kendall firmly believed she was in harms way. Her subsequent overreaction was influenced by the THREAT she perceived as credible.

But in our system, undifferentiated FEAR or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from

the majority's opinion may inspire _FEAR_. Any word spoken that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this _RISK_. Tinker v. Des Moines Comm Schools, 393 U.S. 503 (1969); quoting Terminiello v. Chicago, 337 U.S. 1 (1949); and our history says that it is this sort of hazardous _FREEDOM_- this kind of _OPENNESS_- that is the basis of our National strength and of the _INDEPENDENCE_ and _VIGOR_ of Americans who grow up and live in this relatively permissive, often disputatious society. Id. There was no reason to believe that 62 year old Attorney Kowalski had embarked on anything other than a political protest. While he engaged and participated in peaceful leafleting and carricature billboarding, a venerable tradition.

## HALLOWED POLITICAL SPEECH

The First Amendment encourages exactly this sort of robust political debate. This trial court's retributive justice practices, which penalize Robert for publication of a _LAMPOONING_ cartoon parody, cannot be squared with the _FIRST AMENDMENT_. Despite their sometime caustic nature, from the early cartoon portraying George Washington as an _ASS_ down to the present day, graphic depictions and satirical cartoons have played a prominent role in public and political debate. Hustler Magazine v. Falwell, 485 U.S. 416 (1988). From the viewpoint of history it is clear that our own political discourse would have been

20

considerably poorer without them. Id. It is firmly settled that the public expression of ideas may not be prohibited because the ideas are themselves offensive to some of their hearers. Streets v. New York, 394 U.S. 576 (1969).

It is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions. Bridges v. California, 314 U.S. 252 (1941). It has long been recognized that an assumption that RESPECT for the judiciary can be won by SHIELDING judges from published criticism wrongly appraises the character of American public opinion. ID. Speech can NOT be punished when the purpose is simply to PROTECT the Court as a mythical entity, or the judges as individuals or as appointed priests set apart from the community, and spared the criticism to which in a democracy other public servants are exposed. Bridges, 314 U.S. at 292.

The Seventh Circuit recently observed that judges should expect TOUGH CRITICISM of their work. The power conferred by judge's commissions puts them in the forefront of controversey and debate. They and their work will be criticized, often publicly, and sometimes HARSHLY. In Re Resolution of Misconduct Complaint Judge Adelman, 965 F3d 603 (7th Cir 2020). In addition, because judges may be both the targets of harsh criticisms, from within and without the judiciary, and the officials who impose

discipline, Judges have a responsibility to be most cautious about using their power to impose discipline. Id. Discrimination on the basis of judicial retribution is especially pernicious in the administration of justice.

## PERSONAL BIAS ESTABLISHED

Threatening to murder a Federal Judge constitutes a serious crime under 18 U.S.C 115(a)(1). Once the victimized trial court found Robert had actually threatened to MURDER Federal Judges. It blurred the lines between the conduct charged by the government by indictment with insertion of the interests of its own punitive personal agenda. The billboard campaign antedated this indictment considerably. Consequently, it was wrongful when the tribunal first Resurrected, and then imported the barbs of uncharged criticism from the billboard into its analysis here. This represented an instance where the trial court's festering bias or prejudice proved so passionately extreme that it is wrongful, inappropriate as to display clear inability to render fair judgment. Then exponentially strengthened its damaging BIASED conclusions. When it explained that ALL other Federal District Court Judges are as equally prejudiced. Trial courts, however, must be on guard against CONFUSING offenses to their sensibilities with obstruction to the administration of justice. Brown v. United States, 356 U.S. 148 (1958).

The Supreme Court has recognized that statutes such as §115(a)(1) which make criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind. Watts v. United States, 394 U.S. 705 (1969). "True Threats" encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular group of individuals. Id. Likewise; the Seventh Circuit determined that: "a threat violates the law only if it is a TRUE THREAT rather than idle talk or part of a POLITICAL PROTEST. United States v. Smith, 928 F2d 407 (7th Cir 1990); quoting Watts v. United States, 394 U.S. 705 (1969).

It is unmistakable from the content, Star Chamber-like background, historical carricature symbolism, with the clear crisp bold golden label of an "INDICT CASTILLO" message; the BILLBOARD represented a purely political message. This applied to most everyone who viewed the Billboard, except those thin skinned, humorless, or perhaps paranoid. However, our Federal Judges are supposed to be persons of fortitude able to thrive in a hardy climate. Craig v. Harney, 331 U.S. 367 (1947). It is rather telling, that ONCE the material offensive to the Judiciary, comprising the SEDITIOUS billboard, was CENSORED by U.S. Marshal law enforcement intervention. The need for further action also evaporated.

## JUST LIKE LYNN!

In March 2020 United States District Court Judge Lynn Adelman published a Law Review article. That caustically criticized the orders of the highest Ranking Judge in our Judicial system, calling him a master of disingenuousity. Clearly offended, Chief Justice Roberts did not Rush out to  SILENCE  District Court Judge Adelman with jail time. Neither did he dispatch the U.S. Marshal to gather up, tear down, and then burn the stinging article. If Judge Adelman can harshly criticize his superior judge, our Chief Justice of the Supreme Court of the United States with impunity. In Re Judicial Misconduct Complaint Judge Adelman, 965 F3d 603 (7th Cir 2020). Similarly, the First Amendment provides the highest protection of Roberts right to disseminate his own political expression. Without fear of arbitrary political free speech repression being meted out at Federal  GULAG  MCC-Chicago.

## DUTY TO RECUSE

Judge Kendall's actual bias against Robert, springing as it does from a well documented extrajudicial source [billboard] is on clear display. Especially, since it is confirmed by her OWN WORDS, contained within the trial record and docket itself. In particular, Judge Kendall reveled in how she would just "LOVE" to disadvantage Robert by assisting the prosecution, amongst other things. She unequivocally recounted in detail her belief that herself and  ALL  Federal Judges in the NDIL were  GENUINELY, placed in

danger victims. Having been _THREATENED_, with a heinous _NOOSE MURDER_ from Robert. For good measure this tribunal openly discussed how she intended to pave the way to a government conviction. Moreover, she shared her belief that there remains an ongoing _VENDETTA_ against Federal Judges. Similarly, in United States v. Cerrella, 529 F Supp 1373 (SDFLA 1982); the Judge recused where he had reason to believe that defendant expressed intentions to murder the judge. Indeed, from the record, it is indisputable that Judge Kendall explicitly characterized the billboard as "ANYTHING BUT INHERENT THREAT". One that posed a significant danger. All her subsequent actions were motivated by the threat she deemed as real and genuine.

These unprecedented extraordinarily hostile circumstances support Robert's right to a remedy. Beyond all legal argument, beyond all case precedent, a reasonable person in the street faced with a judge sitting on sentencing matters. That could free a man from incarceration who, the judge believes has _THREATENED_ to murder her and other District Court Judges with a _NOOSE_, would have to harbor serious doubts as to the judges impartiality. Suffice it to say, the due process clause prohibits a judge from ruling upon any matter in which she has an interest.

Wherefore Robert respectfully requests that his motion to compel recusal is granted.

Respectfully Submitted,

Robert M. Kowalski

ROBERT M. KOWALSKI

# 53527-424

Metropolitan Correctional Center

71 West Van Buren Street

Chicago, Illinois 60605

ROBERT M. KOWALSKI
# 53527-424
Metropolitan Correctional Center
71 West Van Buren Street
Chicago, Illinois 60605

CLERK OF THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
219 SOUTH DEARBORN STREET
CHICAGO, ILLINOIS

60604

6060431800 C005

Legal Mail

Legal Mail



08/26/2024-20

METROPOLITAN CORRECTIONAL CENTER
71 W VAN BUREN ST, CHICAGO, IL 60605
The enclosed letter was processed through special mailing procedures for forwarding to you.
This letter has neither been opened nor inspected.

AUG 2 0 2024

If the sender raises a question or problem over which this facility has jurisdiction,
you may wish to return the material for further information or clarification.
If the sender encloses correspondence for forwarding to another addressee,
please return to the enclosure to the above address.